# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-198-CJB |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

Brian P. Egan and Travis J. Murray, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Peter J. Chassman, Michael J. Forbes and Hallie H. Wimberly, REED SMITH LLP, Houston, TX; Anna M. Targowska, Allison M. Haas and Jacob M. Stone, REED SMITH LLP, Chicago, IL; Paul J. McDonnell, REED SMITH LLP, Pittsburgh, PA, Attorneys for Plaintiff Agilent Technologies, Inc.

John G. Day and Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Ryan K. Walsh, Geoffrey K. Gavin and Laura M. Kanouse, JONES DAY, Atlanta, GA; Anna E. Raimer, JONES DAY, Houston, TX; David M. Maiorana, JONES DAY, Cleveland, OH, Attorneys for Defendant Axion Biosystems, Inc.

---

**MEMORANDUM OPINION**

January 6, 2026
Wilmington, Delaware

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

In this patent infringement action filed by Plaintiff Agilent Technologies, Inc. ("Agilent" or "Plaintiff"), Agilent alleges infringement of United States Patent Nos. 7,192,752 (the "'752 patent"), 7,468,255 (the "'255 patent") and 8,026,080 (the "'080 patent" and collectively with the '752 patent and the '255 patent, the "asserted patents"). (D.I. 451 at ¶ 2)[1] Presently pending before the Court are: (1) Agilent's motion for entry of claim construction of the "cell index" terms, and summary judgment of no indefiniteness of asserted claims of the asserted patents ("Agilent's motion"), (D.I. 370); and (2) Defendant Axion Biosystems, Inc.'s ("Axion" or "Defendant") motion for summary judgment that claims reciting "calculating cell index values" and "cell index" are invalid as indefinite ("Axion's motion"), (D.I. 349). For the reasons set forth below, Agilent's motion is GRANTED and Axion's motion is DENIED.[2]

## I.   BACKGROUND

### A.   Procedural Background

Agilent commenced this action on February 23, 2023, asserting infringement of the asserted patents as well as a false advertising claim. (D.I. 1) The instant motions were filed on July 10, 2025, (D.I. 349; D.I. 370), and fully briefed as of August 29, 2025, (D.I. 422; D.I. 425). A jury trial in this matter is set to begin on January 26, 2026. (D.I. 188, ex. A)

### B.   Factual Background

---

[1]   The asserted patents are located on the docket in more than one place; herein, the Court will simply cite to the patents by number.

[2]   The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 19)

2

Agilent asserts that Axion infringes claims 11-12, 14-18 and 20 of the '752 patent, claim 10 of the '255 patent and claims 1-7, 9-10 and 13-14 of the '080 patent. (D.I. 361, ex. 4 at ¶ 25) The '752 and '080 patents are related and share a common specification.[3] (D.I. 355 at ¶ 3; D.I. 394 at ¶ 3) The '255 patent is also related to these patents, and its specification includes everything that is in the specification of the '752 and '080 patents, as well as some additional disclosures. (D.I. 355 at ¶ 23; D.I. 394 at ¶ 23)

The '752 patent was prosecuted first and it issued on March 20, 2007 from an application that was filed on November 12, 2004. ('752 patent at 1; D.I. 361, ex. 12) The '255 patent claims were examined next in 2007 and 2008, and that patent issued on December 23, 2008 from an application that was filed on August 4, 2005. ('255 patent at 1; D.I. 354 at ¶ 39; D.I. 393 at ¶ 39) The '080 patent was prosecuted last in 2010 and 2011, and it issued on September 27, 2011 from an application that was filed on March 15, 2007. ('080 patent at 1; D.I. 355 at ¶ 13; D.I. 394 at ¶ 13) The '255 patent lists the same inventors as the '752 and '080 patents, with the latter two patents listing one additional inventor. ('752 patent at 1; '080 patent at 1; '255 patent at 1)

As relevant to these motions:

- Asserted claims 18 and 20 of the '752 patent recite "calculating a cell index[,]" ('752 patent, col. 72:10, 21);

- All asserted claims of the '080 patent recite "calculating cell index values[,]" ('080 patent, cols. 68:59-70:21); and

- The asserted claim of the '255 patent recites a "cell index[,]" ('255 patent, col. 99:43-51).

Collectively, these terms will be referred to herein as the "cell index terms."

---

[3] In light of this, the Court will cite to only to the '080 patent specification (instead of to both the '752 patent and '080 patent specifications) unless otherwise noted.

The Court here writes primarily for the parties, and so any additional facts relevant to this Memorandum Opinion will be discussed in Section III below.

## II. STANDARD OF REVIEW

### A. Summary Judgment

The Court incorporates by reference the standard of review for summary judgment motions, which it set out in its December 23, 2025 Memorandum Opinion. (D.I. 470 at 3-4) Additional relevant legal standards will be discussed in Section III below.

### B. Claim Construction

The Court has often set out the relevant legal standards for claim construction, including in opinions addressing a motion for summary judgment; one such opinion was *Glaxo SmithKline LLC v. Glenmark Pharms. Inc., USA*, Civil Action No. 14-877-LPS-CJB, Civil Action No. 14-878-LPS-CJB, 2017 WL 8948972, at *3-4 (D. Del. May 24, 2017), *report and recommendation adopted*, 2017 WL 2493786 (D. Del. June 9, 2017). The Court hereby incorporates by reference its discussion in *Glaxo SmithKline LLC* of these legal standards and will follow them herein. To the extent consideration of the disputed terms here necessitates discussion of other, related legal principles, the Court will address those principles in Section III below.

### C. Indefiniteness

Section 112 of the Patent Act requires that a patent claim "particularly point[ ] out and distinctly claim[ ] the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). If it does not, the claim is indefinite and therefore invalid. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 902 (2014). The primary purpose of the definiteness requirement is to ensure that patent claims are written in such a way that they give notice to the public of what is claimed, thus enabling interested members of the public (e.g.,

4

competitors of the patent owner) to determine whether they infringe. *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002). Even so, "absolute precision is unattainable" and is not required. *Nautilus*, 572 U.S. at 910. In the end, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 901. Definiteness is to be evaluated from the perspective of a person of ordinary skill in the art ("POSITA") at the time the patent was filed. *Id.* at 908.

Like claim construction, definiteness is a question of law for the Court. *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1332 (Fed. Cir. 2014). The United States Court of Appeals for the Federal Circuit has stated that "[a]ny fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).

### III. DISCUSSION

During claim construction, the parties briefed the cell index terms. There, Agilent proposed constructions for these terms, while Axion asserted that these terms are indefinite. (D.I. 120 at 61-75) The Court ultimately ordered that because the parties were not able to argue the cell index terms at the *Markman* hearing, and because "indefiniteness is an issue that can sometimes be better suited for resolution at the summary judgment stage," the Court would defer ruling on the terms; the Court explained that Axion could re-raise its definiteness challenge via summary judgment briefing. (D.I. 161)

That is what Axion is now doing here. Axion asserts that the cell index terms render the relevant claims indefinite because the intrinsic evidence fails to place any objective boundaries

on the terms and thus fails to inform the POSITA of the scope of the terms with reasonable certainty. (D.I. 353 at 14-22) Agilent, meanwhile, moves for summary judgment that the cell index terms do not render the claims that incorporate them indefinite. (D.I. 371 at 28-35) Agilent further moves the Court to enter Agilent's proposed constructions for the cell index terms, which are set out below:

| Term | Agilent's Proposed Construction |
|---|---|
| "calculating cell index values" | "calculating parameters derived from measured impedance values that reflect a change in impedance values" |
| "calculating a cell index" | "calculating a parameter derived from measured impedance values that reflects a change in impedance values" |
| "cell index" | "a parameter derived from measured impedance values that reflects a change in impedance values" |

(*Id.* at 30)

Below, the Court will explain why Axion has not met its burden of demonstrating by clear and convincing evidence that the cell index terms are indefinite. It will also note why it agrees with Agilent that its proposed constructions are appropriate.

To begin, the Court notes that it is undisputed that the cell index terms were created by the inventors of the asserted patents. (D.I. 361, ex. 15 at ¶ 308; *id.*, ex. 18 at ¶ 343; *see also id.*, ex. 10 at 67; *id.*, ex. 19 at 50, 52) Terms like this, which do not have an ordinary and customary meaning to a POSITA, are known as "coined terms[;]" the use of these terms raises the question of "whether the intrinsic evidence provides objective boundaries to the scope of the term." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019). The importance of the intrinsic evidence "reaches its zenith" with respect to coined terms, *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 904 (Fed. Cir. 2020), which "ordinarily cannot be construed broader than the disclosure in the specification[,]" *Indacon, Inc. v. Facebook, Inc.*, 824

6

F.3d 1352, 1357 (Fed. Cir. 2016); *see also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("[A]bsent such an accepted meaning [in the art], we construe a claim term only as broadly as provided for by the patent itself."); *Integra LifeScis. Corp. v. HyperBranch Med. Tech., Inc.*, Civil Action No. 15-819-LPS-CJB, 2017 WL 3336274, at *5 (D. Del. July 27, 2017), *report and recommendation adopted*, 2017 WL 5172396 (D. Del. Nov. 8, 2017).

It is also undisputed that the '255 patent "contains a definition for 'cell index.'" (D.I. 353 at 16; *see also* D.I. 371 at 31; D.I. 422 at 16) In that regard, the '255 patent specification teaches that a "cell index" "is a parameter that can [be] derived from measured impedance values and that can be used to reflect the change in impedance values." ('255 patent, col. 22:32-34) While this disclosure is not present in the shared specification of the '752 patent and the '080 patent, Agilent argues that it nevertheless informs the meaning of the cell index terms across all three asserted patents. (D.I. 392 at 22-24) Agilent also contends that the definition provides reasonable certainty to the POSITA about the scope of the cell index terms because it provides two "objective requirements: 1) it is a parameter that is derived from measured impedance values (and, therefore, cannot be the raw, measured impedance values themselves)[4] and 2) it must reflect a change in impedance values." (D.I. 422 at 16; *see also id.* at 15; D.I. 371 at 32;

---

[4] Evidence of record indicates that a raw measured impedance value is a "measurement of impedance at a particular time point." (D.I. 426, ex. 66 at 106) And so it stands to reason that a parameter that is "derived from" a measured impedance value would be a parameter that is obtained by doing some calculation to a raw measured impedance value. (*See, e.g.*, D.I. 361, ex. 18 at ¶ 580 (Axion's expert Dr. Richard B. Fair opining that the definition suggests that a cell index "can be anything that is the result of any calculation or processing step that includes a measured impedance value as an input"))

D.I. 392 at 22)  As the Court will explain below, it agrees with Agilent that this definition helps demonstrate why the cell index terms are not indefinite.

Axion has three rejoinders as to why the '255 patent definition does not help Agilent overcome Axion's indefiniteness challenge.  These rejoinders are ultimately not persuasive, for the reasons set out below.

First, Axion argues that because the '255 patent specification was filed later than the specification of the '752 and '080 patents, a POSITA would not have looked to the later '255 patent specification to understand the cell index terms' use in the claims of the '752 and '080 patents.  (D.I. 353 at 18; *see also* D.I. 361, ex. 18 at ¶ 380)  The Court disagrees.  The asserted patents are closely related members of the same patent family, and the specification of the '255 patent was filed less than a year after the filing of the specification of the '752 patent.  The Court therefore sees no reason why a term's usage in the '255 patent—a patent involving the same inventors as the '752 and '080 patents and the same technology as the '752 and '080 patents— would not shed light on the meaning of essentially that same term (conceived of by those same inventors) as used in the '752 and '080 patents.  *Cf. Microsoft Corp. v. Multi-Tech Sys., Inc.* ["*Microsoft*"], 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) (concluding that a patentee's statements made during the prosecution of the ′627 patent were relevant to an understanding of the common disclosure in the earlier-issued, related ′649 patent—and emphasizing that the relevance of the statement "made in this instance is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention"); *see also, e.g.*, *Baxter Healthcare Corp. v. Mylan Lab'ys Ltd.*, 346 F. Supp. 3d 643, 658 (D.N.J. 2016) (concluding that the "express definition embodied in the '540 Patent can be imputed to the earlier-issued '094 Patent[,]" where the patents were related and shared the

8

same inventors and the defendants "identified no authority for their position that related patents can *only* be construed consistently from the earlier-issued patent to the later-in-time patent, and not in reverse"); *Cummins-Allison Corp. v. Glory Ltd.*, 457 F. Supp. 2d 843, 850 (N.D. Ill. 2006) (relying on *Microsoft* to find that a statement in a subsequent patent was relevant to construing a term in an earlier patent, as the "*Microsoft* court's logic—that a patentee's considered statement about the scope of an earlier patent in an official proceeding on a later patent is relevant to determining the scope of the earlier patent—applies with equal, if not more, force to statements made in a later specification" that is "directed to all practitioners skilled in the art in the field"); *cf. Nanoco Techs. Ltd. v. Samsung Elecs. Co.*, Case No. 2:20-cv-00038-JRG, 2021 WL 1890453, at *1, *6-7 (E.D. Tex. May 11, 2021) (where all but one asserted patent (the '557 patent) contained definitions for the term at issue, finding that same meaning applied to the term in the '557 patent, even though that patent was not in the same family as the other patents, because "one of skill in the art would have read the '557 patent in light of the other specifications—and the general understanding of that term in the art—to determine its meaning"); *Cree, Inc. v. SemiLEDs Corp.*, Civil Action No. 10-866-RGA, 2012 WL 975697, at *6 (D. Del. Mar. 21, 2012) (relying on the definition in the patent specification of a "closely related patent" to construe a claim term, where that patent pertained to the same technology and was created three years after the asserted patent by some of the same inventors).[5]

---

[5] Axion also argues that the prosecution history of the '080 patent further underscores that a POSITA would not have looked to the '255 patent to understand the meaning of the cell index terms. (D.I. 353 at 15, 18) Relevant to Axion's argument here is that with respect to the application that led to the '080 patent, the Examiner rejected application claim 169 as anticipated by a prior art reference known as the Ehret 1997 Publication ("Ehret"). (D.I. 361, ex. 21 at AGILE0001122) In their October 2010 response, the applicants added the limitation "calculating cell index values" to claim 169 and distinguished the claim over Ehret by asserting that they had "developed a value referred to as a cell index value [which] reveals information

Indeed, the '255 patent's definition is in line with the other disclosures across all three patent specifications in describing a cell index as a parameter derived from measured impedance values (such that it is therefore not the raw measured impedance value itself). (D.I. 392 at 25-26) For example, the specifications of all asserted patents teach that:

> [b]ased on the dependent relationship between the measured impedance, cell number . . . and cell attachment status, it is possible to derive a so-called "cell number index" or "cell index" *from the measured impedance frequency spectra* that provides a useful index for quantitating and comparing cell behavior in the impedance-based assays of the present invention.

('080 patent, col. 24:31-38 (emphasis added); '255 patent, col. 30:60-67 (emphasis added)) And the asserted patents incorporate by reference two prior patent applications "for disclosure relating to Cell Index or Cell Number Index" and in doing so, reiterate that "*the measured cell-substrate impedance can be used to calculate* a parameter termed Cell Index or Cell Number Index." ('080 patent, col. 26:37-45 (emphasis added); '255 patent, col. 33:8-16 (emphasis added))[6]

---

regarding status of the cell that is not readily apparent viewing raw impedance values." (*Id.* at AGILE0001100) Axion argues that because the applicants could have, but did not, point the Examiner to the '255 patent's definition as part of this discussion, this further shows that a POSITA would not have looked to the '255 patent to understand the "calculating cell index values" term in the '080 patent. (D.I. 353 at 18) But the Court agrees with Agilent that "Agilent's choice of arguments to present during prosecution does not undo the applicability of the '255 [p]atent disclosure in construction of the '080 [p]atent." (D.I. 392 at 24) Moreover, as Agilent notes, the '255 patent is a related patent to the '080 patent and the '255 patent's prosecution history was available to the Examiner during the prosecution of the '080 patent; thus, the Examiner might well have considered the '255 patent's prosecution history in assessing the '080 patent's viability. (*Id.*) Lastly, the Court also notes that what the applicants told the Examiner here about a "cell index value" seems to be exactly consistent with the definition in the '255 patent. (D.I. 361, ex. 21 at AGILE0001100 (applicants noting that their invention "extends beyond the measurement and comparison of raw impedance values" and that the cell index value "reveals information regarding status of the cell that is not readily apparent viewing raw impedance values"))

[6]     Axion also suggests that it would be error to define the cell index terms in line with the '255 patent's definition because of the "varying specifications" of the asserted patents. (D.I. 425 at 11) But Axion fails to support this conclusory point with anything indicating how

10

Second, Axion attacks the '255 patent definition's use of permissive-sounding words like "can" and "can be" (i.e., "is a parameter that *can [be]* derived from measured impedance values and that *can be* used to reflect the change in impedance values"). Axion asserts that such language creates ambiguity—and that Agilent's removal of this language in its proposed construction amounts to an implicit recognition that the definition does *not* provide objective boundaries to a POSITA. (D.I. 353 at 17-18) It is true that sometimes, this type of language can signal that the patent is not establishing a mandatory requirement. *See, e.g.*, *Virco Mfg. Corp. v. SSI Liquidating, Inc.*, Civil Action No. 20-906-LPS-CJB, 2022 WL 1184060, at *5 n.3 (D. Del. Apr. 21, 2022), *report and recommendation adopted*, 2022 WL 2235840 (D. Del. June 22, 2022); *Kaifi LLC v. AT&T Corp.*, Case No. 2:19-CV-00138-JRG, 2020 WL 1905358, at *11-12 (E.D. Tex. Apr. 17, 2020). But here, both parties agree that the '255 patent's disclosure amounts to a definition, and that it conveys that one is able to derive a cell index—i.e., a parameter that can then be used to reflect the change in impedance values—by utilizing raw impedance values. (D.I. 371 at 32; D.I. 392 at 25) And while Axion suggests that the "can" and "can be" language in the definition must mean that "cell index" can be defined in *other ways too*, the definition doesn't have to be read like that. It can also be read as a way of conveying that: (1) *it is possible to* derive a cell index from raw measured impedance values so as to reflect a change in impedance values; (2) the inventors discovered this; and so (3) they coined this (singular)

---

the additional disclosure found in the '255 patent specification *contradicts* the disclosure in the shared specification of the '752 and '080 patent. (*Id.*); *cf. FMC Corp. v. Sharda USA, LLC*, 145 F.4th 1326, 1332 (Fed. Cir. 2025) (explaining that a court should "typically interpret a claim term consistently across a patent family when the patents 'derive from the same parent application[]' . . . [but that this] principle [would] not hold true when the patent owner . . . materially alters the specification of some of the members of the patent family in a manner that directs a skilled artisan to interpret the claim term differently") (internal citation omitted). And so this argument is not a winning one.

11

definition of the cell index terms to require exactly that meaning. That latter interpretation, which is Agilent's interpretation, (D.I. 392 at 25), makes good sense to the Court in this particular case, in light of all the Court has noted above. To that end, Agilent's expert opined that removal of the "can be" language in Agilent's proposed construction "is an appropriate grammatical simplification of the definition to plainly state the inventors' intended meaning of" the cell index terms. (D.I. 401, ex. AH at ¶ 92)

Importantly, Axion does not point to anything else in the intrinsic record that teaches a different or contradictory definition of "cell index." And because this is a coined term created by the inventors, the Court finds that the POSITA would be guided by the consistent disclosures in the intrinsic record of each of these patents—all indicating that a cell index is derived from measured impedance values, and is used to reflect a change in impedance values—in order to determine the meaning of the cell index terms.

Third, Axion asserts that the definition fails to inform a POSITA about the scope of the invention with reasonable certainty because it does not tell a POSITA *how* to derive or calculate cell index values. (D.I. 353 at 16; D.I. 425 at 11) Just after disclosing the definition, the '255 patent states that "[t]here are a number of methods to derive or calculate Cell Index." ('255 patent, col. 22:34-35) The specifications of all three asserted patents go on to disclose seven examples of how to do so. ('080 patent, cols. 27:4-29:43; '255 patent, cols. 33:43-36:34) The '255 patent specification states that "[v]arious methods for calculating [] a cell number index can be used, some of which are novel methods disclosed herein[,]" ('255 patent, col. 31:13-15), while the '080 patent specification states that "[t]he following discussion provides novel methods of calculating cell index of cells[,]" ('080 patent, col. 25:19-20).

Agilent retorts that the intrinsic record *does* inform a POSITA as to how to derive a cell index with reasonable certainty, pointing in support to the testimony of its expert Dr. A. Bruno Frazier.  Dr. Frazier testified that a POSITA would know how to calculate a cell index "either by choosing one of the disclosed examples of calculation or using experience and expertise in crafting a cell index calculation using measured impedance values, meaning a [POSITA] can come up with their own formula for calculating cell index values."  (D.I. 355 at ¶ 34 (internal quotation marks omitted) (citing D.I. 361, ex. 15 at ¶¶ 338-39; *id.*, ex. 10 at 81; *see also id.*, ex. 18 at ¶ 393; *id.*, ex. 15 at ¶ 349))[7]

To that, Axion contends that Agilent's position—i.e., that a POSITA could craft his own cell index—allows the POSITA to "consult the unpredictable vagaries of any one person's opinion" and further shows why these coined terms are indefinite.  (D.I. 353 at 20 (quoting *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 635 (Fed. Cir. 2015)); *see also* D.I. 425 at 12 (same)).[8]  But in the primary case that Axion cites to for this proposition—*Dow Chem. Co.*

---

[7] Agilent explains that the seven examples disclosed in the patent specifications are non-limiting because nothing therein limits the definition of cell index to these examples.  (D.I. 392 at 26)  That is so.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (explaining that "the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so" and noting that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"); *RSB Spine, LLC v. Depuy Synthes Sales, Inc.*, Civil Action No. 19-01515-RGA, 2025 WL 40843, at *8-9 (D. Del. Jan. 7, 2025) (declining to construe the coined term "fixation element" as limited to the list of embodiments in the specification).

[8] With regard to the seven examples of calculating cell index values disclosed in the patent specifications, at times Axion seems to acknowledge that they provide helpful guidance to a POSITA regarding the scope of the cell index terms.  (D.I. 353 at 15 ("Apart from these disclosed examples . . . the '080/'752 specification provides no guidance to a POSA as to the scope of 'calculating cell index values.'"); D.I. 425 at 14 ("In view of the intrinsic records that control the coined terms here, the only possible construction that could potentially provide objective boundaries would be to construe the terms to mean the specification's seven disclosed examples."); D.I. 376 at ¶ 19; D.I. 405 at ¶ 19 (Axion acknowledging that the seven examples

13

*v. Nova Chems. Corp. (Can.)*, 803 F.3d 620 (Fed. Cir. 2015)—the question before the Court was "whether the existence of multiple methods leading to different results without guidance in the patent or the prosecution history as to which method should be used renders the claims indefinite" with respect to the claim term "a slope of strain hardening coefficient greater than or equal to 1.3." 803 F.3d at 624-25, 634. The Federal Circuit concluded that the answer there was "yes," where "the methods do not always produce the same results [such that] the method chosen for calculating the slope of strain hardening could affect whether or not a given product infringes the claims." *Id.* at 631-35. Here, however, the claims at issue do not present the same problem, as they do not require a particular value or measurement. Instead, they just require "calculating cell index values[,]" "calculating a cell index" or "determining a cell index."

  Nor does Axion explain how the '255 patent's definition is subjective in nature. Again, that definition clearly establishes that a cell index: (1) is a parameter derived from measured impedance values; and (2) is used to reflect a change in impedance values. (D.I. 392 at 28) Thus, the definition seems straightforward—in the sense that if the purported cell index meets these two conditions, then the cell index limitations are infringed. And if it does not meet these two criteria, then the accused method does not infringe. (*See* D.I. 361, ex. 15 at ¶¶ 321, 348) While it is true that Agilent's proposed construction is broad, breadth is not a sin in this context. Therefore, "the fact that there could be multiple calculations that a POSITA could choose to

---

derive the cell index from measured impedance values (as required by the '255 patent's definition))) That said, at other times, Axion suggests that the seven examples "provide no objective boundaries to 'calculating cell index values.'" (D.I. 353 at 15) But Axion cites to nothing in support of its latter position here. And while Axion also asserts that the seven examples "require significantly different calculations" and "vary greatly[,]" (*id.* at 14-15), the breadth of these examples does not render them indefinite, since they would sufficiently guide a POSITA in understanding how to calculate a cell index (as Axion concedes elsewhere).

satisfy the proper construction does not undermine the definiteness of the cell index terms or Agilent's construction[.]" (D.I. 392 at 28); *see also Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) ("[A] claim is not indefinite just because it is broad.").[9]

Indeed, Agilent made that very point in its briefing. Therein, it asserted multiple times that its proposed construction provided reasonable certainty to the POSITA about the scope of the cell index terms because the construction was "simple" and included the two "objective requirements" discussed above: "1) it is a parameter that is derived from measured impedance (and, therefore, cannot be the raw, measured impedance values themselves) and 2) it must reflect a change in impedance values." (D.I. 422 at 15, 16; *see also* D.I. 371 at 32; D.I. 392 at 22) Axion never directly responded as to why these two requirements aren't sufficient objective boundaries, or why they would leave a POSITA still confused about whether or not a party was infringing the cell index limitations.[10]

---

[9] In the other case that Axion prominently cited here—*Vstream Techs., LLC v. PLR Holdings, LLC*, CASE NO.: 6:15cv974-JRG-JDL (Lead Case), 2016 WL 6211550 (E.D. Tex. Sept. 27, 2016)— the plaintiff's expert had opined that whether an output met the "sufficiently correct" limitation "depends on how the designer defines 'sufficiently correct' for their particular application[,]" meaning that the "subjective decision of the individual designer determines what is 'sufficiently correct[.]'" 2016 WL 6211550, at *5-6, *8 (internal quotation marks and citation omitted), *report and recommendation adopted*, 2016 WL 6159624 (E.D. Tex. Oct. 24, 2016) (*cited in* D.I. 425 at 12). But unlike in *Vstream Techs.*, here, as noted above, the cell index limitations require known, objective criteria. Axion has not explained how deriving a parameter from a measured impedance value that reflects a change in impedance is a "subjective decision" akin to what was at play in *Vstream Techs*.

[10] Axion suggests that because the cell index terms are coined terms, they cannot be construed broader than the disclosure in the specification (such that a POSITA could craft his own formula for calculating a cell index). (D.I. 353 at 21 ("[T]he applicants coined a term, disclosed seven examples, and never once suggested in the intrinsic record that 'calculating cell index values' would or should cover other calculations (like normalized resistance or normalized impedance) already known at the time of the alleged invention.")) But the notion that a POSITA

15

For these reasons, Axion's assertions of indefiniteness do not establish that the cell index terms fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention. The Court therefore finds that Axion has failed to demonstrate by clear and convincing evidence that the cell index terms are indefinite.[11] *Cf. Nanoco Techs. Ltd.*, 2021 WL 1890453, at *8 (rejecting the defendants' argument that the "'molecular cluster compound' term is indefinite because there is no commonly understood meaning for the term and the different patents use different definitions for the same term[,]" explaining that "one of skill in the art would be able to reasonably determine what is or is not a molecular cluster based on the Court's construction, which is not an entirely subjective term"); *Nichia Corp. v. VIZIO, Inc.*, Case No. SA CV16-00545 SJO (MRW), 2018 WL 11350040, at *10-12 (C.D. Cal. May 29, 2018)

---

could come up with his own formula so long as it was in line with the definition in the '255 patent (i.e., it is a parameter derived from measured impedance values that reflects a change in impedance values) *is* within the disclosure in the specification—i.e., a disclosure that is broader than just the seven examples described in the asserted patents. (D.I. 392 at 26) Axion has not pointed the Court to language in the specification indicating an intent by the applicants to limit the ways of calculating a cell index to the seven examples set out therein. *See supra* n.7.

[11]     Axion at times suggests that aspects of the infringement analysis of Plaintiff's expert Dr. Frazier (i.e., his opinions that "normalized resistance" and "percent cytolysis" constitute a cell index calculation) underscore that the cell index terms are indefinite. (D.I. 353 at 20-22; D.I. 425 at 13) But this seems more like an infringement dispute (i.e., Do these concepts meet the '255 patent's definition or not?) rather than an issue of indefiniteness. *See Procter & Gamble Co. v. Team Techs., Inc.*, 46 F. Supp. 3d 764, 774-75 (S.D. Ohio 2014) (rejecting the defendants' argument that the "disagreement between their expert and [p]laintiff's experts as to whether the unnoticeable limitation is infringed by the Accused Products is evidence that the claim term is subjective" and therefore indefinite, noting that "if a disagreement among party experts about whether an accused device infringes were evidence of indefiniteness, nearly every patent involved in litigation could be declared invalid"—and emphasizing that definiteness and infringement are separate inquiries). If Axion has arguments as to why these concepts do not meet the construction of the cell index terms, it can make them before the jury. Relatedly, to the extent that Axion disputes that these concepts can satisfy the cell index limitations because they were concepts known in the art, that doesn't seem like an indefiniteness issue either. (D.I. 353 at 21; D.I. 425 at 13)

16

(rejecting the defendant's assertion that there were no objective boundaries for the phrase "white color," where the claims and specification included "enough disclosure to assist a [POSITA] in understanding the boundaries of the term 'white color'"). It will therefore grant Agilent's motion for summary judgment and deny Axion's motion.

And for these reasons, the Court also agrees that it is appropriate to construe the terms as Agilent has proposed, and thus also grants Agilent's motion in that regard. The cell index terms shall be construed as follows:

1. "calculating cell index values" shall be construed to mean "calculating parameters derived from measured impedance values that reflect a change in impedance values"

2. "calculating a cell index" shall be construed to mean "calculating a parameter derived from measured impedance values that reflects a change in impedance values"

3. "cell index" shall be construed to mean "a parameter derived from measured impedance values that reflects a change in impedance values"

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Agilent's motion and DENIES Axion's motion. An appropriate Order will issue.