IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 23-198 (CJB) |
| | ) | |
| AXION BIOSYSTEMS, INC, | ) | REDACED - PUBLIC VERSION |
| | ) | |
| Defendant. | ) | |

## [PROPOSED] JOINT FINAL PRETRIAL ORDER

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jeremy A. Tigan (#5239)
Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jtigan@morrisnichols.com
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant Axion Biosystems, Inc.*

Originally Filed:  March 6, 2026
Redacted Version Filed:  March 31, 2026

TABLE OF CONTENTS

Page

I.      Nature of the Case.................................................................................................. 2

        A.      The Parties ................................................................................................ 2

        B.      Nature of the Action.................................................................................. 2

II.     Jurisdiction.............................................................................................................. 4

III.    Facts ....................................................................................................................... 4

        A.      Uncontested Facts ..................................................................................... 4

        B.      Contested Facts ......................................................................................... 4

IV.     Issues of Law .......................................................................................................... 5

V.      Witnesses ................................................................................................................ 5

        A.      List of Witnesses the Plaintiff Expects to Call ........................................ 6

        B.      List of Witnesses Defendant Expects to Call............................................ 6

        C.      List of Third Party Witnesses the Parties Expect to Call.......................... 7

        D.      Procedures for Identifying and Examining Witnesses............................... 7

        E.      Testimony by Deposition........................................................................... 8

        F.      Impeachment with Prior Inconsistent Testimony .................................... 10

        G.      Objections to Expert Testimony .............................................................. 10

VI.     Exhibits ................................................................................................................ 11

        A.      Exhibits ................................................................................................... 11

        B.      Demonstrative Exhibits............................................................................ 12

VII.    Brief Statement of Intended Proofs...................................................................... 13

VIII.   Damages................................................................................................................ 13

IX.     Bifurcated Trial .................................................................................................... 14

X.      Motions in Limine and Related Agreements ...................................................... 14

XI.     Discovery ............................................................................................................ 15

XII.    Number of Jurors ................................................................................................ 15

XIII.   Length of Trial .................................................................................................... 15

XIV.    Motions for Judgment as a Matter of Law .......................................................... 16

XV.     Amendments of the Pleadings ............................................................................ 16

XVI.    Settlement ........................................................................................................... 16

XVII.   FJC Patent Video ................................................................................................ 16

XVII.   Miscellaneous Issues .......................................................................................... 16

**<u>INDEX OF EXHIBITS</u>**

| Issue | Party | Exhibit No. |
|---|---|---|
| Uncontested Facts | Joint | Exhibit 1 |
| Contested Facts | Plaintiff | Exhibit 2P |
| | Defendant | Exhibit 2D |
| Issues of Law | Plaintiff | Exhibit 3P |
| | Defendant | Exhibit 3D |
| Witnesses | Plaintiff | Exhibit 4P |
| | Defendant | Exhibit 4D |
| Deposition Designations | Plaintiff | Exhibit 5P |
| | Defendant | Exhibit 5D |
| Exhibits | Joint | Exhibit 6J |
| | Plaintiff | Exhibit 6P |
| | Defendant | Exhibit 6D |
| Statement of Intended Proofs | Plaintiff | Exhibit 7P |
| | Defendant | Exhibit 7D |
| Motions *in Limine* | Plaintiff's Motions *in Limine* | Exhibit 8P |
| | Defendant's Motions *in Limine* | Exhibit 8D |

This matter comes before the Court at a final pretrial conference held pursuant to Rule 16 of the Federal Rules of Civil Procedure.

**Plaintiff, Agilent Technologies, Inc.'s, Counsel**:

| Name | Email | Law Firm | Address |
|---|---|---|---|
| Brian P. Egan<br>Jeremy A. Tigan<br>Travis J. Murray | began@morrisnichols.com<br>jtigan@morrisnichols.com<br>tmurray@morrisnichols.com | Morris, Nichols, Arsht & Tunnell LLP | 1201 North Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899-1347 |
| Peter J. Chassman<br>Michael J. Forbes | pchassman@reedsmith.com<br>mforbes@reedsmith.com | Reed Smith LLP | 1221 McKinney Street, Suite 2100<br>Houston, TX 77010 |
| Anna M. Targowska<br>Jacob M. Stone | atargowska@reedsmith.com<br>jstone@reedsmith.com | Reed Smith LLP | 10 South Wacker Drive, 40th Floor<br>Chicago, IL, 60606-7507 |
| Paul J. McDonnell | pmcdonnell@reedsmith.com | Reed Smith LLP | Reed Smith Centre<br>225 Fifth Avenue<br>Pittsburgh, PA 15222 |

**Defendant, Axion BioSystems, Inc.'s, Counsel**:

| Name | Email | Law Firm | Address |
|---|---|---|---|
| John G. Day<br>Andrew C. Mayo | jday@ashbygeddes.com<br>amayo@ashbygeddes.com | Ashby & Geddes | 500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE 19899 |
| Ryan K. Walsh<br>Geoffrey K. Gavin<br>Rachel Krutz Baker<br>Laura Kanouse Vining | rkwalsh@jonesday.com<br>ggavin@jonesday.com<br>rkbaker@jonesday.com<br>lkvining@jonesday.com | Jones Day | 1221 Peachtree Street N.E., Suite 400<br>Atlanta, GA 30361 |
| David M. Maiorana | dmaiorana@jonesday.com | Jones Day | 901 Lakeside Avenue<br>Cleveland, OH 44114 |
| Anna E. Raimer | aeraimer@jonesday.com | Jones Day | 717 Texas, Suite 3300<br>Houston, TX 77002-2712 |
| John M. Michalik<br>Collin J. Kurtenbach | jmichalik@jonesday.com<br>ckurtenbach@jonesday.com | Jones Day | 110 N. Wacker Drive Suite 4800<br>Chicago, IL 60606 |

1

The following matters as to the conduct of the trial scheduled to commence on March 23, 2026, have been stipulated by the parties and are hereby ordered by the Court. This Final Pretrial Order shall control the subsequent course of this action as to those issues that will be tried during the March 2026 trial, unless modified by the Court. Subject to the approval of the Court, the parties reserve the right to amend this Final Pretrial Order based on subsequent events or by agreement.

## I.      Nature of the Case

### A.      The Parties

Plaintiff, Agilent Technologies, Inc. ("Agilent"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 5301 Stevens Creek Boulevard, Santa Clara, California 95051.

Defendant, Axion BioSystems, Inc. ("Axion"), is a corporation organized under the laws of the State of Delaware with a principal place of business at 171 17th Street NW, Suite 500, Atlanta, Georgia, 30363.

### B.      Nature of the Action

On February 23, 2023, Agilent filed suit against Axion, alleging infringement by Axion of claims of U.S. Patent Nos. 7,192,752 (the "'752 Patent"), 7,468,255 (the "'255 Patent"), and 8,026,080 (the "'080 Patent"), along with a claim for false advertising under the Lanham Act arising out of Axion's statements related to its Maestro machines, CytoView-Z plates, and AxIS Z software, and spheroids, which Agilent alleges are false and misleading. On May 15, 2023, Agilent filed its First Amended Complaint including additional information related to Agilent's claims. On December 12, 2023, Agilent filed its Second Amended Complaint adding claims for misappropriation of trade secrets under the Defend Trade Secrets Act (DTSA), and intentional and negligent interference with prospective economic advantage under California law. In February

2025, the Court dismissed Agilent's trade secret count without prejudice and Agilent's interference claims with prejudice. On March 5, 2025, Agilent moved for leave to file a Third Amended Complaint to re-plead its trade secret misappropriation count. On October 30, 2025, the Court granted Agilent's motion, and Agilent filed the Third Amended Complaint on November 4, 2025. Given the imminence of the trial on Agilent's patent infringement and false advertising counts, the parties agree that Agilent's DTSA claim should be tried at a later date and not during the March 2026 trial.

Agilent contends that Axion directly and indirectly infringes claims 11, 12, 14, and 18 of the '752 Patent by use of Axion's Maestro Pro and Maestro ZHT machines, in combination with Axion's AxIS Z software with the Impedance Module, and Axion's CytoView-Z 384-well plates, and claims 1, 3, and 10 of the '080 Patent by use of Axion's Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines, in combination with Axion's AxIS Z software with the Impedance Module, and Axion's CytoView-Z 96-well and 384-well plates (collectively, the "Accused Products") and by inducing the infringement by others through Axion's supply and other acts regarding the Accused Products. Axion denies that it infringes any of the asserted claims, either directly or indirectly and further contends that the claims are invalid as anticipated or rendered obvious by certain prior art. Agilent seeks damages for Axion's alleged infringement in the form of lost profits, which Axion denies are available, and/or a reasonable royalty. Agilent further contends that Axion's infringement is willful and that Agilent is entitled to enhanced damages and attorneys' fees, which Axion denies.

Agilent also alleges violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), arising out of Axion's alleged false and misleading statements related to Axion's Maestro machines, CytoView-Z plates, and AxIS Z software, and spheroids.  Axion denies that such statements are

3

false or misleading, that there is any actual deception or tendency to deceive a substantial portion of the intended audience, that the statements are material to customers' purchasing decisions, and that Agilent has suffered any injury as a result of the statements. Agilent seeks damages for Axion's alleged false advertising in the form of corrective advertising damages, which Axion denies are available.

## II.    Jurisdiction

For purposes of the March 2026 trial, this is an action for patent infringement and false advertising. The subject matter jurisdiction of this Court is not disputed as this Court has federal-question jurisdiction over this action because it arises under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, and the Lanham Act, 15 U.S.C. § 1121. The parties do not dispute personal jurisdiction or venue for the purpose of this action.

## III.    Facts

### A.    Uncontested Facts

Any party, with prior notice to the other party, may read any or all of the uncontested facts to the jury or Court, and will be charged for the time used to do so.

The facts that are not disputed or have been agreed to or stipulated to by the parties are attached here as **Exhibit 1**. These uncontested facts require no proof at trial and will become part of the evidentiary record in this case.

The parties reserve the right to modify or supplement the Joint Statement of Uncontested Facts to the extent necessary to reflect fairly the Court's rulings on any motions or subsequent orders of the Court, or by agreement of the parties.

### B.    Contested Facts

Agilent's Statement of Contested Issues of Fact to be litigated at trial is attached as **Exhibit 2P**.

Axion's Statement of Contested Issues of Fact to be litigated at trial is attached as **Exhibit 2D.**

### IV.    Issues of Law

Agilent's Statement of Issues of Law that remain to be litigated at trial is attached as **Exhibit 3P**.

Axion's Statement of Issues of Law that remain to be litigated at trial is attached as **Exhibit 3D.**

### V.    Witnesses

The presentation of evidence will follow the burden of proof. Agilent will go first, presenting its case-in-chief on infringement, false advertising, and damages. Axion then will present its rebuttal to Agilent's case-in-chief and its case-in-chief on invalidity. Agilent then will present its rebuttal to Axion's case-in-chief on invalidity.

The parties have prepared good faith lists of witnesses expected to be called at trial, either live or by deposition, including a "will call" list and a "may call" list. The listing of a witness on a party's witness list does not require that party to call that witness to testify, either live or by deposition. Any witness not listed will be precluded from testifying, absent good cause shown.

Each party reserves the right to amend but not supplement its trial witness list as part of the meet and confer process leading up to trial, in response to the other party's pretrial disclosures and objections, in response to any pretrial rulings or orders from the Court, and in the event any of the individuals listed become unable to attend the trial or otherwise unable to provide testimony. However, by 5:00 p.m. on March 16, 2026, each party must provide a final indication of whether each fact witness, identified on either party's witness list that is an employee of that party or otherwise within the control of that party will be made available to testify live at trial.  The availability of a fact witness to testify live at trial does not preclude the opposing party from

5

designating that witness's 30(b)(6) deposition testimony to be played in its case-in-chief. The parties agree, however, that any fact witness called to testify live will only testify live once in the producing party's case. Accordingly, the scope of the cross examination of any such witness may extend beyond the scope of the direct examination of that witness. The parties also agree that Dr. Millard will only testify live once (in both his capacity as a fact and expert witness), and that the scope of the cross examination of Dr. Millard may extend beyond the scope of his direct examination and may include examination of Dr. Millard as a fact witness, subject to a limiting instruction, even if Dr. Millard is called by Axion only as an expert, and not as a fact witness. The final indication of whether a witness will be available to be called live cannot be amended absent a showing of good cause.

### A.    List of Witnesses the Plaintiff Expects to Call

#### 1.    Expert witnesses

In **Exhibit 4P**, attached hereto, Plaintiff identifies the expert witnesses it intends to call to testify at trial and the subject matter on which it will ask the Court to recognize the witness's expertise. Defendant's objections to any identified witness are included in **Exhibit 4P**.

#### 2.    Non-expert witnesses

In **Exhibit 4P**, attached hereto, Plaintiff identifies the fact witnesses it intends to call to testify at trial and whether the witnesses will testify in person or by deposition. Defendant's objections to any identified witness are included in **Exhibit 4P**.

### B.    List of Witnesses Defendant Expects to Call

#### 1.    Expert witnesses

In **Exhibit 4D**, attached hereto, Defendant identifies the expert witnesses it intends to call to testify at trial and the subject matter on which it will ask the Court to recognize the witness's expertise. Plaintiff's objections to any identified witness are included in **Exhibit 4D**.

### 2. Non-expert witnesses

In **Exhibit 4D**, attached hereto, Defendant identifies the fact witnesses it intends to call to testify at trial and whether the witnesses will testify in person or by deposition. Plaintiff's objections to any identified witness are included in **Exhibit 4D**.

### C. List of Third Party Witnesses the Parties Expect to Call

Any third-party witness expected to be called to testify by Plaintiff will be included in **Exhibit 4P**. Any third-party witness expected to be called to testify by Plaintiff will be included in **Exhibit 4D**.

### D. Procedures for Identifying and Examining Witnesses

A party shall identify the specific witnesses it intends to call to testify, consistent with the party's identification of witnesses as described above in Section V, in the order in which they will be called, on each trial day by 6:00 p.m. two (2) calendar days before they are to be called. Any objections to disclosed witnesses shall be provided by 6:00 p.m. one (1) calendar day before the witness will be called. The parties shall meet and confer by 9:00 p.m. that same day and should an agreement not be reached, the parties shall notify the Court of the outstanding disputes by 7:00 a.m. the day the witness is scheduled to testify.

Except for expert witnesses and a corporate representative for each party, the parties request that fact witnesses be sequestered pursuant to Federal Rule of Evidence 615 until the witness is excused and not subject to recall. Each party shall identify by email to opposing counsel its corporate representative no fewer than three (3) business days before the first day of the currently scheduled trial, i.e., by 5:00 p.m. on March 18, 2026.

An offering party may discuss with a witness his or her testimony while on direct examination, including during adjournments in the trial, breaks during the trial day and overnight. An offering party may not discuss with a witness his or her testimony after the witness is tendered

7

for cross-examination, including during adjournments in the trial, breaks during the trial day and overnight.  Once cross-examination of a witness is concluded and the witness is passed for re-direct examination, the offering party may discuss with the witness his or her testimony on re-direct examination.

Prior to the start of direct examination of a particular witness, the party conducting the direct examination will provide the other party with one copy of a binder containing all exhibits that they intend to use with that witness on direct examination and will provide all required copies to the Court. With respect to cross examination, the party cross examining a witness shall provide one copy of a binder containing all of the exhibits expected to be used during cross examination to the other party and all required copies to the Court at the start of the cross examination of that witness. The party conducting the cross-examination may collect the binder from opposing counsel if the cross-examination is not completed by the end of the trial day.

### E.    Testimony by Deposition

The deposition testimony that Plaintiff may offer into evidence is identified in **Exhibit 5P**. The deposition testimony that Defendant may offer into evidence is identified in **Exhibit 5D**.

This pretrial order, and the accompanying exhibits, contain the maximum universe of deposition designations, counter-designations, and objections to admission of deposition testimony; none of the foregoing shall be supplemented without approval of all parties or leave of the Court, on good cause shown.

By way of example, should a fact witness previously identified as testifying live not be made available for live testimony at trial, the parties agree that there is good cause for the opposing party to designate deposition testimony of that witness, and the opposing party may designate specific pages and lines of deposition transcript that they intend to play, or if video presentation is unavailable read aloud, in lieu of the witness's appearance upon reasonable notice.  To be clear,

8

this agreement is in no way intended to supersede the witness unavailability requirements of Fed. R. Civ. P. 32(a)(4) should a party request to designate its own, non-adverse witness testimony. If a party intends to call a witness by deposition testimony, that party shall disclose the deposition testimony, exhibits, and a proposed introductory statement to be read to the jury prior to playing the designated testimony by 6:00 p.m. two (2) calendar days before offering the testimony. By 9:00 p.m. that same day, any objections, counter-designations, and additional exhibits shall be provided in response to the proposed testimony. By 6:00 p.m. one (1) calendar day before the testimony is offered, the party intending to play deposition testimony shall provide any objections to counter-designations, and counter-counter designations. At 9:00 p.m. one (1) calendar day before the testimony is to be played the parties shall meet and confer regarding objections. The party offering the witness's testimony by deposition will provide the other party with the final version of the deposition video to be played to the jury by 10:00 pm the night before the testimony is to be introduced. If there are objections that remain to be resolved, the party calling the witness by deposition shall, no later than 7:00 a.m. on the day the witness is to be called at trial, submit, on behalf of all parties: (i) a copy of the entire deposition testimony of the witness at issue, clearly highlighting the designations, counter-designations, and pending objections; and (ii) a cover letter clearly identifying the pending objections as well as a brief indication (i.e., no more than one sentence per objection) of the basis for the objection and the offering party's response to it. Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of the deposition testimony or waiver of objection to the use of the deposition testimony.

A party may play at trial the deposition testimony of an adverse witness even if that witness is appearing live at trial so long as the deposition testimony is testimony that was offered by the witness as a corporate witness under Federal Rule of Civil Procedure 30(b)(6).

All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the deposition is read or viewed at trial.

When the witness is called to testify by deposition at trial, the party calling the witness shall provide the Court with two copies of the transcript of the designations and counter-designations that will be read or played. A designation and any corresponding counter-designations for completeness will be played by video in chronological order at the same time.  The party offering the witness's testimony will be charged for all time that elapses from the time the witness is called until the next witness is called, except for any time counted in the official clip report for counter-designations will be charged to the party introducing the counter-designations.

### F.    Impeachment with Prior Inconsistent Testimony

Any deposition testimony may be used at trial for the purpose of impeachment, regardless of whether a party identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose. The parties agree that they may object to the use of deposition and other prior testimony for impeachment purposes, including objections based on lack of completeness and/or lack of inconsistency.

### G.    Objections to Expert Testimony

The parties agree that the Court should rule at trial on any objections to expert testimony as beyond the scope of prior expert disclosures.  Time for argument over any objection will be charged against the non-prevailing party.

## VI.    Exhibits

### A.    Exhibits

The joint list of exhibits that the parties intend to offer at trial, with the parties' respective objections, are attached as **Exhibit 6J**.

Plaintiff's list of exhibits that it intends to offer at trial, with Defendant's objections, is attached as **Exhibit 6P**. Plaintiff reserves the right to use any exhibit identified by Defendant, and use exhibits not listed for rebuttal and impeachment.

Defendant's list of exhibits that it intends to offer at trial, with Plaintiff's objections, is attached as **Exhibit 6D**. Defendant reserves the right to use any exhibit identified by Plaintiff, and use exhibits not listed for rebuttal and impeachment.

This pretrial order contains the maximum universe of exhibits to be used in any party's case-in-chief, as well as all objections to the admission of such objections, neither of which shall be supplemented without approval of all parties or leave of the Court, on good cause shown. Exhibits not listed will not be admitted unless good cause is shown.

No exhibit will be admitted unless offered into evidence through a witness, who must at least be shown the exhibit. At some point before the completion of the witness' testimony, any party that has used an exhibit with the witness and wishes that exhibit to be admitted into evidence must formally move the exhibit into evidence, by exhibit number. With the exception of exhibits proposed to be used in direct examination to which there remain no objections after parties' meet and confer and/or after raising exhibit objections with the Court, exhibits may not be published, displayed, or otherwise shown to the jury until after they have been admitted into evidence. Once admitted, counsel may publish exhibits to the jury without requesting to do so.  Exhibits proposed to be used in direct examination to which there remain no objections after parties' meet and confer

11

and/or after raising exhibit objections with the Court, may be published, displayed, or otherwise shown to the jury before they have been admitted into evidence.

A party will provide a list of exhibits to be used in connection with direct examination by 6:00 p.m. two calendar days before their intended use, and objections will be provided no later than 8:00 p.m. the night before their intended use.  The parties shall meet and confer at 9:00 p.m. that same night to discuss any outstanding objections.  Should an agreement not be reached, the party objecting to the exhibit shall notify the Court of the outstanding disputes by 7:00 a.m. the day the exhibit is to be used with a witness during direct examination.

[**Agilent's Proposal:**  Exhibits not objected to will be received into evidence by the operation of the Pretrial Order without the need for additional foundation testimony, provided they are shown to a witness.]

Counsel will deliver to the Courtroom Deputy a completed AO Form 187 exhibit list for each party on or before March 20, 2026.

### B.      Demonstrative Exhibits

The parties will exchange demonstratives to be used in opening statements by 6:00 p.m. one day before opening statements. The parties will provide any objections to such demonstratives by 8:00 p.m. one night before opening statements.  Should a meet and confer be necessary, the parties shall confer at 9:00 p.m.  Any unresolved objections shall be raised by 7:00 a.m. on the opening day of trial.

A party will provide demonstrative or physical exhibits for inspection to be used in connection with direct examination by 6:00 p.m. the night before their intended use, and objections will be provided no later than 8:00 p.m. the night before their intended use.  The parties shall meet and confer at 9:00 p.m. that same night to discuss any outstanding objections.  If any of the

12

demonstratives change after the deadline, the party intending to use the demonstrative will promptly notify the opposing party of the change(s).

The party seeking to use a demonstrative will provide a color representation of the demonstrative to the other side in PDF form. However, for video or animations, the party seeking to use the demonstrative will provide it to the other side on a DVD, CD, or other digital means. For irregularly sized physical exhibits, the party seeking to use the demonstrative will provide a color representation as a PDF of 8.5 x 11 copies of the exhibits.

This provision does not apply to demonstratives created during testimony or demonstratives to be used for cross-examination, neither of which need to be provided to the other side in advance of their use. In addition, blow-ups or highlights of exhibits or parts of exhibits or testimony are not required to be provided to the other side in advance of their use.

If good faith efforts to resolve objections to demonstrative exhibits fail, the objecting party shall bring its objections to the Court's attention by 7:00 a.m. on the day the demonstrative is intended to be used. Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of an exhibit or waiver of objection to the exhibit.

## VII.    Brief Statement of Intended Proofs

Plaintiff's brief statement of intended proofs is set forth in **Exhibit 7P**. Defendant's brief statement of intended proofs is set forth in **Exhibit 7D**.

## VIII.   Damages

Agilent intends to seek the following relief:

a.      Lost profits resulting from alleged patent infringement from Axion. 35 U.S.C.  284.

b.      If lost profits are awarded for alleged patent infringement, an additional reasonable royalty from Axion. 35 U.S.C. § 284.

13

c.      If lost profits are not awarded for alleged patent infringement, a reasonable royalty from Axion. 35 U.S.C. § 284.

d.      Enhanced damages of three times actual damages for Axion's alleged willful patent infringement. 35 U.S.C. § 284.

e.      Damages in the form of corrective advertising costs for Axion's alleged false advertising. 15 U.S.C. § 1117.

f.      Pre-judgment and post-judgment interest, costs, and attorneys' fees. 35 U.S.C. §§ 284-285; 15 U.S.C. § 1117.

## IX.    Bifurcated Trial

The parties agree this trial should be bifurcated such that Agilent's claims for trade secret misappropriation and any damages associated therewith should be tried, if at all, at a later date than the March 2026 trial on Agilent's claims for patent infringement and false advertising.

## X.    Motions in Limine and Related Agreements

The parties agree that neither party shall argue, or present evidence to the jury, regarding:

(1) any insurance agreements;

(2) any opinions of counsel or consultation with counsel, or lack thereof, concerning infringement, by the Accused Products, of the Asserted Patents, or invalidity of the Asserted Patents; and

(3) Dr. Fair's opinions implicating Defendant's proposed constructions for the "cell index" terms, given that such constructions were not adopted by the Court (D.I. 480).

Plaintiff's contested motions *in limine*, Defendant's oppositions, and Plaintiff's replies, as well as any exhibits, are attached as **Exhibit 8P.**

Defendant's contested motions *in limine*, Plaintiff's oppositions, and Defendant's replies, as well as any exhibits, are attached as **Exhibit 8D.**

14

## XI.    Discovery

Each party has completed discovery for the patent infringement and false advertising claims. Certain items of discovery remain outstanding on Agilent's trade secrets count, which will be tried separately at a later date.  The remaining discovery items will be addressed following the March 2026 trial.

## XII.    Number of Jurors

There shall be eight jurors. The Court will conduct jury selection through the "struck juror" method, beginning with the Court reading *voir dire* to the jury panel in the courtroom, continuing by meeting with jurors individually in chambers or at sidebar and there addressing any challenges for cause, and concluding with three peremptory strikes per side.

## XIII.   Length of Trial

The trial will be timed. Unless otherwise ordered, time will be charged to a party for its opening statement, direct and redirect examinations of witnesses it calls, cross-examination of witnesses called by any other party, closing argument, and its argument on any motions for judgment as a matter of law.  For arguments on objections a party raises (outside the presence of the jury) to another party's deposition designations or counter-designations, exhibits, and demonstrative exhibits, time for argument will be charged against the non-prevailing party.

The Courtroom Deputy will keep a running total of trial time used by counsel. If any party uses all of its allotted trial time, the Court will terminate that party's trial presentation. Considering the Court's procedures for counting time, and considering the nature and extent of the parties' disputes, the parties request a five (5) day trial.  Jury selection will begin on March 20, 2026, at 9:30 a.m.  Trial will begin on March 23, 2026, at 10:00 a.m. and will run until approximately 5:00 p.m. on March 23, 2026, and will run from 9:00 a.m. to approximately 5:00 p.m. each day

15

thereafter.  Each party will be allotted 15 hours of trial time, including opening statements and closing arguments.

## XIV.    Motions for Judgment as a Matter of Law

Motions for judgment as a matter of law shall be made orally at the earliest break in the trial following the close of a party's case-in-chief on a particular claim or defense. The jury shall be out of the courtroom at the time such motions are made.

## XV.    Amendments of the Pleadings

Neither party intends to request an amendment to its pleadings at the present time.

## XVI.    Settlement

The parties hereby certify that they have engaged in a good-faith effort to explore resolution of the controversy by settlement. Counsel for the parties conducted a mediation in December 2024 and periodic discussions in 2025 and 2026 without reaching a resolution.

## XVII.    FJC Patent Video

The parties stipulate that the Federal Judicial Center Introduction to the Patent System video will be played as part of the Court's preliminary jury instructions, and that the time incurred in playing the video will not be charged to the parties.

## XVII.    Miscellaneous Issues

The parties also identify the two miscellaneous issues below:

(1)    **Axion's Objections to Agilent's Exhibits.** The parties are at an impasse, as described below:

        a.    **Agilent's Statement**: Axion has applied nearly the same boilerplate set of objections to almost every exhibit on the Agilent Exhibit List other than the patents-in-suit, file histories, and prior art.  Moreover, Axion's objections are not consistent with its objections to the Joint Exhibit list.  As just one

16

example, Axion does not list as either objected to or withdrawn JTX183, which is PX2480, which is a user guide for one of the Accused Products. But Axion's objections to PX2480 are the same objections as almost every other document on Agilent's exhibit list. Agilent raised this issue with Axion on December 31, 2025, requesting a response by January 5, 2026, but received no response. Pursuant to the parties' meet and confer on March 5, 2026, Agilent removed exhibits on March 6, 2026 to address Axion's concern with the number of remaining exhibits.

b.  **Axion's Statement**: The parties exchanged initial trial exhibit lists on November 21, 2025. Agilent's exhibit list identified over 3,000 exhibits. Axion's initial exhibit list had 508 exhibits (and Axion's amended exhibit list now has 203 exhibits). The following week, Axion contacted Agilent asking Agilent to serve an amended exhibit list identifying a good-faith, reasonable number of exhibits it may seek to use at trial. Agilent declined. The parties met and conferred on January 7, 2026, during which Axion explained that it is unreasonable to ask Axion to provide objections for more than 3,000 exhibits, the vast majority of which will not be used in a one-week jury trial. Axion committed to providing meaningful objections if Agilent served an exhibit list with a reasonable number of exhibits. Agilent has not done so. It was not until February 25, 2026 that Agilent first served an exhibit list with fewer than 3,000 exhibits. But even Agilent's February 25, 2026 list, served nine days before the due date for the proposed pretrial order, still had almost 1,400 exhibits. It was not until after 5:00 p.m. on the

17

day the proposed pretrial order was due, that Agilent surfaced the exhibit list included at 6P in this pretrial order. In view of the timing of this list, Axion had no opportunity to consider it.

(2)      **Axion's Motion for Leave to File a *Daubert* Motion Out of Time to Exclude Agilent's New Damages Expert Opinion and Testimony on the '080 Patent (D.I. 495).** This motion is pending and has been fully briefed (*see* D.I. 496, D.I. 501, D.I. 503).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Travis J. Murray*

_____

Jeremy A. Tigan (#5239)
Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jtigan@morrisnichols.com
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

March 6, 2026

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant Axion Biosystems, Inc.*

IT IS HEREBY ORDERED that this Final Pretrial Order shall control the subsequent course of the action, unless modified by the Court to prevent manifest injustice.

DATED: _____

_____
UNITED STATES MAGISTRATE JUDGE

18

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) C.A. No. 23-198 (CJB) |
| | ) |
| v. | ) ██████████ |
| | ) ███████████████ |
| AXION BIOSYSTEMS, INC., | ) ██████████ |
| | ) |
| Defendant. | ) |

**EXHIBIT 1 TO PRETRIAL ORDER**
**JOINT STATEMENT OF UNCONTESTED FACTS**

The following facts are not disputed or have been agreed to or stipulated to by the parties:

## I.    The Parties

1.    Agilent Technologies, Inc. ("Agilent") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 5301 Stevens Creek Boulevard, Santa Clara, California 95051.

2.    Axion BioSystems, Inc. ("Axion") is a corporation organized under the laws of the State of Delaware with a principal place of business at 171 17th Street NW, Suite 500, Atlanta, Georgia, 30363.

3.    Agilent and Axion are direct competitors in the market for impedance-based cell analysis systems.

## II.    Agilent's Asserted Patents and Agilent's Products

4.    Agilent is the owner of all right, title, and interest in and to U.S. Patent Nos. 7,192,752 (the "'752 Patent") and 8,026,080 (the "'080 Patent") (collectively the "Asserted Patents").

5.    Dr. Xiaobo Wang is a named co-inventor on each of the Asserted Patents.

6.    The '752 Patent issued on March 20, 2007, from App. No. 10/987,732, filed on November 12, 2004, and expired on July 18, 2023.

7.    The '752 Patent is titled "Real Time Electronic Cell Sensing Systems and Applications for Cell-Based Assays."

8.    The '080 Patent issued on September 27, 2011, from App. No. 11/725,040, filed on March 15, 2007, and expired on July 18, 2023.

9.    The '080 Patent is titled "Real Time Electronic Cell Sensing System and Applications for Cell-Based Assays."

1

10. The '752 Patent and '080 Patent are related family members.

11. Agilent asserts that Axion infringes, directly and indirectly, claims 11, 12, 14, and 18 of the '752 Patent and claims 1, 3, and 10 of the '080 Patent.

12. The '080 Patent defines "electrical traces" as "electrically conductive paths that extend from electrodes or electrode elements or electrode structures toward one end or boundary of a device or apparatus for connecting the electrodes or electrode elements or electrode structures to an impedance analyzer."

13. The '080 Patent defines a "connection pad" as "an area on an apparatus or a device of the present invention which is electrically connected to at least one electrode or all electrode elements within at least one electrode structure on an apparatus or a device and which can be operatively connected to external electrical circuits (e.g., an impedance measurement circuit or a signal source)."

14. Each of Agilent's xCELLigence RTCA Single Plate (SP) Platform, xCELLigence RTCA Multi Plate (MP) Platform; xCELLigence RTCA High Throughput (HT) Platform; and xCELLigence RTCA eSight Platform, identified in the table below, was used to practice at least one of the asserted claims of the '080 Patent, before the expiration of the '080 Patent on July 18, 2023.

| Platform | Items Included |
|---|---|
| SP | xCELLigence RTCA SP/MP/DP Control Unit, xCELLigence RTCA SP/MP Analyzer, and SP Station, alone or in combination with one or more of: E-Plate 96, E-Plate VIEW 96, E-Plate 96 PET; and RTCA Software Pro |
| MP | xCELLigence RTCA SP/MP/DP Control Unit, xCELLigence RTCA SP/MP Analyzer, and MP Station, alone or in combination with one or more of: E-Plate 96, E-Plate VIEW 96, E-Plate 96 PET; and RTCA Software Pro |
| HT | xCELLigence RTCA HT Control Unit, xCELLigence RTCA HT Analyzer, and HT Station, alone or in combination with the E-Plate 384 plate and RTCA Software Pro |

| Platform | Items Included |
|---|---|
| eSight | xCELLigence RTCA eSight Instrument, monitor and workstation, alone or in combination with one or more of: E-Plate 96, E-Plate VIEW 96, E-Plate 96 PET; and RTCA Software Pro |

15.     Each of Agilent's xCELLigence RTCA Single Plate (SP) Platform, xCELLigence RTCA Multi Plate (MP) Platform; xCELLigence RTCA High Throughput (HT) Platform; and xCELLigence RTCA eSight Platform, identified in the table below, was used to practice at least one of the asserted claims of the '752 Patent before the expiration of the '752 Patent on July 18, 2023:

| Platform | Items Included |
|---|---|
| SP | xCELLigence RTCA SP/MP/DP Control Unit, xCELLigence RTCA SP/MP Analyzer, and SP Station, alone or in combination with one or more of: E-Plate 96, E-Plate VIEW 96, E-Plate 96 PET; and RTCA Software Pro |
| MP | xCELLigence RTCA SP/MP/DP Control Unit, xCELLigence RTCA SP/MP Analyzer, and MP Station, alone or in combination with one or more of: E-Plate 96, E-Plate VIEW 96, E-Plate 96 PET; and RTCA Software Pro |
| HT | xCELLigence RTCA HT Control Unit, xCELLigence RTCA HT Analyzer, and HT Station, alone or in combination with the E-Plate 384 plate and RTCA Software Pro |
| eSight | xCELLigence RTCA eSight Instrument, monitor and workstation, alone or in combination with one or more of: E-Plate 96, E-Plate VIEW 96, E-Plate 96 PET; and RTCA Software Pro |

16.     Each of the electrode arrays located at the bottom surface of each well of the Agilent E-Plate 96 plate comprises two electrode structures that operate as a unit.

17.     Each of the electrode structures of the electrode arrays within the wells of the Agilent E-Plate 96 plate comprises multiple electrode elements.

18.     Each electrode array within the Agilent E-Plate 96 plate has an approximately uniform electrode resistance distribution across the entire array.

19.     Each of the electrode arrays located at the bottom surface of each well of the Agilent E-Plate VIEW 96 plate comprises two electrode structures that operate as a unit.

3

20.     Each of the electrode structures of the electrode arrays within the wells of the Agilent E-Plate VIEW 96 plate comprises multiple electrode elements.

21.     Each electrode array within the Agilent E-Plate VIEW 96 plate has an approximately uniform electrode resistance distribution across the entire array.

22.     Each of the electrode arrays located at the bottom surface of each well of the Agilent E-Plate 96 PET plate comprises two electrode structures that operate as a unit.

23.     Each of the electrode structures of the electrode arrays within the wells of the Agilent E-Plate 96 PET plate comprises multiple electrode elements.

24.     Each electrode array within the Agilent E-Plate 96 PET plate has an approximately uniform electrode resistance distribution across the entire array.

25.     Agilent sold and offered for sale its xCELLigence Platforms in the United States from at least 2020 through July 18, 2023 (the expiration date of the Asserted Patents).

26.     Axion became aware of the '752 Patent at least as early as February 13, 2019.

27.     Axion became aware of the '080 Patent at least as early as August 22, 2019.

## III.     Alleged Infringement by Axion's Maestro Platforms

28.     The Accused Products include Axion's five Maestro machine models, the Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ, that may be used in combination with the AxIS Z software and compatible CytoView-Z 96-well and/or CytoView-Z 384-well plates.

29.     Each of the Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines is compatible with the CytoView-Z 96 well plates.

30.     Each of the Maestro Pro and Maestro ZHT machines is compatible with the CytoView-Z 384 well plates.

31.     Each of the Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines is compatible with Axion's AxIS Z software.

32.     Each of the Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with Axion's AxIS Z software.

33.     There are no substantial or practical differences in impedance measurement functionality or operation across the versions of the AxIS Z software released before July 18, 2023 (the expiration date of the Asserted Patents), including version nos. 1.1, 1.2, 1.3, 3.0, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, and 3.9.

34.     The Maestro Pro, Maestro Edge, Maestro Z, and Maestro ZHT machines are representative of one another with respect to impedance measurement functionality, with the exception that (a) Maestro Pro and Maestro ZHT machines can be used with both CytoView-Z 96-well plates and CytoView Z-384-well plates, and (b) Maestro Edge and Maestro Z machines can be used with only CytoView Z-96-well plates.

35.     The Maestro Pro, Maestro Edge, Maestro Z, and Maestro ZHT machines are each a "Maestro M2 Machine," and collectively "Maestro M2 Machines."

36.     The design and impedance measurement functionality of individual hardware components of each accused version of any Maestro M2 Machine is the same.

37.     The impedance measurement functionality provided by each version of the source code of each accused version of any Maestro M2 Machine is the same.

38.     The CytoView-Z 96-well plates are compatible with ▮▮▮▮▮▮▮▮▮▮▮▮ the Maestro Pro and Maestro Edge machines, and the CytoView-Z 384-well plates are compatible with ▮▮▮▮▮▮ the Maestro Pro machine.

5

39.    Axion sold ▮▮▮▮▮▮▮ the Maestro Pro machines in the U.S. beginning at least as early as June 2020.

40.    There are no substantial or practical differences in the impedance measurement functionality or operation between ▮▮▮▮▮▮▮ the Maestro Pro machines.

41.    Any commercially available version of the Maestro Pro machine that includes impedance measurement functionality is representative in terms of its impedance measurement functionality of all versions of the Maestro Pro machine from June 2020 through July 18, 2023.

42.    Axion sold ▮▮▮▮▮▮▮ the Maestro Edge machines in the U.S. beginning at least as early as June 2020.

43.    There are no substantial or practical differences in the impedance measurement functionality or operation between ▮▮▮▮▮▮▮ the Maestro Edge machines.

44.    Any commercially available version of the Maestro Edge machine that includes impedance measurement functionality is representative in terms of its impedance measurement functionality of all versions of the Maestro Edge machine from June 2020 through July 18, 2023.

45.    Axion sold Maestro Z machines in the U.S. beginning as early as January 2020.

46.    There are no substantial or practical differences in the impedance measurement functionality or operation across all commercially available versions of the Maestro Z machines sold through July 18, 2023.

47.    Any commercially available version of the Maestro Z machine is representative in terms of its impedance measurement functionality of all versions of the Maestro Z machine since its release.

48.    The Maestro Z machine is not compatible with any plate other than the CytoView-Z 96-well plates.

6

49.     Axion sold Maestro ZHT machines in the U.S. beginning as early as May 2021.

50.     There are no substantial or practical differences in impedance measurement functionality or operation across all commercially available versions of the Maestro ZHT machines sold through July 18, 2023.

51.     Any commercially available version of the Maestro ZHT machine is representative in terms of its impedance measurement functionality of all versions of the Maestro ZHT machine since its release.

52.     The Maestro ZHT machine is not compatible with any plates other than the CytoView-Z 96-well plates and CytoView-Z 384-well plates.

53.     The Maestro TrayZ machine is not compatible with any plates other than the CytoView-Z 96-well plates.

54.     Axion sold Maestro TrayZ machines in the U.S. beginning as early as April 2023.

55.     Any commercially available version of the Maestro TrayZ machine is representative in terms of its impedance measurement functionality of all versions of the Maestro TrayZ machine since its release.

56.     All commercially available versions of the CytoView-Z 96-well plates made, used, sold, offered for sale, and/or imported from January 2020 through July 18, 2023 are representative in terms of their impedance measurement functionality of all other commercially available versions of such 96-well plates.

57.     ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████

7

58.     The physical samples of any commercially available version of the CytoView-Z 96-well plate (AXION-0751919, AXION-0751923, AXION-0751922, AXION-0011120) are representative of one another.

59.     All commercially available versions of the CytoView-Z 384-well plates made, used, sold, offered for sale, and/or imported from December 2020 through July 18, 2023 are representative in terms of their impedance measurement functionality of all other commercially available versions of such 384-well plates.

60.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

61.     The physical samples of any commercially available version of the CytoView-Z 384-well plate (AXION-0751920, AXION-0011121) are representative of one another.

62.     The AxIS Z software for use with the Maestro Pro, Maestro Edge, Maestro Z, and Maestro ZHT machines is representative of the AxIS Z software for use with the Maestro TrayZ machine.

63.     The impedance measurement functionality in the Maestro Pro, Maestro Edge, Maestro Z, and Maestro ZHT machines when used with the CytoView-Z 96-well plates representative of the impedance  measurement functionality in the Maestro TrayZ machines when used with the CytoView-Z 96-well plates.

64.     The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can each be used with the AxIS Z software and the CytoView-Z 96-well plates to perform an assay that monitors cell-substrate impedance.

65. The Maestro Pro or Maestro ZHT machines can each be used with the AxIS Z software and the CytoView-Z 384-well plates to perform an assay that monitors cell-substrate impedance.

66. The CytoView-Z 96-well plate is a multiple-well cell-substrate impedance monitoring device.

67. The CytoView-Z 384-well plate is multiple-well cell-substrate impedance monitoring device.

68. The wells of the CytoView-Z 96-well plate are designed for receiving cells.

69. The wells of the CytoView-Z 384-well plate are designed for receiving cells.

70. Each well in a CytoView-Z 96-well plate contains an electrode array at the bottom surface of the well.

71. Each well in a CytoView-Z 384-well plate contains an electrode array at the bottom surface of the well.

72. An electrode array of the CytoView-Z 96-well plate is associated with a well of the CytoView-Z 96 plate.

73. An electrode array of the CytoView-Z 384-well plate is associated with a well of the CytoView-Z 384 plate.

74. Each of the electrode arrays located at the bottom surface of each well of the CytoView-Z 96-well plates comprises two electrode structures that operate as a unit.

75. Each of the electrode arrays located at the bottom surface of each well of the CytoView-Z 384-well plates comprises two electrode structures that operate as a unit.

76. Each of the electrode structures of the electrode arrays within the wells of the CytoView-Z 96-well plates comprises multiple electrode elements.

9

77.    Each of the electrode structures of the electrode arrays within the wells of the CytoView-Z 384-well plates comprises multiple electrode elements.

78.    The CytoView-Z 96-well plates include a recording electrode interdigitated with a ground electrode.

79.    The CytoView-Z 384-well plates include a recording electrode interdigitated with a ground electrode.

80.    Each Maestro Z, Maestro ZHT, Maestro Pro, Maestro Edge, and Maestro TrayZ machine includes an impedance analyzer.

81.    Each Maestro Z, Maestro ZHT, Maestro Pro, Maestro Edge, and Maestro TrayZ machine includes a device station comprising electronic circuitry that can engage the CytoView-Z 96-well plates and selectively connect two or more electrode arrays of the CytoView-Z 96-well plates to an impedance analyzer.

82.    Each Maestro ZHT and Maestro Pro machine includes a device station comprising electronic circuitry that can engage the CytoView-Z 384-well plates and selectively connect two or more electrode arrays of the CytoView-Z 384-well plates to an impedance analyzer.

83.    Axion has used each Accused Product to monitor the impedance of cells added into at least one well of the CytoView-Z plates before July 18, 2023 (the expiration date of the Asserted Patents).

84.    Axion has used at least one of the Accused Products to monitor the impedance of cells added into at least one well of the CytoView-Z plates before July 18, 2023 (the expiration date of the Asserted Patents).

85.    The impedance measurement functionality of the Accused Products can be used to analyze impedance changes at three or more time points.

86.    Axion has used each Accused Product to monitor the impedance of cells added into at least one well of the CytoView-Z plates, wherein the monitoring comprises analyzing impedance changes at three or more time points, before July 18, 2023 (the expiration date of the Asserted Patents).

87.    Axion has used at least one of the Accused Products to monitor the impedance of cells added into at least one well of the CytoView-Z plates, wherein the monitoring comprises analyzing impedance changes at three or more time points, before July 18, 2023 (the expiration date of the Asserted Patents).

88.    Test compounds can be added to one or more wells of a CytoView-Z 96-well plate.

89.    Axion has used at least one of the Accused Products by adding a test compound to one or more wells of the CytoView-Z 96-well plate before July 18, 2023 (the expiration date of the Asserted Patents).

90.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to monitor impedance in response to one or more test compounds added into at least one well of the CytoView-Z 96-well plates.

91.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and CytoView-Z 384-well plates to monitor impedance in response to one or more test compounds added into at least one well of the CytoView-Z 384-well plates.

92.    Axion has used at least one of the Accused Products to monitor impedance in response to one or more test compounds added into at least one well of the CytoView-Z plates before July 18, 2023 (the expiration date of the Asserted Patents).

11

93.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to analyze impedance values and calculate percent cytolysis before and after adding at least one test compound and to provide information about cell responses to the at least one test compound.

94.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to analyze impedance values and calculate normalized impedance values before and after adding at least one test compound and to provide information about cell responses to the at least one test compound.

95.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to analyze impedance values and calculate Z-index values before and after adding at least one test compound and to provide information about cell responses to the at least one test compound.

96.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to analyze impedance values and calculate percent cytolysis before and after adding at least one test compound and to provide information about cell responses to the at least one test compound.

97.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to analyze impedance values and calculate normalized impedance values before and after adding at least one test compound and to provide information about cell responses to the at least one test compound.

98.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to analyze impedance values and calculate Z-index values

12

before and after adding at least one test compound and to provide information about cell responses to the at least one test compound.

99.    Axion has used at least one of the Accused Products to analyze impedance values and calculate percent cytolysis before and after adding at least one test compound and to provide information about cell responses to the at least one test compound, before July 18, 2023 (the expiration date of the Asserted Patents).

100.    Axion has used at least one of the Accused Products to analyze impedance values and calculate normalized impedance values before and after adding at least one test compound and to provide information about cell responses to the at least one test compound, before July 18, 2023 (the expiration date of the Asserted Patents).

101.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to monitor cell-substrate impedance of one or more wells before and after adding at least one test compound.

102.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to monitor cell-substrate impedance of one or more wells before and after adding at least one test compound.

103.    Axion has used at least one of the Accused Products to monitor cell-substrate impedance of one or more wells before and after adding at least one test compound before July 18, 2023 (the expiration date of the Asserted Patents).

104.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to monitor impedance at three or more time points spaced at regular intervals.

13

105.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to monitor impedance at three or more time points spaced at regular intervals.

106.    Axion has used each Accused Product to monitor impedance at three or more time points spaced at regular intervals, before July 18, 2023 (the expiration date of the Asserted Patents).

107.    Axion has used at least one of the Accused Products to monitor impedance at three or more time points spaced at regular intervals, before July 18, 2023 (the expiration date of the Asserted Patents).

108.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to introduce cells to a well to which a test compound is not added to create a control well.

109.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to introduce cells to a well to which a test compound is not added to create a control well.

110.    Axion has used at least one of the Accused Products to introduce cells to a well to which a test compound is not added to create a control well, before July 18, 2023 (the expiration date of the Asserted Patents).

111.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to calculate a percent cytolysis from impedance measurements.

112.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to calculate a normalized impedance from impedance measurements.

14

113.    The Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, and Maestro TrayZ machines can be used with the AxIS Z software and the CytoView-Z 96-well plates to calculate a Z-index from impedance measurements.

114.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to calculate a percent cytolysis from impedance measurements.

115.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to calculate a normalized impedance from impedance measurements.

116.    The Maestro Pro or Maestro ZHT machines can be used with the AxIS Z software and the CytoView-Z 384-well plates to calculate a Z-index from impedance measurements.

117.    Axion has used at least one of the Accused Products to calculate a percent cytolysis from impedance measurements, before July 18, 2023 (the expiration date of the Asserted Patents).

118.    Axion has used at least one of the Accused Products to calculate a normalized impedance from impedance measurements, before July 18, 2023 (the expiration date of the Asserted Patents).

IV.    **Axion's Statements at Issue**

119.    Axion's website included the statement "The simple and sensitive assays of the Maestro Z accurately measure tumor growth and immune cell killing of 3D cancer spheroid models" since at least as early as July 2022.

120.    At least as early as July 2022, Axion's website included the statement: "Track *in vitro* tumor growth and immune cell killing in 3D spheroids."

15

121.    The statement included on Axion's website as early as July 2022: "Track *in vitro* tumor growth and immune cell killing in 3D spheroids," is no longer on Axion's website.

122.    Axion's website included the statement "Cancer spheroids placed in a CytoView-Z plate can be noninvasively monitored to track real-time growth and assess the potency of therapeutic candidates" since at least as early as July 2022.

123.    Axion's website included the statement "A cancer spheroid composed of HER2-expressing ovarian cancer cells in a CytoView -Z plate. Growth of spheroids of different starting sizes are monitored over 50 hours. The addition of HER2- targeted CAR T cells at different effector:target ratios at 24 hours shows a dose-dependent decrease in spheroid size" since at least as early as July 2022.

124.    Axion's Cell Culture Protocol entitled "Cancer Spheroids for the Maestro Z," published no later than July 2022, includes the statement "Figure 1: Monitoring attachment and proliferation of cancer spheroids (A) A549 spheroids plated on a CytoView-Z 96-well plate from low to high density (500 to 20k cells/spheroid). Inset: A549 spheroid formed from 5k cells. Scale bar = 200 μm. (B) Resistance at 72 hours post-plating for A549 spheroids."

125.    Axion's Cell Culture Protocol entitled "Cancer Spheroids for the Maestro Z," published no later than July 2022, includes the statement "Figure 2: Immune cell-mediated killing of SKOV3 spheroids (A) SKOV3 spheroids (5k cells per spheroid) were plated on a CytoView-Z 96 plate. HER2-specific CAR T cells were added at 1:1 and 5:1 effector-to-target cell ratios after 20 hours. (B) Resistance at 52 hours post-effector addition."

126.    Axion's Application Note entitled "CAR T Cell Potency Assessment with 3D Cancer Spheroid Models," published no later than July 2022, includes the statement "Figure 2: Cancer spheroid growth tracked over time."

127.    Axion's Application Note entitled "CAR T Cell Potency Assessment with 3D Cancer Spheroid Models," published no later than July 2022, includes the statement "The Maestro Z allows for a simple evaluation of in vitro tumor growth and death in cancer spheroids. The assay was sensitive enough to distinguish spheroids of various cell densities and sizes while continuous, noninvasive measurements tracked growth. CART cell-mediated killing was demonstrated across different effector-target ratios, illustrating the ability of the Maestro Z to evaluate and characterize immunotherapies against 3D cancer models *in vitro*.  A reduction in cytolysis was observed in cancer spheroids relative to the 2D monolayer cultures. This may be due to the 3D model's ability to recapitulate aspects of solid tumor biology."

128.    The Accused Products traveled in interstate commerce.

129.    ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████

130.    Agilent has not performed a customer survey to establish how customers perceive Axion's statements at issue.

131.    Agilent was financially able to conduct corrective advertising between February 2022 and January 2025.

██  ████████████████████████████████

## V.    **Axion Prior Art References**

133.    The resistance of an electrical path is dependent on several factors, including the material used to form the path and the length, width, and cross-sectional area of the path.

134.    The Ehret 1997 Publication is prior art to each of the Asserted Patents.

17

135. Figure 1 of the Ehret 1997 Publication is a block diagram that is not drawn to scale.

136. The Keese Publication is prior art to the '752 Patent.

137. The Wegener Publication is prior art to each of the Asserted Patents.

138. The Van der Weide '709 Publication is prior art to each of the Asserted Patents.

139. The Luong Publication is prior art to each of the Asserted Patents.

140. The Ehret 1997 Publication describes monitoring impedance at three or more time points spaced at regular intervals.

# EXHIBIT 2D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-198-CJB |
| v. | ) | |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT 2D – DEFENDANT AXION'S STATEMENT OF
ISSUES OF FACT THAT REMAIN TO BE LITIGATED**

Pursuant to D. Del. LR 16.3(c)(4), and the parties' agreement to engage in an iterative exchange of components making up the Pretrial Order, Defendant Axion BioSystems, Inc. ("Axion") respectfully submits its Statement of Issues of Fact That Remain to Be Litigated.

This statement is not intended to be exhaustive, and in addition to what is set forth herein, Axion reserves the right to prove any matters identified in the pleadings, fact and expert discovery, and any of the accompanying statements of facts and legal issues to be litigated at trial. Axion reserves the right to disprove, prove a fact contrary to, or prove the opposite of any issue of fact identified in Plaintiff Agilent Technologies, Inc.'s ("Agilent") Statement of Issues of Fact That Remain to Be Litigated.

To the extent Axion's Statement of Issues of Law That Remain to Be Litigated contain issues of fact, those issues are incorporated herein by reference. If the Court determines that any issue identified in this list as an issue of fact is more properly considered an issue of law, Axion incorporates such issues by reference into its Statement of Issues of Law That Remain to Be Litigated. Similarly, if the Court decides that issues that Axion has designated as issues of law are issues of fact, Axion incorporates those issues by reference into this Statement of Issues of Fact That Remain to Be Litigated.

1                                                                    2/27/2026

Axion's Statement of Issues of Fact That Remain to Be Litigated is made pursuant to the Local Rules, the Court's orders, and the parties' agreements, and to preserve Axion's rights, based on the present status of the case.    Axion's identification of the Issues of Fact That Remain to Be Litigated is based in part on its current understanding of the arguments Agilent is likely to make, based upon the pleadings and discovery in the action to date.  To the extent Agilent attempts to introduce different or additional facts to meet its burden of proof, Axion reserves the right to object to and/or contest those facts, and to present any and all rebuttal evidence in response to those facts.

The parties have exchanged and/or will exchange objections and motions *in limine* and otherwise present to the Court disputes regarding the issues and evidence to be presented to the jury and the relevance and admissibility of certain testimony and exhibits.  Axion's Statement of Issues of Fact That Remain to Be Litigated does not waive Axion's right to object to certain categories of evidence as irrelevant or otherwise inadmissible and does not waive its right to pursue motions *in limine*.    Until the Court addresses and rules on such disputes, Axion reserves the right to make final decisions regarding what issues remain to be litigated.

After the parties complete their pretrial exchange and the Court rules on motions and/or other disputes that are presented during pretrial, Axion reserves the right to further clarify its Statement of Issues of Fact That Remain to Be Litigated.

## I.    PATENT INFRINGEMENT

1.    Whether Axion directly infringed, literally, the asserted claims of the '752 patent by using the Maestro Pro and/or Maestro ZHT machines with the AxIS Z software and CytoView-Z 384-well plates.

2.    Whether Axion induced infringement of the asserted claims of the '752 patent.

3.    Whether Axion willfully infringed the asserted claims of the '752 patent.

<div align="center">2</div>

<div align="right">2/27/2026</div>

4. Whether Axion directly infringed, literally, the asserted claims of the '080 patent by using (a) the Maestro Pro and/or Maestro ZHT machines with the AxIS Z software and CytoView-Z 384-well plates, and/or (b) the Maestro Z, Maestro ZHT, Maestro Pro, Maestro Edge, and/or Maestro TrayZ with the AxIS Z software and CytoView-Z 96-well plates.

5. Whether Axion induced infringement of the asserted claims of the '080 patent.

6. Whether Axion willfully infringed the asserted claims of the '080 patent.

## II. PATENT INVALIDITY

7. Whether the asserted claims of the '080 patent are entitled to a priority date of July 20, 2002.

8. Whether the asserted claims of the '752 patent are invalid under 35 U.S.C. § 103 as obvious.

9. Whether the asserted claims of the '080 patent are invalid under 35 U.S.C. § 102 as anticipated.

10. Whether the asserted claims of the '080 patent are invalid under 35 U.S.C. § 103 as obvious.

11. Whether a nexus exists between the alleged secondary considerations of nonobviousness and the patented features.

12. Whether secondary considerations such as long felt but unmet need, failure of others, unexpected results, licensing, commercial success, copying, or industry praise support the nonobviousness of the asserted claims of the '752 patent.

13. Whether secondary considerations such as long felt but unmet need, failure of others, unexpected results, licensing, commercial success, copying, or industry praise support the nonobviousness of the asserted claims of the '080 patent.

3                                                                                         2/27/2026

14.    Whether a person of ordinary skill in the art at the relevant time is someone who had (1) a degree in electrical engineering, physics, mechanical engineering, biomedical engineering, or a closely related field, plus at least two years of experience researching or developing devices for analyzing cells and for conducting cell-based assays, or an advanced degree in one of those fields in lieu of such work experience, or (2)(a) a bachelor's degree in electrical engineering, mechanical engineering, biomedical engineering, or a related field, and approximately two years of relevant experience or equivalent study in systems for bioanalysis of cells; or (b) a bachelor's degree in biological science, or a related field, and approximately two years of relevant experience or equivalent study in developing systems and methods for bioanalysis of cells.

## III.    PATENT DAMAGES AND REMEDIES

15.    Whether Agilent is entitled to lost profits and/or a reasonable royalty for Axion's alleged infringement of the '752 patent.

16.    Whether Agilent is entitled to lost profits and/or a reasonable royalty for Axion's alleged infringement of the '080 patent.

17.    Whether Agilent is entitled to enhanced damages for Axion's alleged infringement of the '752 patent.

18.    Whether Agilent is entitled to enhanced damages for Axion's alleged infringement of the '080 patent.

19.    Whether Agilent is entitled to attorneys' fees.

20.    Whether Axion is entitled to attorneys' fees.

21.    Whether Agilent is entitled to costs.

4                                                    2/27/2026

## IV. FALSE ADVERTISING

22. Whether Axion's statements regarding its products' ability to measure characteristics of spheroid models using impedance are literally false statements of fact.

23. Whether Axion's statements regarding its products' ability to measure characteristics of spheroid models using impedance are misleading in that they are true or ambiguous but have the tendency to deceive a substantial portion of relevant consumers of the products.

24. Whether Axion's statements regarding its products' ability to measure characteristics of spheroid models using impedance actually deceived or have the tendency to deceive a substantial portion of the intended audience.

25. Whether Axion's statements regarding its products' ability to measure characteristics of spheroid models using impedance are material in that they are likely to influence customers' purchasing decisions.

26. Whether Axion's statements regarding its products' ability to measure characteristics of spheroid models using impedance proximately caused any economic or reputational injury to Agilent.

## V. FALSE ADVERTISING DAMAGES AND REMEDIES

27. Whether Agilent is entitled to corrective advertising damages.

28. Whether Agilent is entitled to attorneys' fees.

29. Whether Axion is entitled to attorneys' fees.

30. Whether Agilent is entitled to costs.

31. Whether Agilent is entitled to a permanent injunction that enjoins Axion from making statements regarding its products' ability to measure characteristics of spheroid models using impedance.

5                                                                                    2/27/2026

# EXHIBIT 2P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 23-198 (CJB) |
| | ) |
| AXION BIOSYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

**EXHIBIT 2P TO PRETRIAL ORDER**
**PLAINTIFF'S STATEMENT OF CONTESTED ISSUES OF FACT**

Agilent identifies the following contested issues of fact. The following statement of contested issues of fact is based on the arguments Agilent expects to make to establish infringement of the Asserted Patents and in connection with Agilent's false advertising claims. This statement is also based on the parties' pleadings, documentary and testimony evidence, and Agilent's current understanding of Axion's defenses in connection with Agilent's claims. Agilent reserves the right to supplement this statement to rebut or otherwise address the issues of fact identified by Axion. To the extent Axion intends or attempts to introduce different or additional facts, Agilent reserves its right to supplement this statement and contest those facts and to present any and all rebuttal evidence in response to those arguments. Agilent reserves the right to modify or supplement this statement as part of the meet and confer process leading up to trial, in response to Axion's pretrial disclosures and objections, by agreement with Axion, and/or in response to any pretrial rulings or orders from the Court. Agilent reserves the right to present facts set forth in pending or previously determined motions and to appeal any issues identified in motions that have been decided by the Court. All issues of fact herein shall also be deemed to be issues of law. To the extent that any issues of law are deemed to be issues of fact, they are incorporated herein.

## I.    **Infringement**

1.      Axion directly infringed, literally, all of the asserted claims of the '752 Patent by using the Accused Products, specifically the Maestro Pro and/or Maestro ZHT machines with the AxIS Z software and CytoView-Z 384 well plates, in an infringing manner.

2.      Axion induced infringement of all of the asserted claims of the '752 Patent.

3.      Axion's infringement of at least one of the asserted claims of the '752 Patent was willful.

4.      Axion directly infringed, literally, all of the asserted claims of the '080 Patent by using the Accused Products in an infringing manner.

1

5. Axion induced infringement of all of the asserted claims of the '080 Patent.

6. Axion's infringement of at least one of the asserted claims of the '080 Patent was willful.

## II. Validity

7. The '752 Patent was valid and enforceable before its expiration date.

8. None of the asserted claims of the '752 Patent are invalid as obvious under 35 U.S.C. § 103.

9. The '080 Patent was valid and enforceable before its expiration date.

10. The '080 Patent is entitled to a priority date of July 20, 2002.

11. None of the asserted claims of the '080 Patent are invalid as anticipated under 35 U.S.C. § 102.

12. None of the asserted claims of the '080 Patent are invalid as obvious under 35 U.S.C. § 103.

13. None of the asserted claims of the '080 Patent are invalid as indefinite under 35 U.S.C. § 112.

## III. Secondary Considerations of Non-Obviousness of the Asserted Patents

14. A person of ordinary skill in the art of each of the Asserted Patents, at the respective times of the inventions of each of the Asserted Patents, is someone who had either: (1) a bachelor's degree in electrical engineering, mechanical engineering, biomedical engineering, or a related field, and approximately two years of relevant experience or equivalent study in systems for bioanalysis of cells; or (2) a bachelor's degree in biological science, or a related field, and approximately two years of relevant experience or equivalent study in developing systems and methods for bioanalysis of cells. Additional graduate education (such as master's or doctorate or

2

additional degree in another field) could substitute for experience, or significant experience in the field could substitute for formal education.

15.    Secondary considerations of nonobviousness, including at least a long-left and unresolved need, licensing, commercial success, copying by others, and industry praise, establish that the asserted claims of the '752 Patent are not obvious.

16.    Secondary considerations of nonobviousness, including at least a long-left and unresolved need, licensing, commercial success, copying by others, and industry praise, establish that the asserted claims of the '080 Patent are not obvious.

## IV.    <u>Axion's Unfair Competition</u>

17.    Axion made, and continues to make, false, or at least misleading, statements in violation of the Lanham Act, 15 U.S.C. § 1125(a).

18.    Axion's statements related to the Accused Products' alleged capability to measure the impedance of spheroids are false and/or misleading.

19.    Axion's false and/or misleading statements related to the Accused Products' alleged capability to measure the impedance of spheroids deceived the public.

20.    Axion's false and/or misleading statements related to the Accused Products' alleged capability to measure the impedance of spheroids are likely to mislead and confuse the public.

21.    Axion's false and/or misleading statements related to the Accused Products' alleged capability to measure the impedance of spheroids are likely to influence purchasing decisions of potential customers.

22.    Axion's false and/or misleading statements related to its the Accused Products' alleged capability to measure the impedance of spheroids injured Agilent.

3

## V.    **Damages**

23.    Agilent is entitled to lost profits resulting from Axion's patent infringement and an accompanying reasonable royalty from Axion.

24.    If Agilent is not awarded lost profits, Agilent is entitled to a reasonable royalty from Axion.

25.    Agilent is entitled to corrective advertising costs for Axion's Lanham Act violations.

26.    At least one of Agilent's products was used to practice at least one of the asserted claims of the '752 Patent before the expiration of the '752 Patent.

27.    At least one of Agilent's products was used to practice at least one of the asserted claims of the '080 Patent before the expiration of the '080 Patent.

28.    Agilent is entitled to enhanced damages, attorneys' fees, and/or costs due to Axion's willful infringement of the Asserted Patents.

# EXHIBIT 3D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AGILENT TECHNOLOGIES, INC.,      )
                                 )
    Plaintiff,               )
                                 )
    v.                       )      C.A. No. 23-198-CJB
                                 )
AXION BIOSYSTEMS, INC.,          )
                                 )
    Defendant.               )
                                 )

**EXHIBIT 3D – DEFENDANT AXION'S STATEMENT OF
ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

**TABLE OF CONTENTS**

**Page**

I.      PATENT INFRINGEMENT ............................................................................................ 2

    A.      Issues to be Litigated ...................................................................................... 2

    B.      Legal Standards ............................................................................................... 3

II.     PATENT INVALIDITY ................................................................................................ 6

    A.      Issues to be Litigated ...................................................................................... 6

    B.      Legal Standards ............................................................................................... 6

III.    PATENT DAMAGES AND REMEDIES .................................................................... 12

    A.      Issues to be Litigated .................................................................................... 12

    B.      Legal Standards ............................................................................................. 12

IV.     FALSE ADVERTISING ............................................................................................. 15

    A.      Issues to be Litigated .................................................................................... 15

    B.      Legal Standards ............................................................................................. 16

V.      FALSE ADVERTISING DAMAGES AND REMEDIES ............................................ 21

    A.      Issues to be Litigated .................................................................................... 21

    B.      Legal Standards ............................................................................................. 21

2/27/2026

# TABLE OF AUTHORITIES

**Page**

CASES

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
   561 F.3d 199 (3d Cir. 2009)................................................................................23

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
   377 U.S. 476 (1964)..............................................................................................5

*Aventis Pharma S.A. v. Hospira, Inc.*,
   743 F. Supp. 2d 305 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012)............................10

*Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*,
   561 F.2d 1365 (10th Cir. 1977) ..........................................................................23

*Bosch Auto. Serv. Sols., LLC v. Matal*,
   878 F.3d 1027 (Fed. Cir. 2017), *as amended on reh'g in part* (Mar. 15, 2018)......................11

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
   627 F. Supp. 2d 384 (D.N.J. 2009) ..............................................................21, 24

*Callaway Golf Co. v. Dunlop Slazenger*,
   384 F. Supp. 2d 735 (D. Del. 2005)......................................................22, 23, 24

*Cancer Genetics, Inc. v. Hartmayer*,
   No. 07-5463, 2008 WL 323738 (D.N.J. Feb. 5, 2008) ..........................................17

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
   576 F.3d 1348 (Fed. Cir. 2009)...........................................................................14

*CareDx, Inc. v. Natera, Inc.*,
   No. 23-2427, 2025 WL 2480117 (3d Cir. Aug. 28, 2025) ..............................20, 22

*Castrol, Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993).......................................................................18, 19, 24

*Commil USA, LLC v. Cisco Sys., Inc.*,
   575 U.S. 632 (2015)...........................................................................................4, 5

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015)............................................................................13

2/27/2026

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Creative Compounds, LLC v. Starmark Labs.*,
651 F.3d 1303 (Fed. Cir. 2011)........................................................................................3

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006)........................................................................................4

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015)........................................................................................8

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)......................................................................................14

*Exec. Home Care Franchising LLC v. Marshall Health Corp.*,
642 F. App'x 181 (3d Cir. 2016) ....................................................................................24

*Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*,
618 F.3d 1294 (Fed. Cir. 2010)..................................................................................10, 11

*Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*,
859 F. Supp. 1521 (S.D.N.Y. 1994)...............................................................................17

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)..............................................................................................................8

*Grain Processing Corp. v. American Maize-Products Co.*,
185 F.3d 1341 (Fed. Cir. 1999)......................................................................................13

*Green v. Fornario*,
486 F.3d 100 (3rd Cir. 2007) .........................................................................................24

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016)....................................................................................................14, 15

*Hoffmann-LaRoche Inc. v. Apotex Inc.*,
748 F.3d 1326 (Fed. Cir. 2014)......................................................................................10

*Honeywell Int'l Inc. v. 3G Licensing, S.A.*,
124 F.4th 1345 (Fed. Cir. 2025) ......................................................................................9

*In re Giannelli*,
739 F.3d 1375 (Fed. Cir. 2014).........................................................................................6

2/27/2026

## TABLE OF AUTHORITIES
(continued)

**Page**

*In re Huai-Hung Kao*,
   639 F.3d 1057 (Fed. Cir. 2011)......................................................................................11

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006).......................................................................................10

*Incarcerated Ent., LLC v. CNBC LLC*,
   331 F. Supp. 3d 352 (D. Del. 2018)..............................................................................17

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 784 (Fed. Cir. 2021) .......................................................................................10

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
   392 F.3d 1317 (Fed. Cir. 2004)......................................................................................11

*J & J Snack Foods, Corp. v. Earthgrains Co.*,
   No. CIV.A. 00-6230 (JBS), 2003 WL 21051711 (D.N.J. May 9, 2003)...............................24

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer
   Pharms., Inc.*,
   19 F.3d 125 (3d Cir. 1994).......................................................................................18, 19

*Kaneka Corporation v. Designs for Health, Inc.*,
   760 F. Supp. 3d 152 (D. Del. 2024).................................................................................6

*Keurig, Inc. v. Strum Foods, Inc.*,
   769 F. Supp. 2d 699 (D. Del. 2011).................................................................................18

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
   383 F.3d 1337 (Fed. Cir. 2004) (*en banc*) ...................................................................6

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007).................................................................................................8, 9

*Labware, Inc. v. Thermo Labsystems, Inc.*,
   No. CIV.A. 04-2545, 2005 WL 1541028 (E.D. Pa. June 29, 2005) ................................19, 20

*Larry Pitt & Assocs. v. Lundy Law LLP*,
   294 F. Supp. 3d 329 (E.D. Pa. 2018) ...........................................................................22, 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*
   572 U.S. 118 (2014)......................................................................................................20

2/27/2026

## TABLE OF AUTHORITIES
(continued)

**Page**

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  481 F.3d 1371 (Fed. Cir. 2007)..................................................................................7

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
  572 U.S. 915 (2014)...................................................................................................4

*LIQWD, Inc. v. L'Oreal USA, Inc.*,
  No. 17-14-JFB-SRF, 2019 U.S. Dist. LEXIS 233247 (D. Del. June 25, 2019) .....................16

*LTL Mgmt. LLC v. Moline*,
  No. 23-02990 (GC) (JTQ), 2024 WL 3219683 (D.N.J. June 28, 2024) ..................................17

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009).............................................................................5, 14

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ........................................................3

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).................................................................................11

*Meyer Intellectual Properties Ltd. v. Bodum, Inc.*,
  690 F.3d 1354 (Fed. Cir. 2012)..................................................................................3

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011)......................................................................................................7

*MicroStrategy Inc. v. Business Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005)..................................................................................4

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)..................................................................................................25

*MTD Products Inc. v. Iancu*,
  933 F.3d 1336 (Fed. Cir. 2019)..................................................................................6

*Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*,
  30 F.4th 1339 (Fed. Cir. 2022) ................................................................................14

*Novartis Consumer Health Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002)......................................................................................18

2/27/2026

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014) .........................................................................................................14

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013) ............................................................................................17

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006) .......................................................................................10

*Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
  63 F.4th 240 (3d Cir. 2023) .......................................................................................16, 17

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
  575 F.2d 1152 (6th Cir. 1978) .........................................................................................12

*Parkway Baking v. Freihofer Baking*,
  255 F.2d 641 (3d Cir. 1958) .......................................................................................21, 22

*PBM Prods., Inc. v. Mead Johnson & Co.*,
  174 F. Supp. 2d 417 (E.D. Va. 2001) ..............................................................................23

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*,
  653 F.3d 241 (3d Cir. 2011) .................................................................................18, 19, 20

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007) .......................................................................................10

*Porous Media Corp. v. Pall Corp.*,
  110 F.3d 1329 (8th Cir. 1997) .........................................................................................21

*Plantronics, Inc. v. Aliph, Inc.*,
  724 F.3d 1343 (Fed. Cir. 2013) .........................................................................................9

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  875 F.3d 1369 (Fed. Cir. 2017) .......................................................................................12

*Provisur Techs., Inc. v. Weber, Inc.*,
  119 F.4th 948 (Fed. Cir. 2024) .........................................................................................5

*QVC Inc. v. Your Vitamins Inc.*,
  439 F. App'x 165 (3rd Cir. 2011) ....................................................................................18

2/27/2026

## TABLE OF AUTHORITIES
(continued)

**Page**

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ...............................................15

*Ricoh Co., Ltd. v. Quanta Computer Inc.*,
550 F.3d 1325 (Fed. Cir. 2008)......................................................................................3

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
632 F. Supp. 2d 362 (D. Del. 2009)..............................................................................16

*Roche Diagnostics Corporation v. Meso Scale Diagnostics, LLC*,
30 F.4th 1109 (Fed. Cir. 2022) .......................................................................................5

*Rothman v. Target Corp.*,
556 F.3d 1310 (Fed. Cir. 2009)......................................................................................11

*Sage Prods., LLC v. Stewart*,
133 F.4th 1376 (Fed. Cir. 2025) ......................................................................................7

*Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*,
902 F.2d 222 (3d Cir. 1990)...........................................................................................19

*SecuraComm Consulting, Inc. v. Securacom Inc.*,
224 F.3d 273 (3d Cir. 2000)...........................................................................................24

*Seven Z Enters., Inc. v. Giant Eagle, Inc.*,
No. 2:17-CV-740, 2019 WL 7067148 (W.D. Pa. Dec. 23, 2019), *aff'd sub nom. Z View Enters., LLC v. Giant Eagle, Inc.*, 834 F. App'x 709 (3d Cir. 2020) .....................................................................................................................24

*Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*,
No. CV 16-284 LPS, 2019 WL 9698520 (D. Del. Jan 2, 2019) ...............................13

*SRI International, Inc. v. Cisco Systems, Inc.*,
930 F.3d 1295 (Fed. Cir. 2019)........................................................................................5

*State Indus., Inc. v. A.O. Smith Corp.*,
751 F.2d 1226 (Fed. Cir. 1985).....................................................................................15

2/27/2026

## TABLE OF AUTHORITIES
(continued)

**Page**

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
No. 17-1390-LPS-CJB, 2020 WL 7330715 (D. Del. Jan. 13, 2020), *aff'd*,
No. 2023-1218, 2026 WL 122544 (Fed. Cir. Jan. 16, 2026) ....................................................13

*Tech. Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008)...................................................................................................3

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001).................................................................................................7

*Toro Co. v. Textron, Inc.*,
499 F. Supp. 241 (D. Del. 1980)...............................................................................................22

*TRUSTID, Inc. v. Next Caller, Inc.*,
No. CV 18-172, 2022 WL 318299 (D. Del. Jan. 5, 2022), *aff'd*,
No. 2022-1433, 2023 WL 2298748 (Fed. Cir. Mar. 1, 2023)............................................20, 22

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999)...........................................................................................10, 11

*Wyers v. Master Lock Co.*,
616 F.3d 1231 (Fed. Cir. 2010).............................................................................................10, 11

*Zazu Designs v. L'Oreal, S.A.*,
979 F.2d 499 (7th Cir. 1992) ....................................................................................................23

**STATUTES**

15 U.S.C.
§ 1116.........................................................................................................................................24
§ 1117.....................................................................................................................................21, 23

35 U.S.C.
§ 102.........................................................................................................................................6, 7
§ 103.......................................................................................................................................6, 8, 9
§ 112.............................................................................................................................................8
§ 271.......................................................................................................................................3, 4, 5
§ 282.............................................................................................................................................7
§ 284.......................................................................................................................................12, 14
§ 285.......................................................................................................................................12, 14
§ 298.........................................................................................................................................5, 6

2/27/2026

Pursuant to D. Del. LR 16.3(c)(5), and the parties' agreement to engage in an iterative exchange of components making up the Pretrial Order, Defendant Axion BioSystems, Inc. ("Axion" ) submits the following Statement of Issues of Law That Remain to Be Litigated.

This Statement is not intended to be exhaustive, and, in addition to what is set forth herein, Axion reserves the right to prove any matters identified in the pleadings, fact and expert discovery, any of the accompanying statements of facts and legal issues to be litigated at trial, and statement of intended proofs.

To the extent that Axion's Statement of Issues of Fact That Remain to Be Litigated contains issues of law, those issues are incorporated herein by reference.    If the Court determines that any issue identified in this list as an issue of law is more properly considered an issue of fact, Axion incorporates such issues by reference into their Statement of Issues of Fact That Remain to Be Litigated.    Similarly, if the Court decides that issues that Axion has designated as issues of fact are issues of law, Axion incorporates those issues by reference into this Statement of Issues of Law That Remain to Be Litigated.

Axion's Statement of Issues of Law that Remain to Be Litigated is made pursuant to the Local Rules, the Court's orders, and the parties' agreements, and to preserve Axion's rights, based on the present status of the case.  Axion's identification of the Issues of Law That Remain to Be Litigated is based in part on its current understanding of the arguments Plaintiff Agilent is likely to make, based upon the pleadings and discovery in the action to date.  To the extent Agilent attempts to introduce different or additional legal issues to meet its burden of proof or to rebut Axion's burden of proof, Axion reserves the right to object to and/or contest those issues, and to present any and all arguments in response to those legal issues.

1                                                    2/27/2026

The parties have exchanged and/or will exchange objections and motions *in limine* and otherwise present to the Court disputes regarding the issues and evidence to be presented to the jury and the relevance and admissibility of certain testimony and exhibits. Axion's Statement of Issues of Law That Remain to Be Litigated does not waive Axion's right to object to certain categories of evidence as irrelevant or otherwise inadmissible and does not waive its right to pursue motions *in limine*. Until the Court addresses and rules on such disputes, Axion reserves the right to make final decisions regarding what issues remain to be litigated.

After the parties complete their pretrial exchange and the Court rules on motions and/or other disputes that are presented during pretrial, Axion reserves the right to further clarify its Statement of Issues of Law that Remain to Be Litigated.

## I.    PATENT INFRINGEMENT

### A.    Issues to be Litigated

1.    Whether Agilent can show by a preponderance of the evidence that Axion directly infringed the asserted claims (claims 11, 12, 14, and 18) of the '752 patent.

2.    Whether Agilent can show by a preponderance of the evidence that Axion induced others to infringe the asserted claims of the '752 patent.

3.    Whether Agilent can show by a preponderance of the evidence that Axion willfully infringed the asserted claims of the '752 patent.

4.    Whether Agilent can show by a preponderance of the evidence that Axion directly infringed the asserted claims (claims 1, 3, and 10) of the '080 patent.

5.    Whether Agilent can show by a preponderance of the evidence that Axion induced others to infringe the asserted claims of the '080 patent.

6.    Whether Agilent can show by a preponderance of the evidence that Axion willfully infringed the asserted claims of the '080 patent.

2/27/2026

**B.      Legal Standards**

7.      "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  35 U.S.C. § 271(a).

8.      "The patentee bears the burden of proving infringement by a preponderance of the evidence."  *Creative Compounds, LLC v. Starmark Labs*., 651 F.3d 1303, 1314 (Fed. Cir. 2011) (citation omitted).  That burden never shifts to the defendant.  *See Tech. Licensing Corp. v. Videotek, Inc*., 545 F.3d 1316, 1327 (Fed. Cir. 2008).

9.      In making an infringement determination, the trier of fact must compare the properly construed claims to the accused infringing method or process.  *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

10.      When "the asserted patent claims are method claims, the sale of a product, without more, does not infringe the patent.  Instead, direct infringement of a method claim requires a showing that every step of the claimed method has been practiced."  *Meyer Intellectual Properties Ltd. v. Bodum, Inc*., 690 F.3d 1354, 1366 (Fed. Cir. 2012) (citations omitted); *see also Ricoh Co., Ltd. v. Quanta Computer Inc*., 550 F.3d 1325, 1333 (Fed. Cir. 2008) ("Infringement of a method claim occurs when a party performs all of the steps of the process.") (cleaned up).

2/27/2026

11.    "If … even one claim limitation is missing or not met, there is no literal infringement." *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005) (citation omitted).

12.    "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C.§ 271(b).

13.    Induced infringement requires a showing of direct infringement by another. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 920-21 (2014).  In contrast to direct infringement, liability for inducing infringement attaches only if the defendant knew of the patent and that the induced acts constitute patent infringement.  *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015).  It also "must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement."  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (*en banc* in relevant part) (internal quotation omitted).

14.    "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."  35 U.S.C. § 271(c).

15.    "In order to succeed on a claim of contributory infringement, in addition to proving an act of direct infringement, plaintiff must show that defendant knew that the combination for which its components were especially made was both patented and infringing and that defendant's

4                                          2/27/2026

components have no substantial non-infringing uses." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009) (cleaned up).

16.     Like induced infringement, contributory infringement requires knowledge of the patent in suit and knowledge of patent infringement.  *Commil USA*, 575 U.S. at 639 (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 488 (1964)) (section 271(c) "does require a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing.")

17.     If an accused infringer "reads the patent's claims differently from the plaintiff," and if "that reading is reasonable," then the accused infringer should not be liable for indirect (induced or contributory) infringement.  *Commil USA*, 575 U.S. at 642.

18.     "To establish willfulness, a patentee must show that the accused infringer had a specific intent to infringe at the time of the challenged conduct."  *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 955 (Fed. Cir. 2024) (citation omitted).  "Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness."  *Id*. at 956 (cleaned up and citation omitted).

19.     "In some respects, the intent standard for inducement is akin to the one for willfulness, as both rest on the subjective intent of the accused infringer."  *Roche Diagnostics Corporation v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1119 (Fed. Cir. 2022).

20.     "The failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent."  35 U.S.C. § 298; *see also SRI International, Inc. v. Cisco Systems, Inc*., 930 F.3d 1295, 1309 (Fed. Cir. 2019) ("decision not to

seek an advice-of-counsel defense is legally irrelevant under 35 U.S.C. § 298."); *Kaneka Corporation v. Designs for Health, Inc.*, 760 F. Supp. 3d 152, 172 (D. Del. 2024) ("Likewise, the Federal Circuit has barred "[t]he adverse inference that an opinion was or would have been unfavorable, flowing from the infringer's failure to obtain or produce an exculpatory opinion of counsel.") (quoting *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004) (*en banc*)).

## II.    PATENT INVALIDITY

### A.    Issues to be Litigated

21.    Whether Axion can show by clear and convincing evidence that the asserted claims of the '752 patent are invalid under 35 U.S.C. § 103 as obvious.

22.    Whether Axion can show by clear and convincing evidence that the asserted claims of the '080 patent are invalid under 35 U.S.C. § 102 as anticipated.

23.    Whether Axion can show by clear and convincing evidence that the asserted claims of the '080 patent are invalid under 35 U.S.C. § 103 as obvious.

### B.    Legal Standards

24.    Each of the patents at issue in this case claim priority to an application filed prior to March 16, 2013.  Accordingly, the applicable sections of Title 35 of the United States Code related to invalidity are those that were in effect prior to the Leahy-Smith America Invents Act ("AIA"), *i.e.*, the pre-AIA version of the patent statute at 35 U.S.C. § 1 *et seq*.  *MTD Products Inc. v. Iancu*, 933 F.3d 1336, 1341 n.1 (Fed. Cir. 2019); *In re Giannelli*, 739 F.3d 1375, 1376 n.1 (Fed. Cir. 2014).

2/27/2026

25. An issued patent is presumed valid. 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

26. A party challenging validity has the burden of overcoming the presumption by clear and convincing evidence. *Microsoft*, 564 U.S. at 95.

27. A patent claim is invalid as anticipated if a prior art reference "disclose[s] every limitation of the claimed invention, either explicitly or inherently." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1381 (Fed. Cir. 2007); *see also Sage Prods., LLC v. Stewart*, 133 F.4th 1376, 1380 (Fed. Cir. 2025) ("A claim is anticipated if each and every element as set forth in the claim is found, either expressly or inherently, in a single prior art reference.").

28. Expert testimony "may be used to interpret [an] allegedly anticipating reference and to shed light on what it would have meant to" a person having ordinary skill in the art. *Sage Prods.*, 133 F.4th at 1385; *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1328 (Fed. Cir. 2001) ("[R]ecourse to extrinsic evidence is proper to determine whether a feature, while not explicitly discussed, is necessarily present in a reference.").

29. Prior art includes any of the following items: any product or method that was publicly known or used by others in the United States before the patented invention was made; any product or method that was in public use or on sale in the United States more than one year before the date the application for the patent was filed; patents or publications having a date before the invention was made or more than one year before the date the application for the patent was filed; a U.S. patent or published patent application filed before the patented invention was made. 35 U.S.C. § 102 (pre-AIA).

30. "For a patent to claim priority from the filing date of its provisional application … the specification of the *provisional* must 'contain a written description of the invention and the

7                                                        2/27/2026

manner and process of making and using it, in such full, clear, concise, and exact terms,' 35 U.S.C. § 112 ¶ 1, to enable an ordinarily skilled artisan to practice the invention *claimed* in the *non-provisional* application." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citations omitted).

31.    "To satisfy the written description requirement, the disclosure of the earlier filed application must describe the later claimed invention in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought." *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1331 (Fed. Cir. 2008) (cleaned up and citation omitted). "The prior application must convey with reasonable clarity to those skilled in the art that, as of the filing date sought, the inventor was in possession *of the invention*." *Id*. at 1332 (cleaned up and citation omitted).

32.    A patent claim is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (pre-AIA).

33.    The underlying factual considerations in an obviousness analysis, commonly referred to as the *Graham* factors, include the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and the relevant secondary considerations (or indicia) of nonobviousness. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007); *see also Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

34.    "If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in

the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR*, 550 U.S. at 417.

35.    "Applying a flexible approach to the obviousness inquiry, the Supreme Court observed that common sense can be a source of reasons to combine or modify prior art references to achieve the patented invention.  Therefore, motivation to combine may be found explicitly or implicitly in market forces; design incentives; the interrelated teachings of multiple patents; any need or problem known in the field of endeavor at the time of invention and addressed by the patent; and the background knowledge, creativity, and common sense of the person of ordinary skill."  *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) (cleaned up and citations omitted);  *see also KSR*, 550 U.S. at 418 ("[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.").

36.    "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious under § 103." *KSR*, 550 U.S. at 421.

37.    "Obviousness does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention.  Rather, the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of the claimed invention " *Honeywell Int'l Inc.*

*v. 3G Licensing, S.A.*, 124 F.4th 1345, 1355 (Fed. Cir. 2025) (cleaned up and citations omitted). "It's not necessary to show that a combination is the *best* option, only that it be a *suitable* option." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) (citation omitted).

38.   "Conclusive proof of efficacy is not necessary to show obviousness.  All that is required is a reasonable expectation of success." *Hoffmann-LaRoche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014) (citations omitted).

39.   After a patent challenger has presented a prima facie case of obviousness, the burden of persuasion shifts to the patent owner to rebut that showing through objective indicia, or secondary considerations, of nonobviousness. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

40.   Secondary considerations include commercial success, long felt but unmet need, failure of others, licensing, unexpected results, copying, and industry praise. *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 336 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010).

41.   Allegations of commercial success must be connected to the patented features to be afforded any weight. *See Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010) ("The commercial success of a product is relevant to the non-obviousness of a claim only insofar as the success of the product is due to the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("Thus, if the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant.").

42.   "[P]recedent requires that the applicant submit actual evidence of long-felt need, as opposed to argument.  This is because '[a]bsent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness.'" *In*

*re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006) (quoting *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004)).

43.    "[T]he mere fact of licensing, without more, is generally not a strong indication of nonobviousness if it cannot also be shown that the licensees did so out of respect for the patent rather than to avoid litigation expense." *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1038 (Fed. Cir. 2017), *as amended on reh'g in part* (Mar. 15, 2018).

44.    To support nonobviousness, praise of an invention must be tied to the patented features. *Geo. M. Martin*, 618 F.3d at 1305 ("Industry praise must also be linked to the patented invention.").

45.    "For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention*." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (quoting *Wyers*, 616 F.3d at 1246)).  A "nexus" is a "causal relation" between the secondary consideration and the novel and claimed features of the invention. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376-77 (Fed. Cir. 2005).  "The patentee bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show non-obviousness." *WMS Gaming*, 184 F.3d at 1359.

46.    Secondary considerations "cannot overcome a strong prima facie case of obviousness." *Wyers v.* Master *Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010); *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009) ("Indeed, a strong prima facie obviousness showing may stand even in the face of considerable evidence of secondary considerations.").

### III.    PATENT DAMAGES AND REMEDIES

#### A.    Issues to be Litigated

47.    Whether Agilent has shown that it should be awarded damages for infringement of each of the '752 and '080 patents and, if so, in what amount.

48.    Whether Agilent has shown that it should be awarded enhanced damages under 35 U.S.C. § 284 for infringement of any of the '752 and '080 patents and, if so, in what amount.

49.    Whether this case is an exceptional case under 35 U.S.C. § 285.

50.    Whether Axion or Agilent is the prevailing party, and the amount of fees, if any, and costs the prevailing party is entitled to.

#### B.    Legal Standards

51.    "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.

52.    "To recover lost profits, the patentee bears the burden of proof to show a reasonable probability that, 'but for' infringement, it would have made the sales that were made by the infringer." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (citations omitted).  "But-for" causation can be proven using the *Panduit* factors, "which requires the patentee to show: (1) demand for the patented product; (2) an absence of acceptable, noninfringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit that would have been made." *Presidio Components*, 875 F.3d at 1380 (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

53.    "The 'but for' inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee would have made."

*Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) (cleaned up). "[A] fair and accurate reconstruction of the 'but for market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner." *Id*. at 1350-51.

54.    Evidence of "available alternatives – including but not limited to products on the market" – [may be used] to preclude lost profits damages." *Grain Processing*, 185 F.3d at 1349. "[A]n available technology not on the market during the infringement can constitute a noninfringing alternative." *Id*. at 1351 (citation omitted). An expert's "failure to account for the alternative actions" an accused infringer "would foreseeably have undertaken had it not infringed is a fatal flaw in [the expert's] application of *Panduit*." *Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, No. CV 16-284 LPS, 2019 WL 9698520, at *2 (D. Del. Jan 2, 2019) (citing *Grain Processing*, 185 F.3d at 1350-51).

55.    "[U]nder 35 U.S.C. § 284 [], damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'" *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. 17-1390-LPS-CJB, 2020 WL 7330715, at *3 (D. Del. Jan. 13, 2020) (citing *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015)), *aff'd*, No. 2023-1218, 2026 WL 122544 (Fed. Cir. Jan. 16, 2026).

56.      For method claims, "[d]amages should be apportioned to separate out noninfringing uses, and patentees cannot recover damages based on sales of products with the mere capability to practice the claimed method." *Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022) (affirming district court's exclusion of damages expert's opinion as unreliable); *see also Lucent Techs.*, 580 F.3d at 1334 ("The damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers."). "[W]here the only asserted claim is a method claim, the damages base should be limited to products that were actually used to perform the claimed method." *Niazi Licensing*, 30 F.4th at 1357 (citing *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1358-59 (Fed. Cir. 2009)). And "apportionment is required even for non-royalty forms of damages." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

57.      "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

58.      An "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). A party moving for attorneys' fees must demonstrate, by a preponderance of the evidence, that a case is "exceptional." *Id*. at 557.

59.      Pursuant to 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016). Whether to award enhanced damages is committed to the Court's discretion. *Id.*

60.     The following factors can support an award of enhanced damages: deliberate copying of the ideas or design; whether the defendant, that was aware of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or not infringed; litigation behavior; defendant's size and financial condition; closeness of the case; duration of the defendant's misconduct; remedial action of the defendant; defendant's motivation for harm, and whether defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

61.     To succeed on its claim for willfulness, the patentee must present evidence that the defendant had intent to infringe at the time of the challenged conduct. *See Halo Elecs.*, 579 U.S. at 105-06.  "The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or— indeed—characteristic of a pirate." *Id.* at 103-04.  The patentee must show by a preponderance of the evidence that damages for willful infringement are warranted. *Id.* at 107.

62.     "[M]ore is necessary to support a finding of 'willfulness' than that the infringing acts were not inadvertent.  The court must determine that the infringer acted in disregard of the patent, that is, that the infringer had no reasonable basis for believing it had a right to do the acts." *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1237 (Fed. Cir. 1985) (citation omitted).

## IV.     FALSE ADVERTISING

### A.     Issues to be Litigated

63.     Whether the challenged statements regarding the capabilities of Axion's Maestro impedance products are scientific opinions, or amount to verifiable statements of fact.

64.     If the challenged statements are found to be explicit statements of fact, whether the challenged statements are unambiguous, or can be given multiple reasonable interpretations.

65.     Whether the challenged statements constitute "commercial advertising or promotion."

66.     If the challenged statements are found to be unambiguous statements of fact that constitute "commercial advertising or promotion," whether those statements are literally false, or in other words, whether Agilent has provided affirmative evidence demonstrating that Axion's Maestro impedance products lack the capabilities claimed in Axion's statements.

67.     If the challenged statements are not found to be literally false, whether the statements actually misled customers, as shown through extrinsic evidence.

68.     Whether the challenged statements are material in that they are likely to influence the purchasing decisions of consumers.

69.     Whether Agilent is required to show actual deception, or that consumers have actually been deceived by Axion's allegedly false statements.

70.     Whether Agilent has shown injury in the form of economic or reputational injury that was proximately caused by the challenged statements.

## B.     Legal Standards

71.     As a threshold matter, false advertising claims must concern statements of fact. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 632 F. Supp. 2d 362, 366 (D. Del. 2009) ("Only statements of fact capable of being proven false are actionable under the Lanham Act") (citation omitted). Statements of opinion are "generally nonactionable." *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 245 (3d Cir. 2023).

72.     Whether a statement is one of fact or opinion is a matter of law to be resolved by the Court. *Id.*; *see also LIQWD, Inc. v. L'Oreal USA, Inc.*, No. 17-14-JFB-SRF, 2019 U.S. Dist. LEXIS 233247, at *28 (D. Del. June 25, 2019) (for Lanham Act false advertising claims, "whether a statement is one 'of fact' is a legal question for the Court").

73.    Statements of scientific opinion are not statements of fact for purposes of false advertising claims.  Such statements, regarding "contested and contestable scientific hypotheses," are "more closely akin to matters of opinion, and are so understood by the relevant scientific communities."  *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013).  When statements of scientific opinion are directed at an audience "capable of performing an independent evaluation of the facts upon which an opinion is based," those statements are nonactionable.  *Pacira*, 63 F.4th at 248 n.18.  *See also LTL Mgmt. LLC v. Moline*, No. 23-02990 (GC) (JTQ), 2024 WL 3219683, at *10-11 (D.N.J. June 28, 2024) (finding statements of scientific opinion not verifiably false, and so nonactionable).

74.    Additionally, "[w]hether a statement is 'commercial advertising or promotion' is a threshold issue to determine whether a statement is actionable under the Act."  *Incarcerated Ent., LLC v. CNBC LLC*, 331 F. Supp. 3d 352, 358 (D. Del. 2018).  "Courts use the *Gordon & Breach* test to determine whether a statement at issue is 'commercial advertising or promotion' under the Act," which includes the following factors: "(1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendants goods or services ... [and] (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."  *Id*. (quoting *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994)); see also *Cancer Genetics, Inc. v. Hartmayer*, No. 07-5463, 2008 WL 323738, at *10 (D.N.J. Feb. 5, 2008) (listing factors and dismissing Lanham Act claim for failure to plead statements were made for the purpose of influencing customers to buy goods or services).

75.    To prove a statement of fact amounts to false advertising, a plaintiff must show: (1) "that the defendant has made a false or misleading statements as to his own product" or that of

another; (2) "actual deception" or, at minimum, "a tendency to deceive a substantial portion of the intended audience"; (3) that this "deception is material in that it is likely to influence purchasing decisions"; (4) "that the advertised goods traveled in interstate commerce"; and 5) a likelihood of injury, "in terms of declining sales loss, of good will, etc." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011).

76.    "There are two different theories of recovery for false advertising under § 43(a): '(1) an advertisement may be false on its face; or (2) the advertisement may be literally true, but given the merchandising context, it nevertheless is likely to mislead and confuse consumers.'" *Keurig, Inc. v. Strum Foods, Inc.*, 769 F. Supp. 2d 699, 712 (D. Del. 2011) (quoting *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993)).  A plaintiff must prove that the claim is false or misleading, not merely that it is unsubstantiated. *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994).  A plaintiff can only show that a statement is "literally false" if the statement is also unambiguous. *QVC Inc. v. Your Vitamins Inc.*, 439 F. App'x 165, 167 (3rd Cir. 2011) ("[O]nly an unambiguous message can be literally false. The greater the degree to which a message relies upon the viewer . . . to integrate its components and draw the apparent conclusion . . . the less likely it is that a finding of literal falsity will be supported.") (citation omitted).  If a statement is ambiguous (or, in other words, has multiple reasonable interpretations), it cannot be found "literally false."

77.    "A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Keurig*, 769 F. Supp. 2d at 712 (quoting *Novartis Consumer Health Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586–87 (3d Cir. 2002)).  "Conversely, '[w]hen the challenged advertisement is implicitly

rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction.'" *Id*. (quoting *Castrol*, 987 F.2d. at 943).

78.     In determining if a claim is false or misleading, the "target audience's special knowledge of a class of products is highly relevant to any claim that it was misled by an advertisement for such a product." *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc*., 902 F.2d 222, 229-30 (3d Cir. 1990) (concluding that plaintiff failed to prove pediatricians would be misled by information sheet was not clearly erroneous finding).

79.     When a statement is not literally false, a plaintiff must prove "that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience." *Pernod Ricard USA*, 653 F.3d at 248.  A plaintiff must make this showing of actual deception or a tendency to deceive with extrinsic evidence as a plaintiff "cannot obtain relief by showing how consumers *could* react; it must show how consumers *actually do* react." *Sandoz Pharms*, 902 F.2d at 228-229; *see also Labware, Inc. v. Thermo Labsystems, Inc.*, No. CIV.A. 04-2545, 2005 WL 1541028, at *10-11 (E.D. Pa. June 29, 2005) (determining plaintiff failed to prove actual deception as evidence showed consumers were "extremely smart people" who conducted an assessment of the product's functionality before purchase).  "Public reaction is the measure of a commercial's impact. . . [and] the success of the claim usually turns on the persuasiveness of a consumer survey." *Johnson & Johnson-Merck Consumer Pharms.*, 19 F.3d at 129-30, 136 ("Absent such evidence [of well-designed consumer surveys], neither the district court nor this court can conclude that consumers were misled.").

80.     A plaintiff must also show that the false or misleading statements were material to consumers' purchasing decisions, regardless of whether the claim is false or misleading. *See Johnson & Johnson-Merck Consumer Pharms.*, 19 F.3d at 129-130, 136 (advising that the only

<div align="center">19</div>

presumption that applies to literally false claims is with respect to deception); *see also Pernod Ricard USA*, 653 F.3d at 248 (noting plaintiff must establish the relevant statement "is material in that it is likely to influence purchasing decisions"). This analysis must take into account the target audience: when a product's target consumers are sophisticated customers who thoroughly analyze a product before its purchase, those consumers must be accounted for in determining materiality. *See, e.g., Labware*, 2005 WL 1541028 at \*10-11 (finding no evidence that sophisticated customers were likely to be swayed by marketing claims). "Evidence sufficient to prove materiality generally establishes a causal nexus between the false statement and purchasing decision." *TRUSTID, Inc. v. Next Caller, Inc.*, No. CV 18-172, 2022 WL 318299, at \*9 (D. Del. Jan. 5, 2022), *aff'd*, No. 2022-1433, 2023 WL 2298748 (Fed. Cir. Mar. 1, 2023).

81.    Finally, a plaintiff must show "injury to the plaintiff in terms of declining sales, loss of good will, etc." *Pernod Ricard USA*, 653 F.3d at 248. This must amount to "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.* 572 U.S. 118, 133 (2014). The false advertising must be the proximate cause of this injury. *Id.*

82.    When a party seeks money damages for its false advertising, it must present proof of actual deception. *CareDx, Inc. v. Natera, Inc.*, No. 23-2427, 2025 WL 2480117, at \*9 (3d Cir. Aug. 28, 2025) ("To obtain damages, a plaintiff must prove both that the advertisement was false and that the falsehood 'actually deceive[d] a portion of the buying public.'"); *TRUSTID*, 2022 WL 318299, at \*7 ("[W]here a plaintiff seeks only money damages for a Lanham Act violation, plaintiff must present proof of actual deception").

## V.      FALSE ADVERTISING DAMAGES AND REMEDIES

### A.      Issues to be Litigated

83.      Whether Agilent must show actual customer deception to recover monetary damages from the challenged statements.

84.      Whether "damage control costs" are distinct from monetary damages, and, if so, whether evidence of actual consumer deception is required to collect such "damage control costs."

85.      Whether a party is able to recover prospective corrective advertising damages, as a matter of law, when it was capable of conducting corrective advertising before trial.

86.      Whether there is an economic rationale for Agilent's recovery of prospective corrective advertising.

87.      Whether the challenged statements were the proximate cause of Agilent's alleged damages.

88.      Whether Agilent is entitled to attorneys' fees as a result of the alleged false advertising pursuant to 15 U.S.C. § 1117.

89.      Whether Axion is entitled to attorneys' fees pursuant to 15 U.S.C. § 1117.

90.      Whether Agilent is entitled to a permanent injunction as a result of the alleged false advertising.

### B.      Legal Standards

91.      In the Third Circuit, the causation standard for a damages award is higher than that for injunctive relief: "courts require a heightened level of proof of injury in order to recover money damages." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 480 (D.N.J. 2009) (*citing Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997); *Parkway Baking v. Freihofer Baking*, 255 F.2d 641, 648-49 (3d Cir. 1958)).

92.     In the Third Circuit, a plaintiff must prove actual customer deception to recover monetary damages in false advertising cases. *See Parkway Baking*, 255 F.2d at 648 (3d Cir. 1958) ("[A] plaintiff in order to make out a cause of action for damages under Section 43(a) must show not only that the defendant's advertisement is false but also that this falsification actually deceives a portion of the buying public."); *CareDx*, 2025 WL 2480117, at *9 ("To obtain damages, a plaintiff must prove . . . that the falsehood actually deceive[d] a portion of the buying public.").

93.     Third Circuit courts routinely require "a showing of some customer reliance on the false advertisement" to recover damages under Section 43(a) of the Lanham Act. *Id*.; *see TRUSTID*, 2022 WL 318299, at *7 ("[W]here a plaintiff seeks only money damages for a Lanham Act violation, plaintiff must present proof of actual deception."); *see also Toro Co. v. Textron, Inc*., 499 F. Supp. 241, 254 (D. Del. 1980) ("There is no evidence that any consumer, dealer or distributor relied on the [] advertisement . . . This deficiency is fatal to [plaintiff's] damage claim.").

94.     Further, the plaintiff must show that the allegedly false advertising is the proximate cause of those sales: "The plaintiff bears the burden of showing that the sales for which it seeks disgorgement occurred because of the alleged false advertising." *Larry Pitt & Assocs. v. Lundy Law LLP*, 294 F. Supp. 3d 329, 342 (E.D. Pa. 2018) (finding plaintiff failed to establish unjust enrichment because it did not establish a causal link between the claimed misrepresentations and any profits).

95.     While some courts have distinguished between "damage control costs," such as corrective advertising, and "marketplace damages," the Third Circuit has not: an award of "damage control costs," such as for corrective advertising, constitutes "an award of money" that acts "as a surrogate for plaintiff's damages or defendant's profit." *Callaway Golf Co. v. Dunlop Slazenger*,

384 F. Supp. 2d 735, 741 (D. Del. 2005) (cleaned up).  Further, "a court may only grant damages to pay for corrective advertising when such damages are justifiable as 'a surrogate for plaintiff's damages or defendant's profit'" and that "plaintiffs seeking such corrective advertising damages usually must show some public confusion caused by the defendant's conduct that injures the plaintiff and is most cost-effectively corrected through remedial advertising."  *Larry Pitt & Assocs.*, 294 F.Supp. 3d at 342 (quoting *Callaway Golf*, 384 F.Supp. 2d at 741).

96.     There must also be an "economic rationale" for an award of damages for prospective corrective advertising.  *See, e.g., Callaway Golf*, 384 F. Supp. 2d at 740-41 (citing *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506, 509 (7th Cir. 1992) ("To justify damages to pay for corrective advertising a plaintiff must show that the confusion caused by the defendant's mark injured the plaintiff and that repair of the old mark . . . is the least expensive way to proceed.")).

97.     To obtain an award for prospective corrective advertising, a party must show that it was unable to conduct corrective advertising before trial; courts will decline to award prospective corrective advertising when a party was able to conduct a corrective advertising campaign before trial, but has failed to do so.  *See PBM Prods., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 420 (E.D. Va. 2001) ("In order for a plaintiff to recover purely prospective corrective advertising expenditures, he or she must prove that . . . he or she is unable to undertake a corrective advertising campaign concurrently with the wrong a plaintiff seeks to redress in court[.]") (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375 (10th Cir. 1977)).

98.     Under 15 U.S.C. § 1117(a), the Lanham Act authorizes an award of attorneys' fees for "exceptional cases," which the Third Circuit has held "involve culpable conduct on the part of the losing party, 'such as bad faith, fraud, malice, or knowing infringement.'"  *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 230 (3d Cir. 2009) (declining to award attorneys'

fees, notwithstanding a jury verdict, when there was a "foundation" for the losing party's conduct) (quoting *SecuraComm Consulting, Inc. v. Securacom Inc.,* 224 F.3d 273, 280 (3d Cir. 2000)). For false advertising cases, "willfulness and bad faith require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense." *Callaway Golf*, 384 F. Supp. 2d at 742 (internal citations and quotations omitted). "'Voluntary, knowing and intentional misconduct' is considered an indicator of willfulness." *Id.* (quoting *Castrol*, 169 F.Supp. 2d at 341). In addition to culpable conduct, to find a case exceptional, a court must find that "the circumstances justify altering the general American rule that parties to litigation pay their own attorneys fees (*e.g.*—closeness of liability, damages suffered by plaintiff)." *Bracco*, 627 F. Supp. 2d at 492 (citing *Green v. Fornario*, 486 F.3d 100, 103-04 (3rd Cir. 2007)). Courts may find a Lanham Act case exceptional where a plaintiff presses forward with its case despite being unable to present evidence necessary to show the case had merit. *See, e.g., J & J Snack Foods, Corp. v. Earthgrains Co.*, No. CIV.A. 00-6230 (JBS), 2003 WL 21051711, at *5-6 (D.N.J. May 9, 2003).

99.     Although courts "have the power to grant injunctions" for Lanham Act violations, "according to the principles of equity," 15 U.S.C. § 1116, injunctive relief "is an extraordinary remedy that should be granted only in limited circumstances." *Exec. Home Care Franchising LLC v. Marshall Health Corp.*, 642 F. App'x 181, 182 (3d Cir. 2016). "[A] permanent injunction may only issue when the party seeking injunctive relief has established (1) irreparable injury; (2) inadequacy of other remedies at law, like money damages, to compensate that injury; (3) that the balancing of the equities between the parties favors injunctive relief; and (4) that 'the public interest would not be disserved by a permanent injunction.'" *Seven Z Enters., Inc. v. Giant Eagle, Inc.*, No. 2:17-CV-740, 2019 WL 7067148, at *9 (W.D. Pa. Dec. 23, 2019), *aff'd sub nom. Z View*

*Enters., LLC v. Giant Eagle, Inc.*, 834 F. App'x 709 (3d Cir. 2020) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010)).

2/27/2026

# EXHIBIT 3P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 23-198 (CJB) |
| | ) |
| AXION BIOSYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

**EXHIBIT 3P TO PRETRIAL ORDER – PLAINTIFF'S STATEMENT OF
ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

Agilent identifies the following issues of law that remain to be litigated. The following statements are not exhaustive, and Agilent reserves the right to prove any matters identified in its pleadings, interrogatory responses, or expert reports. Agilent further intends to offer evidence to rebut evidence offered by Axion. Agilent reserves the right to amend or supplement this statement as part of the meet and confer process leading up to trial, in response to Axion's pretrial disclosures and objections, and in response to any pretrial rulings or further orders from the Court.

To the extent Agilent's statement of the issues of fact that remain to be litigated, which is submitted as Exhibit 2P to this Order, contains issues of law, Agilent incorporate those issues of law by reference. To the extent that any issue of law Agilent identifies below is more properly an issue of fact, Agilent incorporates those statements into Agilent's statement of the issues of fact that remain to be litigated.

## I.    INFRINGEMENT

**Issues of Law to be Litigated**

1.    Whether Axion directly infringes at least one asserted claim of the '752 Patent.

2.    Whether Axion indirectly infringes, via induced infringement, at least one asserted claim of the '752 Patent literally.

3.    Whether Axion's infringement of at least one asserted claim of the '752 Patent was willful.

4.    Whether Axion directly infringes at least one asserted claim of the '080 Patent.

5.    Whether Axion indirectly infringes, via induced infringement, at least one asserted claim of the '080 Patent.

6.    Whether Axion's infringement of at least one asserted claim of the '080 Patent was willful.

1

**Legal Authority**

7.      Patentees have the burden of proving infringement by a preponderance of the evidence. *Creative Compounds, LLC v. Starmark Labs*., 651 F.3d 1303, 1314 (Fed. Cir. 2011). This same burden of proof applies to both direct and indirect infringement. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp*., 859 F.2d 878, 889 (Fed. Cir. 1988) (direct infringement); *Manville Sales Corp. v. Paramount Sys., Inc*., 917 F.2d 544, 553 (Fed. Cir. 1990) (induced infringement); *i4i Ltd. P'ship v. Microsoft Corp*., 598 F.3d 831, 848 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) (contributory infringement).

8.      "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Martek BioSciences Corp. v. Nutrinova, Inc*., 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal citations and quotations omitted); *Liquid Dynamics Corp. v. Vaughan Co., Inc*., 449 F.3d 1209, 1219 (Fed. Cir. 2006) ("A patentee may prove direct infringement or inducement of infringement by either direct or circumstantial evidence." (citation omitted)).

9.      In making an infringement determination, the trier of fact must compare the properly construed claims to the accused infringing method or process. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).

### A.      Direct Infringement

10.      35 U.S.C. § 271 provides: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

2

11.     To prevail on infringement, the patentee "must establish by a preponderance of the evidence that the accused device infringes one or more claims of the patent either literally or under the doctrine of equivalents." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001).

12.     A patent claim is literally infringed when each element of the claim is literally found in the accused product. *Markman*, 517 U.S. at 384-91; *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003). "Direct infringement requires a party to perform each and every step or element of a claimed method or product." *Forest Labs. Holdings Ltd. v. Mylan Inc.,* 206 F. Supp. 3d 957, 973 (D. Del. 2016) (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009)).

13.     "Infringement is a question of fact." *Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1275 (Fed. Cir. 2013).

## B.     Indirect Infringement

14.     "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "To prove inducement of infringement, the patentee must show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute infringement. In other words, [patentee is] required to prove that: (1) a third party directly infringed the asserted claims of the [asserted] patents; (2) [defendant] induced those infringing acts; and (3) [defendant] knew the acts it induced constituted infringement." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016). A third party's infringement may be either literal or under the doctrine of equivalents. *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1276 (Fed. Cir. 2011).

3

15.     "Section 271(b), on inducement, does not contain the 'substantial noninfringing use' restriction of 271(c), on contributory infringement. Thus, a person can be liable for inducing an infringing use of a product even if the product has substantial noninfringing uses." *Vanda Pharms. Inc. v. West-Ward Pharms. Int'l, Ltd.*, 887 F.3d. 1117, 1133 (Fed. Cir. 2018) (internal citations and quotations omitted); *Sanofi v. Glenmark Pharms. Inc., USA*, 204 F. Supp. 3d 665, 679–80 (D. Del. 2016) (rejecting Defendants' argument that it does not induce infringement because its medication labels also induce other, non-infringing uses).

16.     A defendant's "good-faith" belief regarding patent validity is not a defense to a claim of induced infringement. *See Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 642–43 (2015). Willful blindness can satisfy the knowledge requirement for active inducement. *See Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1347 (Fed. Cir. 2016) (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)); *see also Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1118 (Fed. Cir. 2022) ("The intent element requires 'knowledge that the induced acts constitute patent infringement,' which can be established by a proper finding of 'willful blindness.'") (quoting *Global-Tech*, 563 U.S. at 766-71)). "[T]he doctrine of willful blindness requires the patentee to show not only that the accused subjectively believed that there was a high risk of infringement, but also that the accused took deliberate actions to avoid confirming infringement." *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1364 (Fed. Cir. 2016). "Providing instructions to use a product in an infringing manner is evidence of the required mental state for inducing infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 905 (Fed. Cir. 2014).

## C.    **Willful Infringement**

17.    Willful infringement is shown where the patentee "actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (internal quotation marks omitted). Willful infringement must be shown by a preponderance of the evidence. *Halo Elecs., Inc. v. Pulse Elec., Inc.*, 579 U.S. 93, 107–08 (2016).

18.    Egregious or shocking infringement behavior is not required for a jury to find willful infringement. *See, e.g., Deere & Co. v. AGCO Corp.*, No. 18-1827-CFC, 2019 WL 668492, at *5 (D. Del. Feb. 19, 2019); *Align Tech., Inc. v. 3Shape A/S*, 339 F. Supp. 3d 435, 448 (D. Del. 2018); *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 342 (S.D.N.Y. 2019). Knowledge of a patent before litigation and a lack of evidence of a pre-litigation belief in invalidity can be evidence of willfulness. *See Arctic Cat Inc.*, 876 F.3d at 1371; *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245 (Fed. Cir. 2017); *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 330 F. Supp. 3d 574, 609-10 (D. Mass. 2018); *Dentsply Sirona, Inc. v. Edge Endo*, LLC, No. 17-1041 WJ/SCY, 2019 WL 1517584, at *4 (D.N.M. Apr. 8, 2019); *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, No. CV 07-8108, 2018 WL 6190604, at *23 (C.D. Cal. Nov. 4, 2018). "Section 284 allows district courts to punish the full range of culpable behavior." *Halo Elecs.*, 579 U.S. at 106.

19.    To sustain a claim of willful infringement, a "patentee need only prove 'subjective willfulness alone.'" *Plastic Omnium Advanced Innovation & Research v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 421 (D. Del. 2018) (quoting *WesternGeco L.L.C. v. ION. Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016)). "The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was

5

objectively reckless." *Halo Elecs.,* 579 U.S. at 105. "Proof of an objectively reasonable litigation-inspired defense to infringement is no longer a defense to willful infringement." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016).

20.    Determining willfulness is a question for the jury. *Richardson v. Suzuki Motor Co. Ltd.*, 868 F.2d 1226, 1250 (Fed. Cir. 1989).

## II.    <u>INVALIDITY</u>

**Issues of Law to be Litigated**

21.    Whether Axion has proven by clear and convincing evidence that each and every asserted claim of the '752 Patent is invalid under § 103 as obvious.

22.    Whether Axion has proven by clear and convincing evidence that the asserted claim of the '255 Patent is invalid under § 103 as obvious.

23.    Whether Axion has proven by clear and convincing evidence that each and every asserted claim of the '080 Patent are invalid under § 102 as anticipated.

24.    Whether Axion has proven by clear and convincing evidence that each and every asserted claim of the '080 Patent are invalid under § 103 as obvious.

25.    Whether the '080 Patent is entitled to a priority date of July 20, 2002.

**Legal Authority**

26.    Patents are presumed valid and a party challenging the validity of a patent must prove invalidity by clear and convincing evidence, and that burden never changes. 35 U.S.C. § 282(a); *see also Microsoft Corp. v. i4i Ltd. P'Ship*, 131 S. Ct. 2238, 2242 (2011); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1346 (Fed. Cir. 2008). Clear and convincing evidence is evidence that "could place in the ultimate factfinder an abiding conviction that the truth of [the] factual

6

contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *see also Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).

### A.   **Priority**

27.   "An application for patent for an invention disclosed in the manner provided by section 112(a) (other than the requirement to disclose the best mode) in an application previously filed in the United States, or as provided by section 363 or 385, which names an inventor or joint inventor in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application." 35 U.S.C. §120.

28.   35 U.S.C. § 120 allows a later-filed patent application to claim the benefit of an earlier filing date in the United States if "the claims of the later-filed application [are] supported by the written description in the parent 'in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.'" *EnOcean GmbH v. Face Intern. Corp.*, 742 F.3d 955, 960 (Fed. Cir. 2014).

29.   "It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112." *In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995) (citing 35 U.S.C. § 120 and *Mendenhall v. Cedarapids Inc.*, 5 F.3d 1557, 1566 (Fed. Cir. 1993) ("A patentee cannot obtain the benefit of the filing date of an earlier application where the claims in issue could not have been made in the earlier application.")). Thus,

a later filed patent application is entitled to the benefit of the earlier filed application if the earlier filed application discloses the subject matter claimed in the later application. *Id.*

### B.    Anticipation

30.    "[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991), overruled in part by *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009).

31.    "To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1381 (Fed. Cir. 2007); *see also Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991).

32.    Inherent anticipation can only be found "when the reference discloses prior art that must *necessarily* include the unstated limitation." *Transclean Corp.*, 290 F.3d at 1373. Inherent anticipation cannot "be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991) (internal quotation marks omitted).

33.    Expert testimony "may be used to interpret [an] allegedly anticipating reference and to shed light on what it would have meant to" a person having ordinary skill in the art. *Sage Prods., LLC v. Stewart*, 133 F.4th 1376, 1385 (Fed. Cir. 2025); *see also Telemac Cellular Corp.*

8

*v. Topp Telecom, Inc.*, 247 F.3d 1316, 1328 (Fed. Cir. 2001) ("[R]ecourse to extrinsic evidence is proper to determine whether a feature, while not explicitly discussed, is necessarily present in a reference.").

### C.    Obviousness

34.    Obviousness is a question of law that is based on underlying issues of fact. *KSR*, 550 U.S. at 427.

35.    Patent claims are invalid as obvious only "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." 35 U.S.C. § 103.

36.    The determination of whether an invention would have been obvious under 35 U.S.C. §103 is a legal conclusion based on underlying findings of fact. *In re Sullivan*, 498 F.3d 1345, 1350 (Fed. Cir. 2007). That determination requires a factual inquiry into: (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the prior art and the claimed invention; and (4) the extent of any objective indicia of non-obviousness. *KSR*, 550 U.S. at 398, 406–07 (citing *Graham*, 383 U.S. at 17-18).

37.    The obviousness determination must be made from the perspective of a person of ordinary skill. 35 U.S.C. § 103; *Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007). The hypothetical person of ordinary skill is "presumed to know all the pertinent prior art, whether or not the applicant is actually aware of its existence." *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1992). The person of ordinary skill is attributed "knowledge of all prior art in the field of the inventor's endeavor and of prior art solutions for a common problem even if outside that field." *In re Nilssen*, 851 F.2d 1401, 1403 (Fed. Cir. 1988). Factors that may

9

be considered are: (1) "type of problems encountered in the art," (2) "prior art solutions to those problems," (3) "rapidity with which innovations are made," (4) "sophistication of the technology," and (5) "educational level of active workers in the field." *In re GPAC Inc*., 57 F.3d 1573, 1579 (Fed. Cir. 1995). "In a given case, every factor may not be present, and one or more factors may predominate." *Id*.

38.    "To invalidate a patent claim based on obviousness, a challenger must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (quoting *Procter & Gamble*, 566 F.3d at 994); *see also Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention.") (emphasis in original).

39.    In analyzing obviousness, the inquiry is from the time of the invention. *Canfield Sci., Inc. v. Melanoscan, LLC*, 987 F.3d 1375, 1382 (Fed. Cir. 2021). Both the suggestion and the reasonable expectation of success "must be founded in the prior art, not in the applicant's disclosure." *Noelle v. Lederman*, 355 F.3d 1343, 1352 (Fed. Cir. 2004). "The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight. What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012); *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000). "A factfinder should be aware, of

10

course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." *KSR*, 550 U.S. at 421.

40.     Evidence of non-obviousness may often be the most probative and cogent evidence in the record and may often establish that an invention appearing to have been obvious in light of the prior art was not. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

41.     The question of obviousness requires consideration of objective indicia of nonobviousness, also referred to as secondary considerations of nonobviousness. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1996)); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007); *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1353-54 (Fed. Cir. 2013). "Objective evidence of nonobviousness can include copying, long felt but unresolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, . . . skepticism of skilled artisans before the invention" and commercial success. *Power Integrations,* 711 F.3d at 1368 (Fed. Cir. 2013); *see also WBIP,* 829 F.3d at 1336; *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 344 (D. Del. 2010), aff'd, 675 F.3d 1324; *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1245-46 (Fed. Cir. 2010). "These objective criteria help inoculate the obviousness analysis against hindsight." *InTouch Techs., Inc. v. VGo Communs., Inc.*, 751 F.3d 1327 (Fed. Cir. 2014) (quoting *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1076-77 (Fed. Cir. 2012).

## III.    UNFAIR COMPETITION

**Issues of Law to be Litigated**

42.    Whether Axion's commercial advertising and marketing activities regarding Axion's Maestro products' ability to measure the impedance of spheroids include literally false statements.

43.    Whether Axion's commercial advertising and marketing activities regarding Axion's Maestro products' alleged ability to measure the impedance of spheroids include misleading statements.

44.    Whether Axion's statements regarding Axion's Maestro products' alleged ability to measure the impedance of spheroids are likely to mislead and confuse the public.

45.    Whether Axion's statements regarding Axion's Maestro products' alleged ability to measure the impedance of spheroids actually deceived consumers.

46.    Whether Axion's statements regarding Axion's Maestro products' alleged ability to measure the impedance of spheroids are material to consumer purchasing decisions.

47.    Whether Axion's statements regarding Axion's Maestro products' alleged ability to measure the impedance of spheroids traveled in interstate commerce.

48.    Whether Agilent was injured by Axion's statements regarding Axion's Maestro products' ability to measure the impedance of spheroids.

**Legal Authority**

49.    To prove a violation of section 1125 of the Lanham Act, a plaintiff has the burden of proving the five elements: (1) that the defendant has made false or misleading statements; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing

12

decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91-92 (3d Cir. 2000).

50.     Whether challenged statements are false or misleading is typically a question of fact to be decided by the factfinder. *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 229 (3d Cir. 2007).

51.     The factfinder "may find that a completely unsubstantiated advertising claim by the defendant is per se false without additional evidence from the plaintiff to that effect." *Warner-Lambert*, 204 F.3d at 92; *Trustid, Inc. v. Next Caller, Inc.*, No. 18-172 (MN), 2022 WL 318299, at *7 (D. Del. Jan. 5, 2022). A claim is completely unsubstantiated if the advertiser had no semblance of support for the claim at the time it was made. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 590 (3d Cir. 2002).

52.     "The 'touchstone' of whether a defendant's statements amount to the requisite commercial advertising or promotion is 'that the contested representations are part of an organized campaign to penetrate the relevant market.'" *Shure Inc. v. ClearOne, Inc.*, No. 19-1343-RGA-CJB, 2020 WL 2839294, *6–7 (D. Del. June 1, 2020) (quoting *Progressive Sterilization, LLC v. Turbett Surgical, LLC*, Civil Action No. 19-627-CFC, 2020 WL 1849709, at *10 (D. Del. Apr. 13, 2020). "While advertising is generally understood by courts to consist of widespread communication through print or broadcast media, promotion may take other forms of publicity used in the industry at issue, such as sales presentations to buyers." *Id*. (internal quotation marks omitted)

53.     Liability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous but has the tendency to deceive consumers. *Novartis*, 290 F.3d at 586; *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993) ("a plaintiff must prove

either literal falsity or consumer confusion, but not both"). *Groupe SEB United States, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014) ("Proof of literal falsity relieves the plaintiff of its burden to prove actual consumer deception."). In analyzing whether an advertisement is literally false, "a court must decide first whether the claim conveys an unambiguous message and second whether that unambiguous message is false." *Id.* (citing *Novartis*, 290 F.3d at 586); *TSI Prods. v. Armor ALL/STP Prods. Co.*, No. 3:18-cv-1682 (MPS), 2019 WL 4600310, at *10 (D. Conn. Sep. 23, 2019). Statements can be literally false either explicitly or "by necessary implication." *Novartis*, 290 F.3d at 586-87, 589.

54.     A plaintiff satisfies its burden to show literal falsity on claims that explicitly or implicitly represent that tests or studies prove its product is superior by demonstrating "even if reliable, [the tests] do not establish the proposition asserted by the defendant." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992); *Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, 702 F. Supp. 2d 266, 275 (D. Del. 2010). "The test for literal falsity is an objective one for the court's determination. '[I]f a defendant's claim is untrue, it must be deemed literally false' regardless of the advertisement's impact on the buying public. *Id.* at 271 (citing *Castrol v. Pennzoil*, 987 F.2d at 943–44).

55.     "False-advertising jurisprudence presumes that when a defendant has made a literally false statement, consumer confusion will result." *QVC Inc. v. Your Vitamins Inc.*, 439 F. App'x 165, 167 (3d Cir. 2011); *see also Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) ("actual deception or a tendency to deceive is presumed if a plaintiff proves that an advertisement is unambiguous and literally false.") (citing *Novartis*, 290 F.3d at 586)). "A Lanham Act plaintiff may be permitted to presume that consumers expect advertisers to have at least some semblance of support for their publicly-disseminated claims."

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228 n.7 (3d Cir. 1990). Where a plaintiff establishes that false advertising claims are literally false, there is a presumption of materiality and deception. *Bracco Diagnostics v. Amersham Health*, 627 F. Supp. 2d 384, 424 (D.N.J. 2009).

56.    Where a defendant has intentionally set out to deceive the public, a court may presume that consumers are being deceived. *See Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics*, 843 F.3d 48, 67–68 (2d Cir. 2016); *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F.Supp.2d 404, 421 (S.D.N.Y. 2013).

57.    A statement is material if it is "likely to influence purchasing decisions." *Pernod Ricard*, 653 F.3d at 248. Statements are also material when parties "are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiffs." *Church & Dwight Co.,* 843 F.3d at 70-71.

58.    "[W]here the parties are direct competitors in a two-player market, and where literal falsity and willful, deliberate deception have been proved, the presumptions of injury and consumer confusion may be used for the purposes of awarding both injunctive relief and monetary damages to a successful plaintiff." *Merck Eprova AG, v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014); *see also Trustid*, 2022 WL 318299, at *9 n.16 (holding that the injury element was met where the parties were in direct competition for customers "which would reasonably imply that any customer Defendant obtained because of its false statement were customers that were diverted from Plaintiff").

59.    Commercial advertisements are not immune from Lanham Act actions simply because their claims are open to scientific debate. *Cent. Hudson Gas & Elec. Corp.v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562-63 (1980); *Eastman Chem. Co. v. Plastipure, Inc.*,

15

775 F.3d 230, 237 (5th Cir. 2014) (holding the Lanham Act prohibits false commercial speech even when that speech makes scientific claims); *Mimedx Grp., Inc. v. Osiris Therapeutics, Inc.*, 16 Civ. 3645 (KPF), 2017 WL 3129799, at *6-8 (S.D.N.Y. July 21, 2017) (finding a press release and brochure did not constitute scientific opinion).

60.     Secondary dissemination of scientific opinions can still violate the Lanham Act where the dissemination using the scientific opinions is promotional in nature. *See Bracco*, 627 F. Supp. 2d at 458 (holding an advertising campaign using a protected scientific article was promotional in nature and constituted commercial speech); *OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*, Civil Action No. 4:16-cv-00350-ALM, 2017 WL 1753376, at *3 (E.D. Tex. May 2, 2017) ("[d]issemination of a scientific article as part of a company's marketing campaign is for promotional purposes and therefore qualifies as commercial speech") (citing *Eastman*, 775 F.3d at 237).

## IV.    DAMAGES

### Issues of Law to be Litigated

61.     Whether Agilent should receive lost profits due to Axion's infringement of at least one of the asserted claims of the '752 and/or '080 Patents.

62.     Whether Agilent should receive reasonable royalty damages in addition to lost profits due to Axion's infringement.

63.     Whether Agilent should receive reasonable royalty damages if Agilent is not awarded lost profits due to Axion's infringement.

64.     Whether Agilent should receive corrective advertising damages due to Axion's Lanham Act violations.

16

65.    Whether Agilent is entitled to enhanced damages, attorneys' fees, and/or costs for Axion's infringement and/or Lanham Act violations.

**Legal Authority**

66.    35 U.S.C. section 284 provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.

67.    "[T]he patent owner bears the burden of proving by a preponderance of the evidence the quantum of damages, an issue of fact." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).

68.    While damages should be apportioned to separate out noninfringing uses, *Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022), there is no "rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009). Experts may rely on evidence "that estimated the amount or percentage of sold devices that were actually used to infringe the claimed method." *SB IP Holdings, LLC v. Vivint, Inc.*, Civil Action No. 4:20-cv-00886, 2023 WL 6601415, at *8 (E.D. Tex. Oct. 10, 2023) (citing *Niazi Licensing Corp.*, 30 F.4th at 1357).

A.    **Lost Profits**

69.    "A patentee may seek to recover actual damages, usually, the amount of profits actually lost . . . ." *SmithKline Diagnostics,* 926 F.2d at 1164 (citations omitted). "[T]he amount of a prevailing party's damages is a finding of fact on which the plaintiff bears the burden of proof by a preponderance of the evidence." *Id.*

17

70.     A plaintiff may prove the amount of its lost sales by the factors set forth in the *Panduit* test, whereby the plaintiff bears the burden of proving "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of profit that would have been." *DePuy Spine,* 567 F.3d at 1329 (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

71.     To recover lost profits damages, "[a] patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement. The patentee need only show that there was a reasonable probability that the sales would have been made 'but for' the infringement." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995).

72.     Modifications to the *Panduit* approach are permissible under certain market conditions. *See e.g., State Indus. v. Mor-Flo Indus.*, 883 F.2d 1573 (Fed. Cir. 1989) (affirming award of lost profits damages based on market share).

### B.     <u>**Reasonable Royalty**</u>

73.     The reasonable royalty may be based on a determination of "the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began" – the "hypothetical negotiation." *Lucent Techs., Inc.*, 580 F.3d at 1324; *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012). "While the Federal Circuit has not prescribed a specific methodology for calculating a reasonable royalty, courts rely upon the fifteen factors set forth in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *St. Clair Intell. Prop. Consultants, Inc. v. Canon, Inc.*, 2004 WL 2213562 (D. Del. Sept. 28, 2004); *accord Lucent*

*Techs., Inc.*, 580 F.3d at 1324. "[I]n conducting the hypothetical negotiation, the Court is permitted to look to events and facts that occurred after the infringement began." *Mobil Oil Corp. v. Amoco Chems. Corp.*, 915 F. Supp. 1333, 1353 (D. Del. 1994) (citing *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988)). "The Court also must assume, for purposes of the hypothetical negotiation, that all parties would have known all relevant information." *Id. at* 1353. The hypothetical negotiation speaks of negotiations as of the time infringement began, yet a court may look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothetical negotiators. *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1571-72 (Fed. Cir. 1988); *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 689 (1933). A jury may consider industry royalty rates in determining an applicable royalty rate, but these "do not necessarily establish a ceiling for the royalty that may be assessed after an infringement trial." *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 617 (Fed. Cir. 1984).

74.    The fifteen factors established in *Georgia–Pacific Corp. v. United States Plywood Corp.* are as follows:

1)    The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty,

2)    The rates paid by Defendants to license other patents comparable to the Asserted Patents.

3)    The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4)      The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5)      The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business.

6)      The effect of selling the patented product in promoting other sales of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such convoyed sales.

7)      The duration of the Asserted Patents and the term of the license.

8)      The established profitability of the product made under the Asserted Patents; its commercial success; and its popularity.

9)      The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10)     The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by or for the licensor; and the benefits to those who have used the invention.

11)     The extent to which Defendants have made use of the invention; and any evidence that shows the value of that use.

12)     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

20

13)     The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14)     The opinion testimony of qualified experts.

15)     The amount that a licensor and a licensee would have agreed upon at the time the infringement began if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license. And any other economic factor that a normally prudent businessperson would, under similar circumstances, take into consideration in negotiating the hypothetical license. *Georgia–Pacific*, 318 F. Supp. at 1120.

75.     Even if evidence presented at trial falls short of supporting a party's specific royalty estimate, "the fact finder is still required to determine what royalty is supported by the record." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1327-28 (Fed. Cir. 2014) (citing cases) (overruled on other grounds, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015)). "The statute is unequivocal that the district court must award damages in an amount no less than a reasonable royalty." *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381–82 (Fed. Cir. 2003); *see also Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed. Cir. 1987)

21

("The requirement to determine actual damages is not diminished by difficulty of determination."). "Indeed, if the record evidence does not fully support either party's royalty estimate, the fact finder must still determine what constitutes a reasonable royalty from the record evidence." *Apple v. Motorola*, 757 F.3d at 1328. "[T]he factual determination of a reasonable royalty, however, need not be supported, and indeed, frequently is not supported by the specific figures advanced by either party. . . . [T]he district court may reject the extreme figures proffered by the litigants as incredible and substitute an intermediate figure as a matter of its judgment from all of the evidence." *SmithKline Diagnostics*, 926 F.2d at 1167–68.

### C.    **Lanham Act Damages**

76.    The Lanham Act provides that subject to the principles of equity, a plaintiff shall be entitled to recover (1) defendant's profits; (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a). A plaintiff need only show that its damages calculation is a "fair and reasonable approximation" of its lost profits. *Brookstone Pharms.,* 920 F. Supp. 2d at 428 (internal citation omitted).

77.    "The requirement that a plaintiff prove injury does not place upon the plaintiff a burden of proving detailed individualization of loss of sales. Such proof only goes to quantum of damages and not to the very right to recover." *United States Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir. 1990).

78.    Courts have distinguished between marketplace damages, such as lost sales, lost profits, or loss of goodwill, and damage control costs, such as costs incurred to avoid lost sales, lost profits, and lost goodwill, such as corrective advertising. *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 691 (6th Cir. 2000).

79.     A plaintiff in a Lanham Act action may "recover costs incurred for corrective advertising and other damage control expenses incurred in response to a defendant's wrongful conduct." *Bracco*, 627 F. Supp. 2d at 491; *U–Haul Int'l v. Jatran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986); *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374 (10th Cir. 1977). Corrective advertising recovery is not limited to advertisements that specifically reference the defendant or its false claims. *Bracco*, 627 F. Supp. 2d at 491 (citing *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949, 952 (D.C. Cir. 1993)). Further, a plaintiff is not required to prove that the false advertising were the sole reason for its corrective advertising expenditures. *Id.*

80.     Recovery for corrective advertising is not limited to corrective advertising expenditures incurred before trial. *Big O*, 561 F.2d at 1375-76; *Callaway Golf Co. v. Dunlop Slazenger*, 384 F. Supp. 2d 735, 741 (D. Del. 2005); *PBM Prods., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 420 (E.D. Va. 2001); *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034 (9th Cir. 1986).

81.     Courts "have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent" false advertising under 15 U.S.C. § 1125(a). 15 U.S.C. § 1116. Under the Lanham Act, a court can enter a permanent injunction if the plaintiff shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *S&P Glob. Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 472 (D. Del. 2022) (quoting *eBay, Inc. v. MercExchange L.L.C.*, 547 U.S. 388, 391 (2006)).

23

## D.    Other Remedies and Costs

82.    "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court has defined an "exceptional" case as "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 554, 557 (2014). The district court "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*. Determining whether a case is exceptional and whether attorneys' fees should be granted under 35 U.S.C. § 285 is a two-step process. *Tate Access Floors*, 222 F.3d at 964. The first step is a factual determination whether the case is exceptional, and the second step, the Court exercises its discretion to determine whether attorneys' fees should be awarded. *Id*.

83.    A party moving for attorney fees must demonstrate, by a preponderance of the evidence, that a case is "exceptional." *Id*. at 557. Exceptional cases involve "litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc*., 279 F.3d 1022, 1034 (Fed. Cir. 2002).

84.    "[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct," and such culpability can be found if an infringer "acts *knowing or having reason to know* of facts which would lead a reasonable man to realize his actions are unreasonably risky." *Halo Elecs.,* 579 U.S. at 105 (emphasis in original and internal quotation omitted).

85.    Under 35 U.S.C. § 284, a court, in its discretion, "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.  Enhanced damages "are not to be

24

metered out in the typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior"; that is, conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." *Halo Elecs.,* 579 U.S. at 103-04. "The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Id*. at 105.

86.     Willfulness is question of fact and "requires a showing that the totality of the circumstances evince the egregious conduct that constitutes willful infringement." *nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1323-24 (Fed. Cir. 2006). For claims for enhanced damages based on willful infringement, a plaintiff must provide "proof that the defendant knew about the asserted patents and knew or should have known that its conduct amounted to infringement of those patents." *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 249 (D. Del. 2021). "[T]he concept of willfulness requires a jury to find no more than deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (internal quotation marks and citation omitted).

87.     As noted above, "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, *together with interest and costs as fixed by the court*." 35 U.S.C. § 284 (emphasis added).

88.     Awarding pre-judgment interest "is the rule, not the exception." *Schwendimann v. Arkwright Adv. Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020); *see Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983) ("prejudgment interest should ordinarily be awarded absent some justification for withholding such an award"). "An award of prejudgment interest serves to

25

make the patentee whole because the patentee also lost the use of its money due to infringement." *Crystal Semiconductor*, 246 F.3d at 1361. Pre-judgment interest should be awarded from the date of infringement to the date of judgment. *Schwendimann*, 959 F.3d at 1076. And the rate of pre-judgment interest "and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court." *Bio-Rad Labs, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986). "In exercising that discretion, however, the district court must be guided by the purpose of pre[-]judgment interest, which is 'to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.'" *Id.* (*quoting Gen. Motors*, 461 U.S. at 655).

89.    Similarly, courts in this District routinely award post-judgment interest in patent infringement cases. *See, e.g., nCUBE*, 313 F. Supp. 2d at 392, *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006) (awarding post-judgment interest to patentee for defendant's willful infringement); *TruePosition Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400, 414 (D. Del. 2009), *aff'd*, 389 F. App'x 1000 (Fed. Cir. 2010) (awarding post-judgment interest for patent infringement); *Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 364-66 (D. Del. 2018); *see also Taltech Ltd. v. Esquel Enters. Ltd.*, 604 F.3d 1324, 1335 (Fed. Cir. 2010) (applying regional circuit law when reviewing post-judgment interest); *Travelers Cas. & Sur. Co. v. Ins. Co. of N.A.*, 609 F.3d 143, 174-75 (3d Cir. 2010). Post-judgment interest "serves to further compensate a winning plaintiff from the time of a judgment until payment is made." *Transmatic, Inc. v. Gulton Indus., Inc.*, 180 F.3d 1343, 1348-49 (Fed. Cir. 1999); 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."). As such, post-judgment interest begins to accrue on the date of the entry of judgment. 28 U.S.C. § 1961(a); *Travelers*, 609 F.3d at 174-75.

26

90.     "Postjudgment interest is awarded on monetary judgments recovered in all civil cases," including ones for patent infringement. *Transmatic*, 180 F.3d at 1347.

# EXHIBIT 4D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-198-CJB |
| v. | ) | |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## EXHIBIT 4D – AXION'S SECOND AMENDED WITNESS LIST

Defendant Axion BioSystems, Inc. ("Axion") respectfully submits this amended list of witnesses that it may call to testify at trial either live or by deposition.

Axion reserves the right to call additional witnesses to testify at trial either live or by deposition to provide foundation testimony should any party contest the authenticity or admissibility of any material proffered at trial. After the parties exchange objections to such materials, Axion will address this issue with Plaintiff Agilent Technologies, Inc. ("Agilent") and/or the Court and will provide notice of any additional witnesses it will or may call to establish the authenticity and admissibility of materials to be proffered at trial.

Axion further incorporates by reference and reserves the right to call all witnesses Agilent lists on its witness list. Axion also reserves the right to call rebuttal witnesses or impeachment witnesses as may be necessary upon reasonable notice.

Axion's list of potential witnesses is made to comply with the Local Rules, the Court's orders and the parties' agreements and to perverse its rights, based on the present status of the case. The parties have exchanged and/or will exchange objections and motions *in limine* and otherwise present to the Court disputes regarding the issues and evidence to be presented to the jury and the

1                                                                                              2/25/2026

relevance and admissibility of certain testimony and exhibits.  Axion's list of potential witnesses does not waive Axion's right to object to certain categories of evidence as irrelevant or otherwise inadmissible and does not waive its right to pursue motions *in limine*.   Until the Court addresses and rules on such disputes, Axion reserves the right to make final decisions regarding what witnesses to call, and what exhibits to proffer.   The inclusion of a witness on Axion's list of potential witnesses does not represent or otherwise require Axion to call that witness to testify, does not constitute a  representation that Axion will bring an identified potential witness to trial, and does not mean that Axion has the power to compel the attendance or live testimony of that potential witness.

Axion's listing of potential witnesses and designations of deposition testimony is also made based on Axion's present understanding of the trial date, the availability of potential witnesses, and the issues.   If an individual identified as a potential witness is not available for trial or otherwise cannot testify live, Axion may designate a replacement witness to testify either live or by deposition and will provide reasonable notice to Agilent.

After the parties complete their pretrial exchange and the Court rules on motions or other disputes that are presented during pretrial, Axion reserves the right to further clarify the witnesses it intends to call and whether the respective witnesses will provide their testimony live or by deposition.

Subject to the foregoing, Axion's current list of witnesses that it may call to testify at trial either live or by deposition is set forth below.

    **A.**    **Axion will call the following expert witnesses live:**

        1.    Richard Fair

        2.    Ambreen Salters

2/25/2026

3.      Daniel Millard

**B.      Axion will call the following fact witnesses live:**

1.      Stacie Chvatal

2.      Daniel Millard

3.      James Ross

**C.      Axion may call the following fact witnesses live:**

1.      Saad Sheikh

2.      David Stahl

3.      Andrew Willsie

**D.      Axion may call the following witnesses by deposition designation:**

1.      Xiaobo Wang

2.      Leyna Zhao

3.      Chris Braun

4.      Todd Christian

3                                                                          2/25/2026

# EXHIBIT 4P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 23-198 (CJB) |
| | ) |
| AXION BIOSYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

**EXHIBIT 4P TO PRETRIAL ORDER**
**PLAINTIFF'S TRIAL WITNESS LIST**

Plaintiff hereby respectfully submits the list of witnesses it will or may call to testify at trial live or by deposition. The inclusion of a witness on this list does not require Plaintiff to call that witness to testify, and does not imply or establish that Plaintiff has the power to compel the live testimony of that witness or make that witness available to the opposing party. Plaintiff expressly reserve the right to call any witness identified by Defendant, whether or not listed on Plaintiff's list below. Plaintiff also expressly reserves the right to call any witness for purposes of rebuttal, impeachment, or authentication of a document. Subject to, and without waiving the foregoing rights and objections, Plaintiff identifies the following list of trial witnesses it may call to testify before the jury:

1.    **Expert witnesses**

| Name | Scope of Testimony | Will Call | May Call | Objections from Axion |
|---|---|---|---|---|
| A. Bruno Frazier | Infringement of Asserted Patent, Validity of Asserted Patents, Agilent's Practicing Products, False Advertising | X | | |
| Brian Napper | Damages | X | | |
| Logan Blue | Source Code for Accused Products | | X | |

2.    **Non-expert witnesses**

| Name | Live or Deposition Testimony | Will Call | May Call | Objections from Axion |
|---|---|---|---|---|
| Alp Aras | Deposition | | X | |
| Andrew Willsie | Deposition | X | | |
| Chris Braun | Live or Deposition | | X | |
| Daniel Millard | Deposition | X | | |
| David Stahl | Deposition | X | | |
| Debbie Hurtado | Deposition | | X | |
| James Filippini | Deposition | | X | |
| Jim Ross | Deposition | X | | |

1

| Name | Live or Deposition Testimony | Will Call | May Call | Objections from Axion |
|---|---|---|---|---|
| Leyna Zhao | Live | X | | |
| Maureen Joseph | Live | | X | |
| Nancy Li | Live | | X | |
| Nathan Griffith | Live | X | | |
| Saad Sheikh | Deposition | X | | |
| Stacie Chvatal | Deposition | X | | |
| Todd Christian | Live or Deposition | | X | |
| Will Deacon | Deposition | | X | |
| Xiaobo Wang | Live or Deposition | X | | |

# EXHIBIT 5D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-198-CJB |
| v. | ) | |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT 5D – DEFENDANT AXION'S DEPOSITION DESIGNATIONS**

Pursuant to D. Del. LR 16.3(c)(7), and the parties' agreement to engage in an iterative exchange of components making up the Pretrial Order, Defendant Axion BioSystems, Inc. ("Axion") respectfully submits its list of deposition designations that it may offer at trial. Axion reserves the right to amend its deposition designations.

The table below provides the key to the objections identified by Agilent to certain deposition testimony.

| Abbreviation | Objections |
|---|---|
| **401/402** | General Admissibility of Relevant Evidence; Irrelevant evidence is not admissible |
| **403** | Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons |
| **408** | Privileged settlement communications |
| **601** | Competency to Testify in General |
| **701** | Improper testimony by lay witness |
| **A** | Assuming facts not in evidence |
| **AA** | Asked and answered |
| **ARG** | Argumentative |
| **C** | Compound |
| **F** | Lacks foundation |

1

2/25/2026

| Abbreviation | Objections |
|---|---|
| H | Hearsay |
| L | Leading |
| LC | Calls for legal conclusion |
| M | Misstates the testimony |
| MIL | Subject to motion in limine |
| MIS | Mischaracterizes the document or evidence |
| N | Lack of notice |
| NLI | Needs limiting instruction |
| P | Unfair prejudice, confusion, waste of time, misleading, probative value substantially outweighed under FRE 403 |
| PK | Lacks Personal Knowledge |
| PRIV | Privileged/work product information |
| S | Beyond the scope of the 30(b)(6) notice |
| SPEC | Calls for speculation |
| SUP | Superseded by amended or supplemental discovery response |
| U | Untimely |
| UNE | Unavailability not established |
| V | Vague |
| Violates CMO | Violates Initial Case Management Order and/or agreement by parties related thereto |
| VPTO | Violates Court's Pretrial Scheduling Order |

2

2/25/2026

| Deposition of Christopher J. Braun January 28-29, 2025 | | | | | |
|---|---|---|---|---|---|
| **Axion's Designations** | **Agilent's Objections** | **Agilent's Counter-designations** | **Axion's Objections to Agilent's Counters** | **Axion's Counter-counter Designations** | **Agilent's Objections to Axion's Counter-counter Designations** |
| 7:25 – 8:5 | | | | | |
| 14:18-25 | | | | | |
| 15:6-11 | | | | | |
| 43:16-18 | | | | | |
| 58:22 – 59:7 | | | | | |
| 68:3-22 | | 68:23-69:14 | | | |
| 111:18 – 112:5 | | | | | |
| 115:19 – 116:2 | U, 403, 701 | 116:6-117:8 117:17-118:4 119:3-6 432:10-20 433:4-11 434:5-19 | MQ, IA (see Axion key) L L, F F, SPEC | 117:9-16 433:13-434:3 | Improper Counter Improper Counter |
| 122:13 – 123:19 | U, 403, 701 | 124:10-15 432:10-20 433:4-11 434:5-19 | L L, F F, SPEC | | |
| 127:14 – 128:11 | PK | 129:4-10 | MQ | | |
| 137:15 – 138:2 | H, PK, 403 | 129:4-10 | MQ | | |
| 142:1 – 143:7 | H, PK | 124:10-15 | | | |
| 144:16 – 145:15 | H, PK | | | | |
| 146:21 – 147:13 | | | | | |
| 149:21 – 150:23 | H, PK, 403 | 124:10-15 | | | |
| 176:19 – 177:12 | | | | | |
| 186:13-18 | | 183:17-22 | 402, MQ | | |
| 187:1-10 | PK, 403 | 186:19-25 188:3-12 | SPEC, PK F, ARG | | |

3

2/25/2026

| 187: 21 – 188:1 | PK, 403 | 186:19-25<br>188:3-12 | SPEC, PK<br>F, ARG | | |
| --- | --- | --- | --- | --- | --- |
| 188:25 – 189:23 | | | | | |
| 191:21 – 192:4 | PK, 403 | | | | |
| 371:14-19 | SPEC, PK | | | | |
| 371:21-23 | SPEC, PK | | | | |

4

2/25/2026

| Deposition of Li Leyna Zhao, Ph.D. January 31, 2025 | | | | |
|---|---|---|---|---|
| **Axion's Designations** | **Agilent's Objections** | **Agilent's Counter-designations** | **Axion's Objections to Agilent's Counters** | **Axion's Counter-counter Designations** |
| 9:8-20 | | | | |
| 14:22-15:1 | | | | |
| 16:11-20 | | | | |
| 16:23 | | | | |
| 39:3-10 | | 39:23-40:1 | MQ (see Axion key) | |
| 56:9-11 | MIS | 108:6-109:2 | MQ, ARG, F, 402, 403, 701, SPEC | |
| 56:14-17 | MIS | 108:6-109:2 | MQ, ARG, F, 402, 403, 701, SPEC | |
| 104:9-12 | F, PK, S, SPEC, 403, 701 | 108:20-109:2 | MQ, ARG, F, 402, 403, 701, SPEC | |
| 104:15 – 105:5 | F, PK, S, SPEC, 403, 701 | 108:20-109:2 | MQ, ARG, F, 402, 403, 701, SPEC | |
| 139:7-10 | F, H, 403, S, V, SPEC | | | |
| 139:12-20 | F, H, 403, S, V, SPEC | | | |
| 139:22-25 | F, H, 403, S, V, SPEC | | | |
| 140:14-25 | | | | |
| 147: 15 – 148:1 | | | | |
| 148:10-11 | F, S | | | |
| 148:13-15 | F, S | | | |
| 149:5-13 | F, R, PK, S, A, 401/402 | 149:21-150:4 | | |
| 149:16-20 | F, R, PK, S, A, 401/402 | 149:21-150:4 151:2-12 | 402, 403, S | |
| 157:8-12 | F, PK, 403, S, V | 158:7-22 | 402, 403, S, ARG, SPEC, MQ | |
| 157:14-23 | F, PK, 403, S, V | 158:7-22 | 402, 403, S, ARG, SPEC, MQ | |

5

2/25/2026

| | | | |
|---|---|---|---|
| 183:18 – 184:5 | | | |
| 184:23 – 185:3 | | | |
| 239:15-17 | F, PK, S, ARG, AA, LC, 403, 701 | | |
| 239:19 – 240:15 | F, PK, S, ARG, AA, LC, 403, 701 | | |
| 240:18 | F, PK, S, ARG, AA, LC, 403, 701 | | |
| 240:21 – 241:23 | F, PK, S, ARG, AA, LC, 403, 701 | | |
| 241:8-10 | F, PK, S, ARG, AA, LC, 403, 701 | | |
| 241:12-24 | F, PK, S, ARG, AA, LC, 403, 701 | | |
| 242:2-3 | F, PK, S, ARG, AA, LC, 403, 701 | | |
| 293:8-10 | F, PK, S, AG, M, MIS, 403 | | |
| 293:13-14 | F, PK, S, AG, M, MIS, 403 | | |
| 293:18-25 | F, PK, S, AG, M, MIS, 403 | | |
| 294:2-5 | F, PK, S, AG, M, MIS, 403 | | |
| 294:8-11 | F, PK, S, AG, M, MIS, 403 | | |

6

2/25/2026

| 362:24 – 363:15 | | | | |
|---|---|---|---|---|
| 366:2-5 | S, M, A | 364:19-365:9 | MQ, S, ARG | |
| 366:8-12 | S, M, A | 364:19-365:9 | MQ, S, ARG | |

7

2/25/2026

| Deposition of Todd Christian February 3-4, 2025 | | | | |
|---|---|---|---|---|
| **Axion's Designations** | **Agilent's Objections** | **Agilent's Counter-designations** | **Axion's Objections to Agilent's Counters** | **Axion's Counter-counter Designations** |
| 8:6-10 | | | | |
| 20:21 – 21:2 | PK, 403 | | | |
| 23:12-14 | | | | |
| 25:5-14 | | | | |
| 30:13-22 | | | | |
| 35:18-22 | S, PK, 403, 701 | | | |
| 36:2-21 | S, PK, 403 | | | |
| 39:3-7 | S, PK, MIS, 403, LC, AA, 701 | | | |
| 39:9-24 | S, PK, MIS, 403, 701 | | | |
| 45:14-16 | 401/402, 403 | 45:25-46:9 | | |
| 45:19-23 | 401/402, 403 | 45:25-46:9 | | |
| 46:15-19 | 401/402, 403 | | | |
| 53:17-19 | 401/402, 403 | | | |
| 53:24-25 | 401/402, 403 | | | |
| 54:2-4 | 401/402, 403 | | | |
| 54:6-7 | 401/402, 403 | | | |

8

2/25/2026

| Deposition of Xiaobo Wang February 6-7, 2025 | | | | |
|---|---|---|---|---|
| **Axion's Designations** | **Agilent's Objections** | **Agilent's Counter-designations** | **Axion's Objections to Agilent's Counters** | **Axion's Counter-counter Designations** |
| 9:20-23 | | | | |
| 12:3-7 | | | | |
| 12:10-12 | | | | |
| 28:8-11 | | | | |
| 36:17 – 36:24 | | | | |
| 50:23-25 | | | | |
| 52:9-19 | | | | |
| 56:10-16 | 701, LC, 403, MIS | | | |
| 56:18 – 57:8 | 701, LC, 403, MIS | | | |
| 57:10-24 | 701, LC, 403, MIS | | | |
| 59:19 – 60:8 | 701, 403 | 50:18-21 61:20-62:24 | MQ, IA (see Axion key) | |
| 60:21 – 61:6 | 701, 403 | 50:18-21 61:20-62:24 | MQ, IA (see Axion key) | |
| 61:9-18 | 701, 403, LC, MIS | 50:18-21 61:20-62:24 | MQ, IA (see Axion key) | |
| 68:21-24 | 701, LC, 403, MIS | | | |
| 69:1-6 | 701, 403 | | | |
| 69:8 – 70:1 | 701, 403 | 50:18-21 | MQ, IA (see Axion key) | |
| 107:10-19 | | | | |
| 109:4 – 112:6 | | | | |
| 113:4 – 115:15 | C (question at 115:10-14), LC | | | |
| 115:17 – 116:1 | C (answer at 115:17), LC | | | |
| 116:14-17 | PK, R, LC, 403 | | | |
| 116:19-22 | | | | |
| 119:11 – 121:13 | F (question at 121:13) | | | |

9

2/25/2026

| | | | | |
|---|---|---|---|---|
| 121:15 – 123:8 | F (answer at 121:15) | | | |
| 123:19 – 126:23 | V (question at 126:23) | | | |
| 126:25 – 127:17 | V (answer at 126:25) | 127:19-129:2 | 402, 403 | |
| 129:3-9 | 701, LC | | | |
| 129:11-18 | 701, LC | | | |
| 130:8-14 | 701, LC | | | |
| 130:16 – 131:4 | 701, LC, A, F | | | |
| 131:6 – 132:15 | R, A, F | | | |
| 132:17-23 | | | | |
| 133:15-20 | | | | |
| 138:20 – 140:8 | 701, LC (question at 140:4-8) | | | |
| 140:10 – 141:1 | 701, LC (answer at 140:10-14) | | | |
| 141:16 – 142:6 | | | | |
| 142:12 – 143:22 | | | | |
| 234:8-18 | S, R, 401/402, 403 | 236:6-13 | 402, 403 | |
| 234:23 – 235:12 | S, 401/402, 403 | 236:6-13 | 402, 403 | |
| 235:25 – 236:5 | S, 401/402, 403 | 236:6-13 | 402, 403 | |
| 236:15 – 237:2 | S, 401/402, 403 | 236:6-13 | 402, 403 | |
| 237:4-9 | S, 401/402, 403, ARG, V | 236:6-13 | 402, 403 | |
| 237:12 – 238:2 | S, 401/402, 403, ARG, V | 236:6-13 | 402, 403 | |
| 238:16-18 | S, 401/402, 403, ARG, V | 236:6-13 | 402, 403 | |
| 238:21-24 | S, 401/402, 403, ARG, V | 236:6-13 | 402, 403 | |
| 240:10-13 | S, 401/402, 403 | | | |
| 240:16-19 | S, 401/402, 403 | | | |
| 263:3-7 | S, 401/402, 403 | | | |
| 263:14 – 265:2 | S, 401/402, 403 | | | |

2/25/2026

| | | | | |
|---|---|---|---|---|
| 265:6 – 266:6 | S, 401/402, 403 | | | |
| 266:9 | S, 401/402, 403 | | | |
| 266:13-14 | S, 401/402, 403 | | | |
| 266:25 – 267:3 | S, A, F, 401/402, 403 | | | |
| 267:5-7 | S, A, F, 401/402,403 | | | |
| 268:12-17 | | | | |
| 269:4-17 | S, 401/402, 403 | | | |
| 270:2-19 | S, 401/402, 403 | | | |
| 271:6-9 | S, 401/402, 403 | | | |

11

2/25/2026

# EXHIBIT 5P

**Exhibit 5P – Plaintiff's Deposition Designations**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 23-198 (CJB) |
| | ) |
| AXION BIOSYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

### EXHIBIT 5P TO PRETRIAL ORDER PLAINTIFF'S DEPOSITION DESIGNATIONS AND DEFENDANT'S COUNTER-DESIGNATIONS

Deposition designations should not be construed as acknowledgement of the scope of the trial or admissibility of evidence. Agilent does not waive its right to contest the admissibility of a witness' trial testimony by designating any portion of that witness' deposition testimony herein, nor does any designation constitute a waiver of any admissibility arguments that a party may raise. Designation of any testimony does not imply admissibility.

Agilent reserves the right to use designations identified by Axion either as counter-designations or as affirmative designations. Agilent reserves the right to use affirmatively any of its or Axion's counter-designations as if it identified them as an affirmative designation. Agilent reserves the right to supplement, amend, or withdraw its list of deposition designations in response to any additional disclosures by Axion and/or as may be needed to rebut any facts or evidence presented by Axion at trial or in response to any rulings by the Court.

Should a fact witness previously identified as testifying live not be made available for live testimony at trial, Agilent reserves the right to designate specific deposition testimony to play, or if video presentation is unavailable, read aloud, in lieu of the witness' appearance upon reasonable notice.

1

**Exhibit 5P – Plaintiff's Deposition Designations**

Pursuant to Federal Rule of Evidence 613, Agilent reserves the right to use at trial deposition or other testimony or statements not specifically identified on Agilent's deposition designation list at trial for the purpose of impeachment, if otherwise competent for such purpose.

The key for Axion's objections to Agilent's Deposition Designations and Agilent's objections to Axion's counter designations is provided in the table below.

| Objection | Explanation |
|---|---|
| 106 | The testimony is objectionable under Fed. R. Evid. 402 because it is incomplete. Remaining portions of writing/statement must, in fairness, be considered contemporaneously. Fed. R. Evid. 106. Fed. R. Civ. P. 32(a)(6). |
| 402 | The testimony is objectionable under Fed. R. Evid. 402 because it is not relevant. |
| 403 | The testimony is objectionable under Fed. R. Evid. 403 because any probative value it may have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. |
| 602 | The testimony is objectionable under Fed. R. Evid. 602 because it constitutes testimony on a matter as to which the witness lacks personal knowledge. |
| 611 | Form/argumentative/compound/leading. Asked and answered, argumentative; compound; foundation; assumes facts not in evidence; non-responsive; vague; beyond the scope of direct (matters affecting credibility allowed); leading questions only allowed 1) on cross-examination; 2) hostile or adverse witness Fed. R. Evid. 611. |
| 701 | The testimony is objectionable under Fed. R. Evid. 701 because it is opinion testimony by a lay witness that is not reasonably based on perception and helpful to a clear understanding of the witness' testimony or the determination of a fact in dispute. |
| A | The question designated is objectionable because it is ambiguous and/or vague. |
| B | The testimony is objectionable because it is beyond the scope of a designated 30(b)(6) topic or because it seeks testimony on behalf of an organization pursuant to Rule 30(b)(6) when the deponent was not designated for any 30(b)(6) topics. |
| CN | The testimony is objectionable because it relates to a legal conclusion by a lay witness. |
| IA | The designated testimony contains an incomplete answer. |
| MQ | The testimony is objectionable because it is missing the question. |
| SP | The testimony is objectionable because it is speculative and lacking in a reasonable base of factual or logical support (Fed. R. Evid. 602). |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Alp Aras | December 6, 2024 | 6:4-22 | 402 | | | |
| Alp Aras | December 6, 2024 | 7:3-21 | 402 | | | |
| Alp Aras | December 6, 2024 | 9:9-10:3 | 402 | | | |
| Alp Aras | December 6, 2024 | 18:2-18 | 402 | | | |
| Andrew Willsie | February 11, 2025 | 9:25–11:18 | | | | |
| Andrew Willsie | February 11, 2025 | 12:23–13:8 | | | | |
| Andrew Willsie | February 11, 2025 | 17:22–18:2 | | | | |
| Andrew Willsie | February 11, 2025 | 18:11–17 | MQ | | Designation corrected to 18:11-17 | |
| Andrew Willsie | February 11, 2025 | 18:23–19:25 | | | | |
| Andrew Willsie | February 11, 2025 | 20:3–10 | | | | |
| Andrew Willsie | February 11, 2025 | 20:13–21:17 | | | | |
| Andrew Willsie | February 11, 2025 | 21:20–22:12 | | | | |
| Andrew Willsie | February 11, 2025 | 22:17–25:1 | | | | |
| Andrew Willsie | February 11, 2025 | 25:4–26:22 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 27:3–28:18 | | | | |
| Andrew Willsie | February 11, 2025 | 29:3–12 | | | | |
| Andrew Willsie | February 11, 2025 | 29:17–30:19 | | | | |
| Andrew Willsie | February 11, 2025 | 30:23–40:24 | | | | |
| Andrew Willsie | February 11, 2025 | 41:12–46:25 | | | | |
| Andrew Willsie | February 11, 2025 | 47:8–48:10 | | 48:11-14 | 402 | |
| Andrew Willsie | February 11, 2025 | 48:15–49:5 | | 49:6-12 | | |
| Andrew Willsie | February 11, 2025 | 49:13–15 | | | | |
| Andrew Willsie | February 11, 2025 | 49:21–50:9 | | | | |
| Andrew Willsie | February 11, 2025 | 50:13–53:4 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 53:11–14 | 402, 403 | | | |

3

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Andrew Willsie | February 11, 2025 | 53:18–54:4 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 54:25–57:18 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 57:22–60:12 | IA | 60:13-14 | | |
| Andrew Willsie | February 11, 2025 | 60:17–62:16 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 62:23–63:6 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 63:9–64:23 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 65:19–68:13 | | | | |
| Andrew Willsie | February 11, 2025 | 68:17–70:9 | | | | |
| Andrew Willsie | February 11, 2025 | 70:17–73:24 | B, SP | | | |
| Andrew Willsie | February 11, 2025 | 74:11–17 | | | | |
| Andrew Willsie | February 11, 2025 | 74:22–75:6 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 76:14–78:13 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 79:10–24 | 402, 403 | | | |
| Andrew Willsie | February 11, 2025 | 81:12–25 | 402, 403, B | | | |
| Andrew Willsie | February 11, 2025 | 82:5–22 | 402, 403, B | 82:23-83:8 | | |
| Andrew Willsie | February 11, 2025 | 83:9–18 | 402, 403, 611, B | | | |
| Christopher Braun | January 28, 2025 | 7:25–8:5 | | | | |
| Christopher Braun | January 28, 2025 | 9:20–23 | | | | |
| Christopher Braun | January 28, 2025 | 11:10–17 | | | | |
| Christopher Braun | January 28, 2025 | 13:4–11 | | | | |
| Christopher Braun | January 28, 2025 | 58:22–70:22 | 402 | | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Christopher Braun | January 28, 2025 | 115:11–127:13 | | | | |
| Christopher Braun | January 28, 2025 | 127:14–129:24 | | | | |
| Christopher Braun | January 28, 2025 | 142:1–145:15 | | | | |
| Christopher Braun | January 28, 2025 | 151:4–25 | 402 | | | |
| Christopher Braun | January 28, 2025 | 152:21–153:10 | 402, IA | | Designation corrected to 152:21 – 153:10. | |
| Christopher Braun | January 28, 2025 | 156:4–164:11 | 402, 403, SP | | | |
| Christopher Braun | January 28, 2025 | 173:17–175:3 | 402, 403, SP | | | |
| Christopher Braun | January 28, 2025 | 176:13–192:4 | | | | |
| Christopher Braun | January 28, 2025 | 193:20–198:15 | 402 | | | |
| Christopher Braun | January 28, 2025 | 199:14–201:23 | 402, 403 | | | |
| Christopher Braun | January 29, 2025 | 294:13-16 | | | | |
| Christopher Braun | January 29, 2025 | 321:5–25 | 402 | | | |
| Christopher Braun | January 29, 2025 | 329:16–330:16 | 402 | | | |

5

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Christopher Braun | January 29, 2025 | 336:7–339:17 | 402, 701, SP | | | |
| Christopher Braun | January 29, 2025 | 343:9–15 | 402 | | | |
| Christopher Braun | January 29, 2025 | 354:20–356:1 | 402 | | | |
| Christopher Braun | January 29, 2025 | 356:25–357:14 | 402 | | | |
| Christopher Braun | January 29, 2025 | 359:11–360:4 | 402 | | | |
| Christopher Braun | January 29, 2025 | 366:19–367:15 | 402 | | | |
| Christopher Braun | January 29, 2025 | 373:11–374:6 | 402 | | | |
| Christopher Braun | January 29, 2025 | 378:7–25 | 402 | | | |
| Christopher Braun | January 29, 2025 | 382:7–21 | 402 | | | |
| Christopher Braun | January 29, 2025 | 384:3–12 | 402 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 10:1–5 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 10:12–23 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 23:16–25 | IA | | Designation corrected to 23:16-25 | |

6

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. I | November 14, 2024 | 24:8–19 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 25:3–10 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 48:15–18 | | 47:7-48:6 | | |
| Daniel Millard Vol. I | November 14, 2024 | 49:10–51:19 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 52:5–18 | | 52:19-20 | | |
| Daniel Millard Vol. I | November 14, 2024 | 53:24–54:7 | | 53:7-23 | 402 | |
| Daniel Millard Vol. I | November 14, 2024 | 54:12–22 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 54:24-25 | IA, 611 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 56:2–57:15 | MQ, 611, 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 58:13–59:1 | 611, A | | | |
| Daniel Millard Vol. I | November 14, 2024 | 59:20–60:4 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 60:8–63:11 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 64:3–65:4 | 611, A | | | |
| Daniel Millard Vol. I | November 14, 2024 | 66:6-8 | MQ | | | |

7

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. I | November 14, 2024 | 66:11–67:24 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 68:19–71:19 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 71:20-82:11 | | 83:12-20 | 602 | |
| Daniel Millard Vol. I | November 14, 2024 | 84:17-87:22 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 87:5–14 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 87:17–90:23 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 91:10–92:5 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 92:13–96:1 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 96:10–98:20 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 99:3–18 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 99:21-100:9 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 100:12–21 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 101:11–102:13 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 103:18–104:18 | | | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. I | November 14, 2024 | 105:19–106:18 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 107:18–108:20 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 110:4–19 | IA | 110:20-22 | | |
| Daniel Millard Vol. I | November 14, 2024 | 111:3–5 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 111:15–21 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 111:25–112:14 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 113:10–115:13 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 116:23–117:4 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 117:8–20 | CN, 611 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 118:20–120:2 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 120:21–122:19 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 123:7–129:20 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 130:3–131:11 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 131:19-132:7 | | | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. I | November 14, 2024 | 135:7–10 | 611 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 139:2–143:22 | 611, 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 144:2–19 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 145:7-146:12 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 147:9–148:8 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 150:11–151:4 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 151:21–156:8 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 157–1–9 | IA | | | |
| Daniel Millard Vol. I | November 14, 2024 | 157:22–160:5 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 161:4-11 | | 161:12-162:7 | | |
| Daniel Millard Vol. I | November 14, 2024 | 162:8–15 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 163:10–163:23 | IA | 164:7-23 | 402, 701, Improper Counter Amended designation to end at 163:23 | |

10

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. I | November 14, 2024 | 164:24–166:6 | IA | 166:7-167:15 | | |
| Daniel Millard Vol. I | November 14, 2024 | 168:10–14 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 168:23-169:19 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 169:23-170:8 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 170:11-25 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 171:25-172:4 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 178:3-9 | 611 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 182:14-183:6 | | 183:7-16 | | |
| Daniel Millard Vol. I | November 14, 2024 | 183:17-184:14 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 185:13–21 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 185:22–186:4 | IA | | Amended designation to end at 186:4 | |
| Daniel Millard Vol. I | November 14, 2024 | 186:12–187:3 | B | | | |
| Daniel Millard Vol. I | November 14, 2024 | 196:4–16 | | 196:1-3 | 402 | |

11

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. I | November 14, 2024 | 197:22–199:7 | 402, 403, B | | | |
| Daniel Millard Vol. I | November 14, 2024 | 199:19–201:1 | 402, 403, B | | | |
| Daniel Millard Vol. I | November 14, 2024 | 202:9–203:25 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 204:11–208:21 | IA | 208:22-209:10 | | |
| Daniel Millard Vol. I | November 14, 2024 | 209:11–210:24 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 211:17–22 | | | | |
| Daniel Millard Vol. I | November 14, 2024 | 213:14–19 | CN | | | |
| Daniel Millard Vol. I | November 14, 2024 | 216:2–217:19 | 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 218:2–17 | 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 219:2–12 | 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 219:17–22 | 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 220:5–22 | 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 221:14–222:6 | 611, A | | | |
| Daniel Millard Vol. I | November 14, 2024 | 223:2–10 | | | | |

12

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. I | November 14, 2024 | 224:15–18 | 402, 403 | 224:19-225:1 | | |
| Daniel Millard Vol. I | November 14, 2024 | 225:2–14 | 402, 403 | 225:15-22 | | |
| Daniel Millard Vol. I | November 14, 2024 | 225:23–25 | IA, 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 227:2–228:9 | 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 228:25–229:16 | 402, 403 | | | |
| Daniel Millard Vol. I | November 14, 2024 | 231:2–232:2 | | 232:3-16 | 402, MIL | |
| Daniel Millard Vol. I | November 14, 2024 | 233:9–235:11 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 10:14-23 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 11:17-12:1 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 12:11-13:14 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 13:17-20 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 13:25-14:18 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 15:16-17:8 | | | | |

13

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. II | November 15, 2024 | 17:22-18:18 | A, IA | | Amended designation to end at 18:18 | |
| Daniel Millard Vol. II | November 15, 2024 | 19:18-22 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 20:2-22:6 | | 22:7-19 | | |
| Daniel Millard Vol. II | November 15, 2024 | 22:20-24:10 | 402, 403 | | | |
| Daniel Millard Vol. II | November 15, 2024 | 26:21-31:10 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 31:15-18 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 32:2-36:7 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 36:18-45:6 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 41:21-25 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 45:13-46:9 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 47:22-54:1 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 54:17-55:7 | | 55:8-24 | | |
| Daniel Millard Vol. II | November 15, 2024 | 55:25-59:11 | | | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. II | November 15, 2024 | 59:16-64:20 | IA | | | |
| Daniel Millard Vol. II | November 15, 2024 | 66:5-67:14 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 68:12-71:9 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 73:18-74:14 | IA | | Amended designation to end at 74:14 | |
| Daniel Millard Vol. II | November 15, 2024 | 74:20-76:15 | | 76:16-77:9 | 402, 701 | |
| Daniel Millard Vol. II | November 15, 2024 | 77:10-83:6 | 611, A | | | |
| Daniel Millard Vol. II | November 15, 2024 | 84:5-85:17 | | 85:18-25 | | |
| Daniel Millard Vol. II | November 15, 2024 | 86:1-89:9 | 402, 403 | | | |
| Daniel Millard Vol. II | November 15, 2024 | 89:21-92:24 | 402, 403, SP | | | |
| Daniel Millard Vol. II | November 15, 2024 | 9:11-10:3 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 95:8-96:15 | 402, 403 | | | |
| Daniel Millard Vol. II | November 15, 2024 | 97:13-25 | | 98:2-17 | 402, PK | |
| Daniel Millard Vol. II | November 15, 2024 | 99:17-100:6 | 402, 403 | 99:3-16 | | |

15

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Daniel Millard Vol. II | November 15, 2024 | 99:3-11 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 100:22-102:20 | 402, 403 | | | |
| Daniel Millard Vol. II | November 15, 2024 | 102:24-103:25 | MQ | 101:25-102:20 | | |
| Daniel Millard Vol. II | November 15, 2024 | 108:20-111:22 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 112:11-114:4 | | | | |
| Daniel Millard Vol. II | November 15, 2024 | 115:15-20 | | | | |
| David Stahl | February 11, 2025 | 7:1-6 | | | | |
| David Stahl | February 11, 2025 | 8:10-15 | | | | |
| David Stahl | February 11, 2025 | 14:8-9 | | | | |
| David Stahl | February 11, 2025 | 14:18-19 | | | | |
| David Stahl | February 11, 2025 | 19:5-20:3 | | | | |
| David Stahl | February 11, 2025 | 20:6-8 | | | | |
| David Stahl | February 11, 2025 | 20:13-25 | | | | |
| David Stahl | February 11, 2025 | 21:6-15 | | | | |
| David Stahl | February 11, 2025 | 22:24-23:4 | | | | |
| David Stahl | February 11, 2025 | 28:22-29:9 | | | | |
| David Stahl | February 11, 2025 | 33:1-34:4 | | | | |
| David Stahl | February 11, 2025 | 34:15-20 | | | | |
| David Stahl | February 11, 2025 | 34:24-35:4 | | | | |
| David Stahl | February 11, 2025 | 36:19-37:10 | | | | |
| David Stahl | February 11, 2025 | 38:19-22 | | | | |
| David Stahl | February 11, 2025 | 41:21-25 | MQ, IA | | | |

16

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| David Stahl | February 11, 2025 | 42:11-43:21 | | | | |
| David Stahl | February 11, 2025 | 44:3-22 | | | | |
| David Stahl | February 11, 2025 | 45:3-46:20 | | 46:21-47:2 | | 47:3-5 |
| David Stahl | February 11, 2025 | 47:3-11 | | | | |
| David Stahl | February 11, 2025 | 47:16-20 | | 47:21-48:1 | | 48:2-7 |
| David Stahl | February 11, 2025 | 48:2-7 | | | | |
| David Stahl | February 11, 2025 | 48:22-49:4 | | | | |
| David Stahl | February 11, 2025 | 49:9-50:3 | | 7:1-6, 14:8-9 | | |
| David Stahl | February 11, 2025 | 50:13-25 | | | | |
| David Stahl | February 11, 2025 | 52:2-53:17 | | | | |
| David Stahl | February 11, 2025 | 54:3-55:18 | | 55:19-24 | | |
| David Stahl | February 11, 2025 | 55:25-56:9 | | 56:10-11 | | |
| David Stahl | February 11, 2025 | 56:12-57:3 | | | | |
| David Stahl | February 11, 2025 | 58:3-11 | MQ | 57:25-58:2 | | |
| David Stahl | February 11, 2025 | 59:2-62:24 | | | | |
| David Stahl | February 11, 2025 | 63:2-70:8 | | | | |
| David Stahl | February 11, 2025 | 70:21-75:14 | | | | |
| David Stahl | February 11, 2025 | 75:20-80:1 | | | | |
| David Stahl | February 11, 2025 | 80:13-82:10 | | 82:11-12 | | |
| David Stahl | February 11, 2025 | 82:13-23 | | 82:24-25 | | |
| David Stahl | February 11, 2025 | 83:1-86:19 | | | | |
| David Stahl | February 11, 2025 | 87:7-89:14 | | | | |
| David Stahl | February 11, 2025 | 89:17-23 | | | | |
| David Stahl | February 11, 2025 | 91:15-92:6 | MQ | 91:12-14 | | |
| David Stahl | February 11, 2025 | 92:10-95:2 | | 95:3-4 | | |
| David Stahl | February 11, 2025 | 95:5-15 | | | | |
| David Stahl | February 11, 2025 | 95:20-96:2 | | 96:3-12 | | |

17

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| David Stahl | February 11, 2025 | 96:13-97:18 | | | | |
| David Stahl | February 11, 2025 | 97:22-98:24 | | | | |
| David Stahl | February 11, 2025 | 99:1-101:11 | | | | |
| David Stahl | February 11, 2025 | 101:21-102:21 | MQ | 101:19-20 | | |
| David Stahl | February 11, 2025 | 104:1-107:24 | | | | |
| David Stahl | February 11, 2025 | 108:1-14 | | | | |
| David Stahl | February 11, 2025 | 108:22-109:23 | | | | |
| Deborah Hurtado | February 12, 2025 | 8:2–21 | 402 | | | |
| Deborah Hurtado | February 12, 2025 | 9:17–24 | 402 | | | |
| Deborah Hurtado | February 12, 2025 | 11:19–14:2 | 402, 403 | | | |
| Deborah Hurtado | February 12, 2025 | 14:20–16:24 | 402 | | | |
| Deborah Hurtado | February 12, 2025 | 17:20–19:17 | 402, 403 | | | |
| Deborah Hurtado | February 12, 2025 | 54:12–57:5 | 402, 403 | | | |
| James Filippini | December 5, 2024 | 8:5–19 | 402 | | | |
| James Filippini | December 5, 2024 | 9:25–10:4 | 402 | | | |
| James Filippini | December 5, 2024 | 11:15–17 | 402 | | | |
| James Filippini | December 5, 2024 | 12:3–19:4 | 402 | | | |
| James Filippini | December 5, 2024 | 35:1-8 | 402 | | | |
| James Filippini | December 5, 2024 | 128:19–130:20 | 402, 403, IA | | | |
| James Filippini | December 5, 2024 | 150:21-151:24 | 402, 403 | | | |
| James Ross | November 21, 2024 | 7:22–8:16 | | | | |

18

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| James Ross | November 21, 2024 | 9:1–5 | | | | |
| James Ross | November 21, 2024 | 10:6–9 | | | | |
| James Ross | November 21, 2024 | 11:4–11 | | | | |
| James Ross | November 21, 2024 | 31:9–22, | | | | |
| James Ross | November 21, 2024 | 34:23–35:18, | | | | |
| James Ross | November 21, 2024 | 38:16–22, | | | | |
| James Ross | November 21, 2024 | 40:7–41:21, | | | | |
| James Ross | November 21, 2024 | 42:7–23 | 402, 403 | | | |
| James Ross | November 21, 2024 | 65:3–67:9 | 402, 403 | | | |
| James Ross | November 21, 2024 | 67:23–68:3 | 402, 403 | | | |
| James Ross | November 21, 2024 | 68:8–21 | 402, 403 | | | |
| James Ross | November 21, 2024 | 69:17–70:7 | 402, 403 | | | |
| James Ross | November 21, 2024 | 79:18–80:25 | 402, 403, SP, 602 | | | |
| James Ross | November 21, 2024 | 81:10–82:7 | 402, 403 | | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| James Ross | November 21, 2024 | 84:14–86:13 | 402, 403, A | | | |
| James Ross | November 21, 2024 | 88:10–89:18 | 402, 403 | | | |
| James Ross | November 21, 2024 | 93:5–94:15 | 402, 403 | | | |
| James Ross | November 21, 2024 | 96:22–97:2 | 402, 403 | | | |
| James Ross | November 21, 2024 | 97:3–15 | 402, 403 | | | |
| James Ross | November 21, 2024 | 98:6–15 | 402, 403 | | | |
| James Ross | November 21, 2024 | 99:21–100:23 | 402, 403 | | | |
| James Ross | November 21, 2024 | 102:4–9 | 402, 403 | | | |
| James Ross | November 21, 2024 | 102:21–22 | 402, 403 | | | |
| James Ross | November 21, 2024 | 104:8–105:12 | 402, 403, 602 | | | |
| James Ross | November 21, 2024 | 107:6–15 | 402, 403 | | | |
| James Ross | November 21, 2024 | 109:8–13 | 402, 403 | | | |
| James Ross | November 21, 2024 | 114:15–115:12 | 402, 403 | | | |
| James Ross | November 21, 2024 | 117:4–16 | 402, 403 | | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| James Ross | November 21, 2024 | 121:12–21 | 402, 403 | | | |
| James Ross | November 21, 2024 | 140:17–141:8 | 402, 403 | | | |
| James Ross | November 21, 2024 | 294:24–301:2, | | | | |
| James Ross | November 21, 2024 | 302:19–303:4 | | | | |
| James Ross | November 21, 2024 | 303:8–304:9, | | | | |
| James Ross | November 21, 2024 | 305:3–19, | | | | |
| James Ross | November 21, 2024 | 307:3–312:3 | 402, 403, A, SP, 602 | | | |
| James Ross | November 21, 2024 | 313:1–324:24 | A, M | | | |
| James Ross | November 21, 2024 | 329:4–13, | | | | |
| James Ross | November 21, 2024 | 330:22–332:24 | 402, 403, 611, A, B, SP | | | |
| James Ross | November 21, 2024 | 333:5–336:22 | B | | | |
| James Ross | November 21, 2024 | 337:4–341:13 | A, B, 701, CN, 611 | | | |
| James Ross | November 21, 2024 | 341:16–347:20 | 602, B, 402, 403 | | | |

21

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| James Ross | November 21, 2024 | 347:22–351:9 | 602, B, 402, 403, SP | | | |
| James Ross | November 21, 2024 | 351:10–356:14 | 402, 403, 602, A, B, SP | | | |
| James Ross | November 21, 2024 | 357:14–361:14 | 402 | | | |
| James Ross | November 21, 2024 | 361:19–364:4 | 402 | 364:5-7 | | |
| James Ross | November 22, 2024 | 394:13-395:4 | | | | |
| James Ross | November 22, 2024 | 426:15-428:14 | | | | |
| Saad Sheikh | January 24, 2025 | 7:6–17 | | | | |
| Saad Sheikh | January 24, 2025 | 8:9–12 | | | | |
| Saad Sheikh | January 24, 2025 | 8:25–9:4 | | | | |
| Saad Sheikh | January 24, 2025 | 9:25–10:8 | | | | |
| Saad Sheikh | January 24, 2025 | 14:7–14 | | | | |
| Saad Sheikh | January 24, 2025 | 15:14–17:5 | 402 | | | |
| Saad Sheikh | January 24, 2025 | 18:1–11 | | | | |
| Saad Sheikh | January 24, 2025 | 18:23–19:11 | 402 | 19:14-20:8 | | |
| Saad Sheikh | January 24, 2025 | 26:13–27:10 | 402 | | | |
| Saad Sheikh | January 24, 2025 | 27:15–22 | | | | |
| Saad Sheikh | January 24, 2025 | 27:12–28:19 | | 28:20-23 | 402 | |
| Saad Sheikh | January 24, 2025 | 41:8–12 | | | | |
| Saad Sheikh | January 24, 2025 | 41:25–42:23 | | | | |
| Saad Sheikh | January 24, 2025 | 43:11–44:23 | | | | |
| Saad Sheikh | January 24, 2025 | 45:5–7 | | | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Saad Sheikh | January 24, 2025 | 46:2–47:7 | | | | |
| Saad Sheikh | January 24, 2025 | 48:1–49:6 | | | | |
| Saad Sheikh | January 24, 2025 | 49:12–16 | | | | |
| Saad Sheikh | January 24, 2025 | 49:25–52:10 | | 52:19-53:19 | PK, SPEC | |
| Saad Sheikh | January 24, 2025 | 55:8–12 | | 54:14-55:2 | 402, PK | |
| Saad Sheikh | January 24, 2025 | 55:18–58:8 | | 55:15-17 | | |
| Saad Sheikh | January 24, 2025 | 58:23–60:20 | | | | |
| Saad Sheikh | January 24, 2025 | 61:12–62:15 | | | | |
| Saad Sheikh | January 24, 2025 | 62:17–71:18 | 611 | | | |
| Saad Sheikh | January 24, 2025 | 72:21–23 | | 72:24-73:12 | | 73:13-16 |
| Saad Sheikh | January 24, 2025 | 73:19–74:7 | | 74:10-15 | | |
| Saad Sheikh | January 24, 2025 | 75:23–25 | | 74:8-15 | | |
| Saad Sheikh | January 24, 2025 | 76:4–8 | 611, SP | | | |
| Saad Sheikh | January 24, 2025 | 76:14–78:3 | 611 | 78:4-6 | | |
| Saad Sheikh | January 24, 2025 | 79:14–17 | | | | |
| Saad Sheikh | January 24, 2025 | 81:2–82:15 | | 82:16-19 | | |
| Saad Sheikh | January 24, 2025 | 82:20–83:11 | | | | |
| Saad Sheikh | January 24, 2025 | 83:15–86:13 | 402 | | | |
| Saad Sheikh | January 24, 2025 | 86:15–17 | | | | |
| Saad Sheikh | January 24, 2025 | 87:1–8 | | | | |
| Saad Sheikh | January 24, 2025 | 87:12–19 | | 87:20-88:10 | 402, P | |
| Saad Sheikh | January 24, 2025 | 88:11–18 | | | | |
| Saad Sheikh | January 24, 2025 | 89:14–16 | 602, 611 | | | |
| Saad Sheikh | January 24, 2025 | 90:1–3 | | 90:10-15 | | |
| Saad Sheikh | January 24, 2025 | 90:22–93:3 | 402, 611 | 93:4-8 | 402 | |
| Saad Sheikh | January 24, 2025 | 93:10–21 | 402 | | | |
| Saad Sheikh | January 24, 2025 | 94:7–95:1 | | | | |

23

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Saad Sheikh | January 24, 2025 | 95:5–96:4 | 106 | 96:5-10 | | |
| Saad Sheikh | January 24, 2025 | 96:11–25 | | | | |
| Saad Sheikh | January 24, 2025 | 97:8–25 | | | | |
| Saad Sheikh | January 24, 2025 | 99:20–101:19 | | 98:24-99:19 | 402 | |
| Saad Sheikh | January 24, 2025 | 101:21–103:17 | | 103:18-23 | 402, P | |
| Saad Sheikh | January 24, 2025 | 103:24–104:1 | | | | |
| Saad Sheikh | January 24, 2025 | 105:1–23 | | | | |
| Saad Sheikh | January 24, 2025 | 106:4–108:6 | | | | |
| Saad Sheikh | January 24, 2025 | 108:8–21 | | 108:25-109:1 | | |
| Saad Sheikh | January 24, 2025 | 109:2–110:6 | 602, 611 | 110:7-20 | | |
| Saad Sheikh | January 24, 2025 | 110:21–111:14 | | | | |
| Saad Sheikh | January 24, 2025 | 111:16–112:8 | 602 | 112:9-12 | | |
| Saad Sheikh | January 24, 2025 | 112:13–114:6 | | | | |
| Stacie Chvatal | November 12, 2024 | 9:2-6 | | | | |
| Stacie Chvatal | November 12, 2024 | 9:13-10:2 | | | | |
| Stacie Chvatal | November 12, 2024 | 10:10-12 | | | | |
| Stacie Chvatal | November 12, 2024 | 11:1-3 | | | | |
| Stacie Chvatal | November 12, 2024 | 11:14-21 | | | | |
| Stacie Chvatal | November 12, 2024 | 12:7-10 | | | | |
| Stacie Chvatal | November 12, 2024 | 12:21-13:1 | | | | |

24

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Stacie Chvatal | November 12, 2024 | 13:20-16:19 | | 16:20-17:1 | MQ, IA, NE | |
| Stacie Chvatal | November 12, 2024 | 17:3-18:19 | | | | |
| Stacie Chvatal | November 12, 2024 | 19:2-20:13 | | 20:14-21 | MQ, IA, NE | |
| Stacie Chvatal | November 12, 2024 | 20:23-26:22 | | 26:3-22 | Amended designation to end at 26:22 | |
| Stacie Chvatal | November 12, 2024 | 27:6-30:20 | | | | |
| Stacie Chvatal | November 12, 2024 | 31:13-20 | | | | |
| Stacie Chvatal | November 12, 2024 | 32:1-33:14 | | 34:6-13 | 402 | |
| Stacie Chvatal | November 12, 2024 | 35:19-24 | | 35:25-36:18 | 402 | |
| Stacie Chvatal | November 12, 2024 | 36:19-24 | | 36:25-37:3 | 402 | |
| Stacie Chvatal | November 12, 2024 | 37:4-43:10 | | | | |
| Stacie Chvatal | November 12, 2024 | 44:14-46:9 | | | | |
| Stacie Chvatal | November 12, 2024 | 46:21-47:2 | | 46:18-20 | | |
| Stacie Chvatal | November 12, 2024 | 47:9-48:7 | | 48:8-11 | | |

25

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Stacie Chvatal | November 12, 2024 | 48:12-51:19 | | 51:20-52:1 | | |
| Stacie Chvatal | November 12, 2024 | 52:16-19 | 402, 403 | 52:20-22 | | |
| Stacie Chvatal | November 12, 2024 | 53:6-65:19 | B | | | |
| Stacie Chvatal | November 12, 2024 | 65:25-66:6 | | | | |
| Stacie Chvatal | November 12, 2024 | 66:9-21 | | | | |
| Stacie Chvatal | November 12, 2024 | 67:1-72:7 | | | | |
| Stacie Chvatal | November 12, 2024 | 72:13-79:10 | B | | | |
| Stacie Chvatal | November 12, 2024 | 79:16-80:19 | | | | |
| Stacie Chvatal | November 12, 2024 | 80:20-82:10 | | | | |
| Stacie Chvatal | November 12, 2024 | 82:16-83:16 | | | | |
| Stacie Chvatal | November 12, 2024 | 83:25-84:6 | | | | |
| Stacie Chvatal | November 12, 2024 | 84:24-85:12 | | | | |
| Stacie Chvatal | November 12, 2024 | 85:14-87:7 | | 87:8-14 | | |
| Stacie Chvatal | November 12, 2024 | 87:15-88:1 | 402 | 88:2-6 | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Stacie Chvatal | November 12, 2024 | 88:7-88:13 | 402 | | | |
| Stacie Chvatal | November 12, 2024 | 91:15-92:2 | | 94:5-10, 95:2-7 | | 95:8-9 |
| Stacie Chvatal | November 12, 2024 | 95:10-96:17 | | | | |
| Stacie Chvatal | November 12, 2024 | 97:13-16 | | 96:25-97:10 | 402, Improper Counter | |
| Stacie Chvatal | November 12, 2024 | 99:20-100:9 | | 100:10-19, 101:5-14 | 402, Improper Counter | |
| Stacie Chvatal | November 12, 2024 | 102:14-103:2 | | | | |
| Stacie Chvatal | November 12, 2024 | 103:11-104:6 | | | | |
| Stacie Chvatal | November 12, 2024 | 105:3-106:17 | 402, 403 | | | |
| Stacie Chvatal | November 12, 2024 | 110:23-112:9 | | | | |
| Stacie Chvatal | November 12, 2024 | 114:9-125:23 | | 125:24-126:12 | | |
| Stacie Chvatal | November 12, 2024 | 126:14-127:5 | | | | |
| Stacie Chvatal | November 12, 2024 | 128:4-17 | | | | |
| Stacie Chvatal | November 12, 2024 | 129:2-8 | | | | |
| Stacie Chvatal | November 12, 2024 | 129:14-130:12 | | | | |

27

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Stacie Chvatal | November 12, 2024 | 130:23-132:9 | | 132:10-14 | | |
| Stacie Chvatal | November 12, 2024 | 132:15-24 | | 132:25-133:6 | | |
| Stacie Chvatal | November 12, 2024 | 133:7-135:6 | | | | |
| Stacie Chvatal | November 12, 2024 | 136:22-139:11 | | 139:12-140:19 | | |
| Stacie Chvatal | November 12, 2024 | 140:20-145:13 | | 145:14-146:12 | 402, Improper Counter | |
| Stacie Chvatal | November 12, 2024 | 146:13-147:2 | | 147:3-25 | 402, Improper Counter | |
| Stacie Chvatal | November 12, 2024 | 148:1-150:22 | B | | | |
| Stacie Chvatal | November 12, 2024 | 151:17-154:3 | B | | | |
| Stacie Chvatal | November 12, 2024 | 155:11-156:3 | | | | |
| Stacie Chvatal | November 12, 2024 | 156:7-23 | | | | |
| Stacie Chvatal | November 12, 2024 | 156:25-196:8 | 402, 602, 611, B | | | |
| Stacie Chvatal | November 12, 2024 | 196:16-202:7 | | | | |
| Stacie Chvatal | November 12, 2024 | 202:19-203:10 | | 202:9-18, 204:4-19 | 402, Improper Counter | |
| Stacie Chvatal | November 12, 2024 | 207:2-210:7 | | | | |

28

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Stacie Chvatal | November 12, 2024 | 210:11-211:13 | | 211:14-212:21 | 402, Improper Counter | |
| Stacie Chvatal | November 12, 2024 | 213:12-214:21 | B | | | |
| Stacie Chvatal | November 12, 2024 | 218:25-219:9 | | 218:6-24; 219:10-23 | | |
| Stacie Chvatal | November 12, 2024 | 222:2-226:10 | | 226:11-227:10 | 402, Improper Counter | |
| Stacie Chvatal | November 12, 2024 | 230:5-233:23 | B, 611 | | | |
| Stacie Chvatal | November 12, 2024 | 234:22-236:1 | | | | |
| Stacie Chvatal | November 12, 2024 | 238:2-240:8 | | | | |
| Stacie Chvatal | November 12, 2024 | 240:21-246:16 | | | | |
| Stacie Chvatal | November 12, 2024 | 246:18-25 | | | | |
| Stacie Chvatal | November 12, 2024 | 247:14-24 | | 247:3-13 | | |
| Stacie Chvatal | November 12, 2024 | 248:21-250:19 | | | | |
| Stacie Chvatal | November 12, 2024 | 253:10-254:15 | | | | |
| Stacie Chvatal | November 12, 2024 | 257:18-259:3 | | | | |
| Stacie Chvatal | November 12, 2024 | 260:13-262:11 | | 260:1-12 | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Stacie Chvatal | November 12, 2024 | 266:2-267:4 | | | | |
| Stacie Chvatal | November 12, 2024 | 268:17-270:11 | | 268:10-16 | | |
| Stacie Chvatal | November 12, 2024 | 270:19-271:8 | | | | |
| Stacie Chvatal | November 12, 2024 | 277:3-25 | | 278:1-279:11 | | |
| Stacie Chvatal | November 12, 2024 | 281:15-282:24 | | | | |
| Stacie Chvatal | November 12, 2024 | 283:22-284:3 | | 284:4-11 | | |
| Stacie Chvatal | November 12, 2024 | 284:12-285:3 | | | | |
| Stacie Chvatal | November 13, 2024 | 300:21-22 | | | | |
| Stacie Chvatal | November 13, 2024 | 301:16-304:6 | | | | |
| Stacie Chvatal | November 13, 2024 | 306:11-307:6 | | 307:7-13 | | |
| Stacie Chvatal | November 13, 2024 | 307:14-22 | | 307:23-24 | | |
| Stacie Chvatal | November 13, 2024 | 308:4-13 | | | | |
| Stacie Chvatal | November 13, 2024 | 310:11-311:21 | | 311:22-312:8 | | |
| Stacie Chvatal | November 13, 2024 | 312:9-314:1 | 602 | 314:4-7 | | |

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Stacie Chvatal | November 13, 2024 | 314:8-15 | | 314:16-25 | | |
| Stacie Chvatal | November 13, 2024 | 315:1-15 | | | | |
| Stacie Chvatal | November 13, 2024 | 331:4-332:8 | | | | |
| Stacie Chvatal | November 13, 2024 | 335:5-25 | | | | |
| Stacie Chvatal | November 13, 2024 | 343:18-345:16 | | | | |
| Stacie Chvatal | November 13, 2024 | 356:17-358:1 | | | | |
| Stacie Chvatal | November 13, 2024 | 359:1-18 | | | | |
| Stacie Chvatal | November 13, 2024 | 361:3-363:13 | | | | |
| Stacie Chvatal | November 13, 2024 | 375:20-25 | B, 402 | | | |
| Stacie Chvatal | November 13, 2024 | 387:4-392:3 | B, 402, 403, 602, 611 | | | |
| Thomas O'Brien | January 24, 2025 | 9:4-9 | 402 | | | |
| Thomas O'Brien | January 24, 2025 | 10:4-8 | 402 | | | |
| Thomas O'Brien | January 24, 2025 | 10:17-20 | 402 | | | |
| Thomas O'Brien | January 24, 2025 | 12:2-13:8 | 402 | | | |
| Thomas O'Brien | January 24, 2025 | 16:20-22 | 402 | | | |
| Thomas O'Brien | January 24, 2025 | 17:7-9 | 402 | | | |
| Thomas O'Brien | January 24, 2025 | 104:12-107:2 | 402, 403, A | | | |
| Todd Christian | February 3, 2025 | 8:6–10 | | | | |

31

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Todd Christian | February 3, 2025 | 9:6–9 | | | | |
| Todd Christian | February 3, 2025 | 10:11–16 | | | | |
| Todd Christian | February 3, 2025 | 11:9–12 | | | | |
| Todd Christian | February 3, 2025 | 11:17–21 | | | | |
| Todd Christian | February 3, 2025 | 22:23–24:3 | | | | |
| Todd Christian | February 3, 2025 | 25:5–29:25 | | | | |
| Todd Christian | February 3, 2025 | 30:13–22 | | | | |
| Todd Christian | February 3, 2025 | 32:2–34:13 | 402 | | | |
| Todd Christian | February 3, 2025 | 50:10–24 | 402 | | | |
| Todd Christian | February 3, 2025 | 58:7–59:11 | 402, 403 | | | |
| William Deacon | January 25, 2025 | 9:5-10 | 402 | | | |
| William Deacon | January 25, 2025 | 13:25-14:4 | 402 | | | |
| William Deacon | January 25, 2025 | 16:11-25 | 402 | | | |
| William Deacon | January 25, 2025 | 18:9-16 | 402 | | | |
| William Deacon | January 25, 2025 | 34:12-17 | 402, 611 | | | |
| William Deacon | January 25, 2025 | 64:9-65:21 | 402, 403, 611 | | | |
| William Deacon | January 25, 2025 | 69:1-70:14 | 402, 403, 611 | | | |
| William Deacon | January 25, 2025 | 70:22-71:21 | 402, 403, 611 | | | |
| William Deacon | January 25, 2025 | 80:25-81:15 | 402, 403, 611, CN, SP | | | |
| William Deacon | January 25, 2025 | 82:21-23 | 402, 403, SP | | | |
| William Deacon | January 25, 2025 | 86:5-20 | 402, 403, 611 | | | |
| William Deacon | January 25, 2025 | 87:10-88:5 | 402, 403, SP, 611 | 88:6-15 | | |

32

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| William Deacon | January 25, 2025 | 115:8-116:24 | 402, 403, 611 | | | |
| William Deacon | January 25, 2025 | 117:10-118:8 | 402, 403, 611 | 118:9-120:6 | | |
| William Deacon | January 25, 2025 | 141:17-142:10 | 402, 403 | 142:11-20 | 402, Improper counter | |
| Xiaobo Wang | February 6, 2025 | 9:20–23 | | | | |
| Xiaobo Wang | February 6, 2025 | 13:1–9 | | | | |
| Xiaobo Wang | February 6, 2025 | 13:22–25 | | | | |
| Xiaobo Wang | February 6, 2025 | 23:20-24:3 | | | | |
| Xiaobo Wang | February 6, 2025 | 24:8-19 | | | | |
| Xiaobo Wang | February 6, 2025 | 24:23-25:3 | | | | |
| Xiaobo Wang | February 6, 2025 | 25:12-15 | | | | |
| Xiaobo Wang | February 6, 2025 | 25:19-21 | | | | |
| Xiaobo Wang | February 6, 2025 | 25:25-26:8 | | | | |
| Xiaobo Wang | February 6, 2025 | 26:15-27:2 | | | | |
| Xiaobo Wang | February 6, 2025 | 28:1-11 | | | | |
| Xiaobo Wang | February 6, 2025 | 29:5-14 | | | | |
| Xiaobo Wang | February 6, 2025 | 30:15-32:12 | | | | |
| Xiaobo Wang | February 6, 2025 | 40:6-17 | | 40:22-41:3, 41:7-9 | 701 | |
| Xiaobo Wang | February 6, 2025 | 43:14-44:4 | | 41:20-43:9 | 701, LC | |
| Xiaobo Wang | February 6, 2025 | 44:5-45:4 | 402 | | | |
| Xiaobo Wang | February 6, 2025 | 45:5-21 | | | | |
| Xiaobo Wang | February 6, 2025 | 46:22-49:11 | | 46:3-21 | 701, LC | |
| Xiaobo Wang | February 6, 2025 | 49:25-50:21 | | 49:21-24, 50:23-25, 52:9-19, 56:10-16, | 402, 701, LC, Improper Counter | |

33

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| | | | | 56:18-57:8, 57:10-24, 59:19-60:8, 60:21-61:2 | | |
| Xiaobo Wang | February 6, 2025 | 61:3-18 | | same as row above | same as row above | |
| Xiaobo Wang | February 6, 2025 | 68:19-69:6 | | | | |
| Xiaobo Wang | February 6, 2025 | 69:10-13 | | 69:14-70:1 | 701, LC | |
| Xiaobo Wang | February 6, 2025 | 72:12-76:11 | | | | |
| Xiaobo Wang | February 6, 2025 | 80:21-81:20 | 70, CN | | | |
| Xiaobo Wang | February 6, 2025 | 87:12-20 | 402 | | | |
| Xiaobo Wang | February 6, 2025 | 89:7-90:24 | 402, 611, A | | | |
| Xiaobo Wang | February 6, 2025 | 92:5-13 | 402 | 91:2-92:4 | | |
| Xiaobo Wang | February 6, 2025 | 99:23-101:3 | | | | |
| Xiaobo Wang | February 6, 2025 | 102:21-103:21 | | 103:22-105:8 | 402, 701, LC, Improper Counter | |
| Xiaobo Wang | February 6, 2025 | 137:11-14 | 106, IA | | | |
| Xiaobo Wang | February 6, 2025 | 140:4-14 | | 138:20-140:3, 140:16-141:1, 141:16-142:6, 142:12-143:16 | 402, 701, LC, Improper Counter | |
| Xiaobo Wang | February 6, 2025 | 143:17-22 | | Same as row above | Same as row above | |
| Xiaobo Wang | February 6, 2025 | 143:24-163:12 | 402, 403 | | | |
| Xiaobo Wang | February 6, 2025 | 170:9-24 | SP | 168:15-17, 168:19-20, 169:5-8, 169:10-18 | | 168:5-14 |

34

**Exhibit 5P – Plaintiff's Deposition Designations**

| Witness | Date | Designated Testimony | Axion's Objections | Axion's Counter-Designations | Agilent's Objections to Axion's Counter-Designations | Agilent's Counters to Axion's Counter-Designations |
|---|---|---|---|---|---|---|
| Xiaobo Wang | February 6, 2025 | 172:2-176:10 | MQ, SP | 176:11-12, 176:14-18 | ARG, SPEC, P | |
| Xiaobo Wang | February 6, 2025 | 190:3-191:15 | 402 | | | |
| Xiaobo Wang | February 7, 2025 | 252:23-25 | | | | |
| Xiaobo Wang | February 7, 2025 | 277:16-278:9 | 402, 403 | 278:11-15 | | |
| Xiaobo Wang | February 7, 2025 | 308:2-314:14 | 402, 403, 611, A | | | |

35

# EXHIBIT 6D

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| colspan="6" | **Axion Trial Exhibit List (03/04/2026)** |
| DTX-0006 | AXION-0029602 | AXION-0029638 | 4/23/2002 | U.S. Patent No. 6,376,233 to Wolf et al., entitled "Device For Conducting Research On Cell Specimens And Similar Materials" (filed May 11, 1999; issued April 23, 2002; claims priority as a continuation of PCT/EP97/05997 filed October 30, 1997 and published May 22, 1998 as International Publication WO 98/20974) ("Wolf '233 Patent") | DNM; 402 |
| DTX-0023 | AGILE3225608 | AGILE3225673 | 4/18/2017 | U.S. Patent No. 9,625,472 ("'472 patent") | |
| DTX-0024 | AXION-0011222 | AXION-0011320 | 12/30/2008 | U.S. Patent No. 7,470,533 ("'533 patent") (incorporated by reference into the '080, '752, and '255 patent specifications) | |
| DTX-0025 | AXION-0011383 | AXION-0011444 | 12/2/2008 | U.S. Patent No. 7,459,303 ("'303 patent") (incorporated by reference into the '080, '752, and '255 patent specifications) | |
| DTX-0026 | AXION-0012968 | AXION-0013132 | 1/29/2004 | PCT/US03/22557 (published January 29, 2004 as WO 2004/010103) | |
| DTX-0028 | AXION-0751353 | AXION-0751902 | Various | File History of U.S. Patent No. 9,625,472 (Application No. 13/244,004) ("'472 File History") | |
| DTX-0029 | AGILE0041450 | AGILE0041475 | Undated | Schedule of Exhibits | |
| DTX-0032 | AGILE0066164 | AGILE0066164 | Undated | history-60598608.pdf | |
| DTX-0033 | N/A | N/A | 11/25/2024 | Axion's Notice of 30(b)(6) Deposition of Agilent | BRPL |
| DTX-0034 | N/A | N/A | Undated | LinkedIn resume of Chris Braun | |
| DTX-0035 | AGILE3752442 | AGILE3752442 | Undated | PLXF, Cell Analysis Marketing org chart | |
| DTX-0036 | AGILE3896236 | AGILE3896289 | Undated | Agilent DGG - Cell Analysis Division org chart | |
| DTX-0037 | AGILE1382864 | AGILE1383029 | 5/2/2018 | Long Range Strategy, Phrase 2; Going Bigger in Cancer Research & Diagnostics | |
| DTX-0038 | N/A | N/A | 2/23/2023 | Complaint | BRPL |
| DTX-0039 | AGILE5066609 | AGILE5066609 | Undated | Excel spreadsheet with sales data requested by customers | |
| DTX-0040 | AGILE5069414 | AGILE5069417 | Undated | DGG/Cell Analysis Division org chart | |
| DTX-0041 | AGILE5069419 | AGILE5069419 | Nov-24 | Agilent OFS IM Cell Analysis Manufacturing and Technology Centre org chart | |
| DTX-0042 | AGILE5069418 | AGILE5069418 | 11/25/2024 | Agilent Org chart | |
| DTX-0044 | N/A | N/A | 3/20/2025 | Opening Expert Report on Invalidity of Agilent Patents by Richard Fair | BRPL; H |
| DTX-0045 | N/A | N/A | 4/25/2025 | Rebuttal Expert Report on Non-Infringement of Agilent Patents by Dr. Richard Fair | BRPL; H |
| DTX-0046 | N/A | N/A | 3/20/2025 | Reply Expert Report on Invalidity of Agilent Patents by Dr. Richard Fair | BRPL; H |
| DTX-0047 | N/A | N/A | Undated | Live Cell Imaging and Analysis by Sartorius website printouts | 401; H; NP; 402; 701 |

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| colspan=6 | **Axion Trial Exhibit List (03/04/2026)** |
| DTX-0048 | AGILE3436182 | AGILE3436182 | 2/20/2021 | FY21 CLSD Division Review: March 22, 2021;  Product Line Overview and Framework | |
| DTX-0049 | N/A | N/A | 4/15/2001 | Monitoring Motility, Spreading, and Mortality of Adherent Insect Cells Using an Impedance Sensor | H; 701 |
| DTX-0051 | AXION-0267153 | AXION-0267158 | Undated | CAR T Cell Potency Assessment with 3D Cancer Spheroid Models | |
| DTX-0053 | AXION-1071419 | AXION-1071443 | 2/6/2025 | Cell Stem Cell Patient-derived glioblastoma organoids as real-time avatars for assessing responses to clinical CAR-T cell therapy | |
| DTX-0054 | N/A | N/A | Undated | LinkedIn page of Nathan Griffith | |
| DTX-0055 | AGILE4415009 | AGILE4415032 | 4/10/2023 | Grant Expeditor Package; Agilent xCELLigence Real Time Cell Analyzers | |
| DTX-0056 | AGILE5068721 | AGILE5068721 | Undated | Excel spreadsheet profit and loss statement for services division | |
| DTX-0057 | AGILE5068719 | AGILE5068719 | Undated | Excel spreadsheet of profit and loss statement | |
| DTX-0058 | AGILE5068720 | AGILE5068720 | Undated | Excel spreadsheet with actuals and projections for the next level below the total ACEA business | |
| DTX-0059 | AGILE5066608 | AGILE5066608 | Undated | Excel spreadsheet listing revenue for the most recent five years for a subset of products within ACEA business | |
| DTX-0060 | AGILE5068718 | AGILE5068718 | Undated | Excel spreadsheet with sales data requested by customers | |
| DTX-0061 | AGILE5068717 | AGILE5068717 | Undated | Excel spreadsheet with services revenue | |
| DTX-0062 | AGILE3916540 | AGILE3916540 | Jan-22 | Cell Analysis Division Leadership Team org chart | |
| DTX-0063 | AGILE0931618 | AGILE0931632 | 8/30/2021 | Agilent - Global IM COE; Footprint Analysis: Core Site Capacity Planning Aug 2021, sharing to LSAG staff | |
| DTX-0064 | AGILE3326574 | AGILE3326608 | Jun-23 | Cell Analysis Market Global Forecast to 2028 Report Brochure by Markets and Markets | 401; H; 402 |
| DTX-0065 | AGILE1476643 | AGILE1477823 | Apr-23 | SDi Global Assessment Report 2023; Market Analysis & Perspectives 2022-2027 | 401; H; 402 |
| DTX-0066 | N/A | N/A | Undated | LinkedIn page of Nan (Nancy) Li | |
| DTX-0067 | AXION-0045974 | AXION-0045978 | 5/15/2023 | Exhibit P to First Amended Complaint - Axion webpage re Cancer Spheroid | |
| DTX-0068 | AXION-0045971 | AXION-0045973 | 5/15/2023 | Cell Culture Protocol; Cancer Spheroids for the Maestro Z | |
| DTX-0069 | AGILE0002101 | AGILE0002101 | 9/27/2010 | 3D Cell Structure Impedance Measurement; 1. Hugel Mini Tumor deck | |
| DTX-0070 | AGILE3436686 | AGILE3436686 | 10/22/2019 | Agilent - 3D Spheroids Cytoxicity test deck | 401; H; 402 |

2

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| colspan="6" | **Axion Trial Exhibit List (03/04/2026)** |
| DTX-0071 | AGILE3436510 | AGILE3436510 | 8/18/2020 | Agilent - PLXA: Proposal for Agilent Lab Advanced Technologies deck | |
| DTX-0072 | AGILE3250495 | AGILE3250496 | 3/8/2023 | Email chain from N. Li re 3D spheroid on 96x E-plate | NCT |
| DTX-0073 | AGILE5069398 | AGILE5069410 | Mar-23 | Agilent - 3D SKOV3 spheroids on 96x E-plate deck | |
| DTX-0074 | AGILE2951509 | AGILE2951512 | 9/25/2019 | Email chain from M. Zhu re eSight application | 401; H; 402; 701; 403 |
| DTX-0075 | AGILE1351175 | AGILE1351180 | 8/30/2023 | Email chain from L. Zhao re ▮▮▮▮▮▮▮▮▮▮ | 401; 402; 701; 403 |
| DTX-0076 | AGILE2975760 | AGILE2975761 | 4/7/2020 | Email chain from J. Tirone re COVID-19 Axion Maestro Z Virology Collateral | 401; H; 402 |
| DTX-0077 | AGILE3253823 | AGILE3253826 | 10/23/2023 | Email chain from T. Yao re PCB | 401; H; 402; NCT; 403 |
| DTX-0078 | AGILE4291098 | AGILE4291107 | 3/24/2022 | Agilent Application Note, Cell Analysis; Monitoring Drug-Mediated 3D Tumor Spheroid Shrinkage in Real Time Using the Agilent xCELLigence RTCA eSight | 401; 402; 403 |
| DTX-0079 | AXION-0579515 | AXION-0579542 | Undated | xCELLigence RTCA Handbook Cancer Immunotherapy | |
| DTX-0080 | AXION-0750365 | AXION-0750372 | 2/7/2017 | Real-time and label-free impedimetric analysis of the formation and drug testing of tumor spheroids formed via the liquid overlay technique. RSC Adv., 2017, 7, 13939-13946 | |
| DTX-0081 | AGILE4957005 | AGILE4957008 | Undated | Battle Card: Impedance-base label-free real time cell analysis platform | |
| DTX-0082 | AGILE3436106 | AGILE3436106 | Undated | xCELLigence Real Time Analysis Instruments (S16, SP, MP, HT) | |
| DTX-0083 | AGILE0019010 | AGILE0019010 | Undated | PL XA - Flow Cytometer & Real-Time Cell Analyzers | |
| DTX-0084 | AGILE0028895 | AGILE0028895 | 6/3/2025 | xCELLigence Market Trends, Competition and Positioning deck | |
| DTX-0085 | AGILE5069413 | AGILE5069413 | Undated | Excel spreadsheet | |
| DTX-0086 | N/A | N/A | Undated | LinkedIn page of Xiaobo Wang | |
| DTX-0088 | AGILE0074250 | AGILE0074285 | 10/29/2002 | ACEA Presentation to Dr. Howard Lee of CDIB | |
| DTX-0089 | AGILE0041387 | AGILE0041424 | Undated | Development, OEM Supply and Distribution Agreement between ACEA and Roche Diagnostics GmbH (pp. 1-38) | |
| DTX-0090 | AGILE0041476 | AGILE0041476 | Undated | Signature page of Development, OEM Supply and Distribution Agreement | |
| DTX-0091 | AGILE0041477 | AGILE0041478 | 12/12/2007 | 1st Amendment to Development, OEM Supply and Distribution Agreement | |
| DTX-0092 | AGILE0041479 | AGILE0041480 | 9/23/2008 | 2nd Amendment to Development, OEM Supply and Distribution Agreement | |
| DTX-0093 | AGILE0041481 | AGILE0041483 | 3/12/2008 | 3rd Amendment to Development, OEM Supply and Distribution Agreement | |
| DTX-0094 | AGILE0041484 | AGILE0041490 | 1/12/2010 | 4th Amendment to Development, OEM Supply and Distribution Agreement | |
| DTX-0095 | AGILE0041491 | AGILE0041492 | 5/12/2010 | 5th Amendment to Development, OEM Supply and Distribution Agreement | |

3

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| colspan="6" | **Axion Trial Exhibit List (03/04/2026)** |||||
| DTX-0096 | AGILE0041493 | AGILE0041496 | 10/11/2010 | 6th Amendment to Development, OEM Supply and Distribution Agreement | |
| DTX-0097 | AGILE0041425 | AGILE0041429 | 4/13/2011 | 7th Amendment to Development, OEM Supply and Distribution Agreement | |
| DTX-0098 | AGILE0041430 | AGILE0041445 | 8/30/2012 | 8th Amendment to Development, OEM Supply and Distribution Agreement | |
| DTX-0099 | AGILE0041446 | AGILE0041449 | 7/22/2014 | 9th Amendment to Development, OEM Supply and Distribution Agreement | |
| DTX-0100 | AGILE0041627 | AGILE0041628 | Undated | Exhibit 7 to the ACEA-Roche agreement | |
| DTX-0101 | AGILE0041536 | AGILE0041599 | Undated | Development, OEM Supply and Distribution Agreement between ACEA and Roche Diagnostics GmbH | |
| DTX-0102 | AGILE3261375 | AGILE3261375 | 4/13/2022 | Email from T. Yao re ▮▮▮▮▮▮▮▮▮ | H; 402; 701 |
| DTX-0103 | AGILE3436083 | AGILE3436083 | 2/7/2025 | CytoView-Z Plate from Axion; Cell Analysis Division, LSAG | H; 402; 701; 403 |
| DTX-0104 | AGILE3006168 | AGILE3006169 | 12/9/2022 | Email chain from X. Wang re RTCA instruments lost to Axion? | |
| DTX-0105 | AGILE3313869 | AGILE3313871 | 12/9/2022 | Email chain from N. Yu re RTCA instruments lost to Axion? | |
| DTX-0106 | AGILE3313881 | AGILE3313882 | 12/9/2022 | Email chain from S. Nasrollahi re RTCA instruments lost to Axion? | |
| DTX-0107 | AGILE3006170 | AGILE3006171 | 12/9/2022 | Email chain from M. Lewis re RTCA instruments lost to Axion? | |
| DTX-0108 | AGILE3313864 | AGILE3313865 | 12/9/2022 | Email chain from A. Nayebosadri re RTCA instruments lost to Axion? | |
| DTX-0109 | AGILE2149769 | AGILE2149771 | 12/17/2019 | Email chain from X. Wang re JP Morgan - Axion | |
| DTX-0110 | AGILE2150763 | AGILE2150763 | 1/9/2020 | Email chain from X. Wang re Axion Biosystems call | 402; 403 |
| DTX-0111 | N/A | N/A | Undated | LinkedIn profile of Leyna Zhao | |
| DTX-0112 | AGILE0004164 | AGILE0004171 | 2/2/2021 | Dynamic Monitoring of Cell Adhesion and Spreading. xCELLigence real-time cell analysis. | |
| DTX-0113 | AGILE1319466 | AGILE1319468 | 7/20/2017 | Email chain from B. Lamarche re Hanging drop assays for CTCs and personalized cancer immunotherapy assays | |
| DTX-0114 | AGILE4916870 | AGILE4916876 | 9/23/2000 | Biohybrid microarrays - Impedimetric biosensors with 3D in vitro tissues for toxicological and biomedical screening. Fresenius J Anal Chem (2001) 369:23-29 | 401; H; 402; 701 |
| DTX-0115 | AGILE2905647 | AGILE2905651 | 4/10/2017 | Email from L. Zhao re ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ | H; 402; 701 |
| DTX-0116 | AGILE3170791 | AGILE3170792 | 8/3/2022 | Email chain from L. Zhao re Axion's Car-T killing cancer 3D spheroids app note is just out | |
| DTX-0117 | AGILE1593792 | AGILE1593795 | 7/21/2022 | Email chain from P. Ye re Special Edition! Monthly RTCA meeting | |
| DTX-0119 | AGILE1602261 | AGILE1602262 | 5/3/2022 | Email chain from R. Raver re Ryan/Leyna biweekly 1:1 | 401; 402; 701; 403 |

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| | | | | **Axion Trial Exhibit List (03/04/2026)** | |
| DTX-0120 | AGILE4105373 | AGILE4105377 | 9/7/2016 | Email chain from B. Lamarche re spheroids part 2 | 401; H; INC; 402; 701 |
| DTX-0121 | AGILE4105384 | AGILE4105391 | 7/30/2014 | Betaglycan blocks metastatic behaviors in human granulosa cell tumors by suppressing NFkB-mediated induction of MMP2. Cancer Letters 354 (2014) 107- 114 | 401; H; 402; 701; 403 |
| DTX-0122 | AGILE4673575 | AGILE4673575 | Jul-22 | Summary of AXION BioSystems; PLXA Team | |
| DTX-0123 | AGILE1337338 | AGILE1337346 | 3/16/2021 | Email chain from D. Faugaret re xCELLigence 2 HT bundle +1 HT station | |
| DTX-0124 | AGILE1685453 | AGILE1685464 | 8/14/2023 | Email chain from R. Barakat re Why we lost to AXION - Meet the Customer! | |
| DTX-0125 | AGILE2982456 | AGILE2982457 | 5/19/2022 | Email chain from L. Zhao re Competition CardioECR | |
| DTX-0126 | AGILE2986101 | AGILE2986103 | 8/22/2023 | Email chain from L. Zhao re ████████████ | |
| DTX-0127 | AGILE1566080 | AGILE1566080 | 5/4/2022 | Meeting invite from L. Zhao for 5/5/2022 re ████████ | |
| DTX-0128 | AGILE1337349 | AGILE1337350 | 3/16/2021 | Email chain from R. Raven re ████████ | |
| DTX-0129 | AGILE2974773 | AGILE2974774 | 3/18/2021 | Email chain from L. Zhao re ████████ | |
| DTX-0130 | AGILE5068797 | AGILE5068797 | Undated | CLSD P&L.xls | |
| DTX-0131 | N/A | N/A | Undated | Maestro Z web page print out | |
| DTX-0132 | N/A | N/A | Undated | Maestro ZHT web page print out | |
| DTX-0133 | N/A | N/A | Undated | Maestro TrayZ web page print out | |
| DTX-0134 | N/A | N/A | Undated | Maestro Pro web page print out | |
| DTX-0135 | N/A | N/A | Undated | Maestro Edge web page print out | |
| DTX-0136 | N/A | N/A | Undated | Excerpts from the Appendices to the Opening Expert Report of Dr. A. Bruno Frazier dated March 20, 2025 | BRPL; H; INC |
| DTX-0139 | AXION-0267153 | AXION-0267158 | | Document titled "Application Note CAR T Cell Potency Assessment with 3D Cancer Spheroid Models" | |
| DTX-0141 | AGILE0918280 | AGILE0918306 | 6/13/2018 | Project Apex Pre-Concept Review Discussion | |
| DTX-0142 | N/A | N/A | 12/13/2023 | Agilent Technologies, Inc.'s Objections and Responses to Axion Biosystems, Inc.'s First Set of Interrogatories (Nos. 1-9) | |

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| colspan="6" | **Axion Trial Exhibit List (03/04/2026)** |
| DTX-0143 | N/A | N/A | 3/14/2024 | Agilent Technologies, Inc.'s First Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 3 | BRPL |
| DTX-0144 | N/A | N/A | 3/29/2024 | Agilent Technologies, Inc.'s Objections and Responses to Axion Biosystems, Inc.'s Second Set of Interrogatories (Nos. 10-19) | |
| DTX-0145 | N/A | N/A | 4/8/2024 | Agilent Technologies, Inc.'s First Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatories Nos. 1, 2, 5 and 6 | BRPL |
| DTX-0146 | N/A | N/A | 8/14/2024 | Agilent Technologies, Inc.'s First Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory Nos. 11 and 12 | BRPL |
| DTX-0147 | N/A | N/A | 8/16/2024 | Agilent Technologies, Inc.'s First Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatories Nos. 7-9 | |
| DTX-0148 | N/A | N/A | 11/27/2024 | Agilent Technologies, Inc.'s Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatories Nos. 2 and 22 | |
| DTX-0149 | N/A | N/A | 1/14/2025 | Agilent's 4th Amended Objections and Responses to Axion's Interrogatories Nos. 13-16 (excerpts) | BRPL |
| DTX-0150 | N/A | N/A | 1/22/2025 | Agilent Technologies, Inc.'s Second Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 11 | BRPL |
| DTX-0151 | N/A | N/A | 1/27/2025 | Agilent Technologies, Inc.'s Second Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 1 | BRPL |
| DTX-0152 | N/A | N/A | 1/28/2025 | Agilent Technologies, Inc.'s Second Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 6 | |
| DTX-0153 | N/A | N/A | 1/30/2025 | Agilent Technologies, Inc.'s Corrected Third Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 11 | |
| DTX-0154 | N/A | N/A | 2/3/2025 | Agilent Technologies, Inc.'s Second Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 12 | |
| DTX-0155 | N/A | N/A | 2/5/2025 | Agilent Technologies, Inc.'s Corrected Second Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 6 | BRPL |

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| colspan="6" | **Axion Trial Exhibit List (03/04/2026)** |
| DTX-0156 | N/A | N/A | 2/5/2025 | Agilent Technologies, Inc.'s Third Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 1 | BRPL |
| DTX-0157 | N/A | N/A | 2/12/2025 | Agilent Technologies, Inc.'s Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 22 | BRPL |
| DTX-0158 | N/A | N/A | 2/12/2025 | Agilent Technologies, Inc.'s Second Amended Objections and Responses to Axion Biosystems, Inc.'s Interrogatory No. 5 | BRPL |
| DTX-0159 | N/A | N/A | Undated | Agilent's 3rd Amended Objections and Response to Axion's Interrogatory No. 11 (excerpts) | BRPL |
| DTX-0160 | AGILE2218936 | AGILE2218937 | 12/9/2015 | 4.1.4.2.3 - MP Spec Sheet.pdf | |
| DTX-0161 | AGILE2218943 | AGILE2218946 | 12/5/2013 | 4.1.4.2.7 - Consumables Spec Sheet.pdf | |
| DTX-0177 | AXION-0002584 | AXION-0002589 | Undated | F1295689-AppNote_CAR_T_in_3D_Cancer_Spheroids.pdf | |
| DTX-0183 | AXION-0003015 | AXION-0003015 | Undated | Z96-IMP-96B DATASHEET v2.pdf | |
| DTX-0184 | AXION-0004694 | AXION-0004694 | Undated | .dat file | |
| DTX-0198 | AXION-0045521 | AXION-0045530 | 3/24/2022 | Ye, P., et al. Monitoring Drug-Mediated 3D Tumor Spheroid Shrinkage in Real Time Using the Agilent xCELLigence RTCA eSight | |
| DTX-0199 | AXION-0047816 | AXION-0047899 | Undated | Maestro Z Slide Deck - Oct2023.pptx | |
| DTX-0210 | AXION-0078021 | AXION-0078021 | Undated | Webinars from Immuno-Oncology Insights video | |
| DTX-0212 | AXION-0085149 | AXION-0085193 | Oct-23 | Axion Company Overview_Oct 2023_BMG Labtech.pdf | |
| DTX-0213 | AXION-0089376 | AXION-0089395 | Jan-24 | Axion Company Overview_Jan 2024.pdf | |
| DTX-0214 | AXION-0094631 | AXION-0094631 | Undated | Spheroids (CytoView-Z 384 plate) - Cell Culture Protocol Draft.pptx | |
| DTX-0263 | AXION-0271935 | AXION-0271936 | 12/1/2022 | Email from A. Passaro Re: collaboration contract discussion | |
| DTX-0264 | AXION-0272169 | AXION-0272169 | 12/16/2022 | Email from S. Chvatal re Suspension target cell protocols and figures | |
| DTX-0271 | AXION-0274086 | AXION-0274086 | 3/14/2023 | Email from B. Streeter re TrayZ Protocols | |
| DTX-0274 | AXION-0274657 | AXION-0274657 | 3/27/2023 | Email from D. Califano re TrayZ Documentation | |
| DTX-0278 | AXION-0280772 | AXION-0280775 | 1/2/2024 | Email from D. Greenberg Re: TrayZ demo and RFQ: Axion Bio + Enoda, dinner 11/7 | |
| DTX-0297 | AXION-0416782 | AXION-0416789 | Undated | Axion Bio - Brochure - Immunooncology Development.pdf | |
| DTX-0302 | AXION-0420404 | AXION-0420409 | Undated | Maestro ZHT Brochure_v2.pdf | |
| DTX-0304 | AXION-0425442 | AXION-0425442 | 7/24/2023 | Axion BioSystems - Sampled - Intro call 230724.pptx | |
| DTX-0310 | AXION-0582826 | AXION-0582828 | 7/30/2022 | Email Re: ACEA NK cell assay IP | |
| DTX-0314 | AXION-0666365 | AXION-0666368 | 1/13/2020 | Email from D. Hurtado RE: Spec sheet for Maestro Z | |
| DTX-0334 | AXION-1072085 | AXION-1072085 | | Dr. Logun' public webinar. | |
| DTX-0335 | AXION-1072086 | AXION-1072210 | Feb-06 | SR715, SR720, LCR Meters User Manual | 401; H; 402; U; 701; 403 |

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| | | | | **Axion Trial Exhibit List (03/04/2026)** | |
| DTX-0336 | AXION-1072211 | AXION-1072425 | Jan-96 | Solartron manual1260.pdf | 401; H; 402; U; 701; 403 |
| DTX-0337 | AXION-1072426 | AXION-1072501 | May-92 | STANFORD RESEARCH SYSTEMS SR715 Program and Instruction.pdf | 401; H; 402; U; 701; 403 |
| DTX-0338 | AXION-1072502 | AXION-1072515 | 6/21/2005 | RT-CES Trademark Application.pdf | 402 |
| DTX-0339 | AXION-1072516 | AXION-1072516 | 12/13/2003 | Abstracts of the American Society for Cell Biology 43rd Annual Meeting. December 13-17 2003, San Francisco, California, USA - PubMed.pdf | 401; H; 402 |
| DTX-0340 | AXION-1072518 | AXION-1072521 | Undated | Electrical Impedance Spectroscopy in GPCR Research Technical note | 401; H; 402; 701 |
| DTX-0341 | AXION-1072522 | AXION-1072523 | Undated | Applied BioPhysics Applications web page print out | 401; H; 402; 701 |
| DTX-0342 | AXION-1072524 | AXION-1072526 | Undated | Applied BioPhysics ECIS Z-Theta web page print out | 401; H; 402; 701 |
| DTX-0343 | AXION-1072527 | AXION-1072529 | Undated | Circular segment Wikipedia web page print out | A; 401; 402 |
| DTX-0344 | AXION-1072530 | AXION-1072534 | Undated | Axion Our History web page print out | |
| DTX-0345 | AXION-1072535 | AXION-1072536 | Undated | Millipore Sigma Downloadable 96 Well Plate Templates web page print out | 401; H; 402; 701 |
| DTX-0346 | AXION-1072537 | AXION-1072546 | 6/24/1997 | U.S. Patent 5,641,995 Attachment of Ceramic Chip Carriers to Printed Circuit Boards | 401; H; 402; U |
| DTX-0347 | AXION-1072547 | AXION-1072549 | Undated | IC50 Wikipedia web page print out | A; 401; H; 402 |
| DTX-0348 | AXION-1072550 | AXION-1072552 | Undated | TO-8 Wikipedia web page print out | A; 401; H; 402 |
| DTX-0429 | AXION-0564128 | AXION-0564128 | Undated | Cell Analysis battle card.xlsx | 401; 402 |
| DTX-0468 | N/A | N/A | 1/7/2020 | Assessing the Potency of T Cell-Redirecting Therapeutics Using In Vitro Cancer Cell Killing Assays. https://experiments.springernature.com/articles/10.1007/978-1-0716-0171-6_4 | 401; H; NP; 402; U |
| DTX-0470 | N/A | N/A | 2015 | Single, A., et al., A Comparison of Real-Time and Endpoint Cell Viability Assays for Improved Synthetic Lethal Drug Validation. https://pubmed.ncbi.nlm.nih.gov/26384394/#:~:text=The%20IncuCyte%20and%20xCELLigence%20real,proliferation%20at%20sub%2Dconfluent%20growth | 401; H; NP; 402; U |
| DTX-0472 | N/A | N/A | Undated | BrainWave Unlock the full story of cellular activity web page print out. https://www.3brain.com/ | 401; H; NP; 402; U |
| DTX-0474 | N/A | N/A | 1/8/2018 | Agilent Press Release "Agilent Expands Cell Analysis Portfolio with Acquisition of Luxcel Biosciences" web page print out. https://www.agilent.com/about/newsroom/presrel/2018/09jan-gp17025.html | 401; H; NP; 402; U |

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| | | | | **Axion Trial Exhibit List (03/04/2026)** | |
| DTX-0476 | N/A | N/A | 7/10/2019 | Agilent Press Release "Agilent to Acquire BioTek, Strengthening Leadership Position in Growing Cell Analysis Segment" web page print out. https://www.agilent.com/about/newsroom/presrel/2019/11jul-gp19100.html | 401; H; NP; 402; U |
| DTX-0477 | N/A | N/A | Undated | Agilent xCELLigence Real-Time Cell Analysis Instruments https://www.agilent.com/cs/library/brochures/5994-1596EN_General%20xC%20Brochure.pdf | 401; H; NP; 402; U |
| DTX-0478 | N/A | N/A | 8/14/2019 | Agilent Press Release "Agilent Introduces Revolutionary Real-Time Cell Analyzer" web page print out. https://www.agilent.com/about/newsroom/presrel/2019/15aug-ca19020.html | 401; H; NP; 402; U |
| DTX-0480 | N/A | N/A | Undated | xCELLigence RTCA S16 - Pilot Scale web page print out. https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca-analyzers/xcelligence-rtca-s16-pilot-scale-741231#productdetails | 401; H; NP; 402; U |
| DTX-0481 | N/A | N/A | Undated | RTCA eSight Software web page print out. https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca- software/rtca-esight-software-921150 | 401; H; NP; 402; U |
| DTX-0482 | N/A | N/A | Undated | RTCA Software Pro web page print out. https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca-software/rtca-software-pro-741236 | 401; H; NP; 402; U |
| DTX-0484 | N/A | N/A | Undated | Alpha MED64 MEA System web page print out. https://www.autom8.com/med64-system/?srsltid=AfmBOoo5S8PvKjmsQJAQGrHclisomuHpf57IrdVioOl9yFf1rN7SRo EX | 401; H; NP; 402; U |
| DTX-0486 | N/A | N/A | Undated | Axion Live-cell imaging web page print out. https://www.axionbiosystems.com/live-cell-imaging | 401; H; NP; 402; U |
| DTX-0488 | N/A | N/A | Undated | Axion Cell Analysis web page print out. https://www.axionbiosystems.com/products/cell-analysis | 401; H; NP; 402; U |
| DTX-0489 | N/A | N/A | Undated | Axion GxP Impedance Module web page print out. https://www.axionbiosystems.com/products/cell-analysis/cell-analysis-software/gxp-impedance-module | 401; H; NP; 402; U |
| DTX-0490 | N/A | N/A | Undated | Axion Impedance Module web page print out. https://www.axionbiosystems.com/products/cell-analysis/cell-analysis-software/impedance-automation-module | 401; H; NP; 402; U |

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| | | | | **Axion Trial Exhibit List (03/04/2026)** | |
| DTX-0491 | N/A | N/A | Undated | Axion Impedance Automation Module web page print out. https://www.axionbiosystems.com/products/cell-analysis/cell-analysis-software/impedance-module | 401; H; NP; 402; U |
| DTX-0493 | N/A | N/A | Undated | Axion Maestro MEA web page print out. https://www.axionbiosystems.com/products/mea | 401; H; NP; 402; U |
| DTX-0496 | N/A | N/A | Undated | Axion Maestro MEA Brochure. https://www.axionbiosystems.com/resources/product-brochure/maestro-mea-brochure | 401; H; NP; 402; U |
| DTX-0497 | N/A | N/A | 4/15/2013 | Advertorial: ACEA Biosciences web page print out. https://www.genengnews.com/insights/roche-all-set-to-launch-xcelligence-system/ https://www.genengnews.com/sponsored/advertorial-acea-biosciences/ | 401; H; NP; 402; U |
| DTX-0498 | N/A | N/A | 9/9/2015 | Agilent Technologies to Acquire Seahorse Bioscience, Industry Leader in Tools for Measuring Cell Metabolism press release. https://www.investor.agilent.com/news-and-events/news/news-details/2015/Agilent- Technologies-to-Acquire-Seahorse-Bioscience-Industry-Leader-in-Tools-for-Measuring-Cell-Metabolism/default.aspx | 401; H; NP; 402; U |
| DTX-0499 | N/A | N/A | Undated | Microelectrode Arrays web page print out. https://www.multichannelsystems.com/products/microelectrode-arrays | 401; H; NP; 402; U |
| DTX-0500 | N/A | N/A | Undated | MaxOne web page print out. https://www.mxwbio.com/products/ | 401; H; 402; U |
| DTX-0503 | N/A | N/A | 12/2/2008 | Marquez-Vega, E., High Throughput Online-Measurement of Cell Activities without Labeling: The New xCELLigence RTCA MP Instrument. https://www.selectscience.net/article/high-throughput-online-measurement-of-cell-activities-without-labeling-the-new-xcelligence-rtca-mp-instrument | 401; H; NP; 402; U |
| DTX-0507 | N/A | N/A | Undated | Agilent RTCA E-Plates web page print out https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca-microplates/rtca-e-plates-759976 | 401; H; NP; 402; U |
| DTX-0508 | AXION-0482959 | AXION-0482961 | 3/21/2024 | Email from A. Aras re Monday M&A Workshop Session Materials | 401; H; 402; 701 |
| DTX-0509 | N/A | N/A | Undated | Physical Exhibit of AG-PHYS-01 (relating to devices shown DTX0014 / PTX-0813 / JTX0024) | |
| DTX-0510 | N/A | N/A | Undated | Physical Exhibit of AG-PHYS-02 (relating to devices shown DTX0014 / PTX-0814 / JTX0024) | |
| DTX-0511 | N/A | N/A | Undated | Physical Exhibit of AG-PHYS-03 (relating to devices shown DTX0014 / PTX-0815 / JTX0024) | |

| Trial Exhibit No. | BegDoc | EndDoc | Doc Date | Description | Objections |
|---|---|---|---|---|---|
| | | | | **Axion Trial Exhibit List (03/04/2026)** | |
| DTX-0512 | N/A | N/A | Undated | Physical Exhibit of AG-PHYS-04 (relating to devices shown DTX0014 / PTX-0816 / JTX0024) | |
| DTX-0513 | N/A | N/A | Undated | Physical Exhibit of AG-PHYS-05 (relating to devices shown DTX0014 / PTX-0817 / JTX0024) | |
| DTX-0515 | AXION-0048686 | AXION-0048746 | 3/2021 | March 2020 Management powerpoint presentation | CUM, H, 401, 402, U |
| DTX-0516 | AXION-0697682 | AXION-0697732 | 4/2021 | April 2021 Company Overview powerpoint presentation | CUM, H, 401, 402, U |
| DTX-0517 | AXION-0690914 | AXION-0690920 | 7/24/2018 | National Institute of Health Award dated 7/24/2018 | 401, 402, U |
| DTX-0518 | AXION-0690146 | AXION-0690152 | 12/7/2017 | National Institute of Health Award dated 12/7/2017 | 401, 402, U |
| DTX-0519 | AGILE1566640 | AGILE1566641 | 7/6/2022 | Email chain from B. Walker re ▮▮▮▮▮▮▮▮ | 401, 402, 403, U |
| DTX-0520 | AXION-0689242 | AXION-0689248 | 3/27/2017 | National Institute of Health Award dated 3/27/2017 | 401, 402, U |
| DTX-0521 | N/A | N/A | Undated | Physical Sample of Maestro Z | 401, 402, 403, NP, U |
| DTX-0522 | AXION-0691727 | AXION-0691734 | 6/20/2019 | National Institute of Health Award dated 6/20/2019 | 401, 402, U |
| DTX-0523 | N/A | N/A | Undated | Physical Sample of Maestro Pro | 401, 402, 403, NP, U |

# EXHIBIT 6J

| Joint Exhibit Number | Agilent Exhibit Number | Axion Exhibit Number | Trial Exhibit Description | Begin Bates | End Bates |
|---|---|---|---|---|---|
| JTX0001 | PX-0060 | DTX0015 | U.S. Patent 7,192,752, B2 Real Time Electronic Cell Sensing Systems and Applications for Cell-Based Assays | AGILE0000001 | AGILE0000069 |
| JTX0002 | PX-0062 | DTX0017 | U.S. Patent 8,026,080 B2 Real Time Electronic Cell Sending System andApplications for Cell-Based Assays | AGILE0000174 | AGILE0000240 |
| JTX0003 | PX-0061 | DTX0016 | U.S. Patent 7,468,255 B2 Method for Assaying for Natural Killer, Cytotoxic T-Lymphocyte and Neutrophil-Mediated Killing of Target Cells Using Real-Time Microelectronic Cell Sensing Technology | AGILE0000070 | AGILE0000138 |
| JTX0004 | PX-0063 | DTX0018 | File History of U.S. Patent No. 7,192,752 (Application No. 10/987,732) ("'752 FileHistory") | AGILE0000241 | AGILE0000597 |
| JTX0005 | PX-0065 | DTX0020 | File History of U.S. Patent No. 8,026,080 (Application No. 11/725,040) ("'080 FileHistory") | AGILE0000980 | AGILE0001645 |
| JTX0006 | PX-0064 | DTX0019 | File History of U.S. Patent No. 7,468,255 (Application No. 11/197,194) ("'255 FileHistory") | AGILE0000598 | AGILE0000979 |
| JTX0007 | PX-0539 | DTX0021 | U.S. Provisional Application No. 60/397,749, filed July 20, 2002 | AGILE0063917 | AGILE0064032 |
| JTX0008 | PX-0540 | DTX0022 | U.S. Provisional Application No. 60/435,400, filed December 20, 2002 | AGILE0064033 | AGILE0064257 |
| JTX0009 | PX-0545 | DTX0027 | U.S. Provisional Application No. 60/598,608, filedAugust 4, 2004 (the "'608 Provisional Application") | AGILE0064596 | AGILE0064614 |
| JTX0010 | PX-0536 | DTX0030 | Filing history of U.S. Patent 7,470,533.pdf | AGILE0061737 | AGILE0062810 |
| JTX0011 | PX-0542 | DTX0031 | U.S. Provisional Application No. 60/519,567, filed 11/12/2003 | AGILE0064379 | AGILE0064437 |

| JTX0012 | PX-1058 | DTX0001 | Ehret et al., "Monitoring of cellular behaviour by impedance measurements on interdigitated electrode structures," Biosensors & Bioelectronics, Vol. 12, No. 1, 29-41 (1997) ("Ehret 1997 Publication") | AXION-0021823 | AXION-0021825 |
|---|---|---|---|---|---|
| JTX0013 | PX-1064 | DTX0002 | Keese et al., "Real-Time Impedance Assay to Follow the Invasive Activities of Metastatic Cells in Culture," BioTechniques, 33, 842-850 (October 2002) ("Keese Publication") | AXION-0026290 | AXION-0026296 |
| JTX0014 | PX-1057 | DTX0003 | Wegener et al., "Electric Cell-Substrate Impedance Sensing (ECIS) as a Noninvasive Means to Monitor the Kinetics of Cell Spreading to Artificial Surfaces," Experimental Cell Research, 259, 158-166 (2000) ("Wegener Publication") | AXION-0021814 | AXION-0021822 |
| JTX0015 | PX-1155 | DTX0004 | U.S. Patent Publication No. 2002/0197709 to Van der Weide et al., entitled "Microfabricated Microbial Growth Assay Method And Apparatus" (filed June 22, 2001; published December 26, 2002; issued November 18, 2003 as U.S. PatentNo. 6,649,402) ("Van der Weide '709 Publication") | AXION-0041246 | AXION-0041261 |
| JTX0016 | PX-1066 | DTX0005 | Luong et al., "Monitoring Motility, Spreading, and Mortality of Adherent Insect Cells Using an Impedance Sensor," Analytical Chemistry, Vol. 73, No. 8, 1844-1848 (April 2001) ("Luong Publication") | AXION-0027604 | AXION-0027608 |
| JTX0017 | PX-1154 | DTX0007 | Watanabe et al., "Antibody dependent cellular phagocytosis (ADCP) and antibody dependent cellular cytotoxicity (ADCC) of breast cancer cells mediated by bispecific antibody, MDX- 210," Breast Cancer Research and Treatment, 53, 199-207 (1999)("Watanabe Publication") | AXION-0041237 | AXION-0041245 |
| JTX0018 | PX-0798 | DTX0008 | Color photograph of a device | AGILE5069355 | AGILE5069355 |

| JTX0019 | PX-0799 | DTX0009 | Color photograph of a device | AGILE5069356 | AGILE5069356 |
|---|---|---|---|---|---|
| JTX0020 | PX-0801 | DTX0010 | Color photograph of a device | AGILE5069381 | AGILE5069381 |
| JTX0021 | PX-0802 | DTX0011 | Color photograph of a device | AGILE5069382 | AGILE5069382 |
| JTX0022 | PX-0800 | DTX0012 | Color photograph of a device | AGILE5069380 | AGILE5069380 |
| JTX0023 | PX-0803 | DTX0013 | Color photograph of ACEA team | AGILE5069383 | AGILE5069383 |
| JTX0024 | PX-0813 | DTX0014 | Color photographs of devices produced for physical inspection at Jones Day, San Diego office - photo of AG-PHYS-01, photo of AG-PHYS-02, photo of AG-PHYS-03, photo of AG-PHYS-04, photo of AG-PHYS-05 | AGILE5069787 | AGILE5069796 |
| JTX0025 | PX-0482 | DTX0050 | CAR T Cell Potency Assessment with 3D Cancer Spheroid Models (filed versionwith the court) | AGILE0042270 | AGILE0042275 |
| JTX0026 | PX-0789 | DTX0052 | Real-time and label-free impedimetric analysis of the formation and drug testing of tumor spheroids formed via the liquid overlay technique. RSC Adv., 2017, 7, 13939-13946 | AGILE5066241 | AGILE5066248 |
| JTX0027 | PX-0894 | DTX0164 | Axion 2022 Financial Data.xlsm | AXION-0002493 | AXION-0002493 |
| JTX0028 | PX-0895 | DTX0165 | Axion 2021 Financial Data.xlsm | AXION-0002495 | AXION-0002495 |
| JTX0029 | PX-0896 | DTX0166 | Axion 2020 Financial Data.xlsm | AXION-0002497 | AXION-0002497 |
| JTX0030 | PX-0897 | DTX0167 | Axion 2023 Financial Data.xlsm | AXION-0002499 | AXION-0002499 |
| JTX0031 | PX-0898 | DTX0168 | F1295698-Axion_BioSystems_-_Tech_Note_-_Best_Practices_for_Potency_Assays_Maestro_Z.pdf | AXION-0002501 | AXION-0002508 |
| JTX0032 | PX-0899 | DTX0169 | F1295693-Axion_Bio_-_Tech_Note_-_Multiplate_cell-based_assays_with_Maestro_TrayZ_for_cytotoxicity_and_potency.pdf | AXION-0002509 | AXION-0002514 |
| JTX0033 | PX-0900 | DTX0170 | F1295696-Axion_BioSystems_-_Application_Note_-_Z_prime.pdf | AXION-0002515 | AXION-0002518 |
| JTX0034 | PX-0901 | DTX0171 | F1295700-Axion_BioSystems_in_vitro_potency_assays_for_cell-mediated_killing_0.pdf | AXION-0002531 | AXION-0002538 |

| | | | | | |
|---|---|---|---|---|---|
| JTX0035 | PX-0902 | DTX0172 | F1295690-AppNote_Quantifying_NK-mediated_Cytolysis_of_Glioblastoma.pdf | AXION-0002539 | AXION-0002545 |
| JTX0036 | PX-0903 | DTX0173 | F1295705-Maestro_Z_App_Note_-_Scratch_Assay_28129.pdf | AXION-0002546 | AXION-0002550 |
| JTX0037 | PX-0904 | DTX0174 | F1295699-Axion_BioSystems_-_Tech_Note_-_Dose_Response_Analysis_of_Impedance-based_Potency_Assays.pdf | AXION-0002551 | AXION-0002558 |
| JTX0038 | PX-0905 | DTX0175 | F1295697-Axion_BioSystems_-_Quantifying_Proliferation_and_Cytotoxicity_of_Suspension_Human_Cancer_Cell_Lines_Using_the_Maestro_Z.pdf | AXION-0002568 | AXION-0002571 |
| JTX0039 | PX-0906 | DTX0176 | F1295703-Maestro_Z_App_Note_-_Cell_signaling.pdf | AXION-0002579 | AXION-0002581 |
| JTX0040 | PX-0908 | DTX0178 | F1295704-Maestro_Z_App_Note_-_Cytotoxicity_-_rev_01.pdf | AXION-0002590 | AXION-0002592 |
| JTX0041 | PX-0909 | DTX0179 | F1295706-Maestro_Z_App_Note_-_T_cell_-_rev_01.pdf | AXION-0002593 | AXION-0002595 |
| JTX0042 | PX-0919 | DTX0180 | Cell Culture Protocol - Impedance - 384-well plate.pdf | AXION-0003010 | AXION-0003011 |
| JTX0043 | PX-0920 | DTX0181 | Z384-IMP-384B DATASHEET v5.pdf | AXION-0003012 | AXION-0003012 |
| JTX0044 | PX-0921 | DTX0182 | Cell Culture Protocol - Impedance - Non-Adherent Cell Lines.pdf | AXION-0003013 | AXION-0003014 |
| JTX0045 | PX-0925 | DTX0185 | Cell Culture Protocol - Impedance - K562 cells | AXION-0004890 | AXION-0004891 |
| JTX0046 | PX-0926 | DTX0186 | Cell Culture Protocol - Impedance - Non-Adherent Cell Lines - Raji.pdf | AXION-0004892 | AXION-0004893 |
| JTX0047 | PX-0927 | DTX0187 | Cell Culture Protocol - Impedance - TrayZ Adherent Cell Lines.pdf | AXION-0004960 | AXION-0004961 |
| JTX0048 | PX-0928 | DTX0188 | Cell Culture Protocol - Impedance - TrayZ Potency.pdf | AXION-0004962 | AXION-0004963 |
| JTX0049 | PX-0929 | DTX0189 | AxIS Z 3.8 User Guide.pdf | AXION-0004964 | AXION-0005048 |
| JTX0050 | PX-1055 | DTX0190 | Physical sample Box of five 96-well plates. File with corresponding productiondesign produced at AXION-0002488 | AXION-0011120 | AXION-0011120 |

| | | | | | |
|---|---|---|---|---|---|
| JTX0051 | PX-1056 | DTX0191 | Physical sample Box of five 384-well plates. File with corresponding productiondesign produced at AXION-0075021 | AXION-0011121 | AXION-0011121 |
| JTX0052 | PX-1144 | DTX0192 | TrayZ System Description.pptx | AXION-0040559 | AXION-0040568 |
| JTX0053 | PX-1149 | DTX0193 | argus_basin_v5.pdf | AXION-0041057 | AXION-0041092 |
| JTX0054 | PX-1158 | DTX0194 | CAR-TCR 2023 packing list.xlsx | AXION-0041421 | AXION-0041421 |
| JTX0055 | PX-1159 | DTX0195 | SITC 2023 Packing List.xlsx | AXION-0041466 | AXION-0041466 |
| JTX0056 | PX-1165 | DTX0196 | Cell Culture Protocol - A549 Spheroids (CytoView-Z 96 plate).pdf | AXION-0044287 | AXION-0044288 |
| JTX0057 | PX-1166 | DTX0197 | Cancer spheroid slides.pptx | AXION-0044375 | AXION-0044376 |
| JTX0058 | PX-1175 | DTX0200 | MaestroPro_Brochure.pdf | AXION-0048004 | AXION-0048011 |
| JTX0059 | PX-1176 | DTX0201 | Maestro Z Brochure.pdf | AXION-0048012 | AXION-0048017 |
| JTX0060 | PX-1177 | DTX0202 | AxionBioSystems-MaestroTrayZ-Brochure.pdf | AXION-0048018 | AXION-0048023 |
| JTX0061 | PX-1178 | DTX0203 | MaestroEdge_Brochure.pdf | AXION-0048024 | AXION-0048031 |
| JTX0062 | PX-1196 | DTX0204 | impedance_96V2.dwg | AXION-0054640 | AXION-0054640 |
| JTX0063 | PX-1220 | DTX0205 | 384imp_V2.dwg | AXION-0074979 | AXION-0074979 |
| JTX0064 | PX-1244 | DTX0206 | 384imp_JW_v8.dwg | AXION-0075021 | AXION-0075021 |
| JTX0065 | PX-1249 | DTX0207 | impedance_96V2_2.dxf | AXION-0075028 | AXION-0075028 |
| JTX0066 | PX-1252 | DTX0208 | impedance_reduced_v1.2.dwg | AXION-0075040 | AXION-0075040 |
| JTX0067 | PX-1812 | DTX0209 | M2 Block Diagram For Manufacturing.pptx | AXION-0077892 | AXION-0077898 |
| JTX0068 | PX-1821 | DTX0211 | Email from A. Daly re Social Media Updates: Travel Award Winner, AACR Poster,New Maestro Z Publication, New App Note | AXION-0079722 | AXION-0079723 |
| JTX0069 | PX-1837 | DTX0215 | Email from S. Chvatal Re: UGA Maestro - Impedance Update | AXION-0102866 | AXION-0102872 |
| JTX0070 | PX-1838 | DTX0216 | Axion application note | AXION-0103903 | AXION-0103903 |
| JTX0071 | PX-1839 | DTX0217 | Email from S. Chvatal Re: [External] CAR T cells and impedance assay | AXION-0103918 | AXION-0103920 |
| JTX0072 | PX-1846 | DTX0218 | Email from S. Chvatal Fwd: Final impedance App Notes | AXION-0104450 | AXION-0104451 |
| JTX0073 | PX-1847 | DTX0219 | Application Note_Cell signaling_v5.pdf | AXION-0104452 | AXION-0104454 |
| JTX0074 | PX-1856 | DTX0220 | Email from S. Chvatal re Scratch assay App Note - final review | AXION-0106449 | AXION-0106449 |
| JTX0075 | PX-1857 | DTX0221 | AxIS Z User Guide 05Dec2019.pdf | AXION-0106493 | AXION-0106522 |

| | | | | | |
|---|---|---|---|---|---|
| JTX0076 | PX-1858 | DTX0222 | Email from S. Chvatal re Maestro Z follow-up from Analytical Development meeting | AXION-0106529 | AXION-0106529 |
| JTX0077 | PX-1860 | DTX0223 | Email from S. Chvatal Re: Maestro Z | AXION-0107026 | AXION-0107027 |
| JTX0078 | PX-1862 | DTX0224 | Email from A. Nicolini Re: Impedance experiment demo checklist | AXION-0107219 | AXION-0107223 |
| JTX0079 | PX-1863 | DTX0225 | Email from S. Chvatal re Maestro scratch assay | AXION-0107964 | AXION-0107964 |
| JTX0080 | PX-1868 | DTX0226 | Email from S. Chvatal re AACR poster | AXION-0110168 | AXION-0110168 |
| JTX0081 | PX-1871 | DTX0227 | Axion Maestro Z Sole Source DEC 2019.pdf | AXION-0110425 | AXION-0110425 |
| JTX0082 | PX-1875 | DTX0228 | Email from S. Chvatal re Maestro Z logistics | AXION-0110745 | AXION-0110745 |
| JTX0083 | PX-1876 | DTX0229 | Product Page - Software - GxP Impedance Module v2 (SAC).pptx | AXION-0110944 | AXION-0110944 |
| JTX0084 | PX-1892 | DTX0230 | Maestro ZHT Brochure.pdf | AXION-0115166 | AXION-0115171 |
| JTX0085 | PX-1893 | DTX0231 | Axion_NeuropathicPain_HW2021.pptx | AXION-0117584 | AXION-0117584 |
| JTX0086 | PX-1894 | DTX0232 | Email from S. Chvatal re GEN Assay Tutorial | AXION-0117586 | AXION-0117586 |
| JTX0087 | PX-1895 | DTX0233 | 21.08.12_AXB_GEN COVID Assay Tutorial_FINAL_Axion.docx | AXION-0117587 | AXION-0117590 |
| JTX0088 | PX-1896 | DTX0234 | GEN COVID Assay Tutorial figures.pptx | AXION-0117591 | AXION-0117591 |
| JTX0089 | PX-1901 | DTX0235 | Email from S. Chvatal re Maestro Z documents | AXION-0119069 | AXION-0119070 |
| JTX0090 | PX-1902 | DTX0236 | Email from S. Chvatal Fwd: potency assay app note timeline | AXION-0119533 | AXION-0119535 |
| JTX0091 | PX-1910 | DTX0237 | Email from M. Clements re Targeted advertisements - Immune cell kill assays | AXION-0152734 | AXION-0152735 |
| JTX0092 | PX-1911 | DTX0238 | Email from M. Clements re Competitor watch: MCS | AXION-0155165 | AXION-0155166 |
| JTX0093 | PX-1914 | DTX0239 | Email from M. Clements RE: Webinar \| Targeting glioblastoma: Assessing thepotency of T cells to kill cancer | AXION-0156595 | AXION-0156598 |
| JTX0094 | PX-1918 | DTX0240 | Axion Biosystems - Overview (March 2021).pdf | AXION-0168424 | AXION-0168426 |
| JTX0095 | PX-1920 | DTX0241 | Email from M. Clements RE: New Maestro Pro Brochure | AXION-0172638 | AXION-0172644 |
| JTX0096 | PX-1921 | DTX0242 | Innate Killer 2022 Packing List.xlsx | AXION-0173639 | AXION-0173639 |

| JTX0097 | PX-1922 | DTX0243 | AACR 2022 Packing List.xlsx | AXION-0173641 | AXION-0173641 |
|---|---|---|---|---|---|
| JTX0098 | PX-1925 | DTX0244 | Email from S. Chvatal re New resources for website | AXION-0188576 | AXION-0188576 |
| JTX0099 | PX-1926 | DTX0245 | Axion BioSystems - Tech Note - Dose Response Analysis of Impedance-basedPotency Assays.pdf | AXION-0188577 | AXION-0188584 |
| JTX0100 | PX-1927 | DTX0246 | Axion BioSystems - Tech Note - Best Practices for Potency Assays Maestro Z.pdf | AXION-0188585 | AXION-0188592 |
| JTX0101 | PX-1928 | DTX0247 | Cell Culture Protocol - Impedance - Immuno-oncology Potency Assay.pdf | AXION-0188593 | AXION-0188594 |
| JTX0102 | PX-1936 | DTX0248 | Email from V. Stahl re Download Axion's 3D cancer spheroid protocol | AXION-0193631 | AXION-0193632 |
| JTX0103 | PX-1943 | DTX0249 | Email from V. Stahl Re: New app note: CAR-T Cell Potency Assessment with 3DCancer Spheroid Models | AXION-0194812 | AXION-0194814 |
| JTX0104 | PX-1951 | DTX0250 | Impedance FAQ v2 23July2019.docx | AXION-0209075 | AXION-0209076 |
| JTX0105 | PX-2087 | DTX0251 | Email from R. Yamazaki RE: [#5216] Maestro Z Demo | AXION-0256098 | AXION-0256100 |
| JTX0106 | PX-2088 | DTX0252 | Cell Culture Protocol - General Impedance - Adherent Cell Lines.pdf | AXION-0256101 | AXION-0256102 |
| JTX0107 | PX-2096 | DTX0253 | AxionImpedance for CAR T .pptx | AXION-0263345 | AXION-0263345 |
| JTX0108 | PX-2097 | DTX0254 | Email from O. Weems Re: customer-facing cancer spheroid messaging/data | AXION-0263593 | AXION-0263597 |
| JTX0109 | PX-2098 | DTX0255 | Email from W. Deacon RE: New Maestro Z potency assay app note | AXION-0264112 | AXION-0264113 |
| JTX0110 | PX-2106 | DTX0256 | Email from S. Chvatal re Cancer spheroid protocol | AXION-0265930 | AXION-0265930 |
| JTX0111 | PX-2107 | DTX0257 | Email from J. Strong Re: [External] Maestro Z demo - checking in | AXION-0266124 | AXION-0266130 |
| JTX0112 | PX-2108 | DTX0258 | Email from E. Kwee RE: checking in - Maestro Z | AXION-0266494 | AXION-0266497 |
| JTX0113 | PX-2109 | DTX0259 | slides for Maestro meeting with Stacie_060322.pptx | AXION-0266498 | AXION-0266498 |
| JTX0114 | PX-2113 | DTX0260 | Email from A. Passaro Re: checking in - Maestro Z | AXION-0270924 | AXION-0270931 |

| | | | | | |
|---|---|---|---|---|---|
| JTX0115 | PX-2114 | DTX0261 | Email from D. Millard Re: SITC 37th Annual Meeting Abstract Notification | AXION-0271108 | AXION-0271113 |
| JTX0116 | PX-2115 | DTX0262 | SITC2022_Spheroid_Potency_Final.pptx | AXION-0271115 | AXION-0271115 |
| JTX0117 | PX-2119 | DTX0265 | Cell Culture Protocol - Impedance - Non-Adherent Cell Lines - Daudi.pdf | AXION-0272177 | AXION-0272178 |
| JTX0118 | PX-2121 | DTX0266 | Email from S. Chvatal re Omni and Lux collaborations | AXION-0272407 | AXION-0272407 |
| JTX0119 | PX-2122 | DTX0267 | ExternalCollaborationsDeliverablesSummary.pdf | AXION-0272408 | AXION-0272410 |
| JTX0120 | PX-2123 | DTX0268 | Glioblastoma_AppNote_Nov2022_Final.pdf | AXION-0272426 | AXION-0272432 |
| JTX0121 | PX-2126 | DTX0269 | Email from A. Passaro Re: [EXTERNAL]Re: Collaboration proposal with MiltenyiBiotec | AXION-0272733 | AXION-0272736 |
| JTX0122 | PX-2127 | DTX0270 | Email from E. Naimo RE: [EXTERNAL]Re: [EXTERNAL]Re: Collaboration proposalwith Miltenyi Biotec | AXION-0272877 | AXION-0272881 |
| JTX0123 | PX-2130 | DTX0272 | Email from S. Chvatal re Maestro TrayZ data | AXION-0274371 | AXION-0274371 |
| JTX0124 | PX-2131 | DTX0273 | CONFIDENTIAL Emory Rafiq lab TrayZ demo results.pdf | AXION-0274372 | AXION-0274394 |
| JTX0125 | PX-2137 | DTX0275 | Email from D. Califano RE: Immunology Poster | AXION-0275753 | AXION-0275754 |
| JTX0126 | PX-2138 | DTX0276 | Immunology2023_Non-AdherentPotency_DC.pptx | AXION-0275755 | AXION-0275755 |
| JTX0127 | PX-2139 | DTX0277 | Email from D. Califano RE: TrayZ installation training discussion | AXION-0275999 | AXION-0276004 |
| JTX0128 | PX-2152 | DTX0279 | Email from S. Chvatal Re: Axion resources | AXION-0281110 | AXION-0281112 |
| JTX0129 | PX-2154 | DTX0280 | Email from V. Stahl Fwd: TEST-Download Axion's cancer spheroid culture protocol | AXION-0286547 | AXION-0286548 |
| JTX0130 | PX-2159 | DTX0281 | Trade Show planning 2023 - final selections.xlsx | AXION-0288625 | AXION-0288625 |
| JTX0131 | PX-2163 | DTX0282 | Email from S. Chvatal Re: error in ISSCR impedance poster | AXION-0291989 | AXION-0291991 |
| JTX0132 | PX-2164 | DTX0283 | ISSCR2023_Potency_Final.pdf | AXION-0291992 | AXION-0291992 |
| JTX0133 | PX-2165 | DTX0284 | Email from V. Stahl Re: IO Insights items needed | AXION-0292278 | AXION-0292281 |
| JTX0134 | PX-2169 | DTX0285 | Bayer_Data Summary_ED.pdf | AXION-0299492 | AXION-0299507 |

| | | | | | |
|---|---|---|---|---|---|
| JTX0135 | PX-2174 | DTX0286 | Email from J. Ross Re: Mock ups | AXION-0318222 | AXION-0318223 |
| JTX0136 | PX-2176 | DTX0287 | Impedance Training.pptx | AXION-0318911 | AXION-0318911 |
| JTX0137 | PX-2178 | DTX0288 | Accepted: GoToMeeting Invitation - ACEA software for impedance over... @ Thu 11Jun 2020 16:00 - 17:00 (BST) (gdefilippi@axionbiointl.com) | AXION-0320326 | AXION-0320327 |
| JTX0138 | PX-2181 | DTX0289 | General Impedance Calculations For E-Flask.pptx | AXION-0321438 | AXION-0321438 |
| JTX0139 | PX-2225 | DTX0290 | SRD-CTI-001_Rev7 ConductiveTech Impedance Plate SRD.docx | AXION-0362997 | AXION-0363003 |
| JTX0140 | PX-2238 | DTX0291 | Potency Assay Application Note - Final Draft.pdf | AXION-0406381 | AXION-0406387 |
| JTX0141 | PX-2239 | DTX0292 | ApplicationNote_Antibody-dependent Cellular Cytotoxicity of Natural KillerCells_V2.pdf | AXION-0410827 | AXION-0410832 |
| JTX0142 | PX-2241 | DTX0293 | ApplicationNote_CAR T 3D Cancer Spheroid Models_Digital (1).pdf | AXION-0411760 | AXION-0411765 |
| JTX0143 | PX-2242 | DTX0294 | Axion BioSystems - Application Note - ADCC of Natural Killer Cells.pdf | AXION-0412069 | AXION-0412074 |
| JTX0144 | PX-2245 | DTX0295 | Axion Bio Liquid Tumors Application Note.pdf | AXION-0416491 | AXION-0416496 |
| JTX0145 | PX-2246 | DTX0296 | Cell Therapy Potency Assay Summit 2023 Packing List.xlsx | AXION-0416688 | AXION-0416688 |
| JTX0146 | PX-2253 | DTX0298 | T cell Application Note v6.pdf | AXION-0419294 | AXION-0419296 |
| JTX0147 | PX-2254 | DTX0299 | Application Note_Cytotoxicity_v4.pdf | AXION-0419380 | AXION-0419382 |
| JTX0148 | PX-2255 | DTX0300 | Application Note_Cell Proliferation_v4.pdf | AXION-0419387 | AXION-0419389 |
| JTX0149 | PX-2256 | DTX0301 | AxIS-Z User Guide 2019 v6 SAC HBH.docx | AXION-0419572 | AXION-0419606 |
| JTX0150 | PX-2278 | DTX0303 | ISSCR 2023 Packing List.xlsx | AXION-0425373 | AXION-0425373 |
| JTX0151 | PX-2335 | DTX0305 | 2403 - Nanion Meeting.v1.pptx | AXION-0481093 | AXION-0481093 |
| JTX0152 | PX-2368 | DTX0306 | AxIS Z 3.6 User Guide.pdf | AXION-0539573 | AXION-0539648 |
| JTX0153 | PX-2369 | DTX0307 | Axion Bio - Cancer Spheroids - Cell Culture Protocol.pdf | AXION-0539916 | AXION-0539917 |
| JTX0154 | PX-2390 | DTX0308 | Cell Culture Protocol - Impedance - Adherent Cell Lines (1).pdf | AXION-0570795 | AXION-0570796 |
| JTX0155 | PX-2391 | DTX0309 | AxIS Z 3.11 User Guide.pdf | AXION-0571030 | AXION-0571123 |
| JTX0156 | PX-2425 | DTX0311 | Email from T. O'Brien Re: meeting today | AXION-0634289 | AXION-0634289 |
| JTX0157 | PX-2429 | DTX0312 | Email from T. O'Brien Fwd: thanks | AXION-0635508 | AXION-0635508 |

| JTX0158 | PX-2451 | DTX0313 | Email from J. Ross Re: Applied Biophysics Patent | AXION-0666181 | AXION-0666181 |
|---|---|---|---|---|---|
| JTX0159 | PX-2454 | DTX0315 | ACEA xCELLigence SP Sole Source 2015.docx | AXION-0666369 | AXION-0666369 |
| JTX0160 | PX-2467 | DTX0316 | Email from M. Clements Fw: Tonya Webb data | AXION-0712309 | AXION-0712311 |
| JTX0161 | PX-2468 | DTX0317 | Maestro Report.pdf | AXION-0712312 | AXION-0712318 |
| JTX0162 | PX-2480 | DTX0318 | AxIS-Z User Guide 2020_May_FINAL.pdf | AXION-0750118 | AXION-0750161 |
| JTX0163 | PX-2596 | DTX0319 | AxIS Z 3.12 User Guide.pdf | AXION-0750487 | AXION-0750580 |
| JTX0164 | PX-2597 | DTX0320 | Impedance Processing Pipeline_V2.html | AXION-0751286 | AXION-0751292 |
| JTX0165 | PX-2599 | DTX0321 | Axion Multi-Level BOM Requirements.. (2024-08-27).xlsx | AXION-0751903 | AXION-0751903 |
| JTX0166 | PX-2600 | DTX0322 | Physical sample Box of five 96-well plates. File with corresponding productiondesign produced at AXION-0075040 | AXION-0751918 | AXION-0751918 |
| JTX0167 | PX-2601 | DTX0323 | Physical sample made available for inspection on September 30, 2024; File withcorresponding production design produced at AXION-0054640 | AXION-0751919 | AXION-0751919 |
| JTX0168 | PX-2602 | DTX0324 | Physical sample made available for inspection on September 30, 2024; File withcorresponding production design produced at AXION-0074979 | AXION-0751920 | AXION-0751920 |
| JTX0169 | PX-2603 | DTX0325 | Physical sample made available for inspection on September 30, 2024; File withcorresponding production design produced at AXION-0074979 | AXION-0751921 | AXION-0751921 |
| JTX0170 | PX-2604 | DTX0326 | Physical sample made available for inspection on September 30, 2024; File withcorresponding production design produced at AXION-0075028-31 | AXION-0751922 | AXION-0751922 |
| JTX0171 | PX-2605 | DTX0327 | Physical sample made available for inspection on September 30, 2024; File withcorresponding production design produced at AXION-0054640 | AXION-0751923 | AXION-0751923 |

| | | | | | |
|---|---|---|---|---|---|
| JTX0172 | PX-2612 | DTX0329 | Email from S. Chvatal Re: [External] Fwd: your Maestro Z data - HESI ITCpresentation | AXION-0775044 | AXION-0775050 |
| JTX0173 | PX-2614 | DTX0330 | Email from R. Jain RE: NK cytotox experiment | AXION-0775103 | AXION-0775104 |
| JTX0174 | PX-2703 | DTX0331 | All leads with applications-2024-09-04-07-08-24.xlsx | AXION-1063614 | AXION-1063614 |
| JTX0175 | PX-2762 | DTX0332 | Demo Summary Form Report-2024-11-05-16-23-05.xlsx | AXION-1066356 | AXION-1066356 |
| JTX0176 | PX-2767 | DTX0333 | 2023-2024 Revenue by Quarter | AXION-1070874 | AXION-1070874 |
| JTX0177 | PX-2334 | DTX0349 | Business plan spreadsheet | AXION-0479659 | AXION-0479659 |
| JTX0178 | PX-1179 | DTX0363 | Confidential_Maestro vs. xCELLigence battle card.xlsx | AXION-0048032 | AXION-00048032 |
| JTX0179 | PX-0871 | DTX0162 | AxIS Z 3.3 User Guide.pdf | AXION-0001715 | AXION-0001785 |
| JTX0180 | PX-0893 | DTX0163 | impedance_96V2_3.dwg | AXION-0002488 | AXION-0002488 |
| JTX0181 | PX-2329 | DTX0418 | TAM Assessment Final_26MAR2021.pdf | AXION-0449879 | AXION-00449906 |
| JTX0182 | PX-2770 | DTX0459 | ASC Topic 350: Impairment Testing Analysis by HDH Advisors LLC | AXION-1071313 | AXION-1071363 |
| JTX0183 | PX-2786 | DTX0463 | Axion December 2024 Board Meeting_v1.pptx | AXION-1072517 | AXION-1072517 |
| JTX0184 | PX-3033 | DTX0475 | Agilent Press Release "Agilent Completes Acquisition of ACEA Biosciences" web page print out.https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html | N/A | N/A |
| JTX0185 | PX-3040 | DTX0479 | xCELLigence Real-Time Cell Analysis web page print out. https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca-analyzers | N/A | N/A |
| JTX0186 | PX-3042 | DTX0483 | Cellular Impedance web page print out.https://www.agilent.com/en/technology/cellular-impedance | N/A | N/A |
| JTX0187 | PX-2992 | DTX0492 | Axion CytoView-Z Plate web page print out.https://www.axionbiosystems.com/products/cell-analysis/cytoview-z-plate | N/A | N/A |

| JTX0188 | PX-3039 | DTX0495 | Axion Impedance web page print out.https://www.axionbiosystems.com/technology/impedance-general | N/A | N/A |
| JTX0189 | PX-0742 | DTX0118 | 3D Spheroids test on 96x E-plate deck | N/A | N/A |
| JTX0190 | PX-0481 | DTX0137 | Axion's website with the caption "Cancer Spheroid" | AGILE0042266 | AGILE0042269 |
| JTX0191 | PX-2367 | DTX0138 | Document titled "Cell Culture Protocol Cancer Spheroids for the Maestro Z" | AXION-0537252 | AXION-0537253 |
| JTX0192 | PX-2711 | DTX0140 | Axion August 2024 Board Meeting_Final 08.30.24.pdf | AXION-1063622 | AXION-1063790 |
| JTX0193 | PX-0526 | DTX0087 | U.S. Patent 7,470,533 B2 | AGILE0059448 | AGILE0059546 |
| JTX0194 | PX-0765 | DTX0043 | CV of Todd Christian | AGILE3898401 | AGILE3898403 |
| JTX0195 | PX-1072 | DTX0514 | U.S Patent 6,376,233 | AXION-0029630 | AXION-0029638 |

# EXHIBIT 6P

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PDX-01 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-02 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-03 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-04 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-05 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-06 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-07 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-08 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-09 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-10 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-11 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-12 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-13 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-14 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-15 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-16 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-17 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-18 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-19 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-20 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-21 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-22 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-23 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-24 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-25 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-26 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-27 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-28 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-29 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-30 | Trial Demontrative | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PDX-31 | Trial Demontrative | N/A | N/A | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PDX-32 | Trial Demontrative | N/A | N/A | | |
| PDX-33 | Trial Demontrative | N/A | N/A | | |
| PDX-34 | Trial Demontrative | N/A | N/A | | |
| PDX-35 | Trial Demontrative | N/A | N/A | | |
| PDX-36 | Trial Demontrative | N/A | N/A | | |
| PDX-37 | Trial Demontrative | N/A | N/A | | |
| PDX-38 | Trial Demontrative | N/A | N/A | | |
| PDX-39 | Trial Demontrative | N/A | N/A | | |
| PDX-40 | Trial Demontrative | N/A | N/A | | |
| PDX-41 | Trial Demontrative | N/A | N/A | | |
| PDX-42 | Trial Demontrative | N/A | N/A | | |
| PDX-43 | Trial Demontrative | N/A | N/A | | |
| PDX-44 | Trial Demontrative | N/A | N/A | | |
| PDX-45 | Trial Demontrative | N/A | N/A | | |
| PX-0001 | Physical Exhibit of Axion's Source Code Computer | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0002 | Physical Exhibit of Maestro ZHT | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0003 | Physical Exhibit of xCELLigence SP | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0004 | Physical Exhibit of xCELLigence MP | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0005 | Physical Exhibit of xCELLigence HT | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0006 | Physical Exhibit of E-Plate 96 ID 077312, Lot 20131150 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0007 | Physical Exhibit of E-Plate 96 ID 077313 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0008 | Physical Exhibit of E-Plate VIEW 96 ID C043323, Lot 20230320 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0009 | Physical Exhibit of E-Plate VIEW 96 ID C047151 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0010 | Physical Exhibit of E-Plate 96 PET ID H122496, Lot 20240719 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0011 | Physical Exhibit of E-Plate 96 PET ID H122495 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0012 | Physical Exhibit of E-Plate 384 ID A117705 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0013 | Physical Exhibit of E-Plate 384 ID A122382 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0014 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0113-1202 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0015 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0119-8603 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0016 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 84-4558 | N/A | N/A | Willsie Ex. 25 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0017 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 84-3342 | N/A | N/A | Willsie Ex. 27 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0018 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 2004-3013 | N/A | N/A | Willsie Ex. 29 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0019 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 88-3342 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0020 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0111-8048 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0021 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0111-8034 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0022 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0113-1210 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0023 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0113-1223 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0024 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0113-8608 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0025 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0119-8605 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0026 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0119-8606 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0027 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0119-8608 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0028 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0122-6509 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0029 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0122-6510 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0030 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0122-6533 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0031 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0122-6534 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0032 | Physical Exhibit of CytoView 96 Well Plate Serial No.: 20 0122-6556 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0033 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 91-0749 | N/A | N/A | Willsie Ex. 31 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0034 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 92-2820 | N/A | N/A | Willsie Ex. 33 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0035 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0115-2002 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0036 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0115-2013 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0037 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0115-2011 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0038 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0115-2015 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0039 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0115-2029 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0040 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0125-1336 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0041 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0125-1338 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0042 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0125-1339 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0043 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0125-1348 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0044 | Physical Exhibit of CytoView 384 Well Plate Serial No.: 21 0125-1349 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0045 | Physical Exhibit of AG-PHYS-01 | N/A | N/A | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0046 | Physical Exhibit of AG-PHYS-02 | N/A | N/A | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0047 | Physical Exhibit of AG-PHYS-03 | N/A | N/A | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0048 | Physical Exhibit of AG-PHYS-04 | N/A | N/A | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0049 | Physical Exhibit of AG-PHYS-05 | N/A | N/A | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0050 | REMOVED | | | | |
| PX-0051 | REMOVED | | | | |
| PX-0052 | REMOVED | | | | |
| PX-0053 | REMOVED | | | | |
| PX-0054 | REMOVED | | | | |
| PX-0055 | REMOVED | | | | |
| PX-0056 | Cell Analysis 2021 SPR Review_Sept 30 2021_Final.pptx | AGILE_BRG-AXION_0005755 | AGILE_BRG-AXION_0005782 | Ferrick Ex. 33; Christian Ex. 9 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0057 | REMOVED | | | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0058 | | | REMOVED | | |
| PX-0059 | | | REMOVED | | |
| PX-0060 | | | REMOVED | | |
| PX-0061 | | | REMOVED | | |
| PX-0062 | | | REMOVED | | |
| PX-0063 | | | REMOVED | | |
| PX-0064 | | | REMOVED | | |
| PX-0065 | | | REMOVED | | |
| PX-0066 | | | REMOVED | | |
| PX-0067 | XA150349(1.03)RTCA eSight Software 1.2.1 Release Notes.pdf | AGILE0001914 | AGILE0001943 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0068 | 150349(1.0)RTCA eSight Software Release Notes-v1.1.1.pdf | AGILE0001960 | AGILE0001987 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0069 | | | REMOVED | | |
| PX-0070 | | | REMOVED | | |
| PX-0071 | | | REMOVED | | |
| PX-0072 | | | REMOVED | | |
| PX-0073 | | | REMOVED | | |
| PX-0074 | | | REMOVED | | |
| PX-0075 | | | REMOVED | | |
| PX-0076 | 3D Cell Impedance Measurement.pptx | AGILE0002101 | AGILE0002118 | Li Ex. 10; Zhao Ex. 14 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0077 | | | REMOVED | | |
| PX-0078 | | | REMOVED | | |
| PX-0079 | | | REMOVED | | |
| PX-0080 | | | REMOVED | | |
| PX-0081 | | | REMOVED | | |
| PX-0082 | | | REMOVED | | |
| PX-0083 | | | REMOVED | | |
| PX-0084 | | | REMOVED | | |
| PX-0085 | | | REMOVED | | |
| PX-0086 | | | REMOVED | | |
| PX-0087 | | | REMOVED | | |
| PX-0088 | | | REMOVED | | |
| PX-0089 | | | REMOVED | | |
| PX-0090 | | | REMOVED | | |
| PX-0091 | | | REMOVED | | |
| PX-0092 | | | REMOVED | | |
| PX-0093 | | | REMOVED | | |
| PX-0094 | | | REMOVED | | |
| PX-0095 | | | REMOVED | | |
| PX-0096 | | | REMOVED | | |
| PX-0097 | | | REMOVED | | |
| PX-0098 | | | REMOVED | | |
| PX-0099 | 3D Cells Impedance Measurement Results.pptx | AGILE0002256 | AGILE0002260 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0100 | | | REMOVED | | |
| PX-0101 | | | REMOVED | | |
| PX-0102 | | | REMOVED | | |
| PX-0103 | | | REMOVED | | |
| PX-0104 | | | REMOVED | | |
| PX-0105 | 3D Cells Impedance Measurement Results.ppt | AGILE0002301 | AGILE0002306 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0106 | | | REMOVED | | |
| PX-0107 | | | REMOVED | | |
| PX-0108 | | | REMOVED | | |
| PX-0109 | | | REMOVED | | |
| PX-0110 | | | REMOVED | | |
| PX-0111 | | | REMOVED | | |
| PX-0112 | | | REMOVED | | |
| PX-0113 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|--------|-------------|-------------|-----------|------------------------|------------|
| PX-0114 | | | REMOVED | | |
| PX-0115 | | | REMOVED | | |
| PX-0116 | | | REMOVED | | |
| PX-0117 | | | REMOVED | | |
| PX-0118 | | | REMOVED | | |
| PX-0119 | | | REMOVED | | |
| PX-0120 | | | REMOVED | | |
| PX-0121 | | | REMOVED | | |
| PX-0122 | | | REMOVED | | |
| PX-0123 | | | REMOVED | | |
| PX-0124 | | | REMOVED | | |
| PX-0125 | | | REMOVED | | |
| PX-0126 | | | REMOVED | | |
| PX-0127 | | | REMOVED | | |
| PX-0128 | | | REMOVED | | |
| PX-0129 | | | REMOVED | | |
| PX-0130 | | | REMOVED | | |
| PX-0131 | | | REMOVED | | |
| PX-0132 | | | REMOVED | | |
| PX-0133 | | | REMOVED | | |
| PX-0134 | | | REMOVED | | |
| PX-0135 | | | REMOVED | | |
| PX-0136 | | | REMOVED | | |
| PX-0137 | | | REMOVED | | |
| PX-0138 | | | REMOVED | | |
| PX-0139 | | | REMOVED | | |
| PX-0140 | | | REMOVED | | |
| PX-0141 | | | REMOVED | | |
| PX-0142 | | | REMOVED | | |
| PX-0143 | | | REMOVED | | |
| PX-0144 | | | REMOVED | | |
| PX-0145 | | | REMOVED | | |
| PX-0146 | | | REMOVED | | |
| PX-0147 | | | REMOVED | | |
| PX-0148 | | | REMOVED | | |
| PX-0149 | | | REMOVED | | |
| PX-0150 | | | REMOVED | | |
| PX-0151 | | | REMOVED | | |
| PX-0152 | | | REMOVED | | |
| PX-0153 | | | REMOVED | | |
| PX-0154 | | | REMOVED | | |
| PX-0155 | | | REMOVED | | |
| PX-0156 | | | REMOVED | | |
| PX-0157 | | | REMOVED | | |
| PX-0158 | | | REMOVED | | |
| PX-0159 | | | REMOVED | | |
| PX-0160 | | | REMOVED | | |
| PX-0161 | | | REMOVED | | |
| PX-0162 | | | REMOVED | | |
| PX-0163 | | | REMOVED | | |
| PX-0164 | | | REMOVED | | |
| PX-0165 | | | REMOVED | | |
| PX-0166 | | | REMOVED | | |
| PX-0167 | | | REMOVED | | |
| PX-0168 | | | REMOVED | | |
| PX-0169 | | | REMOVED | | |
| PX-0170 | | | REMOVED | | |
| PX-0171 | | | REMOVED | | |
| PX-0172 | | | REMOVED | | |
| PX-0173 | | | REMOVED | | |
| PX-0174 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0175 | | | REMOVED | | |
| PX-0176 | | | REMOVED | | |
| PX-0177 | | | REMOVED | | |
| PX-0178 | | | REMOVED | | |
| PX-0179 | | | REMOVED | | |
| PX-0180 | | | REMOVED | | |
| PX-0181 | | | REMOVED | | |
| PX-0182 | | | REMOVED | | |
| PX-0183 | | | REMOVED | | |
| PX-0184 | | | REMOVED | | |
| PX-0185 | | | REMOVED | | |
| PX-0186 | | | REMOVED | | |
| PX-0187 | | | REMOVED | | |
| PX-0188 | | | REMOVED | | |
| PX-0189 | | | REMOVED | | |
| PX-0190 | | | REMOVED | | |
| PX-0191 | | | REMOVED | | |
| PX-0192 | | | REMOVED | | |
| PX-0193 | | | REMOVED | | |
| PX-0194 | | | REMOVED | | |
| PX-0195 | | | REMOVED | | |
| PX-0196 | | | REMOVED | | |
| PX-0197 | | | REMOVED | | |
| PX-0198 | | | REMOVED | | |
| PX-0199 | | | REMOVED | | |
| PX-0200 | | | REMOVED | | |
| PX-0201 | | | REMOVED | | |
| PX-0202 | | | REMOVED | | |
| PX-0203 | | | REMOVED | | |
| PX-0204 | | | REMOVED | | |
| PX-0205 | | | REMOVED | | |
| PX-0206 | | | REMOVED | | |
| PX-0207 | | | REMOVED | | |
| PX-0208 | | | REMOVED | | |
| PX-0209 | | | REMOVED | | |
| PX-0210 | | | REMOVED | | |
| PX-0211 | | | REMOVED | | |
| PX-0212 | | | REMOVED | | |
| PX-0213 | | | REMOVED | | |
| PX-0214 | | | REMOVED | | |
| PX-0215 | | | REMOVED | | |
| PX-0216 | | | REMOVED | | |
| PX-0217 | | | REMOVED | | |
| PX-0218 | | | REMOVED | | |
| PX-0219 | | | REMOVED | | |
| PX-0220 | | | REMOVED | | |
| PX-0221 | | | REMOVED | | |
| PX-0222 | | | REMOVED | | |
| PX-0223 | | | REMOVED | | |
| PX-0224 | | | REMOVED | | |
| PX-0225 | | | REMOVED | | |
| PX-0226 | | | REMOVED | | |
| PX-0227 | | | REMOVED | | |
| PX-0228 | | | REMOVED | | |
| PX-0229 | | | REMOVED | | |
| PX-0230 | | | REMOVED | | |
| PX-0231 | | | REMOVED | | |
| PX-0232 | | | REMOVED | | |
| PX-0233 | | | REMOVED | | |
| PX-0234 | | | REMOVED | | |
| PX-0235 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|--------|-------------|-------------|-----------|------------------------|------------|
| PX-0236 | | | REMOVED | | |
| PX-0237 | | | REMOVED | | |
| PX-0238 | | | REMOVED | | |
| PX-0239 | | | REMOVED | | |
| PX-0240 | | | REMOVED | | |
| PX-0241 | | | REMOVED | | |
| PX-0242 | | | REMOVED | | |
| PX-0243 | | | REMOVED | | |
| PX-0244 | | | REMOVED | | |
| PX-0245 | | | REMOVED | | |
| PX-0246 | | | REMOVED | | |
| PX-0247 | | | REMOVED | | |
| PX-0248 | | | REMOVED | | |
| PX-0249 | | | REMOVED | | |
| PX-0250 | | | REMOVED | | |
| PX-0251 | | | REMOVED | | |
| PX-0252 | | | REMOVED | | |
| PX-0253 | | | REMOVED | | |
| PX-0254 | | | REMOVED | | |
| PX-0255 | | | REMOVED | | |
| PX-0256 | | | REMOVED | | |
| PX-0257 | | | REMOVED | | |
| PX-0258 | | | REMOVED | | |
| PX-0259 | | | REMOVED | | |
| PX-0260 | | | REMOVED | | |
| PX-0261 | | | REMOVED | | |
| PX-0262 | | | REMOVED | | |
| PX-0263 | | | REMOVED | | |
| PX-0264 | | | REMOVED | | |
| PX-0265 | | | REMOVED | | |
| PX-0266 | | | REMOVED | | |
| PX-0267 | | | REMOVED | | |
| PX-0268 | | | REMOVED | | |
| PX-0269 | | | REMOVED | | |
| PX-0270 | | | REMOVED | | |
| PX-0271 | | | REMOVED | | |
| PX-0272 | | | REMOVED | | |
| PX-0273 | | | REMOVED | | |
| PX-0274 | | | REMOVED | | |
| PX-0275 | | | REMOVED | | |
| PX-0276 | | | REMOVED | | |
| PX-0277 | | | REMOVED | | |
| PX-0278 | | | REMOVED | | |
| PX-0279 | | | REMOVED | | |
| PX-0280 | | | REMOVED | | |
| PX-0281 | | | REMOVED | | |
| PX-0282 | | | REMOVED | | |
| PX-0283 | | | REMOVED | | |
| PX-0284 | | | REMOVED | | |
| PX-0285 | | | REMOVED | | |
| PX-0286 | | | REMOVED | | |
| PX-0287 | | | REMOVED | | |
| PX-0288 | | | REMOVED | | |
| PX-0289 | | | REMOVED | | |
| PX-0290 | | | REMOVED | | |
| PX-0291 | | | REMOVED | | |
| PX-0292 | | | REMOVED | | |
| PX-0293 | | | REMOVED | | |
| PX-0294 | | | REMOVED | | |
| PX-0295 | | | REMOVED | | |
| PX-0296 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0297 | | | REMOVED | | |
| PX-0298 | | | REMOVED | | |
| PX-0299 | | | REMOVED | | |
| PX-0300 | | | REMOVED | | |
| PX-0301 | | | REMOVED | | |
| PX-0302 | | | REMOVED | | |
| PX-0303 | | | REMOVED | | |
| PX-0304 | | | REMOVED | | |
| PX-0305 | | | REMOVED | | |
| PX-0306 | | | REMOVED | | |
| PX-0307 | | | REMOVED | | |
| PX-0308 | | | REMOVED | | |
| PX-0309 | | | REMOVED | | |
| PX-0310 | | | REMOVED | | |
| PX-0311 | | | REMOVED | | |
| PX-0312 | | | REMOVED | | |
| PX-0313 | | | REMOVED | | |
| PX-0314 | | | REMOVED | | |
| PX-0315 | | | REMOVED | | |
| PX-0316 | | | REMOVED | | |
| PX-0317 | | | REMOVED | | |
| PX-0318 | | | REMOVED | | |
| PX-0319 | | | REMOVED | | |
| PX-0320 | | | REMOVED | | |
| PX-0321 | | | REMOVED | | |
| PX-0322 | | | REMOVED | | |
| PX-0323 | | | REMOVED | | |
| PX-0324 | | | REMOVED | | |
| PX-0325 | | | REMOVED | | |
| PX-0326 | | | REMOVED | | |
| PX-0327 | | | REMOVED | | |
| PX-0328 | | | REMOVED | | |
| PX-0329 | | | REMOVED | | |
| PX-0330 | | | REMOVED | | |
| PX-0331 | | | REMOVED | | |
| PX-0332 | | | REMOVED | | |
| PX-0333 | | | REMOVED | | |
| PX-0334 | | | REMOVED | | |
| PX-0335 | | | REMOVED | | |
| PX-0336 | | | REMOVED | | |
| PX-0337 | | | REMOVED | | |
| PX-0338 | | | REMOVED | | |
| PX-0339 | | | REMOVED | | |
| PX-0340 | | | REMOVED | | |
| PX-0341 | | | REMOVED | | |
| PX-0342 | | | REMOVED | | |
| PX-0343 | | | REMOVED | | |
| PX-0344 | | | REMOVED | | |
| PX-0345 | | | REMOVED | | |
| PX-0346 | | | REMOVED | | |
| PX-0347 | | | REMOVED | | |
| PX-0348 | | | REMOVED | | |
| PX-0349 | | | REMOVED | | |
| PX-0350 | | | REMOVED | | |
| PX-0351 | | | REMOVED | | |
| PX-0352 | | | REMOVED | | |
| PX-0353 | | | REMOVED | | |
| PX-0354 | | | REMOVED | | |
| PX-0355 | | | REMOVED | | |
| PX-0356 | | | REMOVED | | |
| PX-0357 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0358 | | | REMOVED | | |
| PX-0359 | | | REMOVED | | |
| PX-0360 | | | REMOVED | | |
| PX-0361 | | | REMOVED | | |
| PX-0362 | | | REMOVED | | |
| PX-0363 | | | REMOVED | | |
| PX-0364 | | | REMOVED | | |
| PX-0365 | | | REMOVED | | |
| PX-0366 | | | REMOVED | | |
| PX-0367 | | | REMOVED | | |
| PX-0368 | | | REMOVED | | |
| PX-0369 | | | REMOVED | | |
| PX-0370 | | | REMOVED | | |
| PX-0371 | | | REMOVED | | |
| PX-0372 | | | REMOVED | | |
| PX-0373 | | | REMOVED | | |
| PX-0374 | | | REMOVED | | |
| PX-0375 | | | REMOVED | | |
| PX-0376 | | | REMOVED | | |
| PX-0377 | | | REMOVED | | |
| PX-0378 | | | REMOVED | | |
| PX-0379 | | | REMOVED | | |
| PX-0380 | | | REMOVED | | |
| PX-0381 | | | REMOVED | | |
| PX-0382 | | | REMOVED | | |
| PX-0383 | | | REMOVED | | |
| PX-0384 | | | REMOVED | | |
| PX-0385 | | | REMOVED | | |
| PX-0386 | | | REMOVED | | |
| PX-0387 | 5994-1596_General xC_brochure.pdf | AGILE0008796 | AGILE0008805 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0388 | PLXA_Lead_Share_Products_Overview_2022 DE52417342.pdf | AGILE0016629 | AGILE0016638 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0389 | Customer Facing Slide Deck eSight 2021.pptx | AGILE0018961 | AGILE0019009 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0390 | cross-sell-upsell-plxa-acea.pptx | AGILE0019010 | AGILE0019011 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0391 | xCELLigence RTCA 10 apps overview.pptx | AGILE0019020 | AGILE0019058 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0392 | eSight customer-facing slides (2019 August).pptx | AGILE0019580 | AGILE0019615 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0393 | xcelligence-rtca-esight-product-overview-clsd-competency-webinar.pptx | AGILE0028784 | AGILE0028811 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0394 | 150003(3.1)RTCA S16 System Operator's Manual.pdf | AGILE0028965 | AGILE0029031 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0395 | 150064(3.1)xCELLigence RTCA SP Operator's Manual.pdf | AGILE0029033 | AGILE0029109 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0396 | 150065(3.1)xCELLigence RTCA MP Operator's Manual.pdf | AGILE0029111 | AGILE0029186 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0397 | 150134(3.1)RTCA DP System Operator's Manual.pdf | AGILE0029192 | AGILE0029284 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0398 | 150140(3.1)xCELLigence RTCA HT Operator's Guide.pdf | AGILE0029289 | AGILE0029396 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0399 | 150142(1.2)RTCA HT Software Guide.pdf | AGILE0029398 | AGILE0029509 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0400 | 150168(1.4)RTCA Software Pro Guide.pdf | AGILE0029626 | AGILE0029865 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0401 | | | REMOVED | | |
| PX-0402 | XA150211(1.06)xCELLigence RTCA eSight Operator's Guide.pdf | AGILE0029996 | AGILE0030141 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0403 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0404 | XA150212(1.05)xCELLigence RTCA eSight Software Guide.pdf | AGILE0030143 | AGILE0030472 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0405 | | REMOVED | | | |
| PX-0406 | | REMOVED | | | |
| PX-0407 | | REMOVED | | | |
| PX-0408 | | REMOVED | | | |
| PX-0409 | | REMOVED | | | |
| PX-0410 | | REMOVED | | | |
| PX-0411 | | REMOVED | | | |
| PX-0412 | | REMOVED | | | |
| PX-0413 | | REMOVED | | | |
| PX-0414 | | REMOVED | | | |
| PX-0415 | | REMOVED | | | |
| PX-0416 | | REMOVED | | | |
| PX-0417 | | REMOVED | | | |
| PX-0418 | | REMOVED | | | |
| PX-0419 | | REMOVED | | | |
| PX-0420 | | REMOVED | | | |
| PX-0421 | | REMOVED | | | |
| PX-0422 | | REMOVED | | | |
| PX-0423 | | REMOVED | | | |
| PX-0424 | | REMOVED | | | |
| PX-0425 | | REMOVED | | | |
| PX-0426 | | REMOVED | | | |
| PX-0427 | | REMOVED | | | |
| PX-0428 | | REMOVED | | | |
| PX-0429 | | REMOVED | | | |
| PX-0430 | | REMOVED | | | |
| PX-0431 | | REMOVED | | | |
| PX-0432 | | REMOVED | | | |
| PX-0433 | | REMOVED | | | |
| PX-0434 | | REMOVED | | | |
| PX-0435 | | REMOVED | | | |
| PX-0436 | | REMOVED | | | |
| PX-0437 | | REMOVED | | | |
| PX-0438 | | REMOVED | | | |
| PX-0439 | | REMOVED | | | |
| PX-0440 | | REMOVED | | | |
| PX-0441 | | REMOVED | | | |
| PX-0442 | | REMOVED | | | |
| PX-0443 | | REMOVED | | | |
| PX-0444 | | REMOVED | | | |
| PX-0445 | E-Plates Information Summary.pptx | AGILE0041374 | AGILE0041386 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0446 | 5.5.1 - US-ACEA_OEM Supply and Distribution Agreement_13-Nov-2007 Pg 1-38.pdf | AGILE0041387 | AGILE0041424 | Wang Ex. 16 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0447 | 5.5.10 - US-ACEA_OEM Supply_7th Amendmnt_13-Apr-2011.tif | AGILE0041425 | AGILE0041429 | Wang Ex. 25 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0448 | 5.5.11 - US-ACEA_OEM Supply_8th Amendment_30-Aug_2012 - Agreement Termination.pdf | AGILE0041430 | AGILE0041445 | Wang Ex. 26 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0449 | 5.5.12 - US-ACEA_OEM Supply_9th Amendment 7.28.14.pdf | AGILE0041446 | AGILE0041449 | Wang Ex. 27 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0450 | 5.5.2 - US-ACEA_OEM Supply and Distribution Agreement_13-Nov-2007 Pg 39-64.pdf | AGILE0041450 | AGILE0041475 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0451 | 5.5.3 - US-ACEA_OEM Supply and Distribution Agreement_13-Nov-2007 - Signature Page.pdf | AGILE0041476 | AGILE0041476 | Wang Ex. 17 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0452 | 5.5.4 - US-ACEA_OEM Supply_1st Amendment_07-Dec-2007 - Joint Steering Committee.pdf | AGILE0041477 | AGILE0041478 | Wang Ex. 19 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0453 | 5.5.5 - US-ACEA_OEM Supply_2nd Amendment_23-Sep-2008 - Software Lic.pdf | AGILE0041479 | AGILE0041480 | Wang Ex. 20 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0454 | 5.5.6 - US-ACEA_OEM Supply_3rd Amendment_03-Dec-2008 - Application Lab.pdf | AGILE0041481 | AGILE0041483 | Wang Ex. 21 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0455 | 5.5.7 - US-ACEA_OEM Supply_4th Amendment_12-Jan-2010 - Transfer Pricing.pdf | AGILE0041484 | AGILE0041490 | Wang Ex. 22 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0456 | 5.5.8 - US-ACEA_OEM Supply_5th Amendment_12-May-2010 - RTCA Cardio.pdf | AGILE0041491 | AGILE0041492 | Wang Ex. 23 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0457 | 5.5.9 - US-ACEA_OEM Supply_6th Amendmnt_11-Oct-2010.tif | AGILE0041493 | AGILE0041496 | Wang Ex. 24 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0458 | ACEA_OEM Supply and Distribution Agreement_13-Nov-2007.pdf | AGILE0041498 | AGILE0041535 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0459 | ACEA OEM Supply and Distribution Agreement final_ES 3.DOC | AGILE0041536 | AGILE0041599 | Wang Ex. 31 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0460 | Exhibit_7_Patent_List_071002.doc | AGILE0041627 | AGILE0041628 | Wang Ex. 28 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0461 | FAC - Exhibit BB (Cytotoxicity and Cell Viability Webpage) | AGILE0041908 | AGILE0041912 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0462 | FAC - Exhibit CC.pdf | AGILE0041977 | AGILE0041979 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0463 | FAC - Exhibit D.pdf | AGILE0041980 | AGILE0041985 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0464 | FAC - Exhibit DD.pdf | AGILE0041986 | AGILE0041989 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0465 | FAC - Exhibit E.pdf | AGILE0041990 | AGILE0041995 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0466 | FAC - Exhibit EE.pdf | AGILE0041996 | AGILE0041999 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0467 | FAC - Exhibit F.pdf | AGILE0042000 | AGILE0042008 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0468 | REMOVED | | | | |
| PX-0469 | FAC - Exhibit G.pdf | AGILE0042091 | AGILE0042096 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0470 | FAC - Exhibit GG.pdf | AGILE0042097 | AGILE0042160 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0471 | FAC - Exhibit H.pdf | AGILE0042161 | AGILE0042189 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0472 | FAC - Exhibit I.pdf | AGILE0042193 | AGILE0042198 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0473 | FAC - Exhibit J.pdf | AGILE0042206 | AGILE0042226 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0474 | FAC - Exhibit JJ.pdf | AGILE0042227 | AGILE0042228 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0475 | FAC - Exhibit K.pdf | AGILE0042229 | AGILE0042238 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0476 | FAC - Exhibit L.pdf | AGILE0042246 | AGILE0042247 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0477 | FAC - Exhibit LL.pdf | AGILE0042248 | AGILE0042253 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0478 | FAC - Exhibit MM.pdf | AGILE0042256 | AGILE0042259 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0479 | FAC - Exhibit N.pdf | AGILE0042260 | AGILE0042263 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0480 | FAC - Exhibit O.pdf | AGILE0042264 | AGILE0042265 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0481 | REMOVED | | | | |
| PX-0482 | REMOVED | | | | |
| PX-0483 | FAC - Exhibit R.pdf | AGILE0042276 | AGILE0042280 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0484 | FAC - Exhibit T.pdf | AGILE0042282 | AGILE0042286 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0485 | FAC - Exhibit U.pdf | AGILE0042287 | AGILE0042290 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0486 | FAC - Exhibit V.pdf | AGILE0042291 | AGILE0042293 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0487 | FAC - Exhibit W.pdf | AGILE0042294 | AGILE0042298 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0488 | FAC - Exhibit X.pdf | AGILE0042299 | AGILE0042300 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0489 | FAC - Exhibit Y.pdf | AGILE0042301 | AGILE0042354 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0490 | FAC - Exhibit Z.pdf | AGILE0042355 | AGILE0042357 | | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0491 | Maestro ZHT High-throughput Live-Cell Analysis System _ Axion Biosystems_Website Printout 4-14-23.pdf | AGILE0042358 | AGILE0042363 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0492 | Maestro Z _ Axion Biosystems_Web Printout 4-14-2023.pdf | AGILE0042379 | AGILE0042383 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0493 | Maestro Edge MEA and Live-Cell Analysis System _ Axion Biosystems_Web Printout 4-14-23.pdf | AGILE0042384 | AGILE0042388 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0494 | Monitoring Rapid Receptor-Mediated Signaling in Real-Time with the Maestro Z Impedance Assay _ Axion Biosystems_Web Printout 4-20-2023.pdf | AGILE0042391 | AGILE0042398 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0495 | How to get started with Maestro Z cell analysis system (downloaded from https___www.youtube.com_watch_v=Hz1HAZnfhbs_t=125s on 4-20-2023).mp4 | AGILE0042407 | AGILE0042407 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0496 | Maestro ZHT High-throughput Live-Cell Analysis System _ Axion Biosystems - Web Printout 4-20-2023.pdf | AGILE0042409 | AGILE0042413 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0497 | Maestro Pro _ Axion Biosystems_Web Printout 4-20-2023.pdf | AGILE0042414 | AGILE0042417 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0498 | AACR2020_Immuno-oncology_Glioblastoma_Final.pdf | AGILE0042441 | AGILE0042441 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0499 | Gargett et al_.pdf | AGILE0042442 | AGILE0042479 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0500 | Impedance Automation Module _ Axion Biosystems.pdf | AGILE0042480 | AGILE0042482 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0501 | Logun et al.pdf | AGILE0042483 | AGILE0042495 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0502 | GxP Impedance Module _ Axion Biosystems.pdf | AGILE0042496 | AGILE0042500 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0503 | Measuring Real-Time Cell Therapy Potency With Bioelectronic Assays _ Axion Biosystems.pdf | AGILE0042514 | AGILE0042519 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0504 | Watanabe et al_.pdf | AGILE0042520 | AGILE0042542 | | |
| PX-0505 | ACEA Specifcation 96X E-Plate Device | AGILE0042983 | AGILE0042991 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0506 | System Component Test Plan 96X E-Plate Device | AGILE0042992 | AGILE0042997 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0507 | ACEA Specifcation 96X Resistor Device | AGILE0043001 | AGILE0043007 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0508 | ACEA Specifcation RTCA SP Pro Software | AGILE0043127 | AGILE0043158 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0509 | System Component Test Protocol: The Function of Cover of E-Plate Device | AGILE0043232 | AGILE0043237 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0510 | Alan Harper 2003 Lab Notebook No. 0009 | AGILE0057303 | AGILE0057414 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0511 | Joann J 2003 Lab Notebook | AGILE0057415 | AGILE0057702 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0512 | Junquan Xu 2003 Lab Notebook No. 0014 | AGILE0057703 | AGILE0057905 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0513 | Tommy 2003 Lab Notebook | AGILE0057906 | AGILE0057931 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0514 | Xiaobo Wang 2002 Lab Notebook No. 0002 | AGILE0057932 | AGILE0058249 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0515 | Yamma Abassi 2003 Lab Notebook No. 0013 | AGILE0058250 | AGILE0058371 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0516 | Yamma Abassi 2004-2005 Lab Notebook | AGILE0058372 | AGILE0058422 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0517 | Yamma Abassi 2005 Lab Notebook | AGILE0058423 | AGILE0058433 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0518 | Josephine Atienza 2004 Lab Notebook No. 0021 | AGILE0058434 | AGILE0058539 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0519 | Jerome David 2004 Lab Notebook No. 0016 | AGILE0058540 | AGILE0058721 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0520 | Junquan Xu 2004 Lab Notebook No. 0027 | AGILE0058722 | AGILE0058812 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0521 | Nu Somvilay 2003 Lab Notebook No. 0010 | AGILE0058813 | AGILE0058905 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0522 | Priya Ramani 2004 Lab Notebook No. 0024 | AGILE0058906 | AGILE0058942 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0523 | Xiaobo Wang 2004 Lab Notebook No. 0018 | AGILE0058943 | AGILE0059144 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0524 | Xiaobo Wang 2004 Lab Notebook No. 0020 | AGILE0059145 | AGILE0059385 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0525 | US7459303.pdf | AGILE0059386 | AGILE0059447 | | |
| PX-0526 | REMOVED | | | | |
| PX-0527 | application-10705447.pdf | AGILE0059547 | AGILE0059646 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0528 | application-10705615.pdf | AGILE0059647 | AGILE0059712 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0529 | application-10987732.pdf | AGILE0059713 | AGILE0059778 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0530 | application-11055639.pdf | AGILE0059779 | AGILE0059853 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0531 | application-11198831pdf.pdf | AGILE0059854 | AGILE0059994 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0532 | application-PCTUS0322557.pdf | AGILE0059995 | AGILE0060159 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0533 | application-PCTUS2004037696.pdf | AGILE0060160 | AGILE0060320 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0534 | application-PCTUS2005004481.pdf | AGILE0060321 | AGILE0060495 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0535 | history-10705447.pdf | AGILE0060496 | AGILE0061736 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0536 | REMOVED | | | | |
| PX-0537 | history-11055639.pdf | AGILE0062811 | AGILE0063290 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0538 | history-11198831.pdf | AGILE0063291 | AGILE0063916 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0539 | REMOVED | | | | |
| PX-0540 | REMOVED | | | | |
| PX-0541 | history-60469572.pdf | AGILE0064258 | AGILE0064378 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0542 | REMOVED | | | | |
| PX-0543 | history-60542927.pdf | AGILE0064438 | AGILE0064535 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0544 | history-60548713.pdf | AGILE0064536 | AGILE0064595 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0545 | REMOVED | | | | |
| PX-0546 | history-60598609.pdf | AGILE0064615 | AGILE0064637 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0547 | history-60630071.pdf | AGILE0064638 | AGILE0064661 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0548 | history-60647075.pdf | AGILE0064662 | AGILE0064697 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0549 | history-60647189.pdf | AGILE0064698 | AGILE0064738 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0550 | history-60660829.pdf | AGILE0064739 | AGILE0064771 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0551 | history-60660898.pdf | AGILE0064772 | AGILE0064804 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0552 | history-60689422.pdf | AGILE0064805 | AGILE0064838 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0553 | history-PCTUS0322557.pdf | AGILE0064839 | AGILE0064839 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0554 | history-PCTUS2004037696.pdf | AGILE0064840 | AGILE0065024 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0555 | history-PCTUS2005004481.pdf | AGILE0065025 | AGILE0065221 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0556 | history-_11197994.pdf | AGILE0065222 | AGILE0065603 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0557 | history-_60613872.pdf | AGILE0065604 | AGILE0065624 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0558 | history-_60614601.pdf | AGILE0065625 | AGILE0065650 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0559 | 01292024 Xcelligence COPA Profit Report 2019 to 2023 limited to US.xlsx | AGILE0066164 | AGILE0066164 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0560 | Jenny Zhu Lab Notebook | AGILE0073874 | AGILE0074188 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0561 | | REMOVED | | | |
| PX-0562 | Presentation_for_Dr_Lee_v1.PPT | AGILE0074250 | AGILE0074285 | Wang Ex. 15 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0563 | Xiao Xu Lab Notebook | AGILE0074286 | AGILE0074504 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0564 | Cell Analysis 2021 SPR Review_Sept 30 2021_Final.pptx | AGILE0129951 | AGILE0129978 | Joseph Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0565 | | REMOVED | | | |
| PX-0566 | | REMOVED | | | |
| PX-0567 | | REMOVED | | | |
| PX-0568 | | REMOVED | | | |
| PX-0569 | | REMOVED | | | |
| PX-0570 | | REMOVED | | | |
| PX-0571 | Please cascade to your organizations **Cell Analysis Just Got Better: ACEA Acquisition Closed! | AGILE0919980 | AGILE0919981 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0572 | Cell Analysis Division Review 2020 - v19.pptx | AGILE0928556 | AGILE0928593 | Christian Ex. 16 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0573 | | REMOVED | | | |
| PX-0574 | | REMOVED | | | |
| PX-0575 | | REMOVED | | | |
| PX-0576 | | REMOVED | | | |
| PX-0577 | | REMOVED | | | |
| PX-0578 | | REMOVED | | | |
| PX-0579 | | REMOVED | | | |
| PX-0580 | | REMOVED | | | |
| PX-0581 | | REMOVED | | | |
| PX-0582 | | REMOVED | | | |
| PX-0583 | | REMOVED | | | |
| PX-0584 | | REMOVED | | | |
| PX-0585 | | REMOVED | | | |
| PX-0586 | | REMOVED | | | |
| PX-0587 | | REMOVED | | | |
| PX-0588 | | REMOVED | | | |
| PX-0589 | | REMOVED | | | |
| PX-0590 | | REMOVED | | | |
| PX-0591 | | REMOVED | | | |
| PX-0592 | | REMOVED | | | |
| PX-0593 | | REMOVED | | | |
| PX-0594 | | REMOVED | | | |
| PX-0595 | RE: Research grant for 3D cell culture | AGILE1320599 | AGILE1320600 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0596 | | | REMOVED | | |
| PX-0597 | 3D spheroid app note - v.13.docx | AGILE1354081 | AGILE1354090 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0598 | RE: eSIGHT blurb for investors | AGILE1356312 | AGILE1356314 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0599 | | | REMOVED | | |
| PX-0600 | LRS phase 2 combined final 2018_05_02.pdf | AGILE1382864 | AGILE1383029 | Braun Ex. 8 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0601 | 20210510-FINAL-Next Level LSAG-Workshop II PRE-READ.pdf | AGILE1389513 | AGILE1389623 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0602 | | | REMOVED | | |
| PX-0603 | 5994-4871EN-D1.pdf | AGILE1395102 | AGILE1395108 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0604 | 3D spheroid app note - v.13_RA Review.docx | AGILE1395264 | AGILE1395274 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0605 | Monitoring Drug-Mediated 3D Tumor Spheroid Shrinkage in Real Time Using an Agilent xCELLigence RTCA eSight | AGILE1395278 | AGILE1395287 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 2, MIL 3 |
| PX-0606 | 3D Spheroid Draft App Note 12-15.pdf | AGILE1399157 | AGILE1399172 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0607 | | | REMOVED | | |
| PX-0608 | | | REMOVED | | |
| PX-0609 | 20220224 Brandon_3D spheroid app note - v.13.docx | AGILE1431654 | AGILE1431663 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0610 | Monitoring Drug-Mediated 3D Tumor Spheroid Shrinkage in Real Time Using an Agilent xCELLigence RTCA eSight | AGILE1472876 | AGILE1472885 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0611 | xCELLigence RTCA DP Training for Fisher_03042024.pptx | AGILE1545548 | AGILE1545548 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0612 | CLSD Webinar Series PLXA- xCELLigence RTCA eSight Product Overview.pptx | AGILE1546359 | AGILE1546359 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0613 | SAJK Webinar eSight 2021.pptx | AGILE1546784 | AGILE1546784 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0614 | | | REMOVED | | |
| PX-0615 | Re: How you plan to generate thin layers of hydrogel, and what the thinnest layer of layer you can produce? | AGILE1674166 | AGILE1674167 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0616 | RE: eSight application | AGILE1674530 | AGILE1674536 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0617 | Principle of Operation Cell Index.JPG | AGILE1688674 | AGILE1688674 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0618 | 00000000F3956EC1E2A49041B82BCEC9D0C4E0ED84673100.MSG | AGILE2149769 | AGILE2149771 | Wang Ex. 45 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0619 | 4.1.4.2.1 - HT Spec Sheet.pdf | AGILE2218932 | AGILE2218933 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0620 | | | REMOVED | | |
| PX-0621 | 4.1.4.2.3 - MP Spec Sheet.pdf | AGILE2218936 | AGILE2218937 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0622 | 4.1.4.2.4 - SP Spec Sheet.pdf | AGILE2218938 | AGILE2218939 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0623 | 4.1.4.2.7 - Consumables Spec Sheet.pdf | AGILE2218943 | AGILE2218946 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0624 | | | REMOVED | | |
| PX-0625 | 8.1.1 - US-IP Portfolio Summary.pdf | AGILE2223598 | AGILE2223607 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0626 | 8.1.2 - China-IP Portfolio Summary.pdf | AGILE2223608 | AGILE2223608 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0627 | 8.1.3 - ACEA IP Portfolio Summary (7.25.2018).pdf | AGILE2223609 | AGILE2223617 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRCE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0628 | 110168(B)-Receiver Plate 96,Co-Culture Device(CCD96接收板).pdf | AGILE2248431 | AGILE2248435 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0629 | | | REMOVED | | |
| PX-0630 | | | REMOVED | | |
| PX-0631 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0632 | | | REMOVED | | |
| PX-0633 | | | REMOVED | | |
| PX-0634 | | | REMOVED | | |
| PX-0635 | | | REMOVED | | |
| PX-0636 | | | REMOVED | | |
| PX-0637 | | | REMOVED | | |
| PX-0638 | | | REMOVED | | |
| PX-0639 | | | REMOVED | | |
| PX-0640 | | | REMOVED | | |
| PX-0641 | | | REMOVED | | |
| PX-0642 | | | REMOVED | | |
| PX-0643 | | | REMOVED | | |
| PX-0644 | xC_Quick_Start_Guide SP v3.0.pdf | AGILE2854043 | AGILE2854044 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0645 | jove-protocol-52423-using-cell-substrate-impedance-live-cell-imaging-to-measure-real-time.pdf | AGILE2857423 | AGILE2857430 | Salters Ex. 12 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0646 | ACEA - Design Review 96X Multiple E-Plate Station | AGILE2881963 | AGILE2882137 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0647 | | | REMOVED | | |
| PX-0648 | ACEA Specification: W380 RT-CES Analyzer | AGILE2882275 | AGILE2882293 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0649 | | | REMOVED | | |
| PX-0650 | | | REMOVED | | |
| PX-0651 | | | REMOVED | | |
| PX-0652 | ACEA Scanned Documentation | AGILE2899127 | AGILE2899383 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0653 | 3D Update and Summary | AGILE2961786 | AGILE2961787 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0654 | Cell Analysis Division Review 2020 - Final.pdf | AGILE2976916 | AGILE2976953 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0655 | FY23 CLSD Marketing Strategic Priorities.pdf | AGILE2980070 | AGILE2980104 | Christian Ex. 17 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0656 | CLSD Intro - COM 051723.pdf | AGILE2980898 | AGILE2980914 | Zhao Ex. 25 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0657 | | | REMOVED | | |
| PX-0658 | 030120 Risk assessmen RTCA SPMP System.pdf | AGILE3186845 | AGILE3186855 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0659 | | | REMOVED | | |
| PX-0660 | | | REMOVED | | |
| PX-0661 | | | REMOVED | | |
| PX-0662 | | | REMOVED | | |
| PX-0663 | | | REMOVED | | |
| PX-0664 | | | REMOVED | | |
| PX-0665 | RE: 3D spheroid on 96x E-plate | AGILE3324987 | AGILE3324988 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0666 | eSight Technology Page Side by Side Updated 7-7-23 (2).pptx | AGILE3436048 | AGILE3436048 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0667 | FY21 CLSD Division Review - RTCA_slidesLZ_preliminary.pptx | AGILE3436182 | AGILE3436182 | Braun Ex. 6 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0668 | PLXA-Proposal for Agilent Lab Advanced Technologies-Aug. 2020.pptx | AGILE3436510 | AGILE3436510 | Li Ex. 12 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0669 | merck_02_26.ppt | AGILE3437859 | AGILE3437896 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0670 | merckpresentation.ppt | AGILE3438003 | AGILE3438039 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0671 | research plan071902.doc | AGILE3438206 | AGILE3438220 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0672 | 030041-Stable Cell Index.doc | AGILE3442620 | AGILE3442625 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0673 | | | REMOVED | | |
| PX-0674 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0675 | | | REMOVED | | |
| PX-0676 | | | REMOVED | | |
| PX-0677 | | | REMOVED | | |
| PX-0678 | | | REMOVED | | |
| PX-0679 | | | REMOVED | | |
| PX-0680 | | | REMOVED | | |
| PX-0681 | | | REMOVED | | |
| PX-0682 | | | REMOVED | | |
| PX-0683 | | | REMOVED | | |
| PX-0684 | | | REMOVED | | |
| PX-0685 | | | REMOVED | | |
| PX-0686 | | | REMOVED | | |
| PX-0687 | | | REMOVED | | |
| PX-0688 | | | REMOVED | | |
| PX-0689 | | | REMOVED | | |
| PX-0690 | | | REMOVED | | |
| PX-0691 | | | REMOVED | | |
| PX-0692 | | | REMOVED | | |
| PX-0693 | | | REMOVED | | |
| PX-0694 | | | REMOVED | | |
| PX-0695 | | | REMOVED | | |
| PX-0696 | | | REMOVED | | |
| PX-0697 | 010051_pre-release.doc | AGILE3459835 | AGILE3459843 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0698 | | | REMOVED | | |
| PX-0699 | | | REMOVED | | |
| PX-0700 | | | REMOVED | | |
| PX-0701 | | | REMOVED | | |
| PX-0702 | | | REMOVED | | |
| PX-0703 | | | REMOVED | | |
| PX-0704 | | | REMOVED | | |
| PX-0705 | | | REMOVED | | |
| PX-0706 | | | REMOVED | | |
| PX-0707 | | | REMOVED | | |
| PX-0708 | 010038 1.0.doc | AGILE3460427 | AGILE3460435 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0709 | | | REMOVED | | |
| PX-0710 | | | REMOVED | | |
| PX-0711 | | | REMOVED | | |
| PX-0712 | | | REMOVED | | |
| PX-0713 | | | REMOVED | | |
| PX-0714 | | | REMOVED | | |
| PX-0715 | | | REMOVED | | |
| PX-0716 | | | REMOVED | | |
| PX-0717 | | | REMOVED | | |
| PX-0718 | | | REMOVED | | |
| PX-0719 | | | REMOVED | | |
| PX-0720 | | | REMOVED | | |
| PX-0721 | | | REMOVED | | |
| PX-0722 | | | REMOVED | | |
| PX-0723 | | | REMOVED | | |
| PX-0724 | | | REMOVED | | |
| PX-0725 | | | REMOVED | | |
| PX-0726 | | | REMOVED | | |
| PX-0727 | | | REMOVED | | |
| PX-0728 | | | REMOVED | | |
| PX-0729 | | | REMOVED | | |
| PX-0730 | | | REMOVED | | |
| PX-0731 | | | REMOVED | | |
| PX-0732 | | | REMOVED | | |
| PX-0733 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0734 | | | REMOVED | | |
| PX-0735 | | | REMOVED | | |
| PX-0736 | | | REMOVED | | |
| PX-0737 | | | REMOVED | | |
| PX-0738 | | | REMOVED | | |
| PX-0739 | RE_ Axion's Car-T killing cancer 3D spheroids app note is just out.msg | AGILE3559106 | AGILE3559107 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0740 | 回复_ Axion 3D spheroids.msg | AGILE3559108 | AGILE3559108 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0741 | 回复_ SPECIAL EDITION! Monthly RTCA meeting.msg | AGILE3559109 | AGILE3559112 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0742 | 20220524 3D Spheroids test on 96x E-plate.pptx | AGILE3559114 | AGILE3559114 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0743 | | | REMOVED | | |
| PX-0744 | | | REMOVED | | |
| PX-0745 | | | REMOVED | | |
| PX-0746 | | | REMOVED | | |
| PX-0747 | Product sheet_E-plateview96PET.DOCX | AGILE3559775 | AGILE3559776 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0748 | Product sheet_E-plate96.docx | AGILE3559777 | AGILE3559778 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0749 | Product sheet_E-plateview96.docx | AGILE3559779 | AGILE3559780 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0750 | Product sheet_E-plate384.docx | AGILE3559781 | AGILE3559782 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0751 | | | REMOVED | | |
| PX-0752 | | | REMOVED | | |
| PX-0753 | | | REMOVED | | |
| PX-0754 | | | REMOVED | | |
| PX-0755 | | | REMOVED | | |
| PX-0756 | | | REMOVED | | |
| PX-0757 | Product Sheet_E-plateview96_June2020.pdf | AGILE3575374 | AGILE3575375 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0758 | | | REMOVED | | |
| PX-0759 | | | REMOVED | | |
| PX-0760 | | | REMOVED | | |
| PX-0761 | | | REMOVED | | |
| PX-0762 | | | REMOVED | | |
| PX-0763 | | | REMOVED | | |
| PX-0764 | | | REMOVED | | |
| PX-0765 | | | REMOVED | | |
| PX-0766 | | | REMOVED | | |
| PX-0767 | RTCA_SP_MP_ACEA_PRESS_75F1A712-07EA-4211-A096-1FB65A5030232020-11-18T11-54-45.pdf | AGILE4223745 | AGILE4223764 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0768 | Agilent Cell Analysis condensed 011221.pptx | AGILE4350741 | AGILE4350741 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0769 | 20230316 xCELLigence RTCA Grant Expeditor Package_v1.docx | AGILE4415009 | AGILE4415032 | Griffith Ex. 5 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0770 | Agilent to Acquire ACEA Biosciences_Final Press Release.pdf | AGILE4570618 | AGILE4570621 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0771 | ▓▓▓▓▓▓05092022_748F395A-5124-4AE4-902D-E40264D09EC92023-06-22T14-20-12.pptx | AGILE4673575 | AGILE4673575 | Zhao Ex. 27 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0772 | Agilent Overview Presentation_July 2022.pptx | AGILE4760259 | AGILE4760259 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0773 | Project Apex - L.E.K. Report.pdf | AGILE4893226 | AGILE4893370 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0774 | | | REMOVED | | |
| PX-0775 | ▓▓▓▓▓▓▓▓11082022.docx | AGILE4957005 | AGILE4957008 | Zhao Ex. 10; Napper Ex. 4 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0776 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0777 | 010096 Specification E-Plate VIEW 96 PET.doc | AGILE5025277 | AGILE5025284 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0778 | Three-Dimensional (3D) cell culture monitoring: Opportunities and Challenges for impedance spectroscopy | AGILE5066147 | AGILE5066157 | Braun Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0779 | A review of impedance measurements of whole cells | AGILE5066158 | AGILE5066170 | Braun Ex. 19 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0780 | 3D cell-based biosensor for cell viability and drug assessment by 3D electric cell/matrigel-substrate impedance sensing | AGILE5066171 | AGILE5066178 | Li Ex. 24; Braun Ex. 20 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, 3RE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0781 | Towards a high throughput impedimetric screening of chemosensitivity of cancer cells suspended in hydrogel and cultured in a paper substrate | AGILE5066179 | AGILE5066184 | Braun Ex. 21 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, Towards 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0782 | Real-time monitoring of 3D cell culture using a 3D capacitance biosensor | AGILE5066185 | AGILE5066190 | Li Ex. 23; Braun Ex. 22 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0783 | Three-dimensional cell culture models for anticancer drug screening: Worth the effort? | AGILE5066191 | AGILE5066201 | Braun Ex. 23 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0784 | Modeling Physiological Events in 2D vs. 3D Cell Culture | AGILE5066202 | AGILE5066213 | Braun Ex. 24 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0785 | A planar imedance sensor for 3D spheroids | AGILE5066214 | AGILE5066224 | Braun Ex. 25 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0786 | Three-dimensional cell cultures as a new tool in drug discovery | AGILE5066225 | AGILE5066231 | Braun Ex. 26 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0787 | | | REMOVED | | |
| PX-0788 | | | REMOVED | | |
| PX-0789 | | | REMOVED | | |
| PX-0790 | Updated xcelligence through FY24.xlsx | AGILE5066608 | AGILE5066608 | Griffith Ex. 6E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0791 | xcelligence cust data.xlsx | AGILE5066609 | AGILE5066609 | Griffith Ex. 7E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0792 | xCELLigence service revenue and cost.xlsx | AGILE5068717 | AGILE5068717 | Griffith Ex. 9E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0793 | xCELLigence product revenue and cost with customers.xlsx | AGILE5068718 | AGILE5068718 | Griffith Ex. 8E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0794 | ACEA P&L from Acquisition through end of Fiscal 2024.xls | AGILE5068719 | AGILE5068719 | Griffith Ex. 12E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0795 | ACEA forward projection orders and Revenue.xlsx | AGILE5068720 | AGILE5068720 | Griffith Ex. 13E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0796 | Services Division P&L.xlsx | AGILE5068721 | AGILE5068721 | Griffith Ex. 10E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0797 | CLSD P&L.xls | AGILE5068797 | AGILE5068797 | Griffith Ex. 11E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0798 | | | REMOVED | | |
| PX-0799 | | | REMOVED | | |
| PX-0800 | | | REMOVED | | |
| PX-0801 | | | REMOVED | | |
| PX-0802 | | | REMOVED | | |
| PX-0803 | | | REMOVED | | |
| PX-0804 | Nan Li Lab Notebook | AGILE5069384 | AGILE5069397 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0805 | 20230306 3D Spheroids on 96x E-Plate.pptx | AGILE5069398 | AGILE5069410 | Li Ex. 14; Zhao Ex. 19 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0806 | 20250124Capture.JPG | AGILE5069411 | AGILE5069411 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0807 | Physical Prototype of ACEA Device.docx | AGILE5069412 | AGILE5069412 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0808 | xCELL Opps by Lost Reason.xlsx | AGILE5069413 | AGILE5069413 | Napper Ex. 9-10; Braun Ex. 9 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0809 | real-time-cell-analysis-eSight-NPI-webinar-slides-agilent (Public Facing)(184144299.1).pdf | AGILE5069534 | AGILE5069599 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0810 | Agilent - ACEA PPA Report FINAL.pdf | AGILE5069643 | AGILE5069764 | Christian Ex. 35 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0811 | | | REMOVED | | |
| PX-0812 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0813 | | | REMOVED | | |
| PX-0814 | Photograph of AG-PHYS-02.pdf | AGILE5069789 | AGILE5069790 | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0815 | Photograph of AG-PHYS-03.pdf | AGILE5069791 | AGILE5069792 | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0816 | Photograph of AG-PHYS-04.pdf | AGILE5069793 | AGILE5069794 | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0817 | Photograph of AG-PHYS-05.pdf | AGILE5069795 | AGILE5069796 | Wang Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0818 | | | REMOVED | | |
| PX-0819 | | | REMOVED | | |
| PX-0820 | | | REMOVED | | |
| PX-0821 | | | REMOVED | | |
| PX-0822 | | | REMOVED | | |
| PX-0823 | | | REMOVED | | |
| PX-0824 | | | REMOVED | | |
| PX-0825 | | | REMOVED | | |
| PX-0826 | | | REMOVED | | |
| PX-0827 | | | REMOVED | | |
| PX-0828 | | | REMOVED | | |
| PX-0829 | | | REMOVED | | |
| PX-0830 | | | REMOVED | | |
| PX-0831 | | | REMOVED | | |
| PX-0832 | | | REMOVED | | |
| PX-0833 | | | REMOVED | | |
| PX-0834 | | | REMOVED | | |
| PX-0835 | | | REMOVED | | |
| PX-0836 | | | REMOVED | | |
| PX-0837 | 11-03-A-00 Artichoke Heart PCA.docx | AXION-0000364 | AXION-0000364 | Millard Ex. 14 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0838 | | | REMOVED | | |
| PX-0839 | | | REMOVED | | |
| PX-0840 | | | REMOVED | | |
| PX-0841 | | | REMOVED | | |
| PX-0842 | 11-06-A-00 Complete Assembly.docx | AXION-0000438 | AXION-0000439 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0843 | 11-18-A-00 Pogo PCA 1.docx | AXION-0000452 | AXION-0000452 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0844 | | | REMOVED | | |
| PX-0845 | POGO_BOARD_1.pdf | AXION-0000725 | AXION-0000781 | Millard Ex. 48 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0846 | | | REMOVED | | |
| PX-0847 | | | REMOVED | | |
| PX-0848 | | | REMOVED | | |
| PX-0849 | | | REMOVED | | |
| PX-0850 | 11-04-A-01 Pogo PCA 0.docx | AXION-0000970 | AXION-0000971 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0851 | | | REMOVED | | |
| PX-0852 | | | REMOVED | | |
| PX-0853 | BD-BioCore 4B.dwg | AXION-0000989 | AXION-0000989 | Millard Ex. 17 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0854 | | | REMOVED | | |
| PX-0855 | | | REMOVED | | |
| PX-0856 | | | REMOVED | | |
| PX-0857 | 11-07-M-01.pdf | AXION-0001268 | AXION-0001268 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0858 | 11-20-A-00 SBC (MI991AF).docx | AXION-0001283 | AXION-0001283 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0859 | | | REMOVED | | |
| PX-0860 | | | REMOVED | | |
| PX-0861 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0862 | xy-placement_MezzoDigital_V5.xlsx | AXION-0001456 | AXION-0001456 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0863 | 11-05-A-00 M2 Digital PCA.docx | AXION-0001458 | AXION-0001459 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0864 | | | REMOVED | | |
| PX-0865 | | | REMOVED | | |
| PX-0866 | | | REMOVED | | |
| PX-0867 | | | REMOVED | | |
| PX-0868 | 09_67_m_20_00_microplate.pdf | AXION-0001597 | AXION-0001597 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0869 | microplate_96_tmea.pdf | AXION-0001599 | AXION-0001599 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0870 | | | REMOVED | | |
| PX-0871 | | | REMOVED | | |
| PX-0872 | M2 EDGE hardware guide v11.pdf | AXION-0001786 | AXION-0001809 | Chvatal Ex. 20 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0873 | | | REMOVED | | |
| PX-0874 | | | REMOVED | | |
| PX-0875 | | | REMOVED | | |
| PX-0876 | M2 Edge hardware guide v12.pdf | AXION-0001904 | AXION-0001927 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0877 | | | REMOVED | | |
| PX-0878 | | | REMOVED | | |
| PX-0879 | | | REMOVED | | |
| PX-0880 | | | REMOVED | | |
| PX-0881 | | | REMOVED | | |
| PX-0882 | | | REMOVED | | |
| PX-0883 | | | REMOVED | | |
| PX-0884 | | | REMOVED | | |
| PX-0885 | | | REMOVED | | |
| PX-0886 | | | REMOVED | | |
| PX-0887 | | | REMOVED | | |
| PX-0888 | | | REMOVED | | |
| PX-0889 | | | REMOVED | | |
| PX-0890 | | | REMOVED | | |
| PX-0891 | | | REMOVED | | |
| PX-0892 | | | REMOVED | | |
| PX-0893 | | | REMOVED | | |
| PX-0894 | | | REMOVED | | |
| PX-0895 | | | REMOVED | | |
| PX-0896 | | | REMOVED | | |
| PX-0897 | | | REMOVED | | |
| PX-0898 | | | REMOVED | | |
| PX-0899 | | | REMOVED | | |
| PX-0900 | | | REMOVED | | |
| PX-0901 | | | REMOVED | | |
| PX-0902 | | | REMOVED | | |
| PX-0903 | | | REMOVED | | |
| PX-0904 | | | REMOVED | | |
| PX-0905 | | | REMOVED | | |
| PX-0906 | | | REMOVED | | |
| PX-0907 | F1295689-AppNote_CAR_T_in_3D_Cancer_Spheroids.pdf | AXION-0002584 | AXION-0002589 | Millard Ex. 68 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0908 | | | REMOVED | | |
| PX-0909 | | | REMOVED | | |
| PX-0910 | dac_schematic_orig.eps | AXION-0002606 | AXION-0002606 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0911 | Endpoints and Computations for General Impedance.html | AXION-0002710 | AXION-0002714 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0912 | Impedance Processing Pipeline_V4.html | AXION-0002825 | AXION-0002825 | Millard Ex. 41 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0913 | image2019-8-9_10-40-11.png | AXION-0002837 | AXION-0002837 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0914 | | REMOVED | | | |
| PX-0915 | | REMOVED | | | |
| PX-0916 | | REMOVED | | | |
| PX-0917 | | REMOVED | | | |
| PX-0918 | Cell Culture Protocol - Impedance - Adherent Cell Lines.pdf | AXION-0003008 | AXION-0003009 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0919 | | REMOVED | | | |
| PX-0920 | | REMOVED | | | |
| PX-0921 | | REMOVED | | | |
| PX-0922 | Z96-IMP-96B DATASHEET v2.pdf | AXION-0003015 | AXION-0003015 | Willsie Ex. 3; Millard Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0923 | | REMOVED | | | |
| PX-0924 | PT-SOP-003 Impedance Plate Testing.docx | AXION-0004756 | AXION-0004761 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0925 | | REMOVED | | | |
| PX-0926 | | REMOVED | | | |
| PX-0927 | | REMOVED | | | |
| PX-0928 | | REMOVED | | | |
| PX-0929 | | REMOVED | | | |
| PX-0930 | | REMOVED | | | |
| PX-0931 | Maestro Z hardware guide v8.pdf | AXION-0005206 | AXION-0005229 | Chvatal Ex. 17 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0932 | Maestro TrayZ Hardware Guide v1.0.pdf | AXION-0005230 | AXION-0005249 | Chvatal Ex. 21 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0933 | Maestro ZHT hardware guide v2.pdf | AXION-0005250 | AXION-0005273 | Chvatal Ex. 19 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0934 | M2 Pro hardware guide v12.pdf | AXION-0005274 | AXION-0005297 | Chvatal Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0935 | | REMOVED | | | |
| PX-0936 | | REMOVED | | | |
| PX-0937 | | REMOVED | | | |
| PX-0938 | | REMOVED | | | |
| PX-0939 | | REMOVED | | | |
| PX-0940 | | REMOVED | | | |
| PX-0941 | | REMOVED | | | |
| PX-0942 | mezzodigital_v9.pdf | AXION-0005572 | AXION-0005658 | Millard Ex. 45 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0943 | argus_tray_v5.pdf | AXION-0005690 | AXION-0005772 | Millard Ex. 63 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0944 | | REMOVED | | | |
| PX-0945 | DAC Saturation.pptx | AXION-0005819 | AXION-0005819 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0946 | | REMOVED | | | |
| PX-0947 | | REMOVED | | | |
| PX-0948 | | REMOVED | | | |
| PX-0949 | POGOSTICK.pdf | AXION-0006056 | AXION-0006109 | Millard Ex. 49 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0950 | POGO_BOARD_0.pdf | AXION-0006138 | AXION-0006194 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0951 | | REMOVED | | | |
| PX-0952 | | REMOVED | | | |
| PX-0953 | | REMOVED | | | |
| PX-0954 | | REMOVED | | | |
| PX-0955 | | REMOVED | | | |
| PX-0956 | POGO_BOARD_1.pdf | AXION-0006577 | AXION-0006633 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0957 | | REMOVED | | | |
| PX-0958 | | REMOVED | | | |
| PX-0959 | | REMOVED | | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-0960 | | | REMOVED | | |
| PX-0961 | | | REMOVED | | |
| PX-0962 | | | REMOVED | | |
| PX-0963 | | | REMOVED | | |
| PX-0964 | | | REMOVED | | |
| PX-0965 | | | REMOVED | | |
| PX-0966 | | | REMOVED | | |
| PX-0967 | BD-BioCore 4B.pdf | AXION-0006999 | AXION-0006999 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0968 | | | REMOVED | | |
| PX-0969 | | | REMOVED | | |
| PX-0970 | | | REMOVED | | |
| PX-0971 | | | REMOVED | | |
| PX-0972 | | | REMOVED | | |
| PX-0973 | | | REMOVED | | |
| PX-0974 | | | REMOVED | | |
| PX-0975 | | | REMOVED | | |
| PX-0976 | | | REMOVED | | |
| PX-0977 | | | REMOVED | | |
| PX-0978 | | | REMOVED | | |
| PX-0979 | | | REMOVED | | |
| PX-0980 | | | REMOVED | | |
| PX-0981 | | | REMOVED | | |
| PX-0982 | DAC AckhIVB.pptx | AXION-0007542 | AXION-0007542 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0983 | | | REMOVED | | |
| PX-0984 | | | REMOVED | | |
| PX-0985 | AchkIV_bond_diagram Model.pdf | AXION-0007748 | AXION-0007748 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0986 | | | REMOVED | | |
| PX-0987 | | | REMOVED | | |
| PX-0988 | | | REMOVED | | |
| PX-0989 | MEZZODIGITAL_V4.pdf | AXION-0007931 | AXION-0008017 | Millard Ex. 46 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0990 | artichoke_heart_v6.pdf | AXION-0008082 | AXION-0008100 | Millard Ex. 51 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0991 | | | REMOVED | | |
| PX-0992 | Artichoke_III_description-3.pdf | AXION-0008181 | AXION-0008207 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-0993 | | | REMOVED | | |
| PX-0994 | | | REMOVED | | |
| PX-0995 | | | REMOVED | | |
| PX-0996 | | | REMOVED | | |
| PX-0997 | | | REMOVED | | |
| PX-0998 | | | REMOVED | | |
| PX-0999 | argus_console_v4.pdf | AXION-0008430 | AXION-0008451 | Millard Ex. 65 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1000 | | | REMOVED | | |
| PX-1001 | | | REMOVED | | |
| PX-1002 | | | REMOVED | | |
| PX-1003 | Argus Basin Board V1 Documentation.docx | AXION-0008654 | AXION-0008703 | Millard Ex. 62 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1004 | | | REMOVED | | |
| PX-1005 | | | REMOVED | | |
| PX-1006 | | | REMOVED | | |
| PX-1007 | | | REMOVED | | |
| PX-1008 | POGO_BOARD_1.pdf | AXION-0008756 | AXION-0008812 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1009 | | | REMOVED | | |
| PX-1010 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1011 | Registers_Ack_IV.xlsx | AXION-0008870 | AXION-0008870 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1012 | | | REMOVED | | |
| PX-1013 | | | REMOVED | | |
| PX-1014 | | | REMOVED | | |
| PX-1015 | | | REMOVED | | |
| PX-1016 | | | REMOVED | | |
| PX-1017 | | | REMOVED | | |
| PX-1018 | | | REMOVED | | |
| PX-1019 | | | REMOVED | | |
| PX-1020 | | | REMOVED | | |
| PX-1021 | | | REMOVED | | |
| PX-1022 | | | REMOVED | | |
| PX-1023 | | | REMOVED | | |
| PX-1024 | | | REMOVED | | |
| PX-1025 | | | REMOVED | | |
| PX-1026 | mezzodigital_v1.pdf | AXION-0009641 | AXION-0009726 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1027 | | | REMOVED | | |
| PX-1028 | argus_pcba_bottomsideclearance.dxf | AXION-0009879 | AXION-0009879 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1029 | | | REMOVED | | |
| PX-1030 | | | REMOVED | | |
| PX-1031 | | | REMOVED | | |
| PX-1032 | PogoBoard0_v3.pdf | AXION-0010115 | AXION-0010115 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1033 | | | REMOVED | | |
| PX-1034 | | | REMOVED | | |
| PX-1035 | | | REMOVED | | |
| PX-1036 | | | REMOVED | | |
| PX-1037 | | | REMOVED | | |
| PX-1038 | | | REMOVED | | |
| PX-1039 | | | REMOVED | | |
| PX-1040 | | | REMOVED | | |
| PX-1041 | PogoBoard1_V3.pdf | AXION-0010601 | AXION-0010601 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1042 | | | REMOVED | | |
| PX-1043 | | | REMOVED | | |
| PX-1044 | | | REMOVED | | |
| PX-1045 | | | REMOVED | | |
| PX-1046 | | | REMOVED | | |
| PX-1047 | MEZZODIGITAL_V3.pdf | AXION-0010781 | AXION-0010867 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1048 | | | REMOVED | | |
| PX-1049 | POGO_BOARD_0.pdf | AXION-0010877 | AXION-0010933 | Millard Ex. 47 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1050 | | | REMOVED | | |
| PX-1051 | AnalysisModule.md | AXION-0010954 | AXION-0010969 | Millard Ex. 55 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1052 | ImpedanceCalculation.md | AXION-0010970 | AXION-0010987 | Millard Ex. 57 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1053 | AutomatedImpedanceRecording.md | AXION-0010988 | AXION-0010990 | Millard Ex. 56 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1054 | Cell Culture Protocol - Impedance - Non-Adherent Cell Lines - Daudi.pdf | AXION-0011118 | AXION-0011119 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1055 | | | REMOVED | | |
| PX-1056 | | | REMOVED | | |
| PX-1057 | | | REMOVED | | |
| PX-1058 | | | REMOVED | | |
| PX-1059 | | | REMOVED | | |
| PX-1060 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1061 | | | REMOVED | | |
| PX-1062 | | | REMOVED | | |
| PX-1063 | | | REMOVED | | |
| PX-1064 | | | REMOVED | | |
| PX-1065 | | | REMOVED | | |
| PX-1066 | | | REMOVED | | |
| PX-1067 | | | REMOVED | | |
| PX-1068 | | | REMOVED | | |
| PX-1069 | | | REMOVED | | |
| PX-1070 | | | REMOVED | | |
| PX-1071 | | | REMOVED | | |
| PX-1072 | US6376233B1.pdf | AXION-0029630 | AXION_0029638 | | |
| PX-1073 | | | REMOVED | | |
| PX-1074 | | | REMOVED | | |
| PX-1075 | | | REMOVED | | |
| PX-1076 | | | REMOVED | | |
| PX-1077 | | | REMOVED | | |
| PX-1078 | | | REMOVED | | |
| PX-1079 | | | REMOVED | | |
| PX-1080 | | | REMOVED | | |
| PX-1081 | | | REMOVED | | |
| PX-1082 | | | REMOVED | | |
| PX-1083 | | | REMOVED | | |
| PX-1084 | | | REMOVED | | |
| PX-1085 | | | REMOVED | | |
| PX-1086 | | | REMOVED | | |
| PX-1087 | | | REMOVED | | |
| PX-1088 | | | REMOVED | | |
| PX-1089 | | | REMOVED | | |
| PX-1090 | Impedance on the Maestro Pro and Edge - Kick Off Meeting.pptx | AXION-0032700 | AXION-0032722 | Ross Ex. 32; Millard Ex. 43 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1091 | | | REMOVED | | |
| PX-1092 | | | REMOVED | | |
| PX-1093 | AxIS-Z User Guide 2019_Final_Fixed.docx | AXION-0034327 | AXION-0034365 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1094 | | | REMOVED | | |
| PX-1095 | | | REMOVED | | |
| PX-1096 | | | REMOVED | | |
| PX-1097 | | | REMOVED | | |
| PX-1098 | | | REMOVED | | |
| PX-1099 | | | REMOVED | | |
| PX-1100 | | | REMOVED | | |
| PX-1101 | | | REMOVED | | |
| PX-1102 | | | REMOVED | | |
| PX-1103 | | | REMOVED | | |
| PX-1104 | | | REMOVED | | |
| PX-1105 | | | REMOVED | | |
| PX-1106 | | | REMOVED | | |
| PX-1107 | HW-SOP-016_ Maestro Pro Final Assembly.docx | AXION-0035093 | AXION-0035111 | Millard Ex. 13 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1108 | | | REMOVED | | |
| PX-1109 | | | REMOVED | | |
| PX-1110 | | | REMOVED | | |
| PX-1111 | | | REMOVED | | |
| PX-1112 | | | REMOVED | | |
| PX-1113 | | | REMOVED | | |
| PX-1114 | HW-SOP-008_ Digital Board Provisioning, Serialization, and T.docx | AXION-0035205 | AXION-0035237 | Millard Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1115 | | | REMOVED | | |
| PX-1116 | | | REMOVED | | |
| PX-1117 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1118 | | | REMOVED | | |
| PX-1119 | | | REMOVED | | |
| PX-1120 | | | REMOVED | | |
| PX-1121 | | | REMOVED | | |
| PX-1122 | | | REMOVED | | |
| PX-1123 | | | REMOVED | | |
| PX-1124 | | | REMOVED | | |
| PX-1125 | HW-SOP-007_ Mechanism Assembly.docx | AXION-0035323 | AXION-0035349 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1126 | | | REMOVED | | |
| PX-1127 | | | REMOVED | | |
| PX-1128 | | | REMOVED | | |
| PX-1129 | | | REMOVED | | |
| PX-1130 | | | REMOVED | | |
| PX-1131 | | | REMOVED | | |
| PX-1132 | General Impedance Calculations Reference Deck.pptx | AXION-0035463 | AXION-0035475 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1133 | | | REMOVED | | |
| PX-1134 | Axion TrayZ connector - ODU.docx | AXION-0038822 | AXION-0038822 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1135 | | | REMOVED | | |
| PX-1136 | | | REMOVED | | |
| PX-1137 | | | REMOVED | | |
| PX-1138 | | | REMOVED | | |
| PX-1139 | | | REMOVED | | |
| PX-1140 | | | REMOVED | | |
| PX-1141 | argus_basin_v3r1.pdf | AXION-0040212 | AXION-0040246 | Millard Ex. 64 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1142 | ArgusTray_v1_Documentation.pptx | AXION-0040508 | AXION-0040508 | Millard Ex. 66 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1143 | | | REMOVED | | |
| PX-1144 | | | REMOVED | | |
| PX-1145 | Argus Console V4 Documentation.pptx | AXION-0040635 | AXION-0040635 | Millard Ex. 61 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1146 | Argus Basin V2 Documentation.pptx | AXION-0040743 | AXION-0040743 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1147 | | | REMOVED | | |
| PX-1148 | | | REMOVED | | |
| PX-1149 | | | REMOVED | | |
| PX-1150 | | | REMOVED | | |
| PX-1151 | | | REMOVED | | |
| PX-1152 | | | REMOVED | | |
| PX-1153 | | | REMOVED | | |
| PX-1154 | | | REMOVED | | |
| PX-1155 | | | REMOVED | | |
| PX-1156 | Axion GTRC License Agreement - Executed Copy 11-12-08.pdf | AXION-0041262 | AXION-0041285 | Ross Ex. 38 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1157 | Stanford License Agreement Axion 1-4-2012.pdf | AXION-0041286 | AXION-0041295 | Ross Ex. 39 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1158 | | | REMOVED | | |
| PX-1159 | | | REMOVED | | |
| PX-1160 | | | REMOVED | | |
| PX-1161 | | | REMOVED | | |
| PX-1162 | | | REMOVED | | |
| PX-1163 | | | REMOVED | | |
| PX-1164 | | | REMOVED | | |
| PX-1165 | | | REMOVED | | |
| PX-1166 | | | REMOVED | | |
| PX-1167 | an-3d-tumor-spheroids-esight-5994-4680en-agilent.pdf | AXION-0045521 | AXION-0045530 | Millard Ex. 83 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1168 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1169 | Exhibits A-MM to Amended Complaint (1).pdf | AXION-0045626 | AXION-0046297 | Li Exs. 7-8; Zhao Exs. 6, 35; | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1170 | | | REMOVED | | |
| PX-1171 | | | REMOVED | | |
| PX-1172 | | | REMOVED | | |
| PX-1173 | CONFIDENTIAL Maestro Z Competitor Analysis.pdf | AXION-0047620 | AXION-0047646 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1174 | Maestro Z Slide Deck - Oct2023.pptx | AXION-0047816 | AXION-0047899 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1175 | | | REMOVED | | |
| PX-1176 | | | REMOVED | | |
| PX-1177 | | | REMOVED | | |
| PX-1178 | | | REMOVED | | |
| PX-1179 | Confidential_Maestro vs. xCELLigence battle card.xlsx | AXION-0048032 | AXION-0048032 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1180 | Confidential_Maestro Z vs. AtlaZ battle card.xlsx | AXION-0048035 | AXION-0048035 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1181 | | | REMOVED | | |
| PX-1182 | | | REMOVED | | |
| PX-1183 | Impedance Training (Impedance Data and Analysis)_FAS_Final.pptx | AXION-0048071 | AXION-0048098 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1184 | Maestro Z Pricing and Impedance Competition Rev Sep 20 2019.pptx | AXION-0048246 | AXION-0048259 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1185 | | | REMOVED | | |
| PX-1186 | | | REMOVED | | |
| PX-1187 | DoubleSidedFilm.pptx | AXION-0054577 | AXION-0054577 | Willsie Ex. 42 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1188 | | | REMOVED | | |
| PX-1189 | | | REMOVED | | |
| PX-1190 | | | REMOVED | | |
| PX-1191 | | | REMOVED | | |
| PX-1192 | | | REMOVED | | |
| PX-1193 | Axion_CTI_impedance_96V2.dxf | AXION-0054631 | AXION-0054631 | Willsie Ex. 37; Millard Ex. 26-27 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1194 | | | REMOVED | | |
| PX-1195 | | | REMOVED | | |
| PX-1196 | | | REMOVED | | |
| PX-1197 | | | REMOVED | | |
| PX-1198 | | | REMOVED | | |
| PX-1199 | | | REMOVED | | |
| PX-1200 | | | REMOVED | | |
| PX-1201 | | | REMOVED | | |
| PX-1202 | | | REMOVED | | |
| PX-1203 | | | REMOVED | | |
| PX-1204 | | | REMOVED | | |
| PX-1205 | | | REMOVED | | |
| PX-1206 | | | REMOVED | | |
| PX-1207 | | | REMOVED | | |
| PX-1208 | | | REMOVED | | |
| PX-1209 | | | REMOVED | | |
| PX-1210 | | | REMOVED | | |
| PX-1211 | | | REMOVED | | |
| PX-1212 | | | REMOVED | | |
| PX-1213 | | | REMOVED | | |
| PX-1214 | | | REMOVED | | |
| PX-1215 | | | REMOVED | | |
| PX-1216 | | | REMOVED | | |
| PX-1217 | | | REMOVED | | |
| PX-1218 | | | REMOVED | | |
| PX-1219 | | | REMOVED | | |
| PX-1220 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|--------|-------------|-------------|-----------|------------------------|------------|
| PX-1221 | | | REMOVED | | |
| PX-1222 | | | REMOVED | | |
| PX-1223 | | | REMOVED | | |
| PX-1224 | | | REMOVED | | |
| PX-1225 | | | REMOVED | | |
| PX-1226 | | | REMOVED | | |
| PX-1227 | | | REMOVED | | |
| PX-1228 | | | REMOVED | | |
| PX-1229 | | | REMOVED | | |
| PX-1230 | | | REMOVED | | |
| PX-1231 | | | REMOVED | | |
| PX-1232 | | | REMOVED | | |
| PX-1233 | | | REMOVED | | |
| PX-1234 | | | REMOVED | | |
| PX-1235 | | | REMOVED | | |
| PX-1236 | | | REMOVED | | |
| PX-1237 | | | REMOVED | | |
| PX-1238 | | | REMOVED | | |
| PX-1239 | | | REMOVED | | |
| PX-1240 | | | REMOVED | | |
| PX-1241 | | | REMOVED | | |
| PX-1242 | | | REMOVED | | |
| PX-1243 | | | REMOVED | | |
| PX-1244 | | | REMOVED | | |
| PX-1245 | | | REMOVED | | |
| PX-1246 | | | REMOVED | | |
| PX-1247 | | | REMOVED | | |
| PX-1248 | | | REMOVED | | |
| PX-1249 | | | REMOVED | | |
| PX-1250 | | | REMOVED | | |
| PX-1251 | | | REMOVED | | |
| PX-1252 | | | REMOVED | | |
| PX-1253 | | | REMOVED | | |
| PX-1254 | | | REMOVED | | |
| PX-1255 | | | REMOVED | | |
| PX-1256 | | | REMOVED | | |
| PX-1257 | | | REMOVED | | |
| PX-1258 | | | REMOVED | | |
| PX-1259 | | | REMOVED | | |
| PX-1260 | | | REMOVED | | |
| PX-1261 | | | REMOVED | | |
| PX-1262 | | | REMOVED | | |
| PX-1263 | | | REMOVED | | |
| PX-1264 | | | REMOVED | | |
| PX-1265 | | | REMOVED | | |
| PX-1266 | | | REMOVED | | |
| PX-1267 | | | REMOVED | | |
| PX-1268 | | | REMOVED | | |
| PX-1269 | | | REMOVED | | |
| PX-1270 | | | REMOVED | | |
| PX-1271 | | | REMOVED | | |
| PX-1272 | | | REMOVED | | |
| PX-1273 | | | REMOVED | | |
| PX-1274 | | | REMOVED | | |
| PX-1275 | | | REMOVED | | |
| PX-1276 | | | REMOVED | | |
| PX-1277 | | | REMOVED | | |
| PX-1278 | | | REMOVED | | |
| PX-1279 | | | REMOVED | | |
| PX-1280 | | | REMOVED | | |
| PX-1281 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1282 | | | REMOVED | | |
| PX-1283 | | | REMOVED | | |
| PX-1284 | | | REMOVED | | |
| PX-1285 | | | REMOVED | | |
| PX-1286 | | | REMOVED | | |
| PX-1287 | | | REMOVED | | |
| PX-1288 | | | REMOVED | | |
| PX-1289 | | | REMOVED | | |
| PX-1290 | | | REMOVED | | |
| PX-1291 | | | REMOVED | | |
| PX-1292 | | | REMOVED | | |
| PX-1293 | | | REMOVED | | |
| PX-1294 | | | REMOVED | | |
| PX-1295 | | | REMOVED | | |
| PX-1296 | | | REMOVED | | |
| PX-1297 | | | REMOVED | | |
| PX-1298 | | | REMOVED | | |
| PX-1299 | | | REMOVED | | |
| PX-1300 | Hybrid_Impedance (1).pdf | AXION-0075180 | AXION-0075186 | Willsie Ex. 41 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1301 | Impedance 2 - Sarcina 20180927.pdf | AXION-0075196 | AXION-0075201 | Willsie Ex. 38 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1302 | | | REMOVED | | |
| PX-1303 | | | REMOVED | | |
| PX-1304 | | | REMOVED | | |
| PX-1305 | | | REMOVED | | |
| PX-1306 | | | REMOVED | | |
| PX-1307 | | | REMOVED | | |
| PX-1308 | | | REMOVED | | |
| PX-1309 | | | REMOVED | | |
| PX-1310 | | | REMOVED | | |
| PX-1311 | | | REMOVED | | |
| PX-1312 | | | REMOVED | | |
| PX-1313 | | | REMOVED | | |
| PX-1314 | 80463-9994 Rev -.pdf | AXION-0075252 | AXION-0075253 | Willsie Ex. 36 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1315 | | | REMOVED | | |
| PX-1316 | | | REMOVED | | |
| PX-1317 | | | REMOVED | | |
| PX-1318 | Evotec license agreement dec 2020 Please_DocuSign_Axion_BioSystems_Inc._with_.pdf | AXION-0075299 | AXION-0075308 | Ross Ex. 40 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1319 | | | REMOVED | | |
| PX-1320 | | | REMOVED | | |
| PX-1321 | | | REMOVED | | |
| PX-1322 | | | REMOVED | | |
| PX-1323 | | | REMOVED | | |
| PX-1324 | | | REMOVED | | |
| PX-1325 | | | REMOVED | | |
| PX-1326 | | | REMOVED | | |
| PX-1327 | | | REMOVED | | |
| PX-1328 | | | REMOVED | | |
| PX-1329 | | | REMOVED | | |
| PX-1330 | | | REMOVED | | |
| PX-1331 | | | REMOVED | | |
| PX-1332 | | | REMOVED | | |
| PX-1333 | | | REMOVED | | |
| PX-1334 | | | REMOVED | | |
| PX-1335 | | | REMOVED | | |
| PX-1336 | | | REMOVED | | |
| PX-1337 | | | REMOVED | | |
| PX-1338 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1339 | | | REMOVED | | |
| PX-1340 | | | REMOVED | | |
| PX-1341 | | | REMOVED | | |
| PX-1342 | | | REMOVED | | |
| PX-1343 | | | REMOVED | | |
| PX-1344 | | | REMOVED | | |
| PX-1345 | | | REMOVED | | |
| PX-1346 | | | REMOVED | | |
| PX-1347 | | | REMOVED | | |
| PX-1348 | | | REMOVED | | |
| PX-1349 | | | REMOVED | | |
| PX-1350 | | | REMOVED | | |
| PX-1351 | | | REMOVED | | |
| PX-1352 | | | REMOVED | | |
| PX-1353 | | | REMOVED | | |
| PX-1354 | | | REMOVED | | |
| PX-1355 | | | REMOVED | | |
| PX-1356 | | | REMOVED | | |
| PX-1357 | | | REMOVED | | |
| PX-1358 | | | REMOVED | | |
| PX-1359 | | | REMOVED | | |
| PX-1360 | | | REMOVED | | |
| PX-1361 | | | REMOVED | | |
| PX-1362 | | | REMOVED | | |
| PX-1363 | | | REMOVED | | |
| PX-1364 | | | REMOVED | | |
| PX-1365 | | | REMOVED | | |
| PX-1366 | | | REMOVED | | |
| PX-1367 | | | REMOVED | | |
| PX-1368 | | | REMOVED | | |
| PX-1369 | | | REMOVED | | |
| PX-1370 | | | REMOVED | | |
| PX-1371 | | | REMOVED | | |
| PX-1372 | | | REMOVED | | |
| PX-1373 | | | REMOVED | | |
| PX-1374 | | | REMOVED | | |
| PX-1375 | | | REMOVED | | |
| PX-1376 | | | REMOVED | | |
| PX-1377 | | | REMOVED | | |
| PX-1378 | | | REMOVED | | |
| PX-1379 | | | REMOVED | | |
| PX-1380 | | | REMOVED | | |
| PX-1381 | | | REMOVED | | |
| PX-1382 | | | REMOVED | | |
| PX-1383 | | | REMOVED | | |
| PX-1384 | | | REMOVED | | |
| PX-1385 | | | REMOVED | | |
| PX-1386 | | | REMOVED | | |
| PX-1387 | | | REMOVED | | |
| PX-1388 | | | REMOVED | | |
| PX-1389 | | | REMOVED | | |
| PX-1390 | | | REMOVED | | |
| PX-1391 | | | REMOVED | | |
| PX-1392 | | | REMOVED | | |
| PX-1393 | | | REMOVED | | |
| PX-1394 | | | REMOVED | | |
| PX-1395 | | | REMOVED | | |
| PX-1396 | | | REMOVED | | |
| PX-1397 | | | REMOVED | | |
| PX-1398 | | | REMOVED | | |
| PX-1399 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|--------|-------------|-------------|-----------|------------------------|------------|
| PX-1400 | | | REMOVED | | |
| PX-1401 | | | REMOVED | | |
| PX-1402 | | | REMOVED | | |
| PX-1403 | | | REMOVED | | |
| PX-1404 | | | REMOVED | | |
| PX-1405 | | | REMOVED | | |
| PX-1406 | | | REMOVED | | |
| PX-1407 | | | REMOVED | | |
| PX-1408 | | | REMOVED | | |
| PX-1409 | | | REMOVED | | |
| PX-1410 | | | REMOVED | | |
| PX-1411 | | | REMOVED | | |
| PX-1412 | | | REMOVED | | |
| PX-1413 | | | REMOVED | | |
| PX-1414 | | | REMOVED | | |
| PX-1415 | | | REMOVED | | |
| PX-1416 | | | REMOVED | | |
| PX-1417 | | | REMOVED | | |
| PX-1418 | | | REMOVED | | |
| PX-1419 | | | REMOVED | | |
| PX-1420 | | | REMOVED | | |
| PX-1421 | | | REMOVED | | |
| PX-1422 | | | REMOVED | | |
| PX-1423 | | | REMOVED | | |
| PX-1424 | | | REMOVED | | |
| PX-1425 | | | REMOVED | | |
| PX-1426 | | | REMOVED | | |
| PX-1427 | | | REMOVED | | |
| PX-1428 | | | REMOVED | | |
| PX-1429 | | | REMOVED | | |
| PX-1430 | | | REMOVED | | |
| PX-1431 | | | REMOVED | | |
| PX-1432 | | | REMOVED | | |
| PX-1433 | | | REMOVED | | |
| PX-1434 | | | REMOVED | | |
| PX-1435 | | | REMOVED | | |
| PX-1436 | | | REMOVED | | |
| PX-1437 | | | REMOVED | | |
| PX-1438 | | | REMOVED | | |
| PX-1439 | | | REMOVED | | |
| PX-1440 | | | REMOVED | | |
| PX-1441 | | | REMOVED | | |
| PX-1442 | | | REMOVED | | |
| PX-1443 | | | REMOVED | | |
| PX-1444 | | | REMOVED | | |
| PX-1445 | | | REMOVED | | |
| PX-1446 | | | REMOVED | | |
| PX-1447 | | | REMOVED | | |
| PX-1448 | | | REMOVED | | |
| PX-1449 | | | REMOVED | | |
| PX-1450 | | | REMOVED | | |
| PX-1451 | | | REMOVED | | |
| PX-1452 | | | REMOVED | | |
| PX-1453 | | | REMOVED | | |
| PX-1454 | | | REMOVED | | |
| PX-1455 | | | REMOVED | | |
| PX-1456 | | | REMOVED | | |
| PX-1457 | | | REMOVED | | |
| PX-1458 | | | REMOVED | | |
| PX-1459 | | | REMOVED | | |
| PX-1460 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1461 | | | REMOVED | | |
| PX-1462 | | | REMOVED | | |
| PX-1463 | | | REMOVED | | |
| PX-1464 | | | REMOVED | | |
| PX-1465 | | | REMOVED | | |
| PX-1466 | | | REMOVED | | |
| PX-1467 | | | REMOVED | | |
| PX-1468 | | | REMOVED | | |
| PX-1469 | | | REMOVED | | |
| PX-1470 | | | REMOVED | | |
| PX-1471 | | | REMOVED | | |
| PX-1472 | | | REMOVED | | |
| PX-1473 | | | REMOVED | | |
| PX-1474 | | | REMOVED | | |
| PX-1475 | | | REMOVED | | |
| PX-1476 | | | REMOVED | | |
| PX-1477 | | | REMOVED | | |
| PX-1478 | | | REMOVED | | |
| PX-1479 | | | REMOVED | | |
| PX-1480 | | | REMOVED | | |
| PX-1481 | | | REMOVED | | |
| PX-1482 | | | REMOVED | | |
| PX-1483 | | | REMOVED | | |
| PX-1484 | | | REMOVED | | |
| PX-1485 | | | REMOVED | | |
| PX-1486 | | | REMOVED | | |
| PX-1487 | | | REMOVED | | |
| PX-1488 | | | REMOVED | | |
| PX-1489 | | | REMOVED | | |
| PX-1490 | | | REMOVED | | |
| PX-1491 | | | REMOVED | | |
| PX-1492 | | | REMOVED | | |
| PX-1493 | | | REMOVED | | |
| PX-1494 | | | REMOVED | | |
| PX-1495 | | | REMOVED | | |
| PX-1496 | | | REMOVED | | |
| PX-1497 | | | REMOVED | | |
| PX-1498 | | | REMOVED | | |
| PX-1499 | | | REMOVED | | |
| PX-1500 | | | REMOVED | | |
| PX-1501 | | | REMOVED | | |
| PX-1502 | | | REMOVED | | |
| PX-1503 | | | REMOVED | | |
| PX-1504 | | | REMOVED | | |
| PX-1505 | | | REMOVED | | |
| PX-1506 | | | REMOVED | | |
| PX-1507 | | | REMOVED | | |
| PX-1508 | | | REMOVED | | |
| PX-1509 | | | REMOVED | | |
| PX-1510 | | | REMOVED | | |
| PX-1511 | | | REMOVED | | |
| PX-1512 | | | REMOVED | | |
| PX-1513 | | | REMOVED | | |
| PX-1514 | | | REMOVED | | |
| PX-1515 | | | REMOVED | | |
| PX-1516 | | | REMOVED | | |
| PX-1517 | | | REMOVED | | |
| PX-1518 | | | REMOVED | | |
| PX-1519 | | | REMOVED | | |
| PX-1520 | | | REMOVED | | |
| PX-1521 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1522 | | | REMOVED | | |
| PX-1523 | | | REMOVED | | |
| PX-1524 | | | REMOVED | | |
| PX-1525 | | | REMOVED | | |
| PX-1526 | | | REMOVED | | |
| PX-1527 | | | REMOVED | | |
| PX-1528 | | | REMOVED | | |
| PX-1529 | | | REMOVED | | |
| PX-1530 | | | REMOVED | | |
| PX-1531 | | | REMOVED | | |
| PX-1532 | | | REMOVED | | |
| PX-1533 | | | REMOVED | | |
| PX-1534 | | | REMOVED | | |
| PX-1535 | | | REMOVED | | |
| PX-1536 | | | REMOVED | | |
| PX-1537 | | | REMOVED | | |
| PX-1538 | | | REMOVED | | |
| PX-1539 | | | REMOVED | | |
| PX-1540 | | | REMOVED | | |
| PX-1541 | | | REMOVED | | |
| PX-1542 | | | REMOVED | | |
| PX-1543 | | | REMOVED | | |
| PX-1544 | | | REMOVED | | |
| PX-1545 | | | REMOVED | | |
| PX-1546 | | | REMOVED | | |
| PX-1547 | | | REMOVED | | |
| PX-1548 | | | REMOVED | | |
| PX-1549 | | | REMOVED | | |
| PX-1550 | | | REMOVED | | |
| PX-1551 | | | REMOVED | | |
| PX-1552 | | | REMOVED | | |
| PX-1553 | | | REMOVED | | |
| PX-1554 | | | REMOVED | | |
| PX-1555 | | | REMOVED | | |
| PX-1556 | | | REMOVED | | |
| PX-1557 | | | REMOVED | | |
| PX-1558 | | | REMOVED | | |
| PX-1559 | | | REMOVED | | |
| PX-1560 | | | REMOVED | | |
| PX-1561 | | | REMOVED | | |
| PX-1562 | | | REMOVED | | |
| PX-1563 | | | REMOVED | | |
| PX-1564 | | | REMOVED | | |
| PX-1565 | | | REMOVED | | |
| PX-1566 | | | REMOVED | | |
| PX-1567 | | | REMOVED | | |
| PX-1568 | | | REMOVED | | |
| PX-1569 | | | REMOVED | | |
| PX-1570 | | | REMOVED | | |
| PX-1571 | | | REMOVED | | |
| PX-1572 | | | REMOVED | | |
| PX-1573 | | | REMOVED | | |
| PX-1574 | | | REMOVED | | |
| PX-1575 | | | REMOVED | | |
| PX-1576 | | | REMOVED | | |
| PX-1577 | | | REMOVED | | |
| PX-1578 | | | REMOVED | | |
| PX-1579 | | | REMOVED | | |
| PX-1580 | | | REMOVED | | |
| PX-1581 | | | REMOVED | | |
| PX-1582 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1583 | | | REMOVED | | |
| PX-1584 | | | REMOVED | | |
| PX-1585 | | | REMOVED | | |
| PX-1586 | | | REMOVED | | |
| PX-1587 | | | REMOVED | | |
| PX-1588 | | | REMOVED | | |
| PX-1589 | | | REMOVED | | |
| PX-1590 | | | REMOVED | | |
| PX-1591 | | | REMOVED | | |
| PX-1592 | | | REMOVED | | |
| PX-1593 | | | REMOVED | | |
| PX-1594 | | | REMOVED | | |
| PX-1595 | | | REMOVED | | |
| PX-1596 | | | REMOVED | | |
| PX-1597 | | | REMOVED | | |
| PX-1598 | | | REMOVED | | |
| PX-1599 | | | REMOVED | | |
| PX-1600 | | | REMOVED | | |
| PX-1601 | | | REMOVED | | |
| PX-1602 | | | REMOVED | | |
| PX-1603 | | | REMOVED | | |
| PX-1604 | | | REMOVED | | |
| PX-1605 | | | REMOVED | | |
| PX-1606 | | | REMOVED | | |
| PX-1607 | | | REMOVED | | |
| PX-1608 | | | REMOVED | | |
| PX-1609 | | | REMOVED | | |
| PX-1610 | | | REMOVED | | |
| PX-1611 | | | REMOVED | | |
| PX-1612 | | | REMOVED | | |
| PX-1613 | | | REMOVED | | |
| PX-1614 | | | REMOVED | | |
| PX-1615 | | | REMOVED | | |
| PX-1616 | | | REMOVED | | |
| PX-1617 | | | REMOVED | | |
| PX-1618 | | | REMOVED | | |
| PX-1619 | | | REMOVED | | |
| PX-1620 | | | REMOVED | | |
| PX-1621 | | | REMOVED | | |
| PX-1622 | | | REMOVED | | |
| PX-1623 | | | REMOVED | | |
| PX-1624 | | | REMOVED | | |
| PX-1625 | | | REMOVED | | |
| PX-1626 | | | REMOVED | | |
| PX-1627 | | | REMOVED | | |
| PX-1628 | | | REMOVED | | |
| PX-1629 | | | REMOVED | | |
| PX-1630 | | | REMOVED | | |
| PX-1631 | | | REMOVED | | |
| PX-1632 | | | REMOVED | | |
| PX-1633 | | | REMOVED | | |
| PX-1634 | | | REMOVED | | |
| PX-1635 | | | REMOVED | | |
| PX-1636 | | | REMOVED | | |
| PX-1637 | | | REMOVED | | |
| PX-1638 | | | REMOVED | | |
| PX-1639 | | | REMOVED | | |
| PX-1640 | | | REMOVED | | |
| PX-1641 | | | REMOVED | | |
| PX-1642 | | | REMOVED | | |
| PX-1643 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1644 | | | REMOVED | | |
| PX-1645 | | | REMOVED | | |
| PX-1646 | | | REMOVED | | |
| PX-1647 | | | REMOVED | | |
| PX-1648 | | | REMOVED | | |
| PX-1649 | | | REMOVED | | |
| PX-1650 | | | REMOVED | | |
| PX-1651 | | | REMOVED | | |
| PX-1652 | | | REMOVED | | |
| PX-1653 | | | REMOVED | | |
| PX-1654 | | | REMOVED | | |
| PX-1655 | | | REMOVED | | |
| PX-1656 | | | REMOVED | | |
| PX-1657 | | | REMOVED | | |
| PX-1658 | | | REMOVED | | |
| PX-1659 | | | REMOVED | | |
| PX-1660 | | | REMOVED | | |
| PX-1661 | | | REMOVED | | |
| PX-1662 | | | REMOVED | | |
| PX-1663 | | | REMOVED | | |
| PX-1664 | | | REMOVED | | |
| PX-1665 | | | REMOVED | | |
| PX-1666 | | | REMOVED | | |
| PX-1667 | | | REMOVED | | |
| PX-1668 | | | REMOVED | | |
| PX-1669 | | | REMOVED | | |
| PX-1670 | | | REMOVED | | |
| PX-1671 | | | REMOVED | | |
| PX-1672 | | | REMOVED | | |
| PX-1673 | | | REMOVED | | |
| PX-1674 | | | REMOVED | | |
| PX-1675 | | | REMOVED | | |
| PX-1676 | | | REMOVED | | |
| PX-1677 | | | REMOVED | | |
| PX-1678 | | | REMOVED | | |
| PX-1679 | | | REMOVED | | |
| PX-1680 | | | REMOVED | | |
| PX-1681 | | | REMOVED | | |
| PX-1682 | | | REMOVED | | |
| PX-1683 | | | REMOVED | | |
| PX-1684 | | | REMOVED | | |
| PX-1685 | | | REMOVED | | |
| PX-1686 | | | REMOVED | | |
| PX-1687 | | | REMOVED | | |
| PX-1688 | | | REMOVED | | |
| PX-1689 | | | REMOVED | | |
| PX-1690 | | | REMOVED | | |
| PX-1691 | | | REMOVED | | |
| PX-1692 | | | REMOVED | | |
| PX-1693 | | | REMOVED | | |
| PX-1694 | | | REMOVED | | |
| PX-1695 | | | REMOVED | | |
| PX-1696 | | | REMOVED | | |
| PX-1697 | | | REMOVED | | |
| PX-1698 | | | REMOVED | | |
| PX-1699 | | | REMOVED | | |
| PX-1700 | | | REMOVED | | |
| PX-1701 | | | REMOVED | | |
| PX-1702 | | | REMOVED | | |
| PX-1703 | | | REMOVED | | |
| PX-1704 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1705 | | | REMOVED | | |
| PX-1706 | | | REMOVED | | |
| PX-1707 | | | REMOVED | | |
| PX-1708 | | | REMOVED | | |
| PX-1709 | | | REMOVED | | |
| PX-1710 | | | REMOVED | | |
| PX-1711 | | | REMOVED | | |
| PX-1712 | | | REMOVED | | |
| PX-1713 | | | REMOVED | | |
| PX-1714 | | | REMOVED | | |
| PX-1715 | | | REMOVED | | |
| PX-1716 | | | REMOVED | | |
| PX-1717 | | | REMOVED | | |
| PX-1718 | | | REMOVED | | |
| PX-1719 | | | REMOVED | | |
| PX-1720 | | | REMOVED | | |
| PX-1721 | | | REMOVED | | |
| PX-1722 | | | REMOVED | | |
| PX-1723 | | | REMOVED | | |
| PX-1724 | | | REMOVED | | |
| PX-1725 | | | REMOVED | | |
| PX-1726 | | | REMOVED | | |
| PX-1727 | | | REMOVED | | |
| PX-1728 | | | REMOVED | | |
| PX-1729 | | | REMOVED | | |
| PX-1730 | | | REMOVED | | |
| PX-1731 | | | REMOVED | | |
| PX-1732 | | | REMOVED | | |
| PX-1733 | | | REMOVED | | |
| PX-1734 | | | REMOVED | | |
| PX-1735 | | | REMOVED | | |
| PX-1736 | | | REMOVED | | |
| PX-1737 | | | REMOVED | | |
| PX-1738 | | | REMOVED | | |
| PX-1739 | | | REMOVED | | |
| PX-1740 | | | REMOVED | | |
| PX-1741 | | | REMOVED | | |
| PX-1742 | | | REMOVED | | |
| PX-1743 | | | REMOVED | | |
| PX-1744 | | | REMOVED | | |
| PX-1745 | | | REMOVED | | |
| PX-1746 | | | REMOVED | | |
| PX-1747 | | | REMOVED | | |
| PX-1748 | | | REMOVED | | |
| PX-1749 | | | REMOVED | | |
| PX-1750 | | | REMOVED | | |
| PX-1751 | | | REMOVED | | |
| PX-1752 | | | REMOVED | | |
| PX-1753 | | | REMOVED | | |
| PX-1754 | | | REMOVED | | |
| PX-1755 | | | REMOVED | | |
| PX-1756 | | | REMOVED | | |
| PX-1757 | | | REMOVED | | |
| PX-1758 | | | REMOVED | | |
| PX-1759 | | | REMOVED | | |
| PX-1760 | | | REMOVED | | |
| PX-1761 | | | REMOVED | | |
| PX-1762 | | | REMOVED | | |
| PX-1763 | | | REMOVED | | |
| PX-1764 | | | REMOVED | | |
| PX-1765 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1766 | | | REMOVED | | |
| PX-1767 | | | REMOVED | | |
| PX-1768 | | | REMOVED | | |
| PX-1769 | | | REMOVED | | |
| PX-1770 | | | REMOVED | | |
| PX-1771 | | | REMOVED | | |
| PX-1772 | | | REMOVED | | |
| PX-1773 | | | REMOVED | | |
| PX-1774 | | | REMOVED | | |
| PX-1775 | | | REMOVED | | |
| PX-1776 | | | REMOVED | | |
| PX-1777 | | | REMOVED | | |
| PX-1778 | | | REMOVED | | |
| PX-1779 | | | REMOVED | | |
| PX-1780 | | | REMOVED | | |
| PX-1781 | | | REMOVED | | |
| PX-1782 | | | REMOVED | | |
| PX-1783 | | | REMOVED | | |
| PX-1784 | | | REMOVED | | |
| PX-1785 | | | REMOVED | | |
| PX-1786 | | | REMOVED | | |
| PX-1787 | | | REMOVED | | |
| PX-1788 | | | REMOVED | | |
| PX-1789 | | | REMOVED | | |
| PX-1790 | | | REMOVED | | |
| PX-1791 | | | REMOVED | | |
| PX-1792 | | | REMOVED | | |
| PX-1793 | | | REMOVED | | |
| PX-1794 | | | REMOVED | | |
| PX-1795 | | | REMOVED | | |
| PX-1796 | | | REMOVED | | |
| PX-1797 | | | REMOVED | | |
| PX-1798 | | | REMOVED | | |
| PX-1799 | | | REMOVED | | |
| PX-1800 | | | REMOVED | | |
| PX-1801 | | | REMOVED | | |
| PX-1802 | | | REMOVED | | |
| PX-1803 | | | REMOVED | | |
| PX-1804 | | | REMOVED | | |
| PX-1805 | | | REMOVED | | |
| PX-1806 | | | REMOVED | | |
| PX-1807 | | | REMOVED | | |
| PX-1808 | | | REMOVED | | |
| PX-1809 | | | REMOVED | | |
| PX-1810 | | | REMOVED | | |
| PX-1811 | | | REMOVED | | |
| PX-1812 | | | REMOVED | | |
| PX-1813 | | | REMOVED | | |
| PX-1814 | | | REMOVED | | |
| PX-1815 | AXION-0078021.mp4 | AXION-0078021 | AXION-0078021 | Millard Ex. 79; Chvatal Ex. 79 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1816 | Sales Revenue Template Budget 2023_v.9.xlsm | AXION-0078071 | AXION-0078071 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1817 | | | REMOVED | | |
| PX-1818 | | | REMOVED | | |
| PX-1819 | Sales by Region and Customer Type 2022-12.xlsm | AXION-0078096 | AXION-0078096 | Sheikh Ex. 13 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1820 | 2022 STRAP 5 year vision-commercial meeting 230210-final.pptx | AXION-0078567 | AXION-0078567 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1821 | | | REMOVED | | |
| PX-1822 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1823 | Market Insights_ IO&Neuro&Cell Analysis.pptx | AXION-0086128 | AXION-0086128 | Salters Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1824 | | | REMOVED | | |
| PX-1825 | | | REMOVED | | |
| PX-1826 | 2024 Revenue Model_full detail_JB_v.11.22.2023 No links.xlsx | AXION-0087436 | AXION-0087436 | Aras Ex. 6E; Sheikh Ex. 18, 19 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1827 | Top 10 customer_v2.xlsx | AXION-0087789 | AXION-0087789 | Aras Ex. 8E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1828 | Business Plan Assumptions_2024.pptx | AXION-0089362 | AXION-0089362 | Sheikh Ex. 14, 15 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1829 | Invoice & Backlog 2024-03-18.xlsm | AXION-0092395 | AXION-0092395 | Sheikh Ex. 16, 17 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1830 | Spheroids and Aggregates - Lab Meeting.pptx | AXION-0094492 | AXION-0094492 | Millard Ex. 70; Chvatal Ex. 72 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1831 | Spheroids (CytoView-Z 384 plate) - Cell Culture Protocol Draft.pptx | AXION-0094631 | AXION-0094631 | Chvatal Ex. 44 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1832 | Geltrex.pptx | AXION-0094954 | AXION-0094954 | Millard Ex. 69; Chvatal Ex. 71 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1833 | | | REMOVED | | |
| PX-1834 | | | REMOVED | | |
| PX-1835 | | | REMOVED | | |
| PX-1836 | | | REMOVED | | |
| PX-1837 | | | REMOVED | | |
| PX-1838 | | | REMOVED | | |
| PX-1839 | | | REMOVED | | |
| PX-1840 | | | REMOVED | | |
| PX-1841 | Gomillion Lab Axion Maestro Scratch assay 25Sep2019.pptx | AXION-0104442 | AXION-0104442 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1842 | Re: Maestro impedance data | AXION-0104443 | AXION-0104446 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1843 | GomillionLab_Axion_impedance_data_25Sep2019_NormalizedToJustBeforeScratch.xlsx | AXION-0104447 | AXION-0104447 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1844 | GomillionLab_Axion_impedance_data_25Sep2019.xlsx | AXION-0104448 | AXION-0104448 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1845 | GomillionLab_Axion_impedance_data_25Sep2019_NormalizedToJustAfterScratch.xlsx | AXION-0104449 | AXION-0104449 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1846 | | | REMOVED | | |
| PX-1847 | | | REMOVED | | |
| PX-1848 | Maestro impedance experiment - checking in | AXION-0105659 | AXION-0105659 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1849 | Maestro Impedance experiment data | AXION-0105875 | AXION-0105875 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1850 | Maestro impedance experiment update | AXION-0105945 | AXION-0105946 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1851 | Treatment Effects.pdf | AXION-0105947 | AXION-0105949 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1852 | | | REMOVED | | |
| PX-1853 | | | REMOVED | | |
| PX-1854 | RE: Abstract for AACR | AXION-0106347 | AXION-0106348 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, RE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1855 | AACR2020_Scratch_TNBC_Abstract_Final_CGrev.docx | AXION-0106349 | AXION-0106349 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1856 | | | REMOVED | | |
| PX-1857 | | | REMOVED | | |
| PX-1858 | | | REMOVED | | |
| PX-1859 | | | REMOVED | | |
| PX-1860 | | | REMOVED | | |
| PX-1861 | | | REMOVED | | |
| PX-1862 | | | REMOVED | | |
| PX-1863 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1864 | Re: Some questions from a new Lead | AXION-0109111 | AXION-0109115 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1865 | | REMOVED | | | |
| PX-1866 | | REMOVED | | | |
| PX-1867 | | REMOVED | | | |
| PX-1868 | | REMOVED | | | |
| PX-1869 | AACR2020_Scratch_TNBC_Poster_Final.pdf | AXION-0110169 | AXION-0110169 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1870 | | REMOVED | | | |
| PX-1871 | | REMOVED | | | |
| PX-1872 | 384well Dimensions.msg | AXION-0110579 | AXION-0110579 | Willsie Ex. 39 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1873 | HT_Spec_Sheet.pdf | AXION-0110580 | AXION-0110581 | Willsie Ex. 39 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1874 | ANSI_SLAS_4-2004_WellPositions.pdf | AXION-0110582 | AXION-0110594 | Willsie Ex. 39 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1875 | | REMOVED | | | |
| PX-1876 | | REMOVED | | | |
| PX-1877 | Fwd: RE CART | AXION-0111150 | AXION-0111160 | Deacon Ex. 8; Chvatal Ex. 67 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1878 | | REMOVED | | | |
| PX-1879 | | REMOVED | | | |
| PX-1880 | Re: Maestro Z - suspension cells | AXION-0111671 | AXION-0111672 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1881 | Master Price List USD SEP 15 2020.xlsx | AXION-0112500 | AXION-0112500 | Sheikh Ex. 21, 22 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1882 | RE: Xcelligence HT Update | AXION-0112548 | AXION-0112549 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1883 | RE: Carolina BioOncology | AXION-0113282 | AXION-0113283 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1884 | Well Group Selection and Local Controls - Final to Software - 20201105.pptx | AXION-0113452 | AXION-0113452 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1885 | 384-well plating protocol | AXION-0113948 | AXION-0113948 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1886 | Cell Therapy Analytical Development Summit - booth content and poll | AXION-0113980 | AXION-0113980 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1887 | | REMOVED | | | |
| PX-1888 | Immunology abstract - updated to include RV vs non-viral CRISPR results | AXION-0114468 | AXION-0114468 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1889 | Immunology2021_GSC_NV vs CRISPR CAR-T.docx | AXION-0114469 | AXION-0114469 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1890 | | REMOVED | | | |
| PX-1891 | RE: APAC ZHT demo and AZ status | AXION-0114843 | AXION-0114844 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1892 | | REMOVED | | | |
| PX-1893 | | REMOVED | | | |
| PX-1894 | | REMOVED | | | |
| PX-1895 | | REMOVED | | | |
| PX-1896 | | REMOVED | | | |
| PX-1897 | Maestro Z CAR-T data | AXION-0118414 | AXION-0118416 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1898 | | REMOVED | | | |
| PX-1899 | NIST Maestro Z presentation Nov2021.pptx | AXION-0118803 | AXION-0118803 | Salters Ex. 6 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1900 | | REMOVED | | | |
| PX-1901 | | REMOVED | | | |
| PX-1902 | | REMOVED | | | |
| PX-1903 | AACR poster - quick review | AXION-0124946 | AXION-0124946 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1904 | AACR2022_GSC_NV vs CRISPR CAR-T_Final.docx | AXION-0124947 | AXION-0124947 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1905 | AACR_2022_Lohitash_Saha_Viral-vs-Non-Viral_CAR-T_18Mar2022.pdf | AXION-0124948 | AXION-0124948 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1906 | RE: Today's discussion | AXION-0136575 | AXION-0136579 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1907 | REMOVED | | | | |
| PX-1908 | REMOVED | | | | |
| PX-1909 | Axion Competitive Table iPSC QC tool (JR 0325) - Mike tjo JR JF MikeV2 edits JR.xlsx | AXION-0149751 | AXION-0149751 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1910 | REMOVED | | | | |
| PX-1911 | REMOVED | | | | |
| PX-1912 | REMOVED | | | | |
| PX-1913 | REMOVED | | | | |
| PX-1914 | REMOVED | | | | |
| PX-1915 | RE: demo last year with Impedance technology | AXION-0160260 | AXION-0160263 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1916 | GoToMeeting Invitation - ACEA software for impedance overview & feedback on customer most wanted features | AXION-0162590 | AXION-0162590 | Deacon Ex. 7 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, GR 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1917 | REMOVED | | | | |
| PX-1918 | REMOVED | | | | |
| PX-1919 | Maestro Z ZHT status update - 211206.pdf | AXION-0172298 | AXION-0172319 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1920 | REMOVED | | | | |
| PX-1921 | REMOVED | | | | |
| PX-1922 | REMOVED | | | | |
| PX-1923 | Neuroimmunology Drug Dev 2022 Packing List.xlsx | AXION-0173642 | AXION-0173642 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1924 | Fw: SelectScience Cancer Spheroid leads | AXION-0175917 | AXION-0175917 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1925 | REMOVED | | | | |
| PX-1926 | REMOVED | | | | |
| PX-1927 | REMOVED | | | | |
| PX-1928 | REMOVED | | | | |
| PX-1929 | REMOVED | | | | |
| PX-1930 | REMOVED | | | | |
| PX-1931 | REMOVED | | | | |
| PX-1932 | REMOVED | | | | |
| PX-1933 | REMOVED | | | | |
| PX-1934 | Latest version of Strategy Slides | AXION-0193558 | AXION-0193558 | Ferrick Ex. 17; Ross Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1935 | REMOVED | | | | |
| PX-1936 | REMOVED | | | | |
| PX-1937 | REMOVED | | | | |
| PX-1938 | REMOVED | | | | |
| PX-1939 | REMOVED | | | | |
| PX-1940 | REMOVED | | | | |
| PX-1941 | REMOVED | | | | |
| PX-1942 | REMOVED | | | | |
| PX-1943 | REMOVED | | | | |
| PX-1944 | REMOVED | | | | |
| PX-1945 | Re: Acea was acquired by Agilent for $250 million! | AXION-0204439 | AXION-0204440 | Filippini Ex. 15 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1946 | REMOVED | | | | |
| PX-1947 | REMOVED | | | | |
| PX-1948 | REMOVED | | | | |
| PX-1949 | REMOVED | | | | |
| PX-1950 | REMOVED | | | | |
| PX-1951 | REMOVED | | | | |
| PX-1952 | notes from Acea rep interview today | AXION-0209281 | AXION-0209281 | O'Brien Ex. 21 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1953 | Notes from Hurtado meeting 7_24_2019.docx | AXION-0209282 | AXION-0209282 | Hurtado Ex. 5; O'Brien Ex. 21; | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-1954 | | | REMOVED | | |
| PX-1955 | | | REMOVED | | |
| PX-1956 | | | REMOVED | | |
| PX-1957 | hurtado update | AXION-0212122 | AXION-0212122 | Filippini Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1958 | | | REMOVED | | |
| PX-1959 | | | REMOVED | | |
| PX-1960 | | | REMOVED | | |
| PX-1961 | | | REMOVED | | |
| PX-1962 | | | REMOVED | | |
| PX-1963 | | | REMOVED | | |
| PX-1964 | Re: FW: one more thing | AXION-0221944 | AXION-0221946 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-1965 | | | REMOVED | | |
| PX-1966 | | | REMOVED | | |
| PX-1967 | | | REMOVED | | |
| PX-1968 | | | REMOVED | | |
| PX-1969 | | | REMOVED | | |
| PX-1970 | | | REMOVED | | |
| PX-1971 | | | REMOVED | | |
| PX-1972 | | | REMOVED | | |
| PX-1973 | | | REMOVED | | |
| PX-1974 | | | REMOVED | | |
| PX-1975 | | | REMOVED | | |
| PX-1976 | | | REMOVED | | |
| PX-1977 | | | REMOVED | | |
| PX-1978 | | | REMOVED | | |
| PX-1979 | | | REMOVED | | |
| PX-1980 | | | REMOVED | | |
| PX-1981 | | | REMOVED | | |
| PX-1982 | | | REMOVED | | |
| PX-1983 | | | REMOVED | | |
| PX-1984 | | | REMOVED | | |
| PX-1985 | | | REMOVED | | |
| PX-1986 | | | REMOVED | | |
| PX-1987 | | | REMOVED | | |
| PX-1988 | | | REMOVED | | |
| PX-1989 | | | REMOVED | | |
| PX-1990 | | | REMOVED | | |
| PX-1991 | | | REMOVED | | |
| PX-1992 | | | REMOVED | | |
| PX-1993 | | | REMOVED | | |
| PX-1994 | | | REMOVED | | |
| PX-1995 | | | REMOVED | | |
| PX-1996 | | | REMOVED | | |
| PX-1997 | | | REMOVED | | |
| PX-1998 | | | REMOVED | | |
| PX-1999 | | | REMOVED | | |
| PX-2000 | | | REMOVED | | |
| PX-2001 | | | REMOVED | | |
| PX-2002 | | | REMOVED | | |
| PX-2003 | | | REMOVED | | |
| PX-2004 | | | REMOVED | | |
| PX-2005 | | | REMOVED | | |
| PX-2006 | | | REMOVED | | |
| PX-2007 | | | REMOVED | | |
| PX-2008 | | | REMOVED | | |
| PX-2009 | | | REMOVED | | |
| PX-2010 | | | REMOVED | | |
| PX-2011 | | | REMOVED | | |
| PX-2012 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2013 | | | REMOVED | | |
| PX-2014 | | | REMOVED | | |
| PX-2015 | | | REMOVED | | |
| PX-2016 | | | REMOVED | | |
| PX-2017 | | | REMOVED | | |
| PX-2018 | | | REMOVED | | |
| PX-2019 | | | REMOVED | | |
| PX-2020 | | | REMOVED | | |
| PX-2021 | | | REMOVED | | |
| PX-2022 | | | REMOVED | | |
| PX-2023 | | | REMOVED | | |
| PX-2024 | | | REMOVED | | |
| PX-2025 | | | REMOVED | | |
| PX-2026 | | | REMOVED | | |
| PX-2027 | | | REMOVED | | |
| PX-2028 | | | REMOVED | | |
| PX-2029 | | | REMOVED | | |
| PX-2030 | | | REMOVED | | |
| PX-2031 | | | REMOVED | | |
| PX-2032 | | | REMOVED | | |
| PX-2033 | | | REMOVED | | |
| PX-2034 | | | REMOVED | | |
| PX-2035 | | | REMOVED | | |
| PX-2036 | | | REMOVED | | |
| PX-2037 | | | REMOVED | | |
| PX-2038 | | | REMOVED | | |
| PX-2039 | | | REMOVED | | |
| PX-2040 | | | REMOVED | | |
| PX-2041 | | | REMOVED | | |
| PX-2042 | | | REMOVED | | |
| PX-2043 | | | REMOVED | | |
| PX-2044 | | | REMOVED | | |
| PX-2045 | | | REMOVED | | |
| PX-2046 | | | REMOVED | | |
| PX-2047 | | | REMOVED | | |
| PX-2048 | | | REMOVED | | |
| PX-2049 | | | REMOVED | | |
| PX-2050 | biocoreboard_v1.pdf | AXION-0232550 | AXION-0232565 | Millard Ex. 52 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2051 | | | REMOVED | | |
| PX-2052 | | | REMOVED | | |
| PX-2053 | | | REMOVED | | |
| PX-2054 | | | REMOVED | | |
| PX-2055 | | | REMOVED | | |
| PX-2056 | | | REMOVED | | |
| PX-2057 | | | REMOVED | | |
| PX-2058 | | | REMOVED | | |
| PX-2059 | | | REMOVED | | |
| PX-2060 | | | REMOVED | | |
| PX-2061 | | | REMOVED | | |
| PX-2062 | | | REMOVED | | |
| PX-2063 | | | REMOVED | | |
| PX-2064 | | | REMOVED | | |
| PX-2065 | | | REMOVED | | |
| PX-2066 | | | REMOVED | | |
| PX-2067 | | | REMOVED | | |
| PX-2068 | | | REMOVED | | |
| PX-2069 | | | REMOVED | | |
| PX-2070 | | | REMOVED | | |
| PX-2071 | | | REMOVED | | |
| PX-2072 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2073 | CH196A02.pdf | AXION-0237376 | AXION-0237377 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2074 | REMOVED | | | | |
| PX-2075 | REMOVED | | | | |
| PX-2076 | REMOVED | | | | |
| PX-2077 | AxIS Suite 3.10.1.9 Deployment and Release Notes | AXION-0238015 | AXION-0238017 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2078 | FW: my talk with David | AXION-0242442 | AXION-0242443 | Filippini Ex. 5 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FW 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2079 | RE: Maestro impedance data | AXION-0253193 | AXION-0253199 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2080 | REMOVED | | | | |
| PX-2081 | Re: Maestro impedance experiment - checking in | AXION-0253629 | AXION-0253639 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2082 | REMOVED | | | | |
| PX-2083 | REMOVED | | | | |
| PX-2084 | REMOVED | | | | |
| PX-2085 | RE: Scratch assay App Note | AXION-0253729 | AXION-0253730 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2086 | Scratch Assay Application Note Draft_CGrev.pdf | AXION-0253731 | AXION-0253735 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2087 | REMOVED | | | | |
| PX-2088 | REMOVED | | | | |
| PX-2089 | RE: monthly field demo discussion meeting: add Will and feedback from him on Z | AXION-0256542 | AXION-0256549 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2090 | Re: Day 1 - hints and tips | AXION-0259507 | AXION-0259511 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2091 | RE: FW: [Non-DoD Source] brain injury research _ Axion MEA for measuring neuronal network activity | AXION-0259806 | AXION-0259810 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, RE: 403, [Non 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2092 | FW: AACR 2021 poster ready for review | AXION-0260355 | AXION-0260358 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2093 | AACR_2021_Lohitash_Glioma_Non-Viral_CAR-T_Final.pptx | AXION-0260359 | AXION-0260359 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2094 | Re: Hypoxia | AXION-0260660 | AXION-0260665 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2095 | RE: ACTION NEEDED - RE: Speaking Opportunity: Cell UK (London) 28 October | AXION-0263340 | AXION-0263344 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, RE: 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2096 | REMOVED | | | | |
| PX-2097 | REMOVED | | | | |
| PX-2098 | RE: New Maestro Z potency assay app note | AXION-0264112 | AXION-0264113 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2099 | RE: Maestro Z for gene therapy with AAV | AXION-0264241 | AXION-0264242 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2100 | Cell analysis instrument interview | AXION-0264616 | AXION-0264616 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2101 | REMOVED | | | | |
| PX-2102 | REMOVED | | | | |
| PX-2103 | REMOVED | | | | |
| PX-2104 | REMOVED | | | | |
| PX-2105 | Re: [External] cell analysis instrument interview | AXION-0265917 | AXION-0265919 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2106 | REMOVED | | | | |
| PX-2107 | REMOVED | | | | |
| PX-2108 | REMOVED | | | | |
| PX-2109 | REMOVED | | | | |
| PX-2110 | Spheroid App Note.pdf | AXION-0267153 | AXION-0267158 | Li Ex. 9; Zhao Ex. 36; Millard Ex. 78; Frazier Ex. 38 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2111 | RE: Promotion announcement - Austin Passaro | AXION-0269806 | AXION-0269807 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2112 | Axion Maestro Z - 05Oct2022.pdf | AXION-0270517 | AXION-0270563 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2113 | | | REMOVED | | |
| PX-2114 | | | REMOVED | | |
| PX-2115 | | | REMOVED | | |
| PX-2116 | Re: cancer spheroid demo data | AXION-0271255 | AXION-0271256 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2117 | Re: collaboration contract discussion | AXION-0271935 | AXION-0271936 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2118 | Suspension target cell protocols and figures | AXION-0272169 | AXION-0272169 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2119 | | | REMOVED | | |
| PX-2120 | RE: Maestro Z follow-up from Analytical Development meeting | AXION-0272224 | AXION-0272231 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, RE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2121 | | | REMOVED | | |
| PX-2122 | | | REMOVED | | |
| PX-2123 | | | REMOVED | | |
| PX-2124 | | | REMOVED | | |
| PX-2125 | JurkatPlatemap_Condensed.implate | AXION-0272668 | AXION-0272668 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2126 | | | REMOVED | | |
| PX-2127 | | | REMOVED | | |
| PX-2128 | | | REMOVED | | |
| PX-2129 | TrayZ Protocols | AXION-0274086 | AXION-0274086 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2130 | | | REMOVED | | |
| PX-2131 | | | REMOVED | | |
| PX-2132 | Kumquat: HOT LEAD - Omni Cell-Mediated Killing Data | AXION-0274565 | AXION-0274566 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2133 | Master Price List USD 16SEP2022.xlsx | AXION-0274619 | AXION-0274619 | Sheikh Ex. 25, 26 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2134 | TrayZ Documentation | AXION-0274657 | AXION-0274657 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2135 | Fw: TEST-New: Axion Immuno-Oncology Special Edition | AXION-0275226 | AXION-0275231 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, Fw 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2136 | RE: sensitiviy of Impedance vs Imaging | AXION-0275577 | AXION-0275578 | Salters Ex. 9 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, RE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2137 | | | REMOVED | | |
| PX-2138 | | | REMOVED | | |
| PX-2139 | | | REMOVED | | |
| PX-2140 | | | REMOVED | | |
| PX-2141 | 2023MAY16-MSC-p4-100K-1684341167.png | AXION-0276430 | AXION-0276430 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2142 | | | REMOVED | | |
| PX-2143 | | | REMOVED | | |
| PX-2144 | RE: Tonya Webb data spheroid cell killing | AXION-0277198 | AXION-0277202 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2145 | Re: Today's discussion | AXION-0278320 | AXION-0278325 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2146 | RE: MRS meeting and presentation details | AXION-0278473 | AXION-0278474 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2147 | RE: Training "Certificate" for customers | AXION-0280531 | AXION-0280534 | Chvatal Ex. 16 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2148 | Attendance Certificate v4.docx | AXION-0280535 | AXION-0280535 | Chvatal Ex. 16 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2149 | Re: TrayZ demo and RFQ: Axion Bio + Enoda, dinner 11/7 | AXION-0280772 | AXION-0280775 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2150 | Cell Culture Protocol - Impedance - Non-Adherent Cell Lines.pdf | AXION-0280778 | AXION-0280779 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2151 | Re: Axion resources | AXION-0280909 | AXION-0280911 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2152 | | | REMOVED | | |
| PX-2153 | Cancer Neuroscience 2023 Packing List.xlsx | AXION-0281488 | AXION-0281488 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2154 | | | REMOVED | | |
| PX-2155 | Z96 margin analysis_new price.xlsx | AXION-0287053 | AXION-0287053 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2156 | Spheroid App Note_BWS_DDSedits_PJE_SJF (1).docx | AXION-0287140 | AXION-0287145 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2157 | Re: In Progress Cancer Spheroid App Note | AXION-0287146 | AXION-0287147 | Chvatal Ex. 45 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2158 | | | REMOVED | | |
| PX-2159 | | | REMOVED | | |
| PX-2160 | Board slides - 230208 - Marketing data V5.pdf | AXION-0289871 | AXION-0289892 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2161 | STEMCELL-Axion meeting - 230202 v3.pdf | AXION-0290080 | AXION-0290130 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2162 | Re: Collaboration updates - Miltenyi and UMB | AXION-0291235 | AXION-0291237 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2163 | | | REMOVED | | |
| PX-2164 | | | REMOVED | | |
| PX-2165 | | | REMOVED | | |
| PX-2166 | SfN 2023 Packing List.xlsx | AXION-0294261 | AXION-0294261 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2167 | Fw: what do we need- from marketing? | AXION-0294561 | AXION-0294567 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2168 | RE: GSM 2024??    RE: Closed-Lost opps in Q4 2023 | AXION-0294820 | AXION-0294826 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2169 | | | REMOVED | | |
| PX-2170 | Commission Calculation 2017-08-24 OS.xlsx | AXION-0299556 | AXION-0299556 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2171 | RE: list of Axion vs Acea wins | AXION-0303037 | AXION-0303038 | Filippini Ex. 30 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2172 | FW: New IO content | AXION-0309244 | AXION-0309248 | Chvatal Ex. 69 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2173 | Re: Axion-Myokardia Follow-Up | AXION-0317523 | AXION-0317524 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2174 | | | REMOVED | | |
| PX-2175 | Update from lab | AXION-0318586 | AXION-0318587 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2176 | | | REMOVED | | |
| PX-2177 | | | REMOVED | | |
| PX-2178 | | | REMOVED | | |
| PX-2179 | Re: New Activity [#5374] low A549 resistance signals | AXION-0320671 | AXION-0320680 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2180 | RE: impedance platelet adhesion assays | AXION-0321056 | AXION-0321058 | Deacon Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2181 | | | REMOVED | | |
| PX-2182 | | | REMOVED | | |
| PX-2183 | | | REMOVED | | |
| PX-2184 | | | REMOVED | | |
| PX-2185 | | | REMOVED | | |
| PX-2186 | | | REMOVED | | |
| PX-2187 | | | REMOVED | | |
| PX-2188 | [No Subject] | AXION-0324541 | AXION-0324541 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2189 | SITC2022_Spheroid_Potency_OmariEdits.pptx | AXION-0325375 | AXION-0325375 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2190 | Re: Questions about Skov3 spheroid app note | AXION-0327886 | AXION-0327887 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2191 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2192 | Re: strategic plan | AXION-0338869 | AXION-0338870 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2193 | SRD-CTI-001_ ConductiveTech Impedance Plate SRD.docx | AXION-0343456 | AXION-0343462 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2194 | | REMOVED | | | |
| PX-2195 | Fwd: David Ferrick shared a Lightroom Album with you | AXION-0345333 | AXION-0345335 | Ferrick Ex. 34 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2196 | | REMOVED | | | |
| PX-2197 | | REMOVED | | | |
| PX-2198 | | REMOVED | | | |
| PX-2199 | | REMOVED | | | |
| PX-2200 | | REMOVED | | | |
| PX-2201 | | REMOVED | | | |
| PX-2202 | | REMOVED | | | |
| PX-2203 | | REMOVED | | | |
| PX-2204 | | REMOVED | | | |
| PX-2205 | | REMOVED | | | |
| PX-2206 | | REMOVED | | | |
| PX-2207 | | REMOVED | | | |
| PX-2208 | | REMOVED | | | |
| PX-2209 | | REMOVED | | | |
| PX-2210 | | REMOVED | | | |
| PX-2211 | | REMOVED | | | |
| PX-2212 | | REMOVED | | | |
| PX-2213 | | REMOVED | | | |
| PX-2214 | | REMOVED | | | |
| PX-2215 | | REMOVED | | | |
| PX-2216 | | REMOVED | | | |
| PX-2217 | | REMOVED | | | |
| PX-2218 | | REMOVED | | | |
| PX-2219 | | REMOVED | | | |
| PX-2220 | | REMOVED | | | |
| PX-2221 | | REMOVED | | | |
| PX-2222 | | REMOVED | | | |
| PX-2223 | | REMOVED | | | |
| PX-2224 | SRD-CTI-001_ ConductiveTech 96-well Impedance Plate r5.pdf | AXION-0362602 | AXION-0362609 | Willsie Ex. 35 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2225 | | REMOVED | | | |
| PX-2226 | CS657-00-R01.PDF | AXION-0363677 | AXION-0363679 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2227 | CRB - ZHT Plate Process.pdf | AXION-0366659 | AXION-0366676 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2228 | CRB_ 96 Well Impedance Test Tool.pdf | AXION-0366677 | AXION-0366699 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2229 | CS657-00 PN VAT-X392HW-657 .pdf | AXION-0366906 | AXION-0366907 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2230 | CS2159-00.PDF | AXION-0367610 | AXION-0367612 | Millard Ex. 50 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2231 | Product Page - Software - Impedance Module v1 (SAC).pptx | AXION-0393587 | AXION-0393587 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2232 | Technology Page - Impedance General V2 - MC edits.pptx | AXION-0394222 | AXION-0394222 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2233 | AxIS Z User Guide Final.pdf | AXION-0395988 | AXION-0396033 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2234 | RE: Breast cancer migration webinar | AXION-0396750 | AXION-0396753 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2235 | Coffee Break Webinar_Gomillion Cancer Study.pptx | AXION-0396754 | AXION-0396754 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2236 | | REMOVED | | | |
| PX-2237 | Maestro Z slide deck - 202012.pptx | AXION-0400712 | AXION-0400712 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2238 | | | REMOVED | | |
| PX-2239 | | | REMOVED | | |
| PX-2240 | Potency Assay Summit Boston slides 14Jul2022.pptx | AXION-0411746 | AXION-0411746 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2241 | | | REMOVED | | |
| PX-2242 | | | REMOVED | | |
| PX-2243 | | | REMOVED | | |
| PX-2244 | CTAD_Tech Slam_2022_v2.pptx | AXION-0414697 | AXION-0414697 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2245 | | | REMOVED | | |
| PX-2246 | | | REMOVED | | |
| PX-2247 | Master Price List USD 22JUN2023 DRAFT.xlsx | AXION-0416764 | AXION-0416764 | Sheikh Ex. 27, 28 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2248 | Axion Bio - Brochure - Immunooncology Development.pdf | AXION-0416782 | AXION-0416789 | Chvatal Ex. 55 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2249 | ISSCR 2023 Packing List (1).xlsx | AXION-0416869 | AXION-0416869 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2250 | 2023.09.20_Live cell analysis tools_MRS meeting .pptx | AXION-0417569 | AXION-0417569 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2251 | | | REMOVED | | |
| PX-2252 | | | REMOVED | | |
| PX-2253 | | | REMOVED | | |
| PX-2254 | | | REMOVED | | |
| PX-2255 | | | REMOVED | | |
| PX-2256 | | | REMOVED | | |
| PX-2257 | | | REMOVED | | |
| PX-2258 | Re: Breast cancer migration webinar | AXION-0420212 | AXION-0420216 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2259 | | | REMOVED | | |
| PX-2260 | | | REMOVED | | |
| PX-2261 | | | REMOVED | | |
| PX-2262 | | | REMOVED | | |
| PX-2263 | | | REMOVED | | |
| PX-2264 | | | REMOVED | | |
| PX-2265 | | | REMOVED | | |
| PX-2266 | | | REMOVED | | |
| PX-2267 | | | REMOVED | | |
| PX-2268 | | | REMOVED | | |
| PX-2269 | | | REMOVED | | |
| PX-2270 | | | REMOVED | | |
| PX-2271 | | | REMOVED | | |
| PX-2272 | | | REMOVED | | |
| PX-2273 | | | REMOVED | | |
| PX-2274 | | | REMOVED | | |
| PX-2275 | | | REMOVED | | |
| PX-2276 | | | REMOVED | | |
| PX-2277 | Day2_PM_2_KOL Collaborations_Stacie Chvatal.pptx | AXION-0424825 | AXION-0424825 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2278 | | | REMOVED | | |
| PX-2279 | Axion BioSystems - Sampled - Intro call 230724.pptx | AXION-0425442 | AXION-0425442 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2280 | Cell Culture Protocol - Impedance - Non-Adherent Cell Lines.pdf | AXION-0426373 | AXION-0426374 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2281 | Cell Culture Protocol - Impeda.pdf | AXION-0426375 | AXION-0426376 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2282 | Cell Culture Protocol - Impedance - Non-Adherent Cell Lines - .pdf | AXION-0426450 | AXION-0426451 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2283 | | | REMOVED | | |
| PX-2284 | | | REMOVED | | |
| PX-2285 | | | REMOVED | | |
| PX-2286 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2287 | | | REMOVED | | |
| PX-2288 | | | REMOVED | | |
| PX-2289 | | | REMOVED | | |
| PX-2290 | | | REMOVED | | |
| PX-2291 | | | REMOVED | | |
| PX-2292 | | | REMOVED | | |
| PX-2293 | | | REMOVED | | |
| PX-2294 | | | REMOVED | | |
| PX-2295 | | | REMOVED | | |
| PX-2296 | | | REMOVED | | |
| PX-2297 | | | REMOVED | | |
| PX-2298 | | | REMOVED | | |
| PX-2299 | | | REMOVED | | |
| PX-2300 | | | REMOVED | | |
| PX-2301 | | | REMOVED | | |
| PX-2302 | | | REMOVED | | |
| PX-2303 | | | REMOVED | | |
| PX-2304 | | | REMOVED | | |
| PX-2305 | | | REMOVED | | |
| PX-2306 | | | REMOVED | | |
| PX-2307 | | | REMOVED | | |
| PX-2308 | | | REMOVED | | |
| PX-2309 | | | REMOVED | | |
| PX-2310 | | | REMOVED | | |
| PX-2311 | | | REMOVED | | |
| PX-2312 | | | REMOVED | | |
| PX-2313 | | | REMOVED | | |
| PX-2314 | | | REMOVED | | |
| PX-2315 | | | REMOVED | | |
| PX-2316 | | | REMOVED | | |
| PX-2317 | | | REMOVED | | |
| PX-2318 | | | REMOVED | | |
| PX-2319 | | | REMOVED | | |
| PX-2320 | | | REMOVED | | |
| PX-2321 | | | REMOVED | | |
| PX-2322 | | | REMOVED | | |
| PX-2323 | | | REMOVED | | |
| PX-2324 | | | REMOVED | | |
| PX-2325 | | | REMOVED | | |
| PX-2326 | | | REMOVED | | |
| PX-2327 | FW: Customer surveys | AXION-0449807 | AXION-0449808 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2328 | [Cyto] Phase 2 GLG CDD Deliverable 1.26.22.pdf | AXION-0449809 | AXION-0449862 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2329 | | | REMOVED | | |
| PX-2330 | 210608 Axion - Strategy Session No.2 v04.pdf | AXION-0449907 | AXION-0449991 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2331 | 1. Consolidated Financials YTD 2023-08.xlsx | AXION-0470340 | AXION-0470340 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2332 | Business Plan Assumptions_02102023.pptx | AXION-0470710 | AXION-0470710 | Bradley Ex. 5 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2333 | Axion Survey Results_02122023_Summa.pptx | AXION-0470717 | AXION-0470717 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2334 | | | REMOVED | | |
| PX-2335 | | | REMOVED | | |
| PX-2336 | Re: Intro: Axion Biosystems/Seed Bioscience | AXION-0481249 | AXION-0481256 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2337 | Re: Axion Maestro impedance experiment | AXION-0491785 | AXION-0491789 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2338 | Re: eSight price | AXION-0497971 | AXION-0497972 | Hurtado Ex. 13 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2339 | Axion Product ProfileV2.pptx | AXION-0500587 | AXION-0500587 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2340 | Maestro Z Improvements - Final Priority Ranked.pptx | AXION-0500799 | AXION-0500799 | Chvatal Ex. 66 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2341 | GxP Impedance Training 17Sep2020.pptx | AXION-0511565 | AXION-0511565 | Millard Ex. 44; Chvatal Ex. 65 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2342 | AxIS Z User Guide GxP.pdf | AXION-0513783 | AXION-0513841 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2343 | AxIS Z 3.2 User Guide.pdf | AXION-0517500 | AXION-0517568 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2344 | | | REMOVED | | |
| PX-2345 | | | REMOVED | | |
| PX-2346 | | | REMOVED | | |
| PX-2347 | | | REMOVED | | |
| PX-2348 | AxIS-Z 3.4 User Guide_Final.pdf | AXION-0527341 | AXION-0527411 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2349 | Re: hypoxia cell potency assay collaboration | AXION-0528126 | AXION-0528129 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2350 | AxIS Z 3.5 User Guide_v2.pdf | AXION-0528667 | AXION-0528737 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2351 | | | REMOVED | | |
| PX-2352 | | | REMOVED | | |
| PX-2353 | RE: checking in on K562 transduction | AXION-0533298 | AXION-0533303 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2354 | | | REMOVED | | |
| PX-2355 | | | REMOVED | | |
| PX-2356 | | | REMOVED | | |
| PX-2357 | | | REMOVED | | |
| PX-2358 | | | REMOVED | | |
| PX-2359 | Re: Cancer spheroid plating protocol | AXION-0533784 | AXION-0533787 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2360 | Competitor cheatsheet | AXION-0533860 | AXION-0533860 | Chvatal Ex. 61 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2361 | Z competitor cheat sheet_HTR edits.docx | AXION-0533861 | AXION-0533864 | Chvatal Ex. 61 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2362 | Z competitor cheat sheet_SC 06Dec2021_HTR 12072021.docx | AXION-0533901 | AXION-0533902 | Chvatal Ex. 62 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2363 | | | REMOVED | | |
| PX-2364 | | | REMOVED | | |
| PX-2365 | | | REMOVED | | |
| PX-2366 | | | REMOVED | | |
| PX-2367 | | | REMOVED | | |
| PX-2368 | | | REMOVED | | |
| PX-2369 | | | REMOVED | | |
| PX-2370 | Yin 2022 BiTE MolTher.pdf | AXION-0539995 | AXION-0540024 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2371 | Re: Axion follow-up from Potency Assay summit | AXION-0553201 | AXION-0553203 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2372 | AxIS Z 3.7 User Guide.pdf | AXION-0553457 | AXION-0553538 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2373 | | | REMOVED | | |
| PX-2374 | | | REMOVED | | |
| PX-2375 | | | REMOVED | | |
| PX-2376 | | | REMOVED | | |
| PX-2377 | | | REMOVED | | |
| PX-2378 | | | REMOVED | | |
| PX-2379 | | | REMOVED | | |
| PX-2380 | | | REMOVED | | |
| PX-2381 | | | REMOVED | | |
| PX-2382 | | | REMOVED | | |
| PX-2383 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2384 | | | REMOVED | | |
| PX-2385 | Google Demo Summary form 14Dec2022.csv | AXION-0566753 | AXION-0566753 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2386 | Demo Summary Form 03May2023.xlsx | AXION-0566754 | AXION-0566754 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2387 | AxIS Z 3.9 User Guide.pdf | AXION-0568869 | AXION-0568953 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2388 | AxIS Z 3.10 User Guide.pdf | AXION-0569014 | AXION-0569100 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2389 | Competitive analysis_Impedance Focus Group.pptx | AXION-0570691 | AXION-0570691 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2390 | | | REMOVED | | |
| PX-2391 | | | REMOVED | | |
| PX-2392 | Fwd: seahorse slides | AXION-0577424 | AXION-0577424 | O'Brien Ex. 13; Ross Ex. 17 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2393 | Seahorse Introduction 2014 r38-2.pptx | AXION-0577425 | AXION-0577425 | O'Brien Ex. 12 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2394 | Impedance Interview.pptx | AXION-0580650 | AXION-0580650 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2395 | RE: ACEA NK cell assay IP.msg | AXION-0582820 | AXION-0582822 | Millard Ex. 40 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2396 | Re: ACEA NK cell assay IP | AXION-0582826 | AXION-0582829 | Ross Ex. 31 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2397 | | | REMOVED | | |
| PX-2398 | | | REMOVED | | |
| PX-2399 | | | REMOVED | | |
| PX-2400 | RE: Cancer Spheroid App Note email | AXION-0598716 | AXION-0598717 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2401 | Re: SelectScience Cancer Spheroid leads | AXION-0599362 | AXION-0599368 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2402 | | | REMOVED | | |
| PX-2403 | | | REMOVED | | |
| PX-2404 | | | REMOVED | | |
| PX-2405 | | | REMOVED | | |
| PX-2406 | | | REMOVED | | |
| PX-2407 | | | REMOVED | | |
| PX-2408 | | | REMOVED | | |
| PX-2409 | | | REMOVED | | |
| PX-2410 | | | REMOVED | | |
| PX-2411 | | | REMOVED | | |
| PX-2412 | | | REMOVED | | |
| PX-2413 | | | REMOVED | | |
| PX-2414 | | | REMOVED | | |
| PX-2415 | | | REMOVED | | |
| PX-2416 | | | REMOVED | | |
| PX-2417 | | | REMOVED | | |
| PX-2418 | | | REMOVED | | |
| PX-2419 | | | REMOVED | | |
| PX-2420 | | | REMOVED | | |
| PX-2421 | Impedance Interview.pdf | AXION-0631860 | AXION-0631866 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2422 | Re: Notes from Beth Interview and other suggested pre-read materials for offsite planning | AXION-0631869 | AXION-0631870 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2423 | | | REMOVED | | |
| PX-2424 | | | REMOVED | | |
| PX-2425 | Re: meeting today | AXION-0634289 | AXION-0634289 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2426 | | | REMOVED | | |
| PX-2427 | Re: Axion Impedance Index | AXION-0635088 | AXION-0635090 | Salters Ex. 5 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2428 | RE: GSS Marketing & Axion | AXION-0635356 | AXION-0635358 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2429 | Fwd: thanks | AXION-0635508 | AXION-0635508 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2430 | Notes for Z 384-well system | AXION-0635822 | AXION-0635822 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2431 | REMOVED | | | | |
| PX-2432 | REMOVED | | | | |
| PX-2433 | REMOVED | | | | |
| PX-2434 | REMOVED | | | | |
| PX-2435 | REMOVED | | | | |
| PX-2436 | REMOVED | | | | |
| PX-2437 | REMOVED | | | | |
| PX-2438 | REMOVED | | | | |
| PX-2439 | REMOVED | | | | |
| PX-2440 | REMOVED | | | | |
| PX-2441 | RE: Maestro Z - xCELLigence & IncuCyte comparison data | AXION-0645147 | AXION-0645149 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2442 | Re: can you help me here... | AXION-0645585 | AXION-0645593 | Ross Ex. 41 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2443 | REMOVED | | | | |
| PX-2444 | REMOVED | | | | |
| PX-2445 | REMOVED | | | | |
| PX-2446 | REMOVED | | | | |
| PX-2447 | REMOVED | | | | |
| PX-2448 | REMOVED | | | | |
| PX-2449 | REMOVED | | | | |
| PX-2450 | REMOVED | | | | |
| PX-2451 | REMOVED | | | | |
| PX-2452 | ACEA IP Discussion | AXION-0666343 | AXION-0666343 | Ross Ex. 36 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2453 | RE: Spec sheet for Maestro Z | AXION-0666365 | AXION-0666368 | Millard Ex. 35; Chvatal Ex. 68 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2454 | REMOVED | | | | |
| PX-2455 | Z Index versus Cell Index | AXION-0666957 | AXION-0666957 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2456 | IP | AXION-0667904 | AXION-0667904 | Ross Ex. 35 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2457 | Fwd: Summa IP Concerns | AXION-0668191 | AXION-0668193 | Ross Ex. 37; Millard Ex. 72 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2458 | REMOVED | | | | |
| PX-2459 | RE: TEER | AXION-0671205 | AXION-0671207 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2460 | RE: spheroids experiments on the Maestro ZHT | AXION-0673236 | AXION-0673241 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2461 | REMOVED | | | | |
| PX-2462 | REMOVED | | | | |
| PX-2463 | REMOVED | | | | |
| PX-2464 | REMOVED | | | | |
| PX-2465 | REMOVED | | | | |
| PX-2466 | REMOVED | | | | |
| PX-2467 | REMOVED | | | | |
| PX-2468 | REMOVED | | | | |
| PX-2469 | REMOVED | | | | |
| PX-2470 | Axion Group Org Chart May 22_signed.pdf | AXION-0724195 | AXION-0724195 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2471 | REMOVED | | | | |
| PX-2472 | REMOVED | | | | |
| PX-2473 | REMOVED | | | | |
| PX-2474 | REMOVED | | | | |
| PX-2475 | REMOVED | | | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2476 | | | REMOVED | | |
| PX-2477 | | | REMOVED | | |
| PX-2478 | | | REMOVED | | |
| PX-2479 | RE: Hydra. IP.msg | AXION-0748247 | AXION-0748248 | Willsie Ex. 43 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2480 | | | REMOVED | | |
| PX-2481 | | | REMOVED | | |
| PX-2482 | | | REMOVED | | |
| PX-2483 | | | REMOVED | | |
| PX-2484 | | | REMOVED | | |
| PX-2485 | | | REMOVED | | |
| PX-2486 | ReleaseNotes_AxisSuite3.9.pdf | AXION-0750260 | AXION-0750262 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2487 | ReleaseNotes_AxisSuite3.10.pdf | AXION-0750263 | AXION-0750265 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2488 | ReleaseNotes_AxisSuite3.7.1.pdf | AXION-0750266 | AXION-0750269 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2489 | Article titled "Real-time and label-free impedimetric analysis of the formation and drug testing of tumor spheroids formed via the liquid overlay technique" | AXION-0750365 | AXION-0750372 | Li Ex. 22 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2490 | | | REMOVED | | |
| PX-2491 | | | REMOVED | | |
| PX-2492 | | | REMOVED | | |
| PX-2493 | | | REMOVED | | |
| PX-2494 | Global Trade Show Planner 2022 - Shared.xlsx | AXION-0750380 | AXION-0750380 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2495 | | | REMOVED | | |
| PX-2496 | | | REMOVED | | |
| PX-2497 | Global Trade Show Planner 2023.xlsx | AXION-0750383 | AXION-0750383 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2498 | | | REMOVED | | |
| PX-2499 | | | REMOVED | | |
| PX-2500 | Global Trade Show Schedule 2024.xlsx | AXION-0750386 | AXION-0750386 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2501 | | | REMOVED | | |
| PX-2502 | | | REMOVED | | |
| PX-2503 | SfN 2022 Leads.xls | AXION-0750389 | AXION-0750389 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2504 | ISSCR 2022 Leads.csv | AXION-0750390 | AXION-0750390 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2505 | 2022 Cell Therapy Analytical Development leads and contacts.xlsx | AXION-0750391 | AXION-0750391 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2506 | | | REMOVED | | |
| PX-2507 | Leads_AxionBioSystems_ToxExpo2022_20220404145927.xlsx | AXION-0750393 | AXION-0750393 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2508 | | | REMOVED | | |
| PX-2509 | Contacts from Cell Therapy Potency Assay Summit 2022.xlsx | AXION-0750395 | AXION-0750395 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2510 | CAR-TCR Leads 2022.xlsx | AXION-0750396 | AXION-0750396 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2511 | AACR 2022 Leads.csv | AXION-0750397 | AXION-0750397 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2512 | ISCT 2022 Leads.csv | AXION-0750398 | AXION-0750398 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2513 | ASGCT 2022 Leads.csv | AXION-0750399 | AXION-0750399 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2514 | Innate Killer Summit 2022 contacts.xlsx | AXION-0750400 | AXION-0750400 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2515 | | | REMOVED | | |
| PX-2516 | 2023_ISCT Lead list.xlsx | AXION-0750402 | AXION-0750402 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2517 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2518 | AACR 2023 Leads.xlsx | AXION-0750404 | AXION-0750404 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2519 | | | REMOVED | | |
| PX-2520 | SLAS 2023 Leads.xlsx | AXION-0750406 | AXION-0750406 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2521 | | | REMOVED | | |
| PX-2522 | 2023_EMBL Organoids.xlsx | AXION-0750408 | AXION-0750408 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2523 | | | REMOVED | | |
| PX-2524 | 202405 CIMT SFDC leadform.xlsx | AXION-0750410 | AXION-0750410 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2525 | | | REMOVED | | |
| PX-2526 | | | REMOVED | | |
| PX-2527 | 2023_SSI Lead list.xlsx | AXION-0750413 | AXION-0750413 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2528 | | | REMOVED | | |
| PX-2529 | 2024 SOT Cold leads.xlsx | AXION-0750414 | AXION-0750414 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2530 | | | REMOVED | | |
| PX-2531 | 2023_Coreustem.xlsx | AXION-0750415 | AXION-0750415 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2532 | | | REMOVED | | |
| PX-2533 | 2023_Cell UK.xlsx | AXION-0750417 | AXION-0750417 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2534 | | | REMOVED | | |
| PX-2535 | 2024 AACR warm and hot leads.xlsx | AXION-0750419 | AXION-0750419 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2536 | SOT 2023 Leads.xlsx | AXION-0750420 | AXION-0750420 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2537 | | | REMOVED | | |
| PX-2538 | CAR-TCR 2023 Leads List DC final.xlsx | AXION-0750422 | AXION-0750422 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2539 | | | REMOVED | | |
| PX-2540 | 2024 Innate Killer Summit leads.xlsx | AXION-0750424 | AXION-0750424 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2541 | | | REMOVED | | |
| PX-2542 | | | REMOVED | | |
| PX-2543 | 202403 Ettal DGfI Spring School SFDC lead form.xlsx | AXION-0750427 | AXION-0750427 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2544 | | | REMOVED | | |
| PX-2545 | 2023_ESGCT.xlsx | AXION-0750429 | AXION-0750429 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2546 | | | REMOVED | | |
| PX-2547 | 2023_TIMO XVII 2023.xlsx | AXION-0750431 | AXION-0750431 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2548 | | | REMOVED | | |
| PX-2549 | 2023_Organ Modelling.xlsx | AXION-0750433 | AXION-0750433 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2550 | | | REMOVED | | |
| PX-2551 | 2023 Leads List Template.xlsx | AXION-0750435 | AXION-0750435 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2552 | | | REMOVED | | |
| PX-2553 | | | REMOVED | | |
| PX-2554 | SITC 2023 Leads List.xlsx | AXION-0750438 | AXION-0750438 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2555 | | | REMOVED | | |
| PX-2556 | EACR Leads.xlsx | AXION-0750440 | AXION-0750440 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2557 | 20240426 Janssen Seminar SFDC cold leads.xlsx | AXION-0750441 | AXION-0750441 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2558 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2559 | 2023_Festival of Biologics.xlsx | AXION-0750443 | AXION-0750443 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2560 | REMOVED | | | | |
| PX-2561 | 2023_IBRO.xlsx | AXION-0750445 | AXION-0750445 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2562 | REMOVED | | | | |
| PX-2563 | 2023_NeuroDD.xlsx | AXION-0750447 | AXION-0750447 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2564 | REMOVED | | | | |
| PX-2565 | 2024 SOT leads warm.csv | AXION-0750449 | AXION-0750449 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2566 | warm leads Janssen Seminar 2024.csv | AXION-0750450 | AXION-0750450 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2567 | AACR Cold Leads.xlsx | AXION-0750451 | AXION-0750451 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2568 | Lead list PhD Days May 2024 (1).xlsx | AXION-0750452 | AXION-0750452 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2569 | REMOVED | | | | |
| PX-2570 | 2024 NNM Leads.xlsx | AXION-0750454 | AXION-0750454 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2571 | REMOVED | | | | |
| PX-2572 | 2023_SPS.xlsx | AXION-0750456 | AXION-0750456 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2573 | REMOVED | | | | |
| PX-2574 | 2023_ADPD23.xlsx | AXION-0750458 | AXION-0750458 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2575 | REMOVED | | | | |
| PX-2576 | 2023_Innate_Killer_Leads.xlsx | AXION-0750460 | AXION-0750460 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2577 | REMOVED | | | | |
| PX-2578 | PEGS 2023 Leads.xlsx | AXION-0750462 | AXION-0750462 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2579 | REMOVED | | | | |
| PX-2580 | Cancer Neuroscience Symposium - Lead list.xlsx | AXION-0750464 | AXION-0750464 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2581 | 2023_CAR TCR summit EU lead list.xlsx | AXION-0750465 | AXION-0750465 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2582 | REMOVED | | | | |
| PX-2583 | 2023_FENS Regional.xlsx | AXION-0750467 | AXION-0750467 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2584 | REMOVED | | | | |
| PX-2585 | 2023_Ettal Springschool March.xlsx | AXION-0750469 | AXION-0750469 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2586 | REMOVED | | | | |
| PX-2587 | 2023_ GSCN.xlsx | AXION-0750471 | AXION-0750471 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2588 | REMOVED | | | | |
| PX-2589 | 2023_Immuno UK.xlsx | AXION-0750473 | AXION-0750473 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2590 | REMOVED | | | | |
| PX-2591 | Lead list Curie Symposium.xlsx | AXION-0750475 | AXION-0750475 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2592 | SLAS 2024 Leads.xlsx | AXION-0750476 | AXION-0750476 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2593 | REMOVED | | | | |
| PX-2594 | 80463-9999 Rev. 2.pdf | AXION-0750479 | AXION-0750480 | Willsie Ex. 7 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2595 | AXION-0750486_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.xlsx | AXION-0750486 | AXION-0750486 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2596 | REMOVED | | | | |
| PX-2597 | REMOVED | | | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2598 | Cancer Spheroid Webinar.pptx | AXION-0751322 | AXION-0751322 | Chvatal Ex. 48 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2599 | AXION-0751903 - Highly Confidential – Attorneys' Eyes Only.xlsx | AXION-0751903 | AXION-0751903 | Millard Ex. 53-54 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2600 | | | REMOVED | | |
| PX-2601 | | | REMOVED | | |
| PX-2602 | | | REMOVED | | |
| PX-2603 | | | REMOVED | | |
| PX-2604 | | | REMOVED | | |
| PX-2605 | | | REMOVED | | |
| PX-2606 | | | REMOVED | | |
| PX-2607 | RE: Axion impedance experiment follow-up | AXION-0767146 | AXION-0767148 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2608 | RE: xCELLigence software | AXION-0770597 | AXION-0770600 | Hurtado Ex. 15; Chvatal Ex. 82 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2609 | | | REMOVED | | |
| PX-2610 | | | REMOVED | | |
| PX-2611 | Cytotoxicity assays.pptx | AXION-0775043 | AXION-0775043 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2612 | | | REMOVED | | |
| PX-2613 | | | REMOVED | | |
| PX-2614 | | | REMOVED | | |
| PX-2615 | | | REMOVED | | |
| PX-2616 | Re: Checking in from UGA | AXION-0776316 | AXION-0776317 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2617 | Re: GEN Assay Tutorial | AXION-0810637 | AXION-0810642 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2618 | Impedance update.msg | AXION-0927090 | AXION-0927090 | Willsie Ex. 40 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2619 | Impedance plates 310120.pptx | AXION-0927091 | AXION-0927091 | Willsie Ex. 40 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2620 | Immuno-oncology KOL_collaborations - 211118.xlsx | AXION-0986108 | AXION-0986108 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2621 | | | REMOVED | | |
| PX-2622 | | | REMOVED | | |
| PX-2623 | Re: Beth Nigh interviews | AXION-1009821 | AXION-1009822 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2624 | Re: Question about Impedance plates | AXION-1043177 | AXION-1043178 | Ross Ex. 5 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2625 | | | REMOVED | | |
| PX-2626 | | | REMOVED | | |
| PX-2627 | | | REMOVED | | |
| PX-2628 | | | REMOVED | | |
| PX-2629 | | | REMOVED | | |
| PX-2630 | | | REMOVED | | |
| PX-2631 | | | REMOVED | | |
| PX-2632 | | | REMOVED | | |
| PX-2633 | | | REMOVED | | |
| PX-2634 | | | REMOVED | | |
| PX-2635 | | | REMOVED | | |
| PX-2636 | | | REMOVED | | |
| PX-2637 | Board Meeting Master Slide Deck 10_13_2021.pptx | AXION-1063244 | AXION-1063244 | O'Brien Ex. 7; Ross Ex. 45 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2638 | | | REMOVED | | |
| PX-2639 | | | REMOVED | | |
| PX-2640 | | | REMOVED | | |
| PX-2641 | | | REMOVED | | |
| PX-2642 | | | REMOVED | | |
| PX-2643 | | | REMOVED | | |
| PX-2644 | | | REMOVED | | |
| PX-2645 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2646 | | | REMOVED | | |
| PX-2647 | | | REMOVED | | |
| PX-2648 | | | REMOVED | | |
| PX-2649 | | | REMOVED | | |
| PX-2650 | | | REMOVED | | |
| PX-2651 | | | REMOVED | | |
| PX-2652 | | | REMOVED | | |
| PX-2653 | | | REMOVED | | |
| PX-2654 | | | REMOVED | | |
| PX-2655 | | | REMOVED | | |
| PX-2656 | | | REMOVED | | |
| PX-2657 | | | REMOVED | | |
| PX-2658 | | | REMOVED | | |
| PX-2659 | | | REMOVED | | |
| PX-2660 | | | REMOVED | | |
| PX-2661 | | | REMOVED | | |
| PX-2662 | | | REMOVED | | |
| PX-2663 | | | REMOVED | | |
| PX-2664 | | | REMOVED | | |
| PX-2665 | | | REMOVED | | |
| PX-2666 | | | REMOVED | | |
| PX-2667 | | | REMOVED | | |
| PX-2668 | | | REMOVED | | |
| PX-2669 | | | REMOVED | | |
| PX-2670 | | | REMOVED | | |
| PX-2671 | | | REMOVED | | |
| PX-2672 | | | REMOVED | | |
| PX-2673 | | | REMOVED | | |
| PX-2674 | STRAP relevant conferences for 2022 based on STRAP segments and use cases.xlsx | AXION-1063580 | AXION-1063580 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2675 | | | REMOVED | | |
| PX-2676 | | | REMOVED | | |
| PX-2677 | | | REMOVED | | |
| PX-2678 | | | REMOVED | | |
| PX-2679 | | | REMOVED | | |
| PX-2680 | | | REMOVED | | |
| PX-2681 | | | REMOVED | | |
| PX-2682 | | | REMOVED | | |
| PX-2683 | Copy of Customer List for CRO-CDMO.xlsx | AXION-1063594 | AXION-1063594 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2684 | | | REMOVED | | |
| PX-2685 | | | REMOVED | | |
| PX-2686 | 221118 Axion M&A Mapping v3.xlsx | AXION-1063597 | AXION-1063597 | Bradley Ex. 4E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2687 | | | REMOVED | | |
| PX-2688 | | | REMOVED | | |
| PX-2689 | | | REMOVED | | |
| PX-2690 | | | REMOVED | | |
| PX-2691 | | | REMOVED | | |
| PX-2692 | | | REMOVED | | |
| PX-2693 | 230428 MA Scope Process_v5.pptx | AXION-1063604 | AXION-1063604 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2694 | | | REMOVED | | |
| PX-2695 | | | REMOVED | | |
| PX-2696 | | | REMOVED | | |
| PX-2697 | | | REMOVED | | |
| PX-2698 | | | REMOVED | | |
| PX-2699 | | | REMOVED | | |
| PX-2700 | | | REMOVED | | |
| PX-2701 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2702 | Pro_Edge Impedance Modules through 30Jul2024.xlsx | AXION-1063613 | AXION-1063613 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2703 | | | REMOVED | | |
| PX-2704 | | | REMOVED | | |
| PX-2705 | | | REMOVED | | |
| PX-2706 | | | REMOVED | | |
| PX-2707 | | | REMOVED | | |
| PX-2708 | | | REMOVED | | |
| PX-2709 | | | REMOVED | | |
| PX-2710 | | | REMOVED | | |
| PX-2711 | | | REMOVED | | |
| PX-2712 | | | REMOVED | | |
| PX-2713 | | | REMOVED | | |
| PX-2714 | | | REMOVED | | |
| PX-2715 | | | REMOVED | | |
| PX-2716 | Business Plan Assumptions_March 2024.pptx | AXION-1064140 | AXION-1064140 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2717 | R&D Cost Allocation - 04.05.24.pptx | AXION-1064141 | AXION-1064141 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2718 | | | REMOVED | | |
| PX-2719 | | | REMOVED | | |
| PX-2720 | | | REMOVED | | |
| PX-2721 | | | REMOVED | | |
| PX-2722 | | | REMOVED | | |
| PX-2723 | | | REMOVED | | |
| PX-2724 | | | REMOVED | | |
| PX-2725 | | | REMOVED | | |
| PX-2726 | | | REMOVED | | |
| PX-2727 | | | REMOVED | | |
| PX-2728 | | | REMOVED | | |
| PX-2729 | | | REMOVED | | |
| PX-2730 | Axion May 2023 Board Meeting_04242023.pptx | AXION-1064282 | AXION-1064282 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2731 | | | REMOVED | | |
| PX-2732 | Axion June 2023 Board Meeting Final v2.pptx | AXION-1064619 | AXION-1064619 | Ross Ex. 50 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2733 | | | REMOVED | | |
| PX-2734 | Axion Feb 2023 Board Meeting_02062023Final.pptx | AXION-1064621 | AXION-1064621 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2735 | | | REMOVED | | |
| PX-2736 | | | REMOVED | | |
| PX-2737 | | | REMOVED | | |
| PX-2738 | | | REMOVED | | |
| PX-2739 | | | REMOVED | | |
| PX-2740 | | | REMOVED | | |
| PX-2741 | | | REMOVED | | |
| PX-2742 | Board Meeting Master Slide Deck 8-23-2022.pptx | AXION-1064629 | AXION-1064629 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2743 | Board Meeting Supplemental Slide Deck 8-23-2022 CEO report.pptx | AXION-1064630 | AXION-1064630 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2744 | | | REMOVED | | |
| PX-2745 | | | REMOVED | | |
| PX-2746 | | | REMOVED | | |
| PX-2747 | | | REMOVED | | |
| PX-2748 | | | REMOVED | | |
| PX-2749 | | | REMOVED | | |
| PX-2750 | | | REMOVED | | |
| PX-2751 | | | REMOVED | | |
| PX-2752 | | | REMOVED | | |
| PX-2753 | | | REMOVED | | |
| PX-2754 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2755 | | | REMOVED | | |
| PX-2756 | | | REMOVED | | |
| PX-2757 | | | REMOVED | | |
| PX-2758 | | | REMOVED | | |
| PX-2759 | | | REMOVED | | |
| PX-2760 | | | REMOVED | | |
| PX-2761 | Axion Group Org Chart May 22 - signed.pdf | AXION-1066285 | AXION-1066286 | Sheikh Ex. 2 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2762 | | | REMOVED | | |
| PX-2763 | Z Plate sales analysis - H1 2024 - 2024-07-17.xlsx | AXION-1066357 | AXION-1066357 | Chvatal Ex. 78 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2764 | 10920_gljibrisd2_179413_01_20241105160000992.mp4 | AXION-1066358 | AXION-1066358 | Chvatal Ex. 80 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2765 | AACR-Agilent-Media-Evenet-.pdf | AXION-1066651 | AXION-1066714 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2766 | | | REMOVED | | |
| PX-2767 | AXION-1070874 - HIGHLY CONFIDENTIAL _ ATTORNEYS EYES ONLY.xlsm | AXION-1070874 | AXION-1070874 | Sheikh Ex. 11 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2768 | | | REMOVED | | |
| PX-2769 | 230930 Q-valuation Axion_vF2.xlsx | AXION-1071231 | AXION-1071231 | Bradley Ex. 18E | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2770 | | | REMOVED | | |
| PX-2771 | AXION-1071364.pdf | AXION-1071364 | AXION-1071414 | Bradley Ex. 25 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2772 | UPenn GBO paper with supplemental data.pdf | AXION-1071419 | AXION-1071443 | Li Ex. 19; Zhao Ex. 9; Millard Ex. 80; Frazier Ex. 40 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2773 | KOL collaborations.xlsx | AXION-1071448 | AXION-1071448 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2774 | | | REMOVED | | |
| PX-2775 | | | REMOVED | | |
| PX-2776 | | | REMOVED | | |
| PX-2777 | | | REMOVED | | |
| PX-2778 | | | REMOVED | | |
| PX-2779 | | | REMOVED | | |
| PX-2780 | | | REMOVED | | |
| PX-2781 | | | REMOVED | | |
| PX-2782 | | | REMOVED | | |
| PX-2783 | | | REMOVED | | |
| PX-2784 | Email Banner 1280x720 Optimising CAR structures to enhance efficacy in solid tumours; moving from linear to lateral architectures.png | AXION-1071503 | AXION-1071503 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2785 | AXION-1072085.mp4 | AXION-1072085 | AXION-1072085 | Millard Ex. 81 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2786 | | | REMOVED | | |
| PX-2787 | | | REMOVED | | |
| PX-2788 | | | REMOVED | | |
| PX-2789 | Printed Source Code for Artichoke.cpp | AXIONCODE-0018 | AXIONCODE-0018 | Stahl Ex. 17 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2790 | | | REMOVED | | |
| PX-2791 | | | REMOVED | | |
| PX-2792 | | | REMOVED | | |
| PX-2793 | Printed Source Code for ArtichokeRodeo.cs | AXIONCODE-0027 | AXIONCODE-0033 | Stahl Ex. 07 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2794 | Printed Source Code for ArtichokeRodeoEngine.cs | AXIONCODE-0034 | AXIONCODE-0044 | Stahl Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2795 | | | REMOVED | | |
| PX-2796 | | | REMOVED | | |
| PX-2797 | Printed Source Code for CalibratedImpedanceMeasurementNode.cs | AXIONCODE-0053 | AXIONCODE-0058 | Stahl Ex. 05 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2798 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|--------|-------------|-------------|-----------|------------------------|------------|
| PX-2799 | Printed Source Code for DataAcquisition.cpp | AXIONCODE-0061 | AXIONCODE-0064 | Stahl Ex. 15 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2800 | Printed Source Code for DataAcquisition.h | AXIONCODE-0065 | AXIONCODE-0066 | Stahl Ex. 14 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2801 | REMOVED | | | | |
| PX-2802 | Printed Source Code for ElectrodeIndexToChannelIdMapper.cs | AXIONCODE-0071 | AXIONCODE-0072 | Stahl Ex. 09 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2803 | REMOVED | | | | |
| PX-2804 | REMOVED | | | | |
| PX-2805 | REMOVED | | | | |
| PX-2806 | REMOVED | | | | |
| PX-2807 | REMOVED | | | | |
| PX-2808 | Printed Source Code for ImpedanceEncapsulator.cs | AXIONCODE-0091 | AXIONCODE-0094 | Stahl Ex. 11 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2809 | REMOVED | | | | |
| PX-2810 | REMOVED | | | | |
| PX-2811 | Printed Source Code for ImpedanceOrderTracker.cs | AXIONCODE-0099 | AXIONCODE-0104 | Stahl Ex. 12 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2812 | Printed Source Code for ImpedanceStimulationFactory.cs | AXIONCODE-0105 | AXIONCODE-0113 | Stahl Ex. 06 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2813 | Printed Source Code for ImpedanceStimulator.cpp | AXIONCODE-0114 | AXIONCODE-0120 | Stahl Ex. 16 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2814 | REMOVED | | | | |
| PX-2815 | REMOVED | | | | |
| PX-2816 | REMOVED | | | | |
| PX-2817 | REMOVED | | | | |
| PX-2818 | REMOVED | | | | |
| PX-2819 | REMOVED | | | | |
| PX-2820 | REMOVED | | | | |
| PX-2821 | REMOVED | | | | |
| PX-2822 | REMOVED | | | | |
| PX-2823 | REMOVED | | | | |
| PX-2824 | REMOVED | | | | |
| PX-2825 | REMOVED | | | | |
| PX-2826 | REMOVED | | | | |
| PX-2827 | REMOVED | | | | |
| PX-2828 | REMOVED | | | | |
| PX-2829 | REMOVED | | | | |
| PX-2830 | REMOVED | | | | |
| PX-2831 | REMOVED | | | | |
| PX-2832 | REMOVED | | | | |
| PX-2833 | REMOVED | | | | |
| PX-2834 | REMOVED | | | | |
| PX-2835 | REMOVED | | | | |
| PX-2836 | REMOVED | | | | |
| PX-2837 | REMOVED | | | | |
| PX-2838 | REMOVED | | | | |
| PX-2839 | Printed Source Code for VoltageMeasurementNode.cs | AXIONCODE-0241 | AXIONCODE-0246 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2840 | REMOVED | | | | |
| PX-2841 | REMOVED | | | | |
| PX-2842 | REMOVED | | | | |
| PX-2843 | REMOVED | | | | |
| PX-2844 | REMOVED | | | | |
| PX-2845 | REMOVED | | | | |
| PX-2846 | REMOVED | | | | |
| PX-2847 | REMOVED | | | | |
| PX-2848 | REMOVED | | | | |
| PX-2849 | REMOVED | | | | |
| PX-2850 | REMOVED | | | | |
| PX-2851 | REMOVED | | | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2852 | | | REMOVED | | |
| PX-2853 | | | REMOVED | | |
| PX-2854 | | | REMOVED | | |
| PX-2855 | | | REMOVED | | |
| PX-2856 | | | REMOVED | | |
| PX-2857 | Printed Document for AnalysisModule.md | AXIONCODE-0350 | AXIONCODE-0371 | Stahl Ex. 18 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2858 | | | REMOVED | | |
| PX-2859 | | | REMOVED | | |
| PX-2860 | Printed Document for PlateMapModule.md | AXIONCODE-0380 | AXIONCODE-0395 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2861 | | | REMOVED | | |
| PX-2862 | | | REMOVED | | |
| PX-2863 | | | REMOVED | | |
| PX-2864 | | | REMOVED | | |
| PX-2865 | | | REMOVED | | |
| PX-2866 | | | REMOVED | | |
| PX-2867 | | | REMOVED | | |
| PX-2868 | | | REMOVED | | |
| PX-2869 | | | REMOVED | | |
| PX-2870 | | | REMOVED | | |
| PX-2871 | | | REMOVED | | |
| PX-2872 | | | REMOVED | | |
| PX-2873 | | | REMOVED | | |
| PX-2874 | | | REMOVED | | |
| PX-2875 | | | REMOVED | | |
| PX-2876 | | | REMOVED | | |
| PX-2877 | | | REMOVED | | |
| PX-2878 | | | REMOVED | | |
| PX-2879 | | | REMOVED | | |
| PX-2880 | | | REMOVED | | |
| PX-2881 | | | REMOVED | | |
| PX-2882 | | | REMOVED | | |
| PX-2883 | | | REMOVED | | |
| PX-2884 | | | REMOVED | | |
| PX-2885 | | | REMOVED | | |
| PX-2886 | | | REMOVED | | |
| PX-2887 | | | REMOVED | | |
| PX-2888 | | | REMOVED | | |
| PX-2889 | Printed Document for AutomatedImpedanceRecording.md | AXIONCODE-0512 | AXIONCODE-0515 | Stahl Ex. 03 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2890 | | | REMOVED | | |
| PX-2891 | | | REMOVED | | |
| PX-2892 | | | REMOVED | | |
| PX-2893 | Printed Document for ImpedanceCalculation.md | AXIONCODE-0526 | AXIONCODE-0544 | Stahl Ex. 04 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2894 | Printed Document for MaestroRestApi.md | AXIONCODE-0545 | AXIONCODE-0545 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2895 | Printed Document for RequirementsFormat.md | AXIONCODE-0546 | AXIONCODE-0552 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2896 | Printed Document for SelfTests.md | AXIONCODE-0553 | AXIONCODE-0554 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2897 | Printed Document for SupportBundles.md | AXIONCODE-0555 | AXIONCODE-0555 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2898 | Printed Document for ArtichokeRodeo.md | AXIONCODE-0556 | AXIONCODE-0560 | Stahl Ex. 08 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2899 | | | REMOVED | | |
| PX-2900 | | | REMOVED | | |
| PX-2901 | | | REMOVED | | |
| PX-2902 | | | REMOVED | | |
| PX-2903 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2904 | | | REMOVED | | |
| PX-2905 | | | REMOVED | | |
| PX-2906 | | | REMOVED | | |
| PX-2907 | | | REMOVED | | |
| PX-2908 | | | REMOVED | | |
| PX-2909 | | | REMOVED | | |
| PX-2910 | | | REMOVED | | |
| PX-2911 | | | REMOVED | | |
| PX-2912 | | | REMOVED | | |
| PX-2913 | | | REMOVED | | |
| PX-2914 | | | REMOVED | | |
| PX-2915 | | | REMOVED | | |
| PX-2916 | | | REMOVED | | |
| PX-2917 | | | REMOVED | | |
| PX-2918 | | | REMOVED | | |
| PX-2919 | | | REMOVED | | |
| PX-2920 | | | REMOVED | | |
| PX-2921 | | | REMOVED | | |
| PX-2922 | | | REMOVED | | |
| PX-2923 | | | REMOVED | | |
| PX-2924 | | | REMOVED | | |
| PX-2925 | | | REMOVED | | |
| PX-2926 | | | REMOVED | | |
| PX-2927 | | | REMOVED | | |
| PX-2928 | | | REMOVED | | |
| PX-2929 | | | REMOVED | | |
| PX-2930 | | | REMOVED | | |
| PX-2931 | Printed Document for eFlask-Data-Acquisition.md | AXIONCODE-0665 | AXIONCODE-0667 | Stahl Ex. 13 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2932 | | | REMOVED | | |
| PX-2933 | | | REMOVED | | |
| PX-2934 | | | REMOVED | | |
| PX-2935 | | | REMOVED | | |
| PX-2936 | | | REMOVED | | |
| PX-2937 | | | REMOVED | | |
| PX-2938 | | | REMOVED | | |
| PX-2939 | | | REMOVED | | |
| PX-2940 | | | REMOVED | | |
| PX-2941 | | | REMOVED | | |
| PX-2942 | | | REMOVED | | |
| PX-2943 | | | REMOVED | | |
| PX-2944 | | | REMOVED | | |
| PX-2945 | | | REMOVED | | |
| PX-2946 | | | REMOVED | | |
| PX-2947 | | | REMOVED | | |
| PX-2948 | | | REMOVED | | |
| PX-2949 | | | REMOVED | | |
| PX-2950 | | | REMOVED | | |
| PX-2951 | | | REMOVED | | |
| PX-2952 | | | REMOVED | | |
| PX-2953 | | | REMOVED | | |
| PX-2954 | | | REMOVED | | |
| PX-2955 | | | REMOVED | | |
| PX-2956 | | | REMOVED | | |
| PX-2957 | | | REMOVED | | |
| PX-2958 | | | REMOVED | | |
| PX-2959 | | | REMOVED | | |
| PX-2960 | | | REMOVED | | |
| PX-2961 | | | REMOVED | | |
| PX-2962 | | | REMOVED | | |
| PX-2963 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2964 | | | REMOVED | | |
| PX-2965 | | | REMOVED | | |
| PX-2966 | | | REMOVED | | |
| PX-2967 | | | REMOVED | | |
| PX-2968 | | | REMOVED | | |
| PX-2969 | | | REMOVED | | |
| PX-2970 | | | REMOVED | | |
| PX-2971 | | | REMOVED | | |
| PX-2972 | | | REMOVED | | |
| PX-2973 | 220203 Fund III Axion - Final IC - Memo_vF[99].pdf | BRG-AXION-008744 | BRG-AXION-008744 | Bradley Ex. 15 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2974 | Fair Ex. 21 - Screenshot Taken from the Native Copy of AXION-0002488 | N/A | N/A | Fair Ex. 21 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2975 | Fair Ex. 22 - Screenshot Taken from the Native Copy of AXION-0002488 | N/A | N/A | Fair Ex. 22 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2976 | Fair Ex. 23 - Screenshot Taken from the Native Copy of AXION-0002488 | N/A | N/A | Fair Ex. 23 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2977 | Appendix A of Frazier Opening Report (Curriculum Vitae of Dr. A. Bruno Frazier) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2978 | Appendix B of Frazier Opening Report (List of Materials Considered) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2979 | Appendix C of Frazier Opening Report (Plate 1 Testing Results) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2980 | Appendix D of Frazier Opening Report (Plate 2 Testing Results) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2981 | Appendix E of Frazier Opening Report (Plate 3 Testing Results) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2982 | Appendix F of Frazier Opening Report (Agilent E-Plate 64 Serial No. 077313 Testing Results) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2983 | Appendix G of Frazier Opening Report (Agilent E-Plate 64 View Serial No. C047151 Testing Results) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2984 | Appendix H of Frazier Opening Report (Agilent E-Plate 64 PET Serial No. H122495 Testing Results) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2985 | Appendix I of Frazier Opening Report (Agilent E-Plate 384 Serial No. A117705 Testing Results) | N/A | N/A | Partial - Frazier Ex. 10 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2986 | Frazier Updates to Curriculum Vitae | N/A | N/A | Frazier Ex. 34 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2987 | Chvatal Deposition Notice | N/A | N/A | Chvatal Ex. 1 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2988 | Axion 30(b)(6) Depostion Notice | N/A | N/A | Chvatal Ex. 2 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2989 | Maestro Z Webpage, https://www.axionbiosystems.com/products/cell-analysis/maestro-z (visited November 9, 2024) | N/A | N/A | Chvatal Ex. 3; Millard Ex. 3 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2990 | Maestro Edge Webpage, https://www.axionbiosystems.com/products/mea/maestro-edge (visited November 9, 2024) | N/A | N/A | Chvatal Ex. 4; Millard Ex. 7 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2991 | Maestro Pro Webpage, https://www.axionbiosystems.com/products/mea/maestro-pro (visited November 9, 2024) | N/A | N/A | Chvatal Ex. 5; Millard Ex. 6 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2992 | | | REMOVED | | |
| PX-2993 | Maestro ZHT Webpage, https://www.axionbiosystems.com/products/cell-analysis/maestro-zht (visited November 9, 2024) | N/A | N/A | Chvatal Ex. 7; Millard Ex. 4 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, ZHT 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2994 | Maestro TrayZ Webpage, https://www.axionbiosystems.com/products/cell-analysis/maestro-trayz (visited November 9, 2024) | N/A | N/A | Chvatal Ex. 8; Millard Ex. 5 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, TRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2995 | LinkedIn Profile of Jim Ross, https://www.linkedin.com/in/jim-ross-18a8444/ (visited Nov. 18, 2024) | N/A | N/A | Ross Ex. 3 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2996 | Axion BioSystems, Inc.'s, Objections and Responses to Plaintiff, Agilent Technologies, Inc.'s, First Set of Interrogatories | N/A | N/A | Ross Ex. 29 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2997 | LinkedIn Profile of Chris Braun, https://www.linkedin.com/in/chris-braun-ba59b58 | N/A | N/A | Braun Ex. 3 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-2998 | First Amended Complaint | N/A | N/A | Braun Ex. 10 | AL, BRPL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-2999 | 2004 Most Innovative New Product Awards Luncheon Brochure | N/A | N/A | Wang Ex. 48 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3000 | Axion 30(b)(6) Depostion Notice | N/A | N/A | Millard Ex. 1; Willsie Ex. 1 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3001 | Millard Deposition Notice | N/A | N/A | Millard Ex. 2 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3002 | Axion's Responses to First Set of Requests for Admission Dated 02.12.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3003 | Axion's Corrected Responses to First Set of Interrogatories Dated 07.01.2024 | N/A | N/A | Chvatal Ex. 54 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3004 | Axion's Responses to Second Set of Interrogatories Dated 09.09.2024 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3005 | Axion's Responses to Third Set of Interrogatories Dated 12.26.2024 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3006 | Exhibits A-C of Axion's Responses to Third Set of Interrogatories | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3007 | Axion's Supplemental Responses to ROGs 3, 5-6, 9-11, 13-15 Dated 02.12.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3008 | Axion's Supplemental Responses to ROGs 17, 18, 20 Dated 02.12.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3009 | Axion's Second Supplemental Response to ROG 13 Dated 02.20.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3010 | Axion's First Supplemental Response to Interrogatory No 1 Dated 09.26.2024 | N/A | N/A | Willsie Ex. 6 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3011 | Agilent's Responses to Axion's 1st Set of Rogs Dated 12.13.2023 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3012 | Agilent's Responses to Axion's 2nd Set of Rogs Dated 03.29.2024 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3013 | Agilent's Responses to Axion's 3rd Set of Rogs Dated 10.28.2024 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3014 | Agilent's Second Amended Response to Axion's Rog 5 Dated 02.12.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3015 | Agilent's Amended Response to Axion's Rogs 7-9 Dated 08.16.2024 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3016 | Agilent's Second Amended Response to Axion's Rog 22 Dated 02.12.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3017 | Agilent's Corrected Third Amended Response to Axion's Rog 1 Dated 02.06.2025 | N/A | N/A | Wang Ex. 8 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3018 | Agilent's Second Amended Response to Axion's Rog 12 Dated 02.03.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3019 | Agilent's Corrected Third Amended Response to Axion's Rog 11 Dated 01.30.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3020 | Agilent's Second Amended Response to Axion's Rog 6 Dated 01.28.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3021 | Agilent's Amended Response to Axion's Rogs 2 and 22 Dated 11.27.2024 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3022 | Agilent's Amended Response to Axion's Rog 20 Dated 01.17.2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3023 | Agilent's Amended Response to Axion's Rog 3 Dated 03.14.2024 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3024 | Axion Leadership Team, https://www.axionbiosystems.com/about-us/leadership-team (visited Jan. 16, 2025) | N/A | N/A | Sheikh Ex. 4 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3025 | LinkedIn Profile of Xiaobo Wang, www.linkedin.com/in/xiaobo-wangb02598223 | N/A | N/A | Wang Ex. 3 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3026 | REMOVED | | | | |
| PX-3027 | Harnessing Combined Expertise: STEMCELL Technologies and Axion BioSystems Partner to Streamline Culture and Analysis of Excitable Cells | N/A | N/A | Chvatal Ex. 14 | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3028 | Agilent Technologies, Inc.'s Fifth Amended Objections and Responses to Axion BioSystems, Inc.'s Interrogatory Nos. 13, 15-16 and Sixth Amended Objections and Responses to Axion BioSystems, Inc.'s Interrogatory No. 14, Feb. 18, 2025 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-3029 | https://www.agilent.com/about/newsroom/presrel/2023/20dec-gp23033.html | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3030 | https://www.agilent.com/about/newsroom/presrel/2018/25sep-gp18055.html | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3031 | https://igbiosystems.com/global-partners/acea-biosciences/ | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3032 | https://www.linkedin.com/company/acea-biosciences | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3033 | REMOVED | | | | |
| PX-3034 | https://summaequity.com/investments/axion/ | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3035 | https://www.linkedin.com/company/axion-biosystems | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3036 | https://www.axionbiosystems.com/resources/news/summa-equity-acquires-axion-biosystems | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3037 | https://www.axionbiosystems.com/about-us/our-history | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3038 | https://meditechinsights.com/cell-analysis-market/ | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3039 | REMOVED | | | | |
| PX-3040 | REMOVED | | | | |
| PX-3041 | https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca-software | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3042 | REMOVED | | | | |
| PX-3043 | REMOVED | | | | |
| PX-3044 | https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca-analyzers/xcelligence-rtca-ht-high-throughput-model-741229 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3045 | https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca-analyzers/xcelligence-rtca-sp-single-plate-741232 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3046 | https://www.agilent.com/en/product/cell-analysis/real-time-cell-analysis/rtca-analyzers/xcelligence-rtca-mp-multiple-plates-741230 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3047 | https://www.businesswire.com/news/home/20240205884891/en/CytoTronics-Reveals-Pixel-System-to-Monitor-Live-Cell-Function-at-an-Unprecedented-Scale-for-Cell-Biology-Applications | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3048 | https://gtrc.gatech.edu/about-us/ | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3049 | https://www.britannica.com/topic/University-of-Illinois | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3050 | https://patents.google.com/patent/US7501301B2/en?oq=7501301 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3051 | https://www.evotec.com/ | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3052 | https://www.marshallip.com/content/uploads/2018/03/IAM_the_-future-of-tech-transfer_2018.pdf | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3053 | https://ipwatchdog.com/2020/04/07/evolution-university-technology-transfer/id=120451 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3054 | https://pmc.ncbi.nlm.nih.gov/articles/PMC4355252 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3055 | https://medinstitute.com/blog/what-is-a-contract-research-organization-cro | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3056 | https://www.uspto.gov/dashboard/patents/design.html#dar | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3057 | https://www.axionbiosystems.com/resources/application-note/car-t-cell-potency-assessment-3d-cancer-spheroid-models | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3058 | https://www.cambridge.org/core/books/social-media-and-democracy/misinformation-and-itscorrection/61FA7FD743784A723BA234533012E810 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3059 | https://www.nature.com/articles/s44159-021-00006-y | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3060 | http://storybistro.com/your-brand-and-the-marketing-rule-of-7/ | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-3061 | https://www.krusecontrolinc.com/rule-of-7-how-social-media-crushes-old-school-marketing-2024/ | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3062 | https://www.axionbiosystems.com/resources/coffee-break-webinar-video/plant-derived-pectin-breast-cancer-therapy?_gl=1*153ulog*_gcl_au*OTI5ODcxNDIxLjE3NDY0NDgxNTE.&_ga=2.129442444.1622024546.1747021472-1490411368.1746448152 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3063 | https://www.axionbiosystems.com/resources/coffee-break-webinar-video/targeting-glioblastoma-assessing-potency-t-cells-kill-cancer?_gl=1*8x4e1k*_gcl_au*OTI5ODcxNDIxLjE3NDY0NDgxNTE.&_ga=2.201130926.1622024546.1747021472-1490411368.1746448152 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3064 | https://axionbiosystems.com/resources/coffee-break-webinar-video/sickle-cell-anemia-studying-inflammation-mediated-vascular | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3065 | https://expertcytometry.com/special-considerations-for-live-cell-imaging/ | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3066 | https://axionbiosystems.com/resources/coffee-break-webinar/igf-1-rescues-proliferation-cells-grown-serum-free-media?_ga=2.114356421.373539864.1747079970-1170508615.1747079970 | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3067 | https://www.agilent.com/about/companyinfo/index.html | N/A | N/A | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3068 | Agilent Annual Report Oct 31 2019.pdf | AGILE5066610 | AGILE5066764 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3069 | Agilent Annual Report Oct 31 2020.pdf | AGILE5066765 | AGILE5066892 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3070 | Agilnt Annual Report Oct 31 2021.pdf | AGILE5066893 | AGILE5067023 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3071 | Agilent Annual Report Oct 31 2022.pdf | AGILE5067024 | AGILE5067147 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3072 | Agilent Annual Report Oct 31 2023.pdf | AGILE5067148 | AGILE5067353 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3073 | Agilent Annual Report Oct 31 2024.pdf | AGILE5067354 | AGILE5067497 | | AL, ERR, Q, FRCP 26, FRE 105, FRE 106, FRE 401/402, FRE 403, FRE 404, FRE 408, FRE 602, FRE 701, FRE 702, FRE 703, FRE 801/802, FRE 901, FRE 1001-1004, FRE 1006, MIL 1, MIL 2, MIL 3 |
| PX-3074 | Physical Ribbon Copy of the '752 Patent | N/A | N/A | | |
| PX-3075 | | | REMOVED | | |
| PX-3076 | Physical Ribbon Copy of the '080 Patent | N/A | N/A | | |
| PX-3077 | 1 Project Apex - Agreement and Plan of Merger (Execution Copy).pdf | AGILE3269837 | AGILE3270054 | Christian Ex. 4 | ERR, 401/402, 403, 602, 901, 1001-1004, MIL 3 |
| PX-3078 | 4. Apex - Disclosure Schedules.pdf | AGILE5039423 | AGILE5039546 | Christian Ex. 5 | ERR, 401/402, 403, 602, 901, 1001-1004, MIL 3 |
| PX-3079 | Email re Project Apex due diligence | AGILE4710595 | AGILE4710597 | Christian Ex. 6 | 401/402, 602, 801/802, MIL 3 |
| PX-3080 | | | REMOVED | | |
| PX-3081 | | | REMOVED | | |
| PX-3082 | LinkedIn page of Nathan Griffith | N/A | N/A | Grifith Ex. 3 | ENP, FRCP 26 |
| PX-3083 | IM Capacity Planning_Sharing with LSAG Staff_ Aug FY21.pdf | AGILE0931618 | AGILE0931632 | Joseph Ex. 17 | Q, 401/402, 602 |
| PX-3084 | Cell Analysis Market Global Forecast to 2028 Report Brochure by Markets and Markets | AGILE3326574 | AGILE3326608 | Joseph Ex. 18 | 602, 701, 703, 801/802, 901 |
| PX-3085 | Cell Analysis Division Org Chart_Aug2023.pptx | AGILE3916540 | AGILE3915640 | Joseph Ex. 4 | |
| PX-3086 | FY21 Cell Analysis Division Strategy Development Update_LSAG Staff June 2020.v7LHK.pptx | AGILE0930048 | AGILE0930075 | Joseph Ex. 5 | 401/402, 403, 602, 801/802 |
| PX-3087 | 2019.10.22-3D Spheroids Cytoxicity test.pptx | AGILE3436686 | AGILE3436686 | Li Ex. 11 | 401/402, 403, 602, 701, 703, 801/802 |
| PX-3088 | xCELLigence RTCA Handbook Cancer Immunotherapy | AXION-0579515 | AXION-0579542 | Li Ex. 21 | |
| PX-3089 | LinkedIn page of Nancy Li | N/A | N/A | Li Ex. 3 | ENP, FRCP 26 |
| PX-3090 | Quarterly Report for Q2 2017, Mike Honeysett, Submitted July 28 2017.pdf | AGILE1604118 | AGILE1604144 | Zhao Ex. 24 | 602, 703, 801/802 |
| PX-3091 | LinkedIn profile of Leyna Zhao | N/A | N/A | Zhao Ex. 3 | ENP, FRCP 26 |
| PX-3092 | 2020 xCELLigence Competitions and Positioning_Cancer Immunotherapy.pptx | AGILE0028895 | AGILE0028939 | Zhao Ex. 8 | 801/802 |
| PX-3093 | | | REMOVED | | |
| PX-3094 | | | REMOVED | | |
| PX-3095 | | | REMOVED | | |
| PX-3096 | | | REMOVED | | |
| PX-3097 | | | REMOVED | | |
| PX-3098 | | | REMOVED | | |
| PX-3099 | | | REMOVED | | |
| PX-3100 | | | REMOVED | | |
| PX-3101 | | | REMOVED | | |
| PX-3102 | | | REMOVED | | |
| PX-3103 | | | REMOVED | | |

| PX No. | Description | Begin Bates | End Bates | Deposition Exhibit No. | Objections |
|---|---|---|---|---|---|
| PX-3104 | | | REMOVED | | |
| PX-3105 | | | REMOVED | | |
| PX-3106 | | | REMOVED | | |
| PX-3107 | | | REMOVED | | |
| PX-3108 | | | REMOVED | | |
| PX-3109 | | | REMOVED | | |
| PX-3110 | | | REMOVED | | |
| PX-3111 | Email from T. O'Brien re strategic plan | AXION-0338860 | AXION-0338860 | | 401/402, 403, MIL 1 |
| PX-3112 | | | REMOVED | | |
| PX-3113 | Email from J. Ross Fwd: Thank You! With attachments | AXION-0580646 | AXION-0580649 | | 403, MIL 1 |
| PX-3114 | Email from A. Willsie Fwd: Notes on 384-well plate | AXION-0746302 | AXION-0746302 | | |
| PX-3115 | 384 well plate (DH).docx | AXION-0746303 | AXION-0746304 | | |
| PX-3116 | | | REMOVED | | |
| PX-3117 | | | REMOVED | | |
| PX-3118 | | | REMOVED | | |
| PX-3119 | Email from Domas Rinksalis re Review 2024 TopLine Budget | AXION-0087434 | AXION-0087435 | | |
| PX-3120 | Email from Alp Aras re Top 10 customer_v2 | AXION-0087788 | AXION-0087788 | | |
| PX-3121 | Email from Alp Aras re Fundraising and M&A documents | AXION-0470709 | AXION-0470709 | | 602 |
| PX-3122 | Email from James Ross re Notes from Beth Interview and other suggested pre-read materials for offsite planning | AXION-0631859 | AXION-0631859 | | 403, MIL 1 |
| PX-3123 | IPmaterials.pptx | AXION-0667905 | AXION-0667905 | Ross Ex. 35; Millard Ex. 71 (partial) | |
| PX-3124 | Email from James Ross re Pros and Cons to the Agilent acquisition of Acea | AXION-0630722 | AXION-0630723 | Ross Ex. 33 | |
| PX-3125 | ACEA xCELLigence SP Sole Source 2015.docx | AGILE1346971 | AGILE1346971 | | |
| PX-3126 | dac_schematic_input_mod_only.eps | AXION-0002607 | AXION-0002607 | | |
| PX-3127 | Dobrzycki et al., Assessing the Potency of T Cell-Redirecting Therapeutics Using In Vitro Cancer Cell Killing Assays, *Immuno-Oncology: Cellular and Translational Approaches, Methods in Pharmacology and Toxicology*, 07 Jan. 2020, pp. 51-72. | N/A | N/A | | ENP, NNP, FRCP 26, 602, 401/402, 403, 701, 702, 703, 801/802, 901, 1001-1004 |

# EXHIBIT 7D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-198-CJB |
| v. | ) | |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### EXHIBIT 7D – DEFENDANT AXION'S STATEMENT OF INTENDED PROOFS

Pursuant to D. Del. LR 16.3(c)(9), and the parties' agreement to engage in an iterative exchange of components making up the Pretrial Order, Defendant Axion BioSystems, Inc. ("Axion") respectfully submits its Statement of Intended Proofs.

This statement is not intended to be exhaustive, and in addition to what is set forth herein, Axion reserves the right to prove any matters identified in the pleadings, fact and expert discovery, and any of the accompanying statements of facts and legal issues to be litigated at trial.  Axion reserves the right to disprove, prove a fact contrary to, or prove the opposite of any issue of fact identified in Plaintiff Agilent Technologies, Inc.'s ("Agilent") Statement of Intended Proofs.

Axion's Statement of Intended Proofs is made pursuant to the Local Rules, the Court's orders, and the parties' agreements, and to preserve Axion's rights, based on the present status of the case.   Axion's Statement of Intended Proofs is based in part on its current understanding of the arguments Agilent is likely to make, based upon the pleadings and discovery in the action to date. To the extent Agilent attempts to introduce different or additional facts to meet its burden of proof, Axion reserves the right to object to and/or contest those facts, and to present any and all rebuttal evidence in response to those facts.

2/27/2026

The parties have exchanged and/or will exchange objections and motions *in limine* and otherwise present to the Court disputes regarding the issues and evidence to be presented to the jury and the relevance and admissibility of certain testimony and exhibits. Axion's Statement of Intended Proofs does not waive Axion's right to object to certain categories of evidence as irrelevant or otherwise inadmissible and does not waive its right to pursue motions *in limine*. Until the Court addresses and rules on such disputes, Axion reserves the right to make final decisions regarding what issues it intends to prove.

After the parties complete their pretrial exchange and the Court rules on motions and/or other disputes that are presented during pretrial, Axion reserves the right to further clarify its Statement of Intended Proofs.

## I.    PATENT INFRINGEMENT

1.    Axion will prove that it did not directly infringe, literally, the asserted claims of the '752 patent by using the Maestro Pro and/or Maestro ZHT machines with the AxIS Z software and CytoView-Z 384-well plates.

2.    Axion will prove that it did not induce infringement of the asserted claims of the '752 patent.

3.    Axion will prove that it did not willfully infringe the asserted claims of the '752 patent.

4.    Axion will prove that it did not directly infringe, literally, the asserted claims of the '080 patent by using (a) the Maestro Pro and/or Maestro ZHT machines with the AxIS Z software and CytoView-Z 384-well plates, or (b) the Maestro Z, Maestro ZHT, Maestro Pro, Maestro Edge, and/or Maestro TrayZ with the AxIS Z software and CytoView-Z 96-well plates.

5.    Axion will prove that it did not induce infringement of the asserted claims of the '080 patent.

2                                                        2/27/2026

6.      Axion will prove that it did not willfully infringe the asserted claims of the '080 patent.

## II.      PATENT INVALIDITY

7.      Axion will prove by clear and convincing evidence that the asserted claims of the '752 patent are invalid under 35 U.S.C. § 103 as obvious.

8.      Axion will prove by clear and convincing evidence that the asserted claims of the '080 patent are invalid under 35 U.S.C. § 102 as anticipated.

9.      Axion will prove by clear and convincing evidence that the asserted claims of the '080 patent are invalid under 35 U.S.C. § 103 as obvious.

10.      Axion will prove that there is no nexus between the alleged secondary considerations of nonobviousness and the patented features.

11.      Axion will prove that secondary considerations such as long felt but unmet need, failure of others, unexpected results, licensing, commercial success, copying, or industry praise do not support the nonobviousness of the asserted claims of the '752 patent.

12.      Axion will prove that secondary considerations such as long felt but unmet need, failure of others, unexpected results, licensing, commercial success, copying, or industry praise do not support the nonobviousness of the asserted claims of the '080 patent.

13.      Axion will prove that a person of ordinary skill in the art at the relevant time is someone who had a degree in electrical engineering, physics, mechanical engineering, biomedical engineering, or a closely related field, plus at least two years of experience researching or developing devices for analyzing cells and for conducting cell-based assays, or an advanced degree in one of those fields in lieu of such work experience.

## III.    PATENT DAMAGES AND REMEDIES

14.    Axion will prove that Agilent is not entitled to lost profits for Axion's alleged infringement of the '752 patent.

15.    Axion will prove that Agilent is not entitled to lost profits for Axion's alleged infringement of the '080 patent.

16.    Axion will prove that Agilent is not entitled to a reasonable royalty because Axion has not infringed the '752 patent.

17.    Axion will prove that Agilent is not entitled to a reasonable royalty because Axion has not infringed the '080 patent.

18.    Axion will prove that Agilent is not entitled to enhanced damages for Axion's alleged infringement of the '752 patent.

19.    Axion will prove that Agilent is not entitled to enhanced damages for Axion's alleged infringement of the '080 patent.

20.    Axion will prove that Agilent is not entitled to attorneys' fees.

21.    Axion will prove that it is entitled to attorneys' fees.

22.    Axion will prove that Agilent is not entitled to costs.

## IV.    FALSE ADVERTISING

23.    Axion will prove that its statements regarding its products' ability to measure characteristics of spheroid models using impedance are nonactionable opinions.

24.    Axion will prove that its statements regarding its products' ability to measure characteristics of spheroid models using impedance are not literally false statements of fact.

25.    Axion will prove that its statements regarding its products' ability to measure characteristics of spheroid models using impedance are not misleading.

4                                                                                    2/27/2026

26. Axion will prove that its statements regarding its products' ability to measure characteristics of spheroid models using impedance have not actually deceived nor have a tendency to deceive a substantial portion of the intended audience.

27. Axion will prove that its statements regarding its products' ability to measure characteristics of spheroid models using impedance are not material in that they are not likely to influence customers' purchasing decisions.

28. Axion will prove that its statements regarding its products' ability to measure characteristics of spheroid models using impedance did not proximately cause any economic or reputational injury to Agilent.

## V. FALSE ADVERTISING DAMAGES AND REMEDIES

29. Axion will prove that Agilent is not entitled to corrective advertising damages.

30. Axion will prove that Agilent is not entitled to attorneys' fees.

31. Axion will prove that it is entitled to attorneys' fees.

32. Axion will prove that Agilent is not entitled to costs.

33. Axion will prove that Agilent is not entitled to injunctive relief.

2/27/2026

# EXHIBIT 7P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 23-198 (CJB) |
| | ) |
| AXION BIOSYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

**EXHIBIT 7P TO PRETRIAL ORDER**
**PLAINTIFF'S BRIEF STATEMENT OF INTENDED PROOFS**

Pursuant to Local Rule 16.3(c)(8), Agilent Technologies, Inc. ("Agilent" or "Plaintiff") submits the following brief statement of what it intends to prove in support of its claims at trial, including the details of the damages claimed or of other relief sought. Plaintiff reserves the right to provide additional proof to rebut any proof offered by Axion Biosystems, Inc., ("Axion" or "Defendant") before or during trial, in response to rulings by the Court, or for any other good cause. By including an issue herein, Agilent does not assume the burden of proof or production with respect to that issue. Agilent incorporates by reference its expert reports in support of any proof to be presented by expert testimony.

## I.    ISSUES ON WHICH AGILENT BEARS THE BURDEN OF PROOF

### A.    Infringement of the '752 Patent

1.    Agilent will prove that, before the expiration of the '752 Patent, the use of the Maestro Pro and Maestro ZHT machines in combination with the AxIS Z software and CytoView-Z 384-well plates ("the '752 Accused Products"), performed each step of claims 11, 12, 14, and 18 (collectively, "the '752 Asserted Claims") of U.S. Patent No. 7,192,752 ("the '752 Patent").

2.    Agilent will prove that, before the expiration of the '752 Patent, Axion and its customers or collaborators directly infringed the '752 Asserted Claims by using the '752 Accused Products.

3.    Agilent will prove that, before the expiration of the '752 Patent, Axion induced infringement of the '752 Asserted Claims by selling the '752 Accused Products in conjunction with providing the instructions in the relevant Axion user guides, software guides, hardware guides, application notes, instructions, and/or trainings ("Axion Instructional Materials") that encouraged customers and collaborators to use the '752 Accused Products in an infringing manner. Agilent will further prove that Axion was aware of the '752 Patent and knew or should have known

that use of the '752 Accused Products by Axion's customers or collaborators, according to the provided Axion Instructional Materials, would infringe the patent.

4.     Agilent will prove that Axion's infringement of the '752 Asserted Claims was willful.

### B.     Infringement of the '080 Patent

5.     Agilent will prove that, before the expiration of the '080 Patent, the use of the Maestro Pro, Maestro Edge, Maestro Z, Maestro ZHT, or Maestro TrayZ machine in combination with the AxIS Z software and compatible CytoView-Z plates ("the '080 Accused Products") performed each step of claims 1, 3 and 10 (collectively, "the '080 Asserted Claims") of U.S. Patent No. 8,026,080 ("the '080 Patent").

6.     Agilent will prove that, before the expiration of the '080 Patent, Axion and its customers or collaborators directly infringed the '080 Asserted Claims by using the '080 Accused Products.

7.     Agilent will prove that, before the expiration of the '080 Patent, Axion induced infringement of the '080 Asserted Claims by selling the '080 Accused Products in conjunction with providing the instructions in the relevant Axion Instructional Materials that encouraged customers and collaborators to use the '080 Accused Products in an infringing manner. Agilent will further prove that Axion was aware of the '080 Patent and knew or should have known that use of the '080 Accused Products by Axion's customers or collaborators, according to the provided Axion Instructional Materials, would infringe the patent.

8.     Agilent will prove that Axion's infringement of the '080 Asserted Claims was willful.

3

### C.      Violations of the Lanham Act

9.      Agilent will prove that Axion is liable for unfair competition under Section 43(a)(1)(B) of the Lanham Act—15 U.S.C. § 1125(a)(1)(B).

### D.      Damages and Other Relief

10.      Agilent will prove it is entitled to lost profits and, in addition, should receive reasonable royalties related to products sold or provided to customers and collaborators in the U.S. At a minimum, in the event that Agilent is not awarded lost profits, Agilent will prove that it is entitled to reasonable royalty damages for accused products sold or provided to customers and collaborators within the U.S.

11.      Agilent will prove at least one of Agilent's products was used to practice at least one of the asserted claims of the '752 Patent before the expiration of the '752 Patent.

12.      Agilent will prove at least one of Agilent's products was used to practice at least one of the asserted claims of the '080 Patent before the expiration of the '080 Patent.

13.      Agilent will prove that it is entitled to corrective advertising damages under 15 U.S.C. § 1117 for Axion's violations of the Lanham Act.

14.      Agilent will prove that it is entitled to enhanced damages under 35 U.S.C. § 284 for Axion's willful infringement of each of the asserted patents.

15.      Agilent will prove, and request the Court finds, that it is entitled to prejudgment and post judgment interest on its damages set forth above.

16.      Agilent will prove, and request the Court finds, that this case is exceptional under 35 U.S.C. § 285 and grant Agilent its attorneys' fees.

## II.      ISSUES ON WHICH AXION BEARS THE BURDEN OF PROOF

17.      Agilent will, to the extent necessary, introduce evidence to rebut Axion's claims related to the invalidity of the Asserted Patents including the issues below.

4

## A.    Invalidity of the Asserted Patents

### 1.    Anticipation

18.    Axion contends claims 1, 3, and 10 of the '080 Patent are invalid as anticipated by the publication entitled "Monitoring of cellular behaviour by impedance measurements on interdigitated electrode structures" ("Ehret"). Axion bears the burden of proof on anticipation by clear and convincing evidence. Agilent will introduce, to the extent necessary, evidence to rebut Axion's assertions.

### 2.    Obviousness

19.    Axion contends that all of the Asserted Claims of the Asserted Patents are invalid as obvious in view of various purported prior art references, either alone or in combination with each other. Axion bears the burden of proof on obviousness by clear and convincing evidence. Agilent will introduce, to the extent necessary, evidence to rebut Axion's assertions. Among other things, Agilent will show that no reference, alone or in combination with one or more other references, discloses each limitation of any claim of the Asserted Claims. Agilent will further show that a person of ordinary skill in the art would not have been motivated to combine the references relied upon by Axion to arrive at the claimed inventions and would not have had a reasonable expectation of successfully doing so.

20.    Agilent will show that objective indicia, including commercial success, industry praise, copying, skepticism, and/or long-felt but unmet need demonstrate that the claimed inventions of the asserted claims would not have been obvious. Agilent will also show that there is nexus between the secondary considerations and the claimed inventions for each Asserted Claim of each Asserted Patent.

# EXHIBIT 8D

**Axion's Motion *in Limine #1***

**AXION MIL NO. 1    Excluding Evidence or Argument Regarding Axion Hiring of Former Agilent Personnel**

### INTRODUCTION

Several current or former Axion employees were, at one time, previously employed at Agilent.  None of these current/former Axion employees were involved in the development of the products at issue for Agilent's patent infringement claims, or the statements about Axion's products that Agilent alleges are false or misleading.  In short, evidence concerning Axion's current/former employees' prior employment at Agilent is not relevant to any issue at trial in this case.

Further, even if such evidence were relevant, any alleged probative value is substantially outweighed by unfair prejudice to Axion.  It would also mislead the jury and risk confusing the issues—e.g., by Agilent intimating that Axion has done something that is somehow improper by hiring employees who were previously with a competitor.  Such evidence has no place in the trial of Agilent's patent and false advertising claims.  This is not a labor dispute, a breach of contract dispute, or any other type of dispute that would require Agilent to introduce evidence that certain former Agilent employees were, at some point, also employed at Axion to prove its claims.

Axion respectfully moves *in limine* to preclude Agilent from introducing any discussion of Axion hiring former Agilent personnel under Federal Rules of Evidence 402 and 403.

### ARGUMENT

Federal Rule of Evidence 402 states that "irrelevant evidence is not admissible."  Fed. R. Evid. 402.  And Rule 403 clarifies that in certain situations courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of . . . unfair prejudice, confusing the issues, [or] misleading the jury[.]"  Fed. R. Evid. 403.  Both rules apply here, as the evidence Agilent seeks to introduce is not relevant and, if admitted, would unfairly prejudice Axion and potentially mislead the jury.

### *Rule 402*

The parties do not dispute that Axion employed William Deacon, Deborah Hurtado, Beth Nigh, James Guo, Alp Aras, and David Ferrick after their time at Agilent.[1]

Deacon joined Axion in June 2020 in Europe.  D.I. 455 at ¶ 84.  Axion employed Hurtado from October 2019 to August 2025.  *Id.*  Nigh worked at Axion from 2019 to November 2023.  *Id.* And Guo joined Axion in August 2018.  *Id.*  Critically, Deacon, Hurtado, Nigh, and Guo are all salespeople; they were not involved in product development at Axion, had no role in development of any of Axion's allegedly infringing products, and were not responsible for the statements underlying Agilent's false advertising claim.  Mention of their status as former Agilent employees is not relevant to the issues in the case.

---

[1] Or at ACEA, the company Agilent acquired in November 2018 and who owned the patents-in-suit and developed the impedance-based cell-analysis products that Agilent still sells.

Mr. Aras was a member of Agilent's corporate development team from October 2017 to June 2021 and joined Axion in January 2023—one month before Agilent filed this lawsuit—following a stint at another company.  D.I. 451 at ¶ 84; D.I. 455 at ¶ 84.  As with the salespeople, Aras's role with Axion's corporate development team has nothing to do with the accused products or any allegedly false or misleading statements.  Indeed, the alleged actions that form the basis of Agilent's claims occurred before Mr. Aras joined Axion.

Finally, Dr. Ferrick was an Associate Vice President at Agilent until he joined Axion as its Chief Scientific Officer in January 2022.  D.I. 455 at ¶¶ 78, 82.  Events that allegedly occurred during Dr. Ferrick's brief tenure at Axion form the basis of Agilent's trade secret claim.[2]  *Id.* at ¶ 90.  Dr. Ferrick departed Axion in July 2023.  *Id.* at ¶ 78.  As with the salespeople and Mr. Aras, Dr. Ferrick had no role in developing Axion's allegedly infringing products, nor was he involved in the statements about Axion's products that Agilent alleges are false or misleading.  Agilent has offered no argument to the contrary.  *See* D.I. 451 at ¶¶ 56-69.

The fact that Deacon, Hurtado, Nigh, Guo, Aras, and Ferrick formerly worked at Agilent before joining Axion has no relevance to Agilent's claims for patent infringement and false advertising.  Their testimony is not admissible under Federal Rule of Evidence 402.  *Corning Inc. v. SRU Biosystems*, No. CIV.A. 03-633 JJF, 2005 WL 2465900, at *6 (D. Del. Oct. 5, 2005) (granting motion *in limine* to exclude evidence that is "irrelevant to the claims at issue"); *Zimmer Surgical, Inc. v. Stryker Corp.*, No. CV 16-679-RGA, 2019 WL 9171206, at *1 (D. Del. Mar. 13, 2019) (excluding evidence irrelevant to infringement).

### *Rule 403*

Even if it were relevant that several former Agilent employees later worked at Axion, the probative value of that evidence is substantially outweighed by the prejudice that Axion would suffer if it were disclosed to the jury.  Specifically, Agilent introducing evidence or argument that Axion hired employees formerly at Agilent may lead the jury to infer that Axion is some type of bad actor building off the time and effort that Agilent has spent training its sales and corporate development employees.  That is, of course, not the case, but the prejudice to Axion stemming therefrom is alone a basis to exclude introduction of these facts at trial.  *See Evolved Wireless, LLC v. Apple Inc.*, No. CV 15-542-JFB-SRF, 2019 WL 1100471, at *3 (D. Del. Mar. 7, 2019) (granting defendant's motion *in limine* because "the prejudicial and confusing effect of the evidence almost certainly outweighs any probative value"); *ICU Med., Inc. v. RyMed Techs., Inc.*, 752 F. Supp. 2d 486, 490 (D. Del. 2010) (excluding evidence that "would risk unduly prejudicing" plaintiff).

For the same reason, this type of evidence could mislead the jury or confuse the issues, which are independent bases to exclude it.  *Id.*; *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, No. 15-CV-152-RGA, 2018 WL 6629705, at *1 (D. Del. Oct. 12, 2018) ("Therefore, even if these matters have marginal probative value, that value is substantially outweighed by the danger of

---

[2] The parties have agreed that any discussion relating to other litigation between the parties (*e.g.*, Case No. 24-cv-00300, D. Del.) and claims (*e.g.*, allegations of trade secret misappropriation by Ferrick or Axion) is not relevant to the January 2026 trial on Agilent's patent infringement and false advertising claims and that neither party will reference such litigation or claims at this trial.

2

confusing the issues [and] misleading the jury[.]"); *Zimmer*, 2019 WL 9171206 at \*1 (excluding evidence that would cause confusion at trial).

The real reason Agilent wants the jury to know that Axion hired employees that once worked at Agilent is to paint Axion in a bad light. To confirm, the Court need look no further than Agilent's Third Amended Complaint. *See* D.I. 451 at ¶¶ 49 ("Moreover, ***Axion engaged in a course of acquiring personnel*** at all levels from Agilent and Agilent-acquired companies in the technology space at issue in this case, to place them in various roles at Axion, ranging from sales to management of Axion's competing technologies in the same space, facilitating the flow of information concerning Agilent's products and the Asserted Patents, from Agilent to Axion."), 51 ("***Another example of Agilent acquiring knowledgeable personnel from Agilent*** was Axion's hiring of employees involved in the sales of [Agilent's] xCELLIgence platform, specifically Deborah Hurtado and William Deacon . . . . Both Ms. Hurtado and Mr. Deacon had been employed at Agilent, for years, selling the xCELLIgence platform, when Axion hired them away from Agilent to sell Axion's competing Maestro Platforms."); *see also id.* at ¶¶ 78-88 (discussing Ferrick, Deacon, Hurtado, Nigh, Guo, and Aras in a subsection titled "Axion's Hiring Away of Agilent Personnel" in connection with Agilent's trade secret misappropriation claims). Preventing Agilent from arguing or implying that Axion "hired someone formerly employed by [Agilent] or its predecessors for a nefarious purpose or to gain an unfair advantage" is precisely Axion's concern here. *See Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-744-JRG-RSP, 2016 WL 3618831, at \*3 (E.D. Tex. Mar. 1, 2016) (granting motion *in limine*).

## CONCLUSION

That the identified former/current Axion employees also previously worked at Agilent has no bearing on the claims and defenses in the January 2026 trial on Agilent's patent infringement and false advertising claims. This evidence is not relevant to Agilent's claims, and it also has the potential to unfairly prejudice Axion, confuse the issues, and mislead the jury. It should be excluded.

**Agilent's Response to Axion's Motion *in Limine #1***

███████████████████████████████

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AGILENT TECHNOLOGIES, INC.,     )

                       )

           Plaintiff,      )

                       )

     v.              )  C.A. No. 23-198 (CJB)

                       )

AXION BIOSYSTEMS, INC.,      )  ████████████████

                       )

           Defendant.     )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* #1
## TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING
## <u>AXION HIRING OF FORMER AGILENT PERSONNEL</u>

<table>
<tr>
<td>

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 23, 2025

</td>
<td>

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

</td>
</tr>
</table>

██████████████████████████████

Plaintiff, Agilent Technologies, Inc. ("Agilent"), respectfully opposes Defendant, Axion Biosystems, Inc.'s ("Axion's"), Motion *in Limine* ("MIL") No. 1, which seeks a blanket order excluding "any discussion of Axion hiring former Agilent personnel" under Federal Rules of Evidence ("FRE") 402 and 403. FRE 402 provides that relevant evidence is generally admissible, and FRE 403 provides that evidence that is relevant may only be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Contrary to the assertions in Axion's motion, the targeted evidence is directly relevant to Agilent's claims for patent infringement, false advertising, and its damages case. This relevance is not substantially outweighed by any prejudice to Axion, which is at best minimal. As a result, evidence of Axion's hiring of former Agilent personnel should not be preclude from disclosure at trial. Axion has not cited a single case where similar evidence of employee knowledge and experience from a former employer was excluded as irrelevant. Axion's MIL No. 1 should be denied.

**The Targeted Evidence is Relevant to Agilent's Claims.** Axion argues that Axion's hiring away of Agilent (or predecessor, ACEA) personnel "has no relevance to Agilent's claims." Evidence is relevant if it has any tendency to make a consequential fact more or less probable, and relevant evidence is admissible. *See* FRE 401, 402. As noted, the evidence that Axion seeks to exclude is relevant to Agilent's patent and false advertising claims because it shows at least: Axion's knowledge of the asserted patents, relevant to Agilent's allegations of induced, contributory, and willful infringement; secondary considerations of non-obviousness, specifically, copying; and the direct competition between Axion and Agilent, relevant to Agilent's patent damages and false advertising cases.

**Knowledge of Patents Relevant to Indirect and Willful Infringement.** The knowledge and experience of these former Agilent employees support Agilent's claim that Axion had knowledge of the asserted patents and technology and is directly relevant at least to Agilent's claims of induced, contributory, and willful infringement. *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018) ("Circumstantial evidence can support a finding of specific intent to induce infringement.") (citing *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010); *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379-1380 (Fed. Cir. 2017) (finding that the plaintiff's allegation that the defendant had hired former employees with direct knowledge of an infringed patent was sufficient to plausibly allege pre-suit knowledge of the patents); *10x Genomics, Inc. v. Celsee, Inc.*, C.A. No. 19-862-CFC-SRF, 2019 WL 5595666, at *3 (D. Del. Oct. 30, 2019) (finding allegation of a party hiring away a party's employees provided relevant background for induced infringement, willful infringement, and non-obviousness). Axion's arguments to the contrary have no merit. The former Agilent personnel's knowledge of the asserted patents makes it more probable that Axion knew of the asserted patents and knew that its activity was infringing. For example, in October 2019, ███████████████ ████████████████████████████████████████████████████████ ███████████████████████████. *See* Ex. A. Ms. Hurtado also provided Stacie Chvatal, Axion's Vice President of Product Management, and Daniel Millard, Axion's Vice President of Research and Development, ██████████████████████ ██████████████████████████████████████ *See* Ex. B.

1

Axion also argues that Axion's hiring away of Agilent/ACEA personnel is irrelevant because they allegedly "had no role in development of any of Axion's allegedly infringing products." Yet, Axion ignores several examples of Axion seeking input from these former Agilent personal on the development of Axion's impedance products or providing information that evidences Axion's desire to copy Agilent and ACEA.[1] For example,

*See* Ex. C at 1.

*See* Ex. D at 2.

**Hiring Away Tied to Copying Supports Nonobviousness.**  Axion's hiring of former Agilent personnel is also relevant to Agilent's secondary considerations of nonobviousness, as it shows Axion's efforts to copy Agilent products and technology. Ex. K at 6,12; *see also Liqwd, Inc. v. L'Oréal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019) ("It is well established that copying by a competitor is a relevant consideration in the objective indicia analysis."). For example, in July 2020,

. *See* Ex. F at 2. Following this discussion,

*See* Ex. G at 28.

**Use of Agilent Know How Relevant to Patent Damages.**  Axion's hiring away of Agilent's sales representatives who brought their knowledge from Agilent and ACEA bears directly on reasonable royalty and lost profit patent damages. *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (noting competition between the hypothetical licensor and the licensee affects reasonable royalties); *WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d 1067, 1072-73 (Fed. Cir. 2019) (noting lost profits require a showing that "the patent owner's and the infringer's *products* are adequate substitutes"). Here, there are several examples of Agilent's and Axion's direct competition and the substitutability of Agilent's and Axion's products as former Agilent personnel using their knowledge of Agilent's products and technology, obtained during their time at Agilent, to sell Axion's competing infringing products.

*See* Ex. H at 1.

*See* Ex. I.

*See* Ex. F at 3, 6. In yet another example,

---

[1]  As noted in Axion's MIL No. 1, the patented technology was developed at ACEA, which Agilent acquired in November 2018.

[2]  "Heather Hayes was a part of the product management team and technical team" at Axion in 2020. Ex. E (Transcript of January 25, 2025 Deposition of Will Deacon) at 90:15-18.

2

*See* Ex. J at 2-3

; *see also* Ex. E at 93:11-96:6.  Mr. Deacon also testified directly concerning the overlap in his impedance customers earlier at ACEA and then later at Axion. Ex. E at 103:15-105:8.

**Use of Agilent Know How Relevant to False Advertising.**  Axion's hiring of Agilent's personnel is further evidence of the competition between Agilent and Axion. *ATC Healthcare Servs. v. RCM Techs., Inc.*, 192 F. Supp. 3d 943, 957 (N.D. Ill. 2016). This competition bears directly on the injury and materiality elements of Agilent's false advertising claim. *See Trustid, Inc. v. Next Caller, Inc.*, No. 18-172 (MN), 2022 WL 318299, at *9 n.16 (holding that the false advertising injury element was met where the parties were in direct competition for customers); *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics*, 843 F.3d 48, 70-71 (2d Cir. 2016) (finding statements are material when parties "are competitors in the same market").

**There is No Risk of Unfair Prejudice.** The probative value of the targeted evidence is substantial as it relates directly to Axion's knowledge of the asserted patents, copying, and direct competition—core issues for inducement, willfulness, non-obviousness, and damages—and provides necessary factual context for the jury. Axion claims that any probative value provided by this evidence is "substantially outweighed by the prejudice that Axion would suffer if it were disclosed to the jury," but the probative value is not diminished merely because the evidence is unfavorable to Axion.  FRE 403 applies only where **unfair** prejudice **substantially** outweighs probative value. Such is not the case here as Agilent seeks only to introduce factual statements about the knowledge and experience of the former Agilent personnel, without any "nefarious purpose." *See Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-744-JRG-RSP, 2016 WL 3618831, at *3 (E.D. Tex. Mar. 1, 2016) (holding parties could make factual statements about prior employment history as long as they did not imply hiring was for a "nefarious purpose.").

While Axion notes this evidence may also be relevant for Agilent's trade secret claim, not currently at issue for this trial, the evidence remains relevant to Agilent's patent infringement, false advertising, and damages claims. Any perceived prejudice is further mitigated because Agilent already agreed not to reference other litigation and claims between the parties during this trial. Thus, there is no risk or danger of prejudice to Axion, and if any such risk exists, it fails to substantially outweigh the probative value of the evidence. Axion's motion therefore should be denied.

**Conclusion.** Axion's requested blanket exclusion under FRE 402 and 403 should be denied. Axion's hiring of former Agilent/ACEA employees is relevant to Agilent's claims, and it also has little to no potential to unfairly prejudice Axion, confuse the issues, or mislead the jury. As a result, it should not be excluded, and Agilent respectfully requests the Court deny Axion's Motion *in Limine* #1. To the extent the Court determines any limits are warranted, the appropriate remedy is a tailored order and limiting instruction, not a blanket ban. *Hologic, Inc. et al. v. Minerva Surgical, Inc.*, C.A. No. 15-1031-JFB-SRF, 2018 WL 3348998, at *1 (D. Del. July 9, 2018) (noting broad evidentiary rulings should generally be deferred until trial).

3

████████████████████████

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Travis J. Murray*

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 23, 2025

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2025, copies of the foregoing were caused to be

served upon the following in the manner indicated:

John G. Day, Esquire                                      *VIA ELECTRONIC MAIL*
Andrew C. Mayo, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
*Attorneys for Defendant Axion Biosystems, Inc.*

David M. Maiorana, Esquire                               *VIA ELECTRONIC MAIL*
JONES DAY
901 Lakeside Avenue
Cleveland, OH  44114
*Attorneys for Defendant Axion Biosystems, Inc.*

Ryan K. Walsh, Esquire                                   *VIA ELECTRONIC MAIL*
Geoffrey K. Gavin, Esquire
Laura M. Kanouse, Esquire
Rachel Krutz, Esquire
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA  30361
*Attorneys for Defendant Axion Biosystems, Inc.*

Anna E. Raimer, Esquire                                  *VIA ELECTRONIC MAIL*
JONES DAY
717 Texas Street, Suite 3300
Houston, TX  77002-2712
*Attorneys for Defendant Axion Biosystems, Inc.*

Collin J. Kurtenbach, Esquire                            *VIA ELECTRONIC MAIL*
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL  60606
*Attorneys for Defendant Axion Biosystems, Inc.*


*/s/ Travis J. Murray*
_____
Travis J. Murray (#6882)

# Exhibit A

| | |
|---|---|
| **From:** | Tom O'Brien[OBrien@axionbio.com] |
| **Sent:** | Sun 10/20/2019 12:01:49 AM (UTC) |
| **To:** | James Ross[jross@axionbio.com]; Jim Filippini[jfilippini@axion-biosystems.com]; Mike Clements[mclements@axion-biosystems.com] |
| **Subject:** | Fwd: thanks |

FYI.

---------- Forwarded message ---------
From: **Debby Hurtado** <debbyhurtadosc@gmail.com>
Date: Sat, Oct 19, 2019 at 5:47 PM
Subject: Re: thanks
To: Tom O'Brien <OBrien@axionbio.com>

I'm really looking forward to working with you all!  Enjoy the rest of the weekend.

Best, Debby

On Oct 19, 2019, at 7:31 AM, Tom O'Brien <OBrien@axionbio.com> wrote:

Hello Debby,





We are looking forward to you starting and "killing it" at Axion.  See you soon.
Tom O'Brien
President and Chief Executive Officer

--
Sent from Gmail Mobile

# Exhibit B

| | |
|---|---|
| **From:** | Debby Hurtado [dhurtado@axion-biosystems.com] |
| **Sent:** | 1/13/2020 1:57:20 PM |
| **To:** | Stacie Chvatal [schvatal@axion-biosystems.com]; Daniel Millard [dmillard@axion-biosystems.com] |
| **CC:** | Tom O'Brien [OBrien@axionbio.com]; Dan Amend [damend@axion-biosystems.com] |
| **Subject:** | RE: Spec sheet for Maestro Z |
| **Attachments:** | ACEA xCELLigence SP Sole Source 2015.docx; Axion Maestro Z Sole Source.docx |



If this is acceptable, I will send off to Cheryl.

Thanks a bunch!

Best, Debby



**From:** Stacie Chvatal <schvatal@axion-biosystems.com>
**Sent:** Monday, January 13, 2020 1:13 PM
**To:** Debby Hurtado <dhurtado@axion-biosystems.com>; Daniel Millard <dmillard@axion-biosystems.com>
**Subject:** Re: Spec sheet for Maestro Z

Hi Debby,

Thanks,
Stacie

Stacie Chvatal, PhD
Product Manager, MEA and Optogenetic Systems
Axion BioSystems
schvatal@axionbio.com

www.axionbio.com

AXION-0666365

On Mon, Jan 13, 2020 at 1:09 PM Debby Hurtado <dhurtado@axion-biosystems.com> wrote:

███████████████████████████████████████████████

Best, Debby



**From:** Debby Hurtado <dhurtado@axion-biosystems.com>
**Sent:** Monday, January 13, 2020 1:08 PM
**To:** 'Stacie Chvatal' <schvatal@axion-biosystems.com>
**Subject:** RE: Spec sheet for Maestro Z

Hi Stacie,

███████████████████████████████████████████████
███████████████████████████████████████████████

Best, Debby



**From:** Stacie Chvatal <schvatal@axion-biosystems.com>
**Sent:** Monday, January 13, 2020 11:45 AM
**To:** Debby Hurtado <dhurtado@axion-biosystems.com>
**Cc:** Heather Hayes <hhayes@axion-biosystems.com>
**Subject:** Re: Spec sheet for Maestro Z

Hi Debby,

AXION-0666366

All of the tech specs are in the Maestro Z hardware guide. Is that what you mean, or is there something else required?

Thanks,

Stacie

Stacie Chvatal, PhD

Product Manager, MEA and Optogenetic Systems
Axion BioSystems

schvatal@axionbio.com

www.axionbio.com

On Mon, Jan 13, 2020 at 11:44 AM Debby Hurtado <dhurtado@axion-biosystems.com> wrote:

Hi Heather,

Thanks!
Debby

Deborah Hurtado

Account Manager - Southeast

Axion BioSystems

dhurtado@axionbio.com

Phone: 843.973.2249

AXION-0666367



www.axionbio.com



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## xCELLigence® Real Time Cell Analyzer Single Plate (SP) System - Sole Source Document

ACEA Biosciences offers a revolutionary platform for real time label free cell analysis. The xCELLigence® RTCA SP System provides state of the art impedance based cellular analysis in a non-invasive format aiding in the advancement of basic research, drug discovery, and safety efficacy.  ACEA Biosciences is the manufacturer and sole distributor of the xCELLigence® product line in the US.

The following specifications set the RTCA SP system apart from other instruments, as the combination of features and benefits listed here is not available from other suppliers in the marketplace.

- The patented inter-digitated gold electrode pattern covers approximately 70-80% of the surface area of E-Plate wells, thus maximizing sensitivity and reproducibility. All components of the E-Plate are biocompatible and the microplates are sterile and tissue-culture treated.

- The dynamic range of the system approaches 2 logs of cell growth – from 100 cells per well to confluence (depending on cell type).

- Well-to-well precision and accuracy are excellent, with typical well-to-well CVs less than 10%.

- The xCELLigence® RTCA SP Station can be placed in a standard tissue culture incubator and is specifically designed to withstand the high temperature and humidity.

- xCELLigence® E Plate View 96 are uniquely designed so cells can be imaged directly on the devices through a specially designed area using a standard laboratory microscope.

- The versatility and design of the xCELLigence® RTCA SP System allows it to be used for a broad range of research applications, including cell proliferation, cytotoxicity, cell adhesion, RTK, GPCR, RNAi functional assays, natural killer cell activity, ADCC, CDC, viral neutralizing antibody detection, and bacterial toxin neutralizing antibody detection.

- The xCELLigence® RTCA SP System is the only system that allows the standard E Plate 96, E Plate 96 view Plate to be used interchangeably.

- The xCELLigence® data analysis software package is fully integrated into the control software and offers specialized algorithms such as – slope, cell index doubling time, and EC50/ IC50 calculations based on maximum cell index, minimum cell index, area under the curve, and time dependent cell index values.

- The xCELLigence® RTCA SP System is built with minimal moving parts to reduce service repairs and does not require any calibration to maintain proper function.

- All ACEA Biosciences instrumentation and consumables are manufactured under ISO 9001.

The xCELLigence RTCA System is a real-time cell based assay system covered by US patent No.7,192,752, 7,459,303, 7,468,255, 7,470,533, 7,560,269, 7,732,127, 7,867,108, 8,026,080, 8,041,505; European patent applications 03748948.1, 03751801.6 and 04801001.1, 05722991.6, 05786773.1, and other patents and patent applications owned by ACEA Biosciences, Inc..

Sincerely,

Jeff Irelan
Director, Applications & Technical Services
ACEA Biosciences

AXION-0666369

# Exhibit C

| | |
|---|---|
| From: | Google Calendar [calendar-notification@google.com] |
| Sent: | 6/5/2020 2:57:24 PM |
| To: | gdefilippi@axionbiointl.com |
| Subject: | Accepted: GoToMeeting Invitation - ACEA software for impedance over... @ Thu 11 Jun 2020 16:00 - 17:00 (BST) (gdefilippi@axionbiointl.com) |
| Attachments: | invite.ics |
| Start: | 6/11/2020 11:00:00 AM |
| End: | 6/11/2020 12:00:00 PM |
| Show Time As: | Busy |
| Recurrence: | (none) |

**Daniel Millard has accepted this invitation.**

## GoToMeeting Invitation - ACEA software for impedance overview & feedback on customer most wanted features

When    Thu 11 Jun 2020 16:00 – 17:00 United Kingdom Time

Calendar    gdefilippi@axionbiointl.com

Who
- gdefilippi@axionbiointl.com – organiser
- James Ross
- Stacie Chvatal
- Daniel Millard
- Mike Clements
- wdeacon@axionbiointl.com
- David Stahl

Thu, Jun 11, 2020 4:00 PM – 5:00 PM (BST) - 11:00 AM – 12:00 AM (EDT)

Please join my meeting from your computer, tablet or smartphone.

https://global.gotomeeting.com/join/866015669

You can also dial in using your phone.
(For supported devices, tap a one-touch number below to join instantly.)

United States: +1 (646) 749-3129
- One-touch: tel:+16467493129,,866015669#

Access Code: 866-015-669

AXION-0320326

More phone numbers:
(For supported devices, tap a one-touch number below to join instantly.)


United Kingdom: +44 330 221 0088
- One-touch: tel:+443302210088,,866015669#


New to GoToMeeting? Get the app now and be ready when your first meeting starts:
https://global.gotomeeting.com/install/866015669

---

Invitation from Google Calendar

You are receiving this email at the account gdefilippi@axionbiointl.com because you are subscribed for invitation replies on calendar gdefilippi@axionbiointl.com.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organiser and be added to the guest list, invite others regardless of their own invitation status or to modify your RSVP. Learn more.

AXION-0320327

# Exhibit D

| | |
|---|---|
| **From:** | Debby Hurtado [dhurtado@axion-biosystems.com] |
| **Sent:** | 9/9/2020 12:48:43 PM |
| **To:** | Stacie Chvatal [schvatal@axion-biosystems.com] |
| **Subject:** | RE: xCELLigence software |



Best, Debby

Deborah Hurtado
Technical Account Manager – Southeast
843-973-2249
https://www.axionbio.com



**From:** Stacie Chvatal <schvatal@axion-biosystems.com>
**Sent:** Wednesday, September 9, 2020 12:23 PM
**To:** Debby Hurtado <dhurtado@axion-biosystems.com>
**Subject:** Re: xCELLigence software

Thanks,
Stacie

Stacie Chvatal, PhD
Product Manager, MEA and Optogenetic Systems
Axion BioSystems
schvatal@axionbio.com
https://www.axionbio.com

AXION-0770597

On Wed, Sep 9, 2020 at 12:19 PM Debby Hurtado <dhurtado@axion-biosystems.com> wrote:

Best, Debby

Deborah Hurtado

Technical Account Manager – Southeast

843-973-2249

https://www.axionbio.com

**AXION**
**BIOSYSTEMS**
explore life's circuitry™

**From:** Stacie Chvatal <schvatal@axion-biosystems.com>
**Sent:** Wednesday, September 9, 2020 11:54 AM
**To:** Debby Hurtado <dhurtado@axion-biosystems.com>
**Subject:** Re: xCELLigence software

Hi Debby,

Thanks,

Stacie

Stacie Chvatal, PhD

AXION-0770598

Product Manager, MEA and Optogenetic Systems
Axion BioSystems

schvatal@axionbio.com

https://www.axionbio.com



On Wed, Sep 9, 2020 at 10:23 AM Debby Hurtado <dhurtado@axion-biosystems.com> wrote:

Hi Stacie,



Debby


Deborah Hurtado

Technical Account Manager – Southeast US

Axion BioSystems

dhurtado@axionbio.com

Phone: 843.973.2249

https://www.axionbio.com



AXION-0770599

*"Every accomplishment starts with the decision to try."* – John F. Kennedy

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit E

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


AGILENT TECHNOLOGIES, INC.,      )  C.A. No. 23-198(CJB)
                                 )
                  Plaintiff,     )
                                 )
        v.                       )
                                 )
AXION BIOSYSTEMS, INC.,          )
                                 )
                  Defendant.     )
_____ )


████████████████████████████████


VIDEOTAPED DEPOSITION OF WILLIAM DEACON

January 25, 2025

8:48 a.m.

1221 Peachtree Street, NE, Suite 400

Atlanta, Georgia


Reported by:  Marcella Daughtry, RPR, RMR

CA CSR 14315

GA No. 6595-1471-3597-5424


Page 1



Heather."

A   Oh, yes.

Q   But then below that, I just want to be clear, there's another -- it looks like another e-mail on the same day at 1:02 p.m. mailed to wdeacon@axionbiointl.com?

A   Yes.

Q   And that's another e-mail from Heather, do you believe so?

A   Yes.

Q

First of all, who was Heather Hayes at the time?

A   Heather Hayes was a part of the product management team and technical team.

Q

Q   Let's move forward in the document to Bates page ending in 51.  And I'll actually go -- actually, go

Page 90

identification.)

Q    BY MR. CHASSMAN:  I'm handing you Exhibit 9.

MR. WALSH:  Sorry, do you want to mark it with one of --

MR. CHASSMAN:  Did I not?

MR. WALSH:  No, you just wrote on it.

MR. CHASSMAN:  Geez.  Thank you.

MR. WALSH:  It's a long week.

MR. CHASSMAN:  That's what happens.

MR. WALSH:  Yeah.

Q    BY MR. CHASSMAN:  Okay.  Mr. Deacon, I'm handing you Exhibit 9 back, noting that the handwritten number 9 on there did not appear in the original.

This is Bates numbers AXION-0533110 through 112.

Have you had a chance to review that, Mr. Deacon?

A    Yes.

Q    Do you recognize this as an e-mail exchange to which you were a party?

A    Yes.

Q    If we go to the bottom of the second page, 111, do you see an e-mail from Stacie Chvatal, October 20th, 2021, at 1:57 p.m.?

A    The second?

Veritext Legal Solutions
346-293-7000



Q    The bottom of 111.

A    Yes.

Q    Okay.   So it's an October 20th, 2021 e-mail from Stacie Chvatal to Debby and you, correct?

A    Yes.

Q    And the Debby is Debby Hurtado, right?

A    Yes.

Q

A

Page 94



Q    Thank you.

Let's go to the front page of this document, the bottom, an e-mail from you at 4:27 p.m. on October 20th, 2021.

Do you see that?

A    Yes.

Q

Q    Okay.  I'm gonna skip in the e-mail to the next page.  You then say,

Page 95

When you are making reference to the engineer, who are you referring to?

A    I believe I would have been referring to Martin Toy.

Q    And what was his role?

A    Field engineer.

Q    All right.  Let's put that one aside.

Actually, sorry.  You know, there was a reference in the e-mail to a competitive situation with Agilent, the first part of the e-mail we looked at.  Do you have an understanding of what the competitive situation was?

A    Please, would you give me a page reference.

Q    If we start at the bottom of 111, just the very beginning of the "Hi Debby and Will" e-mail of October 20, 2021 at 1:57 p.m.

A    Uh-huh.

Q    

A    I don't remember, no.

Q    You can put that one aside.

(Deposition Exhibit No. 10 was marked for identification.)

Page 96



[redacted]

system. [redacted]

[redacted]

Q [redacted]

[redacted]

Page 104



Do you see that?

MR. WALSH:  I'm sorry, which page are you on?

MR. CHASSMAN:  662.

MR. WALSH:  662.  I'm sorry.

Q  BY MR. CHASSMAN:  I'll reread it.  It says,

Do you see that?

A  Yes.

Q  Who is David Ferrick?

A  David Ferrick had a leadership position at Agilent, but I'm unsure as to his specific job title.

Page 105

# Exhibit F

| From: | Stacie Chvatal [schvatal@axion-biosystems.com] |
|---|---|
| Sent: | 7/20/2020 2:47:36 PM |
| To: | Heather Hayes [hhayes@axion-biosystems.com]; Daniel Millard [dmillard@axion-biosystems.com] |
| Subject: | Fwd: RE CART |



Thanks,
Stacie



Stacie Chvatal, PhD
Product Manager, MEA and Optogenetic Systems
Axion BioSystems
schvatal@axionbio.com

www.axionbio.com



---------- Forwarded message ---------
From: <wdeacon@axionbiointl.com>
Date: Sat, Jul 18, 2020 at 6:47 AM
Subject: RE CART

AXION-0111150

To: Heather Hayes <hhayes@axion-biosystems.com>, Stacie Chvatal <schvatal@axion-biosystems.com>, Daniel Millard <dmillard@axion-biosystems.com>



Will Deacon
Account Manager, Northern Europe
Axion BioSystems
Email: mailto:wdeacon@axionbiointl.com
Phone: +44 (0)7940 546 317

https://www.axionbiosystems.com/coffee-break-webinars

From: Heather Hayes <hhayes@axion-biosystems.com>
Sent: Friday, July 17, 2020 9:50 PM
To: Will Deacon <wdeacon@axionbiointl.com>; Stacie Chvatal <schvatal@axion-biosystems.com>
Subject: Re: CART

Hi Will,

Stacie and I are available right now. Are you? She's got about 30 minutes of availability.

Regards,
Heather

On Fri, Jul 17, 2020 at 4:47 PM Heather Hayes <mailto:hhayes@axion-biosystems.com> wrote:
Hi Will,

I can have a quick call. Trying to see if Stacie's around as well as she may be more familiar with Xiaoyu's demo.

Regards,

AXION-0111151

Heather

On Fri, Jul 17, 2020 at 4:17 PM <mailto:wdeacon@axionbiointl.com> wrote:
Hi Heather,

Any chance for a quick call please?

███████████████████████████████████████████████████

Maybe we can share screen.

Thanks

Will

Will Deacon
Account Manager, Northern Europe
Axion BioSystems
Email: mailto:wdeacon@axionbiointl.com
Phone: +44 (0)7940 546 317


https://www.axionbiosystems.com/coffee-break-webinars


From: Heather Hayes <mailto:hhayes@axion-biosystems.com>
Sent: Thursday, July 16, 2020 2:52 PM
To: Will Deacon <mailto:wdeacon@axionbiointl.com>
Subject: Re: Barrier function? GPCR training file...

███████████████████████████████████████████████████

On Thu, Jul 16, 2020 at 4:29 AM <mailto:wdeacon@axionbiointl.com> wrote:
███████████████████████████████████████████████████

Will Deacon
Account Manager, Northern Europe
Axion BioSystems
Email: mailto:wdeacon@axionbiointl.com
Phone: +44 (0)7940 546 317


https://www.axionbiosystems.com/coffee-break-webinars


From: Heather Hayes <mailto:hhayes@axion-biosystems.com>
Sent: Thursday, July 16, 2020 1:57 AM
To: Will Deacon <mailto:wdeacon@axionbiointl.com>

AXION-0111152

Subject: Re: Barrier function? GPCR training file...

On Wed, Jul 15, 2020 at 8:48 PM Heather Hayes <mailto:hhayes@axion-biosystems.com> wrote:
Hi Will,

Regards,
Heather

---------- Forwarded message ---------
From: <mailto:wdeacon@axionbiointl.com>
Date: Wed, Jul 15, 2020 at 2:38 PM
Subject: Barrier function? GPCR training file...
To: Heather Hayes <mailto:hhayes@axion-biosystems.com>

Hi Heather,

Best wishes,

Will

Will Deacon

AXION-0111153

Account Manager, Northern Europe
Axion BioSystems
Email: mailto:wdeacon@axionbiointl.com
Phone: +44 (0)7940 546 317

https://www.axionbiosystems.com/coffee-break-webinars

From: Heather Hayes <mailto:hhayes@axion-biosystems.com>
Sent: Tuesday, July 14, 2020 9:09 PM
To: Will Deacon <mailto:wdeacon@axionbiointl.com>
Subject: Re: URGENT QUESTIONS



Thanks for clarifying!

On Tue, Jul 14, 2020 at 4:05 PM Heather Hayes <mailto:hhayes@axion-biosystems.com> wrote:



On Tue, Jul 14, 2020 at 4:02 PM <mailto:wdeacon@axionbiointl.com> wrote:
Hiya,

See the user manual for sample preparation in relation to the conductivity of the buffer.

Thanks

Will

Will Deacon
Account Manager, Northern Europe
Axion BioSystems
Email: mailto:wdeacon@axionbiointl.com

AXION-0111154

Phone: +44 (0)7940 546 317

https://www.axionbiosystems.com/coffee-break-webinars

From: Heather Hayes <mailto:hhayes@axion-biosystems.com>
Sent: Tuesday, July 14, 2020 8:50 PM
To: Will Deacon <mailto:wdeacon@axionbiointl.com>
Cc: Stacie Chvatal <mailto:schvatal@axion-biosystems.com>; Anthony Nicolini <mailto:anicolini@axion-biosystems.com>
Subject: Re: URGENT QUESTIONS



Regards,
Heather

On Tue, Jul 14, 2020 at 3:20 PM Heather Hayes <mailto:hhayes@axion-biosystems.com> wrote:
Hi Will,



Regards,
Heather

CONFIDENTIAL                                                                    AXION-0111155

On Tue, Jul 14, 2020 at 1:38 PM Heather Hayes <mailto:hhayes@axion-biosystems.com> wrote:
Hi Will,

Anytime this afternoon is fine. I'm in the office until 5:30 or so.

Regards,
Heather

On Tue, Jul 14, 2020 at 1:33 PM <mailto:wdeacon@axionbiointl.com> wrote:
Hi, thanks both for your responses.

I've watched the video and yes Heather I would appreciate a call.

When would be convenient for you please?

Thanks

Will

Will Deacon
Account Manager, Northern Europe
Axion BioSystems
Email: mailto:wdeacon@axionbiointl.com
Phone: +44 (0)7940 546 317

https://www.axionbiosystems.com/coffee-break-webinars

From: Heather Hayes <mailto:hhayes@axion-biosystems.com>
Sent: Tuesday, July 14, 2020 6:19 PM
To: Will Deacon <mailto:wdeacon@axionbiointl.com>
Cc: Stacie Chvatal <mailto:schvatal@axion-biosystems.com>; Anthony Nicolini <mailto:anicolini@axion-biosystems.com>
Subject: Re: URGENT QUESTIONS

Hi Will,

I can hop on a call this afternoon if it would be helpful.

Regards,
Heather

On Tue, Jul 14, 2020 at 1:02 PM <mailto:wdeacon@axionbiointl.com> wrote:
Hi everyone,

Who can help answer these question for me please? If possible on a call I can be flexible.

AXION-0111156



Thanks very much and sorry for the urgent email...!

Will

Will Deacon
Account Manager, Northern Europe
Axion BioSystems
Email: mailto:wdeacon@axionbiointl.com
Phone: +44 (0)7940 546 317


https://www.axionbiosystems.com/newsletter


--


Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com


--


Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

AXION-0111158

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

AXION-0111159

--

Heather Hayes, PhD
Senior Applications Scientist
Axion BioSystems
mailto:hhayes@axionbio.com
http://www.axionbio.com

AXION-0111160

# Exhibit G



# GxP Impedance Module

Field Team Training



**Imagine • Explore • Discover**



# Agenda

- ████████████████

████████████████████

████████████████████████████████████

████████████████████████

██████████████

██████████









# Axion's 21 CFR Part 11 Statement







# GxP Impedance Module – Software Training

## Overview





- ██████████████████████████████████████████████████████████████████████
  ████████████████████████████████



# Activate GxP Impedance Module

## Activate module in AxIS Z (or AxIS Navigator) Help menu

Click **Activate Module…** and select the module activation key (.xlic file)









-



























Screen shot here





















axionbiosystems.com









# Other AxIS Z and Maestro features that support compliance

- ██████████

  ████████████████████████████████

  ██████████████████████████

██████████████

████████████████████████████████████████

████████████

████████████████████████████████

████████████

███████████████████████████████████████████████

████████████████████

████████████████████████████████████

████████████████████████████

█████████████████████████████████████████

████████████





# ISO-based validation of the Maestro impedance assay

## Heather Hayes





-











# Q&A

# Exhibit H

| | |
|---|---|
| **From:** | Tom O'Brien[OBrien@axionbio.com] |
| **Sent:** | Thur 8/1/2019 7:52:35 PM (UTC) |
| **To:** | Debby SouthCarolina[debbyhurtadosc@gmail.com] |
| **Bcc:** | jfilippini@axion-biosystems.com[jfilippini@axion-biosystems.com] |
| **Subject:** | Re: meeting today |



Tom O'Brien
President and Chief Executive Officer



On Thu, Aug 1, 2019 at 12:50 PM Debby SouthCarolina <debbyhurtadosc@gmail.com> wrote:



Thanks for giving me access to the resources. Lots of reading and learning to do!  :-)

Best, Debby

On Wed, Jul 31, 2019 at 10:52 AM Tom O'Brien <OBrien@axionbio.com> wrote:



Tom O'Brien
President and Chief Executive Officer



On Wed, Jul 31, 2019 at 9:59 AM Debby SouthCarolina <debbyhurtadosc@gmail.com> wrote:

Hi Tom,

Just saw the LinkedIn post and information on Z.  Wow. VERY nice addition to the portfolio of products!   :-)

Best, Debby

On Tue, Jul 30, 2019 at 7:24 PM Debby Hurtado <debbyhurtadosc@gmail.com> wrote:

Thanks! Have a nice evening.
Debby

Deborah Hurtado
Regional  Sales Manager - Southeast
ACEA Biosciences, a part of Agilent
843-801-5819
deborah.hurtado@agilent.com

On Jul 30, 2019, at 4:55 PM, Tom O'Brien <OBrien@axionbio.com> wrote:

I will let folks know to give you access.

Tom O'Brien
President and Chief Executive Officer

On Tue, Jul 30, 2019 at 4:30 PM Debby SouthCarolina
<debbyhurtadosc@gmail.com> wrote:

Hi Tom and Jim,
I went to the website to download some resources to learn more about the



Talk to you soon,
Debby

On Thu, Jul 25, 2019 at 11:45 AM Tom O'Brien <OBrien@axionbio.com>
wrote:

Thanks, Debby.  It was good to meet you as well.  Let me caucus with Jim
Filippini and get back to you.

Regards,
Tom O'Brien
President and Chief Executive Officer



Axion BioSystems, Inc
1819 Peachtree Road, Suite 350
Atlanta, GA 30309
www.axionbio.com

On Wed, Jul 24, 2019 at 1:21 PM Debby SouthCarolina
<debbyhurtadosc@gmail.com> wrote:



I look forward to hearing back from you about next steps!

Best ,
Debby

# Exhibit I

**From:** Tom O'Brien [OBrien@axionbio.com]
**Sent:** 1/28/2019 2:17:30 PM
**To:** James Ross [jross@axionbio.com]
**CC:** Jim Filippini [jfilippini@axion-biosystems.com]; Mike Clements [mclements@axion-biosystems.com]
**Subject:** Re: Notes from Beth Interview and other suggested pre-read materials for offsite planning



Regards,
Tom O'Brien
President and Chief Executive Officer

Axion BioSystems, Inc
1819 Peachtree Road, Suite 350
Atlanta, GA 30309
www.axionbio.com

On Tue, Jan 29, 2019 at 2:42 AM James Ross <jross@axionbio.com> wrote:
Hi All,



Jim

--
Jim Ross, PhD
Chief Technology Officer
Axion Biosystems
www.axionbio.com

AXION-0631869

AXION-0631870

# Exhibit J

| From: | Stacie Chvatal [schvatal@axion-biosystems.com] |
|---|---|
| Sent: | 10/20/2021 4:30:28 PM |
| To: | Will Deacon [wdeacon@axionbiointl.com] |
| CC: | Debby Hurtado [dhurtado@axion-biosystems.com]; James Ross [jim.ross@axion-biosystems.com]; Forrest Goodfellow [fgoodfellow@axion-biosystems.com] |
| Subject: | Re: xCELLigence IQOQ |

Hi Will and Debby,

Thanks,
Stacie

Stacie Chvatal, PhD
Senior Product Manager, Bioelectronic Assay Systems
Axion BioSystems
schvatal@axionbio.com
https://www.axionbio.com

On Wed, Oct 20, 2021 at 4:27 PM Will Deacon <wdeacon@axionbiointl.com> wrote:
  Hiya

AXION-0533110



Thanks

Will

Will Deacon
Account Manager Northern Europe
Axion BioSystems
wdeacon@axionbiointl.com
Phone: +44 7940 546 317

On 20 Oct 2021, at 20:30, Debby Hurtado <dhurtado@axion-biosystems.com> wrote:

Debby

Deborah Hurtado
Regional  Sales Manager - Southeast
Axion Biosystems
www.axionbio.com
843.973.2249

On Oct 20, 2021, at 1:57 PM, Stacie Chvatal <schvatal@axion-biosystems.com> wrote:

Hi Debby and Will,

AXION-0533111

If you don't have anything handy, don't worry about tracking it down - we'll be getting back to the customer tomorrow.

Thanks,
Stacie

Stacie Chvatal, PhD
Senior Product Manager, Bioelectronic Assay Systems
Axion BioSystems
schvatal@axionbio.com
https://www.axionbio.com

AXION-0533112

# Exhibit K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AGILENT TECHNOLOGIES, INC.,        )
                                   )
         Plaintiff,                )
                                   )
    v.                             )  C.A. No. 23-198 (CJB)
                                   )
AXION BIOSYSTEMS, INC.,            )
                                   )
         Defendant.                )

**AGILENT TECHNOLOGIES, INC.'S SECOND AMENDED OBJECTIONS
AND RESPONSES TO AXION BIOSYSTEMS, INC.'S INTERROGATORY NO. 5**

In accordance with Federal Rules of Civil Procedure 26 and 33, plaintiff, Agilent Technologies, Inc. ("Agilent"), by and through its counsel, hereby serves the following Second Amended Objections and Response to Defendant Axion BioSystems, Inc.'s ("Axion's") Interrogatory No. 5.

**STATEMENT AND GENERAL OBJECTIONS TO AXION'S
DEFINITIONS AND INSTRUCTIONS**

1.      Agilent asserts the following General Objections. Each individual response to an interrogatory is subject to, and limited in accordance with, the following General Objections, which are incorporated therein as if fully set forth. Although specific objections also are interposed in response to individual Interrogatories, in part for clarity, omission of any part of these General Objections shall not be construed as a waiver of any General Objection.

2.      Agilent objects to each instruction, definition, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure, the Rules adopted by the Court and applicable Orders from the Court, including to the extent that the discovery sought is not relevant to the issues in the

███████████████████████████████

pending action and is not proportional to the needs of this case. Unless expressly stated, Agilent does not accept Axion's "Definitions" other than to the extent they aid in understanding what Axion means.

3.      Agilent objects to the Interrogatories to the extent that they are premature in that discovery is ongoing and information that may be relevant has yet to be produced by Axion and/or may be in the possession, custody, or control of a third party.  The Interrogatories are premature to the extent that they seek final answers at a time when Agilent has not yet had a complete opportunity to review and digest all of Axion's production, including ESI production.

4.      Agilent objects to the Interrogatories as premature to the extent that they call for discovery, including expert discovery, before it is due under the Scheduling Order in this case (D.I. 29) and to the extent that discovery and investigation are ongoing in this case. To the extent that any interrogatory conflicts with the Scheduling Order or other applicable rule, statute, or order, Agilent will follow the dates established in the Scheduling Order and/or other applicable statute, rule, or order.

5.      Agilent objects to the Interrogatories to the extent that they seek information that is protected from discovery by the attorney-client privilege, the attorney work-product doctrine relating to trial preparation materials or is otherwise privileged and/or immune from discovery. This objection includes, but is not limited to, information requested by Axion that relates to mental impressions, conclusions, opinions or legal theories of any attorney or representative of Agilent, and such information available subsequent to the events upon which this lawsuit is based and during or in anticipation of litigation.

6.      Agilent objects to the Interrogatories to the extent they seek information already in the possession, custody, or control of Axion, equally accessible to Axion, and/or available to Axion in the public domain.

7.      Agilent objects to the Interrogatories to the extent that they contain unwarranted factual and legal conclusions. A response by Agilent shall not be construed as an admission by Agilent that any factual or legal conclusion or assertion contained in Axion's Interrogatories is true or accurate. Agilent's responses are not intended to be, and shall not be construed as, an agreement or concurrence with Axion's characterization of any facts or circumstances contained in those Interrogatories.

8.      Agilent objects to the Interrogatories to the extent they invade the legitimate privacy rights of third parties, including Agilent's employees and/or they seek information that is subject to an obligation of confidentiality to a third party that has not waived such obligation.

9.      Agilent objects to the Interrogatories to the extent they seek electronically stored information that is not reasonably accessible because of undue burden or cost, including, to the extent they exist, backup media, storage media from legacy systems, audio recordings, and telephone records.

10.      Agilent objects to the Interrogatories to the extent they seek electronically stored information that is otherwise subject to the Electronically Stored Information ("ESI") protocol; adopted in this case. To the extent not otherwise superseded by the ESI protocol in this case, Agilent objects to the Interrogatories to the extent they seek electronically stored information, the burden or expense of which outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

- 3 -

11.     Agilent objects to the Interrogatories to the extent they seek information originated by entities other than Agilent.

12.     To the extent Agilent is required to provide a response, Agilent will undertake a reasonable effort to provide the information requested, to the extent the requested information is not subject to an objection.

13.     Agilent objects to the Interrogatories to the extent they require production of information beyond the scope of what is reasonably available to Agilent.

14.     By making the accompanying responses and objections to Axion's Interrogatories, Agilent does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of such responses and/or documents into evidence in this action, or in any other proceedings, and on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege. Further, Agilent makes the responses and objections herein without in any way implying that it considers the Interrogatories and its responses to the Interrogatories to be relevant or material to the subject matter of this action.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Agilent objects to the definition of "you," "your," "Plaintiff," and "Agilent" to the extent such definition purports to require Agilent to produce information beyond that within Agilent's possession, custody or control. Agilent further objects to this definition as overly broad and unduly burdensome because it purports to include "all parents, subsidiaries, and affiliates thereof, all divisions, predecessors, successors, and assigns of each of the foregoing, and all officers, employees, investors, representatives, directors, agents, consultants, and all other persons acting or purporting to act on behalf of or under the control of any of the foregoing." Agilent will respond to all requests based on information within Agilent Technologies, Inc.'s possession,

- 4 -

custody, and control. In some responses, "Agilent" may additionally refer to predecessor companies ACEA and/or Seahorse, where applicable.

2.    Agilent objects to the definition of "Patents-in-Suit" as vague and ambiguous to the extent it includes "any other patent that may in the future be asserted in this lawsuit." Agilent will respond as to the patents asserted in the operative complaint. For the avoidance of doubt, Agilent interprets the term "Patents-in-Suit" to include only U.S. Patent Nos. 7,192,752, 7,468,255, and 8,026,080.

3.    Agilent objects to the definition of "Predecessor-in-Title" to the extent such definition purports to require Agilent to produce information beyond that within Agilent's possession, custody or control. Agilent further objects to this definition as overly broad and unduly burdensome because it purports to include "any person that is a predecessor in right, title, or interest of any of the Patents-in-Suit, including, for example, the inventors, any companies that have previously held any of the Patents-in-Suit, and all predecessors (merged, acquired, or otherwise), current and former directors, officers, agents, employees, attorneys, and other persons acting on behalf of any such persons." Agilent will respond to all requests based on information within Agilent Technologies, Inc.'s possession, custody, and control.

4.    Agilent objects to the definition of "Prior Art" as vague and ambiguous to the extent it provides that the phrase encompasses "industry standards, systems, ideas, conceptions." Agilent further objects to this definition as vague and ambiguous to the extent it provides that the term encompasses documents that are "potentially relevant under any subsection of 35 U.S.C. §§ 102 and 103." Agilent further objects to this definition to the extent it seeks documents unrelated to any party's claim or defense and not proportional to the needs of the case.

███████████████████████

**SPECIFIC OBJECTIONS AND RESPONSES TO**
**AXION'S INTERROGATORY NO. 5**

**INTERROGATORY NO. 5:**

For each Patent-in-Suit, identify all secondary considerations (as set forth in *Graham v. John Deere*, 383 U.S. 1 (1966) and its progeny) that you assert are relevant to the obviousness or non-obviousness of each Asserted Claim and describe the applicability of each such secondary consideration, including, without limitation, an explanation of the factual or legal bases for each such contention, an explanation of the nexus between the purported inventions and the secondary considerations, and a description of all evidence or testimony on which you may rely to support your assertion.

**AGILENT'S RESPONSE TO INTERROGATORY NO. 5 (December 23, 2023):**

Agilent incorporates by reference its General Objections and Objections to Definitions and Instructions as if fully set forth herein. Agilent objects to this Interrogatory as containing multiple parts in violation of the limit of interrogatories that can be served on this case. *See* Fed. R. Civ. P. 33(a)(1). Agilent objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable law, doctrine, privilege, or immunity. Agilent further objects to this Interrogatory as premature and untimely because it seeks expert testimony prior to the date or time required by the Scheduling Order. *See* D.I. 29. *See Novanta Corp. v. Iradion Laser, Inc.*, Civil Action No. 15-1033-SLR-SRF, 2016 U.S. Dist. LEXIS 126042 (D. Del. Sep. 16, 2016) (holding "a court may defer [contention] interrogatories until the end of discovery").

Subject to and without waiving any of the foregoing General and Specific Objections, Agilent responds as follows:

The Asserted Patents are presumed valid under 35 U.S.C. § 282. Secondary considerations of non-obviousness of the patented inventions include: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise.

██████████████████████████

Long-left but unresolved needs / Failure of others / Unexpected results. There was a long-felt need for the methods claimed in the Asserted Patents prior to the inventions described and claimed in the Asserted Patents.  For example, there was an urgent need for high-throughput molecular and cellular assays to screen for potential modulators of signaling pathways. The patented inventions provide a real time cell electronic sensing system for conducting cell-based assays based on measurement of cell-substrate impedance and provide the method for using such a system to perform cell-based assays.

Commercial success. The technology claimed in the Asserted Patents achieved commercial success as evidenced by ACEA's, Agilent's, as well as Axion's successful use of the patented technology.  For example, as described in Agilent's Complaint, Axion's has copied Agilent's products and implemented Agilent's patented technology.  Also, Axion's marketing materials taut the advantages of Agilent's patented technology as distinguishing over prior art solutions.

Copying. Axion's copying of the patented technology is evidence of non-obviousness. Axion has been aware of the patent inventions and, on information and belief, analyzed and copied ACEA's and Agilent's practicing products. Axion also hired away Agilent's personnel to, on information and belief, acquire further knowledge of the patented inventions and ACEA's and Agilent's practicing products.  Despite Axion's knowledge of the Asserted Patents prior to this litigation, Axion copied ACEA's and Agilent's practicing products.

Praise. Experts in the industry as well as customers who use the patented technology praise its advantages over prior art.  This is, for example, evidenced by Axion's own advertising of its products that use Agilent's patented technology while emphasizing the benefits provided by Agilent's patented technology.

███████████████████████████████

Additionally, and pursuant to Rule 33(d), Agilent incorporates by reference Agilent's expert reports, once served, and testimony related to the validity of Asserted Patents, including any exhibits and evidence attached thereto and/or cited therein, as well as Agilent's Complaint, and any subsequent amendments thereto. To the extent that additional documents responsive to this Interrogatory are produced, Agilent reserves all rights to supplement its response to this Interrogatory.

**FIRST AMENDED RESPONSE TO INTERROGATORY NO. 5 (April 8, 2024):**

Agilent incorporates by reference its General Objections and Objections to Definitions and Instructions as if fully set forth herein. Agilent objects to this Interrogatory as containing multiple parts in violation of the limit of interrogatories that can be served on this case. *See* Fed. R. Civ. P. 33(a)(1). Agilent objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable law, doctrine, privilege, or immunity. Agilent further objects to this Interrogatory as premature and untimely because it seeks expert testimony prior to the date or time required by the Scheduling Order. *See* D.I. 29. *See Novanta Corp. v. Iradion Laser, Inc.*, Civil Action No. 15-1033-SLR-SRF, 2016 U.S. Dist. LEXIS 126042 (D. Del. Sep. 16, 2016) (holding "a court may defer [contention] interrogatories until the end of discovery").

Subject to and without waiving any of the foregoing General and Specific Objections, Agilent responds as follows:

The Asserted Patents are presumed valid under 35 U.S.C. § 282. Secondary considerations of non-obviousness of the patented inventions include: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise.

███████████████████████████████

Long-left but unresolved needs / Failure of others / Unexpected results. There was a long-felt need for the methods claimed in the Asserted Patents prior to the inventions described and claimed in the Asserted Patents.  For example, there was an urgent need for high-throughput molecular and cellular assays to screen for potential modulators of signaling pathways. The patented inventions provide a real time cell electronic sensing system for conducting cell-based assays based on measurement of cell-substrate impedance and provide the method for using such a system to perform cell-based assays.

Commercial success. The technology claimed in the Asserted Patents achieved commercial success as evidenced by ACEA's, Agilent's, as well as Axion's successful use of the patented technology.  For example, as described in Agilent's Complaint, Axion's has copied Agilent's products and implemented Agilent's patented technology.  Also, Axion's marketing materials taut the advantages of Agilent's patented technology as distinguishing over prior art solutions.

Copying. Axion's copying of the patented technology is evidence of non-obviousness. Axion has been aware of the patent inventions and, on information and belief, analyzed and copied ACEA's and Agilent's practicing products. Axion also hired away Agilent's personnel to, on information and belief, acquire further knowledge of the patented inventions and ACEA's and Agilent's practicing products.  Despite Axion's knowledge of the Asserted Patents prior to this litigation, Axion copied ACEA's and Agilent's practicing products.

Praise. Experts in the industry as well as customers who use the patented technology praise its advantages over prior art.  This is, for example, evidenced by Axion's own advertising of its products that use Agilent's patented technology while emphasizing the benefits provided by Agilent's patented technology.

███████████████████████

Additionally, Agilent incorporates by reference Agilent's expert reports, once served, and testimony related to the validity of Asserted Patents, including any exhibits and evidence attached thereto and/or cited therein, as well as Agilent's Complaint, and any subsequent amendments thereto. To the extent that additional documents responsive to this Interrogatory are produced, Agilent reserves all rights to supplement its response to this Interrogatory consistent with Rule 33(d).

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 5 (February 12, 2025):**

Agilent incorporates by reference its General Objections and Objections to Definitions and Instructions as if fully set forth herein. Agilent objects to this Interrogatory as containing multiple parts in violation of the limit of interrogatories that can be served on this case. *See* Fed. R. Civ. P. 33(a)(1). Agilent objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable law, doctrine, privilege, or immunity. Agilent further objects to this Interrogatory as premature and untimely because it seeks expert testimony prior to the date or time required by the Scheduling Order. *See* D.I. 29. *See Novanta Corp. v. Iradion Laser, Inc.*, Civil Action No. 15-1033-SLR-SRF, 2016 U.S. Dist. LEXIS 126042 (D. Del. Sep. 16, 2016) (holding "a court may defer [contention] interrogatories until the end of discovery").

Subject to and without waiving any of the foregoing General and Specific Objections, Agilent responds as follows:

The Asserted Patents are presumed valid under 35 U.S.C. § 282. Secondary considerations of non-obviousness of the patented inventions include: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise.

███████████████████

Long-left but unresolved needs / Failure of others / Unexpected results. There was a long-felt need for the methods claimed in the Asserted Patents prior to the inventions described and claimed in the Asserted Patents. For example, there was an urgent need for high-throughput molecular and cellular assays to screen for potential modulators of signaling pathways. The patented inventions provide a real time, label-free cell electronic sensing system for conducting cell-based assays based on the nondestructive measurement of cell-substrate impedance over multiple time points and provide the method for using such a system to perform cell-based assays. *See e.g.*, Xiaobo Wang, February 6, 2025, Rough Deposition Transcript ("Wang Vol. I Tr.") at 37:23-38:12, 39:13-42:2, 159:25-165:14.

Licensing. The technology claimed in the Asserted Patents was licensed in a supply and distribution agreement with Roche Diagnostics GmbH. *See* AGILE0041387; AGILE0041476; AGILE0041450; AGILE0041477; AGILE0041479; AGILE0041481; AGILE0041484; AGILE0041491; AGILE0041493; AGILE0041425; AGILE0041430; AGILE0041446; *see also* Xiaobo Wang, February 7, 2025, Rough Deposition Transcript ("Wang Vol. II Tr.") at 58:25-63:13.

Commercial success. The technology claimed in the Asserted Patents achieved commercial success as evidenced by ACEA's, Agilent's, as well as Axion's successful use and sale of the patented technology including as established by the parties' sales records. *See* AGILE0066164; AGILE5066608; AGILE5066609; AGILE5068717; AXION-1070874; AGILE5068718; AGILE5068719; AGILE5068720; AGILE5068721; AGILE5068797; AXION-0002493; AXION-0002495; AXION-0002497; AXION-0002499; AXION-1070874; *see also* AXION-0634289

████████████████████████ AXION-0635508

███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

Copying. Axion's copying of the patented technology is evidence of non-obviousness. Axion has been aware of the patent inventions and, on information and belief, analyzed and copied ACEA's and Agilent's practicing products. Axion also hired away Agilent's personnel to, on information and belief, acquired further knowledge of the patented inventions and ACEA's and Agilent's practicing products.  Despite Axion's knowledge of the Asserted Patents prior to this litigation, Axion copied ACEA's and Agilent's practicing products. *See* AXION-0666181; AXION-0582826; AXION-0666365-69; AXION-0320326; AXION-0770597.   As a further example, and as described in Agilent's Complaint, Axion's has copied Agilent's products and implemented Agilent's patented technology.   Also, Axion's marketing materials taught the advantages of Agilent's patented technology as distinguishing over prior art solutions. *See* AXION-0048012, AXION-0115166, AXION-0048024, AXION-0048004; and AXION-0048018 (collectively promoting Axion's label-free, real-time, impedance-based Maestro systems); *see also* AXION-0152734  (████████████████████████████████████

████████████████████████████████ ).

Praise. Experts in the industry as well as customers who use the patented technology praise its advantages over prior art.  This is, for example, evidenced by Axion's own advertising of its products that use Agilent's patented technology while emphasizing the benefits provided by Agilent's patented technology. Wang Vol. I Tr. at 159:25-165:14; *see also* Wang Deposition Exhibit 48 ("2004, Most Innovative New Product Awards Luncheon, December 2, 2004, San Diego Marriott Hotel and Marina"), Wang Vol. II Tr. at 57:2-58:23 (discussing Agilent being named a finalist for the Most Innovative New Product Awards).

██████████████████████████

Additionally, Agilent incorporates by reference Agilent's expert reports, once served, and testimony related to the validity of Asserted Patents, including any exhibits and evidence attached thereto and/or cited therein, as well as Agilent's Complaint, and any subsequent amendments thereto. To the extent that additional documents responsive to this Interrogatory are produced, Agilent reserves all rights to supplement its response to this Interrogatory consistent with Rule 33(d).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Travis J. Murray*

OF COUNSEL:

Peter J. Chassman
Hallie H. Wimberly
Michael J. Forbes
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
Allison M. Haas
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

February 12, 2025

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

- 13 -

████████████████████████████

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2025, copies of the foregoing were caused to be served upon the following in the manner indicated:

John G. Day, Esquire                          *VIA ELECTRONIC MAIL*
Andrew C. Mayo, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
*Attorneys for Defendant Axion Biosystems, Inc.*

David M. Maiorana, Esquire                    *VIA ELECTRONIC MAIL*
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
*Attorneys for Defendant Axion Biosystems, Inc.*

Ryan K. Walsh, Esquire                        *VIA ELECTRONIC MAIL*
Geoffrey K. Gavin, Esquire
Laura M. Kanouse, Esquire
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
*Attorneys for Defendant Axion Biosystems, Inc.*

Anna E. Raimer, Esquire                       *VIA ELECTRONIC MAIL*
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002-2712
*Attorneys for Defendant Axion Biosystems, Inc.*

*/s/ Travis J. Murray*
_____
Travis J. Murray (#6882)

**Axion's Reply in Support of Motion *in Limine #1***

**Axion's Reply for its MIL No. 1 (Excluding Evidence or Argument Regarding Axion Hiring of Former Agilent Personnel)**

That certain Axion employees were at one time employed by Agilent (or ACEA) is not relevant to any issue in dispute for Agilent's patent and false advertising claims, and presenting such information at trial would only unfairly prejudice Axion and confuse or mislead the jury. Agilent's Opposition to this MIL ("Opp.") confirms that Agilent intends to use the previous employment of these Axion employees to suggest "copying," "willfulness," and other bad-intent-based actions on Axion's part. The Court should reject Agilent's approach.

Agilent first argues that Axion employing a handful of former Agilent employees shows that Axion had pre-suit knowledge of the asserted patents, which meets the relevance threshold under FRE 402. (*See* Opp. at 1.) But Axion has already stipulated that it was aware of all three patents by August 2019—*i.e.*, months before any of the documents and activities referenced by Agilent regarding Axion's supposed knowledge of the patents via former Agilent employees. (*See* Opp. at 1-2, Exs. A-D; Proposed Pretrial Order, Ex. 1 at ¶¶ 43-45.)

Second, Agilent does not (and cannot) tie any "hiring away" to any alleged "copying." Agilent's predecessor, ACEA, published the software calculation Agilent references (Opp. at 2) in its own product user manuals *as early as 2009*, long before any of the supposed "hiring away." (*See* Ex. 1 at 65.) Had Axion wanted or needed to copy the software calculation (and it did not), Axion didn't have to hire someone from Agilent, much less a former Agilent salesperson in the UK such as Mr. Deacon. The software calculation at issue had long been public knowledge.

Third, Agilent also references "use of Agilent know how" as allegedly relevant to patent damages and false advertising (Opp. at 2-3), but the claims at issue in this trial are not about any misuse of "Agilent know how." Moreover, the hiring of Agilent's personnel has no bearing on any element of Agilent's false advertising claim under the law of this Circuit, and in any case, it is undisputed that "Agilent and Axion are direct competitors in the market for impedance-based cell analysis systems." (Proposed Pretrial Order, Ex. 1 at ¶ 3.) And, significantly, Agilent does not point to any portion of its damages expert's reports indicating that the prior employment status of any Axion sales personnel is relevant to his patent damages analysis. (*See* Opp. at 2-3 and Exs. A-K.) That Agilent plans to tell the jury that Axion took "former Agilent personnel" and "us[ed] their knowledge of Agilent's products and technology, obtained during their time at Agilent, to sell Axion's competing infringing products" (Opp. at 2) is exactly the point—such inflammatory argument is both irrelevant and unfairly prejudicial. (*See* Axion's MIL No. 1 at 2-3.)

Agilent can advance its arguments regarding Axion's knowledge of the patents, the parties' direct competitor status, and allegations of copying without disclosing that certain current or former Axion employees had, at one time, previously worked at Agilent or ACEA. The Court can short circuit this dispute by granting Axion's MIL No. 1.

1

# EXHIBIT 1



# RTCA Software Manual

**Software Version 1.2**

**Version November 2009**

| | **Prologue** | **7** |
|---|---|---|
| I. | **Revision History** | 7 |
| II. | **Contact Addresses** | 7 |
| III. | **Trademarks** | 8 |
| IV. | **Intended Use** | 8 |
| V. | **Software License Agreement** | 8 |
| VI. | **Preamble** | 13 |
| VII. | **Usage of the Instrument Software Manual** | 13 |
| VIII. | **Conventions Used in this Manual** | 14 |

| | **About RTCA Software 1.2** | **15** |
|---|---|---|
| A | | |
| 1. | **Entering SP, MP or DP Real-Time Mode Automatically** | 16 |
| 2. | **Entering SP, MP or DP Offline Mode** | 18 |
| 3. | **RTCA Software Command Line Parameters** | 19 |
| 4. | **How to Use this Software Manual** | 20 |

| | **Software Function** | **21** |
|---|---|---|
| B | | |
| 1. | **Overview of the RTCA Software** | 21 |
| 1.1 | Software Functions | 22 |
| 1.1.1 | RTCA Software Functions Required for Running Experiments | 24 |
| 1.1.2 | RTCA Software Functions Required for Monitoring Experiments | 25 |
| 1.2 | System Requirements and RTCA Software Installation | 28 |
| 1.2.1 | Requirements | 28 |
| 1.2.2 | Software Installation | 30 |
| 1.2.3 | Software Uninstallation | 34 |
| 1.3 | User Management | 35 |
| 2. | **Starting an Experiment** | 36 |
| 2.1 | Launch the RTCA Software | 36 |
| 2.2 | Check the Software Version | 36 |
| 2.3 | Menus of Main Window and Plate Window | 37 |
| 2.3.1 | Main Window Menu | 37 |
| 2.3.2 | Plate Window Menu | 40 |
| 2.4 | Experiment Record | 43 |
| 2.5 | Text Boxes on Exp Notes Page | 44 |
| 2.6 | Example of a Completed Exp Notes Page | 45 |
| 3. | **Design an Experiment** | 46 |
| 3.1 | Experiment Layout | 46 |
| 3.2 | Add Experimental Information | 46 |
| 3.3 | Enable Wells | 47 |
| 3.4 | Information Boxes | 48 |
| 3.5 | Example of a Completed Layout Page | 49 |
| 3.6 | Example of Dilution Factor and Dilution Repetition | 50 |
| 3.7 | Copy/Paste Layout Settings | 51 |

| B | Software Function | continued |
|---|---|---|

**4.**         **Schedule Setting** ......................................................................................... 52

4.1         Add Steps ................................................................................................. 52

    4.1.1      Set the Schedule for Each Step ............................................................. 53

    4.1.2      Change the Preset Schedule of a Step ................................................... 53

    4.1.3      Total Time................................................................................................ 53

4.2         Delete Steps............................................................................................. 54

4.3         Insert Steps ............................................................................................. 54

4.4         Set up Multiple Substeps in the Same Step ........................................... 54

4.5         Set up a Background Step ........................................................................ 55

4.6         Text Box and Button Functions ............................................................... 55

4.7         Example of Multiple Substeps in one Experiment.................................... 56

4.8         Saving Set-up(s)...................................................................................... 57

4.9         Opening a Template (Clone Settings) ..................................................... 58

**5.**         **Start an Experiment** ................................................................................ 59

5.1         Scan Plate................................................................................................ 59

    5.1.1      Manual Scan Plate ................................................................................. 59

    5.1.2      Automatic Scan Plate ............................................................................. 59

    5.1.3      Check System......................................................................................... 59

5.2         Example of Results from Scan Plate........................................................ 60

5.3         How to Handle Connection Issues........................................................... 61

5.4         Start Measurement .................................................................................. 62

5.5         Pause the Experiment.............................................................................. 63

5.6         Start Step ................................................................................................. 63

5.7         Abort Step ............................................................................................... 63

5.8         Monitoring the Current Experiment Status............................................... 64

**6.**         **Monitor an Experiment** ........................................................................... 65

6.1         Menu Functions........................................................................................ 65

6.2         Scan Plate Data and Background Data .................................................... 66

**7.**         **Plot Experiment Data** ............................................................................. 68

7.1         Plot Selection........................................................................................... 69

7.2         Curve Options .......................................................................................... 71

7.3         Scale........................................................................................................ 71

7.4         Curve Color Selections............................................................................ 72

7.5         Other Function Buttons ............................................................................ 72

7.6         Well Map .................................................................................................. 73

7.7         Example of Adding Wells to the Chart...................................................... 73

7.8         Example of the Average Function............................................................. 74

7.9         Example of the Log Scale ........................................................................ 75

7.10        Zoom In/Zoom Out .................................................................................. 76

7.11        Curve Repair Function ............................................................................. 77

    7.11.1     Shift of Curves........................................................................................ 78

    7.11.2     Line Fit ................................................................................................... 79

7.12        Baseline Cell Index.................................................................................. 80

7.13        Normalized Cell Index.............................................................................. 82

7.14        Delta Cell Index ....................................................................................... 83

7.15        Settings for Data Analysis ....................................................................... 83

**8.**         **Copy Experiment Data**............................................................................ 84

8.1         Copy Experiment Data to Microsoft Excel............................................... 84

8.2         Copy Graphic Charts or Data on Charts.................................................. 84

8.3         Example of a Right-Click Menu ............................................................... 85

| B | Software Function | continued |
|---|---|---|

| **9.** | **Well Graph** | 86 |
|---|---|---|
| 9.1 | User Interface | 86 |
| 9.2 | Well Graph Display | 87 |
| 9.3 | Zoom Area | 88 |
| 9.4 | Graph Setting | 89 |
| 9.5 | Summary | 90 |
| **10.** | **Data Analysis** | 91 |
| 10.1 | User Interface | 91 |
| 10.2 | Experimental Data for Analysis | 92 |
| 10.3 | Well Selection for Analysis | 92 |
| 10.4 | An Example of Data Analysis: Dose-Response Curve (DRC) at a Time Point | 93 |
| 10.5 | Curve Types and Curve-Fit Formula | 95 |
| 10.5.1 | Curve Types | 95 |
| 10.5.2 | Curve Fit Formula | 101 |
| 10.6 | Data Analysis on Averaged Data for Replicate Wells | 102 |
| 10.7 | Compare Dose-Response Curves and Corresponding EC50/IC50 Values for Selected Wells at Different Time Points | 103 |
| 10.8 | Compare Dose-Response Curves and Corresponding EC50/IC50 Values for Different Wells at the Same Time Point | 104 |
| 10.9 | Compare Cell Index Slopes (or Cell Index Doubling Times) | 105 |
| 10.10 | Tool Bar Button Definitions | 106 |
| 10.10.1 | Draw Curve, Add Curve and Clear Curve | 106 |
| 10.10.2 | Copy Chart and Copy Data on Chart | 106 |
| **11.** | **Message Page** | 107 |
| 11.1 | Warning Message Sign | 108 |
| 11.2 | Error Message Sign | 108 |
| **12.** | **Experiment Reports** | 109 |
| 12.1 | Create a Problem Report | 109 |
| 12.2 | Create an Excel Format Report | 110 |
| **13.** | **RTCA Software Functions Unique To The RTCA MP Instrument** | 111 |
| 13.1 | MP User Graphic Interface | 111 |
| 13.2 | The Major Differences of RTCA SP and RTCA MP Instruments | 112 |
| 13.3 | Overview of Functions and Controls Unique to the RTCA MP Instrument | 112 |
| 13.4 | Launch RTCA MP Software | 116 |
| 13.4.1 | RTCA Software in MP Offline Mode | 116 |
| 13.4.2 | RTCA Software in MP Real-Time Mode | 116 |
| 13.5 | Example of Multiple Users Running Experiments on the same RTCA MP Instrument | 117 |
| **14.** | **RTCA Software Functions Unique To The RTCA DP Instrument** | 119 |
| 14.1 | RTCA DP Instrument Connection | 119 |
| 14.2 | DP User Graphic Interface | 119 |
| 14.3 | The Combination of Using Multiple E-Plates 16 or CIM-Plate 16 Within an Experiment | 120 |
| 14.4 | Overview of Functions and Controls Unique to the RTCA DP Instrument | 121 |
| 14.5 | Launch RTCA DP Software | 122 |
| 14.5.1 | RTCA Software in DP Offline Mode | 122 |
| 14.5.2 | RTCA Software in DP Real-Time Mode | 122 |
| 14.5.3 | Set up RTCA DP Software Default Pattern | 123 |
| 14.5.4 | RTCA DP Software Auto-Scan at Startup | 124 |
| 14.6 | Example of Multiple Users Running Experiments on the RTCA DP Instrument | 125 |

| C | Appendix | 127 |
|---|---|---|

| **1.** | **Ordering Information** | 127 |
|---|---|---|

# 6. Monitor an Experiment

Real-time resistance measurement data will be recorded and presented as arbitrary units called **Cell Index** on the *Cell Index* page. The *Cell Index* table shows the most recent measurement. To view previously collected data, select a particular measurement time point from the *Time* drop-down menu.



## 6.1 Menu Functions

▶ *Time:* Click the corner arrow of this drop-down menu to display measurement time points. If more than nine time points have been recorded, then use the scroll bar to view the hidden time points.

▶ *Calculations:* There are three cell indices taken at different frequencies: Cell Index-I at 10 kHz, Cell Index-II at 25 kHz, and Cell Index-III at 50 kHz. The cell indices are defined as follows:

*Cell Index*$_i$ = $(R_{tn} - R_{t0})/F_i$

Where:
    i = 1, 2, or 3;
    $F_1 = 15\Omega$, $F_2 = 12\Omega$, $F_3 = 10\Omega$;
    and n = 0, 1, 2, …, N (time points).

$R_{t0}$ *is the background resistance measured at time point* $T_0$*,* $R_{tn}$ *is the resistance measured at a time point* $T_n$*.*

*Published by*

Roche Diagnostics GmbH
Roche Applied Science
68298 Mannheim
Germany

© 2009 Roche Diagnostics
All rights reserved.

**05217415001**④1109

**Axion's Motion *in Limine #2***

**AXION MIL NO. 2   Excluding Evidence or Argument Regarding Customer Perception of Axion's Statements, Including Any Alleged Customer Confusion/Deception or Impact on Purchasing Decisions**

## INTRODUCTION

Axion moves *in limine* to preclude Agilent from proffering any evidence or argument on customer perception about Axion's statements at issue in this case, including any testimony of alleged customer deception resulting from the statements or any impact of the statements on customer purchasing decisions.  Specifically, Axion seeks to exclude any reliance by Agilent on: (1) statements attributed to Dr. Or-Yam Revach, and (2) purported beliefs of unspecified customers relating to Axion's statements.  Any such evidence of customer perceptions should be excluded as hearsay, vague, speculative, misleading, unduly prejudicial, and/or improper opinion testimony. *See* Fed. R. Evid. 403, 602, 701, 801, 802, and 805.

## ARGUMENT

Agilent alleges that certain Axion statements regarding the ability of Axion's impedance products to measure characteristics of 3D spheroid models constitutes false advertising.  To prevail on this claim, Agilent must show through extrinsic evidence, among other things, that such statements are deceptive and material in that they are likely to influence purchasing decisions. *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011).

The Court has broad discretion to resolve motions *in limine* and exclude evidence that is inadmissible or would unfairly prejudice Axion.  Relevant evidence may be excluded if its probative value is substantially outweighed by the dangers of "unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.  Out-of-court statements offered for their truth are inadmissible hearsay, and testimony with multiple layers of hearsay is inadmissible unless each layer fits an exception.  Fed. R. Evid. 801, 802 & 805.  A witness may testify only with personal knowledge that is rationally based on the witness's perception.  Fed. R. Evid. 602 & 701.  Any testimony regarding customer perceptions on deception or materiality would suffer from the foregoing evidentiary flaws.

### A.    Testimony or Argument Related to Statements Attributed to Dr. Or-Yam Revach Should Be Excluded.

During discovery, Agilent identified a single individual, Dr. Or-Yam Revach of the Massachusetts General Hospital Cancer Center, as a potential consumer who was purportedly deceived by the challenged statements.  As Agilent adduced no testimony from Dr. Revach (D.I. 363, Ex. 29 at 43), the Court should exclude any evidence predicated on statements allegedly made by Dr. Revach as inadmissible double hearsay and unfairly prejudicial.

According to Agilent, Dr. Revach stated to Agilent employee, Dr. Ryan Raver, "that she had seen on Axion's website that Axion's products could perform impedance measurement of spheroids" and that "she would seek a demonstration from Axion." *See* D.I. 363, Ex. 29 at 43; Ex. 43 at 7; Ex. 30 at ¶ 36; Ex. 36 at 280:1-284:4, 290:17-294:11.  Yet, Agilent took no deposition of Dr. Revach, failed to obtain a declaration from Dr. Revach, and did not name Dr. Revach as a witness at trial.  To introduce this testimony at trial, Agilent needs direct testimony from Dr.

1

Revach. *See, e.g.*, *Talley v. Christiana Care Health Sys.*, No. 17-926-CJB, 2019 WL 5102926, at *17 (D. Del. Oct. 9, 2019) (Burke, J.) (holding that the plaintiff's declaration recounting what a patient and a patient's spouse purportedly said was inadmissible hearsay, and explaining that such proof must come from the out-of-court declarants themselves, e.g., by declaration or deposition). Agilent also failed to obtain testimony from Dr. Raver, who is not a trial witness, regarding this purported conversation, and in any case, testimony by Dr. Raver regarding Dr. Revach's statements would constitute hearsay. *See, e.g.*, *Canton v. Kmart Corp.*, 470 F. App'x 79, 84-85 (3d Cir. 2012) (excluding testimony of an overheard conversation as hearsay).

To the extent that Agilent seeks to introduce evidence of Dr. Revach's purported statements through another witness, such as Dr. Leyna Zhao, such testimony would be inadmissible double hearsay as an out-of-court statement offered for its truth. *See* Fed. R. Evid. 801(c), 802 & 803; *UHS of Delaware, Inc. v. United Health Servs.*, Inc., 227 F. Supp. 3d 381, 396 (M.D. Pa. 2016) (holding that "[a]bsent an exception authorizing admission of the second-level statements, testimony concerning the content of subordinate conversations with customers is inadmissible hearsay"). Allowing the jury to hear this double hearsay would unfairly prejudice Axion and risk confusion, as Axion would have no opportunity to cross-examine Dr. Revach about the statement, its truth, or its basis. No trial witness has any personal knowledge of this statement, including whether Dr. Revach actually made this statement, what her beliefs were about Axion's products, what capabilities of Axion's products would be material to her purchasing decision, or whether she sought a product demonstration from Axion (she did not). *See* Fed. R. Evid. 403. The Court should therefore exclude any purported evidence, testimony, or argument concerning statements attributed to Dr. Revach, including any testimony by Dr. Zhao purportedly recounting them.

**B.**      **Evidence or Argument Related to Vague Assertions Regarding Customer Beliefs Should Be Excluded.**

In an attempt to support the deception and materiality elements necessary to prove its false advertising claim, Agilent has pointed to Dr. Zhao's vague testimony about "many cases" of customers who believed Axion's products could monitor characteristics of spheroid models through impedance and who deemed these statements material. *See* D.I. 361, Ex. 36 at 281:12-23. But Dr. Zhao could not "recall the specifics in terms of the customer names and institutions" for even a single such customer. *Id.* Accordingly, Axion is unable to test the veracity of the claim, such as by seeking testimony from these alleged customers, which is unfairly prejudicial. The Court should exclude any evidence or argument regarding unspecified customers who were allegedly deceived by Axion's statements, or who allegedly were influenced in their purchasing decisions by the statements, because such evidence would be improperly vague, speculative, and prejudicial, and it would constitute hearsay and improper opinion testimony.

Any testimony regarding customer beliefs lacks probative value because it is untethered to any identifiable facts. *See* Fed. R. Evid. 401. Without names, dates, or context, the claim that "many" customers held a particular belief does not make deception or materiality "more or less probable" in any meaningful way. *See, e.g.*, *CareDx, Inc. v. Natera, Inc.*, No. 19-662-CFC, 2023 WL 4561059, at *4 (D. Del. July 17, 2023), *aff'd*, No. 23-2427, 2025 WL 2480117 (3d Cir. Aug. 28, 2025) (finding "vague, conclusory, and hearsay-riddled testimony that consumers were deceived by or relied on false advertisements" insufficient evidence). Additionally, Dr. Zhao's inability to specifically identify a single customer or institution that allegedly made such

2

statements demonstrates that any such testimony would be improperly vague and speculative. *See, e.g.*, *Integra Lifesciences Corp. v. Hyperbranch Med. Tech.*, *Inc.*, No. CV 15-819-LPS-CJB, 2016 WL 4770244, at *16 n. 15 (D. Del. Aug. 12, 2016) (Burke, J.) (declining to give any weight to "vague and speculative" evidence lacking details such as which hospitals, how many, or pricing).

Moreover, any Agilent testimony about customer beliefs would constitute hearsay. Testimony through Dr. Leyna Zhao or any other witness about what unspecified customers believed regarding Axion's statements is inadmissible because it consists of out-of-court statements offered for their truth. *See* Fed. R. Evid. 801(c), 802 & 803; *see also Canton*, 470 F. App'x at 84-85 (excluding testimony of an overheard conversation of unspecified individuals as hearsay). Such testimony would also constitute an improper opinion. *See* Fed. R. Evid. 701 & 702. Agilent failed to conduct a survey in this case regarding how consumers actually react to Axion's statements, and it cannot present a lay witness to opine on the reactions of unspecified consumers, which is specialized knowledge within the scope of Rule 702. *See* Fed. R. Evid. 701; *see also Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129-30 (3d Cir. 1994) ("Public reaction is the measure of a commercial's impact. . . [and] the success of the claim usually turns on the persuasiveness of a consumer survey."); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 439–40 (D.N.J. 2009) (excluding plaintiff's marketing expert's "net opinion or personal belief" on consumer reaction as legally irrelevant and holding plaintiff could not use such testimony "as a substitute for its failure to conduct an adequate survey" to prove deception). Similarly, any Agilent testimony regarding whether Axion's statements influenced the purchasing decisions of the intended audience would be improper because there is no foundation for such an opinion, and such testimony would be improperly based on specialized expert knowledge. *See* Fed. R. Evid. 701; *see also, e.g.*, *Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. CV-11:3684, 2016 WL 3545529, at *25 (D.N.J. June 29, 2016) (striking lay opinion where the witness could identify no foundation beyond speculation).

Finally, any marginal probative value of testimony regarding unspecified customer beliefs is also substantially outweighed by the risk of unfair prejudice, confusion, and misleading the jury. *See* Fed. R. Evid. 403. Allowing generalized, non-specific statements about what unnamed customers supposedly believed or wanted invites speculation and risks misleading the jury into giving such statements undue weight, particularly where the actual declarants cannot be cross-examined. *Missimer v. Tiger Mach. Co.*, No. CIV.A. 04-3443, 2005 WL 3968133, at *1 (E.D. Pa. Sept. 28, 2005) (excluding deposition testimony of employees because "[a]ny slight probative value this testimony might have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury"). Therefore, the Court should preclude Agilent from eliciting or presenting testimony, or otherwise arguing, that unspecified customers were allegedly deceived by Axion's statements or found them material.

**CONCLUSION**

For the foregoing reasons, Axion respectfully requests the Court grant Axion's Motion in Limine No. 2 and exclude any evidence, testimony, or argument regarding alleged customer perceptions of Axion's statements—including alleged deception or materiality—based on hearsay, vagueness, speculation, improper opinion, and/or unfair prejudice.

3

# Agilent's Response to Axion's Motion *in Limine #2*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 23-198 (CJB) |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* #2
TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING
<u>CUSTOMER PERCEPTION OF AXION'S FALSE STATEMENTS</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Brian P. Egan (#6227)

OF COUNSEL:                           Travis J. Murray (#6882)
                                      1201 North Market Street
Peter J. Chassman                     P.O. Box 1347
Michael J. Forbes                     Wilmington, DE  19899-1347
Hallie H. Wimberly                    (302) 658-9200
REED SMITH LLP                        began@morrisnichols.com
1221 McKinney Street, Suite 2100      tmurray@morrisnichols.com
Houston, TX  77010
(713) 469-3800                        *Attorneys for Plaintiff Agilent Technologies, Inc.*

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 23, 2025

**HIGHLY CONFIDENTIAL –ATTORNEYS' EYES ONLY**

Plaintiff, Agilent Technologies, Inc. ("Agilent"), respectfully opposes Defendant, Axion Biosystems, Inc.'s ("Axion's"), Motion *in Limine* ("MIL") No. 2, which seeks a blanket order excluding "any evidence or argument on customer perception about Axion's statements at issue in this case" under Federal Rules of Evidence ("FRE") 403, 602, 701, 801, 802, and 805. Axion's MIL No. 2 is an improper attempt to gain a second bite at the proverbial apple with respect to Axion's motions for summary judgment related to Agilent's false advertising claim and false advertising damages. D.I. 351-351, 357-358, 392, 397, 399, 425. Axion's MIL No. 2 is not the proper vehicle to obtain dispositive rulings on Agilent's false advertising claim.

### Dr. Or-Yam Revach

Axion first seeks to exclude any testimony related to a potential customer of Agilent, Dr. Or-Yam Revach of the Massachusetts General Hospital Cancer Center. Specifically, Axion argues Dr. Revach's statements made to Dr. Ryan Raver, a Senior Product Manager for Agilent's xCELLigence products, that "Axion's products could perform impedance measurement of spheroids" and that "she would seek a demonstration from Axion," are inadmissible as hearsay. However, these statements are not hearsay as they are not offered to show their truth, but rather to show the state of mind of Dr. Revach when she made the statements. *See* FRE 801(c). That is, Agilent need not have direct testimony from Dr. Revach, because the relevance of her statements lies in their existence, rather than their truth. Even if her statements were considered hearsay, they still would be admissible under FRE 803(3) as evidence of her then-existing state of mind. Courts have routinely held such statements are admissible. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004) (noting statements exhibiting confusion "are not hearsay because they are not submitted for their truth; indeed, it is their falsity that shows the speaker's confusion" and statements proclaiming confusion are admissible under FRE 803(3)); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 241 (3d Cir. 1999) (holding employee testimony of customer confusion was admissible as evidence of the customer's state of mind).

Axion next takes issue with testimony from witnesses other than Dr. Raver, and specifically Dr. Leyna Zhao, related to Dr. Revach's statements. Dr. Zhao was designated as Agilent's corporate representative and Rule 30(b)(6) witness to testify on "[a]ny and all consumer feedback, comments, complaints, and/or perceptions related to the truth or accuracy of Axion's claim it can track the impedance of 3D spheroid models as described in Axion's Application Note." Ex. A at p. 7; Ex. B at 16:11-15. Courts have held that "a Rule 30(b)(6) witness may testify both in a deposition and at trial to matters as to which she lacks personal knowledge, notwithstanding the requirements of Federal Rule of Evidence 602." *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) (emphasis added); *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006) ("if a rule 30(b)(6) witness is made available at trial, he should be allowed to testify as to matters within corporate knowledge to which he testified in deposition"); *see also LG Display Co., Ltd. v. Au Optronics Corp.*, 265 F.R.D. 189 (D. Del. limine2010) (denying motion to strike when employee gained personal knowledge of a company's licensing policy from other employees); *Progressive Casualty Insurance Co. v. Drive Trademark Holdings LP*, C.A. No. 09-902-LPS, D.I. 164 (D. Del. Mar. 27, 2012 Trial Tr. at pp. 19-20) (denying motion to exclude testimony from a 30(b)(6) witness noting "[w]hether he has personal knowledge, whether he was there at the time the events occurred, those are matters that can be established through direct or through cross-examination") (Ex. C). Here, Dr. Zhao acts as the agent

1

**HIGHLY CONFIDENTIAL –ATTORNEYS' EYES ONLY**

of Agilent and should be allowed to testify as to Agilent's corporate knowledge gained from its employees during their employment. *Brazos*, 469 F.3d at 434 ("because, under the rule 30(b)(6) framework, Grisby acts as the agent for the corporation, he should be able to present [the corporation's] subjective beliefs as to whether the products were in breach of warranty, as long as those beliefs are based on the collective knowledge of [the corporation's] personnel"). Additionally, Dr. Zhao can testify to receiving reports of confusion in her official capacity as non-hearsay, including those from Dr. Raver. *See Kos Pharms.*, 369 F.3d at 719-20 (allowing testimony of an employee receiving reports of alleged confusion even where reports did not fit into the business records exception).

### *Other Customers*

Axion also seeks to exclude any testimony from Dr. Leyna Zhao related to anecdotal evidence of customer confusion, seemingly because Dr. Zhao, in her deposition, did not provide the exact identity of each customer, the specific date of each customer's statement, and the particular context in which the statement was made. However, such exact details are not required for testimony to be relevant and admissible. *Callahan.*, 182 F.3d at 252 n.11 ("In a practical sense, their identities are not important . . . we do not think that the admissibility of their statements under the Rule 803(3) hearsay exception depends on their being identified."); *Qorvo, Inc. v. Akoustis Techs., Inc.*, C.A. No. 21-1417-JPM, 2024 WL 5334087, at *3 (D. Del. Apr. 25, 2024) ("both direct and circumstantial evidence can be used to show confusion"). Relevant evidence need only have ***any tendency*** to make a fact more or less probable than it would be without the evidence. FRE 401 (emphasis added). To the extent Axion takes issue with the details provided in Dr. Zhao's trial testimony, such issues can be resolved through cross-examination. Even *Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, which Axion relies on in its MIL No. 2, stands for the position that challenges to "vague and speculative" evidence goes to the credibility of the witness and testimony rather than its admissibility. C.A. No. 15-819-LPS-CJB, 2016 WL 4770244, at *16 n. 15 (D. Del. Aug. 12, 2016) (declining to ***give weight*** to identified evidence) (emphasis added). Axion is free to challenge the credibility of the witness and testimony in an effort to argue the jury should give it less weight. However, this is not a proper basis to challenge the admissibility of the testimony.

Axion similarly argues Dr. Zhao's testimony related to anecdotal evidence of customer confusion is inadmissible as hearsay. For the same reasons discussed above, testimony on customers' confusion about Axion's Maestro products' alleged ability to measure the impedance of 3D spheroids is admissible because it is not offered to show its truth, but rather to show the state of mind of Agilent's customers and potential customers. *See* FRE 801(c), 803(3).

Axion also claims that any testimony related to customer reaction or belief would constitute an improper opinion under FRE 701 and 702 because Agilent did not conduct a survey. However, Axion fails to cite any case holding a survey is required to show confusion—because it cannot. Indeed, courts have often held that surveys are not required to show confusion, and other circumstantial evidence is sufficient. *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir. 1990) (noting, in the context of Lanham Act trademark actions, surveys are "not essential" where other evidence of confusion exists); *Qorvo,* 2024 WL 5334087, at *3 (holding the confusion inquiry of a false advertising claim "does not necessarily require the use of

2

**HIGHLY CONFIDENTIAL –ATTORNEYS' EYES ONLY**

consumer surveys or other quantitative measures of customer confusion"); *Rosetta Stone Ltd. v. Google, Inc*., 676 F.3d 144, 157-58 (4th Cir. 2012) (holding, in the context of a trademark dispute, that anecdotal evidence can support an inference of consumer confusion).

Finally, Axion argues that any testimony related to customer confusion, including testimony related to Dr. Revach, should be excluded as unfairly prejudicial under FRE 403. FRE 403 provides that evidence that is relevant may only be excluded if its probative value is **substantially** outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. To establish a false advertising claim under the Lanham Act, a plaintiff must prove, among other things, that there is actual deception or at least a tendency to deceive. *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011). The targeted testimony has substantial probative value as it directly relates actual deception, or at least the tendency to deceive, Agilent's customers and prospective customers. Testimony about what customers said and did in response to Axion's advertising shows that Axion's false statements reached the marketplace, were understood in a particular way, and influenced customer behavior—facts that directly support Agilent's claim. Axion fails to explain how such evidence would be unfairly prejudicial or likely to mislead or confuse the jury. Axion can "test the veracity of the claim" and challenge the credibility of the evidence through cross-examination. For this reason, Axion's MIL No. 2 should be denied. *United States v. Miah*, 120 F.4th 99, 112 (3d Cir. 2024) (affirming district court's inclusion of evidence in part because party seeking to exclude failed to meet burden of explaining how evidence was unfairly prejudicial) *Lauria v. AMTRAK*, 145 F.3d 593, 600-01 (3d Cir. 1998) (noting the permissive trend of allowing lay opinion testimony subject to cross examination).

### *Conclusion*

Agilent's expected testimony related to confusion of Dr. Revach and other prospective customers is not hearsay, or at least falls squarely within a hearsay exception. Survey evidence is not required to show confusion. Dr. Leyna Zhao will testify to the corporate knowledge of Agilent, consistent with her Rule 30(b)(6) deposition, and any challenge to such testimony can be done through cross-examination at trial. Axion failed to explain how it would suffer sufficient unfair prejudice to substantially outweigh the significant probative value of the targeted testimony. Axion's MIL No 2 should be denied.

**HIGHLY CONFIDENTIAL –ATTORNEYS' EYES ONLY**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Travis J. Murray*

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 23, 2025

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

4

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2025, copies of the foregoing were caused to be served upon the following in the manner indicated:

| | |
|---|---|
| John G. Day, Esquire<br>Andrew C. Mayo, Esquire<br>ASHBY & GEDDES<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE  19899<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| David M. Maiorana, Esquire<br>JONES DAY<br>901 Lakeside Avenue<br>Cleveland, OH  44114<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Ryan K. Walsh, Esquire<br>Geoffrey K. Gavin, Esquire<br>Laura M. Kanouse, Esquire<br>Rachel Krutz, Esquire<br>JONES DAY<br>1221 Peachtree Street, N.E., Suite 400<br>Atlanta, GA  30361<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Anna E. Raimer, Esquire<br>JONES DAY<br>717 Texas Street, Suite 3300<br>Houston, TX  77002-2712<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Collin J. Kurtenbach, Esquire<br>JONES DAY<br>110 North Wacker Drive, Suite 4800<br>Chicago, IL  60606<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |

*/s/ Travis J. Murray*

Travis J. Murray (#6882)

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC.,      ) <br><br> Plaintiff,      ) <br><br> v.      ) <br><br> AXION BIOSYSTEMS, INC.,      ) <br><br> Defendant.      ) | C.A. No. 23-198-CJB |

**DEFENDANT AXION TECHNOLOGIES, INC.'S NOTICE OF RULE 30(b)(6)
DEPOSITION OF PLAINTIFF AGILENT BIOSYSTEMS, INC.**

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Defendant Axion Biosystems, Inc. ("Axion") will take the deposition of Plaintiff

Agilent Technologies, Inc. ("Agilent"). The deposition will be by oral examination before a

certified court reporter, Notary Public or other officer authorized by law to administer oaths. The

deposition will take place on December 18, 2024 at offices of Reed Smith at 1221 McKinney

Street Suite 2100, Houston, Texas 77010, beginning at 9:00 a.m. central time, or at such other

date, time and location as the parties may agree or the Court may order. The testimony will be

recorded by stenographic means, real time transcription and/or videographic or other audiovisual

means. The deposition will continue from day to day, excluding weekends, until completed, or

may be continued until completed at a future date or dates. The deposition may be used for all

purposes permitted under the Federal Rules of Civil Procedure, including use at trial.

The deposition will be taken by or through one or more of Agilent's officers, directors,

managing agents or other persons who are able to testify on Agilent's behalf about the matters set

forth in Attachment A pursuant to Rule 30(b)(6). At least two weeks prior to the deposition,

Agilent is requested to designate in writing to Axion the names(s) of the person(s) who will

testify on its behalf concerning the subject matters set forth in Attachment A, and for each such

written designation, the matter(s) as to which that person will testify.  Also, at least two weeks

prior to the deposition, Agilent shall produce all relevant documents in that designee's possession

or custody.


                                        ASHBY & GEDDES

                                        /s/ Andrew C. Mayo
                                        John G. Day (#2403)
*Of Counsel*:                           Andrew C. Mayo (#5207)
                                        500 Delaware Avenue, 8th Floor
Ryan K. Walsh                           P.O. Box 1150
Geoffrey K. Gavin                       Wilmington, DE 19899
Laura M. Kanouse                        (302) 654-1888
JONES DAY                               jday@ashbygeddes.com
1221 Peachtree Street N.E., Suite 400   amayo@ashbygeddes.com
Atlanta, Georgia 30361
(404) 521-3939                          *Attorneys for Defendant Axion BioSystems, Inc.*

David M. Maiorana
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939

Anna E. Raimer
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002-2712
(832) 239-3939

Dated:  November 25, 2024

## ATTACHMENT A

## DEFINITIONS AND INSTRUCTIONS

1.      "You," "your," "Plaintiff," or "Agilent" means Plaintiff Agilent Technologies, Inc. and all parents, subsidiaries, and affiliates thereof, all divisions, predecessors, successors, and assigns of each of the foregoing, and all officers, employees, investors, representatives, directors, agents, consultants, and all other persons acting or purporting to act on behalf of or under the control of any of the foregoing.

2.      "Defendant" or "Axion" means Axion Biosystems, Inc.

3.      "Patents-in-Suit" means U.S. Patent Nos. 7,192,752; 7,468,255; and 8,026,080, and any other patent that may in the future be asserted in this lawsuit.

4.      "Asserted Claim" means each and every claim of each Patent-in-Suit that Agilent asserts Axion has infringed or does infringe, whether directly or indirectly.

5.      "Accused Product" or "Accused Products" means any product, process, device, apparatus, instrumentality, program, software, hardware, service, system, method, act, action, or activity of Axion that Agilent alleges infringes and/or infringed any Asserted Claim.

6.      "Predecessor-in-Title" shall mean any person that is a predecessor in right, title, or interest of any of the Patents-in-Suit, including, for example, the inventors, any companies that have previously held any of the Patents-in-Suit, and all predecessors (merged, acquired, or otherwise), current and former directors, officers, agents, employees, attorneys, and other persons acting on behalf of any such persons.

7.      As used herein, the term "Prior Art" means any and all patents, publications, products, devices, methods, apparatuses, software, industry standards, systems, ideas, conceptions, reductions to practice, inventions, and activities that were known, published, disclosed, offered for sale, sold, in public use, commercially exploited, or derived from another

1

and that are concerning or related to the subject matter of the Patents-in-Suit and have, existed on, or occurred at a date such as to be potentially relevant under any subsection of 35 U.S.C. §§ 102 and 103.

8. "Second Amended Complaint" or "SAC" refers to the Second Amended Complaint filed by Plaintiff Agilent docketed on December 13, 2023 in the United States District Court for the District of Delaware in Civil Action 1:23-cv-00198-CJB, docket number 77.

9. "Trade secret" or "Trade secrets" means any and all forms and types of information that You contend constitutes a trade secret under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq, including the trade secrets identified in response to Axion's Interrogatory No. 13.

10. "Agilent Former Employees" means David Ferrick, Jay Teich, Will Deacon, Deborah Hurtado, James Guo, Alp Aras, and Beth Nigh.

11. As used herein, the term "person" includes any natural person, firm, association, partnership, corporation, group, organization, or other form of legal business entity.

12. The use of the singular form of any word includes the plural and vice versa.

13. As used herein, the term "document" shall have the broadest possible meaning afforded under the Federal Rules of Civil Procedure and shall include without limitation electronically stored information, such as emails and other forms of electronic messaging, as well as every writing or record of any kind that is in Agilent's possession, custody, or control and that is kept by electronic, photographic, mechanical, or other means.

14. The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the interrogatory more inclusive. The terms "any" and "all" shall be given

2

their most inclusive meaning, and should mean "any and all."  The words "each" and "every"

shall be given their most inclusive meaning, and should mean "each and every."

## TOPICS

**TOPIC NO. 1:** The decision to file this lawsuit against Axion for infringement of the Patents-in-Suit, including the identity of the persons involved in making that decision, the identity of any documents or things reviewed or considered in making the decision to file suit, and the factual bases for Agilent's pre-suit determination that Axion infringes the Patents-in-Suit.

**TOPIC NO. 2:** The decision to file this lawsuit against Axion for false advertising under the Lanham Act, including the identity of the persons involved in making that decision, the identity of any documents or things reviewed or considered in making the decision to file suit, and the factual bases for Agilent's pre-suit determination that Axion's statements regarding its capabilities to measure spheroids are false and/or misleading.

**TOPIC NO. 3:** The decision to file this lawsuit against Axion for trade secret misappropriation under the Defend Trade Secrets Act, including the identity of the persons involved in making that decision, the identity of any documents or things reviewed or considered in making the decision to file suit, and the factual bases for Agilent's pre-suit determination that any alleged trade secret has been misappropriated.

**TOPIC NO. 4:** Any investigation, analyses, or tests regarding the Patents-in-Suit and any Axion products, including without limitation the factual portion of any pre-suit investigation undertaken prior to the filing of this lawsuit.

**TOPIC NO. 5:** Any past or present efforts to license the Patents-in-Suit (successful or otherwise), including any express or implied licenses, constructive licenses through settlements, or negotiations and, without limitation, the potential licensees, the terms of the proposed licenses, and the royalty rates/volumes discussed to arrive at lump sum payments proposed under any potential licenses.

4

**TOPIC NO. 6:** The identity of any products that use or used the alleged inventions claimed or described in the Patents-in-Suit.

**TOPIC NO. 7:** The enforcement of the Patents-in-Suit against any person and any steps taken by you to enforce the Patents-in-Suit against any such person, including but not limited to charges of infringement.

**TOPIC NO. 8:** Sales, including units, price, customer, and costs/profits, of any products that use or used the alleged inventions claimed or described in the Patents-in-Suit.

**TOPIC NO. 9:** Agilent business segment variable and fixed cost information related to any products that use or used the alleged inventions claimed or described in the Patents-in-Suit.

**TOPIC NO. 10:** The total revenue to Agilent derived from or otherwise allocated or attributable to each Patent-in-Suit.

**TOPIC NO. 11:** Any studies, third party industry reports, or other analyses of the market, market share, competitors, or products in the industry where the products allegedly covered by the Patents-in-Suit are sold.

**TOPIC NO. 12:** The value (technical, monetary, or otherwise) that Agilent has attributed to any feature or functionality of any version of any product allegedly covered by the Patents-in-Suit, including any consumer surveys.

**TOPIC NO. 13:** Agilent's manufacturing, operating, marketing, and financial capacity/constraints from 2013 to present.

**TOPIC NO. 14:** The acquisition of ACEA by Agilent, including but not limited Agilent's analysis, due diligence, or review of ACEA's intellectual property, ACEA's products, the relevant market relating to Agilent's acquisition of ACEA, or Agilent's reasons behind or justifications for acquiring ACEA.

**TOPIC NO. 15:** Any opinions and/or studies conducted by third parties concerning the Accused Products and relating to any of the Patents-in-Suit.

**TOPIC NO. 16:** Any investigation, study, evaluation, and/or analysis, by Agilent or anyone else, regarding the patentability, validity, enforceability, infringement, or valuation of the subject matter disclosed in any of the Patents-in-Suit.

**TOPIC NO. 17:** Agilent's prosecution of the Patents-in-Suit and U.S. Patent No. 7,560,269.

**TOPIC NO. 18:** The conception, development, or reduction to practice of any of the alleged inventions disclosed in the Patents-in-Suit, as well as diligence between the dates of conception and reduction to practice.

**TOPIC NO. 19:** Any sales, uses, offers for sale, or publications concerning ACEA's RT-CES system prior to August 4, 2005.

**TOPIC NO. 20:** Any objective indicia pertinent to the obviousness and/or nonobviousness of the claims of the Patents-in-Suit under 35 U.S.C. § 103, including without limitation the presence or absence of commercial success, long felt need, attempts by others, failure of others, commercial acquiescence, licensing, praise by others, awards, industry approval, copying, teaching away, simultaneous development, or laudatory or derogatory statements by others.

**TOPIC NO. 21:** Any facts Agilent contends evidence the damages that Agilent has allegedly suffered due to Axion's alleged patent infringement.

**TOPIC NO. 22:** Any facts Agilent contends support its claim that this case should be deemed "exceptional" under 35 U.S.C. § 285.

**TOPIC NO. 23:** The precise Axion statements that Agilent alleges are false or misleading.

**TOPIC NO. 24:** The factual bases for your claim that Axion's statements regarding the ability of its products to accurately measure the impedance of 3D cancer spheroids are false or misleading.

**TOPIC NO. 25:** The factual bases for your statement in Agilent's response to Axion's Interrogatory No. 11 that "Axion's products does not reflect the true impedance of the spheroid as a whole and may reflect the impedance only of a monolayer of cells and/or spheroid cells that are in contact with electrodes on a 2D surface."

**TOPIC NO. 26:** The factual bases for Agilent's response to Axion's Interrogatory No. 11, including, but not limited to, the factual bases for Agilent's claim that Axion's scientific conclusions in its Application Note are not supported by its data.

**TOPIC NO. 27:** All investigations, testing, studies, or analyses performed regarding Axion's products and/or the statements in Axion's advertising that support your allegations and claims in the Second Amended Complaint.

**TOPIC NO. 28:** Any and all consumer feedback, comments, complaints, and/or perceptions related to the truth or accuracy of Axion's claim it can track the impedance of 3D spheroid models as described in Axion's Application Note.

**TOPIC NO. 29:** All investigations, testing, studies, or analyses performed by Agilent, or any of its customers or any other parties, regarding the ability of Agilent's products to measure and/or monitor the growth of 3D spheroid models.

**TOPIC NO. 30:** Any facts Agilent showing that Axion's allegedly false and/or misleading statements have caused actual deception or at least a tendency to deceive a substantial portion of the intended audience.

7

**TOPIC NO. 31:** Any facts supporting that Axion's allegedly false and/or misleading statements are material to customers, including any facts that support that customers would consider those statements in selecting whether to purchase a system from Axion or Agilent or that the statements have otherwise influenced purchasing decisions.

**TOPIC NO. 32:** The facts and circumstances surrounding Agilent's first awareness of each statement Agilent alleges is false or misleading.

**TOPIC NO. 33:** The facts and circumstances regarding any alleged harm or damage Agilent will suffer, has suffered, or is suffering that Agilent maintains is attributable to Axion's allegedly false and/or misleading advertising, including but not limited to decline in reputation, loss of goodwill, lost sales, or lost market share.

**TOPIC NO. 34:** The facts supporting Agilent's allegation in the Second Amended Complaint that "Axion's false and misleading statements are knowing and willful and/or with intentional disregard as to the true nature of the product it offers" (D.I. 77, ¶ 187) and that this case constitutes an "exceptional case within the meaning of Section 35 of the Lanham Act, 15 U.S.C. § 1117" (*id.* at ¶ 188).

**TOPIC NO. 35:** All articles that support Agilent's allegations that Axion has made false and/or misleading statements, including the identification of the article identified during the January 22, 2024 hearing on Axion's Motion to Dismiss (*see* 1/22/24 Hrg. Tr. at 50:19-21).

**TOPIC NO. 36:** The ability of any of Agilent's systems to use impedance or imaging to measure or track characteristics of 3D spheroids, including but not limited to Agilent's "Application Note" entitled "Monitoring Drug-Mediated 3D Tumor Spheroid Shrinkage in Real Time Using the Agilent xCELLigence RTCA eSight."

8

**TOPIC NO. 37:** Agilent's actual and projected sales revenue, gross profit, net profit, units sold, costs and expenses, from the date of first sale until the present for each Agilent product that Agilent contends competes with Axion's products.

**TOPIC NO. 38:** Identification of each of Agilent's alleged Trade Secrets.

**TOPIC NO. 39:** Identification of how each of Agilent's alleged Trade Secrets differs from general skill or knowledge in the industry.

**TOPIC NO. 40:** How each of the alleged Trade Secrets was developed.

**TOPIC NO. 41:** Agilent's efforts to maintain the secrecy of each of the alleged Trade Secrets.

**TOPIC NO. 42:** Agilent's efforts to maintain the secrecy of Agilent confidential information.

**TOPIC NO. 43:** Agilent's training of employees on protecting trade secret information.

**TOPIC NO. 44:** Agilent's Standards of Business Conduct produced at AGILE0073819.

**TOPIC NO. 45:** The steps or measures taken to ensure Agilent employees do not retain any Agilent confidential information upon exit from company, including without limitation all steps or measures taken to prevent Dr. David Ferrick from downloading or transferring Agilent information to an external hard drive or personal cloud-based storage account.

**TOPIC NO. 46:** The facts and circumstances as to why Agilent failed to recognize or identify that Dr. David Ferrick downloaded documents from Agilent's systems shortly before his voluntary separation, including without limitation, whether Agilent has any systems, programs or steps in place to monitor the exfiltration of data, whether any such system was triggered by Dr. David Ferrick's activities or if such a system is not employed at Agilent, the decision and reason the decision was made not to have such a data loss protection system in use.

9

**TOPIC NO. 47:** Agilent's exit interviews with Agilent Former Employees, including, but not limited to, Dr. David Ferrick, Jay Teich, Will Deacon, Deborah Hurtado, James Guo, Alp Aras, and Beth Nigh.

**TOPIC NO. 48:** Any opinions, searches, evaluations, comments or observations regarding the misappropriation, disclosure, scope, validity, value, protection, secrecy, or enforceability of any of the alleged Trade Secrets, including, but not limited to, any opinions of counsel.

**TOPIC NO. 49:** Any independent economic value of the alleged Trade Secrets, including the historical and present valuation, appraisals, revenue derived from, and alleged economic value of each of the alleged Trade Secrets.

**TOPIC NO. 50:** Agilent's policies and procedures to identify trade secret information.

**TOPIC NO. 51:** Agilent's policies and procedures for confidentiality labels in internal presentations.

**TOPIC NO. 52:** Agilent's computer network and location of where each alleged Trade Secret is maintained within Agilent.

**TOPIC NO. 53:** Identification of all person(s) with access to each alleged Trade Secret.

**TOPIC NO. 54:** Agilent's generation and evaluation of market analyses for the Cell Analysis or Life Science Instrumentation market(s).

**TOPIC NO. 55:** Agilent's merger and acquisition strategy, including but not limited to strategy employed by Agilent to identify potential targets.

**TOPIC NO. 56:** Agilent's utilization of each alleged Trade Secret.

**TOPIC NO. 57:** Facts supporting Agilent's allegations that Axion misappropriated any of the alleged Trade Secrets.

10

**TOPIC NO. 58:** Any harm, damage, or loss that Agilent resulting from Axion's alleged misappropriation of the alleged Trade Secrets and any efforts by Agilent to mitigate such harm, including the amount of such damages, harm or loss, and the identification of specific customers, accounts, orders, profits, revenues or sales that were diverted or not made as a result of any alleged misappropriation of alleged Trade Secrets by Dr. David Ferrick or Axion.

**TOPIC NO. 59:** Facts supporting Agilent's allegations that Axion has been unjustly enriched because Axion allegedly misappropriated Agilent's trade secrets.

**TOPIC NO. 60:** Any damages Agilent seeks related to Count V, including but not limited to lost profits, restitution, unjust enrichment, and/or reasonable royalties.

**TOPIC NO. 61:** Disclosures by Agilent between 2016 and 2023 of information relating to market and growth strategy, licensing efforts, and financials.

**TOPIC NO. 62:** Agilent's strategies to monitor competitors, including but not limited to Agilent's analysis of Axion.

**TOPIC NO. 63:** Preparation and approval of investor relations presentations located on Agilent's website.

**TOPIC NO. 64:** The economic benefit Agilent expected to receive from a continuing relationship with Dr. David Ferrick.

**TOPIC NO. 65:** The facts supporting Agilent's allegation that Axion's hiring of Dr. David Ferrick was designed to disrupt Dr. David Ferrick's economic employment relationship with Agilent.

**TOPIC NO. 66:** The facts supporting Agilent's claim that Axion did not act with reasonable care in hiring and onboarding Dr. David Ferrick.

11

**TOPIC NO. 67:** The terms and conditions of Dr. David Ferrick's employment at Agilent, including without limitation all contracts, confidentiality, non-disclosure or other restrictive covenant agreements Dr. David Ferrick signed.

**TOPIC NO. 68:** Any damages Agilent seeks related to Counts VI and VII, including but not limited to lost sales.

**TOPIC NO. 69:** Confirmation of the authenticity and business record status of all documents produced by Agilent in connection with this lawsuit.

**TOPIC NO. 70:** The organizational structure of Agilent.

**TOPIC NO. 71:** Agilent's litigation against Dr. David Ferrick (*Agilent Technologies, Inc. David Ferrick*, Civil Action No. 5:23-cv-06386-SVK (Dec. 12, 2023) and the resulting settlement agreement and/or dismissal in connection with the litigation.

# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


AGILENT TECHNOLOGIES, INC.,      C.A. No. 23-198-CJB

Plaintiff,

v.

AXION BIOSYSTEMS, INC.,

Defendant.

_____


* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

LI LEYNA ZHAO, Ph.D.,

individually and as 30(b)(6) designee for

AGILENT TECHNOLOGIES, INC.

San Diego, California

Friday, January 31, 2025

Volume 1


Reported by:

LESLIE JOHNSON

RPR, CCRR, CSR No. 11451

Job No.: 7128876

PAGES 1 - 379

Page 16

MR. WALSH:  Oh, I'm sorry.  You're right.
Not 27.  I apologize.  28, 29 and 30 on page 7.

Is that right?  Do I have that right?

MS. TARGOWSKA:  On page 7, yes.

MR. WALSH:  Sorry.  That was my mistake.

THE WITNESS:  Can you repeat your question?

BY MR. WALSH:

Q    Sure.  And I apologize for screwing up the first time.

I understand that you've been designated to testify on Topics No. 28, 29, and 30 on page 7.

And the question is, do you believe you're prepared to testify on those three topics today?

A    I believe so.

Q    Okay.  And then I also understand, if you'll flip the page to page 8 of Exhibit 1, that you are testifying today on Topics 31, 32, and 33 at the top of page 8.

Is that right?

MS. TARGOWSKA:  You may answer.  And if I need to clarify, I will.

THE WITNESS:  I believe so.

BY MR. WALSH:

Q    All right.  And then on page 9, there are

# Exhibit C

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

PROGRESSIVE CASUALTY INSURANCE CO.
and PROGRESSIVE DLP CORP.,                    :    CIVIL ACTION
                                              :
            Plaintiffs,                       :
                                              :
        v                                     :
                                              :
DRIVE TRADEMARK HOLDINGS LP, and              :
SANTANDER CONSUMER USA, INC.,                 :
                                              :
            Defendants.                       :    NO. 09-902-LPS
                         - - -

                    Wilmington, Delaware
                    Tuesday, March 27, 2012
                    *Jury Trial - Volume A*

                         - - -

BEFORE: HONORABLE **LEONARD P. STARK**, U.S.D.C.J., and a jury

APPEARANCES:              - - -


            MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
            BY:  THOMAS C. GRIMM, ESQ.

                 and

            KING & SPALDING
            BY:  JEFFREY S. CASHDAN, ESQ., and
                 ASHA JENNINGS PALMER, ESQ.
                 (Atlanta, Georgia)

                 and

            PROGRESSIVE CASUALTY INSURANCE CO.
            BY:  PETER ALBERT, ESQ.
                 (Cleveland, Ohio)

                    Counsel on behalf of Plaintiffs


                         Brian P. Gaffigan Kevin Maurer
                         Official Court Reporters

APPEARANCES:  (Continued)

WILKS, LUKOFF & BRACEGIRDLE, LLC
BY:  DAVID E. WILKS, ESQ.

and

SANTANDER CONSUMER USA, INC.
BY:  PAUL F. JONES, ESQ.
(Dallas, Texas)

Counsel on behalf of Defendant

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following trial proceedings were held in open court, beginning at 8:30 a.m.)

THE COURT:  Good morning, everyone.

(The attorneys respond, "Good morning, your Honor.")

THE COURT:  Let's have you begin by putting your appearances on the record for me, please.

MR. GRIMM:  Good morning, your Honor.  Thomas Grimm at Morris Nichols Arsht & Tunnell here for Progressive.  And with me today, Jeff Cashdan from King & Spalding; Peter Albert, who is in-house counsel for Progressive, and Asha Jennings, who is with King & Spalding.

THE COURT:  Okay.  Thank you.

MR. WILKS:  Good morning, your Honor.

THE COURT:  Good morning.

MR. WILKS:  Dave Wilks of Wilks, Lukoff & Bracegirdle.  I represent the defendants.  With me is in-house counsel at Santander Consumer USA, Paul Jones.

THE COURT:  Okay.  Thank you.

Welcome to all of you.  Have a seat.

We're here for trial today.  There are some matters I have to talk about before we bring the jury pool up which will be around 9:30.

First, on the voir dire.  Hopefully, you will have seen.  I think you have been provided a copy.  We did docket earlier this morning the voir dire.  It was largely based on what you all had proposed, and even though you had agreed on essentially everything, it's too long for me.  I don't want to take up all morning selecting a jury, and I limit the questions to the yes/no format.  I'm also not going to make folks stand up as you will see in the explanation.  They will try their best to remember which things they answered yes to.

Then we'll call them up one by one if they had a "yes" answer to anything.  I do some initial questioning to establish what they have affirmative answers to, and then I allow for some limited follow-up by both sides.

Once they step away, if you have a basis to move to strike for cause, then you can make your motion and I

will rule on it right there. So that is how we'll do voir dire.

Let me ask you about the preliminary jury instructions. There are two disputes and I'll let you argue them in a moment, but as a practical matter, I don't think you provided this version on a disk or in a WordPerfect file or anything to us. So I need to know pretty imminently, can you get that to us? And if you can't, we'll go ahead and start typing it up ourselves.

MR. CASHDAN: I believe, your Honor, we could ask somebody from Mr. Grimm's office to e-mail it over to the Court, if that will be convenient. I think it will probably be Word version. You may prefer WordPerfect.

THE COURT: I think we can work with Word, too, but I need to know if someone can send it over by e-mail to Mr. Golden in the next half hour or so. Can that be done?

MR. GRIMM: I think so, your Honor. I apologize. I should have thought to get that over to you. It's one of the things that I forgot about.

THE COURT: Okay.

MR. CASHDAN: Your Honor, I would note that we did submit complete versions of each different competing version. So to the extent you were going to make a choice between plaintiffs' proposed and defendants' proposed, at least you have version that we could use.

THE COURT: But I don't think you submitted it on a disk.

MR. CASHDAN: That's correct.

THE COURT: There are two versions, I understand that. It seemed to me they were identical except for the two points that you called out in the cover. Did I understand that correctly?

MR. CASHDAN: Yes, your Honor.

THE COURT: All right. So then, Mr. Grimm, you can e-mail over either copy because I could make the changes consistent with what I ruled this morning.

All right. So at this point, why don't we, let me hear from you all on those two points so I can make a decision on them.

MR. CASHDAN: Your Honor, Jeff Cashdan of King & Spalding for the plaintiffs.

As your Honor noted, we had indicated on the cover sheet the differences between the two versions of the preliminary jury instructions. The differences both center around one particular issue. The issue is whether this Court should be instructing the jury that you have determined there was a breach of the contract.

The parties agree it is appropriate for this Court to instruct the jury that the triggering events in Section 9.3 of the license agreement took place and to

delineate the particular provisions in the license agreement which were triggered.

The plaintiffs' position is that it's an essential ingredient of our claim for damages for breach of contract that there was a breach. Your Honor has determined that there was a breach and we simply don't want the jury to be distracted in this case into wondering if there was a breach; and we don't think it's appropriate to require us to put on evidence to establish the breach of contract when your Honor has determined, as a matter of law, that there was a breach.

We don't try to gild the lilly either in the preliminary jury instructions or in the final instructions. We simply note that the Court has determined that there was a breach of the contract in the case and that they are required to accept the Court's determination for purposes of deciding the damages issues.

So we think it's entirely appropriate, your Honor.

THE COURT: Okay. Thank you.

Mr. Wilks, do you want to address that?

MR. WILKS: Sure, your Honor. Thank you.

The important thing here is for the jury to understand what it is they are deciding. To continually hit them with the Judge found them in breach, it's a pejorative

term to accept it that way by the jury. We're not trying to ignore the fact that your Honor has made rulings in this case. We're going to talk about them ourselves.

Your Honor has found that Section 9.3, (b) through (f), have all been triggered. We intend to talk about that as we all have to because that is the reality of the case. But the characterization of that repeatedly of: this is a breach, this is a breach, this is a breach, is prejudicial and it's entirely unnecessary.

What the jury has to decide is does the triggering event cause Progressive to be entitled to their money back? That is all that we're here to determine. We don't have to talk about breach and continually nail it into their head, that pejorative term. That's why we object to it.

THE COURT: Thank you. I agree with the plaintiffs on this. I don't think it's a pejorative term, I don't think it's overly prejudicial. I think it will eliminate any risk of confusion by making it clear to the jury we're here on a breach of contract claim but the breach of contract has been established. What you need to be concerned with is the damages. And,

I'll make an effort not to overdo it but it is a necessary prerequisite in the context that the jury needs to have. And I think that even more so in connection with

looking at the proposed verdict form which happily you all agreed on. The case is simplified.

As you should, you are asking the jury to determine damages on breach of contract, and it says breach the contract right there. I think the jury in that regard needs to know that breach of contract has already been established, whether you heard evidence to prove it or not, because it's already been determined. So we'll be going with the plaintiffs' version of the preliminary jury instructions.

There were three motions in limine in the recently submitted version of the pretrial order. I'll let you argue those briefly, if you wish. They're all plaintiffs' motions.

MR. CASHDAN: Thank you, your Honor. The first motion in limine relates to the testimony of Mr. Kulas, Jason Kulas, who is the current CFO of Santander Consumer USA. The defendants have explained to us recently that their intention is to have Mr. Kulas discuss with the jury the transactions that occurred in December 2006 that triggered the different subsections of Section 9.3.

First and foremost, it's our objection to Mr. Kulas' testimony because Mr. Kulas didn't join Santander Consumer USA until January of 2007. He has testified that he was not personally involved with the transaction either

at his prior employer or when he became an employee of Santander Consumer, so he has no personal knowledge of the transaction, and under Rule 602, he should not be permitted to testify.

Moreover, his testimony would be complete hearsay. Mr. Kulas was deposed in this case. He was designated as a 30(b)(6) witness. He wasn't deposed because of his personal knowledge. He testified during the course of his deposition that his knowledge of the transactions is based solely upon his review of the stock purchase agreement and other documents that were prepared in connection with the transaction and not because he participated in it personally. So it's all hearsay.

Moving past those objections to Mr. Kulas testifying, we think it's inappropriate to spend time with the jury talking about the underlying transactions in that amount of detail. It's perfectly appropriate we think to point out for the jury what the transactions were to give context to the Judge's, your Honor's decision about which triggering events took place.

To have someone get on the stand and explain the intricacies of the transaction, try to explain away the impact of the triggering events we think would be inappropriate.

Your Honor, would you like me to go to the other

motion in limines or have Mr. Wilks respond?

THE COURT: Anything you want to say on all three, say now and do address the timing. I recognize things were done a little bit unusually here, but it does seem like your motions came fairly late.

MR. CASHDAN: Sure, your Honor. Let me address the timing.

As you may recall, the week of the pretrial order, the proposed pretrial order was originally due, as Mr. Wilks noted, there was a health issue in his family and he needed additional time, and we didn't have candidly the kind of interaction between counsel we would have liked.

At the time as well, there were tort claims pending. So Mr. Kulas was listed on the witness list. We assumed that he would have things to say about the triggering events, possibly about the business of Santander Consumer USA, about Santander USA's conduct since 2007 in relation to the DRIVE Mark that might go to tort claims.

When we were talking with Mr. Wilks, the week we submitted the new revised proposed pretrial order after we decided to eliminate the tort claims, we asked the question of why Mr. Kulas' testimony continued to be relevant.

We were told by Mr. Wilks at that time what he expect Mr. Kulas to testify to. We told him at that time we objected. And then in connection with finalizing the

proposed pretrial order, we included our motions in limine. Mr. Wilks had raised a question about whether he had adequate time, asked for another day. We said fine, we gave him another day.

I don't think there is any prejudice, your Honor. We can decide here today whether Mr. Kulas will testify. But if we don't decide it as a motion in limine, you will be hearing the same argument in a day or two when Mr. Kulas is called and I object to his testimony at that time.

THE COURT: I hope it's no longer than within a day since you are limited to five hours.

MR. CASHDAN: The other two motion in limines I think are pretty easily addressed, your Honor.

The first one was we didn't want to have the defendants addressing their so-called timing defenses of waiver estoppel, acquiescence or laches in this trial.

I believe Mr. Wilks has made clear in the defendants' response that they don't intend to raise those issues and so we think an order in the motion in limine be entered making it clear they may not do so is appropriate. There doesn't seem to be a dispute that topic should not be introduced. And,

Finally, we had also filed a motion in limine. I'm sorry. That was No. 3. No. 2 was regarding the

triggering events. I think that is the one where they had agreed they wouldn't but that evidence in.

The timing issue, I think the only remaining dispute there was the plaintiffs think it would be inappropriate again for waiver-type arguments to be made.

The defendants have suggested, even though this Court has found as a matter of law that there was no waiver, that they think it would be appropriate to argue that there was somehow undue delay in Progressive raising the issue to the defendants and, therefore, that ought to undermine our claim to get our money back under the licensing agreements.

I don't think arguing it as a waiver is appropriate given your Honor's ruling that the waiver defense as a matter of law is not valid.

THE COURT: Well, isn't it appropriate, though, for them to establish that context, if they wish, and then I need to make sure that the jury instructions are such that the jury understands that is just for context and the Court has already determined that what you did was timely?

MR. CASHDAN: Yes, I think that is appropriate, your Honor. If they want to establish context, that's fine. But I think what we're asking to be precluded is we don't want them getting up and saying, and be permitted to get up and say, because of that context, Progressive waived its entitlement to get those licensing fee payments back. That

is what we're trying to prevent being argument in this case, your Honor.

THE COURT:  Thank you.  Mr. Wilks.

MR. WILKS:  Thank you, your Honor.

On the first motion, on Mr. Kulas' testimony.

First of all, if I may address the timeliness issue because it's hard to sit in my position and be criticized for waiting for the Third Circuit to make its rulings to file a motion to stay even though we told them about it six months before we filed it.  Then to be told, well, two days before I told you I was going to file it, then they filed it an hour before the pretrial is due.  That is just hard to listen to from my side of the table.  So I think it was untimely.

I identified Mr. Kulas as a witness 13 days, almost two weeks before the pretrial was due, before they raised this motion, so that is the basis of our timeliness motion.  It's argument.  They gave it to me an hour before my response was due.  I told them I will respond by noon tomorrow.  So I got a half a day.

THE COURT:  What about the argument that maybe it was too early and we should be having these arguments during Mr. Kulas' testimony.

MR. WILKS:  That is fine.  But that is not the procedure they followed.  They followed the procedure that

your Honor put forth in your standard order for a pretrial. And so, I mean, they chose this path. They chose to file a motion in limine. And they did it too late. And for that reason it should be denied, just as our motion for stay was denied, albeit for other reasons in addition.

On the substance. Mr. Kulas is the CFO of this company. He joined the company about a month, maybe a little less than a month after the transaction took place. There is nobody at the company who knows these transactions better than their CFO. It's his job to know the corporate history of the company. He knows this transaction as well as or better than anybody on the planet. So to say he has no personal knowledge just because he wasn't in the room ignores the reality that a chief financial officer and corporate officer and former board member has, as it is his business to have, personal knowledge of the transactions that form the structure of the business for which he is servicing.

Two, if Mr. Kulas has a disablement that occurred or defect in his personal knowledge, I wonder how it is the plaintiffs can get this evidence in. They have chosen to put these documents into evidence. We have not objected. They intend to introduce them with a witness who has far less personal knowledge of their contents and the nature of these transactions than does Mr. Kulas.

So it is another argument that they seem to be making, your Honor, they are championing an exhibit and yet at the same time seeking to exclude the only knowledgeable witness on those documents from testifying in the case.

On the assistance of what Mr. Kulas is going to testify to, this isn't confusing testimony. This is elucidating testimony. This case is about contract interpretation. Your Honor has held that these contracts are ambiguous in a certain fashion. The parties made an agreement, had an intention of whether or not more license fee payments would be made. We differ on the interpretation of the contract.

But what gives life to that argument and what illuminates that argument is the underlying transaction that triggered this dispute. And that's the Santander purchase of HBOS's ownership interest in the company.

To have the CFO come before the jury and try to very carefully explain in simple terms exactly what this series of events was, why it took place and how it fits into then allowing the Court and counsel to then make their arguments on how those two things fit together, the parties' intentions when they negotiated the license agreement, and the actual nature of the triggering events and how those two fit together, without Mr. Kulas explaining that and explaining just what the nature of the transaction was, why

the LP was converted to an LLC, why the LLC was merged into a corporation, the fact that that was all done under the Halifax Bank of Scotland umbrella and then a stock sale happened by which Banco Santander came in -- it is a simple chain of transactions, but it doesn't seem so simple when all you are doing is looking at a big stock purchase transaction, the stock purchase agreement and the other operative documents.

So Mr. Kulas's testimony is highly relevant. It's highly helpful to the jury. It doesn't confuse the issues. It simplifies the issues.

His personal knowledge, there is no one else with more personal knowledge of those documents and those transactions than Mr. Kulas.

The triggering events, I think it is just a moot -- the second motion, I think it's just a moot point. We are not disputing your Honor's ruling with this jury. We are not suggesting that the triggering events really didn't happen. That wouldn't be very smart for us. Your ruling is very clear. And we are accepting it for this trial.

I think the entry of an order on evidence that isn't being introduced is inappropriate.

THE COURT: An argument that won't be made. Correct?

MR. WILKS: I will not be arguing that the

triggering events didn't happen. Your Honor ruled that they have.

The timing defense is the third motion in limine. I think your Honor is going to instruct the jury that part of their analysis for contract interpretation is the conduct of the parties post-contract, how did the parties behave after they signed the deal, because that can inform their decision or their analysis of what the parties intended.

Now, in this case, Progressive sees some information, continued to make payments, continued to communicate with Santander, qua Santander rather than as its predecessor. That's relevant to that prong of the jury's deliberations on contract interpretation.

We were going to argue that there is a waiver, there is acquiescence. Your Honor has dispensed with that. We accept that for this trial, absolutely.

But for contract interpretation purposes, it's absolutely relevant. So it should be denied, also, your Honor.

Thank you.

THE COURT: Thank you. Briefly.

MR. CASHDAN: Your Honor, briefly as to Mr. Kulas.

I think if you listen to Mr. Wilks's argument

carefully, what he said is Mr. Kulas has personal knowledge on the documents. The documents speak for themselves. We don't object to the admission of the documents because they are business records. If the documents are admitted and then Mr. Wilks wants to make argument from them, he may do so. Mr. Wilks also has put on his witness list Mr. Burton Brillhart, who is the general counsel of DRIVE Financial Services LP at the time of the stock purchase agreement. He was involved in the stock purchase agreement.

What Mr. Kulas lacks is personal knowledge of the transaction himself.

Mr. Wilks says it's important to understand why the parties consented to convert DRIVE Finances LP into new DRIVE LLC. Mr. Kulas didn't participate in the consideration of that analysis. He didn't participate in discussions about other alternatives. I can't ask him and elicit information about what were the parties discussing as alternative structures at that time because he wasn't there at that time.

His only knowledge is in reading the documents that are admissible and then interpreting them for the jury. That's their job, not Mr. Kulas' job.

THE COURT: Thank you.

With respect to plaintiffs' three motions in limine, they are all denied. First, they are denied as

untimely. Now, I understand the timing here was unusual, so I don't fault plaintiffs for making the effort. But nonetheless, it was represented that there were not expected to be motions in limine. That was the Court's understanding. So these motions in limine are too late. Nonetheless, I will reach the merits, because in some sense they are too early also, because I think all the issues they present are meaningful issues that would come up in this trial nonetheless.

On the merits, I also agree with the defendants. First, with respect to Mr. Kulas, I believe his testimony is appropriate to put into context the occurrence of the triggering events. There will be no evidence and no argument to suggest that the triggering events did not occur. If anyone were to stray across that line, I promise I will make it very clear to the jury that the triggering events did occur for purposes of this trial, as the Court has previously ruled.

With respect to lack of personal knowledge and hearsay, in the Court's view, Mr. Kulas is the CFO, he has information that is relevant. And he is, I believe, sufficiently knowledgeable to testify about these topics. Whether he has personal knowledge, whether he was there at the time the events occurred, those are matters that can be established through direct or through cross-examination.

I am quite confident at the end of effective examination by both sides that the jury will know just exactly what the basis of Mr. Kulas' testimony is and what it is not.

The suggestion that it would be inappropriate to spend time getting into such detail, that's a matter that I don't particularly concern myself with, given that it's a timed trial. The defendant has a total of five hours. If it wishes to spend up to five hours going into the detail of what Mr. Kulas knows or thinks he knows about the transactions, that is how defendants are free to use their time, if that's what they wish to do.

On the other motions, the analysis is pretty much the same. The defendants are not going to be permitted to make an argument about the timeliness and whether there was waiver or estoppel. But they can establish the context from their perspective in which the triggering events occurred. Again, if there is any crossing of that line, I can straighten it out with jury instructions.

So, again, the three motions in limine are denied.

Let me say a few things about the timed trial. You have all worked out that you are limited to the five hours. That five hours for each side begins at opening statements. We will finish with your closing arguments by

o'clock.

Have a good evening.

MR. CASHDAN:  Thank you, your Honor.

(Proceedings adjourn at 4:20 p.m.)


I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.


                              /s/ Brian P. Gaffigan
                              Official Court Reporter
                              U.S. District Court

**Axion's Reply in Support of Motion *in Limine #2***

**Axion's Reply for its MIL No. 2 (Excluding Evidence/Argument Re: Customer Perception)**

Demonstrating the baselessness of its false advertising claim, Agilent suggests in its opposition that the exclusion of testimony regarding Dr. Revach's alleged statement and unspecified customers' statements regarding product capabilities would be dispositive of its claim. However, Agilent cannot prove up a false advertising claim with inadmissible testimony that amounts to double hearsay and an improper opinion that is unfairly prejudicial to Axion.

*Dr. Revach's Alleged Statement Is Double Hearsay*.  Agilent has already tried to rely on Dr. Revach's alleged statement to Dr. Raver for its truth, i.e., that Dr. Revach "would not consider Agilent xCELLigence products" because she wanted a product that could "measure spheroid impedance accurately."  *See* D.I. 363, Ex. L a 286:13-21; D.I. 392 at 38.  And, if introduced through Dr. Zhao, Dr. Revach's alleged statement would be double hearsay.  *Kos* and *Callahan* are inapposite because, among other reasons, they relate to first-level hearsay statements, and Dr. Zhao's testimony concerning a purported conversation between Dr. Revach and Dr. Raver would be second-level hearsay that fails to satisfy a hearsay exception.  *See, e.g., UHS of Delaware, Inc. v. United Health Servs., Inc*., 227 F. Supp. 3d 381, 396 (M.D. Pa. 2016) (noting plaintiff's misreading of the *Kos* decision with respect to second-level statements as "the hearsay rule prohibits any substantive recount of underlying conversations" by employees).  Dr. Zhao's designation as a Rule 30(b)(6) witness provides no such exception as "at trial the designee may not testify to matters outside [her] own knowledge to the extent that information [is] hearsay not falling within one of the authorized exceptions."  *TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 454 (M.D. Pa. 2013), amended (Apr. 8, 2013) (cleaned up).  None of Agilent's cited cases support the position that Dr. Zhao can testify to third-party statements made to another Agilent employee.  *See, e.g., Kos Pharms., Inc. v. Andrx Corp*., 369 F.3d 700, 719 (3d Cir. 2004) (noting affidavit may not be "competent proof or reliable evidence of any particular incident that it describes"); *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006) (agreeing corporate representative "could not offer any testimony at trial [] to the extent that information was hearsay not falling within one of the authorized exceptions"); *LG Display v. Au Optronics Corp.*, 265 F.R.D. 189 (D. Del. 2010) (finding testimony "correlated to [witness'] personal knowledge").

*Alleged Statements of Unnamed Customers Are Inadmissible*.  Agilent should also be precluded from eliciting testimony from Dr. Zhao regarding the perceptions of any other alleged customers because at her 30(b)(6) deposition she could not name *any* customers who sought products that could measure characteristics of 3D cancer spheroids, nor did she testify that any such customers (other than Dr. Revach) believed Axion's products could do so.  *See* D.I. 363, Ex. 36 at 280:20-281:23.  Again, any testimony about customers' alleged reasons for purchasing the products would be offered for its truth, which is classic hearsay.  Moreover, any testimony by Dr. Zhao regarding the purported "many cases" of customers desiring certain product capabilities and the impact on purchasing decisions would be improper opinion testimony, lacking foundation and based on speculation.  The cases Agilent invokes do not hold otherwise, and in any case, Agilent ignores these issues in its opposition, focusing only on alleged "customer confusion" of the unnamed customers, of which there is no evidence of record.

Any marginal probative value of the "targeted testimony" is substantially outweighed by the danger of misleading the jury and causing unfair prejudice under Rule 403.  Axion respectfully requests that the Court grant Axion's MIL No. 2.

1

**Axion's Motion *in Limine #3***

███████████████████████████████████████

**MIL No. 3    All Purchase Price Information Regarding Agilent's Acquisition of ACEA and Summa Equity's ██████████████████████████ Should Be Excluded.**

### INTRODUCTION

Evidence regarding the amount invested in 2021 by Summa Equity ██████████████ ████████ as well as the amount paid by Agilent in 2018 to acquire ACEA (previous owner of the patents-in-suit) is irrelevant to every issue in the case. Even assuming relevance, the dollar figures of these acquisitions ███████████████████ have the potential to confuse the issues, mislead the jury, and unfairly prejudice Axion in a case where Agilent seeks damages totaling around ████████ for both its false advertising claim and its patent infringement claims (and significantly less if Agilent cannot show it is entitled to lost profits). Accordingly, Axion respectfully moves to exclude all acquisition purchase price information under Federal Rules of Evidence 402 and 403.

### I.    ACEA's Purchase Price

Agilent acquired ACEA in November 2018 for approximately $250 million. (Ex. 1 (Napper Op. Report) at ¶¶ 21, 146.) Agilent's damages expert (Brian Napper) mentions this dollar amount in his Report (*id.*), but he does not rely on the acquisition value of ACEA for his calculations of either lost profits or reasonable royalty patent damages or false advertising damages.



. (*See* Ex. 2 (Todd Christian Depo. Tr.) at 83:19–84:7, 475:14–19.) ████████████████ (*Id.* at 81:24–82:1.) ████████████ *Id.* at 82:1–5.) ████████████████ (*Id.* at 450:17–451:2.) ████████████ (*Id.* at 451:3–15 (emphasis added).)

### II.    Axion's Purchase Price

According to Mr. Napper's report, Summa Equity, ████████████████████ n early 2022. (Ex. 1 at ¶ 23.)[1]  Mr. Napper additionally states that ████████████████ (*Id.*)  Both companies were

---

[1] Other testimony in the record indicates ████████████████████████████████████.

███████████████████████████████

███████████████████████████. (*Id.*)  Mr. Napper mentions these███████████████████ ████████████ but, again, does not utilize them in his calculation of alleged patent or false advertising damages.  (*Id.*)

## ARGUMENT

Federal Rule of Evidence 401 states that "[e]vidence is relevant if it (a) has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Federal Rule of Evidence 402 states that "irrelevant evidence is not admissible."  Pursuant to Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues [or] misleading the jury[.]"  All acquisition price information should be excluded under these rules.

## I.    Rules 401 and 402

The dollar amount of Summa Equity's ████████████████████████████ does not provide any indication of allegedly infringing sales by Axion (or Agilent's alleged lost profits) and is therefore irrelevant to the issue of patent damages.  *See, e.g.*, *EMC Corp. v. Pure Storage, Inc.*, 2016 WL 775742 at *3 (D. Del. Feb. 25, 2016) (finding that "IPO and acquisition values of [defendant] have little, if any, relevance to liability or damages issues" in patent infringement action); *Alcatel USA, Inc. v. Cisco Systems, Inc.* 239 F. Supp. 2d 660, 671–72 (E.D. Tex. 2002) ("No case … holds that the acquisition price of a company can provide the measure of a reasonable royalty in the absence of actual lost profits."); *CLO Virtual Fashion Inc. v. Zhejiang Lingdi Digital Tech. Co.*, 2025 WL 1975719 at *3 (E.D. Tex. Apr. 11, 2025), *report and recommendation adopted*, 2025 WL 1960829 (E.D. Tex. July 16, 2025) ("A defendant company's enterprise value, standing alone, is not a viable basis for a reasonable royalty rate calculation."); *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1376 (Fed. Cir. 2002) ("Reasonable royalty damages for patent infringement arise from the fact of infringement, and the portion of the sales price consisting of intangible goodwill is not the sale of infringing goods … that can form the base for determination of a reasonable royalty.").  Further, the dollar amount of the Summa Equity transaction is not related in any way to Mr. Napper's false advertising damages theory, which seeks Agilent's prospective ██████████████████ corrective advertising costs.

The dollar amount Agilent paid for ACEA is likewise not relevant to either Agilent's alleged lost profits or any reasonable royalty, and is thus also irrelevant to the issue of patent damages.  "[A] patent owner's overall valuation is not a factor typically considered in calculating lost profits or reasonable royalty rates." *EMC Corp.*, 2016 WL 775742 at *3 (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978); *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1127–28 (S.D.N.Y. 1970)).  Additionally, as Agilent has acknowledged, ACEA's intellectual property was not factored into the ACEA acquisition price. (Ex. 2 at 83:19–84:7, 475:14–19.)  Furthermore, the dollar amount Agilent paid for ACEA is not in any way related to Mr. Napper's false advertising damages theory that seeks Agilent's prospective corrective advertising costs.

Confirming the lack of relevance here, Agilent's damages expert Mr. Napper does not rely on either the price Agilent paid for ACEA or ███████████████████████████████

██████ in his patent and false advertising damages calculations. (*See*, *e.g.*, Ex. 1 at ¶¶ 21, 23, 146 (Mr. Napper's only references ████████████████ in his opening expert report).)   For example, Mr. Napper never states that ████████████████ are relevant to his opinions or that the respective dollar amounts factor into his damages analysis.

## II.    Rule 403

Providing the dollar amounts of the above-referenced acquisitions to a jury would only risk confusing the issues, misleading the jury, and unfairly prejudicing Axion.  For example, Agilent's $250 million acquisition of ACEA dwarfs the approximately ████████ in total damages that Agilent seeks in the upcoming trial. (*See* Ex. 1 at ¶¶ 11–18.) ████████████████████ ████████████████████████████  These disproportionate numbers, coupled with the lack of any probative value of the acquisition prices, would needlessly confuse a jury on the issue of damages and therefore merit exclusion. *See*, *e.g.*, *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 2019 WL 8685065 at *6 (C.D. Cal. Dec. 3, 2019) (excluding $11.9B acquisition price in patent infringement action where expert did "not use [the] figure[] in his damages calculations" because it was "irrelevant and confusing, given the lack of nexus to the accused product").

## CONCLUSION

The acquisition prices paid by Agilent to acquire ACEA in 2018 and ████████ ████████████████████ have no bearing on any of the issues to be decided in the January 2026 trial, including Agilent's damages theories for its patent infringement and false advertising claims.  Accordingly, evidence and argument regarding these prices are irrelevant and should be excluded.  Even if they were relevant, reference to such acquisition prices substantially outweighs any probative value and risks confusing the issues, misleading the jury, and unfairly prejudicing Axion, and thus should be excluded on that basis as well.

# EXHIBIT 1

███████████████████████████████

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., | |
| Plaintiff, | |
| v. | C.A. No. 23-198 (CJB) |
| AXION BIOSYSTEMS, INC., | |
| Defendant. | |

## EXPERT REPORT OF BRIAN W. NAPPER

███████████████████████████████████████

███████████████████████████

Brian W. Napper

Dated: March 20, 2025

Based on the analysis I have conducted and for the reasons set forth herein, I have reached the conclusions in this report and I declare under the penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the following is true and correct.

████████████████████████████████

expert in this matter, in addition to my review of his report filed in this instant matter.[3]

7.     **Appendix B** of this report identifies the documents and other information I have reviewed to date during my analysis. The materials I reviewed and considered in forming my opinions in this matter are either: 1) cited as footnotes within this report and/or 2) are listed on **Appendix B** attached to this report.

8.     To the extent permitted by the Court, I reserve the right to supplement my report based on my review of any additional information produced by Agilent and/or Axion, its experts, or any third party. Although I may cite to a particular page or pages of documents in this report, such pinpoint cites are provided for clarification purposes only, and I reserve the right to refer to any and all parts of these documents.

9.     In connection with my anticipated trial testimony in this action, I may use as exhibits various documents produced in this litigation that refer to or relate to the matters discussed in this report. I may also create or assist in the creation of certain demonstrative exhibits to assist me in my testimony.

### D.     SUMMARY OF OPINIONS

10.    Based on the totality of the circumstances in this case and the information available to me at this time, I have reached certain conclusions regarding the appropriate measure and amount of monetary recovery due to Axion's alleged infringement of the Asserted Patents and statements construing false advertising, in the event that liability is found against Axion for Agilent's claims.

#### 1.     PATENT DAMAGES

#### i.  Lost Profits

11.    Considering the information and data available to me in this matter and under a presumption of

---

[3] Opening Expert Report of Dr. A. Bruno Frazier Volume I, March 20, 2025 ("Frazier Report VOL I"); Opening Expert Report of Dr. A. Bruno Frazier Volume II, March 20, 2025 ("Frazier Report VOL II"); Opening Expert Report of Dr. A. Bruno Frazier Volume III, March 20, 2025 ("Frazier Report VOL III").

███████████████████████████████████████████

validity and infringement of the Asserted Patents, it is my opinion that, as a result of Axion's infringement, Agilent has suffered damages in the form of lost profits for the Asserted Patents totaling approximately between **$5.20] million and $5.97 million** during the infringement period, and no less than approximately between **$4.36 million and $5.01 million**.[4]

12.    I understand that, should the Court find that Axion willfully infringed Agilent's patents, the amount of damages could be increased by up to three times the actual damages.[5] In addition, Agilent would be entitled to pre- and post-judgment interest, which I could calculate if asked to do so.

### ii.   Reasonable Royalties

13.    Alternatively, should the trier of fact find Agilent is not entitled to lost profits, it is my opinion that Agilent has suffered damages in the form of reasonable royalties due to Axion's infringement of the Asserted Patents in an amount of **$468,343** during the infringement period.[6]

14.    Should the trier of fact find that Agilent is entitled to lost profits as a result of Axion's alleged infringement, I find that Agilent, additionally, would be entitled to approximately between **$92,436 and $141,735** in reasonable royalty damages, which capture sales of Accused Machines and Accused Software not accounted for in my estimate of lost profit damages.

15.    As with lost profits, I understand that, should the Court find that Axion willfully infringed Agilent's patents, the amount of damages could be increased by up to three times the actual damages.[7] In addition, Agilent would be entitled to pre- and post-judgment interest, which I could calculate if asked to do so.

---

[4] **Schedule 5.0.**

[5] 35 U.S. Code § 284.

[6] **Schedule 2.0**.

[7] 35 U.S. Code § 284.

Page **7** of **139**

### 2.    FALSE ADVERTISING DAMAGES

16.    Following a review of damages remedies available pursuant to the Lanham Act, it is my opinion that, as a result of Axion's false advertising to prospective customers, an appropriate award of false advertising damages would be **$848,637**, reflecting the minimum cost of corrective advertising which Agilent would need to incur to undo the harm caused by Axion's misleading and false statements.[8]

### 3.    DAMAGES SUMMARY

17.    In summary, my opinion that the appropriate measure and monetary recovery in the event that liability is found against Axion for Agilent's claims is as shown in the following figure.

---

[8] **Schedule 6.0.**

**Figure 1**

**Summary of Damages[9]**

| | Scenario A | Scenario B |
|---|---|---|
| **Multi-Supplier Market** | | |
| Lost Profits | $ 4,362,076 | $ 5,008,309 |
| Reasonable Royalties | 141,735 | 92,436 |
| **Lost Profits and Reasonable Royalites** | **$ 4,503,811** | **$ 5,100,745** |
| | **Scenario A** | **Scenario B** |
| **Two-Supplier Market** | | |
| Lost Profits | $ 5,201,252 | $ 5,971,807 |
| Reasonable Royalties | 141,735 | 92,436 |
| **Lost Profits and Reasonable Royalites** | **$ 5,342,987** | **$ 6,064,243** |
| **Reasonable Royalties Assuming No Lost Profits** | **$ 468,343** | |
| **False Advertising Corrective Damages** | **$ 848,637** | |

18.    I reserve the right to consider and respond to any analyses, calculations, or other opinions concerning monetary recovery offered by Defendants, their witnesses, or their experts. I also reserve the right to supplement my opinions, based on any further discovery, document production, or deposition testimony prior to trial in this matter.

## II.    RELEVANT PARTIES

### A.  AGILENT TECHNOLOGIES, INC.

19.    Agilent is a "global biotech leader" and "world-leading research, development, and

---

[9] **Schedule 1.0.** ███████████████████████████

████████████████████████████████████████████

██████████████████████████  *See,* **§ VII.B.4**, **§ IX.D.**

■■■■■■■■■

manufacturing company whose laboratory products and services target the food, environmental and forensics, pharmaceutical, diagnostics, chemical and energy, and research markets, among others."[10] Headquartered in Santa Clara, California, Agilent provides "application focused solutions" in life sciences, diagnostics and applied chemical markets that "include instruments, software, services and consumables for the entire laboratory workflow."[11]

20.    Agilent's business segments are comprised of the life sciences and applied markets business, the diagnostics and genomics business, and the Agilent CrossLab business.[12] In the first fiscal year of 2024, Agilent moved its cell analysis business from their life sciences and applied markets segment to their diagnostics and genomics operating segment.[13] Agilent's diagnostics and genomics business includes providing active pharmaceutical ingredients for oligo-based therapeutics and solutions that include "reagents, instruments, software and consumables which enable customers in the clinical life and sciences research areas to interrogate samples at the cellular and molecular level."[14] Agilent also produces high-throughput impedance-based cell analysis products through its cell analysis division.[15]

21.    ACEA Biosciences Inc. ("ACEA") was "a developer of cutting-edge cell analysis instruments for life science research and clinical diagnostics."[16] ACEA provided cell analysis tools in "drug discovery and development, toxicological analysis, flow cytometry, pharmacological studies, clinical diagnosis and basic cell biology" through the innovation and commercialization of its xCELLigence Real-Time Cell Analysis instruments ("xCELLigence") and NovoCyte Quanteon

---

[10] Second Amended Complaint, ¶¶ 11, 81.

[11] Agilent Technologies, Inc. Form 10-K for the fiscal year ended October 31, 2023, p. 3.

[12] Agilent Technologies, Inc. Form 10-K for the fiscal year ended October 31, 2023, p. 3.

[13] https://www.agilent.com/about/newsroom/presrel/2023/20dec-gp23033.html.

[14] Agilent Technologies, Inc. Form 10-K for the fiscal year ended October 31, 2023, p. 3.

[15] Second Amended Complaint, ¶¶ 15-16.

[16] https://www.agilent.com/about/newsroom/presrel/2018/25sep-gp18055.html; 2018 Agilent Technologies, Inc. Annual Report, p. 101.

flow cytometers ("NovoCyte").[17] The xCELLigence product line consists of impedance-based cell analysis platforms for label-free, real-time cellular function measurements.[18] NovoCyte provides high performance bench flow cytometry systems.[19] In November 2018, Agilent completed its acquisition of ACEA for approximately $250 million to bring together the "two pioneers in cellular function and metabolism measurements" with "a common goal to provide the most innovative solutions for cell analysis."[20]

### B. AXION BIOSYSTEMS, INC.

22. Axion is a privately held biotechnology research and life sciences tools company that develops, produces, and markets bioelectronic assay systems, consumables, and software that researchers use for microelectrode array ("MEA") and impedance cell analysis in biomedical research.[21] Headquartered in Atlanta, Georgia, Axion offers "solutions for continuous, noninvasive monitoring of in vitro cell models" and "real-time, label-free monitoring, power software, and scalable throughput."[22] Axion further characterizes itself as a "leading provider of MEA [multielectrode array] and impedance technology for single-cell analysis."[23] Axion introduced its first MEA system in 2010, and in 2019, Axion released Maestro Z as an "impedance-based cell analysis system, for label-free oncology, virology, cellular kinetics assays."[24] In North America, Axion directly sells to customers within the academic, biotechnology, healthcare

---

[17] https://igbiosystems.com/global-partners/acea-biosciences/; https://www.linkedin.com/company/acea-biosciences.

[18] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html.

[19] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html.

[20] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html; 2018 Agilent Technologies, Inc. Annual Report, p. 29.

[21] AXION-1071364–414 at 369; https://summaequity.com/investments/axion/; https://www.linkedin.com/company/axion-biosystems.

[22] https://www.linkedin.com/company/axion-biosystems.

[23] https://www.axionbiosystems.com/resources/news/summa-equity-acquires-axion-biosystems.

[24] https://www.axionbiosystems.com/about-us/our-history.

████████████████████████████████████

corporations, and research spaces.[25] I discuss Axion's product offerings in further detail in Section **§ VI.A** below.

23.    In July 2021, Summa Equity AB ("Summa") ████████████████████████

████████████████████████████████████

███████████████████████████ █████████████████████

████████████████████████████████████

█████████████████████████████████ █ █

████████████████████████████████████

█ █████████████████████████████████

███████████████ █████████████████████

███████████████████████████ █

## III.    RELEVANT MARKET AND COMPETITIVE DYNAMICS

24.    As will be discussed throughout this expert report, I understand Agilent and Axion to be direct competitors in the impedance-based cell analysis industry, with Agilent being the clear market leader within this industry. A March 2021 ████████████████████████

█████████████████████████████████

████████████████████████████████████

████████████████████████ █ ████████████

████████████████████████████████████

---

[25] AXION-1071364–414 at 369.

[26] AXION-1071364–414 at 372.

[27] AXION-1071364–414 at 372; Deposition of Julien Bradley, January 9, 2025 ("Bradley Deposition"), pp. 77:24–78:8.

[28] AXION-1071364–414 at 372; Bradley Deposition, p. 78:5–8.

[29] AXION-1071364–414 at 372.

[30] AXION-0449879–906 at 886.

expiration of the last-to-expire Asserted Patent.[267] I understand from Dr. Frazier that the infringing features of the Asserted Patents were available and present in the Accused Products throughout this timeframe.[268] Therefore, I have assumed that the hypothetical negotiation for the Asserted Patents would have taken place in or around January 2020, when Axion made its first sale of an Accused Product (specifically, Axion's first sale of a Maestro Z system).

146.    At the time of the hypothetical negotiation, the Asserted Patents were owned by Agilent.[269] I have thus assumed the hypothetical negotiation would involve Agilent as a willing licensor and Axion as a willing licensee. Should Axion claim that the date of first infringement occurs sometime before January 2020, I do not believe it would have an impact on my forthcoming analysis of the *Georgia-Pacific* factors as Agilent would have been the owner of the Asserted Patents as early as November 2018, when Agilent obtained ownership of these patents following its $250 million acquisition of the prior owner of the Asserted Patents, ACEA.[270]

### B. ROYALTY BASE FOR THE ACCUSED PRODUCTS

147.    I understand that the sales data provided by Axion includes worldwide sales of the Accused Products.[271] For the purposes of my reasonable royalty analysis, I consider the appropriate royalty base to be the unit sales of Accused Machines (for the Maestro Z, Maestro ZHT, and Maestro TrayZ) and Accused Software (for the Maestro Edge and Maestro Pro) sold by Axion during the infringement period. I do so to account for the fact that the at-issue claims of the Asserted Patents recite method, not apparatus, claims; this is in recognition of the fact that one would need an Accused Machine, Accused Software, and Accused Plates in order to infringe on

---

[267] ████████████████████████████████████████████████████ *ee* Sheikh Deposition, Exhibit 11.

[268] Frazier Report VOL I, ¶ 340; February 20, 2025 Discussion with Bruno Frazier

[269] Recall from **§ II** that Agilent acquired the Asserted Patents in November 2018 as a result of its acquisition of ACEA. *See* https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html; 2018 Agilent Technologies, Inc. Annual Report, p. 29.

[270] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html.

[271] AXION-0002497; AXION-0002495; AXION-0002493; AXION-107874; AXION-0002499.

# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


AGILENT TECHNOLOGIES, INC.,        C.A. No. 23-198-CJB

        Plaintiff,

    v.

AXION BIOSYSTEMS, INC.,

        Defendant.

_____


    * HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *


 VIDEO-RECORDED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF

            AGILENT TECHNOLOGIES, INC.

                 by and through

                 TODD CHRISTIAN

             San Diego, California

            Monday, February 3, 2025

                    Volume 1


 Reported by:

 LESLIE JOHNSON

 RPR, CCRR, CSR No. 11451

 Job No.: 7129739

 PAGES 1 - 249

Page 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


AGILENT TECHNOLOGIES, INC.,      C.A. No. 23-198-CJB

      Plaintiff,

   v.

AXION BIOSYSTEMS, INC.,

      Defendant.

_____


VIDEO-RECORDED 30(b)(6) VIDEOCONFERENCE DEPOSITION OF AGILENT TECHNOLOGIES, INC., by and through TODD CHRISTIAN, Volume 1, taken on behalf of Defendant, at Jones Day, 4655 Executive Drive, Suite 1500, San Diego, California, beginning at 9:16 a.m. and ending at 6:03 p.m., on Monday, February 3, 2025, before LESLIE JOHNSON, Certified Shorthand Reporter No. 11451.

Page 3

APPEARANCES:


For Plaintiff:

     REED SMITH LLP

     BY: PETER J. CHASSMAN, ESQ.

     1221 McKinney Street, Suite 2100

     Houston, Texas   77010

     (713)469-3800

     pchassman@reedsmith.com

For Defendant:

     JONES DAY LLP

     BY: RYAN K. WALSH, ESQ.

         LAURA KANOUSE VINING, ESQ.

     1221 Peachtree Street, N.E., Suite 400

     Atlanta, Georgia   30361

     (404)521-3939

     rkwalsh@jonesday.com

     lkvining@jonesday.com

Also Present:

     GREGG EISMAN, Videographer

     JOHN LOW, Agilent

Page 81



Page 82



MR. CHASSMAN:  Objection to form.  Outside the scope.  And caution the witness not to reveal anything that's privileged.

Page 83



BY MR. WALSH:

Q    I'm just talking about -- I don't know what's happened since this litigation was filed.

I'm just trying to ask you, are you aware of any valuations of the patents that are asserted in this case prior to the filing of this lawsuit?

MR. CHASSMAN:  Caution the witness not to provide anything that's privileged.  Subject to that, he can answer.

THE WITNESS:  Just to clarify, any

Page 84

valuation to the IP related to this case?

BY MR. WALSH:

Q    Yes.  The patents that are at issue in this case.

MR. CHASSMAN:  Same caution and instructions.

(Exhibit 8 marked for identification.)

BY MR. WALSH:

Q    Okay.  All right.  Let me show you what we've marked as Exhibit 8, Mr. Christian.  I will represent to you that this is an excerpt from Agilent Technologies, Inc.'s fourth amended objections and responses to Axion BioSystem Inc.'s Interrogatories Nos. 13 through 16.

And we -- after Agilent's counsel expressed some concerns about Axion confidential information, we -- that's why we're only providing you with an excerpt of just the trade -- well, just certain portions of Agilent's most recent response to Interrogatory No. 13.

MR. CHASSMAN:  Before you get into that, I just want to get some clarification.  So I realize that you -- it looks like you've excerpted pages. But have you modified the text of the responses?

Page 249

REPORTER'S CERTIFICATION

I, Leslie Johnson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested. I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name. Dated:  February 10, 2025

*Leslie Johnson*

LESLIE JOHNSON

CSR No. 11451, RPR, CCRR

Page 250

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AGILENT TECHNOLOGIES, INC.,        C.A. No. 23-198-CJB

      Plaintiff,

  v.

AXION BIOSYSTEMS, INC.,

      Defendant.

_____

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

VIDEO-RECORDED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF

AGILENT TECHNOLOGIES, INC.

by and through

TODD CHRISTIAN

San Diego, California

Tuesday, February 4, 2025

Volume 2

Reported by:

LESLIE JOHNSON

RPR, CCRR, CSR No. 11451

Job No.: 7129740

PAGES 250 - 511

Page 251

                IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF DELAWARE


AGILENT TECHNOLOGIES, INC.,        C.A. No. 23-198-CJB

          Plaintiff,

      v.

AXION BIOSYSTEMS, INC.,

          Defendant.

_____




        VIDEO-RECORDED 30(b)(6) VIDEOCONFERENCE DEPOSITION OF

AGILENT TECHNOLOGIES, INC., by and through TODD CHRISTIAN,

Volume 2, taken on behalf of Defendant, at Jones Day,

4655 Executive Drive, Suite 1500, San Diego, California,

beginning at 9:10 a.m. and ending at 6:53 p.m., on

Tuesday, February 4, 2025, before LESLIE JOHNSON,

Certified Shorthand Reporter No. 11451.

HIGHLY  CONF-AEO  30(b)(6)  Todd Christian , Vol 2    February 4, 2025
Agilent Technologies v Axion Biosystems

Page 252

APPEARANCES:


For Plaintiff:

    REED SMITH LLP

    BY: PETER J. CHASSMAN, ESQ.

    1221 McKinney Street, Suite 2100

    Houston, Texas  77010

    (713)469-3800

    pchassman@reedsmith.com

For Defendant:

    JONES DAY LLP

    BY: RYAN K. WALSH, ESQ.

        LAURA KANOUSE VINING, ESQ.

    1221 Peachtree Street, N.E., Suite 400

    Atlanta, Georgia  30361

    (404)521-3939

    rkwalsh@jonesday.com

    lkvining@jonesday.com

Also Present:

    GREGG EISMAN, Videographer

    JOHN LOW, Agilent

Page 450

alleged Trade Secret No. 27, did those projections have to be done before Agilent acquired ACEA in November of 2018?

A    What do you mean by "be done"?

Q    Have been conducted, finished.

Page 451

Q    So is it your testimony, Mr. Christian, that projections that Agilent did for the ACEA business unit in 2020, that those projections would fall within the scope of alleged Trade Secret No. 27?

A    In 2020?

Q    Correct.  After the acquisition of ACEA.

Q    I'm sorry, Mr. Christian.  We must be talking past each other, because I see this as a very simple question but we're not -- we're obviously -- we're talking past each other.

We're trying to figure out what the scope

Page 475

acquisition of ACEA's intellectual property?

    A    That's what triggered the conversation, yes.



Page 511

REPORTER'S CERTIFICATION

I, Leslie Johnson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.
I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  February 9, 2025

LESLIE JOHNSON

CSR No. 11451, RPR, CCRR

**Agilent's Response to Axion's Motion *in Limine #3***

████████████████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 23-198 (CJB) |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | ████████████████ |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* #3
TO EXCLUDE ALL PURCHASE PRICE INFORMATION REGARDING
AGILENT'S ACQUISITION OF ACEA AND SUMMA EQUITY'S ACQUISITION
OF A MAJORITY STAKE IN AXION**

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 23, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

Plaintiff, Agilent Technologies, Inc. ("Agilent"), opposes Defendant, Axion Biosystems, Inc.'s ("Axion's"), Motion *in Limine* ("MIL") No. 3 because the purchase price of ACEA by Agilent is relevant to damages, will not confuse the issues or mislead the jury, and is not unduly prejudicial to Axion.[1] Exclusion under Federal Rule of Evidence ("FRE") 402 and/or 403 is not warranted. Axion cannot exclude Agilent's purchase price of ACEA because, contrary to Axion's assertion, it is plainly relevant to Agilent's damages case and is supported by the case law, including that cited by Axion. Axion's alleged prejudice is not sufficiently described, and, in any event, does not "substantially outweigh" the relevance to Agilent's damages theory in this case. Axion's dispute is more properly characterized as a dispute of the weight of the evidence, which Axion would be free to address by cross examining Agilent's damages expert at trial.

## I.      The purchase price of ACEA is relevant to damages.

First, Agilent's damages expert, Brian Napper, relies on Agilent's $250 million acquisition price of ACEA (where the patented inventions were developed) to frame the hypothetical negotiation between Agilent and ACEA for his opinions on the reasonable royalty for the Asserted Patents. Mr. Napper cites the acquisition price as relevant to Agilent's position in the hypothetical negotiation with Axion. *See* Ex. A (Napper Opening Rpt.) at ¶¶ 21, 144-46. Axion's damages expert, Ambreen Salters, also cites the purchase price of ACEA as relevant background to her analysis. *See* Ex. B (Salters Rpt.) at ¶ 12. Ms. Salters does not dispute the relevance of the purchase price of ACEA and ultimately does not dispute Mr. Napper's reasonable royalty determination. *See* Ex. B at ¶ 54. This further bolsters the relevance of the ACEA purchase price to the damages analysis, by both experts.

Second, it is axiomatic that the hypothetical negotiation "would involve a market place confrontation of the parties, the outcome of which would depend upon such factors as their relative bargaining strength . . . and any other economic factor that normally prudent businessmen would . . . take into consideration"). *Georgia-Pac. Corp. v. Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970). Subsequent case law clarifies that the value of an acquisition by a plaintiff is a starting point in a damages analysis that should not be excluded on relevance grounds. *See 10X Genomics, Inc. v. Nanostring Techs., Inc.*, 690 F. Supp. 3d 449, 462 (D. Del. 2023) (citing *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003) (comparing the jury's reasonable royalty award with the purchase price of a corporate acquisition that included "all of its products, patents and know-how"), *vacated on other grounds*, 545 U.S. 193, (2005)); *Zimmer Surgical v. Stryker Corp.*, C.A. No. 16-679-RGA, 2019 WL 9171206, at *1 (D. Del. Mar. 13, 2019) (denying MIL seeking to exclude acquisition price because it "may be relevant to a reasonable royalty analysis"). Applying that law here, the purchase price of ACEA reflects Agilent's bargaining strength in any hypothetical negotiation because it informs Agilent's view of the value of the patented technology (even if not rigidly apportioned thereto). Ms. Salters does not dispute this, evidencing that the purchase price is an economic factor that normally prudent businesspeople would take into consideration.

Lastly, Axion's cited case law is distinguishable from the facts of this case and does not support excluding the purchase price of ACEA under FRE 403. In *EMC Corp. v. Pure Storage*,

---

[1]   Agilent concedes the portion of Axion's MIL No. 3 related to the acquisition of Axion and agrees not to present any facts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

the Court excluded the acquisition value at issue because of a lack of nexus between the commercial success of the patented features and the acquisition value; it did not focus on the relevance of the acquisition value to the hypothetical negotiation between the parties for a reasonable royalty, as is the case here. C.A. No. 13-1985-RGA, 2016 WL 775742, *3 (D. Del. Feb. 25, 2016). In *Transclean Corp. v. Bridgewood Servs.*, Plaintiff's expert "sought lost profits calculated as the difference between the sales price of the infringer's business and its expert's valuation of the business without the infringing devices." 290 F.3d 1364, 1376 (Fed. Cir. 2002). In contrast, Agilent seeks to introduce the purchase price of ACEA to inform Agilent's position in the hypothetical negotiation for a reasonable royalty, not as a proxy to determine lost profits. *See* Ex. A at ¶¶ 21, 144-46. Further, consistent with the holding in *Transclean*, the court in *Alcatel USA, Inc. v. Cisco Sys., Inc.* held that the acquisition price of a company **alone** was not a reliable approximation of the value of allegedly misappropriated trade secrets and could not be the **sole** measure of reasonable royalty; it did not hold that the acquisition price is irrelevant or unfairly prejudicial. 239 F. Supp. 2d 660, 671 (E.D. Tex. 2002) (noting that Alcatel's "entire damages theory rests" on the company acquisition price). Similarly, in *Clo Virtual Fashion Inc. v. Zhejiang Lingdi Digital Tech. Co.*, the court held that the value of a company "standing alone" cannot form the basis for reasonable royalty, and not that the value of a company is irrelevant or unfairly prejudicial. C.A. No. 2:23-cv-00274-JRG-RSP, 2025 WL 1975719, at *3 (E.D. Tex. Apr. 11, 2025). As Axion cannot dispute, Mr. Napper relies on more than just the value of ACEA alone in his damages analysis, relying also on, for example, the sales of the accused products and sales of Agilent's practicing products.

## II.  Any alleged potential confusion and prejudice would not substantially outweigh the probative value of the purchase price of ACEA.

Evidence of the purchase price for Agilent's acquisition of ACEA will not confuse the issues, mislead the jury, or unfairly prejudice Axion. Axion argues prejudice and jury confusion because the acquisition price of ACEA ($250 million) is substantially larger than the ▮▮▮ damages model. Axion fails to explain how this evidence prejudices it, let alone how any prejudice would "substantially outweigh" the probative value to Agilent. *See United States v. Miah,* 120 F.4th 99, 112 (3d Cir. 2024) (affirming district court's inclusion of evidence in part because party seeking to exclude failed to meet burden of explaining how the prejudice caused by the evidence substantially outweighed the probative value); *see also, Coleman v. Home Depot, Inc.* 306 F. 3d 1333, 1343-44 (3d Cir. 2002) ("for exclusion under Rule 403 to be justified, the probative value of the evidence must be substantially outweighed by the problems in admitting it").

Axion does not cite any law where exclusion of an acquisition price is warranted simply because it is large. Instead, Axion cites *Juno*, which is easily distinguished from the facts here, and the Court need not look further than the quoted language in Axion's opening brief. Namely, the Court in *Juno* excluded the acquisition price at issue because the expert did "not use [the] figure[] in his damages calculations." *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, No. 2:17-cv-07639 SJO-KS, 2019 WL 8685065 at *6 (C.D. Cal. Dec. 3, 2019). That is not the case here because, as discussed above, Mr. Napper does cite the ACEA purchase price as relevant to the hypothetical negotiation between Agilent and Axion for the reasonably royalty analysis. Thus, Axion's argument, which relies on the incorrect premise that the ACEA acquisition price "lack[s] any probative value," must be rejected by the Court.

2

In addition, *potential* to damage Axion's case is not "unfair prejudice" warranting exclusion of relevant evidence. *See United States v. Ligambi*, 890 F. Supp. 2d 564, 579 (E.D. Pa. 2012) ("evidence that bears on a relevant issue in the case, though possessing the potential to damage the defendant's cause, is not inadmissible for that reason alone"); *see also Personalized User Model, L.L.P. v. Google Inc.*, C.A. No. 09-525-LPS, 2014 WL 807736, at *4 (D. Del. Feb. 27, 2014) (denying motion *in limine* to exclude revenue and acquisition evidence, reasoning that the evidence would not be unduly prejudicial because "Google may effectively challenge the weight the jury should give this evidence through cross-examination"). Axion has not articulated any *actual* prejudice it would suffer if the jury were to learn of the ACEA acquisition price, let alone *unfair* prejudice that *substantially outweighs* the probative value.  Mr. Napper has opined that it is relevant to the hypothetical negotiation between Agilent and Axion, demonstrating its clear probative value. Axion makes only general claims of potential prejudice and juror confusion without identifying any specific prejudice or juror confusion. To the extent Axion is concerned that the jury will put too much stock into the ACEA acquisition price, Axion will be free to cross-examine Mr. Napper on the weight of the purchase price to his analysis, but the Court should not exclude it on relevance or prejudice grounds.

## III.    Conclusion

Accordingly, Axion's motion under FRE 402 and 403 to exclude all purchase price information regarding Agilent's acquisition of ACEA should be denied. The purchase price is relevant to damages in this case, as Agilent's damages expert relies on it to frame the hypothetical negotiation between Agilent and Axion for the reasonably royalty determination. Axion's damages expert does not dispute its relevance and also cites it as relevant background to her analysis. Axion's alarmist view of the potential to confuse the jury or create unfair prejudice does not "substantially outweigh" the probative value to Agilent. To the extent the Court determines any limits are warranted, the appropriate remedy is a tailored order and limiting instruction, not a blanket ban. *Hologic, Inc. et al. v. Minerva Surgical, Inc.*, C.A. No. 15-1031-JFB-SRF, 2018 WL 3348998, at *1 (D. Del. July 9, 2018) (noting broad evidentiary rulings should generally be deferred until trial).

███████████████████████████████

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                        */s/ Travis J. Murray*

OF COUNSEL:
                                        _____

                                        Brian P. Egan (#6227)
Peter J. Chassman                       Travis J. Murray (#6882)
Michael J. Forbes                       1201 North Market Street
Hallie H. Wimberly                      P.O. Box 1347
REED SMITH LLP                          Wilmington, DE  19899-1347
1221 McKinney Street, Suite 2100        (302) 658-9200
Houston, TX  77010                      began@morrisnichols.com
(713) 469-3800                          tmurray@morrisnichols.com

Anna M. Targowska                       *Attorneys for Plaintiff Agilent Technologies, Inc.*
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 23, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, copies of the foregoing were caused to be served upon the following in the manner indicated:

| | |
|---|---|
| John G. Day, Esquire<br>Andrew C. Mayo, Esquire<br>ASHBY & GEDDES<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE  19899<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| David M. Maiorana, Esquire<br>JONES DAY<br>901 Lakeside Avenue<br>Cleveland, OH  44114<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Ryan K. Walsh, Esquire<br>Geoffrey K. Gavin, Esquire<br>Laura M. Kanouse, Esquire<br>Rachel Krutz, Esquire<br>JONES DAY<br>1221 Peachtree Street, N.E., Suite 400<br>Atlanta, GA  30361<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Anna E. Raimer, Esquire<br>JONES DAY<br>717 Texas Street, Suite 3300<br>Houston, TX  77002-2712<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Collin J. Kurtenbach, Esquire<br>JONES DAY<br>110 North Wacker Drive, Suite 4800<br>Chicago, IL  60606<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |

*/s/ Travis J. Murray*

_____
Travis J. Murray (#6882)

# EXHIBIT A

██████████████████████████████

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AGILENT TECHNOLOGIES, INC.,

      Plaintiff,

      v.

AXION BIOSYSTEMS, INC.,

      Defendant.

C.A. No. 23-198 (CJB)

## EXPERT REPORT OF BRIAN W. NAPPER

████████████████████████████████████

██████████████████████████

_____

Brian W. Napper

Dated: March 20, 2025

Based on the analysis I have conducted and for the reasons set forth herein, I have reached the conclusions in this report and I declare under the penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the following is true and correct.

████████████████████

manufacturing company whose laboratory products and services target the food, environmental and forensics, pharmaceutical, diagnostics, chemical and energy, and research markets, among others."[10] Headquartered in Santa Clara, California, Agilent provides "application focused solutions" in life sciences, diagnostics and applied chemical markets that "include instruments, software, services and consumables for the entire laboratory workflow."[11]

20.   Agilent's business segments are comprised of the life sciences and applied markets business, the diagnostics and genomics business, and the Agilent CrossLab business.[12] In the first fiscal year of 2024, Agilent moved its cell analysis business from their life sciences and applied markets segment to their diagnostics and genomics operating segment.[13] Agilent's diagnostics and genomics business includes providing active pharmaceutical ingredients for oligo-based therapeutics and solutions that include "reagents, instruments, software and consumables which enable customers in the clinical life and sciences research areas to interrogate samples at the cellular and molecular level."[14] Agilent also produces high-throughput impedance-based cell analysis products through its cell analysis division.[15]

21.   ACEA Biosciences Inc. ("ACEA") was "a developer of cutting-edge cell analysis instruments for life science research and clinical diagnostics."[16] ACEA provided cell analysis tools in "drug discovery and development, toxicological analysis, flow cytometry, pharmacological studies, clinical diagnosis and basic cell biology" through the innovation and commercialization of its xCELLigence Real-Time Cell Analysis instruments ("xCELLigence") and NovoCyte Quanteon

---

[10] Second Amended Complaint, ¶¶ 11, 81.

[11] Agilent Technologies, Inc. Form 10-K for the fiscal year ended October 31, 2023, p. 3.

[12] Agilent Technologies, Inc. Form 10-K for the fiscal year ended October 31, 2023, p. 3.

[13] https://www.agilent.com/about/newsroom/presrel/2023/20dec-gp23033.html.

[14] Agilent Technologies, Inc. Form 10-K for the fiscal year ended October 31, 2023, p. 3.

[15] Second Amended Complaint, ¶¶ 15-16.

[16] https://www.agilent.com/about/newsroom/presrel/2018/25sep-gp18055.html; 2018 Agilent Technologies, Inc. Annual Report, p. 101.

flow cytometers ("NovoCyte").[17] The xCELLigence product line consists of impedance-based cell analysis platforms for label-free, real-time cellular function measurements.[18] NovoCyte provides high performance bench flow cytometry systems.[19] In November 2018, Agilent completed its acquisition of ACEA for approximately $250 million to bring together the "two pioneers in cellular function and metabolism measurements" with "a common goal to provide the most innovative solutions for cell analysis."[20]

### B. AXION BIOSYSTEMS, INC.

22.    Axion is a privately held biotechnology research and life sciences tools company that develops, produces, and markets bioelectronic assay systems, consumables, and software that researchers use for microelectrode array ("MEA") and impedance cell analysis in biomedical research.[21] Headquartered in Atlanta, Georgia, Axion offers "solutions for continuous, noninvasive monitoring of in vitro cell models" and "real-time, label-free monitoring, power software, and scalable throughput."[22] Axion further characterizes itself as a "leading provider of MEA [multielectrode array] and impedance technology for single-cell analysis."[23] Axion introduced its first MEA system in 2010, and in 2019, Axion released Maestro Z as an "impedance-based cell analysis system, for label-free oncology, virology, cellular kinetics assays."[24] In North America, Axion directly sells to customers within the academic, biotechnology, healthcare

---

[17] https://igbiosystems.com/global-partners/acea-biosciences/; https://www.linkedin.com/company/acea-biosciences.

[18] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html.

[19] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html.

[20] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html; 2018 Agilent Technologies, Inc. Annual Report, p. 29.

[21] AXION-1071364–414 at 369; https://summaequity.com/investments/axion/; https://www.linkedin.com/company/axion-biosystems.

[22] https://www.linkedin.com/company/axion-biosystems.

[23] https://www.axionbiosystems.com/resources/news/summa-equity-acquires-axion-biosystems.

[24] https://www.axionbiosystems.com/about-us/our-history.

Page **11** of **139**

████████████████

can be determined through evaluation of a hypothetical negotiation.[261] Specifically, the hypothetical negotiation involves a determination of a reasonable royalty that would have resulted from a hypothetical, arm's length negotiation between a willing licensor and a willing licensee for a license to the patent(s) just before infringement began.[262] The hypothetical negotiation assumes that both parties acknowledge that the Asserted Patents, in particular the asserted claims, are valid, enforceable, and infringed.[263]

143.    Herein, I discuss my opinions regarding each of the *Georgia-Pacific* Factors, as well as the appropriate royalty to which the parties would agree for a license to the Asserted Patents.

## A. HYPOTHETICAL NEGOTIATION

144.    As discussed above in **§ VII.A.2**, a hypothetical negotiation involves a determination of a reasonable royalty that would have resulted from a hypothetical, arm's length negotiation between a willing licensor and a willing licensee to the patent.[264] The hypothetical negotiation assumes both parties acknowledge that the Asserted Patents claims are valid, enforceable, and infringed.[265] The hypothetical negotiation typically, but not always, occurs at the later of 1) the earliest issuance date of the Asserted Patents, and 2) the date of first sale or use of the accused product or functionality.

145.    In this case, the Asserted Patents each issued at different times and therefore establish different windows of infringement and dates for the hypothetical negotiation. However, I understand Axion produced sales of the Accused Products starting in January 2020,[266] and that Axion continued to make sales of the Accused Products through and beyond the May 28, 2024

---

[261] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *aff'd as modified*, 446 F.2d 295 (2d Cir. 1971).

[262] *Lucent Techs. v. Gateway*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[263] *Lucent Techs. v. Gateway*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[264] *Lucent Techs v. Gateway,* 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[265] *Lucent Techs v. Gateway,* 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[266] AXION-0002497; AXION-0002495; AXION-0002493; AXION-107874; AXION-0002499.

expiration of the last-to-expire Asserted Patent.[267] I understand from Dr. Frazier that the infringing features of the Asserted Patents were available and present in the Accused Products throughout this timeframe.[268] Therefore, I have assumed that the hypothetical negotiation for the Asserted Patents would have taken place in or around January 2020, when Axion made its first sale of an Accused Product (specifically, Axion's first sale of a Maestro Z system).

146.    At the time of the hypothetical negotiation, the Asserted Patents were owned by Agilent.[269] I have thus assumed the hypothetical negotiation would involve Agilent as a willing licensor and Axion as a willing licensee. Should Axion claim that the date of first infringement occurs sometime before January 2020, I do not believe it would have an impact on my forthcoming analysis of the *Georgia-Pacific* factors as Agilent would have been the owner of the Asserted Patents as early as November 2018, when Agilent obtained ownership of these patents following its $250 million acquisition of the prior owner of the Asserted Patents, ACEA.[270]

### B.  ROYALTY BASE FOR THE ACCUSED PRODUCTS

147.    I understand that the sales data provided by Axion includes worldwide sales of the Accused Products.[271] For the purposes of my reasonable royalty analysis, I consider the appropriate royalty base to be the unit sales of Accused Machines (for the Maestro Z, Maestro ZHT, and Maestro TrayZ) and Accused Software (for the Maestro Edge and Maestro Pro) sold by Axion during the infringement period. I do so to account for the fact that the at-issue claims of the Asserted Patents recite method, not apparatus, claims; this is in recognition of the fact that one would need an Accused Machine, Accused Software, and Accused Plates in order to infringe on

---

[267]                                                                                  *See* Sheikh Deposition, Exhibit 11.

[268] Frazier Report VOL I, ¶ 340; February 20, 2025 Discussion with Bruno Frazier

[269] Recall from **§ II** that Agilent acquired the Asserted Patents in November 2018 as a result of its acquisition of ACEA. *See* https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html; 2018 Agilent Technologies, Inc. Annual Report, p. 29.

[270] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html.

[271] AXION-0002497; AXION-0002495; AXION-0002493; AXION-107874; AXION-0002499.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **AGILENT TECHNOLOGIES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | **Civil Action No. 1:23-198 (CJB)** |
| | § | |
| **AXION BIOSYSTEMS, INC.,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## EXPERT REPORT OF AMBREEN SALTERS
## ON BEHALF OF DEFENDANT

███████████████████████████

This report is being provided pursuant to the agreements of the parties, the Court's scheduling and

other orders, the Local Rules, and the Federal Rules of Civil Procedure and Evidence. If additional

information that may be relevant to my opinions comes to light or is discovered or produced by

the parties near or after the date this report is signed, I reserve the right to supplement my opinions.

Further, I may offer opinions at trial that are not disclosed in this report but are related to the

subjects of my opinions or my expertise and that are responsive to opinions in the reports or

testimony of any witness that occurs near or after my report is signed or my deposition is taken.

Further, I reserve the right to expand upon the opinions reflected in this report.

*Agilent*

11. A spin-off of Hewlett-Packard Company in 1999, Agilent is a publicly traded company whose products include instruments, software, consumables and services used in life science research, patient diagnostics, and testing.[7] Agilent currently reports three business segments including life sciences and applied markets, diagnostics and genomics, and Agilent CrossLab.[8] Within its diagnostics and genomics segment,[9] Agilent's "cell analysis business includes instruments, reagents, software, and labware associated with unique live-cell analysis platforms," among other products.[10]

12. Agilent acquired several bioscience companies since its inception. In September 2015, it acquired Seahorse Bioscience, a company focused on cell metabolism and bioenergetics, for $235 million.[11] In January 2018, Agilent acquired Luxcel Biosciences, a developer of real-time fluorescence cell assay kits, for an undisclosed price.[12] In November 2018, Agilent acquired ACEA Biosciences ("ACEA"), a developer of cell analysis tools, including the xCELLigence RTCA impedance platform, for $250 million.[13] In July 2019, Agilent acquired BioTek Instruments, a developer of cell imaging systems and other life science instrumentation, for $1.165 billion.[14]

## Cell Analysis Market

13. Understanding cell function is important to many pharmaceutical segments, particularly in developing cell and gene therapies.[15] Cell analysis instruments allow scientists to perform cell culture experiments and understand aspects of cell function.[16] During cell culture

---

[7] https://www.agilent.com/about/companyinfo/; https://www.agilent.com/about/companyinfo/history/.

[8] Agilent Form 10K for the Fiscal Year Ended October 31, 2024 at p. 3.

[9] Prior to 2024, Agilent's cell analysis business was reported under its life sciences and applied markets segment. Agilent Form 10K for the Fiscal Year Ended October 31, 2024 at pp. 3 and 33.

[10] Agilent Form 10K for the Fiscal Year Ended October 31, 2024 at p. 7.

[11] https://www.investor.agilent.com/news-and-events/news/news-details/2015/Agilent-Technologies-to-Acquire-Seahorse-Bioscience-Industry-Leader-in-Tools-for-Measuring-Cell-Metabolism/default.aspx.

[12] https://www.agilent.com/about/newsroom/presrel/2018/09jan-gp17025.html.

[13] https://www.agilent.com/about/newsroom/presrel/2018/14nov-gp18062.html.

[14] https://www.agilent.com/about/newsroom/presrel/2019/11jul-gp19100.html.

[15] Bradley Deposition Exhibit 21 (AXION-1071313-363 at 318).

[16] Bradley Deposition Exhibit 21 (AXION-1071313-363 at 318).

5

54. With respect to a royalty scenario with no lost profits damages, I do not dispute the $468,000 reasonable royalty set forth in the Agilent Damages Report.[118] StoneTurn Exhibit 1.

55. Finally, to the extent that corrective advertising expenditures are required as a result of Axion's false advertising, related damages are no more than $413,000. StoneTurn Exhibit 1.

## REBUTTAL OPINIONS TO THE AGILENT DAMAGES REPORT

56. One form of compensatory damages potentially available for patent infringement is lost profits.  Lost profits are the incremental profits the plaintiff would have made "but for" the defendants' infringement. The generally accepted method for evaluating a patentee's entitlement to lost profits is to apply the long-established *Panduit* factors.  These factors consider whether a patentee can show: (i) demand for the patented product; (ii) an absence of an available, acceptable non-infringing substitute for the patented product; (iii) capacity to exploit the unmet demand in the absence of the accused sales; and (iv) the amount of lost profits computed to a reasonable certainty.

### Agilent's Analysis of Lost Profits

57. Agilent does not reasonably establish the *Panduit* factors and cannot establish that "but for" the alleged infringement, Agilent would have made Axion's sales. As shown hereafter, Agilent: (1) overstates the benefits of the Patents-in-Suit, (2) fails to consider imaging products as non-infringing alternatives to Axion, (3) fails to consider design-around options available to Axion, (4) fails to consider the differences between Axion's MEA products and Agilent's products, (5) inappropriately assumes that Agilent would have made Axion's sales at Axion's price, but with Agilent's profit margin, and (6) underestimates the variable expenses in its incremental profit calculation.

*Demand*

58. Sales of the Accused Products and/or sales of the patent holder's products that practice the Patents-in-Suit is a consideration in *Panduit* Factor 1; however, the mere existence of such

---

[118] Agilent Damages Report at 7 and 71.

18

growth rate.[180] It then applies a ratio of Accused Product sales as a percentage of Axion overall sales, then prorates the 2022 data begin on February 15, the supposed first instance of false advertising.[181]

87. Axion produced its actual advertising spend specific to its impedance products from 2022 through 2024.[182] In total, ████████████████████████████████████████ ████████████████████████████████████████████████████. StoneTurn Exhibit 6.

## OTHER ISSUES

88. If the Court plans to submit pre-judgment interest to the jury or should otherwise request my assistance in computing pre-judgment interest, I am prepared to do so. Further, as discovery is currently ongoing, including expert depositions that will occur after the issuance of this report, I reserve the right to supplement my report when additional information becomes available.

Respectfully Submitted,

*Ambreen Salters*

Ambreen Salters
April 25, 2025

---

[180] Agilent Damages Report at 128-129 and Schedule 6.0.
[181] Agilent Damages Report at 121, 128-129 and Schedule 6.0.
[182] AXION-1072517 at p. 17. ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

28

**Axion's Reply in Support of Motion *in Limine #3***

███████████████████████████████████████

**Axion's Reply for its MIL No. 3 (All Purchase Price Information Regarding Agilent's Acquisition of ACEA and Summa Equity's** ██████████████████████████████ **Should Be Excluded.)**

Agilent has "agree[d] not to present any facts regarding ████████████████ ████████ Agilent Response to Axion's MIL No. 3 at 1 n.1.)  The Court should also grant the remainder of Axion's MIL No. 3 regarding the ACEA purchase price.

As Agilent acknowledges, the $250 million ACEA purchase price is not relevant to Agilent's alleged lost profits patent damages or false advertising damages.  (*See id*. at 1-2.)  Agilent argues, however, that the purchase price is relevant to its alleged reasonable royalty patent damages, and in particular the parties' hypothetical negotiation regarding a royalty rate.  (*See id*.)

But Agilent's damages expert, Mr. Napper, *did not rely* on the $250 million purchase price in his reasonable royalty analysis.  Mr. Napper mentioned the $250 million amount twice, once in a background paragraph and a second time in conjunction with observing that Agilent acquired the patents more than a year before the January 2020 hypothetical negotiation date.  (*See* Agilent Response, Ex. 1 at ¶¶ 21, 144-146.)  Agilent does not point to anywhere in Mr. Napper's opinions where he explains how or why the purchase price *amount* is relevant to the hypothetical negotiation or his determined royalty rate.  This is not surprising given Mr. Napper's opinion that Agilent's reasonable royalty patent damages for infringement by all accused products of all three asserted patents would have been limited to $468,343[1]—less than 1/500th of the ACEA purchase price. (*See* Axion MIL No. 1, Ex. 1 at ¶ 17.)

Agilent also notes that Axion's damages expert, Ms. Ambreen Salters, "does not dispute Mr. Napper's reasonable royalty determination" (Agilent Response at 1), but this only further supports that the ACEA purchase price is both (i) not relevant and (ii) does not need to be introduced at trial to establish the appropriate amount of reasonable royalty damages (should Agilent prove infringement of any valid patent claims).  Further, the case law Agilent cites is inapposite given the parties' experts' positions on the reasonable royalty and that Agilent's own expert did not actually rely on the purchase price to support his reasonable royalty determination.

Agilent's arguments regarding Rule 403 also fail.  As discussed above, the purchase price amount has no probative value because Mr. Napper does nothing more than merely mention it twice in passing.  Further, the magnitude of the $250 million purchase may confuse the jury or encourage it to award damages in a higher amount that is unsupported by the record evidence or of a different form to which Agilent cannot otherwise show it is entitled (*i.e*., Agilent's alleged lost profits damages), instead of awarding damages based on Mr. Napper's low six-figure reasonable royalty amount.

---

[1] Mr. Napper's proposed reasonable royalty damages at trial will be even less in view of the Court's December 23 opinion and order (D.I. 470, D.I. 471) granting summary judgment of non-infringement for the '752 and '255 patents for all uses of the accused 96-well plates.

1

# Exhibit 8P

**Agilent's Motion *in Limine #1***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 23-198 (CJB) |
| | ) | |
| v. | ) | ██████████████████ |
| | ) | ██████████████████ |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | ████████████ |
| Defendant. | ) | |

**PLAINTIFF'S MOTION *IN LIMINE* #1**
**TO EXCLUDE CERTAIN TESTIMONY BY AXION'S EXPERT, DR. FAIR**

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 16, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

Plaintiff, Agilent Technologies, Inc. ("Agilent"), respectfully moves *in limine* to bar Defendant, Axion Biosystems, Inc. ("Axion"), from introducing testimony by its expert, Dr. Fair, that (1) was not supported in his opening expert report and appeared for the first time in his reply report, responding only to the now-stricken portions of the rebuttal report of Agilent's expert, Dr. Frazier, as prejudicial to Agilent under Federal Rule of Evidence ("FRE") 403 or (2) was based on an improper construction of "individually addressed" that the Court rejected, as irrelevant and which is likely to confuse the jury and prejudice Agilent under FRE 401, 402, and 403.

## I.       There is no basis for Dr. Fair's opinions rebutting stricken opinions of Dr. Frazier.

During expert discovery, Dr. Fair submitted an Opening Expert Report on Invalidity, Dr. Frazier responded in a Rebuttal Expert Report on Validity ("Frazier Rpt."), and Dr. Fair replied in a Reply Expert Report on Invalidity. On May 14, 2025, Axion filed a motion to strike portions of Dr. Frazier's Rebuttal Report, D.I. 325, which the Court granted on November 25, 2025. D.I. 456. Agilent now seeks to prevent Dr. Fair from testifying regarding the opinions in the portions of his reply report and associated deposition testimony that are ***only responsive*** to the stricken portions of Dr. Frazier's Rebuttal Report. *See* Ex. A (Fair Reply) at ¶¶ 76-97, 189, 195 (replying to Frazier Rpt. (Ex. B) at ¶¶ 196-220), ¶¶ 134-39 (replying to Frazier Rpt. at ¶¶ 200-02, 207-11, 214–19), ¶¶ 189, 195, 220-22 (replying to Frazier Rpt. at ¶¶ 360-62, 414-16); ¶ 241 (replying to Frazier Rpt. at ¶¶ 455-59), ¶¶ 242-44 (replying to Frazier Rpt. at ¶¶ 460-63), ¶¶ 245-46 (replying to Frazier Rpt. at ¶¶ 464-67), ¶¶ 264-66 (replying to Frazier Rpt. at ¶¶ 488-94); Ex. C (Fair Depo. transcript) at 29:7-30:3, 32:22-40:25, 41:9-42:3, 43:16-46:25, 48:1-53:22, 68:23-69:15, 70:16-17, 73:13-74:14, 75:6-25, 81:18-84:17, 98:1-99:1, 99:11-12, 100:12-20, 101:8-16, 102:17-18, 103:3-7, 103:12-17, 104:18-24, 105:3-4, 107:15-16, 108:4, 108:12-109:1, 109:6-7, 109:14-15, 110:1-112:15, 112:17-20, 112:22-114:18, 114:24-116:5, 118:6-120:12, 195:4-13,

196:6-197:2, 207:13-18, 211:7-213:2.[1]

"A rebuttal or reply expert report is proper if the intent of the report is solely to contradict or rebut evidence on the same subject matter identified by the opposing party's expert report." *Withrow v. Spears*, 967 F. Supp. 2d 982, 1001 (D. Del. 2013); *see also* Fed. R. Civ. P. 26(a)(2)(c)(ii). Courts routinely exclude opinions of experts that respond to opinions of other experts that have been stricken. *See, e.g.*, *Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, C.A. No. 12-540-LPS (D. Del. Mar. 31, 2015) (Special Master Order No. 6) (excluding expert opinions in response to stricken expert opinions), adopted in 2015 WL 1883960 (D. Del. Apr. 24, 2015); *Citizens Fin. Grp. v. Citizens Nat'l Bank*, C.A. No. 01-1524, 2003 WL 24010950, at *5-6 (W.D. Pa. Apr. 23, 2003) (excluding portion of rebuttal expert report rebutting an excluded opening report "as moot"); *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 2020 WL 4251229, *10 (S.D.N.Y. Feb. 19, 2020) (excluding rebuttal testimony after excluding the opening testimony it rebutted because "there is no opinion [ ] to rebut, making his opinion irrelevant and unnecessary"); *Altagracia Banuchi v. City of Homestead*, 606 F. Supp. 3d 1262, 1284 (S.D. Fla. 2022) (same). So too here. As to the stricken portions of Dr. Frazier's report, there is nothing for Dr. Fair to rebut. Dr. Fair was obligated to present all of his opinions in his opening report and should not be permitted to cure deficiencies in reply to stricken opinions of Dr. Frazier and prejudice Agilent.

## II.    Dr. Fair should not be permitted to testify contrary to the Court's construction of the "individually addressed" claim term.

Dr. Fair expressed noninfringement opinions based upon a reading of the "individually addressed" claim term that does not comply with the Court's construction. Dr. Fair should not be

---

[1] Agilent also has moved to strike these portions of Dr. Fair's Reply and deposition. See D.I. 464, 465. A decision to grant Agilent's motion to strike would not fully moot this motion in limine because Axion could attempt to present these opinions as further explanation of Dr. Fair's opening opinions.

permitted to offer those opinions at trial. Specifically, the Court construed "electrode array is individually addressed" in '752 Patent claims 11 and 14 and '080 Patent claim 1. *See* D.I. 156. Following the Court's construction, Dr. Fair submitted a rebuttal report in which he opined that: (1) the Accused Products are not "individually addressed" because certain electrode arrays are energized when a measuring voltage is applied to a different electrode array, *see* Ex. D at ¶¶ 218-20, 223-29, 238-40; Ex. C at 258:6-12; 258:16-18; 259:25-260:12, 261:7-21, 265:20-266:8; 267:15-272:25; 274:24-275:14; and (2) the "individually addressed" limitation cannot be satisfied when an electrode array to which a measuring voltage is applied shares common ground with electrode arrays to which no measuring voltage is applied, *see* Ex. D at ¶¶ 220, 227-33, 238-40. His opinions as to the first advance a proposed claim construction that the Court considered and rejected. *See* D.I. 156 (rejecting Defendant's argument that no electrical current can be conducted in any different array at that same time). His opinions as to the second improperly attempt to add an additional limitation to the Court's construction – specifically that individually addressed electrode arrays do not share a common ground.

Expert testimony must adhere to the Court's construction. *CytoLogix Corp. v. Ventana Medical Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (improper to allow expert testimony to the jury that is inconsistent with the Court's construction). Expert testimony is irrelevant, unhelpful to the jury, and prejudicial when it relies on a construction considered and rejected by the court. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n. 2 (Fed. Cir. 2006); *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, 232 F. Supp. 3d 632, 635 (D. Del. 2017) (same). For these same reasons, the Court should preclude these identified opinions of Dr. Fair.[2]

---

[2] Agilent's Daubert motion also seeks to exclude these portions of Dr. Fair's opinions. See, e.g., D.I. 371 at 35-41. The Court's grant of Agilent's Daubert motion would moot this portion of the motion in limine because Dr. Fair would be precluded from offering these opinions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 16, 2025

4

## RULE 7.1.1 CERTIFICATE

I hereby certify that the subject of the foregoing motion has been discussed with counsel

for the defendant and that the parties have not been able to reach agreement.


*/s/ Brian P. Egan*

Brian P. Egan (#6227)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 23-198 (CJB) |
| | ) |
| AXION BIOSYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

**[PROPOSED] ORDER ON PLAINTIFF'S MOTION *IN LIMINE* #1
TO EXCLUDE CERTAIN TESTIMONY BY AXION'S EXPERT, DR. FAIR**

The Court, having considered Agilent's Motion *in Limine* #1 to Exclude Certain Testimony

by Axion's Expert, Dr. Fair and all papers filed in connection therewith,

IT IS HEREBY ORDERED that Agilent's motion is GRANTED.


**SO ORDERED** this _____ day of _____, 2025.


_____
United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2025, copies of the foregoing were caused to be served upon the following in the manner indicated:

| | |
|---|---|
| John G. Day, Esquire | *VIA ELECTRONIC MAIL* |
| Andrew C. Mayo, Esquire | |
| ASHBY & GEDDES | |
| 500 Delaware Avenue, 8th Floor | |
| P.O. Box 1150 | |
| Wilmington, DE  19899 | |
| *Attorneys for Defendant Axion Biosystems, Inc.* | |

| | |
|---|---|
| David M. Maiorana, Esquire | *VIA ELECTRONIC MAIL* |
| JONES DAY | |
| 901 Lakeside Avenue | |
| Cleveland, OH  44114 | |
| *Attorneys for Defendant Axion Biosystems, Inc.* | |

| | |
|---|---|
| Ryan K. Walsh, Esquire | *VIA ELECTRONIC MAIL* |
| Geoffrey K. Gavin, Esquire | |
| Laura M. Kanouse, Esquire | |
| Rachel Krutz, Esquire | |
| JONES DAY | |
| 1221 Peachtree Street, N.E., Suite 400 | |
| Atlanta, GA  30361 | |
| *Attorneys for Defendant Axion Biosystems, Inc.* | |

| | |
|---|---|
| Anna E. Raimer, Esquire | *VIA ELECTRONIC MAIL* |
| JONES DAY | |
| 717 Texas Street, Suite 3300 | |
| Houston, TX  77002-2712 | |
| *Attorneys for Defendant Axion Biosystems, Inc.* | |

| | |
|---|---|
| Collin J. Kurtenbach, Esquire | *VIA ELECTRONIC MAIL* |
| JONES DAY | |
| 110 North Wacker Drive, Suite 4800 | |
| Chicago, IL  60606 | |
| *Attorneys for Defendant Axion Biosystems, Inc.* | |

*/s/ Brian P. Egan*

_____
Brian P. Egan (#6227)

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-198-CJB |
| vs. | ) | |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPLY EXPERT REPORT ON INVALIDITY OF AGILENT PATENTS**

**BY RICHARD B. FAIR, PH.D.**

       **(b)**      **Claim 1, element a: "(a) providing a cell-substrate impedance monitoring system, comprising:"**

75.     Dr. Frazier relies only on his separate opinions concerning claim elements a(i), a(iii), and a(iv) in discussing claim 1, element a, and Dr. Frazier does not dispute that the Ehret 1997 Publication describes "providing a cell-substrate impedance monitoring system." (*See* Frazier Rebuttal Report at ¶¶193-195.)

      **(i)**      **Claim 1, element a(i): "(i) at least one multiple-well cell-substrate impedance measuring device, wherein at least two of the multiple wells comprise an electrode array at the bottom of the well, wherein each electrode array comprises two electrode structures and each electrode structure comprises multiple electrode elements, further wherein each electrode array is individually addressed;"**

76.     For reference, I have reproduced the Court's constructions of claim terms within claim 1, element a(i) in the table below.

| Term | Construction |
|---|---|
| "at least two of the multiple wells comprise an electrode array at the bottom of the well" | "each of at least two of the multiple wells includes an electrode array at the bottom surface of the well" |
| "electrode array" | "two or more electrode structures that operate as a unit" |
| "is individually addressed" / "electrode array is individually addressed" | "electrode array [as construed by the Court] is individually addressed, which means that the electrical traces and connection pads of the arrays are configured such that an array can be connected to an impedance analyzer in such a way that a measuring voltage can be applied to the electrode array independent of any measuring voltage applied to another electrode array, at a given time, by using switches" |

(*See* Docket Nos. 151, 153, 156.)

31

77.     Dr. Frazier addresses claim 1, element a(i) in paragraphs 196-220 of the Frazier Rebuttal Report, opining that the Ehret 1997 Publication does not disclose this claim element. (*See* Frazier Rebuttal Report ¶¶196-220.)   I disagree, as explained in my Invalidity Report (*see* Invalidity Report at ¶¶194-200) and for the reasons explained below.  Ehret's eight IDES form a multi-well device that includes all of the limitations recited in claim 1, element a(i).

78.     First, I note that Dr. Frazier's opinion is the only instance I am aware of where someone affiliated with the patentee has disputed that the Ehret 1997 Publication discloses claim element a(i).  As I explained in my Invalidity Report, (a) Agilent did not dispute that the Ehret 1997 Publication describes claim element a(i) in its interrogatory responses in this case; (b) the applicants and inventors for the '080 patent did not dispute that the Ehret 1997 Publication describes claim element a(i) during prosecution of the '080 patent when faced with a rejection of the claims in view of Ehret; and (c) during the prosecution of at least one other patent related to the '080 patent where Ehret was cited in claim rejections by the Patent Office, the applicants and inventors likewise did not dispute that the Ehret 1997 Publication describes the subject matter in claim element a(i).  (*See* Invalidity Report at ¶¶196-197, 85-90.)

79.     As I explained in my Invalidity Report, each of Ehret's IDES has an electrode array at the bottom of a well and includes two electrode structures each having multiple electrode elements.  (*See* Invalidity Report at ¶¶198-200.)  Dr. Frazier does not dispute that each IDES meets all the structural limitations of the claimed electrode arrays.  (*See* Frazier Rebuttal Report at ¶¶196-220.)  Dr. Frazier does, however, criticize my report for not saying that "each IDES operate as a unit."  (*Id*. at ¶204.)  Dr. Frazier's criticism is unfounded.  I explained how cells are cultured directly on the IDES and impedance is measured using the IDES (*i.e*., the IDES operate as a unit in order for the measurements to occur).  That Ehret's IDES operate as a unit is also something the

32

applicants admitted in the '080 patent specification via the incorporated '533 patent, which references Ehret and states "[t[he presence of targeted cells in the same is indicated by a change in impedance between evenly sized and spaced electrode pairs to which the cells adhere."  ('533 patent at 1:36-42; *see also* Section VI.B.1 above.)

80.    In the eight IDES configuration that Ehret describes being used across multiple experiments, Dr. Frazier does not dispute that each IDES is configured "such that an [IDES] can be connected to an impedance analyzer in such a way that a measuring voltage can be applied to the [IDES] independent of any measuring voltage applied to another [IDES], at a given time, by using switches"—in other words, Dr. Frazier does not dispute that Ehret discloses the functional portion of the Court's construction of the "electrode array is individually addressed" claim term. (Docket No. 156; *see* Frazier Rebuttal Report at ¶¶205-219; *see also* Invalidity Report at ¶200.)

81.    Dr. Frazier argues, however, that each IDES does not include "electrical traces and connection pads" configured to provide the claimed functionality.  (*See* Frazier Rebuttal Report at ¶¶207-211 (discussing electrical traces), ¶¶214-219 (discussing connection pads).)  I disagree with Dr. Frazier.

82.    The '080 patent specification defines "electrical traces" and "connection pads" broadly:

> "Electrode traces" or "electrically conductive traces" or "electrical traces", are electrically conductive paths that extend from electrodes or electrode elements or electrode structures toward one end or boundary of a device or apparatus for connecting the electrodes or electrode elements or electrode structures to an impedance analyzer. The end or boundary of a device may correspond to the connection pads on the device or apparatus.
>
> A "connection pad" is an area on an apparatus or a device of the present invention which is electrically connected to at least one electrode or all electrode elements within at least one electrode structure on an apparatus or a device and which can be operatively connected to external electrical circuits (e.g., an impedance measurement circuit or a signal source).

('080 patent at 11:7-20.) As explained below, a person of ordinary skill in the art at the time of the alleged invention of the '080 patent would have understood the Ehret 1997 Publication to disclose electrical traces and connection pads configured to provide the claimed functionality of the "individually addressed" limitation of claim element a(i).

83. The Ehret 1997 Publication provides disclosure about how the IDES are made. (*See* Ehret 1997 Publication at 30.) The IDES sensors were fabricated on a sapphire wafer and thin film interconnects of Pt on Ti were patterned on the individual sensor chips. (*Id.*) After wafer processing was completed, Ehret states that "[t]he sensors were isolated and assembled on a chip carrier (TO-8 package)." (*Id.*) Dr. Frazier references Ehret's use of a TO-8 package numerous times in his rebuttal report. (*See, e.g.*, Frazier Rebuttal Report at ¶¶144-145, 211, 216, 218.)

84. I am personally familiar with TO-8 packages, which have been available since at least the time that I attended graduate school and long before the Ehret 1997 Publication. "TO" stands for transistor outline. TO packages come in various configurations based on size, and each particular package has its own generally standard dimensions (with some minor variation and tolerances allowed). A TO-8 package is a specific type of integrated circuit (IC) package that is a

34

cylindrical metal can with a flat top and multiple leads extending from the bottom side. The number of leads may vary, and the package has a mounting base to which a printed circuit board or individual chip may be mounted.

85.    To illustrate some basics of a TO-8 package, I refer to some of the images on the Wikipedia page for TO-8 at https://en.wikipedia.org/wiki/TO-8 (last visited May 19, 2025). The available images are helpful in explaining how a TO-8 package works and would have worked at the time of the Ehret 1997 Publication. One of the images shows a size comparison of a TO-8 package (on the left in the image below) with TO-5 (center) and TO-18 (right) packages.



(https://en.wikipedia.org/wiki/TO-8 (last visited May 19, 2025).) Another image shows a TO-8 variant with 12 leads.

35



(*Id.*)

86.      The chip carrier technology available around 1995-1996 (*see* Ehret 1997 Publication at 29 (indicating paper was "[r]eceived 17 January 1996")) referred to by Ehret would have allowed the IDES chips to be assembled in chip carrier packages and then have the packages mounted on the printed circuit board with no wire connections, for example. (*See, e.g.*, U.S. Patent No. 5,641,995, entitled "Attachment of ceramic chip carriers to printed circuit boards," filed March 22, 1995 and issued June 24, 1997.) The chips themselves could be assembled in chip carrier packages through a process that involves attaching the individual chip to the carrier, typically using wire bonding, direct attachment, or flip-chip techniques. The chip carrier then provides a way to connect each chip to the circuit board beneath. Electrical connections from the chip carrier to the TO-8 package leads typically involve soldering or crimping wires directly to the leads.

87. Given the thin film deposition technologies used to make the IDES (*see* Ehret 1997 Publication at 30; Frazier Rebuttal Report at ¶399) and the sensor fabrication Ehret describes, a person of ordinary skill in the art at the time of the alleged invention of the '080 patent would have understood that electrically conductive paths ("electrical traces") were necessary to connect the IDES to the leads on the outer perimeter of a TO-8 package. The image above provides an illustration showing electrically conductive paths, traces on the substrate and wires, that lead to the top ends of various TO-8 leads. The leads on a TO-8 package allow for connection of the electronics on the mounted board or chip to be connected to external electrical circuits or devices. A person of ordinary skill in the art at the time of the alleged invention of the '080 patent would have understood that the leads of the TO-8 package that Ehret references were used as part of connecting the IDES to Ehret's multiplexer. In sum, the TO-8 package leads are "connection pads."

88. Dr. Frazier argues that the Ehret 1997 Publication does not disclose "electrical traces" that are part of the device and provide the claimed functionality because the connection lines in Ehret's Figure 1 that run between the IDES and the multiplexer show "wires" and extend outside the IDES (or outside the "device"). (*See* Frazier Rebuttal Report at ¶207.) Ehret's Figure 1 is a schematic (a "[b]lock diagram of assembly used for measurements with SR 715/720 …"), and Ehret does not describe the connection lines as "wires" (something I discuss further below with respect to claim element a(iii)). (*See* Ehret 1997 Publication at 31-32.) Even if Dr. Frazier was correct, Ehret discloses electrical traces configured to provide the "individually addressed" functionality (as construed by the Court) because a person of ordinary skill in the art at the time of the alleged invention of the '080 patent would have understood that electrically conductive paths

37

were necessarily present in Ehret's device to connect Ehret's IDES to the leads on the outer perimeter of the TO-8 package.

89. The remainder of Dr. Frazier's opinions on the alleged lack of "electrical traces" in Ehret are not relevant because his opinions are focused on arguing that the connection lines or electrically conductive paths shown in Ehret's Figure 1 (between the IDES and the multiplexer) do not disclose the claimed "electrical traces" required by the "individually addressed" limitation. (*See* Frazier Rebuttal Report at ¶¶208-211.)  Dr. Frazier does not address the electrically conductive paths that are necessarily present in Ehret's device to connect the IDES to the leads on the TO-8 package.

90. As noted above, Dr. Frazier also argues that the Ehret 1997 Publication does not disclose "connection pads" that are part of the device and provide the claimed "individually addressed" functionality. (*See* Frazier Rebuttal Report at ¶¶215-219.)  In ¶216 of the Frazier Rebuttal Report, Dr. Frazier acknowledges that a TO-8 package has "metal leads" for what he describes as "connecting the wires shown in Figure 1 of Ehret to the multiplexer." (*Id.* at ¶216.) Dr. Frazier claims that Ehret "teaches away" from using connection pads, given the TO-8 package leads. (*Id.*)  I disagree.

91. Dr. Frazier's opinion ignores the broad definition of "connection pad" that he reproduces in ¶217 of his rebuttal report. (*See id.* at ¶217.)  I reproduce the definition again below:

> A "connection pad" is an area on an apparatus or a device of the present invention which is electrically connected to at least one electrode or all electrode elements within at least one electrode structure on an apparatus or a device and which can be operatively connected to external electrical circuits (e.g., an impedance measurement circuit or a signal source).

38

('080 patent at 11:15-20.)  A person of ordinary skill in the art at the time of the alleged invention of the '080 patent would have understood that the TO-8 package leads are areas on Ehret's device that are electrically connected to an electrode of the IDES, and, as Dr. Frazier concedes, the leads can be operatively connected to an external electrical circuit (*e.g.*, Ehret's multiplexer).

92.    No "complete" or "major" "redesign" of Ehret is needed, contrary to Dr. Frazier's opinions.  (*See* Frazier Rebuttal Report at ¶¶210-211, 219.)  In my opinion, the Ehret 1997 Publication discloses both "electrical traces" and "connection pads" configured to provide the claimed "individually addressed" functionality (functionality that Dr. Frazier concedes Ehret discloses).

93.    The final limitation of claim element a(i) that Dr. Frazier disputes concerns whether the Ehret 1997 Publication discloses a multi-well device or, as Dr. Frazier argues, just eight single well devices.  (*See* Frazier Rebuttal Report at ¶¶200-202, 209, 218.)  Dr. Frazier's opinion appears to be based on the fact that the Ehret 1997 Publication does not explicitly describe a structure like that shown in Figure 1A of the '080 patent (reproduced below).



Figure 1A

('080 patent at Figure 1A.)  I do not understand the claim phrase "multiple-well cell-substrate impedance measuring device" to be limited to the embodiment shown in Figure 1A.  Nor does Dr. Frazier explain why the claim phrase should be so limited.  (*See* Frazier Rebuttal Report at ¶¶200-

202.) Even if each IDES is fabricated on its own TO-8 package, the method of fabricating each well or each electrode array is not relevant to whether multiple wells together are a multi-well device.

94.    The Ehret 1997 Publication repeatedly describes using the eight IDES collectively to run experiments. (*See* Ehret 1997 Publication at 31-32, 37-38.) I also note again that, in contrast to the inventors and applicants for the '080 patent, the Patent Office, and even Agilent (in its interrogatory responses in this case), Dr. Frazier is the only person to argue that the Ehret 1997 Publication does not disclose the multi-well device limitation of claim 1, element a(i) of the '080 patent. (*See* ¶78 above; Invalidity Report at ¶¶196-197, 85-90.) To the extent that Dr. Frazier argues that Ehret's IDES are wired for permanent engagement with Ehret's multiplexer (with respect to claim element a(iii)), this would also contradict Dr. Frazier's opinion that Ehret discloses only eight separate, single well devices, given that all eight IDES would be permanently interconnected together for use in such an event. As discussed below, I do not believe Ehret's device is permanently engaged via <u>wires</u> to the multiplexer.

95.    In addition, even if Dr. Frazier was correct that Ehret discloses only a number of separate, single well devices, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '080 patent to form a multi-well device using, for example, two (or more) IDES. Two (or more) separate TO-8 packages, for example, could be interconnected together in any number of ways that would have been well within the capabilities of one of ordinary skill in the art at the time of the alleged invention of the '080 patent. At minimum, combining such devices would have increased convenience and ease of handling to produce at least some multi-well devices, as opposed to exclusively single well devices, and it would have also been obvious to try. The applicants also admitted that it was known to persons of ordinary skill in the

40

art at the time of the alleged invention of the '080 patent that Ehret's IDES had been used in a multi-well microtiter plate format—confirming that a multi-well plate using Ehret's IDES would have been obvious to a person of ordinary in the art at the time of the alleged invention in view of the Ehret 1997 Publication and the knowledge of a person of ordinary skill in the art. (*See* Section VI.B.1 above; '533 patent at 1:31-48; Invalidity Report at ¶124.)

96.     Finally, Dr. Frazier suggests that there should be no presumption that the Ehret 1997 Publication is an enabling disclosure in this case, but I note that Dr. Frazier does not separately challenge my opinion that Ehret is, in fact, an enabling disclosure with respect to the '080 patent claims. (*See* Frazier Rebuttal Report at ¶¶212-213; Invalidity Report at ¶182.)

97.     For the above reasons and those stated in my Invalidity Report, it is my opinion that the Ehret 1997 Publication describes claim 1, element a(i) of the '080 patent and also that claim 1, element a(i) would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '080 patent in view of the Ehret 1997 Publication.

### (ii)     Claim 1, element a(ii) "(ii) an impedance analyzer;"

98.     Dr. Frazier does not dispute that the Ehret 1997 Publication describes impedance analyzers. (*See* Frazier Rebuttal Report at ¶¶189-236 (analysis of '080 patent claim 1).) For some reason that is unclear, Dr. Frazier says that Ehret's impedance analyzers do not meet claim 1, element a(iii) (the next claim element), even though element a(iii) only references the claimed "impedance analyzer" in the context of reciting the functionality of the device station having circuitry capable of selecting and connecting electrode arrays to the impedance analyzer. (*See id.* at ¶¶221-223.) As I explain below, Dr. Frazier in analyzing claim element a(iii) does not dispute that Ehret's multiplexer has circuitry capable of selecting and connecting electrode arrays within any of the multiple wells to Ehret's impedance analyzer, as claimed.

41

been obvious in view of the Ehret 1997 Publication combined with one or more specific prior art references that disclose elements a(i), a(iii), and a(iv) of claim 1.

> **(a)    Claim 1, element a(i): "(i) at least one multiple-well cell-substrate impedance measuring device, wherein at least two of the multiple wells comprise an electrode array at the bottom of the well, wherein each electrode array comprises two electrode structures and each electrode structure comprises multiple electrode elements, further wherein each electrode array is individually addressed;"**

134.    For the reasons stated above in Section VI.C.1(b)(i), it is my opinion that the Ehret 1997 Publication describes element a(i) of claim 1 and that element a(i) would also have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '080 patent in view of the Ehret 1997 Publication.

135.    As noted above in Section VI.C.1(b)(i), Dr. Frazier argues that the Ehret 1997 Publication does not disclose claim element a(i) because (a) Ehret describes only multiple single-well devices, not a multi-well device, and (b) Ehret does not describe using electrical traces and connection pads to implement the functionality of the "individually addressed" limitation. (*See also* Frazier Rebuttal Report at ¶¶200-202, 207-211, 214-219.) I disagree (as discussed above).

136.    However, even if Dr. Frazier was correct about Ehret, it is my opinion that claim 1 of the '080 patent would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '080 patent because it would have obvious to modify Ehret to form a multi-well device (*e.g.*, in a plate format) with IDES in each well and to use electrical traces and connection pads to implement the claimed functionality of the "individually addressed" limitation in claim element a(i). As further explained below, the use of IDES (like Ehret's) in multi-well devices (such as plates) was known in the prior art, and it was also well known to use electrical traces and connection pads in multi-well plates for connecting the electrodes in the wells of such

55

devices to external circuitry (*e.g.*, a multiplexer, as switch/control unit, an impedance analyzer, a signal source, a "device station," etc.).  The modification of Ehret's device (based on what Dr. Frazier opines that Ehret discloses as being Ehret's "device") in order to arrive at the invention of claim 1 would have been routine, straightforward, and well within the capabilities of a person of ordinary skill in the art at the time of the alleged invention of the '080 patent.  A person of ordinary skill in the art would have had reason to form a multi-well device in plate format for the increased convenience and ease of handling of such a multi-well device (as compared to having many single well devices), and it would also have been obvious to try.  To use a multi-well device in a plate format would also have been an available design choice from among a limited number of known, finite options, with a reasonable expectation of success.

137.    The applicants for the '080 patent admitted that, before the alleged invention of the '080 patent, Ehret's IDES had been used with an IDES in each well of a multi-well plate and that the plate included electrical conduits (electrical traces) extending from each electrode of the IDES. (*See* '533 patent at 1:31-48; *see also* Invalidity Report at ¶¶124, 175; Sections VI.B.1, VI.B.9, and VI.C.1(b)(i) above; Wolf '233 Patent at Figures 5-6.)  The applicants therefore conceded that it was known, and would also have been obvious, to form a multi-well plate with Ehret's IDES with electrical traces connected to and extending from each electrode so that the IDES could ultimately be connected to external circuitry for impedance measurement.  A person of ordinary skill in the art at the time of the alleged invention of the '080 patent would also have known that pads on a substrate were one of a finite number of options for connecting electrodes in the wells of the multi-well device to external circuitry for impedance measurement and would have had a reasonable expectation of success.  For a person of ordinary skill in the art at the time of the alleged invention of the '080 patent, use of electrical traces and connection pads in the manner described would have

been a predictable use of prior art elements according to their established functions.  For these reasons, claim 1, element a(i) would have been obvious in view of the Ehret 1997 Publication and the applicants' admissions regarding the prior art.

138.    As the applicants also admitted, it was known by those skilled in the art at the time of the alleged invention that interdigitated electrodes (like Ehret's IDES) were often fabricated on glass or silicon substrates.  ('533 patent at 3:16-22.)  It would have been obvious to form Ehret's IDES on the sapphire substrate described in Ehret, on glass or silicon substrates as the applicants admitted, or on other suitable substrates.  Dr. Frazier argues that, for Ehret, components like wires and leads (that would connect IDES to external circuitry for impedance measurement) are not within the scope of "electrical traces" and "connection pads" as defined in the '080 patent.  Even if Dr. Frazier was correct, Dr. Frazier concedes that the use of "electrical traces" and "connection pads" was known by persons skilled in the art at the time of the alleged invention of the '080 patent.  More specifically, Dr. Frazier admits that the multi-well device disclosed by the Wegener Publication "makes use of traces and connection pads."  (Frazier Rebuttal Report at ¶507; *see also* Invalidity Report at ¶558.)  I have reproduced a partial, annotated version of Wegener's Figure 1 below (the yellow boxes identify each of the 8 wells).



(Wegener Publication at 159 (Figure 1, annotated, partial version).)

139.    It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '080 patent to fabricate Ehret's IDES on an appropriate substrate and use electrical traces and connection pads like those disclosed by Wegener in order to be able to connect each IDES to external circuitry for impedance measurement.  Further, unlike the Wegener configuration, a person of ordinary skill in the art would have had reason to use eight additional connection pads, rather than the common ground connection pad in Wegener, to maintain the individual connections to the IDES in each well that Ehret describes, and there would have been adequate space on an appropriately-sized substrate for the additional connection pads needed for an eight-well device.  A person of ordinary skill in the art would have known that electrical traces and connection pads (like those Wegener discloses) were suitable options for connecting to external circuitry for impedance measurement and among a finite number of options for connecting electrodes in the wells of the multi-well plate to external circuitry for impedance measurement with a reasonable expectation of success.  For a person of ordinary skill in the art at the time of the alleged invention of the '080 patent, use of electrical traces and connection pads in the manner described would have been a predictable use of prior art elements according to their established functions.  Accordingly, claim 1, element a(i) would have been obvious in view of the Ehret 1997 Publication in view of the Wegener Publication (alone or further in view of the applicants' admissions regarding the prior art).

       **(a)**       **Claims 14 and 11, preambles and elements a, a(i), a(ii), a(iii), and a(iv)**

187.    In ¶¶356-357 and ¶¶410-411 of the Frazier Rebuttal Report, Dr. Frazier addresses the preambles of claims 14 and 11.  (*See* Frazier Rebuttal Report at ¶¶356-357, 410-411.)  Dr. Frazier refers back to his analysis of the preamble of claim 1 of the '080 patent in which Dr. Frazier conceded that the preamble was not limiting and, in discussing the preamble, relied only on his separate opinions concerning claim elements a(i), a(iii), and a(iv).  (*See id.* at ¶¶356-357, 410-411, 191-192.)  Dr. Frazier does not actually dispute that the Ehret 1997 Publication discloses the preambles of claims 14 and 11.

188.    In ¶¶358-359 and ¶¶412-413 of the Frazier Rebuttal Report, Dr. Frazier addresses claim element a ("providing the system of claim 1") of claims 14 and 11.  (*See* Frazier Rebuttal Report at ¶¶358-359, 412-413.)  Dr. Frazier refers back to his analysis of '080 patent claim 1, element a in which Dr. Frazier relies only on his separate opinions concerning claim elements a(i), a(iii), and a(iv) of '080 patent claim 1 and does not dispute that the Ehret 1997 Publication describes providing a cell-substrate impedance monitoring system.  (*See id.* at ¶¶358-359, 412-413, 193-195.)  Dr. Frazier does not dispute that the Ehret 1997 Publication discloses "providing a system," only that the "system" does not include specific components further recited in other claim elements (elements a(i), a(iii), and a(iv)).

189.    In ¶¶360-362 and ¶¶414-416 of the Frazier Rebuttal Report, Dr. Frazier addresses claim element a(i) of claims 14 and 11.  (*See* Frazier Rebuttal Report at ¶¶360-362, 414-416.)  Dr. Frazier refers back to his analysis of '080 patent claim 1, element a(i) as support for his opinion on claim element a(i) of claims 14 and 11 of the '752 patent.  (*See id.*)  For the same reasons I explained above in Section VI.C.1(b)(i) and in my Invalidity Report, I disagree with Dr. Frazier,

and it is my opinion that the Ehret 1997 Publication discloses and would also have rendered obvious claim element a(i) of claims 14 and 11.

190.    In ¶¶363-364 and ¶417 of the Frazier Rebuttal Report, Dr. Frazier addresses claim element a(ii) of claims 14 and 11.  (*See* Frazier Rebuttal Report at ¶¶363-364, 417.)  Dr. Frazier refers back to his analysis of '080 patent claim 1, element a(ii) in which Dr. Frazier relies only on his opinion that claim element a(iii) is not met by Ehret's impedance analyzers.  (*See id.* at ¶¶363-364, 417, 221-223.)  As I explained above in Sections VI.C.1(b)(ii)-(iii), Dr. Frazier does not dispute that Ehret discloses an impedance analyzer or that Ehret's multiplexer has circuitry capable of selecting and connecting electrode arrays to Ehret's impedance analyzer (as recited in claim element a(iii)).  For the same reasons I explained above in Section VI.C.1(b)(ii) and in my Invalidity Report, the Ehret 1997 Publication discloses claim element a(ii) of claims 14 and 11.

191.    In ¶¶365-368 and ¶418 of the Frazier Rebuttal Report, Dr. Frazier addresses claim element a(iii) of claims 14 and 11.  (*See* Frazier Rebuttal Report at ¶¶365-368, 418.)  Dr. Frazier refers back to his analysis of '080 patent claim 1, element a(iii) as support for his opinion on claim element a(iii) of claims 14 and 11 of the '752 patent.  (*See id.*)  For the same reasons I explained above in Section VI.C.1(b)(iii) and in my Invalidity Report, I disagree with Dr. Frazier, and it is my opinion that the Ehret 1997 Publication discloses claim element a(iii) of claims 14 and 11.

192.    In ¶¶369-371 and ¶419 of the Frazier Rebuttal Report, Dr. Frazier addresses claim element a(iv) of claims 14 and 11.  (*See* Frazier Rebuttal Report at ¶¶369-371, 419.)  Dr. Frazier refers back to his analysis of '080 patent claim 1, element a(iv) as support for his opinion on claim element a(iv) of claims 14 and 11 of the '752 patent.  (*See id.*)  For the same reasons I explained above in Section VI.C.1(b)(iv) and in my Invalidity Report, I disagree with Dr. Frazier, and it is

76

195.    Dr. Frazier first argues that the Ehret 1997 Publication does not render claim element a(v) obvious because Ehret does not describe electrical traces and connection pads, referring to his analysis for '080 patent claim 1, element a(i). (*See* Frazier Rebuttal Report at ¶377 (referring to Section X.A.1(b)(i) of the Frazier Rebuttal Report).) I disagree with Dr. Frazier. As I explained above in Section VI.C.1(b)(i) for claim element a(i) of '080 patent claim 1, a person of ordinary skill in the art at the time of the alleged invention of the '752 patent would have understood that electrically conductive paths ("electrical traces") were necessary to connect Ehret's IDES to the leads ("connection pads") of a TO-8 package. Further, as I explained above in Section VI.C.2(a), even if Dr. Frazier was correct about Ehret, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '752 patent to modify Ehret to form a multi-well device (*e.g.*, in a plate format) with IDES in each well and to use electrical traces and connection pads.

196.    Dr. Frazier and I appear to agree that while the Ehret 1997 Publication provides some information about its IDES (*e.g.*, lengths and widths of electrode elements, spacing between electrode elements, etc.), Ehret does not provide all of the information that would be necessary to calculate a specific resistance value at a specific location on the IDES. (*See* Frazier Rebuttal Report at ¶¶378-379.) Dr. Frazier, however, argues that a person of ordinary skill in the art would not have understood that resistance values at locations on Ehret's IDES would be similar and would not have known the 30% "limit." (*See id.* at ¶¶380-381.) A person of ordinary skill in the art, however, would not have needed to know the 30% "limit" in order to understand from Ehret's disclosure that resistance values at locations on Ehret's IDES would be similar such that any differences in resistances would be expected to be small and likely less than 30%. (*See* Invalidity Report at ¶¶423-424.)

78

elements of '080 patent claim 1—why, in my opinion, claims 14 and 11 (and all dependent claims) would have also been obvious in view of the Ehret 1997 Publication combined with one or more specific prior art references that disclose elements a(i), a(iii), and a(iv) of claims 14 and 11.

> **(a)** **Claims 14 and 11, element a(i): "a) one or more multiple well cell-substrate impedance monitoring devices, wherein at least two of the multiple wells of said device comprise an electrode array at the bottom of the well, wherein said electrode array is individually addressed, further wherein said device can be used to measure differences in impedance values that relate to cell behavior;"**

220.    For the same reasons discussed above for claim element a(i) of claim 1 of the '080 patent, claim element a(i) of claims 14 and 11 of the '752 patent would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '752 patent in view of the Ehret 1997 Publication in combination with one or both of the Wegener Publication and the applicants' admissions regarding the prior art.

221.    I described the relevant prior art disclosures and reasons for combining them with the Ehret 1997 Publication in Section VI.C.2(a) above, and the same disclosures and reasons to combine such disclosures with Ehret also apply to element a(i) of claims 14 and 11 of the '752 patent. Claims 11-12, 14-18, and 20 of the '752 patent would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '752 patent for the same reasons discussed above in Section VI.C.2(a).

> **(b)** **Claims 14 and 11, elements a(iii) and a(iv): "c) a device station comprising electronic circuitry that can engage said device and selectively connect said two or more electrode arrays of said device to said impedance analyzer"; and "d) a software program that can control said device station and record and analyze data obtained from said impedance analyzer"**

222.    For the same reasons discussed above for claim elements a(iii) and a(iv) of claim 1 of the '080 patent, claim elements a(iii) and a(iv) of claims 14 and 11 of the '752 patent would

have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '752 patent in view of the Ehret 1997 Publication (alone or as modified as discussed above for claim element a(i)) in combination with the Van der Weide '709 Publication and/or applicant-admitted prior art.

223.    I described the relevant prior art disclosures and reasons for combining them with the Ehret 1997 Publication in Section VI.C.2(b) above, and the same disclosures and reasons to combine such disclosures with Ehret also apply to elements a(iii) and a(iv) of claims 14 and 11 of the '752 patent.  Claims 11-12, 14-18, and 20 of the '752 patent would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '752 patent for the same reasons discussed above in Section VI.C.2(b).

### (c)    Dependent claims 12, 15-18, and 20

224.    As I noted above in Section VI.D.1(c), Dr. Frazier does not dispute that the Ehret 1997 Publication describes the additional claim limitations in dependent claims 12, 15-18, and 20. Therefore, for the reasons claims 11 and 14 would have been obvious in view of the Ehret 1997 Publication combined with one or more secondary prior art references (as explained above), dependent claims 12, 15-18, and 20 would also have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '752 patent.

### 3.    The term "calculating a cell index" in claim 18 is indefinite, and claims 18 and 20 are invalid.

225.    Dr. Frazier's opinion on "calculating a cell index" in claim 18 of the '752 patent refers back to and relies only on his analysis for "calculating cell index values" in claim 1 of the '080 patent.  (*See* Frazier Rebuttal Report at ¶¶438-440 (¶439 is identical to ¶440).)

226.    It is my opinion that a person of ordinary skill in the art would not understand, with reasonable certainty, the scope of "calculating a cell index" when read in view of the '752 patent

90

ACEA systems publicly launched in December 2003, Dr. Frazier disputes only their prior art status (*see id.* at ¶444), which I discussed above.

240.    The specific claim elements that Dr. Frazier maintains are not disclosed by the Keese Publication (alone or in combination with the Watanabe Publication) are:

- Claim 9, preamble: "A method of measuring cytolytic activity comprising:"
- Claim 9, element b: "b) adding target cells to at least two wells, wherein at least one well is a control well and at least one well is a test well;"
- Claim 9, element c: "c) adding effector cells to said test well;"
- Claim 9, element d: "d) monitoring impedance of said control and said test wells before and after adding said effector cells and optionally determining a cell index from said impedance, wherein said monitoring said impedance comprises measuring said impedance during at least two time points; and"
- Claim 9, element e: "e) determining viability of said target cells in said test well at a given time point after said adding effector cells by comparing said impedance or optionally said cell index of said test well to said control well at said given time point."

(*See id.* at ¶¶455-477.)  I disagree with Dr. Frazier.  Below, I focus this portion of my reply to the Frazier Rebuttal Report on these claim elements that are in dispute.

> (a)    **Claim 9, preamble: "A method of measuring cytolytic activity comprising:"**

241.    While Dr. Frazier states that the Keese Publication does not describe measuring cytolytic activity, Dr. Frazier never clearly says that the preamble of claim 9 is limiting or explains why the preamble should be limiting.  (*See* Frazier Rebuttal Report at ¶¶455-459.)  I understand one way that a claim's preamble can be found to be limiting is if words in the preamble are used in the body of the claim, or the body of claim refers back to specific recitations in the preamble.  For claims 9 and 10, none of the language used in claim 9's preamble is recited in the body of the two claims.  In my opinion, the preamble is not limiting.  Even if the preamble was limiting, the

96

Watanabe Publication discloses a method of measuring cytolytic activity (although not using an impedance-based system). (*See* Watanabe Publication at 199-201, 203-204, Figure 3.) Accordingly, a combination where the ACEA systems publicly launched in December 2003 were used to carry out Watanabe's effector-cell-on-target-cell experiment describes claim 9's preamble.

**(b)    Claim 9, element b: "b) adding target cells to at least two wells, wherein at least one well is a control well and at least one well is a test well;"**

242.    Dr. Frazier addresses claim 9, element b in paragraphs 460-463 of the Frazier Rebuttal Report, opining that the Keese Publication does not disclose this claim element. (*See* Frazier Rebuttal Report ¶¶460-463.)  I disagree, as explained in my Invalidity Report (*see* Invalidity Report at ¶¶497-501) and for the reasons explained below.

243.    Dr. Frazier's opinion that the HUVECs added to the wells in the Keese Publication's experiments are not target cells is based on Dr. Frazier's observation that Keese does not explicitly describe that it is concerned with cytolysis of the HUVECs, as well as Dr. Frazier's view that the cancer cells added to the HUVECs are not "effector cells" ("effector cells" are recited in claim element c, which I address below). (*See* Frazier Rebuttal Report at ¶461.)  The '255 patent states that "'target cells' refers to any cell that can be lysed or killed by the effector cells" and specifically lists endothelial cells as an example of a target cell. ('255 patent at 23:9-13.)  The HUVECs (human umbilical vein endothelial cells) are endothelial cells and can be killed by the cancer cells Keese describes adding to the HUVECs.  In addition, Dr. Frazier does not dispute that the Keese Publication describes the use of a control well to which only HUVECs, and no other cells, are added. (*See* Frazier Rebuttal Report at ¶¶460-463.)

244.    The Watanabe Publication also discloses adding target cells to multiple wells. (*See* Watanabe Publication at 199, 201-204.)  For example, Watanabe states: "The ADCC assay was

97

performed in a modified fashion as previously described, and in a fashion similar to the ADCP assay [15]. Target and effector cells were suspended in RF1 medium (RPMI 1640 supplemented with 1% FBS) during the assay." (*Id.* at 201.) I explained this in my Invalidity Report (*see* Invalidity Report at ¶¶170-173, 518-520) but did not specifically address Watanabe when discussing claim 9, element b because Agilent had not previously disputed that the Keese Publication describes this claim element. (*See id.* at ¶501.)

(c)    Claim 9, element c: "c) adding effector cells to said test well;"

245.    Dr. Frazier addresses claim 9, element c in paragraphs 464-467 of the Frazier Rebuttal Report, opining that the Keese Publication does not disclose this claim element. (*See* Frazier Rebuttal Report ¶¶464-467.) I disagree, as explained in my Invalidity Report (*see* Invalidity Report at ¶¶502-505) and for the reasons explained below.

246.    Dr. Frazier alleges that I ignored the meaning of the claim term "effector cells" as "cells capable of killing or lysing target cells." (*See* Frazier Rebuttal Report ¶465.) I did not. While Dr. Frazier states that "Keese does not describe that the Dunning cells kill or lyse any cell, nor that they are capable of doing so" (*id.*), Dr. Frazier does not affirmatively state that his opinion is that the Dunning cells are not capable of lysing or killing the HUVECs. That the Keese Publication may not be focused on "cytolysis" does not indicate that the invasive, metastatic cancer cells that Keese uses to challenge his HUVECs are not <u>capable of</u> lysing or killing the HUVECs. Rather, metastatic cancer cells (like the Dunning cells used by Keese) were used to challenge HUVECs by "attach[ing] to and invad[ing]" them and thus were "capable of killing or lysing target cells." (Keese Publication at 842; *see also* Frazier Rebuttal Report at ¶¶455, 88 (describing "lysis as when the cell membrane is broken apart …").) To the extent that Dr. Frazier disputes this, I note that the Keese Publication also describes using human prostatic cancer cell lines, including PPC1 cells, to challenge HUVECs. (Keese Publication at 843, 849-850.) The Keese Publication

98

describes how cancer cells "disrupt the basement membrane structure" of endothelial cells, and Keese explains, with reference to its Figure 8, that "[t]he PPC1 line clearly results in the most rapid and complete disruption of the endothelial cell layer." (*Id.* at 843, 850.) In my opinion, what Keese describes includes the breaking apart of a cell membrane (*i.e.*, killing or lysing of cells).

247. The Watanabe Publication also discloses adding effector cells to target cells. (*See* Watanabe Publication at 199, 201-204.) I explained this in my Invalidity Report (*see* Invalidity Report at ¶¶170-173, 518-520) but did not specifically address Watanabe when discussing claim 9, element c because Agilent had not previously disputed that the Keese Publication describes this claim element. (*See id.* at ¶505.)

> **(d)    Claim 9, element d: "d) monitoring impedance of said control and said test wells before and after adding said effector cells and optionally determining a cell index from said impedance, wherein said monitoring said impedance comprises measuring said impedance during at least two time points; and"**

248. Dr. Frazier addresses claim 9, element d in paragraphs 468-470 of the Frazier Rebuttal Report, opining that the Keese Publication does not disclose this claim element only because of Dr. Frazier's opinion that Keese does not describe using "effector cells" at all. (*See* Frazier Rebuttal Report ¶¶468-470.) I disagree with Dr. Frazier, as explained in my Invalidity Report (*see* Invalidity Report at ¶¶497-501, 506-510) and for the reasons explained above for claim element c. I note that Dr. Frazier does not dispute that the Keese Publication describes monitoring impedance both before and after adding the cancer cells to the wells that contain HUVECs and also measuring impedance during at least two time points. (*See* Frazier Rebuttal Report ¶¶468-470.)

249. Further, as noted above for elements b and c of claim 9, the Watanabe Publication describes adding effector cells and target cells to multiple wells. It would have been obvious to a

99

person of ordinary skill in the art at the time of the alleged invention of the '255 patent to monitor impedance of wells both before and after addition of effector cells in a combination where the ACEA systems publicly launched in December 2003 were used to carry out an effector-cell-on-target-cell experiment using impedance-based technology for the same reasons Keese describes monitoring impedance both before and after cancer cells are added to the HUVECs (*e.g.*, to obtain baseline impedance measurements before effector cells are added so that the effects of the addition of the effector cells on the target cells can be more easily determined and analyzed).

> **(e)** **Claim 9, element e: "e) determining viability of said target cells in said test well at a given time point after said adding effector cells by comparing said impedance or optionally said cell index of said test well to said control well at said given time point."**

250.    Dr. Frazier addresses claim 9, element e in paragraphs 471-477 of the Frazier Rebuttal Report, opining that the Keese Publication, alone or in combination with the Watanabe Publication, does not disclose this claim element. (*See* Frazier Rebuttal Report ¶¶471-477.)  As I explained in my Invalidity Report, I disagree with Dr. Frazier <u>in the event that</u> Dr. Frazier's incorrect understanding and application of "determining viability …" in his infringement analysis is accepted or adopted by the Court. (*See* Invalidity Report at ¶¶511-521.)

251.    As I explained in my Non-Infringement Rebuttal Report, "determining viability …" requires determining the quantity or percentage of viable cells. (*See* Non-Infringement Rebuttal Report at ¶¶305-312.)  Axion's products have not been used to infringe '255 patent claim 10 because the Axion products do not determine a quantity or percentage of viable cells and have not been used to make such a determination. (*See id.* at ¶¶296-327.)  I note that Dr. Frazier's understanding of "viability" set forth in ¶472 of the Frazier Rebuttal Report is incorrect, and Dr. Frazier does not cite to the specific definition of "viability" in the '255 patent. (*See* Frazier

100

264.    For the reasons explained above in Section VI.E.1(a), I disagree with Dr. Frazier's opinions regarding the preamble of claim 9.  In addition, I note that Dr. Frazier does not dispute that the Ehret 1997 Publication, and the combination of Ehret with Keese/Wegener, discloses claim 9's preamble.  (*See* Frazier Rebuttal Report at ¶¶488-490.)

265.    For the reasons explained above in Section VI.E.1(b), I disagree with Dr. Frazier's opinions regarding claim 9, element b.  (*See* Frazier Rebuttal Report at ¶¶491-492.)  In addition, as noted above, the Watanabe Publication discloses this claim element.

266.    For the reasons explained above in Section VI.E.1(c), I disagree with Dr. Frazier's opinions regarding claim 9, element c.  (*See* Frazier Rebuttal Report at ¶¶493-494.)  In addition, as noted above, the Watanabe Publication discloses this claim element.

267.    For the reasons explained above in Section VI.E.1(d), I disagree with Dr. Frazier's opinions regarding claim 9, element d.  (*See* Frazier Rebuttal Report at ¶¶495-496.)

268.    In ¶¶497-499 of the Frazier Rebuttal Report, Dr. Frazier addresses claim 9, element e.  (*See* Frazier Rebuttal Report at ¶¶497-499.)  I explained my opinions with respect to this claim element in Section VI.E.1(e) above.

269.    For the preamble and element e of claim 9, Dr. Frazier also states that a person of ordinary skill in the art at the time of the alleged invention of the '255 patent "would not have been motivated to make such a combination[,] and would not have had a reasonable expectation of success if they did make the attempt."  (Frazier Rebuttal Report at ¶¶490, 499.)  I disagree for the reasons explained above in this Section VI.E.2 and in my Invalidity Report.

**(b)    Claim 10, elements b, c, d, and e**

270.    Dr. Frazier specifically addresses only four claim elements of claim 10 with respect to the proposed modification of the Keese/Wegener multi-well device to use Ehret's IDES—claim

105

## VII.    RESERVATION OF RIGHTS

284.    My opinions are based upon the information that I have considered to date.  I reserve the right to supplement or amend my opinions in response to opinions expressed by plaintiff's expert(s), any further claim construction by the Court, or in light of any additional evidence, testimony, or other information that may be provided to me, or that I am asked to consider, after the date of this report, including at trial.  In addition, I expect that I may be asked to testify regarding my opinions contained herein as well as related matters including those raised on cross-examination, those necessary to address matters raised by plaintiff's witnesses who testify concerning technical issues, or those otherwise raised at trial by plaintiff's attorneys or the Court in relation to matters set forth in this report.

## VIII.    CONCLUSION

285.    I declare under penalty of perjury that all statements made in this declaration of my own knowledge are true and that all statements made on information and belief are believed to be true.

Executed on May 21, 2025.

_____
Richard B. Fair, Ph.D.

113

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-198 (CJB) |
| v. | ) | |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**REBUTTAL EXPERT REPORT OF DR. A. BRUNO FRAZIER**
**VALIDITY OF U.S. PATENT NOS. 8,026,080, 7,192,752, AND 7,468,255**

*Based on the analysis I have conducted and for the reasons set forth herein, I have reached the conclusions in this report and I declare under the penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the following is true and correct.*

Submitted    April 25, 2025

A. Bruno Frazier, Ph.D.

i

████████████████████████████

**Table of Contents**

I.    BACKGROUND AND QUALIFICATIONS ................................................................ 2

II.   MATERIALS CONSIDERED ................................................................................... 3

III.  DEMONSTRATIVES ............................................................................................... 4

IV.   SUMMARY OF OPINIONS ..................................................................................... 4

V.    LEGAL STANDARDS ............................................................................................. 6

      A.   Claim Construction ........................................................................................ 6

      B.   Burden of Proof .............................................................................................. 7

      C.   Prior Art ......................................................................................................... 8

      D.   Anticipation .................................................................................................... 9

      E.   Obviousness .................................................................................................. 10

            1.   Motivation to Combine ....................................................................... 11

            2.   Modification of Prior Art References .................................................. 12

            3.   Secondary Considerations of Non-Obviousness .................................. 13

      F.   Indefiniteness ................................................................................................ 13

      G.   Person of Ordinary Skill in the Art .............................................................. 14

      H.   Priority Dates of Claims ............................................................................... 15

      I.   Invention Date of Claims .............................................................................. 16

VI.   BACKGROUND OF THE RELEVANT TECHNOLOGY ..................................... 16

VII.  BACKGROUND OF ASSERTED PATENTS ('752, '080, AND '255 PATENTS) ........... 17

      A.   Prosecution History of the '080 Patent ......................................................... 26

      B.   Prosecution History of the '752 Patent ......................................................... 27

      C.   Prosecution History of the '255 Patent ......................................................... 28

      D.   Relevant Prosecution History of Related Applications .................................. 29

VIII. PRIORITY DATES OF THE ASSERTED PATENTS ............................................. 30

      A.   Priority Date Analysis of the Asserted Claims of the '080 Patent ................. 31

            1.   All Asserted Claims of the '080 Patent are entitled to a July 20, 2002 Priority Date ......................................................................................... 31

            2.   Dr. Fair Is Incorrect that the '749 Application does not disclose "calculating cell index values." .......................................................................................... 55

      B.   Priority Date Analysis of the Asserted Claims of the '752 Patent ................. 57

      C.   Priority Date Analysis of the Asserted Claims of the '255 Patent ................. 57

            1.   The Asserted Claim 10 of the '255 Patent is entitled to an August 4, 2004 Priority Date ......................................................................................... 57

███████████████████████████

  2. Dr. Fair Is Incorrect Regarding the Priority Date for the Asserted Claim of the '255 Patent................................................................................................. 65

IX. OVERVIEW OF THE REFERENCES RELIED UPON BY DR. FAIR ............................. 67

  A. The Alleged "Admissions by the Applicants in the Specifications of the Asserted Patent" ..................................................................................................... 67

  B. The Ehret 1997 Publication ................................................................................ 70

  C. The Van der Weide '709 Publication .................................................................. 72

  D. The Wegener Publication .................................................................................... 73

  E. The Luong Publication ........................................................................................ 75

  F. The Keese Publication......................................................................................... 76

  G. The Purported "ACEA Systems" cited by Dr. Fair............................................ 78

  H. The Watanabe Publication .................................................................................. 80

  I. The Wolf '233 Patent........................................................................................... 80

X. THE ASSERTED CLAIMS ARE NOT INVALID.............................................................. 83

  A. The Asserted Claims of the '080 Patent Are Not Invalid................................... 83

    1. Ehret does not anticipate claims 1-7, 9-10, and 13-14, and claims 1-7, 9-10, and 13-14 would not have been obvious in view of Ehret..................................... 83

    2. Claims 1-7, 9-10, and 13-14 would not have been obvious based upon Ehret and "other prior art"................................................................................................. 100

    3. The term "calculating cell index values" is not indefinite and does not render claims 1-7, 9-10, and 13-14 of the '080 Patent invalid ..................................... 124

  B. The Asserted Claims of the '752 Patent Are Not Invalid................................... 137

    1. Claims 11-12, 14-18, and 20 would not have been obvious in view of Ehret ....... 137

    2. Claims 11-12, 14-18, and 20 would not have been obvious in view of the Ehret 1997 Publication and other prior art. .................................................................. 155

    3. The term "calculating a cell index" is not indefinite and does not render claims 18 and 20 of the '752 Patent invalid .................................................................... 159

  C. The Asserted Claim of the '255 Patent Is Not Invalid ....................................... 160

    1. Claim 10 would not have been obvious in view of Keese and the ACEA systems publicly launched in December 2003, and also as further modified in view of Watanabe................................................................................................................. 160

    2. Claim 10 would not have been obvious in view of Keese and Wegener, as modified by Ehret, and also further in view of Watanabe..................................... 170

    3. Secondary consideration of non-obviousness of the '255 Patent ......................... 179

    4. The term "cell index" is not indefinite does not render claims 9 and 10 of the '255 Patent invalid .................................................................................................. 180

ii



Fig. 6

Wolf at Fig. 6.

## X.    THE ASSERTED CLAIMS ARE NOT INVALID

### A.    The Asserted Claims of the '080 Patent Are Not Invalid

188.    I understand that claims 1-7, 9-10, and 13-14 of the '080 Patent are asserted in this litigation. In my opinion, none of the asserted claims are invalid.

#### 1.    Ehret does not anticipate claims 1-7, 9-10, and 13-14, and claims 1-7, 9-10, and 13-14 would not have been obvious in view of Ehret

189.    In my opinion Ehret does not anticipate claims 1-7, 9-10, and 13-14 of the '080 Patent as it fails to disclose at least the following claim portions:

- Claim 1, portion a(i): "(i) at least one multiple-well cell-substrate impedance measuring device, wherein at least two of the multiple wells comprise an electrode array at the bottom of the well, wherein each electrode array comprises two electrode structures and each electrode structure comprises multiple electrode elements, further wherein each electrode array is individually  addressed;"
- Claim 1, portion a(iii): "(iii) a device station comprising electronic circuitry capable of engaging said device and selecting and connecting electrode arrays within any of the multiple wells to the impedance analyzer;"
- Claim 1, portion a(iv): "(iv) a software program capable of controlling the device station and performing data acquisition and data analysis from said impedance analyzer;

190.    In my opinion, Ehret also does not render claims 1-7, 9-10, and 13-14 of the '080 Patent obvious because a POSITA would not have been motivated to modify Ehret to arrive at the claimed inventions and more specifically would not have been motivated to modify Ehret to arrive at claim 1, claim portions a(i), a(iii) and a(iv). Also, a POSITA would not have understood that Ehret in view of the skill in the art discloses claim 1, portions a(i), a(iii), or a(iv).  Finally, with respect to claim 1, claim portions a(i) and a(iii), Dr. Fair opines that these claim portions are disclosed by Ehret alone, and not Ehret in view of the skill in the art, nor does he opine that a POSITA would have been motivated to modify Ehret in view of the skill in the art to arrive at claim 1, portions a(i) and a(iii).

(a)    Claim 1, preamble: "A method of performing a cell-based assay that monitors cell-substrate impedance in response to one or more test compounds, comprising:"

191.    I understand that the preamble of claim 1 is non-limiting.

192.    In my opinion Ehret, alone or in view of the skill in the art, does not disclose a method for performing a cell-based assay that monitors cell-substrate impedance in response to one or more compounds because it does not disclose claim 1, claim portions a(i), a(iii) and a(iv), and therefore cannot disclose the method as required by claim 1 of the '080 Patent.

███████████████████████████████

(b)    **Claim 1, portion a: "(a) providing a cell-substrate impedance monitoring system, comprising:"**

193.    In my opinion Ehret, alone or in view of the skill in the art, does not disclose providing a cell-substrate impedance monitoring system because it does not disclose claim 1, claim portions a(i), a(iii) and a(iv), and therefore cannot disclose the system as required by claim 1 of the '080 Patent.

194.    I understand that Dr. Fair identifies the following elements of Ehret as allegedly comprising the claims system: "(i) computer connected to (ii) an SR 715/720 LCR meter that is connected to (iii) an eight-fold multiplex unit, which is connected to (iv) eight IDES" and a "Solatron [sic] MTC 1260 A impedance/gain-phase analyser."  Fair Rpt. at ¶ 191.

195.    Dr. Fair addresses these components only with respect to the subsequent claim portions. I do the same below.

(i)    **Claim 1, portion a(i): "(i) at least one multiple-well cell-substrate impedance measuring device, wherein at least two of the multiple wells comprise an electrode array at the bottom of the well, wherein each electrode array comprises two electrode structures and each electrode structure comprises multiple electrode elements, further wherein each electrode array is individually addressed;"**

196.    In my opinion, Ehret, alone or in view of the skill in the art, does not disclose claim 1, claim portion a(i) of the '080 Patent because Ehret, alone or in view of the skill in the art, does not disclose that "each electrode array is individually  addressed" as construed by the Court.

197.    I note that Dr. Fair opines that Ehret "describes this claim element."  Fair Rpt. at ¶ 194. Accordingly, I understand that Dr. Fair does not opine that Ehret in view of the skill in the art discloses this claim portion.  Although Dr. Fair has not provided an opinion on whether this claim portion is disclosed by Ehret in view of the skill in the art, it is my opinion that it is not because a

POSITA would not have understood in view of the skill in the art that Ehret discloses "each electrode array is individually addressed" as construed by the Court. Nor would a POSITA have been motivated to modify Ehret in view of the skill in the art to arrive at the invention as claimed and more specifically one including electrode arrays where each electrode array is individually addressed as construed by the Court.

198.    I understand that the Court has construed the following terms with respect to this claim portion:

| Term | Court's Construction |
|---|---|
| "at least two of the multiple wells comprise an electrode array at the bottom of the well" | "each of at least two of the multiple wells includes an electrode array at the bottom surface of the well" |
| "electrode array" | "two or more electrode structures that operate as a unit" |
| "is individually addressed" / "electrode array is individually addressed" | "electrode array [as construed by the Court] is individually addressed, which means that the electrical traces and connection pads of the arrays are configured such that an array can be connected to an impedance analyzer in such a way that a measuring voltage can be applied to the electrode array independent of any measuring voltage applied to another electrode array, at a given time, by using switches" |

199.    I applied the Court's constructions in my analysis.

200.    Dr. Fair does not clearly identify what he opines to be the claimed multi-well device. Instead, Dr. Fair states "[t]he Ehret 1997 Publication describes a cell-substrate impedance measuring device with eight IDES." Fair Rpt. at ¶ 198. Therefore, I understand that Dr. Fair opines that the combination of the eight IDES units is the claimed multi-well device, but this is incorrect. Ehret discloses that an IDES is a single-well unit. Dr. Fair has not identified any additional basis for combining eight separate IDES units into the claimed multi-well device. I disagree that a POSITA would have understood separate IDES units to form a single device, as

claimed. Ehret does not disclose a single device containing multiple IDES units.  It is Dr. Fair's creation and, therefore, to label eight IDES units as a single device is incorrect.

201.     Moreover, a POSITA would have looked to the specification of the Asserted Patents to inform their understanding of the invention as claimed. Even where a plain and ordinary meaning applies, it must be derived in context of the invention as informed by the specification. Dr. Fair's labeling of eight IDES units collectively as a single claimed device is inconsistent with the inventions as disclosed in the specification the Asserted Patents.  Fig 1A of each Asserted Patents illustrates a multi-well device:



Figure 1A

'080 Patent, '752 Patent, '255 Patent at Fig. 1A.

202.     Separate IDES units are not akin to the multi-well device shown in Figure 1A.  And there are no embodiments in the Asserted Patents where each well, and hence each electrode array is embedded in a separate unit like the IDES units embedded in separate T0-8 packages.

203.     Dr. Fair's remaining  opinions are based on his erroneous premise that eight IDES units are within the meaning of the claimed device.  Nonetheless, they fail for additional reasons as further explained below.

████████████████████████

204.    Dr. Fair further opines that each IDES unit comprises an electrode array with two or more structures, where each structure has multiple elements ("fingers").  Fair Rpt. at ¶ 198. However, Dr. Fair does not explain how, and does not even opine, that the alleged electrode structures within each IDES operate as a unit.  Fair Rpt. at ¶ 198.

205.    Dr. Fair opines that "each IDES is individually addressed."  Fair Rpt. at ¶ 200.  I disagree. The "individually addressed" limitation, as construed by the Court requires that "**the electrical traces and connection pads of the arrays** are configured" to perform the claimed "individually addressed" functionality.

206.    In my opinion, Ehret, alone or in view of the skill in the art, does not disclose either electrical traces of the arrays or connection pads of the arrays that are "configured" to perform the claimed functionality.

207.    **No electrical traces.**  Dr. Fair opines that "Figure 1 shows electrical traces extending from opposite sides of the electrode pairs in each IDES that all connect individually to the 'multiplexer (relay).'" I disagree. Ehret does not refer to the connections identified in Figure 1 by Dr. Fair as "electrical traces."  Moreover, Figure 1 shows wires, and not electrical traces, for connecting each IDES unit with the multiplexer.  A POSITA would have understood that such wires are not within the plain and ordinary meaning of electrical traces.  Indeed, in Ehret, the connections extend outside of the IDES units (as shown in Figure 1 and as acknowledged by Dr. Fair) and thus cannot constitute an electrical trace on the claimed device (which Dr. Fair identified as the combination of all eight IDES units in paragraph 198).  Finally, Dr. Fair does not opine that Ehret, in view of the skill in the art, discloses the claimed "electrical traces" or that a POSITA would have been motivated to modify Ehret by replacing the wires with electrical traces.

208.    Separately, the '080 Patent (as well as the '752 and '255 Patents) describes the electrical traces as follows in the "Definitions" section:

> "Electrode traces" or "electrically conductive traces" or "electrical traces", are electrically conductive paths that extend from electrodes or electrode elements or electrode structures toward one end or boundary of a device or apparatus for connecting the electrodes or electrode elements or electrode structures to an impedance analyzer. The end or boundary of a device may correspond to the connection pads on the device or apparatus.

'080 Patent at 11:7-14; '752 Patent at 11:12-19; '255 Patent at 16:60-65.

209.    This definition concerning electrical traces further contradicts Dr. Fair's opinion that separate IDES units can meet the claimed device limitation because as clearly explained above electrical traces "extend... toward one end or boundary of a device or apparatus for connecting the electrode or electrode elements or electrode structures to an impedance analyzer." The eight IDES units do not form a boundary towards which any of the wires in Ehret extend (as shown in Figure 1) and thus a POSITA would not have considered them to be within the meaning of the claimed electrical traces. Dr. Fair has not shown that either.

210.    Additionally, a POSITA would not have been motivated to modify Ehret by completely redesigning Ehret's system to form the claimed multi-well device with electrical traces instead of individually wired separate IDES units. A POSITA would not have been motivated to do so because such modification, in addition to being hindsight, would have required a complete re-design of Ehret's system -- turning a simple design without any identifiable disadvantages into a much more complicated design. A POSITA would have found adding electrical traces completely unnecessary. Dr. Fair does not opine that Ehret provides a teaching that would suggest to a POSITA that a modification is needed to include electrical traces.

211.    Moreover, a POSITA would have understood that adding electrical traces to Ehret's design would require designing a custom packaging strategy that could accommodate multiple

REBUTTAL EXPERT REPORT OF DR. A. BRUNO FRAZIER ON
VALIDITY OF U.S. PATENT NOS. 8,026,080, 7,192,752, AND 7,468,255

██████████████████████████████

IDES units (as TO-8 can only accommodate one), a redesign of the IDEs adding electrical traces and connection pads to the integrated IDE design, and formulating a new system level assembly strategy (as all the subcomponents have changed) to create a completely different working system.

212.    I understand that Dr. Fair opines that Ehret provides enabling disclosure and that such enabling disclosure is presumed for references cited during prosecution.  Fair Rpt. at ¶ 182. I understand that such a presumption is true for prosecution before the USPTO but does not apply after the claims are issued.  Instead, all issued claims are presumed valid and a defendant must prove invalidity (including that the references are enabling) by clear and convincing evidence.

213.    I also understand that an applicant need not identify every element missing from a reference in response to an office action and can pick arguments to present to the Patent Office. Thus, I understand that the fact that an applicant did not make an argument against a specific portion of a rejection, accordingly, is non-binding. Dr. Fair points out that the applicant did not make an argument that claim portion a(i) was missing from Ehret (Fair Rpt. at ¶ 197), but I understand that this did not constitute an admission in connection with claim portion a(i) or that Ehret made an enabling disclosure.

214.    **No connection pads.** Dr. Fair does not identify or mention any "connection pads" or "pads" in his report. Fair Rpt. at ¶¶ 194-200.  The word "pad" is not found in the reference, nor is the concept.

215.    Dr. Fair's failure to identify the claimed connection pads is fatal to his assertion that Ehret, alone, discloses the "individually addressed" claim portion as construed by the Court. Moreover, Dr. Fair does not opine that the connection pads (required by Court's construction) are disclosed by Ehret in view of the skill in the art or that a POSITA would have been motivated to modify Ehret in view of the skill in the art to include connection pads with the design of Ehret.

216.    A POSITA would have understood that the system of Ehret did not use connection pads. Moreover, Ehret states that "[t]he sensors [IDES units] were isolated and assembled on a chip carrier (TO-8 package)." Ehret at p. 30. As a result, a POSITA would have understood that Ehret does not disclose, and instead teaches away from, using connection pads. This is because a POSITA would have understood that a TO-8 chip carrier package would instead include metal leads for connecting the wires shown in Figure 1 of Ehret to the multiplexer, rather than electrical traces:



Fig. 1. Block diagram of assembly used for measurements with SR 715/720. The 100 kΩ resistor is needed for current reduction. The multiplex unit allows the measurement of eight IDES in parallel. Data acquisition is computer controlled.

217.    Separately, the '080 Patent (as well as the '752 and '255 Patents) describes the connection pads as follows in the "Definitions" section:

> A "connection pad" is an area on an apparatus or a device of the present invention which is electrically connected to at least one electrode or all electrode elements within at least one electrode structure on an apparatus or a device and which can be operatively connected to external electrical circuits (e.g., an impedance measurement circuit or a signal source).

'080 Patent at 11:15-20; '752 Patent at 11:20-26; '255 Patent at 17:1-6.

218.    The definition of connection pads also further undercuts Dr. Fair's opinion that a combination of eight separate IDES units can meet the claimed device limitation because, as

████████████████████████

clearly explained above, a connection pad is an area on the device. And in case of Ehret, even if anything within the TO-8 package could be considered as a connection pad (and it cannot), because there are eight separate TO-8 packages, the hypothetical pads would now be on separate devices.

219.    In sum, Dr. Fair does not opine that connection pads (as required by the Court's construction) are disclosed explicitly, or inherently, or in view of the skill in the art, and does not opine that a POSITA would have been motivated to modify Ehret to include connection pads (much less why).  Therefore, in my opinion, a POSITA would not have been motivated to make such a major design change for the same reasons as explained in connection with the electrical traces.  A POSITA would have understood that adding connection pads would require a similar level of re-design as adding electrical traces, such that the connection pads can accommodate electrode arrays fabricated on a single substrate (as explained in detail above). Such complete redesign would have also been above the level of skill of a POSITA for the same reasons as explained above with respect to the electrical traces.

220.    Accordingly, Dr. Fair failed to show that Ehret, alone or in view of the skill in the art, discloses the "individually addressed" claim portion as construed by the Court and hence failed to show that Ehret, alone or in view of the skill in the art, discloses claim 1, portion (a)(i). Accordingly, Ehret does not anticipate and does not render claim 1 obvious.

> **(ii)    Claim 1, portion a(ii) "(ii) an impedance analyzer;"**

221.    In my opinion, Ehret does not disclose this claim portion of claim 1 of the '080 Patent because the impedance analyzers identified by Dr. Fair do not operate as required by claim 1 at least with respect to claim 1, portion a(iii).

222.    I understand that Dr. Fair opines that Ehret discloses multiple impedance analyzers, including the "Stanford Research System SR 715 or SR 720 LCR meter" and "Solatron [sic] MTC 1260 A impedance/gain-phase analyser."  Fair Rpt. at ¶¶ 202-203.

███████████████████████████████

**(b)      Claim 14, portion a: "providing the system of claim 1;"**

358.    For claim 14, portions a(i) through a(iv) of the '752 Patent, Dr. Fair relies on his analysis of Ehret in with respect to claim 1, portions a(i) through a(iv) of the '080 Patent in Section VI.C.1(b) of his report and provides no additional analysis. Fair Rpt. at ¶ 405.

359.    In my opinion, Ehret, alone or in view of the skill in the art, does not disclose, claim 14, portions a(i) though a(iv) of the '752 Patent as explained above with respect to claim 1, portions a(i)-a(iv) of the '080 Patent in Sections X.A.1.b.i-iv.

> **(i)      Claim 14, portion a(i): "a) one or more multiple well cell-substrate impedance monitoring devices, wherein at least two of the multiple wells of said device comprise an electrode array at the bottom of the well, wherein said electrode array is individually addressed, further wherein said device can be used to measure differences in impedance values that relate to cell behavior;"**

360.    For claim 14, portion a(i) of the '752 Patent, Dr. Fair relies on his analysis of Ehret in with respect to claim 1, portion a(i) of the '080 Patent in Section VI.C.1(b)(i) of his report. Fair Rpt. at ¶ 408.

361.    As explained in Section X.C.1.b.i, I applied the Court's constructions in my analysis.

362.    In my opinion, Ehret, alone or in view of the skill in the art, does not disclose claim 14, portion a(i) of the '752 Patent as explained above with respect to claim 1, portions a(i)-a(iv) of the '080 Patent in Section X.A.1.b.i. I understand that Dr. Fair does not opine that it would have been obvious to a POSITA to modify Ehret to satisfy this claim portion.  Nevertheless, it is my opinion that it would not have been obvious to a POSITA to modify Ehret to satisfy this claim portion.

**(f)      Claim 18: "The method of claim 16, wherein said analyzing comprises calculating a cell index."**

408.    In my opinion, Ehret in view of the skill in the art does render obvious claim 18 of the '752 Patent because it does not disclose or render obvious Claim 14 as described above.

**(g)      Claim 20: "The method of claim 18, wherein said cell index is used as an indicator of cytotoxicity."**

409.    In my opinion, Ehret in view of the skill in the art does render obvious claim 20 of the '752 Patent because it does not disclose or render obvious Claim 18 as described above.

**(h)      Claim 11, preamble: "A method of performing an assay that monitors cell-substrate impedance, comprising:"**

410.    For claim 11, preamble of the '752 Patent, Dr. Fair relies on his analysis of Ehret in with respect to claim 1, preamble of the '080 Patent in Section VI.C.1(a) of his report and provides no additional analysis. Fair Rpt. at ¶ 447.

411.    In my opinion, Ehret does not disclose claim 11, preamble of the '752 Patent as explained above with respect to claim 1, preamble of the '080 Patent in Section X.A.1.a.

**(i)      Claim 11, portion a: "providing the system of claim 1;"**

412.    For claim 14, portions a(i) through a(iv) of the '752 Patent, Dr. Fair relies on his analysis of Ehret in with respect to claim 1, portions a(i) through a(iv) of the '080 Patent in Section VI.C.1(b) of his report, and provides no additional analysis. Fair Rpt. at ¶ 449.

413.    In my opinion, Ehret, alone or in view of other art, does not disclose claim 11, portions a(i) though a(iv) of the '752 Patent as explained above with respect to claim 1, portions a(i)-a(iv) of the '080 Patent in Sections X.A.1.b.i-iv.

**(i)      Claim 11, portion a(i): "a) one or more multiple well cell-substrate impedance monitoring devices, wherein at least two of the multiple wells of said device comprise an electrode array at the bottom of the well, wherein said electrode array is individually addressed, further wherein**

██████████████████████████

> **said device can be used to measure differences in impedance values that relate to cell behavior;"**

414.    For claim 11, portion a(i) of the '752 Patent, Dr. Fair relies on his analysis of Ehret in with respect to claim 1, portion a(i) of the '080 Patent in Section VI.C.1(b)(i) of his report. Fair Rpt. at ¶ 451.

415.    As explained in Section X.C.1.b.i, I applied the Court's constructions in my analysis.

416.    In my opinion, Ehret, alone or in view of other art, does not disclose claim 11, portion a(i) of the '752 Patent as explained above with respect to claim 1, portions a(i)-a(iv) of the '080 Patent in Section X.A.1.b.i.

### (ii)    Claim 11, portion a(ii): "b) an impedance analyzer;"

417.    Dr. Fair incorporated his opinions for this claim portion by reference. Fair Rpt. at ¶ 454.  I do the same.  In my opinion, Ehret, alone or in view of other art, does not disclose claim 11, portion a(ii) of the '752 Patent for the same reasons explained above for claim 1, portion a(ii) of the '080 Patent in Section X.A.1b.ii.

### (iii)    Claim 11, portion a(iii): "c) a device station comprising electronic circuitry that can engage said device and selectively connect said two or more electrode arrays of said device to said impedance analyzer; and"

418.    Dr. Fair incorporated his opinions for this claim portion by reference. Fair Rpt. at ¶ 455.  I do the same. In my opinion, Ehret, alone or in view of other art, does not disclose claim 14, portion a(iii) of the '752 Patent for the same reasons explained above for claim 1, portion a(iii) of the '080 Patent in Section X.A.1.b.iii and for claim 14, portion a(iii) of the '752 Patent in Section X.A.1.b.iii, which addresses variations in claim language.

████████████████████████████████████████

would make this change and drastically understates the difficulties that a POSITA would have encountered if attempting to do so.

453.    Dr. Fair's addition of Watanabe cannot save this purported combination.  Watanabe does not relate to an impedance-based measurement at all, and nothing in Watanabe would provide any guidance to a POSITA in making a wholesale replacement of the impedance system or determining whether there was any component of an impedance measurement which would accurately reflect surface coverage.

454.    Accordingly, it is my opinion that, even if the ACEA Systems were prior art (and again, they are not), a POSITA would not have been motivated to wholesale replace the system described in Wegener and used by Keese.  Moreover, a POSITA would not have been successful in doing so if they did make the attempt, without requiring undue experimentation to determine what, if any, components of the impedance could be used as a monitor of surface coverage on the electrode.  Therefore, the combination of Keese with the ACEA Systems does not render claim 10 obvious.

### (a)    Claim 9, preamble: "A method of measuring cytolytic activity comprising:"

455.    Claim 10 depends on claim 9, and for this portion of claim 9, Dr. Fair relies on Keese's disclosure of Dunning cells which "attach to and invade the HUVEC cell layer."  Fair Rpt. ¶ 491.  Dr. Fair appears to concede that Keese does not involve a method of measuring cytolytic activity, because attaching to and invading a cell layer is not the same as cytolysis – which a POSITA would understand refers to the lysing or killing of cells.

456.    Indeed, Keese expressly describes that the impedance changes he measures are **not** due to cytolysis, but to structural changes in the HUVEC cell layer:

████████████████████████████

These changes are presumably due to direct interactions of the metastatic cells and endothelial monolayer, resulting first in retraction of the endothelial cell junctions, followed by extravasation of the metastatic cells to the substratum. After this drop, the sustained reduced resistance is that of the collection of HUVEC and MLL cells on the substratum. Microscopic examination of fixed and stained preparations of the cells a few hours after the challenge revealed a disorderly layer with some open areas and a considerable number of partially spread and rounded cells. above in connection with "target cells," the parties agreed that the term "effector cells" means "cells capable of killing or lysing Keese at 844.

457.   Thus, Dr. Fair does not explain how the disclosure of Keese relates in any way to measuring cytolytic activity.  In my opinion, Keese does not disclose the preamble of claim 9 for at least these reasons.  Nor does Dr. Fair cite to any portion of the alleged ACEA systems to disclose this method.  Agilent's Dr. Xiaobo Wang expressly testified that the ACEA prototype (which, as discussed above, Dr. Fair has not shown to be a prior art system) did not practice the method of claim 10:

> Claim 10 is a method claim.  It involves talking about adding target cells and adding effector cells.  So what is shown over there [the prototype physically present at Dr. Wang's deposition] does not have those elements of claim 10.

Wang Tr. at 140:4-14.

458.   Even considering Dr. Fair's alternate ground, Keese and the ACEA systems further modified by Watanabe, Dr. Fair does not cite to any portion of Watanabe to disclose the required method, either.

459.   Thus, it is my opinion that claim 10 would not have been obvious at the time of its invention over the combination of Keese and the ACEA systems (with or without Watanabe) at least because none of the three references identified by Dr. Fair discloses this claim portion.

████████████████████

**(b)     Claim 9, portion b: "b) adding target cells to at least two wells, wherein at least one well is a control well and at least one well is a test well;"**

460.    Claim 10 depends on claim 9, and for this portion of claim 9, Dr. Fair is incorrect that Keese describes adding target cells to wells.  Dr. Fair relies on Keese's description of culturing of HUVEC cells into a confluent epithelial cell layer.  Fair Rpt. ¶ 498.  However, Dr. Fair states without any explanation that the HUVEC cells are target cells.  I disagree.

461.    During claim construction, I understand that the parties agreed that the term "effector cells" means "cells capable of killing or lysing target cells."  Second Amended Join Claim Construction Chart, Docket No. 134 (filed April 26, 2024) at 2.  Although this is not an express definition of "target cells," it clarifies that the target cells must be cells which are killed or lysed.  This is entirely consistent with the preamble of claim 9, which explains that the method of claim 9 is a method "of measuring **cytolytic** activity." (emphasis added).  Because Keese does not describe any cytolysis of the HUVEC cells, the HUVEC cells described by Keese are not target cells.

462.    Dr. Fair also does not rely on any portion of the ACEA systems or Watanabe to disclose this limitation.

463.    Thus, in my opinion, the combination of Keese and the ACEA systems (with or without Watanabe) does not render claim 10 obvious at least because none of the three references identified by Dr. Fair discloses this claim portion.

**(c)     Claim 9, portion c: "c) adding effector cells to said test well;"**

464.    Claim 10 depends on claim 9, and for this portion of claim 9, in Paragraph 503 of his report, Dr. Fair quotes a portion of Keese which describes the culturing and addition of Dunning

██████████████████████████████

cells.  Fair Report ¶ 503 (quoting Keese at 843).  However, Dr. Fair incorrectly states without explanation that "Dunning cells are effector cells."  Fair Report ¶ 503.

465.    Dr. Fair does not provide any explanation for his statement, and is clearly not correct.  As discussed above in connection with "target cells," the parties agreed that the term "effector cells" means "cells capable of killing or lysing target cells."  Dunning cells refer to the Dunning rat model, which is a prostate cancer cell model with multiple sublines that metastasize quickly and reproducibly to multiple organs.  The Dunning murine prostatic adenocarcinomaseries G,ATI, AT2, AT3, ML, and MLL are example of sublines.  The sublines allow investigation of different aspects of tumor growth, metastasis, and the effects of genetic and phenotypic changes. Keese does not describe that the Dunning cells kill or lyse any cell, nor that they are capable of doing so.  Instead, Keese expressly describes that the impedance changes he measures are **not** due to cytolysis:

> These changes are presumably due to direct interactions of the metastatic cells and endothelial monolayer, resulting first in retraction of the endothelial cell junctions, followed by extravasation of the metastatic cells to the substratum. After this drop, the sustained reduced resistance is that of the collection of HUVEC and MLL cells on the substratum. Microscopic examination of fixed and stained preparations of the cells a few hours after the challenge  revealed a disorderly layer with some open areas and a considerable number of partially spread and rounded cells.

Keese at 844.  In  this quote, the "MLL cells" are the cells Dr. Fair calls Dunning cells. Thus, Dr. Fair's unsupported assertion that "Dunning cells are effector cells" ignores the parties' agreed construction of the term and is incorrect.

466.    Dr. Fair also does not rely on any portion of the ACEA systems or Watanabe to disclose this limitation.

467.    Thus, in my opinion, the combination of Keese and the ACEA systems (with or without Watanabe) does not render claim 10 obvious at least because none of the three references identified by Dr. Fair discloses this claim portion.

████████████████████████████

487.    Dr. Fair's addition of Watanabe cannot save this purported combination. Watanabe does not relate to an impedance-based measurement at all, and nothing in Watanabe would provide any guidance to a POSITA in making a wholesale replacement of the impedance measurement system or determining whether there was any component of an impedance measurement which would accurately reflect surface coverage.

### (a)    Claim 9, preamble: "A method of measuring cytolytic activity comprising:"

488.    Claim 10 depends on claim 9, and for this portion of claim 9, Dr. Fair relies on the same teachings of Keese that he relied on in the previously discussed combination (Keese with ACEA systems, with or without Watanabe). Accordingly, I incorporate by reference my discussion of this element in Section X.C.1.a.

489.    Although I agree with Dr. Fair (Fair Report ¶ 545) that Ehret does disclose monitoring cytolysis, the rationale behind Dr. Fair's proposed combination (performing the Keese experiment with the IDES electrode) is based on Dr. Fair's mistaken conclusion that Keese does disclose a method of measuring cytolytic activity. Dr. Fair cannot apply hindsight to pick and choose which parts of the Keese experiment and which parts of the Ehret experiment are relevant to the claim.

490.    Thus, in my opinion, the combination of Keese and Wegener as modified by Ehret and further in view of Watanabe does not render claim 10 obvious at least because a POSITA would not have been motivated to make such a combination and would not have had a reasonable expectation of success if they did make the attempt.

███████████████████████

**(b)** **Claim 9, portion b: "b) adding target cells to at least two wells, wherein at least one well is a control well and at least one well is a test well;"**

491.    Claim 10 depends on claim 9, and for this portion of claim 9, Dr. Fair relies on the same teachings of Keese that he relied on in the previously discussed combination (Keese with ACEA systems, with or without Watanabe). Accordingly, I incorporate by reference my discussion of this element in Section X.C.1.b.  It is undisputed that Ehret does not disclose adding target cells, so the addition of the Ehret reference also does not disclose this element.  Nor does Dr. Fair identify any disclosure of target cells in Wegener or Watanabe.

492.    In my opinion, the combination of Keese and Wegener as modified by Ehret and in further view of Watanabe does not render claim 10 obvious at least because none of the allegedly combined references disclose this portion of the claim.

**(c)** **Claim 9, portion c: "c) adding effector cells to said test well;"**

493.    Claim 10 depends on claim 9, and for this portion of claim 9, Dr. Fair relies on the same teachings of Keese for this claim portion that he relied on in the previously discussed combination (Keese with ACEA systems, with or without Watanabe). Accordingly, I incorporate by reference my discussion of this element in Section X.C.1.c.  It is undisputed that Ehret does not disclose adding effector cells, so the addition of the Ehret reference also does not disclose this element. Nor does Dr. Fair identify any disclosure of effector cells in Wegener or Watanabe.

494.    In my opinion, the combination of Keese and Wegener as modified by Ehret and in further view of Watanabe does not render claim 10 obvious at least because none of the allegedly combined references disclose this portion of the claim.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

C.A. No. 23-198 (CJB)

Volume 1

AGILENT TECHNOLOGIES, )
INC., )
)
    Plaintiff, )
)
vs. )
)
AXION BIOSYSTEMS, INC., )
)
)
    Defendant. )
_____)

VIDEOTAPED DEPOSITION OF RICHARD FAIR, PH.D.

(Taken by Plaintiff)

Durham, North Carolina

May 28, 2025

9:21 a.m. - 5:35 p.m.

---Reporter:  Tina Sarcia-Maxwell, RPR, CRR

Page 1

package in my report.

Q.    Your opening report, Exhibit 1, with respect to Claim 1, Element a(i) of the '080 patent based on Ehret makes no reference to the TO-8 package, correct?

A.    Correct.

Q.    I would like to direct your attention to Exhibit 3, which is your reply report, Section VI.C.1(b)(i) beginning on page 31. Section VI.C.1(b)(i) in your reply report in Exhibit 3 addresses the same Element a(i) of Claim 1 of the '080 patent based on the Ehret reference that we just discussed, correct?

A.    Yes.

Q.    In paragraph 83 of Exhibit 3 on page 34, you refer to the TO-8 package; is that right?

A.    Yes.

Q.    In paragraph 88 on pages 37 and 38 of Exhibit 3, you provide an opinion that -- towards the bottom of page 37 -- because a person of ordinary skill in the art at the time of the alleged invention of the '080 patent would have understood that electrically conductive paths were necessarily present in Ehret's device to connect Ehret's IDES to the leads on the outer perimeter

Page 29

of the TO-8 package.

Do you see that?

A.    I do.

Q.    You did not provide that opinion in your opening report, Exhibit 1, correct?

A.    Well, yes, I did not discuss the TO-8 package.

Q.    And you also didn't discuss that electrically conducted pass would be necessarily present to connect the IDES still leads on the outer perimeter of the TO-8 package, correct?

A.    Well, I referred to them as electrical traces and, of course, they were necessary.  I mentioned them.

Q.    You did not refer to anything within a TO-8 package in your opening report though.

A.    I didn't talk about the TO-8 package, although, it is part of the reference and disclosed in the Ehret reference as part of what I relied upon.

Q.    So that's not the question that I asked you.  You did not refer to any contents of a TO-8 package in your opening report, right, because you didn't mention the TO-8 package at all?

A.    I did not mention the TO-8 package, but

Page 30

in a reply report, you mention what you need to reply to.

Q.   So you stated that you have evaluated the entire Ehret reference at the time of submitting your opening report, correct?

A.   Yes.

Q.   And you were aware of the fact that Ehret discussed the TO-8 packages, correct, at the time of submitting your opening?

A.   I was certainly aware, yes.

Q.   And you did not rely on that disclosure in your opening report, yes?

A.   I relied upon the disclosure, but I did not include it in my report.

Q.   So you didn't provide any opinions on Ehret's disclosure of TO-8 packages even though you were aware of that disclosure and the Ehret reference at the time you submitted your opening report, correct?

A.   Could I have that again?

Q.   Sure.

You didn't provide any opinions on Ehret's disclosure of TO-8 packages at the time of submitting your opening report even though at that time you were aware of the TO-8 disclosure and the

Page 31

Ehret reference?

A.   I did rely upon the Ehret report in its entirety.  I simply did not put any discussion of the TO-8 package in my opening report.

Q.   Is that a yes to my question?  Because it was a different question than you just answered.

MR. GAVIN:  Objection to form.

THE WITNESS:  Well, please ask the question again.

BY MS. TARGOWSKA:

Q.   Sure.  I'll read it again.

You didn't provide any opinions on Ehret's disclosure of the TO-8 packages at the time of submitting your opening report even though at that time you were aware of the TO-8 package disclosure in Ehret, correct?

A.   Well, that's correct.  I believe that's what I said.  I didn't -- I relied upon what everything was in Ehret, but I didn't refer to any discussion on the TO-8 package in my opening report.

Q.   Ehret does not provide any details on the TO-8 package referenced in the publication, right?

A.   Well, I would disagree.  He does -- Ehret describes a TO-8 package --

Page 32

Q.    So why don't we take a look at Ehret, which is Exhibit 16.  If you can turn to the next page, which is internal page 30 with Bates Axion 0021824.  There's a section entitled Sensor Fabrication.  Do you see that?

A.    Yes.

Q.    And Ehret says "After removing the photoresist, both the SiO2 etching mask and the noncovered Ti layer were removed in HF.  The sensors were isolated and assembled on a chip carrier (TO-8 package)."

Do you see that?

A.    I do see that.

Q.    And does Ehret provide any additional details on the TO-8 package that it refers to?

A.    Well, the key here is chip carrier.  To one of ordinary skill in the art, that opens a great deal of information to what was in that TO-8 package.

Q.    And TO-8 packages that can be a chip carrier come in different configurations, correct?

A.    They do.

Q.    And Ehret does not specify any particular configuration of a TO-8 package that is a chip carrier to be used here?

Page 33

A.    He does not give specifics, but in the general art of chip carriers in TO-8s that he provides an insight into what would have been inside, what would have been the possibility.

Q.    What insight are you referring to?

A.    The mentioning of chip carrier.

Q.    Okay.  Any other insight?

A.    No.  I think the -- what is divulged here is chip carrier TO-8 package.

Q.    And one could use different configurations of a chip carrier TO-8 package to accommodate IDES, correct?

A.    That would have been obvious, yes.

Q.    And different chip carrier TO-8 packages could have a different amount of leads?

A.    Right.  Chip -- well, the TO-8 package had anywhere from three to 12 leads, and as time went on, the number of leads increased.  So that was one of the variables that distinguished earlier versions from later versions.

Q.    So let's make sure we're talking about the time frame that's relevant here.  Ehret was published sometime in 1997.  How many leads were available on a chip carrier TO-8 package at that time?

Page  34

A.    Well, probably anywhere from three to eight.

Q.    If you could please take a look at your reply report, Exhibit 3, on page 35, paragraph 85. You provide your opinions in paragraph 85 of Exhibit 3 in connection with a specific TO-8 package; is that right?

A.    Yes.

Q.    And that's TO-8 package that you selected based on what was available on Wikipedia?

A.    Yes.

Q.    And you accessed that Wikipedia website on May 19, 2025?

A.    Yes.

Q.    And the chip package -- or the chip carrier TO-8 package that you rely on in your reply report has 12 leads?

A.    Yes.

Q.    And those type of TO-8 packages were not available at the time of Ehret's publication?

A.    By being available, you mean they would have been provided by a package manufacturer and made available to people who wanted to consume those devices, those packages.

Q.    Well, a few minutes ago you told me that

Page 35

around 1997 available TO-8 packages included between three and eight leads, and the one you are identifying here on page 36 includes 12 leads.  So I'm trying to understand how we can reconcile that because I don't think we can.  So let me ask you the question again.

The TO-8 package that you refer to on page 36, which has 12 leads, was not available in 1997 when Ehret was published, correct?

A.   Well, as I mentioned, I don't -- what I was saying was that typically you increase the number of leads with time.  The TO-8 package goes back to the 1950s.  And so what I said was in 1997, it would have been possible to get up to eight leads.  It doesn't mean you couldn't get 12, but I said more likely eight, but there's no barrier to having more leads.  So 12 are possible.

Q.   You're not aware of any specific TO-8 packages available in 1997 with 12 leads, correct?

A.   I just don't remember.

Q.   What's a typical size of a chip carrier TO-8 package in terms of its diameter?

A.   The active area would have been about 81 millimeters squared.

Q.   So my question was about a diameter.  Can

Page 36

we start with that?

A.    Take the square root and divide.

Q.    Okay.   Around 9 millimeters?

A.    Yeah.

Q.    It would be helpful if you just answer the question so someone reading this doesn't have to do square roots.

MR. GAVIN:   Yeah, Anna, it would be helpful if you just let him answer the question and don't chastise him for his answer.

MS. TARGOWSKA:   I asked about a diameter, and I got an answer about an area.

BY MS. TARGOWSKA:

Q.    So a typical diameter of a TO-8 chip carrier package would be around 9 millimeters in terms of its active area?

A.    About that, yes.

Q.    You understand that the active area of the IDES described in Ehret is 5 by 5 millimeters?

A.    I do know that.

Q.    So in order to accommodate an IDES on a chip carrier, you do need more than 5 by 5 because 5 by 5 is just the active area, correct?

MR. GAVIN:   Objection.   Form.

THE WITNESS:   So I do know that the

Page 37

sensitive area is 5 by 5 or 25 millimeters squared, and there are electrode buses that would need to be added to that sensitive area.  So yeah, you would need more area more than 25 millimeters squared.

BY MS. TARGOWSKA:

Q.    How many IDES that are described in Ehret can you fit on a TO-8 package?

A.    You could do one.

Q.    Can you do more than one?

A.    I don't know.

Q.    What is your opinion in that regard?  Do you not have an opinion on whether you can fit more than one TO-8 package -- I'm sorry.  Strike that.

Do you have an opinion on whether you can fit more than one IDES into a TO-8 package?

A.    So I would say that's a complex issue, and I don't have an opinion because of the complexity of trying to put more than one IDES on a TO-8 package.

Q.    So Ehret uses IDES to measure impedance of the contents that are placed on the IDES, right?

A.    You're asking about putting content --

Page 38

Q.    So like cells.

A.    Oh, that's what it's designed for.

Q.    Right.  So the IDES would need to be flat in order for you to put cells into it to take the measurements, correct?

A.    Well, what I do know is that the IDES chips were in fact flat.

Q.    Right.  But what I mean is you would not orient them vertically.  You would need to place them horizontally in order to perform a measurement of the contents that you place within the IDES, correct?

A.    Well, I don't know about vertical versus horizontal.  If I take an IDES chip that's mounted and I turn the package on its side, then the orientation of the plane of the IDES is vertical. But in the experiments, the electrode array is in the bottom of the well, and the cells and the medium are placed on top.  So in that normal configuration, it would be in the horizontal plane.

Q.    Okay.  That's the horizontal plane I'm referring to, so thank you for clarifying.

If that is the intended use of the IDES, you can't fit more than one of these in a TO-8

Page 39

package in that configuration, can you?

A.    Well, as I said, I'm not sure whether you can or not.  I think the reality is, and in what Ehret says, he's put one in a TO-8 package.

Q.    Please take a look at paragraph 89 on page 38 of your reply report, Exhibit 3.  Do you see where you say "The remainder of Dr. Frazier's opinions on the alleged lack of 'electrical traces' in Ehret are not relevant because his opinions are focused on arguing that the connection lines or electrically conductive paths shown in Ehret's Figure 1 (between the IDES and the multiplexer) do not disclose the claimed 'electrical traces' applied by the 'individually addressed limitation'?"

A.    I see that.

Q.    And so Dr. Frazier is providing opinions on the connection lines in Figure 1 between the IDES and the multiplexer.  Is that what he's referring to?

A.    Yes.

Q.    In your opinion, Dr. Frazier's opinions aren't relevant?

A.    I don't know about not being relevant.  I think they have no basis.

Page 40

Q.    Okay.  So how about you take a look at Exhibit 1, which is your opening report, on page 81, paragraph 200.  Page 81, paragraph 200.  In paragraph 200 of Exhibit 1, your opening report, you say "Figure 1 shows electrical traces extending from opposite sides of the electrode pairs in each IDES that all connects individually to the multiplexer."

These are the same lines that you're saying that Dr. Frazier opined on that you said are relevant in paragraph 9 of your reply report of Exhibit 3, right?

A.    Well, what I remember about Dr. Frazier's opinion was that he called those wires based upon information available in Figure 1 of Ehret.

Q.    Okay.  But that's not what you say in paragraph 89, right?  You're saying that his opinions are focused on arguing that the connection lines or electrically conductive paths shown in Ehret's Figure 1 (between the IDES and the multiplexer) do not disclose the electrical traces.

A.    That's what I said but --

Q.    But he --

A.    Excuse me for interrupting.

Page 41

Q.    Go ahead.

A.    He called them wires and, therefore, they were not electrical traces.

MR. GAVIN:  We've been going a little over an hour.  When we can get to a break point.

MS. TARGOWSKA:  Yes, let me finish with the questions on this and then we can take a break.

BY MS. TARGOWSKA:

Q.    What I'm trying to understand is that you rely on the connection lines shown in Figure 1 of Ehret in your opening report, Exhibit 1, correct?

A.    Well, I call them electrical traces, yes, because electrical traces are electrical conductive paths.  Ehret doesn't call them traces. He doesn't call them wires, but in the '080 patent, the definition of an electrical trace is an electrically conductive path, and that's exactly what they are, its electrical traces or electrical conductive paths.

Q.    I understand that.  I'm just trying to get an answer to my question.  You relied on the lines shown in Figure 1 of Ehret as the electrical traces in your opening report in Exhibit 1, correct?

Page  42

A.    So in my opinion in my opening report, I call them electrical traces because the patent is broad enough in its definition of what an electrical trace is to include an electrically conductive path.  So that's why I called them electrical traces.

Q.    I'm not asking you why you did something. I'm just asking you a very simple question.  Have you relied on the lines in Figure 1 of Ehret in your opening report, Exhibit 1, as the electrical traces?  Yes or no?

A.    What I say is Figure 1, yes, shows electrical traces extending and simply because that term is an alternative description of electrically conductive path.

Q.    Okay.  And then in your reply report in paragraph 89, you criticize Dr. Frazier for responding to your opinion in paragraph 200, right?

A.    What I was responding to, and maybe we ought to look and see what Frazier --

Q.    We will.  I'm just asking you a question. You criticized Dr. Frazier in paragraph 89 for responding to your opinions with respect to Ehret's Figure 1, and more particularly with

Page 43

respect to the lines that you identified between the IDES and the multiplexer as the electrical traces?  Yes or no?

MR. GAVIN:  Objection to form.

THE WITNESS:  I'd like to look at Frazier rebuttal report at the cite that's given.

BY MS. TARGOWSKA:

Q.  Yes.  So let's turn to Exhibit 11, on page 89.  Your report -- your reply report, Exhibit 3, in paragraph 89 cites to Frazier rebuttal report, which is Exhibit 11, in paragraphs 208 to 211.

And before we look at those -- that your opinion in paragraph 89 is that Dr. Frazier's rebuttal report in paragraph 208 through 211 is irrelevant?

MR. GAVIN:  Objection.  Asked and answered.

MS. TARGOWSKA:  Not answered.

BY MS. TARGOWSKA:

Q.  Well, let me make it simple.  You say his opinions are irrelevant, and you cite to paragraphs 208 through 211, correct?

A.  What I said is his opinions are not relevant because he does call those connections

Page  44

wires.

Q.    Okay.  Is that what it states in paragraph 89 because I can't see that?

A.    Well, I'm just using the referral there to the Frazier report, paragraph 207 --

Q.    No, no, no.  So wait a second.  In paragraph 89, you cite to paragraphs 208 through 211; is that correct?  These are the opinions that you stated in paragraph 89 are irrelevant.  If you're changing your opinion, we can discuss this, but I'm asking about the opinion as stated in paragraph 89.  So let me repeat the question.

In paragraph 89, you have labeled Dr. Frazier's opinion in paragraphs 208 through 211 of Exhibit 11 as irrelevant for the reasons that you describe in paragraph 89, right?

I will repeat the question.  In paragraph 89, you have labeled Dr. Frazier's opinions in paragraph 208 through 211 of Exhibit 11, which is his rebuttal report, as irrelevant for the reasons you described in paragraph 89 of Exhibit 3, correct?

A.    Well, actually, in paragraph 209 --

Q.    I would like the answer to my question. I am going to ask you questions and you are going

Page 45

to provide the answers is how this works.

MR. GAVIN:  You can ask one more question.  He'll answer that question and then we're taking a break.

MS. TARGOWSKA:  I'm waiting for the answer to the question I just asked.

MR. GAVIN:  Re-ask the question you want answered, and when he answers it, we'll take a break.

MS. TARGOWSKA:  So you're not going to tell me how to ask my question.

BY MS. TARGOWSKA:

Q.   Dr. Fair, do you need the question repeated, or do you remember the question?

A.   Why don't you repeat it.

Q.   Dr. Fair, in paragraph 89 of your reply report, Exhibit 3, you labeled Dr. Frazier's opinions in paragraphs 208 through 211 of Exhibit 11, which is his rebuttal report, as irrelevant for the reasons you describe of paragraph 89 of Exhibit 3, correct?

A.   Well, yes, that's correct.

Q.   Okay.

A.   And the reason is --

Q.   My question did not ask for --

Page 46

MR. GAVIN:  You're interrupting him.

MS. TARGOWSKA:  I am interrupting him because I'm entitled --

MR. GAVIN:  You don't get to interrupt the witness while he gives an answer, Anna.  You are not entitled to interrupt his answer and stop in the middle.

MS. TARGOWSKA:  If you want to ask him a follow-up question --

(Cross-talk.)

MR. GAVIN:  He answered your question. You interrupted him.

MS. TARGOWSKA:  He answered yes, so we can move on.

MR. GAVIN:  We need to take a break.

MS. TARGOWSKA:  It sounds like you need a break, so absolutely.

THE VIDEOGRAPHER:  Off record at 10:39 a.m.

(Recess)

THE VIDEOGRAPHER:  On record at 10:54 a.m.

BY MS. TARGOWSKA:

    Q.    Welcome back, Dr. Fair.

    A.    Thank you.

Page 47

Q.    Before the break, we were talking about paragraph 89 of your reply report, Exhibit 3, and which references Dr. Frazier's rebuttal report, which is Exhibit 11, paragraphs 208 to 211.  Do you recall that?

A.    Yes.

Q.    So I would like to understand the basis for why you said certain opinions of Dr. Frazier in paragraph 208 through 211 are irrelevant.  And so let's take a look at Exhibit 11, paragraph 208 of Dr. Frazier's report.

In paragraph 208 of Exhibit 11, Dr. Frazier relies on the definition of electrode traces are electrically conductive traces or electrical traces from the '080, '752, and '255 patents.  Do you see that?

A.    Yes.

Q.    Is it still your opinion that these definitions are still not relevant?

MR. GAVIN:  Objection to form.

THE WITNESS:  No.

BY MS. TARGOWSKA:

Q.    Let's take a look at paragraph 209 of Exhibit 11, which is Dr. Frazier's rebuttal report, and take a minute to read that paragraph

Page 48

and let me know whether it is still your opinion that opinions of Dr. Frazier in paragraph 209 are irrelevant.

Are you able to answer that question?

A.    Give me a few minutes, please.

The question again is?

Q.    The question is is it still your opinion that Dr. Frazier's opinions in paragraph 209 of Exhibit 11 are irrelevant?

A.    Yes.

Q.    In paragraph 209, Dr. Frazier is applying the definition of the electrical traces that he cited in paragraph 208 that you confirmed as relevant, correct?

A.    Correct.

Q.    So why in your opinion application of a definition that's relevant to this analysis renders Dr. Frazier's opinions irrelevant?

A.    Well, it's irrelevant because of his conclusion based upon the definitions which he says "Therefore the eight IDES units do not form a boundary towards which any of the wires in Ehret can extend and would not have considered them to be within the meaning of the claimed electrical traces."  That's why I find it irrelevant.

Page 49

Q. So I think what you're really saying is that you disagree with Dr. Frazier's conclusion but not that his opinions aren't irrelevant to the analysis of whether electrical traces are disclosed; is that accurate?

A. I think his opinions are wrong. The definitions that he cites to to what electrical traces are as cited in the '080 patent I think are correct.

Q. And you said that you disagree with Dr. Frazier's conclusion in paragraph 209 that begins with "The eight IDES units do not form a boundary towards which any wires in which Ehret extend."

You did not address that in your reply report, did you?

A. Could I get that again?

Q. Sure.

You said that you disagree with Dr. Frazier's conclusion in paragraph 209 that begins with "The eight IDES units do not form a boundary," but you did not address his opinion in your reply report, correct?

A. That's correct.

Q. So I'll continue on with the paragraphs

Page 50

that you referred to in paragraph 89 of your reply report.  So the next one is paragraph 210 in Exhibit 11, which is Dr. Frazier's rebuttal report.  Take a minute to read it, and I'm just trying to understand whether it's still your opinion that Dr. Frazier's opinions in paragraph 210 are irrelevant or is it your opinion that you simply disagree with his opinions?

A.    I disagree with it.

Q.    Same question for paragraph 211 of Exhibit 11.

A.    I disagree with it.

Q.    So you disagree with Dr. Frazier's opinions in paragraphs 210 and 211 of his rebuttal report of Exhibit 11, but you did not address those opinions in your reply report, correct?

A.    Again?

Q.    You said that you disagree with Dr. Frazier's opinions in paragraphs 210 and 211 of his rebuttal report of Exhibit 11, but you did not address those opinions in your reply report, Exhibit 3, correct?

A.    I disagree with that.

Q.    Where did you address those paragraphs?

A.    What I did was to show in my reply report

Page 51

Veritext Legal Solutions
346-293-7000

how the electrical conductive paths necessary in Ehret's device to connect to the IDES to the leads on the TO-8 package were performed, and in showing a path, if we're doing a design with a TO-8 chip carrier package is in opposition to what Dr. Frazier says in his paragraph 211.

Q.    And that's that TO-8 package on page 36 from Wikipedia?

A.    It's from paragraph 84 to 87 in my reply.

Q.    Right.  And those opinions are based on the TO-8 package on page 36, correct?

MR. GAVIN:  Objection to form.

THE WITNESS:  Well, I disagree they're based on it.  It's an example of what was possible, and I elaborate further beyond what is shown in that package.

BY MS. TARGOWSKA:

Q.    You did not provide any other examples of TO-8 packages in paragraphs 84 through 87 of your report, correct?

A.    So I gave -- well, it's not correct because I gave pictures of TO-8 packages compared to other metal can packages.  I gave the image of the chip carrier kind of package on page 36, and I pointed out technologies that could -- were well

Page 52

known at the time for building a chip carrier into a TO-8 package.

Q.    So you did not provide any specific examples of other TO-8 packages other than the one on page 38 and the unidentified one on page 35?

A.    So I gave two specific pictures and a description of the technology.  That's what I gave.

Q.    I understand, but my question is a little different.  I'm asking you whether you provided any additional specific examples of other TO-8 packages in paragraphs 84 through 87 to which you pointed before?

A.    Well, I gave two specific examples in the form of pictures, but then I gave a description of what was possible with that chip carrier TO-8.

Q.    Can you take a look at paragraph 87 on page 37 of your reply report in Exhibit 3?  In paragraph 87 of Exhibit 3, you conclude that the TO-8 package leads are the connection pads.  Do you see that, the last sentence?

A.    Yes.

Q.    And if you turn to Exhibit 1, which is your opening report, Section VI.C.1(b)(i) beginning on page 78, that spans paragraph 194

Page 53

based on Ehret alone?

A.   Correct.

Q.   So we've been talking about your opinions in Section VI.C.1 for a while now, and I wanted to talk about your opinions in Section VI.C.2 in which you rely on other references besides Ehret. So if you can turn to page 55 of your reply report, Exhibit 3.

MR. GAVIN:   We've been going about an hour.

MS. TARGOWSKA:   Oh, sure.

MR. GAVIN:   I don't want to stop you, but if you're shifting to another section, maybe it's a good time to take a short break.

MR. CHASSMAN:   And let me just say, I took matters into my own hands and ordered lunch, and I think it should be here within the next 10 to 15 minutes.   So maybe we can keep going until lunch is here.

MR. GAVIN:   Are you okay with that?

THE WITNESS:   That's okay.

BY MS. TARGOWSKA:

Q.   In Exhibit 3, which is your reply report on page 55, you provided your opinions with respect to Element a(I) of Claim 1 of the '080

Page 68

patent based on Ehret in combination with other art, right?

A.   Correct, yes.

Q.   In paragraph 138 on page 57 of Exhibit 3, you're referring to a specific modification of Ehret in view of the Wegener reference; is that correct?

A.   Which paragraph?

Q.   138.

A.   Okay.   What's the question?

Q.   In paragraph 138 on page 57 of your reply report, Exhibit 3, you're providing your opinions on a combination of Ehret and the Wegener reference, correct?

A.   Correct.

(Exhibit No. 17, Publication, Electric Cell-Substrate Impedance Sensing (ECIS) As a Noninvasive Means to Monitor the Kinetics of Cell Spreading to Artificial Surfaces, so marked)

BY MS. TARGOWSKA:

Q.   And for the record, I'm handing you what I've marked as Exhibit 17.   Exhibit 17 has been produced at Axion 002184 through Axion 0021822 and this is publication entitled Electric

Page 69

Cell-Substrate Impedance Sensing (ECIS) as a Noninvasive Means to Monitor the Kinetics of Cell Spreading to Artificial Surfaces.  The first author is Joachim Wegener.  This is -- this is the Wegener reference in which you relied in your reports, correct?

A.    Right.

Q.    And so in your opening report beginning on page 105, you provide your opinions based on Ehret and prior art with respect to the asserted claims of the '080 patents, correct?

A.    Correct.

Q.    And for the same claim element that we were just looking at which is Element a(i) of Claim 1 on the '080 patents, you rely on Ehret alone and then Ehret in combination with any other references, correct?

A.    So is there a question?

Q.    Yes.  So let's break it up.  So I am talking about the basis of your opinion beginning on page 105 in Section VI.C.2, which is based on Ehret and prior art.  In your opening report for that basis, you don't provide any additional explanation beyond what you provided in Section VI.C.1 for Claim Element a(i), correct?

Page 70

information.  We could have just, you know, replicated that conversation if we had chosen to include all of the claim limitations, but we only addressed those that were brought up in Agilent's interrogatories.

Q.    What I'm asking you is in your opening report, you have not rendered any opinions with respect to Element a(i) of Claim 1 of the '080 patent based on Ehret in combination with any other reference, correct?  Your opinions are based on Ehret alone, yes or no?

A.    For Element a(i), yes.

Q.    And in your reply report for Element a(i) of Claim 1 of the '080 patent that begins on page 55 of Exhibit 3 in paragraph 138 on page 57, you're relying on Ehret in combination with the Wegener reference, right?

A.    Correct.

Q.    And you did not have this opinion in your opening report, correct?

A.    So what I said in paragraph 138 was simply a reply to Dr. Frazier and, therefore, that's why it got included and wasn't included in my opening report.

Q.    So in your opinion, Dr. Frazier addressed

Page 73

a combination of Ehret and Wegener with respect to Element a(i) of Claim 1 of the '080 patent?

A.    Well, what he -- that's not what I'm saying.  I'm saying he actually admitted that the multi-well device disclosed by Wegener makes use of traces and connection pads.

Q.    So I would like you to answer the question that I asked, which is the opinion that you provided in your reply report, Exhibit 3, with respect to Element a(i) of the '080 patent that relies on Ehret in combination with Wegener has not been provided in your opening report?  Yes or no?

A.    I can't answer that yes or no.

Q.    Okay.  We can move on.

MS. TARGOWSKA:  Lunch is here, and we can take a break.

THE VIDEOGRAPHER:  Off record at 12:13 p.m.

(Recess)

THE VIDEOGRAPHER:  On record at 1:05 p.m.

BY MS. TARGOWSKA:

Q.    Welcome back, Dr. Fair.

A.    Thank you.

Q.    Before the break, we were discussing your

Page 74

opinions related to Element a(i) of Claim 1 of the '080 patent in connection with the second bases in your report in Section VI.C.2.  Do you recall that?

A.    What page was that?

Q.    55 of your reply report, Exhibit 3.

A.    Okay.

Q.    On page 58 of Exhibit 3, paragraph 139, you discuss your opinion in connection of why a person of ordinary skill in the art would have been motivated to combine Ehret with Wegener; is that right?

A.    Yes.

Q.    And I want to make sure I understand the result of your proposed combination here.  I understand that you are proposing to combine Ehret with Wegener by using Ehret's IDES in place of the electrodes in Wegener and then also other modifying Wegener's connection pads and the design of the common ground to accommodate 16 separate connections; is that right?

A.    Well, it's correct to the point that you would have to replace that common ground connection pad with eight connection pads, but yes.

Page 75

you is whether the contents of the well are in contact with the small working electrode or are they in contact with the small working electrode and the large counter electrode?

A.  Well, based upon what's shown in Figure 1 in the higher level view, you see that the cells would be in contact with the counter electrode, the large area, as well as the small electrode. That lower figure is just to schematically show cells filling the small contact area and then continuing to be deposited, but they don't show the location of the boundaries of the larger counter electrode.

Q.  And in that design, the small working electrode is not interdigitated with the counter electrode, correct?

A.  Correct.

Q.  So in paragraph 139 of your reply report on page 58, Exhibit 3, your opinion is that a person of ordinary skill in the art would have had a reason to use additional connection pads.  Do you see that?

A.  Yes.

Q.  And in that entire paragraph, you have not cited any portions of the Wegener reference,

Page 81

correct?

A.    I'm sorry.  I don't understand.

Q.    In paragraph 139 of Exhibit 3, you did not quote or cite to any portions of Wegener specifically?

A.    But I do refer to Wegener in paragraph 139.

Q.    I'm asking you if you cited any specific portions of Wegener in paragraph 139?

A.    Well, yeah, Figure 1 is cited.

Q.    Where?

A.    Previous page.

Q.    I'm asking you about the paragraph in which you describe motivation to combine, which is paragraph 139 on page 58.  So the question is in paragraph 139 on page 58 of Exhibit 3, you're not providing any citations or quotes from Wegener in support of your motivation to combine opinions, correct?

A.    I do.  I cite to -- unlike the Wegener configuration that is a cite to Wegener and that is on the previous page, you'd have to know what Wegener is disclosing before you understood what it would mean to add eight additional connection pads.

Page 82

Q. Right. So you're referring to Wegener in the context of changing what it discloses, but you're not citing to anything in Wegener to support that proposed modification, correct?

A. Wegener does not -- yes, that's correct. Wegener does not propose these changes, but I'm saying this is what one of ordinary skill in the art had reason to modify Wegener in view of the issue of making individual connections.

Q. And then similarly in paragraph 139 on page 58 of Exhibit 3, you're not citing to Ehret specifically to support your motivation to combine these two references, right?

A. Well, I do. I cite to the -- Ehret's IDES as the basis for the modification of Wegener and so I do cite to Ehret.

Q. Okay. And you don't identify any disclosure in Ehret that suggests an implementation on a plate with connection pads, correct?

A. Well, that's correct. I cite to what one of ordinary skill in the art would have known to do.

Q. So that specific modification that you are proposing is not disclosed either in Wegener

Page 83

or Ehret, correct?

A.    The specific modifications are not disclosed in either reference.  However, this is offered in terms of what one of ordinary skill of the art would have had reason to do to maintain individual connections to Ehret's IDES.

Q.    Right.  But you're starting with the premise that these two references would be combined, and once they're combined, you're proposing a modification.  I'm asking about any support that you identify here, which I don't see for why a person of ordinary skill in the art would modify Wegener in view of Ehret.  You don't describe that in paragraph 139, right?

A.    That modification, I don't describe it specifically, but it's embodied in the knowledge of one of ordinary skill in the art.

Q.    Let's take a look at Section VI.C -- I'm sorry.  VI.D.1(b) on page 77 of your reply report. This section addresses your opinions with respect to Element a(v) wherein said electrode array has an approximately uniform electrode resistance distribution across said electrode array so that the electrode resistances between two locations on said electrode array do not differ by more than

Page 84

Q.    So I wanted to understand which references you're combining in Section VI.D.2 of your reply report.  So if you take a look at page 89 of your reply report, Exhibit 3, in paragraph 220 you say that for the same reasons discussed about the Element a(i) of Claim 1 of the '080 patent, Claim 1, Element a(i) of Claims 14 and 11 of the '752 patent would have been obvious to the person of ordinary skill in the art in view of Ehret in combination with one or both of Wegener and applicant's admissions regarding the prior art.  Do you see that?

A.    I see that.

Q.    So that's three different possibilities, right, Ehret in combination with Wegener, Ehret in combination with what I'll refer to as applicant's admissions, and, third, Ehret in combination with Wegener and what you refer to as the applicant's admissions?

A.    Right.

Q.    And is it your understanding that when you're performing an obviousness analysis that you need to show that the entire claim is obvious in view of the same combinations of references?

MR. GAVIN:    Objection to form.

Page 98

THE WITNESS:  Yes.

BY MS. TARGOWSKA:

Q.   In paragraph 222 on pages 89 and 90 of Exhibit 3, which is your reply report, you state that for the same reasons discussed above for Claim Elements a(iii) and a(iv) of Claim 1 of the '080 patent, Claim Elements a(iii) and a(iv) of Claims 14 and 11 of the '752 patent would have been obvious to the person of ordinary skill in the art at the time of the alleged invention of the '752 patent in view of Ehret alone or as modified as discussed above for Claim Element a(i) in combination with the Van der Weide '709 publication and/or applicant-admitted prior art.

Do you see that?

A.   Okay.  I see it.

Q.   But you understand that you can't rely on Ehret alone in combination with another reference because you have already relied on Ehret as modified in view of Wegener and/or the applicant's admissions as you term them?

MR. GAVIN:  Objection to form.

THE WITNESS:  It sounds like you want me to give you a legal opinion.

BY MS. TARGOWSKA:

Page 99

Q.   Well, I want to understand your opinions on obviousness, and I think you've agreed that you can't use different -- a mix of different references across different elements, that you need to use a specific combination for the entire claim.  Yes or no?

MR. GAVIN:  Objection to form.

THE WITNESS:  Well, to the extent it requires a legal opinion, I'm unable to answer that.

BY MS. TARGOWSKA:

Q.   All right.  So if for Element a(i) you rely on Ehret and Wegener, when you provide your opinions on Elements a(iii) and a(iv), is it your understanding that you can rely on Ehret alone without accounting for the modifications that you made to Ehret in view of Wegener?

A.   Well, again, if it requires -- if you want a legal opinion from me, you're not going to get one.

Q.   I need to understand what you have combined in this ground, and I don't know that, do you?

A.   Well, it's in my report.

Q.   Well, can you tell me which references

Page 100

you combined for your obviousness opinions for the basis identified in Section VI.D.2, Ehret plus prior art?

A.    Well, that is in my report.

Q.    Where in your report?

A.    I'm just trying to find where to begin.

Q.    Okay.

A.    I'm starting on page 89 with the Claim Element a(i).

Q.    Uh-huh.

A.    And I say, "It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention in view of the Ehret publication in combination with one or more" -- "one or both of the Wegener publication and the applicant's admissions regarding the prior art."

Q.    So what does it mean for an element of a claim to be obvious?

A.    It's obvious in view of the combination.

Q.    So isn't the standard that you need to show obviousness of the entire claim?  Are you relying on the same combination for all elements of Claim 14 and 11?

A.    So I'm not relying on all the elements to proving each individual claim element, but I have

Page 101

this combination of resources, and I'm going to apply those to the claims as needed.

Q.   Okay.  So in your opinion, Claim 11 and 14 is obvious in view of what combinations?

A.   Well, you have to go by -- step by step.  We just went through a(i).  We can go through -- let's see, an impedance analyzer, we didn't cover that because that's already been -- we don't need the combination there because we have an impedance analyzer in Ehret.

And then we move on to (iii) and (iv), Elements a(iii) and a(iv) -- I'm going to take this thing off.  And we said that Elements a(iii) and a(iv) of the '752 patent would have been obvious to a person of ordinary skill in the art at the time of the alleged invention in view of Ehret 1997 publication alone or as modified as discussed above for Claim Element a(i) in combination with Van der Weide '709 publication.

So that is one, two, three, four, and then we get to the fifth element which is a(v) which is the uniformity element.

Q.   Okay.  So I understand you have opinions on which references disclose a specific claim element, but I would like to understand what are

Page 102

the combinations of references specifically that you rely on to say that Claim 14 and 11 is obvious?  Is it Ehret plus Wegener plus Van der Weide?  Is it Wegener, Ehret, and Van der Weide and what you refer to as applicant's admissions? Is it something else?  Is it -- how many combinations are you relying on?

A.    I am doing a claim element by claim element analysis clearing each of the elements and saying therefore the entire claim in view of those arguments would be obvious.

Q.    So in view of Ehret -- so in your opinion, Claims 11 and 14 of the '752 patent as explained in Section 62 would have been obvious in view of Ehret, Wegener, what you refer to as applicant's admissions regarding prior art and Van der Weide?

A.    No.  What I'm saying is you need various combinations in a claim element by claim element analysis, and once you've cleared those claim elements, that clears the entire claim which combines those elements.

Q.    What are the combinations that you rely on to say that claim element is obvious?

A.    I just went through those.

Page 103

Q.   No.   What you said is you need various combinations depending on a claim element.   I want to know what your opinion on obviousness is for Claim 11 because you need to identify what references you're relying on, which references you're combining for Claim 11.

A.   Well, I did that for both Claim 14 and 11.   So I've asked -- that's been asked and answered.

Q.   I'm not sure it's your position to make an objection, and it hasn't been answered.   My question is what combinations of prior art references are you relying on in your opinion that Claim 11 and 14 of the '752 patent is obvious?   Please identify those combinations for me specifically.

MR. GAVIN:   Objection to form.

THE WITNESS:   Claim Element a(i), I'm saying that Claim 11 and 14 would have been obvious to a person of ordinary skill in the art, and that combination is the Ehret publication in combination with one or both of the Wegener publications and the applicant's admissions regarding the prior art.

Elements a(iii) and a(iv) would be

Page 104

obvious to a person of ordinary skill of the art at the time in view of the Ehret 1997 publication alone or as modified as discussed above for Claim Element a(i) in combination with the Van der Weide '709 publication and/or applicant admitted art.

Those are the only claim elements that I applied my obviousness analysis to and the only two, three elements or four elements that I needed to in order to prove that Claim 11 and 14 are obvious.

BY MS. TARGOWSKA:

Q.   All right.  So let's do this, if you have a claim that has two limitations and you say the claim is obvious, and for limitation 1 you rely on reference A, and for limitation 2, you rely on reference B, then wouldn't the opinion be that the claim is obvious in view of both A and B?

A.   I think I've made my understanding clear. I do a claim element by claim element analysis based upon the combinations of references that I need to make those elements obvious in those combinations.  Once I do that and I have no challenge on the other elements, then the whole claim is obvious.

Q.   But what you don't understand is that the

Page 105

combination of references they're making are inconsistent across the claim elements.  So I'm not going to guess here.  I need to understand in view of what specific combinations do you opine that Claim 11 is -- of the '752 patent is obvious?

MR. GAVIN:  Objection to form.  Asked and answered a bunch of times.  He's told you the potential combination.  They're in 220 and 222. You can continue to ask him this --

MS. TARGOWSKA:  Are you here to testify, Geoff?

MR. GAVIN:  No.  You can continue to ask him this, but you've asked him 100 times, and he's given you the combinations in 200 and 222. They're stated very clearly there, Anna.

MS. TARGOWSKA:  He has provided answers on --

MR. GAVIN:  It's been an hour and 15 minutes.  We need to take a break.

MS. TARGOWSKA:  Well, that's a different request and absolutely.

THE VIDEOGRAPHER:  Off record at 2:20 p.m.

(Recess)

THE VIDEOGRAPHER:  On record at 2:41 p.m.

Page 106

BY MS. TARGOWSKA:

Q. All right, Dr. Fair. If you could refer to your reply report Section VI.D.2 on page 86. Oh, sorry. Wrong page. Please turn to Exhibit 3, Section VI.D.2. Never mind.

A. Where are we? Excuse me.

Q. Sorry. We are in Section VI.D.2 in your reply report. The section begins on page 86.

A. Okay.

Q. Those are your opinions on obviousness of the '752 patent in view of Ehret and prior art, right?

A. Okay.

Q. And in terms of the elements of Claims 11 and 14, you have subsections for Element a(i) in Section A and then Elements a(iii) and a(iv) in Section B, right?

A. That's what we just talked about, I believe.

Q. These are the sections that we were talking about before the break.

A. Right. Okay.

Q. And you don't have any specific subsections for the remaining elements for Claim 11 and 14, right? Page 89 and 90.

Page 107

A.   And the question?

Q.   The question was that you don't provide any -- a separate subsection for elements of Claim 11 and 14 other than for Claim Element a(i), a(iii) and a(iv), right?

A.   Right.

Q.   So for the remaining elements of Claims 11 and 14, as part of the basis in Section VI.D.2 beginning on page 86, you're relying on the disclosure of Ehret alone, correct?

A.   Correct.

Q.   All right.  And you stated that for Element a(i) of both Claims 11 and 14 of the '752 patent, you relied on the disclosure of Ehret in combination with one or both of the Wegener publication and what you refer to as the applicant's admissions regarding the prior art, right?

A.   Right.

Q.   So that is a total of three different combinations, the first one being Ehret and Wegener, the second one being Ehret and what you referred to as the applicant's admissions, and the third one being Ehret and Wegener and what you referred to as the applicant's admissions, right?

Page 108

A.    Yes.

Q.    And then for your opinions with respect to Elements a(iii) and a(iv) of Claims 11 and 14 of the '752 patent as part of your opinions and the basis in Section 62, you're relying on the disclosure of Ehret alone or as modified as discussed above for Claim Element a(i) in combination with Van der Weide '709 publication and/or what you refer to as the applicant's admitted prior art, right?

A.    Correct.

Q.    So let me try to see if I can get all of the combinations that you reference in that sentence.  You're starting with either Ehret or Ehret as modified, correct, for Elements a(iii) and a(iv)?

A.    Right.

Q.    So starting with Ehret, the possible combinations that you refer to for Elements a(iii) and a(iv) are Ehret plus Van der Weide, one; two, Ehret plus what you refer to as applicant's admitted prior art; and, three, Ehret plus Van der Weide plus what you referred to as the applicant admitted prior art, right?

A.    Right.

Page 109

Q.    And if we take Ehret as modified, are you referring to the three combinations that we discussed with respect to Element a(i), which is Ehret plus Wegener or Ehret plus what you referred to as the applicant's admitted prior art and Ehret plus Wegener plus the applicant's admitted prior art?

A.    So the question is is Ehret modified include the Ehret plus Wegener and applicant's admissions?  Is that your question?

Q.    I just want to make sure we're on the same page so we're -- in Elements a(iii) and a(iv), you said that you're relying either on Ehret alone or Ehret as modified as discussed with respect to Element a(i).

A.    Okay.

Q.    And in Element a(i), you confirm that that modification comes as three separate combinations.

A.    Right.

Q.    And so I'm asking you whether when you say in paragraph 222 "Ehret as modified," are you referring to one of the three combinations that you provided with respect to Element a(i) in paragraph 220?

Page 110

A.    So the combinations in Element a(i), it's what would have been obvious to a person of ordinary skill in the art in view of the Ehret, Wegener and applicant's admissions.  I don't know how else to make that clearer.

Q.    Well, what paragraph 220 says is Ehret with one or both of the Wegener publication and the applicant's admissions which results in three possibilities.

A.    Oh, I see.  Sorry for interrupting, but I do see.  I missed the "one or both."  So Ehret by itself or in combination with one of Wegener -- the Wegener or applicants and then in combination with both, so that would be Ehret, Wegener and the applicant's admissions.  So there are three different scenarios there.

Q.    Okay.  You just said Ehret alone.  That's not stated in paragraph 220, is it?

A.    Oh, I'm sorry.  It's in Ehret in combination with so -- okay.  There's one, two or three.

Q.    Right.  So there are three possibilities in a(i), right, Ehret plus Wegener, Ehret plus applicant's admissions, or Ehret plus Wegener plus applicant's admissions, right?

Page 111

A.    Right.

Q.    In paragraph 222 you referred to Ehret alone, we covered that, or Ehret as modified.  I'm asking you what Ehret as modified means.  Is it one of the three combinations that we just listed for Element a(i), which is Ehret plus Wegener, Ehret plus applicant's admissions, or Ehret plus Wegener plus applicant's admissions?

A.    Yeah, it says alone or as modified as discussed above in Claim Element a(i).  So, yeah, that's the modified Ehret because it's combined.  And then also for Element a(iii) and a(v) in combination with Van der Weide.

Q.    And/or applicant's admitted prior art?

A.    Yes.

Q.    Okay.  So I'm just trying to get all the permutations.  If we take Ehret alone, that would be Ehret plus Van der Weide, Ehret plus applicant's admitted art plus -- or Ehret plus Van der Weide plus applicant's admitted art, right?

A.    Right.

Q.    Now I'm moving on to Ehret as modified with Van der Weide and/or applicant's admitted prior art, okay?

A.    Right.

Page 112

Q.    So that is going to result in a lot more combinations.  So starting with the first modification of Ehret, so that's Ehret plus Wegener.  The possibilities are Ehret plus Wegener plus Van der Weide.  The second one is Ehret plus Wegener plus applicant's admitted prior art.  And the third one is Ehret plus Wegener plus Van der Weide plus applicant's admitted prior art, right?

A.    Right.

Q.    Okay.  Now I'm moving on to the second modification of Ehret that you described in Element a(i).  That's Ehret with applicant's admitted prior art.  And the possibilities here are Ehret's plus applicant's admitted prior art plus Van der Weide, right?

A.    Right.

Q.    And then Ehret plus applicant's admitted prior art -- that's actually just one.  Because you already have applicant's admitted prior art, right?

A.    Right.

Q.    And then the third way in which you modified Ehret in Element a(i) is Ehret plus Wegener plus APA.  And so for Elements a(iii) and a(iv), the resulting combination based on that

modification of Ehret are Ehret plus Wegener plus applicant's admitted prior art, and the second one is Ehret plus Wegener plus Van der Weide plus applicant's admitted prior art, correct?

A.    Right.

Q.    All right.  So I'm up to nine combinations and for -- that you referred to in your opinions for Elements a(iii) and a(iv).  So is your understanding -- are there any other combinations of references that you're relying on for your opinions on obviousness of Claims 11 and 14 of the '752 patent?

A.    Not that I'm aware of.

Q.    And so you agree that your opinions on obviousness with respect to Claims 11 and 14 are based on the nine combinations of references as we just discussed?

A.    Yes.

Q.    So let me ask you this:  For Element a(iii) and a(iv), one of the combinations that you identified is unmodified Ehret and Van der Weide, right?

A.    Right.

Q.    But you are not relying on an unmodified Ehret for Element a(i), right?

Page 114

MR. GAVIN:  Objection to form.

THE WITNESS:  That's right.

BY MS. TARGOWSKA:

Q.   And just look at another example combination, Ehret plus Wegener plus Van der Weide.  You first opine that you would modify Ehret in view of Wegener with respect to Element a(i), right?

A.   Right.

Q.   And then you explain a different modification of Ehret in view of Van der Weide with respect to Elements a(iii) and a(iv), correct?

A.   Yes.

Q.   So when you modified Ehret in view of Van der Weide, you're not taking into account the Ehret references modified by Wegener, right?

MR. GAVIN:  Objection to form.

THE WITNESS:  Could you say that again, please?

BY MS. TARGOWSKA:

Q.   Sure.

When -- for the combination of Ehret, Wegener and Van der Weide, when you're modifying Ehret in view of Van der Weide for Elements a(iii)

Page 115

and a(iv) of the '752 patent, you are not taking into account the modifications that you already made to Ehret in view of Wegener, right?

MR. GAVIN:   Objection to form.

THE WITNESS:   Yeah, I just don't recall.

BY MS. TARGOWSKA:

Q.   Okay.  So in section addressing Elements a(iii) and a(iv) with respect to the '752 patent in Section VI.D.2, you're incorporating by reference your analysis for Elements a(iii) and a(iv) respectively of Claim 1 of the '080 patent, is that right, in the beginning of paragraph 222?

A.   222?

Q.   Yes.

A.   And the question again?

Q.   In section addressing Elements a(iii) and a(iv) with respect to the '752 patent, in Section VI.D.2, you are incorporating by reference your analysis for Elements a(iii) and a(iv) respectively of Claim 1 of the '080 patent, right?

A.   Right.

Q.   And that analysis is provided on page 59 of Exhibit 3, beginning on page 59, right?

A.   Your question?

Q.   Your analysis for Elements a(iii) and

Page 116

a(iv) of the '752 patent under Section VI.D.2 incorporates by reference your analysis of Elements a(iii) and a(iv) of Claim 1 of the '080 patent as outlined in Subsection B beginning on page 59, correct?

A.    That's what it said.

Q.    Okay.    And Section VI.C.2.b beginning on page 59 addressing Elements a(iii) and a(iv) of the '080 patent provide your analysis with respect to a(i) as modified in view of Van der Weide, correct?

A.    I missed that question.    Sorry.

Q.    Yeah.    No problem.    Section -- the one that I just pointed you to.    I'm not jumping around.    Section VI.C.2.b beginning on page 59 of Exhibit 3 includes your opinions on Elements a(iii) and a(iv) of the '080 patent based on Ehret or Ehret in combination with Van der Weide, right?

A.    So the section I'm referencing is at what page?

Q.    59 of your reply report.

A.    Okay.    I have lost my sections here.    The section that I'm referring to -- well, from, the section I'm referring from --

Q.    The section that you are referring from

Page 117

is on page 90 of your reply report.

A.   Okay.

Q.   And the section that you are referring to VI.C.2.b is on page 59.

A.   Okay.  That helps a lot.  Right.

Q.   So we were talking about the combination of Ehret, Wegener and Van der Weide, which is one of the combinations that you proposed in paragraph 222, and my question is in the section that you incorporate by reference, which is Section VI.C.2.b beginning on page 59, only references Ehret in combination with Van der Weide but does not address Ehret as modified by Wegener in combination with Van der Weide, right?

A.   Wait.  So we have Ehret in combination with Van der Weide and/or applicant's admitted prior art.  The one that seems to be missing in that previous discussion is which one?

Q.   Wegener.

A.   Wegener is not included.  But -- apparently.  I don't recall exactly why, but the combination was adequate as I reported.

Q.   Right.  So for one of the proposed combinations for the '752 patent which is Ehret, Wegener and Van der Weide, your opinions with

Page 118

respect to Element a(iii) and a(iv) of the '752 patent are limited to the combination of Ehret and Van der Weide, not Ehret as modified by Wegener in view of Van der Weide through the incorporation by reference of Elements a(iii) and a(iv) from the '080 patent and section beginning on page 59, Section VI.C.2.b, right?

A. I didn't need them, but they were available within the combinations that I had at my disposal.

Q. Okay. Is it your opinion that Claims 11 and 14 of the '752 patent are obvious in view of Ehret, Wegener, and Van der Weide?

A. My opinion is what it is.

Q. Is that part of your opinion?

A. No. My opinion is that Claims 11 and 14 are obvious in view of the combinations that are required to satisfy the claim-by-claim analysis and show obviousness in each of the elements of those claims.

Q. Okay. And one of those combinations as we just went through is Ehret, Wegener, and Van der Weide, right?

A. Yes.

Q. Okay. But you don't address that

Page 119

specific combination for Elements a(iii) and a(iv) of the '752 patent because you are only incorporating by reference Section VI.C.2.b which addresses Elements 3 -- a(iii) and a(iv) of the '080 patent where you provided your opinions based on Ehret in view of Van der Weide but not Ehret as modified by Wegener in view of Van der Weide, right?

MR. GAVIN:  Objection to form.

THE WITNESS:  So I said my inquiry of obviousness based upon what I reported in my report.

BY MS. TARGOWSKA:

Q.  Yeah, that's what I'm trying to understand because it's less than clear and I haven't been able to get a confirmation from you which combinations you are relying on for each claim.

MR. GAVIN:  He already named -- you already agreed on nine combinations.  So that's not a correct statement what you just said.

BY MS. TARGOWSKA:

Q.  All right.  As part of the nine combinations that we discussed with respect to Claims 11 and 14 of the '752 patent, one of the

Page 120

REPORTER'S CERTIFICATE

I, Tina Sarcia-Maxwell, a Notary Public in and for the State of North Carolina, do hereby certify that there came before me on May 28, 2025 the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of their knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination reduced to typewriting under my direction, and the transcript is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to nor employed by any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand, this 3rd day of June, 2025.


Tina Sarcia-Maxwell, Notary Public

Page 158

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

C.A. No. 23-198 (CJB)

Volume 2

AGILENT TECHNOLOGIES,          )
INC.,                          )
                               )
        Plaintiff,             )
                               )
vs.                            )
                               )
AXION BIOSYSTEMS, INC.,        )
                               )
        Defendant.             )
_____

CONTINUED VIDEOTAPED DEPOSITION OF
RICHARD FAIR, PH.D.
(Taken by Plaintiff)
Durham, North Carolina
May 29, 2025
9:17 a.m. - 3:42 p.m.

---Reporter:  Tina Sarcia-Maxwell, RPR, CRR

Page 159

Q.   Is that the definition of effector cells that you applied in your analysis in this case?

A.   Correct.

Q.   In your reply report, Exhibit 3, on page 96 in paragraph 241, you opine that you do not understand the preamble of Claim 9 to be limiting?

A.   Correct.

Q.   And then in paragraph 241 of your reply report, Exhibit 3, you also opine that if the preamble was limiting then in your opinion the Watanabe publication discloses a method for measuring cytolytic activity?

A.   Correct.

Q.   You did not provide that opinion in your opening report?

A.   Well, that's correct.  And what I was doing was just responding to Dr. Frazier's statement in paragraph 241 so I added that additional cite in response.

MR. GAVIN:  Sorry.  Real quick, for the record, Watanabe -- pronounce how you want to pronounce it.  It is W-A-T-A-N-A-B-E.

MS. TARGOWSKA:  What are you going with?

MR. GAVIN:  I say Watanabe.  I don't know if that's right.

Page 195

MS. TARGOWSKA:  I agree with you.

MR. GAVIN:  I think we'll understand, but I'm not trying to side track you if we get into that.  I wanted her to get the spelling.

BY MS. TARGOWSKA:

Q.    In your reply report, Exhibit 3, you do not rely on the Keese reference as disclosing the preamble of Claim 9 of the '255 patent?

A.    As disclosing what?  Did you say preamble?

Q.    Yes.

A.    I'd have to go back and look.

Q.    In your reply report, Exhibit 3, on pages 96 and 97, in paragraph 241, you are not relying on the Keese publication as disclosing the preamble of the Claim 9 of the '255 patent?

A.    Correct, alone.

Q.    Keese is K-E-E-S-E.

In you reply report, Exhibit 3, what combination of references are you relying on for the disclosure of preamble of Claim 9 of the '255 patent?

A.    So I was going to rely upon Watanabe publication, in combination with the ACEA systems publicly launched in December of 2003.

Page 196

Q.    And not on Keese?

A.    Correct.

(Exhibit No. 18, Research Report, Realtime Impedence Assay to Follow the Invasive Activities of Metastatic Cells in Culture, so marked)

BY MS. TARGOWSKA:

Q.    I'm handing you what has been marked as Exhibit 18.  Exhibit 18 has been produced at Axion 0026290 through Axion 0026296.  This is a research report titled Realtime Impedence Assay to Follow the Invasive Activities of Metastatic Cells in Culture.  First author is Charles R. Keese.

Dr. Fair, is Exhibit 18 the Keese reference that you relied upon in your opinions?

A.    Yes.

Q.    Keese does not describe cytolysis, correct?

A.    Well, I think that's correct.  Keese does not explicitly describe that is concerned with cytolysis of the epithelial cells.

Q.    In your opinion, the HUVEC cells are corresponding to the target cells in Claim 9?

A.    Yes.

Q.    Those are the only target cells that you

Page 197

with gelatin in .15 M NaCI created the basement membrane layer.

Q.   Okay.  So your opinion now is that the gelatin layer that was created with gelatin created the basement membrane described in Keese?

A.   I've not offered an opinion prior to this on what the basement membrane layer was.  I've talked about in general terms, but now reading further in Keese, I see that there is a procedure to create that first layer, and this is the first opinion I've had on what that basement layer is comprised of in Keese.

Q.   I understand, but you did provide opinions that involved the basement membrane, and for example, paragraph 246 of your reply report, Exhibit 3, and so I was trying to understand what definition of the basement membrane you applied when you evaluated the disclosure in Keese.

So in your opinion the basement layer described by Keese is created out of gelatin?

A.   Yes, out of gelatin as described of page 846 of Keese.

Q.   About 10 or 15 minutes ago you said that the basement membrane of Keese is probably the first layer of the cell barrier that is sitting on

Page 207

described in Keese?

A.   That specific step in cell death is not described in Keese.

Q.   And the basement membrane is not the same thing as a cell membrane, correct?

A.   Correct.

Q.   If you can take a look at your reply report, Exhibit 3, on pages 98 and 99 in paragraph 246, towards the end you say "The Keese publication describes how cancer cells 'disrupt the basement membrane structure' of endothelial cells, and Keese explains with reference to its Figure 8 that the '[t]he PPC1 line clearly results in the most rapid and complete disruption of the endothelial cell layer.'  In my opinion what Keese describes includes the breaking apart of cell membranes killing or lysing cells."

Is that the opinion you provide in paragraph 246?

A.   Yes.

Q.   You said that Keese describes breaking apart of a cell membrane.  Where is that in Keese because the way I read this is you described the disrupting of the basement membrane which is not a cell membrane and concluded that Keese describes

Page 211

breaking apart a cell membrane so correct me on that if it is wrong?

MR. GAVIN:  Objection to form.

THE WITNESS:  Question again?

BY MS. TARGOWSKA:

Q.  Sure.  Is your opinion that Keese describes breaking apart of a cell membrane as stated in paragraph 246 based on Keese's disclosure of the disruption of the basement membrane?

A.  No.  In fact, as I've admitted, Keese does not focus on cytolysis or breaking the cell membrane, but there are half a dozen ways to kill a cell, and it is clear to me from the impedence measurements that Keese describes that cells are dying, and I think that is the key message here of this paragraph.

Q.  So your opinion that Keese -- strike that.

So you are withdrawing your opinion that Keese describes breaking apart of a cell membrane that you stated in paragraph 246 of your reply report, Exhibit 3?

A.  I don't think I say that.  I say that the Keese publication may not be focused on cytolysis.

Page 212

So he does not detail cytolysis in the endothelial cells.

Q.    Where does Keese describe the breaking apart of a cell membrane?  Could you point me to a sentence or a paragraph of Keese where he talks about any cell membranes being broken?

A.    I could not find anything in Keese that says that.

Q.    You previously refer to the description of Figure 8 in Keese as support for your understanding that some cells are dying; is that right?

A.    Yes.  What's described in Figure 8 is a result of presumably due to the retraction of the HUVECs from one another, opening up intercellular spaces for less obstructive current flow, but once that process begins those isolated cells are vulnerable to attack by the cancer cells.  That's the basis for my opinion.

Q.    In Keese on page 850, first column towards the bottom describes what is shown in Figure 8.  It says "We have carried out challenges with several human prostatic cancer lines. Results of confluent HUVEC monolayers challenged with 10 to the power of 5 cells/cm squared DU154,

Page 213

just means to apply voltage.

Q.   Was the answer to my question the word "energized" is not part of the Court's claim construction as reproduced by you on page 84 of Exhibit 2?

A.   The word "energized" does not appear in the Court's construction, but the word -- connected to, impedence analyzer in such a way that a measuring voltage can be applied.  Applied the energizing that's performed by the return ground current is part of the voltage that appears to measure impedence in the A-5.

Q.   With all respect, I have no idea what any of this means.  So let's maybe try to break it down in smaller portions.

What is the definition or meaning of the word "energize" as used throughout your report?

A.   To apply a voltage.

Q.   So in paragraph 226 when you say that -- that the other electrode arrays are energized, are you saying that a voltage is applied to these arrays?

A.   What I'm saying is there's -- the other arrays cause the voltage that appears across well A-5 to measure impedence is going to be affected.

Page 258

So it is the sum of the voltage drops through those ground buses that is the energize which is the applied voltage which in addition to the measuring voltage give you the voltage that you are using to measure an impedence.

And, therefore, the electrode array voltage is not independent of any measuring voltage applied to any another electrode array at a given time by using switches.

Q.   Yes, that's -- that is convoluted so let's try to break that down too.

After measuring voltage applied to well A-5 is the voltage between the connection pad leading to well A-5 on the active side and the ground connection pad, correct?

A.   Yes.

Q.   The voltage potential that you described before is a potential drop.  It is not an application of voltage, correct?

A.   No, it is an application of voltage.

Q.   Between what points?  So for well B-5, you said that there is a potential drop on the ground electrode bus of electrode array in well B-5.  Which points are you referring to?

A.   So the applied voltage is the voltage

Page 259

between the left side of the array of A-5 and the right side, and I'm saying that the right side which is the voltage that is on the ground bus is not zero.  It is not ground.  It is elevated because of a current that is being carried through the circuit to the ground connection, and you get a voltage drop.

And so the other arrays that are not activated are influencing the electrode array -- influencing the measuring voltage applied to the electrode array so there is no independence, no individually addressed aspect.

Q.   All right.  So what you are saying is that the reference voltage could be nonzero, right?

A.   It certainly is nonzero.

Q.   And by definition voltage is a difference in potential between two points, right?

A.   Correct.

Q.   And it is standard practice to use reference voltage as typically connected to ground as one point when you are measuring voltages in the circuit, right?

A.   It is not standard practice.  The reference potential is whatever the potential is

Page 260

that you are measuring a reference to.

Q. So that ground potential that you are describing when you're measuring ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓

A. Well, I don't know there will be a difference. It depends on -- if you look at page 93 of my rebuttal report. The ground connection is the top of the picture, upper left. That's the ground connection.

Q. Right.

A. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓

Q. Yes. I understand. And so at any given point in time when you are measuring ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 261

Veritext Legal Solutions
346-293-7000

Q.   Okay.  So in that scenario if you are measuring the voltage for array A-5, putting the probes on the active side of the electrode and the ground side of the electrode, that's not impacted by any voltage drops in arrays B-5, C-5, and D-5, right?

MR. GAVIN:  Objection to form.

THE WITNESS:  I don't understand that.

BY MS. TARGOWSKA:

Q.   Well, I'm trying to understand your opinion.  You said that the measuring voltage for an array is the voltage across the array between the active electrode bus and the ground electrode bus.  Is that your opinion?

A.   Yes.

Q.   Okay.  So in order to get that voltage, you would put probes across that array to measure it?

A.   Yes.

Q.   And so the potential at the point on the ground bus is not affected by the current flowing through the ground trace below well A-5, correct?

A.   So are we activating A-5 or not?

Q.   Yes, we -- that's what we've been talking about A-5 activated.

Page 265

A.    We are going to activate A-5.  There will be a voltage induced on the ground bus to the right, and that potential difference between what's activated voltage on the left and right is the measuring voltage.  The right-hand side point number 2 is influenced by the current drop -- the voltage drop by the current returning to ground connection.

Q.    So you are saying that the voltage potential on the right side in the ground electrode bus of the electrode array in well A-5 is the same as the voltage potential at the ground connection pad that's circled in white on the top of the plate in image -- on page 98 of your rebuttal report?

A.    No, what I'm saying is --

Q.    It is different?

A.    The ground potential -- the voltage on the ground bus of A-5 is different from the voltage at the ground connection where the circle is because you have a voltage drop from the ground bus of A-5 down the vertical trace across the horizontal trace and up the vertical trace to the ground connection.

Q.    Right.  So I think what you are telling

Page 266

me is that if the measuring voltage is the voltage across the array as measured between the active electrode bus and the ground electrode bus then it is not affected by any voltage drop that occurs below A-5 because you just told me that will lead to a different voltage potential and the ground pad, rights?

A.    I did not say that.

Q.    Okay.  So is the voltage potential on the electrode ground bus of the electrode in A-5 the same as the ground potential at the ground connection pad when you are applying and measuring voltage to the array in well A-5?

A.    No, it is not.

Q.    ███████████████████████████████
███████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
███████    ██████████████████████████████
██████████████████████    ████████████████
███████████████████████████████████████████
██████████████████████    ███████████████████
█████████████    ████████████████████████████
██████████    ████████████████████████████
███████████████████████████████    ████████

Page 267

is another voltage drop from the connection of the horizontal voltage drops to the vertical connection up to the ground connection.

So as you are moving doing these traces -- so let's take the ground connection as zero volts.  As you go down the vertical trace, the vertical ground trace, the voltage is going up because current is flowing up, and then you go horizontally, the current is going up because you have a voltage drop.

And then when you hit the vertical trace and the ground bus connections, the voltage goes up until it hits the ground -- the ground bus of A-5, and so the ground potential on the bus on A-5 is at a higher voltage than zero.

Q.

Page 268



Q.    And you are saying a continuous voltage drop because the voltage potential in the ground bus is the same for all points in the ground bus, right?

A.    No.

Q.    Sorry.  I used the wrong word.  You are

Page 269

saying it a continuous voltage drop because the voltage potential in the ground trace is the same for all points in the ground trace?

A. No, no. The voltage on the ground trace is a continuously variable voltage.

Q. I'm asking you about the potential of the electrical ground trace. So I don't understand when you say a continuously variable voltage because a voltage is a difference in potential between two points, and I'm asking you about the potential on the points of the ground bus.

MR. GAVIN: Objection to form.

BY MS. TARGOWSKA:

Q. You can't have variable voltage at a point, can you? Can you have variable voltage at a point? Is that a thing?

A. I'm not sure what you are talking about.

Q. That's my problem. You said there are variable voltage on an electrical trace. I don't know what that means.

A. The electrical trace is a wire.

Q. Yes.

A. And the current is coming in at the top of the wire. As you go down the wire, you create a voltage drop to drive the current down that

Veritext Legal Solutions
346-293-7000

trace.

Q. Right.

A. Without a voltage drop, you don't get any current down your trace.

Q. Uh-huh.

A. And then you go horizontally, you get another voltage drop. So you add up the three voltage drops and that gives you what the reference potential is on the ground electrode bus at A-5. That is a voltage referenced to the ground potential of zero at the ground connection.

Q. Right. So the reference voltage potential on the ground trace is the same for all points on the ground trace, right?

A. No, that's not what I said. I'm saying there is a continuous voltage drop on the ground trace from where the voltage -- where the current is coming in at A-5 and as you move down, as that current passes down the trace, you are getting a voltage drop, otherwise, you wouldn't get a current. This is Ohm's law.

Q. So you are saying if I measure voltage between the active electrode array of the array in A-5 and the point on the ground electrode array of the array in A-5, I am going to get a different

Page 271

measurement than if I measure it between the active electrode array of array A-5 and the ground connection pad on the top of the plate as circled on page 98?

A.    Correct.

Q.    And you define the measuring voltage as the voltage being measured between the electrode -- the active electrode structure and the ground electrode structure of a given array?

MR. GAVIN:   Objection to form.

THE WITNESS:   It is the potential difference between the actuating voltage on the left side of A-5 and the actual voltage on the actual voltage on the ground electrode bus of A-5, and that ground electrode potential on the bus is influenced by the voltage drops through all the ground electrode buses on its vertical path down. It traces across to the horizontal, and it is trajectory back to the ground potential.

BY MS. TARGOWSKA:

Q.    So how is it that potential different than the potential at the ground pad?

A.    It is elevated.   It is elevated because you have resistive losses and you have currents flowing and you thereby have voltage drops.

Page 272

Q.   And the Court's claim construction on page 84 of your rebuttal report talks about application of a measuring voltage, correct?

A.   Yes.   This is the whole process of applying a measuring voltage to the electrode array -- to each electrode array.

Q.   And in the CytoView-Z plates, the points of application of a measuring voltage are on the active electrode bus and the ground electrode bus of a given array as opposed to the pad that leads to a given array and then the ground pad that's coming for the plate?

A.   Yes.

Q.   You do understand your testimony is inconsistent with both Dr. Millard's testimony and your opinions that you've given in this report, right?

A.   That is incorrect.

Q.   You did rely on Dr. Millard's testimony for your understanding of how the accused products work?

A.   I absolutely did, and I've cited it in my reply report.

Q.   Great.   And do you have a reason to believe Dr. Millard's testimony given in this case

Page 273

is inaccurate with respect to how the accused products operate?

MR. GAVIN:  Objection to form.

THE WITNESS:  I don't know how to respond to that.  I take him as being correct.  He's the authority.

BY MS. TARGOWSKA:

Q.  In paragraph 231 of your report only page 97, you opined that the very bottom "a measuring voltage is applied between two points, (see e.g., Millard Deposition Transcript Volume 1 at 135:7-10, 141:12-15); in this case two points are individual connection pad assigned to a particular well on a CytoView-Z 96-well plate and the common ground connection point that is assigned to all 96 wells."

Did I read that correctly?

A.  This is 231?

Q.  Correct.  Are you on page 97?

A.  Okay.

Q.  My question is did I read your opinion correctly?  Let me strike everything above and ask a question that you can answer.

On page 97 of your rebuttal report, Exhibit 2, in paragraph 231 towards the bottom you

Page 274

state a measuring voltage is applied between two points citing to Millard deposition transcript. In this case two points are an individual connection pad assigned to a particular well on the CytoView-Z plate and the common ground connection point that is assigned to all 96 wells.

Did I read that correctly?

MR. GAVIN:   Objection to form.

THE WITNESS:   That's correct but the actual measuring voltage applied across that array -- the actual voltage that appears across the array on which you base your impedence measurements is going to be affected by all the voltage drops that occur on the connection pads.

BY MS. TARGOWSKA:

Q.   All right.  For the record, everything after that is it correct is not responsive to my question which was asking if this is the opinion you rendered.

A.   It is completely consistent.

Q.   There is no question pending.

So when I ask you a question whether the measuring voltage is the voltage across the array between the active electrode bus and the ground electrode bus and you said that the measuring

Veritext Legal Solutions
346-293-7000

REPORTER'S CERTIFICATE

I, Tina Sarcia-Maxwell, a Notary Public in and for the State of North Carolina, do hereby certify that there came before me on May 29, 2025 the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of their knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination reduced to typewriting under my direction, and the transcript is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to nor employed by any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand, this 5th day of June, 2025.


Tina Sarcia-Maxwell, Notary Public

Page 281

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

AGILENT TECHNOLOGIES, INC.,

      Plaintiff,

  vs.

AXION BIOSYSTEMS, INC.,

      Defendant.

)
)
)
)
)
)
)
)
)

C.A. No. 23-198-CJB

## REBUTTAL EXPERT REPORT ON NON-INFRINGEMENT OF AGILENT PATENTS

## BY RICHARD B. FAIR, PH.D.

███████████████████████████████████████████████

217.    In my opinion, Dr. Frazier's analysis of the "electrode array is individually addressed" limitation in claim element a(i) overlooks the Court's explanation of its claim construction, and Agilent's explanations of the "independent of …" language in Agilent's proposed construction that the Court adopted as part of the Court's claim construction for "individually addressed."

218.    The Court's claim construction for "individually addressed" requires, in part, "that an array can be connected to an impedance analyzer in such a way that a measuring voltage can be applied to the electrode array independent of any measuring voltage applied to another electrode array." (Docket No. 156.)  Where application of a measuring voltage to a selected electrode array necessarily energizes other, unselected electrode arrays, that measuring voltage is not applied to the selected array independent of measuring voltage applied to other electrode arrays, and the selected electrode array is therefore <u>not</u> "individually addressed."

219.    Dr. Frazier's analysis focuses on the fact that the application of a particular measuring voltage leads to an impedance measurement for a particular well, and such measuring voltage is not used for impedance measurements of other wells.  (*See* Frazier Volume I.A at ¶¶231, 235-236, 247, 255, 259, 281.)  Dr. Frazier does not address the question of whether the application of a measuring voltage to a selected electrode array necessarily energizes other, unselected electrode arrays on an accused CytoView-Z plate.  Dr. Frazier also does not address the fact that, in use, multiple measuring voltages are applied simultaneously and that the accused CytoView-Z plates use a common ground connection.

---

electrode interaction in the vicinity of the electrode buses No 1 and No 2 for the unselected arrays 1 and 2 may contribute to the impedance measurement for the selected array No 3. … the device does not meet the individually addressable requirement ….").)

88

220.    As I explain further below, each accused CytoView-Z plate includes electrode arrays where the application of a measuring voltage to a selected electrode array results in energizing other, unselected electrode arrays—meaning each electrode array is not "individually addressed" in the accused CytoView-Z plates.  In addition, in use of CytoView-Z plates with a Maestro machine, multiple measuring voltages are applied simultaneously ███████████

███████████████████████████████████████

and such measuring voltages are not independent of one another because of the common ground connection, and this is another reason that each electrode array is not "individually addressed" in the accused CytoView-Z plates.

221.    With respect to Dr. Frazier's allegations that Axion induced third parties to infringe claims 11 and 14 of the '752 patent, I note again that Dr. Frazier does not provide any explanation or cite any evidence that anyone at Axion acted with knowledge that the induced acts would constitute infringement of the '752 patent.  I discuss this further in Section VI.D.1 below.  With respect to Dr. Frazier's allegations that Axion contributed to infringement by others of claim 11 of the '752 patent, I discuss this further in Section VI.D.2 below.

### (b)    CytoView-Z 96-well plates

222.    Before turning to the accused CytoView-Z 96-well plates, I have reproduced below a reference image of a standard 96-well plate configuration that has 8 rows (labeled A-H) and 12 columns (labeled 1-12).  I will use the same labeling/numbering nomenclature shown in this reference image when referring to specific wells in the accused plates (*e.g.*, well A6, well D9, etc.).



(*See*    https://www.sigmaaldrich.com/US/en/technical-documents/technical-article/cell-culture-and-cell-culture-analysis/cell-based-assays/96-well-plate-template (last visited April 23, 2025).) Axion uses this same labeling/numbering as well for its 96-well plates. (*See* Millard Deposition Transcript Vol. I at 124:19-125:21.)

223.    Below, I have reproduced the CytoView-Z 96-Well Plate Drawing that I referenced and explained above (in Section V.B.2(a)).  I have annotated the drawing by adding a white box that encompasses eight wells (wells A5, B5, C5, and D5 on the left, and wells A6, B6, C6, and D6 on the right), as well as horizontal and vertical ground traces that lead to the common ground point—all of which I explain further below.

90



(CytoView-Z 96-Well Plate Drawing (annotated).)

██████████████████████████████████████████████████

224.    In the next image, below, I have cropped the CytoView-Z 96-Well Plate Drawing to include just the area around wells A5, B5, C5, and D5, and labels are added to identify examples of various items.



(CytoView-Z 96-Well Plate Drawing (annotated, partial version).)  For each well shown, (i) an electrical trace extends from a connection pad to the left side of an electrode array (the yellow-orange electrode), and (ii) an electrical trace extends from the right side of the electrode array (the dark orange electrode) down toward a common ground bus that leads to a common ground point

92

██████████████████████████████████████████████████████████

(not shown in the above image) that is the ground for all of the electrode arrays on the 96-well plate. (*See also, e.g.*, Millard Deposition Transcript Vol. I at 126:20-129:20.)

225.    Returning to the full plate and focusing on the area of the CytoView-Z 96-Well Plate Drawing inside the white box (left), below I have reproduced on the right an enlarged image of this area and added white arrows to show the current path when a measuring voltage is applied to electrode array in well A5.



(CytoView-Z 96-Well Plate Drawing (annotated).)

93

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████                    As Axion stated in its

interrogatory responses in this case, ██████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████                    (*See*

Axion's First Supplemental Response to Agilent's Interrogatory Nos. 3, 5-6, 9-11, and 13-15

(February 12, 2025) at page 16.)  During his deposition, Dr. Millard also explained the ground

return path, ███████████████████████████████████████

████████████████████████████████████                    (*See* Millard Deposition

Transcript Vol. I at 125:22-129:20, 145:7-146:12, 150:23-152:12, 154:2-156:8.)  As shown above,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████                    There are four interconnected pads

at the common ground connection point for connecting to a Maestro machine.

226.    In my opinion, because current from the application of a measuring voltage to the electrode array in well A5 is conducted through portions of, and energizes, other electrode arrays ████████████████████████████████████████████ the electrode array in well A5 is <u>not</u> individually addressed under the Court's construction.

227.    The above analysis also applies to other electrode arrays in other wells on a CytoView-Z 96-well plate.  In the above example, if a measuring voltage was applied to the

94

█████████████████████████████████████████████████████████

electrode array in well B5 (████████████████████████████████████████

███████████████████████████████████████████████████████████, if a

measuring voltage was applied to the electrode array in well C6 ██████████████

█████████████████████████████████████████████████████████

████████████████ For each electrode array in a well that is in rows A-C and F-H in a CytoView-Z

96-well plate, the application of a measuring voltage to the electrode array will result in current

that returns to the common ground connection point █████████████████████████

███████████████████████████████ Therefore, the electrode arrays in the wells

in rows A-C and F-H are not "individually addressed" for at least this reason.

228.    I understand that an infringement analysis must compare the claims at issue to the

accused product or method, and not the drawings in the patent to the accused product/method, but

a contrast of Figure 1A of the '752 patent and the accused CytoView-Z 96-well plate is helpful to

further illustrate the points I discussed above.  I understand from the claim construction process

that the parties agreed that Figure 1A of the '752 patent is an embodiment of the "electrode array

is individually addressed" claim term.  (*See* Docket No. 120 at 22-31; *see also* Claim Construction

Hearing Transcript at 124:21-126:2, 129:1-131:6.)

229.    I have reproduced an annotated version of the '752 patent's Figure 1A below.  As

shown in the figure, each electrical trace 103 is connected to a connection pad 104.  ('752 patent

at 19:36-20:5.)  There are four groups of electrode arrays, with four electrode arrays in each group;

each group of four electrode arrays has five connection pads 104—one common connection pad

104 (that is, the ground connection pad) connected to all four electrode arrays and four other

individual connection pads 104 that are each connected to only one electrode array.  (*See id.*)  I

added red arrows in the annotated image to show the current path when a measuring voltage is

95

applied to the electrode array located in the bottom right corner of the multi-well device. It can be seen that current from the measuring voltage applied to the highlighted electrode array is only collected by the ground electrode bus of that one specific electrode array and then is returned toward the common ground connection pad via an electrical trace that does not overlap with the ground electrode buses of any other electrode arrays. And further analysis shows that when a measuring voltage is applied to any one of the 16 electrode arrays in Figure 1A, current from the measuring voltage applied to that electrode array is only collected by the ground electrode bus of that one specific electrode array and then is returned toward the common ground connection pad (for the group of four wells to which that electrode array belongs) via an electrical trace that does not overlap with the ground electrode buses of any other electrode arrays.



Fig. 1A, 752 patent

A    B    C    D    102    101    103    104

('752 patent at Figure 1A (annotated).) Thus, the current path (represented by the red lines) is not conducted through portions of other electrode arrays, in contrast to the current path in CytoView-Z 96-well plates as I discussed above (and as shown in the CytoView-Z 96-Well Plate Drawing below, annotated and rotated 90°).



96

██████████████████████████████████████████████████████████████

(CytoView-Z 96-Well Plate Drawing (annotated, partial version).)

230.    In addition to the above, the electrode arrays in the wells in all rows (rows A-H) of CytoView-Z 96-well plates are also not "individually addressed" because the electrical traces and connection pads are <u>not</u> configured in such a way that a measuring voltage can be applied to the electrode array independent of any measuring voltage applied to another electrode array.

231.    Dr. Daniel Millard testified that, in normal operation of the Maestro machines with a CytoView-Z 96-well plate, measuring voltages are always applied to electrode arrays ██████ ████████ (*See* Millard Deposition Transcript Vol. I at 132:3-7, 142:14-143:11, 164:12-23.)  Dr. Frazier does not directly acknowledge ███████████████████████████████████████, other than perhaps in ¶259 where he references "that a measurement can be taken from more than one well at a time":

> 259.   The fact that a measurement can be taken from more than one well at a time does not change the fact that each measurement is accomplished independent of the remaining measurements within the group of the well being measured at a given time.  The remaining wells within the "group" receive their own measuring voltages applied to their respective connection pads leading to their respective electrode arrays, such that the voltage at each connection can only be used to measure impedance associated with the electrode array to which the connection pad is connected, and not any other electrode array. As a result, each electrode array of the CytoView-Z plates is individually addressed.

(Frazier Volume I.A at ¶259.)  I disagree with Dr. Frazier's conclusions.  That ██████████ ████████████████████████████████████████████████████████ does not mean that the application of each measuring voltage is "independent of" the application of the other ██ ████████████████    A measuring voltage is applied between two points (*see, e.g.*, Millard Deposition Transcript Vol. I at 135:7-10, 141:12-15); in this case, those two points are an

97

individual connection pad assigned to a particular well on a CytoView-Z 96-well plate and the common ground connection point that is assigned to all 96 wells. (*See id.* at 164:12-23, 166:24-167:15.)

232.    When these ▮▮▮▮▮▮▮▮▮▮▮▮ are applied to the electrode arrays ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ the currents associated with all ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ travel to a vertical common ground electrical trace that terminates in the common ground connection that is shared by all 96 wells on the plate. (*See* Millard Deposition Transcript Vol. I at 129:17-20, 130:3-131:11, 164:12-23, 166:24-167:15.)    In the annotated drawing below, I have marked two common horizontal ground electrical traces and the common ground connection by circling them in white, and I have identified the vertical common ground electrical trace (shown in gray) with the yellow arrow.  The vertical common ground trace leads to the common ground connection point at the top of the plate (also circled in white).



98

███████████████████████████████████████████████████████████

(CytoView-Z 96-Well Plate Drawing (annotated).)  As shown in the annotated drawing, the application of ███████████████████████████████████████████ (the example given by Dr. Millard in his testimony) results in currents flowing to the horizontal ground traces, as indicated by the white lines with arrows.  (*See* Millard Deposition Transcript Vol. I at 142:14-143:11, 164:12-23, 163:10-23 (mentioning different order for wells when TrayZ is used).)  From there, currents flow to the vertical ground trace in the center, and then all currents go through the vertical ground trace to the common ground connection point at the top of the plate.  (*See id*. at 142:14-143:11, 164:12-23.)  The signals for the ███████████████ will interfere on the common ground electrical traces leading to the common ground connection point and affect the measurements for █████████.  Dr. Millard referenced these effects.  (*See, e.g.*, Millard Deposition Transcript Vol. I at 166:1-10, 166:24-167:15.)

233.    In normal operation of the CytoView-Z 96-well plates with the Maestro machines, ███████████████████████████ are applied to one side of each of ███████████████ simultaneously.  As a result, the resulting measuring voltages across each electrode array are established with reference to the common ground electrical trace connected to the opposite side of the electrode array in each well.  The resulting measurement currents through ███████████ accumulate in the common ground electrical trace causing a voltage drop to occur along the common ground electrical trace.  The result is that each electrode array's measuring voltage is affected by the measurement currents of ███████████████ as those currents are accumulated on the common ground electrical trace leading to the common ground connection point.  Thus, the measuring voltage applied to a specific electrode array is not "independent of any measuring voltage applied to another electrode array" (under the Court's claim construction) because the measuring voltages are all affected by the voltage drop on the common ground electrical trace, and

███████████████████████████████████████████████████████

measurements for a particular well are affected by the application of the ███████████

█████████████████████████████████████████. Therefore, none of the electrode arrays in the wells of CytoView-Z 96-well plates are "individually addressed" for at least the additional reason that ████████████████████████████ on the common ground electrical trace interfere, causing variation and "noise" in the individual well impedance measurements.

### (c)    CytoView-Z 384-well plates

234.    CytoView-Z 384-well plates are "similar in concept to the design" of CytoView-Z 96-well plates.  (Millard Deposition Transcript Vol. I at 156:7-8.)

235.    Below, I have reproduced the CytoView-Z 384-Well Plate Drawing that I referenced and explained above (in Section V.B.2(b)).  I have annotated the drawing by adding a white box around well A24.



(CytoView-Z 384-Well Plate Drawing (annotated).)

100

236.    During his deposition, Dr. Millard explained the current flow path when a measuring voltage is applied to the electrode array in well A24 in a CytoView-Z 384-well plate. (*See* Millard Deposition Transcript Vol. I at 152:12-156:8.) Below, I have reproduced the top right portion of the CytoView-Z 384-Well Plate Drawing and added white lines to show the current flow path when a measuring voltage is applied to the electrode array in well A24, as described by Dr. Millard in his deposition and that Dr. Millard confirmed in a conversation with me on April 24th.

(CytoView-Z 384-Well Plate Drawing (annotated, partial version).)  As shown, current from the measuring voltage applied to the electrode array in well A24 flows into the right side electrode of the electrode array in the well and then (if conductive media is in the well) into the left side electrode including the electrode bus portion.  (*See* Millard Deposition Transcript Vol. I at 154:22-156:8.)  From there, current flows through ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████  (*See id.*)  As shown, and like the CytoView-Z 96-well plate, there are four interconnected pads at the common ground connection point.

237.    The CytoView-Z 384-well plate also has a second common ground connection point at the bottom of the plate, ███████████████████████████████

101





(CytoView-Z 384-Well Plate Drawing (annotated).)

238.    In my conversation with Dr. Millard, he explained to me that, in normal operation of the CytoView-Z 384-well plates with the Maestro ZHT and Pro machines, ████████ ██████████████████████████████ to electrode arrays ████████. As Dr. Frazier noted in his reports, the Maestro ZHT and Maestro Pro machines (the only two machines compatible with CytoView-Z 384-well plates) ████████████████████. (*See* Frazier Volume I.A at ¶319.) The wells of the CytoView-Z 384-well plate include ████████████████████████ ████████████████████████ Below is an annotated version of the CytoView-Z 384-Well Plate Drawing with rectangles ████████████████████████████ ████████████████ based on my conversation with Dr. Millard.  For the top left group

102

████████████████████████████████████████████████████████

for example, Dr. Millard also explained ████████████████████████████████

██████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████

(Cytoview-Z 384-Well Plate Drawing (annotated).)  As Dr. Millard explained, ████████

████████████████████████████████████████ and is not changeable by the user.

239.    As Dr. Millard explained to me, when ██████████████████████████

█████████  ████████████████████████████████████████████████

████████    Below is an annotated version of the CytoView-Z 384-Well Plate Drawing ████████

████████████████████████████████████████████████████████

████████    based on my conversation with Dr. Millard.

103





(Cytoview-Z 384-Well Plate Drawing (annotated).)   As shown, ███████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████ It is the case that multiple measuring voltages applied simultaneously share at least the common vertical ground electrical trace, given the configuration of the CytoView-Z 384-well plate and similar to what I discussed above for CytoView-Z 96-well plates.  When these multiple measuring voltages are applied simultaneously, also similar to what I discussed above for CytoView-Z 96-well plates, the signals ██████████ ████████████████████████████████████████ will interfere at least on the common vertical ground electrical trace and affect the measurements ████████████ .

240.    For these reasons, the measuring voltage applied to a specific electrode array is not "independent of any measuring voltage applied to another electrode array" (under the Court's

██████████████████████████████████████████████████████████

claim construction) because the measuring voltages are all affected by the voltage drop on the common ground electrical traces, and measurements for a particular well are affected by █

██████████████████████████████████████████████████████████

Therefore, none of the electrode arrays in the wells of CytoView-Z 384-well plates are "individually addressed" for this reason.

### 3. Dependent claims 12, 15-18, and 20 have not been infringed.

241. As noted above, it is my understanding that if an independent claim is not infringed, then none of the claims that depend from that independent claim can be infringed.

242. Because Dr. Frazier has not shown that either of claims 11 and 14 has been infringed, Dr. Frazier has also failed to show any infringement of dependent claims 12, 15-18, and 20 for at least this reason.

243. With respect to Dr. Frazier's allegations that Axion induced third parties to infringe dependent claims 12, 15-18, and 20 of the '752 patent, I note again that Dr. Frazier does not provide any explanation or cite any evidence that anyone at Axion acted with knowledge that the induced acts would constitute infringement of the '752 patent. I discuss this further in Section VI.D.1 below.

244. With respect to Dr. Frazier's allegations that Axion contributed to infringement by others of dependent claim 12 of the '752 patent, I discuss this further in Section VI.D.2 below.

### 4. Dr. Frazier does not show that Axion or any user of Axion's products "calculat[ed] a cell index" as recited in dependent claims 18 and 20.

245. Below, I address additional reasons why Dr. Frazier has failed to show infringement of dependent claims 18 and 20.

## VIII.    RESERVATION OF RIGHTS

385.    My opinions are based upon the information that I have considered to date.    I reserve the right to supplement or amend my opinions in response to opinions expressed by plaintiff's expert(s), any further claim construction by the Court, or in light of any additional evidence, testimony, or other information that may be provided to me, or that I am asked to consider, after the date of this report, including at trial.    In addition, I expect that I may be asked to testify regarding my opinions contained herein as well as related matters including those raised on cross-examination, those necessary to address matters raised by plaintiff's witnesses who testify concerning technical issues, or those otherwise raised at trial by plaintiff's attorneys or the Court in relation to matters set forth in this report.

## IX.    CONCLUSION

386.    I declare under penalty of perjury that all statements made in this declaration of my own knowledge are true and that all statements made on information and belief are believed to be true.

Executed on April 15, 2025.

Richard B. Fair, Ph.D.

154

**Axion's Response to Agilent's Motion *in Limine #1***

**Axion's Response to Agilent's MIL #1 to Exclude Certain Testimony by Axion's Expert, Dr. Fair**

Agilent's MIL#1 is directed to the same issues that Agilent has already separately raised with the Court in two other pending motions: (1) Agilent's December 11 motion to strike (*see* D.I. 464 (motion), D.I. 465 (brief)); and (2) Agilent's July 10 *Daubert* motion #1 regarding Dr. Fair's non-infringement opinions related to the "individually addressed" claim limitation in the '080 and '752 patent claims (*see* D.I. 362 (motion), D.I. 371 (brief) at 35-4). (*See* Agilent's MIL #1 at 2 n.1, at 3 n.2.) Both the motion to strike and the *Daubert* motion have been fully briefed, and the Court will, of course, address Agilent's already-pending motions in due course. The Court does not need to entertain duplicative arguments and should thus deny Agilent's MIL #1 as moot in view of those already-pending motions. *See, e.g.*, *Roland Corp. v. inMusic Brands, Inc.*, No. 17-CV-22405, 2022 WL 22907227, at *4 (S.D. Fla. Aug. 16, 2022) ("In other words, Plaintiff's Fourth Motion in Limine is entirely duplicative of the arguments raised in its *Daubert* motion to exclude Dr. Kytomaa. It is DENIED on that basis.").

Further, the Court should deny Agilent's MIL #1 on substance as well. For the reasons Axion has previously explained in full, Agilent's motion to strike should be denied (*see* D.I. 467), and Agilent's *Daubert* #1 should also be denied (*see* D.I. 395 at 32-39).

*Dr. Fair's Reply Report and Deposition Testimony Are Not Untimely or Improper*

The cases Agilent cites again in its MIL #1 (at 2) related to Dr. Fair's reply report are inapposite for the reasons Axion explained in its opposition to Agilent's motion to strike. (*See* D.I. 467 at 1-3.) Those cases do not support striking Dr. Fair's reply report or his deposition testimony simply because the opinions of Agilent's rebuttal expert were stricken as untimely. (*See id.* at 2-4.) The elaborations and opinions in Dr. Fair's reply report were timely and proper under the circumstances in this case. (*See id.* at 3-5.)

Agilent, in its footnote 1, also makes clear that it wants to exclude Dr. Fair from offering *any* testimony at trial that elaborates or further explains the opinions in his opening report. (Agilent's MIL #1 at 2 n.2.) The Court should reject Agilent's overreach here. *See, e.g.*, *Laboratory Skin Care, Inc. v. Limited Brands, Inc.*, No. 06-601-LPS, 2011 WL 4005444, *8 (D. Del. Sept. 8, 2011) ("When testifying at trial, however, expert witnesses are allowed to elaborate on the opinions set out in their expert reports; this elaboration is not improper evidence.") (citing *Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.*, 237 F.R.D. 106, 113 (D. Del. 2006)); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 581 (D. Del. 2008) ("In determining whether an expert's testimony has exceeded the scope of his or her report, the Court has not required verbatim consistency with the report, but has allowed testimony which is consistent with the report and is a reasonable synthesis and/or elaboration of the opinions contained in the expert's report.")

*Dr. Fair's Non-Infringement Opinions on the "Individually Addressed" Limitation Apply the Court's Claim Construction to the Products at Issue*

As Axion explained in its opposition to Agilent's July 10 *Daubert* motion #1, Dr. Fair's noninfringement opinions reflect his application of the Court's construction to the facts of this case.

1

(*See* D.I. 395 at 32-39.)  Dr. Fair's opinions do not advance a construction the Court rejected, nor do they attempt to add a limitation to the Court's construction.  (*See id.*)

In short, Dr. Fair's opinions are appropriate expert testimony.  *See, e.g.*, *Cirba Inc. v. VMware, Inc.*, No. CV 19-742-GBW, 2023 WL 3151853, at *8 (D. Del. Apr. 18, 2023) (denying motion to exclude and finding that disagreement with the expert's application of the construction went to weight, not admissibility) (citing *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 109 (D. Del. 2016) ("Expert testimony regarding whether an accused device falls within the scope of a court's claim construction is appropriate and raises a factual issue for the jury to resolve.")); *see also Wasica Finance GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 459 (D. Del. 2020) (denying motion to exclude non-infringement opinions for allegedly contradicting court's construction as the "[movant's] concerns can be addressed through cross-examination and the presentation of competing evidence at trial."); *Corning Inc. v. SRU Biosystems*, No. CIV.A. 03-633 JJF, 2005 WL 2465900, at *2 (D. Del. Oct. 5, 2005) (denying plaintiff's MIL because "Dr. Buckman's supplemental expert report applies the Court's claim construction, and Corning had ample opportunity at trial to cross-examine Dr. Buckman on his opinions to the extent that they departed from the Court's claim construction.").

**Agilent's Reply in Support of Motion *in Limine #1***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AGILENT TECHNOLOGIES, INC.,                    )
                                               )
                    Plaintiff,                 )
                                               )
        v.                                     )  C.A. No. 23-198 (CJB)
                                               )
AXION BIOSYSTEMS, INC.,                        )
                                               )
                    Defendant.                 )


**PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION *IN LIMINE* #1 TO EXCLUDE CERTAIN TESTIMONY BY AXION'S EXPERT, DR. FAIR**

<u>Agilent's Arguments are not Duplicative.</u> Dr. Fair's opinions are not only improper, irrelevant, and unsupported, they are also highly prejudicial, which is the crux of Agilent's motion *in limine* ("MIL#1"). Axion's argument that MIL#1 is duplicative of prior motions is unsupported because the prior motions do not concern prejudice under Rule 403. Even if the Court finds that Dr. Fair's opinions withstand Agilent's *Daubert* challenge, the opinions can still be excluded under a motion *in limine*. Indeed, because this is a jury trial, issues of prejudice under Rule 403 are paramount. *See, e.g., ICU Med., Inc. v. Rymed Techs, Inc.*, 752 F. Supp. 2d 486, 496 (D. Del. Nov. 23, 2010) (excluding an expert's opinion on FRE 403 grounds even though the Court found that the expert satisfied the *Daubert* factors). Similarly, even if the Court were to strike Dr. Fair's opinions, as Agilent has separately requested, Axion should be precluded from introducing these opinions in any form, including by attempting to couch them as explanations of the opinions provided in Dr. Fair's opening report. Axion's Br. at 1. They are not and, if introduced, would result in prejudice.

<u>Dr. Fair's Opinions in Response to Stricken Opinions.</u> Agilent seeks to exclude opinions that respond to the stricken opinions of another expert. Axion improperly intends to repackage them as a further explanation of Dr. Fair's opinions in his opening report. In other words, in Axion's view, even if Dr. Fair's opinions are stricken on a procedural basis under a motion to strike, they are still proper because they allegedly explain Dr. Fair's prior opinions. Axion's Br. at 1. They do not. This does not mean that Agilent is trying to "exclude Dr. Fair from offering *any* testimony that elaborates on the opinions in his opening report." Axion's Br. at 1 (emphasis in original). But, to be clear, rendering opinions that rely on a different part of a reference as meeting a functional claim limitation not previously addressed is rendering a new opinion, and is not elaborating upon a prior opinion. *Conceptus, Inc. v. Hologic, Inc.*, 2011 U.S. Dist. LEXIS 109968, at *6-9 (N.D. Cal. Sept. 27, 2011) (excluding expert's reply opinions that added new material to the opening report opinions). Similarly, relying on a new combination of references is a new opinion and not an explanation of an original opinion that relied on a single reference or a different combination of references. *Id*. at *4, *10 (limiting expert on direct to "the specific combinations of references laid out in [the expert's] opening report"). Axion's response is tellingly devoid of any explanation why introduction of such opinions would not result in prejudice, especially in view of the fact that they no longer respond to Dr. Frazier's opinions, which are no longer in the case.

<u>Dr. Fair's Opinions on "Individually Addressed" Element.</u> Dr. Fair advances opinions that were rejected during claim construction. *See* MIL#1 at 3. This is improper. *See e.g.*, *France Telecom S.A. v. Marvell Semiconductor Inc.*, 2014 WL 4272771, at *3-4 (N.D. Cal. Aug. 28, 2014) (granting MIL because, *inter alia*, expert advanced a claim construction that was rejected by the Court). Axion attempts to twist the facts by arguing that Dr. Fair's opinions simply ***apply*** the Court's construction to the products. But the question is ***what*** construction Dr. Fair applies. Here, Dr. Fair ***first explains what he thinks the construction is***, which improperly redoes the Court's claim construction, and ***then*** applies his implausible version of the construction to the products. Dr. Fair's application is not, as Axion suggests, a matter of the weight of the evidence. Any opinions that apply the ***wrong*** construction are improper and demand exclusion as prejudicial and causing jury confusion. Axion cites *Cirba*, *Wasica*, and *Corning*, none of which address the issue of applying the ***wrong*** construction. Instead, they all note in the very quotes reproduced by Axion that, unlike here, the experts in those cases were applying the Court's construction.

Agilent respectfully asks that the Court grant Agilent's MIL#1.

1

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Travis J. Murray*

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

January 6, 2026

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

2

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2026, copies of the foregoing were caused to be served upon the following in the manner indicated:

| | |
|---|---|
| John G. Day, Esquire<br>Andrew C. Mayo, Esquire<br>ASHBY & GEDDES<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE  19899<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| David M. Maiorana, Esquire<br>JONES DAY<br>901 Lakeside Avenue<br>Cleveland, OH  44114<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Ryan K. Walsh, Esquire<br>Geoffrey K. Gavin, Esquire<br>Laura M. Kanouse, Esquire<br>Rachel Krutz, Esquire<br>JONES DAY<br>1221 Peachtree Street, N.E., Suite 400<br>Atlanta, GA  30361<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Anna E. Raimer, Esquire<br>JONES DAY<br>717 Texas Street, Suite 3300<br>Houston, TX  77002-2712<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |
| Collin J. Kurtenbach, Esquire<br>JONES DAY<br>110 North Wacker Drive, Suite 4800<br>Chicago, IL  60606<br>*Attorneys for Defendant Axion Biosystems, Inc.* | *VIA ELECTRONIC MAIL* |

*/s/ Travis J. Murray*

_____

Travis J. Murray (#6882)

**Agilent's Motion *in Limine #2***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 23-198 (CJB) |
| | ) | |
| AXION BIOSYSTEMS, INC., | ) | ███████████ |
| | ) | ███████████ |
| Defendant. | ) | |

## PLAINTIFF'S MOTION *IN LIMINE* #2 TO EXCLUDE
## IMPROPER TESTIMONY BY AXION'S NON-RETAINED EXPERT, DR. MILLARD

<table>
<tr><td></td><td>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>Brian P. Egan (#6227)<br>Travis J. Murray (#6882)</td></tr>
<tr><td>OF COUNSEL:</td><td>1201 North Market Street<br>P.O. Box 1347</td></tr>
<tr><td>Peter J. Chassman<br>Michael J. Forbes<br>Hallie H. Wimberly<br>REED SMITH LLP<br>1221 McKinney Street, Suite 2100<br>Houston, TX  77010<br>(713) 469-3800</td><td>Wilmington, DE  19899-1347<br>(302) 658-9200<br>began@morrisnichols.com<br>tmurray@morrisnichols.com<br><br>*Attorneys for Plaintiff Agilent Technologies, Inc.*</td></tr>
</table>

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 16, 2025

Plaintiff, Agilent Technologies, Inc. ("Agilent"), respectfully moves *in limine* to bar Defendant, Axion Biosystems, Inc. ("Axion"), from soliciting testimony by its hybrid witness, Dr. Daniel Millard, in his capacity as an expert, that exceeds his Fed. R. Civ. P. 26(a)(2)(C) disclosure ("the Millard Disclosure") or deposition testimony, as prejudicial to Agilent under Federal Rule of Evidence 403. Specifically, when it comes to the subject matter areas identified below, Dr. Millard should be limited to the specific examples identified in his Rule 26 disclosure and those he identified during his deposition.

Axion designated Dr. Daniel Millard, its VP of Research & Development, as a non-reporting testifying expert under Rule 26(a)(2)(C) to provide expert testimony on a broad range of subjects, including the use of indirect measurements in cell analysis, using impedance to monitor cellular activity, cell culture models, other technologies to monitor cellular technology, design of Axion's electrodes on CytoView-Z plates, Axion's spheroid application note, statements on Axion's website regarding capabilities to monitor spheroids using impedance, Axion's cancer spheroids for the Maestro Z cell culture protocol, third party use of Axion's CytoView-Z plates to monitor spheroids, and third party use of impedance to monitor spheroids. Exhibit A (the "Millard Disclosure").

Agilent deposed Dr. Millard as an expert on June 6, 2025, seeking details of his intended trial testimony on these broad categories. Dr. Millard was able to provide no or limited details on some topics, and Agilent seeks to limit his testimony to the examples and details provided in his deposition. For example, Paragraph 8 of the Millard Disclosure states that scientists rely on "indirect measurements" to understand things like "cell analysis." When asked to clarify what "principles of indirect measurements in cell analysis do[es he] intend to provide testimony at trial," Exhibit B (excerpts of Dr. Millard's June 6, 2025, Deposition Transcript ("Millard Tr.") at 51:25-

52:2, Dr. Millard identified seven examples of cell analysis that are not "directly" measured by impedance: cell proliferation, Millard Tr. at 53:7–10; cell death / cytolysis, Millard Tr. at 54:5; cell swelling, Millard Tr. at 54:5–7; the activation of cells via GPCRs for cell signaling, Millard Tr. at 54:9-10; the use of impedance to measure the barrier properties of an endothelial or epithelial cell layer, Millard Tr. at 54:10-12; cell motion, Millard Tr. at 54:12; and cell motility as it relates to scratch assays, Millard Tr. at 54:12-13. Counsel for Agilent asked, "Are there any other examples that you're aware of sitting here today?" and Dr. Millard replied "No, I don't – I don't consider that an exhaustive list, but it's the ones that come to mind off the top of my head." Millard Tr. at 54:19-23.

Dr. Millard gave the same types of non-committal testimony throughout his deposition on a number of topics from the Millard Disclosure, leaving the door open to the possibility that he may provide more examples at trial. Specifically, Dr. Millard's testimony should be limited to the examples identified in his Disclosure and in his deposition as follows (in addition to the above example): paragraph 8 limited by his testimony at 50:9-17, 51:16-20; paragraph 10 limited by the examples in paragraph 27 of the Millard Disclosure and his testimony at 55:19-23, 57:13-15, 58:1-3, 58:13-15, 58:16-17, 60:17-20, 61:1-6; paragraph 16 limited by his testimony at 67:25-68:19; paragraphs 32-33 limited by the examples in paragraphs 12, 32, and 33 and his testimony at 121:14-19, 122:15-17; paragraph 36 limited by his testimony at 126:7-10; paragraph 38 limited by his testimony at 127:18-128:8; paragraph 56 limited by his testimony at 160:4-14; paragraph 83 limited by the examples in paragraphs 67-84 and his testimony at 113:8-15, 115:1-2, 115:9-10. A chart of the subject matter and limitations of Dr. Millard's testimony is attached hereto as Exhibit C.

2

A party designating a non-reporting expert witness must disclose the subject matter and a summary of the facts and opinions on which the witness is expected to testify. Fed. R. Civ. P. 26(a)(2)(C). The advisory notes explain that the Rule "mandate[s] summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports … and of the facts supporting those opinions." Rule 26 Advisory Committee Notes, 2010 Amendment, Subdivision (a)(2)(C). Failure to comply with Rule 26(a)(2) precludes a party from using, at trial, expert testimony that was not timely or fully disclosed. *Eli Lilly & Co. v. Actavis Elizabeth LLC*, No. 07-3770 (DMC), 2010 WL 1849913, at *4 (D.N.J. May 7, 2010); *see also Liquid Dynamics Corp. v. Vaughan Co.*, No. 01 C 6934, 2004 WL 2260626, at *2 (N.D. Ill. Sep. 30, 2004) (granting motion *in limine* to exclude evidence or testimony beyond Rule 26 disclosure).

Axion had the opportunity to disclose the facts and opinions to which Dr. Millard would testify, and Dr. Millard had the opportunity to clarify those facts and opinions at his deposition. Accordingly, Dr. Millard's expert trial testimony should be limited to the facts and opinions set forth in Axion's Rule 26(a)(2)(C) disclosures, as clarified at his deposition. To allow Dr. Millard to testify beyond that would violate Rule 26 and unfairly prejudice Agilent because Agilent would not have had the opportunity to pressure test Dr. Millard on the full scope of his trial testimony. Agilent should not suffer surprise at trial, if Dr. Millard were to think up additional examples to support his opinions that he was not able to provide at his deposition.

For the foregoing reasons, the Court should so limit Dr. Millard's testimony at trial.

3

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800


Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

December 16, 2025

4

## RULE 7.1.1 CERTIFICATE

I hereby certify that the subject of the foregoing motion has been discussed with counsel for the defendant and that the parties have not been able to reach agreement.

*/s/ Brian P. Egan*

Brian P. Egan (#6227)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AGILENT TECHNOLOGIES, INC.,               )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )  C.A. No. 23-198 (CJB)
                                          )
AXION BIOSYSTEMS, INC.,                   )
                                          )
                    Defendant.            )

**[PROPOSED] ORDER ON PLAINTIFF'S MOTION *IN LIMINE* #2 TO EXCLUDE IMPROPER TESTIMONY BY AXION'S NON-RETAINED EXPERT, DR. MILLARD**

The Court, having considered Agilent's Motion *in Limine* #2 to Exclude Improper Testimony by Axion's Non-Retained Expert, Dr. Millard and all papers filed in connection therewith,

IT IS HEREBY ORDERED that Agilent's motion is GRANTED.


**SO ORDERED** this _____ day of _____, 2025.


_____
United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2025, copies of the foregoing were caused to be

served upon the following in the manner indicated:

John G. Day, Esquire                                   *VIA ELECTRONIC MAIL*
Andrew C. Mayo, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
*Attorneys for Defendant Axion Biosystems, Inc.*

David M. Maiorana, Esquire                             *VIA ELECTRONIC MAIL*
JONES DAY
901 Lakeside Avenue
Cleveland, OH  44114
*Attorneys for Defendant Axion Biosystems, Inc.*

Ryan K. Walsh, Esquire                                 *VIA ELECTRONIC MAIL*
Geoffrey K. Gavin, Esquire
Laura M. Kanouse, Esquire
Rachel Krutz, Esquire
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA  30361
*Attorneys for Defendant Axion Biosystems, Inc.*

Anna E. Raimer, Esquire                                *VIA ELECTRONIC MAIL*
JONES DAY
717 Texas Street, Suite 3300
Houston, TX  77002-2712
*Attorneys for Defendant Axion Biosystems, Inc.*

Collin J. Kurtenbach, Esquire                          *VIA ELECTRONIC MAIL*
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL  60606
*Attorneys for Defendant Axion Biosystems, Inc.*


*/s/ Brian P. Egan*

Brian P. Egan (#6227)

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AGILENT TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 23-198-CJB |
| v. | ) ) | |
| AXION BIOSYSTEMS, INC., | ) ) | |
| Defendant. | ) ) ) | |

## AXION BIOSYSTEMS, INC'S RULE 26(a)(2)(C) DISCLOSURES

In accordance with Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure and the Court's Scheduling Order as amended (D.I. 29, D.I. 188, D.I. 307), Defendant Axion BioSystems, Inc. ("Axion") makes the following disclosures regarding the subject matter on which Daniel C. Millard, Ph.D. is expected to present evidence, along with a summary of the facts and opinions to which he is expected to testify:

1.      Daniel C. Millard, Ph.D. is Vice President of Research and Development for Axion, which is the Defendant in the above-captioned matter.  He has held that position since July 2023. Prior to this role, Dr. Millard was Director of Applications at Axion from November 2017 to July 2023.  Prior to this role, Dr. Millard was Manager of Applications Development at Axion from January 2014 to November 2017.

2.      Dr. Millard obtained a Bachelor of Science degree in Applied Science with a concentration in Biomedical Engineering from the University of North Carolina at Chapel Hill in May 2008.  Dr. Millard then obtained his doctoral degree in Biomedical Engineering from the Georgia Institute of Technology in December 2013.

3.      Dr. Millard will offer opinions in this case based on his more than 10 years of experience in the bioelectronics industry.  Dr. Millard has worked with bioelectronics and specifically with planar electrodes since January 2014.  During his tenure at Axion, he has developed substantial knowledge of electrode design, impedance, and the various applications where Axion's Maestro products can be utilized.

4.      As the Manager of the Applications team, Dr. Millard was responsible for the development of new applications using Axion's Maestro products.  In this capacity, Dr. Millard contributed to the development of new products and product features, including leading the project for adding impedance measurement capabilities to the Maestro Pro and Edge products and the development of the Maestro Z and ZHT products.

5.      Dr. Millard was also responsible for the internal scientific studies performed at Axion using the Maestro products, including scientific literature review, experiment design, data collection, data analysis, and scientific writing.  The scientific results and conclusions of these studies were published as Application Notes on the Axion website or in peer-reviewed scientific journals.  The scientific results and conclusions were also presented at numerous scientific conferences.

6.      Dr. Millard is an author on Axion's Application Note entitled "CAR T Cell Potency Assessment with 3D Cancer Spheroid Model" that was published in July 2022 (hereafter, the "Spheroid Application Note") and is at issue in Agilent's false advertising claim.

7.      The opinions Dr. Millard may offer regarding these topics if called to testify at trial, and the facts supporting those opinions, are summarized below.

**The Use of Indirect Measurements in Cell Analysis**

8.      The scientific community heavily relies on indirect measurements to understand the world, especially aspects that cannot easily be directly measured.  As an example, smart

2

watches are widely used to measure a user's heart rate, but the smart watch does not directly measure the mechanical beating of the heart.  Instead, the smart watch uses optical techniques to measure blood flow that is then correlated to the user's heart rate.  As another example, water displacement—a 1D change—is frequently used to determine volume of irregularly shaped objects.  As the object is submerged in the water, the change in height of the water is measured, which then provides information about 3D properties (e.g., volume) of the object.  These principles of indirect measurements apply in other areas of science, such as cell analysis.

9.      Cell analysis is the study of cells, which can include live cells or dead cells.  Cell analysis techniques are used to study cells to understand cell behavior, functions, and responses under various conditions.

10.      In order to correlate an indirect measurement to a characteristic that is being studied, many scientists use models.  Models do not provide an exact replica of a system being studied, but only provide a simplified version that allows detailed study of key aspects of a phenomenon.  In cell analysis, cell culture models do not represent the full complexity of a living organism, but offer significant advantages in cost, time, and details compared to performing *in vivo* studies.  Scientists must validate their models and communicate their assumptions and results to the scientific community so others may understand and replicate the experiments.

11.      The goal of cell analysis is to study cells *ex vivo* to allow scientists to study important aspects of cells that can then predict *in vivo* outcomes.  To study cells *ex vivo*, scientists culture the cells in labs and then use a multitude of technologies and experiments to study cells under various conditions.  By working with cell cultures, scientists are provided greater access to various biology and conditions for laboratory measurements than would be possible in human subjects.

3

12.      There are various techniques used in cell analysis, which include flow cytometry, microplate readers, and cell imaging.

**Using Impedance to Monitor Cellular Activity**

13.      One type of assay used to analyze cells relies on impedance technology to study live cells. Impedance is an assay technology amenable to live cell analysis because the impedance measurement provides an indirect and non-destructive assessment of the cells.

14.      Generally, impedance is the opposition to an alternating current presented by the combined effect of resistance and reactance in a circuit.

15.      With impedance-based cell analysis, cells are plated in wells of a multi-well plate that contains electrodes at the bottom of the wells. A stimulating signal is applied to the electrodes so that a voltage can be measured and converted into impedance values that can be recorded and analyzed.

16.      The stimulating signal applied to the electrodes creates an electrical field within the well. The electrical field is strongest toward the bottom of the well and weakens as it extends toward the top of the well. The depth that the electrical field extends into the well is directly dependent upon the spacing of the electrodes in the well.

17.      When cells are plated in the wells, the cells impede the flow of the current from the stimulating signal. The amount of change in impedance to the current (*i.e.*, how much the cells impede the current) can be correlated to a specific characteristic of the cells that is the subject of the experiment.

18.      An impedance measurement for a given well at a single time point provides very little useful information about the cells being studied. Rather, impedance measurements are useful because one can track changes in impedance over time with high precision and high sensitivity.

4

19.    In all scenarios, an impedance measurement for a given well is reflective of the entire contents of the well.  For example, any media that is contained in the well and also the electrodes themselves contribute to an impedance measurement for the well.

20.    Impedance measurements can only be interpreted through the careful use of experimental design and experimental controls.

21.    To account for contributions of the media and the electrodes to impedance measurements, scientists may use a media-only baseline that operates as a reference measurement against which later impedance measurements may be compared.

22.    For example, to determine a change in impedance due to the cells added to a well and any subsequent changes to such cells, an impedance measurement recorded for a media-only control well may be subtracted from impedance measurements recorded over time from the same well after the addition of cells (*i.e.*, wells with cells and media).  Further, a separate media-only control well, which receives only media and no cells for the duration of the experiment, can be subtracted from test wells.  Generally, live cell assays using impedance measurements are made under the assumption that the impedance of the media and the electrodes, as well as any electrical traces and contact pads that form part of the circuit to which the stimulating signal is applied, do not change appreciably over time.  Thus, after cells have been added to a well, the impedance changes measured over time for that well against a baseline measurement and media-only control well represent the impedance contribution of the cells alone.

23.    In one scenario, where there is an increase in impedance over time, this increase may be caused by (i) cells attaching to the surface and spreading out, (ii) cells dividing and increasing the total number of cells in the well, and/or (iii) cell swelling induced by a cytotoxic drug added to the well.  To support the scientific conclusion that the scientist intends to draw, the

5

scientist will need to use additional experimental controls to correlate the increase or decrease in impedance to any one of those causes.

24.     Any change in impedance from the cells is not an intrinsic property of the cells themselves.  Changes in impedance of a well containing cells can be used to reach conclusions regarding cell characteristics, such as cell proliferation, cell cytolysis, or cell death.  But impedance can only be used to reach these scientific conclusions through careful experimental designs.

**Cell Culture Models**

25.     When cells are cultured for use in cell-based assays, they can be cultured in various forms, such as a monolayer or as a spheroid.

26.     A cell monolayer, typically all of the same cell line, refers to when the cells grow in a single layer where no cell is growing on top of another cell, but instead all cells are growing side by side.

27.     A cell spheroid, typically all of the same cell line, refers to when the cells grow in a three-dimensional (3D) cell aggregate—similar to a ball.  Certain cell lines produce better spheroids than others because they are able to maintain a tighter aggregate.

28.     In recent years, the use of spheroids in cell analysis studies has increased, especially in the oncology and immuno-oncology areas, because spheroids more closely resemble *in vivo* aggregates of tumor cells and can better model *in vivo* tissue environments.

29.     *In vivo*, tumors (*e.g.*, 3D structures) create a unique tumor microenvironment that creates an array of obstacles for existing therapies, including a physical barrier that slows or blocks the penetration of therapies into the core of a tumor, or enhanced cellular resistance due to the altered gene and protein expression driven by hypoxic conditions.  These obstacles are the subject of intense scientific investigation related to the design of cancer therapies.

30.    To better model the complexities of solid tumors, scientists have developed a variety of 3D cell culture models, including 3D cancer spheroids. These 3D cell culture models report differences in gene and protein expression that change drug efficacy, metabolism, and cell communication compared to 2D cultures (*i.e.*, monolayers).

31.    Dr. Millard is not aware of scientific evidence that 3D cancer spheroids naturally exfoliate cells once they are attached to a planar surface.

**Other Technologies to Monitor Cellular Activity**

32.    In addition to impedance, there are other cell analysis technologies that capitalize on the direct access to the biology afforded by cell culture models. For example, immunostaining is a ubiquitous technique whereby antibodies are used to label and visualize proteins within cells and tissues. With 3D cell culture models, like spheroids, the biology is processed to create thin slices for immunostaining and imaging. Each 2D slice provides important information about protein expression of the 3D spheroid model, even if only a subset of the model is imaged and studied. These detailed analyses allow scientific conclusions that extrapolate to the *in vivo* tissues being modeled.

33.    When the phenomenon of interest must be studied in live cells, brightfield imaging may be used to characterize a 3D cell culture model without disrupting the integrity of the biology. With brightfield imaging, light illuminates the sample, and a camera captures an image of the biology. Typically, a 3D cancer spheroid model is too dense for the light to fully penetrate the tissue. Instead, imaging captures a 2D cross-sectional area of the spheroid. Although the 2D image cannot be used to reconstruct the full 3D shape of the cancer spheroid model, the image is used to estimate the diameter of the spheroid and track changes in the spheroid that develop over time.

**Design of Axion's Electrodes on CytoView-Z Plates**

34.     Axion's CytoView-Z multi-well plates may be used with Axion's AxIS Z software and a compatible Axion Maestro machine to conduct impedance-based cell analysis assays. Axion's CytoView-Z plates are available in either a 96- or 384-well format.  Axion's CytoView-Z plates utilize interdigitated electrode arrays that are in the bottom of each well of the plate.

35.     Axion first commercially released its CytoView-Z plates in or around January 2020.

36.     Axion published the Spheroid Application Note in July 2022, after months of internal testing and validation of the reported results and conclusions.  These validations include verifying results with spheroid imaging data and comparing results to monolayer controls.

37.     Axion's impedance products are highly sensitive to changes in impedance. Axion's impedance instruments utilize a media-only reference measurement and then monitor changes in impedance of the wells.  Axion's impedance instruments subtract the reference measurement from the recorded impedance measurement, ensuring the change in impedance is caused by the addition, attachment, spreading, or proliferation of the cells in the well.  Axion's ability to detect changes in impedance can be further enhanced via additional experiment controls, averaging across multiple consecutive measurements, or averaging across multiple biological replicates.  In this way, Axion can detect changes in impedance even when only a small fraction of the bottom of the well is covered.

38.     In addition, an electrode's sensitivity to measure changes in impedance due to spheroids is related to multiple design choices, including the spacing between the electrodes. Axion believes Axion's CytoView-Z plates are more sensitive to changes in impedance due to spheroids, as compared to Agilent's E-plates, because Axion's electrodes have a larger spacing

8

between the alternating interdigitated elements of the electrode pair in the bottom of the well and this allows the electrical field to penetrate farther into the well.

39.     The electrical field does not need to fully cover a spheroid in order for Axion's impedance instruments to monitor changes in impedance due to changes in the spheroid.  This is similar to brightfield imaging, in which a series of 2D images can track changes in a spheroid model even though only a portion of the spheroid is imaged.

**Axion's Spheroid Application Note**

40.     The Spheroid Application Note reports scientific observations and conclusions from a variety of rigorous experiments that involve reliably measuring changes in impedance measurements for the whole well after a spheroid was added to the well.  AXION-0267153-AXION-0267158.  The Spheroid Application Note provides sufficient information for the relevant audience to determine how Axion reached these conclusions.  Axion does not report the absolute impedance of a spheroid in the Spheroid Application Note (or any of its other material related to monitoring spheroids using impedance).

41.     The Spheroid Application Note explains Axion's materials and methods, results, and conclusions.  The information provided in the Spheroid Application Note allows a reader from the intended audience to understand and replicate Axion's experiment using Axion's CytoView-Z 96-well or 384-well plate, a compatible Maestro machine, and AxIS Z software.

42.     As described in the materials and method section of the Spheroid Application Note, Axion obtained the data using (i) Axion's Maestro ZHT machine with CytoView-Z 96-well and 384-well plates, (ii) SKOV3 cells obtained from ATCC, (iii) fibronectin for coating from Gibco, (iv) CAR T cells targeting HER2 from ProMAB Biotechnologies, and (v) CAR T media also from ProMAB Biotechnologies.

9

43.    The SKOV3 cancer cells were cultured in an ultra-low attachment U-bottom plate to support formation of the spheroid, as shown in Figure 1 of the Spheroid Application Note. Four cell densities were tested—1,000 cells, 5,000 cells, 10,000 cells, and 20,000 cells.

44.    After the spheroid formation, the CytoView-Z 96-well and 384-well plates were coated with fibronectin to facilitate attachment and then the SKOV3 spheroid was transferred from a U-bottom plate to the CytoView-Z plates, as shown in Figure 1 of the Spheroid Application Note. A media only reference measurement was acquired from each well of the plates before the addition of the spheroids to the well(s). The media only reference measurement was used to decouple the impedance of the spheroid from the impedance of the media and electrodes.

45.    In the Spheroid Application Note, Figure 1 reports the attachment of the spheroids to the wells of the CytoView-Z plate. The figure and text explicitly acknowledge and describe how the 3D spheroids attach to the bottom of the well, change in shape, and cells spread out from the spheroid. The cartoon portion reports that the bottom of the spheroid slightly flattens as it attaches to the plate. At no point during the testing described in the Spheroid Application Note is the spheroid no longer considered a spheroid because it fails to maintain a perfectly spherical shape. The attachment of the spheroid is confirmed via imaging taken with Axion's CytoSMART Lux3 FL imaging device.

46.    The Spheroid Application Note implemented a careful experimental design. In addition to the media only control, the experiment described in the Spheroid Application Note also utilized positive and negative control groups.

47.    Figure 2 of the Spheroid Application Note reports changes in resistance (*i.e.*, impedance) over time for the various spheroids seeded in the CytoView-Z plates. Over a 48-hour period, all spheroids reported an increase in resistance compared to time zero. Based on

10

experimental design and controls used, Axion concluded that spheroid size was positively correlated with resistance.  That is, the spheroids were growing in size over time.

48.    The Spheroid Application Note also reports that resistance values obtained are related to the size of recording area of the electrodes in the wells.  Axion noted that because the CytoView-Z 384-well plate has a smaller recording area than the CytoView-Z 96-well plate, the spheroid occupies a larger portion of the electrode area for the electrodes in the wells of the 384-well plate, and therefore outputs a larger change in resistance.

49.    Figure 3 of the Spheroid Application Note reports cytolysis of the SKOV3 spheroids treated with CAR T cells.  The spheroids were in three treatment groups—(i) no CAR T cells (control), (ii) ratio of 1:2 CAR T cells to SKOV3 cells, and (iii) ratio of 5:2 CART T cells to SKOV3 cells.  The SKOV3 spheroid treated with the highest ratio of CAR T cells showed the slowest increase in resistance, followed by the lower ratio of CAR T cells, and then the control group.  Based on the experimental design and control group, Axion concluded that the spheroid cytotoxicity was dose dependent.

50.    In order to study cytotoxicity in spheroids compared to monolayers, Axion compared spheroid and monolayers of the same seeding density.  Both groups were then treated with CAR T effector cells at five ratios (1:10, 1:5, 1:2, 1:1, and 5:1).

51.    Figure 4 of the Spheroid Application Note reports that spheroids required a higher ratio of effector to target cells in order to reach 50% cytolysis.  The treatment groups that received a small ratio of CAR T cells reported a higher increase in resistance over time compared to the treatment groups that received a larger ratio of CAR T cells.  Based on the experimental design and control group, Axion concluded CAR T cells are less effective at killing spheroids than they are at killing monolayers, suggesting spheroids more accurately model solid tumors *in vivo*.

11

52.     In the Spheroid Application Note, all measurements of resistance are compared to the baseline resistance measurement recorded prior to the addition of any cells to the well.  Thus, all measurements presented in the Spheroid Application Note are impedance or resistance changes related to changes of the cells in the wells.

**Statements on Axion's Website Regarding Capabilities to Monitor Spheroids Using Impedance**

53.     Axion's website provides information regarding using Axion's Maestro Z machine to measure tumor growth and immune cell killing of 3D cancer spheroid models.  AXION-0045975-AXION-0045978.  The information provided on Axion's website is an accurate summary of Axion's conclusions reached from reliable data and scientific principles.

54.     The figures, text, and data on Axion's website support the statements made on the website.  AXION-0045975-AXION-0045978.  The figures, text, and data on the website are replicated from the Spheroid Application Note.  The Spheroid Application Note is also linked on Axion's website for users to further understand the support Axion is relying on for its statements and conclusions.

55.     The data presented in the Spheroid Application Note is accurate and reports that Axion's Maestro ZHT machine with CytoView-Z plates was able to measure changes in impedance over time from spheroids.  The data obtained in the Spheroid Application Note supports Axion's scientific conclusions that its Maestro products can accurately measure tumor growth and immune cell killing of 3D cancer spheroid models

**Axion's Cancer Spheroids for the Maestro Z Cell Culture Protocol**

56. Axion also provides customers with a cell culture protocol to enable customers to culture spheroids.  AXION-0045972-AXION-0045973.  The information and figures provided in Axion's cell culture protocol are based on reliable data.  Axion's interpretation of the information

12

in the cell culture protocol is supported by this data, and the intended audience would understand how Axion reached its conclusions based on the reported information.

57.  The cell culture protocol first provides eight steps to culture a spheroid.  It also provides five additional steps to prepare a CytoView-Z plate for a spheroid and to perform a baseline measurement.

58.  Below step 13 of the cell culture protocol, the protocol provides a figure.  The figure shows that A549 spheroids plated at different densities reported an increase in resistance over time.

59.  The cell culture protocol also provides five additional steps to transfer the spheroids from the U-bottom plate to a CytoView-Z plate.

60.  Below step 18, the protocol provides another figure.  This figure shows that SKOV3 spheroids that were treated with various ratios of CAR T effector cells showed a slow increase in resistance compared to the no treatment control.

**Third Party Use of Axion's CytoView-Z Plates to Monitor Spheroids**

61.  Third parties have successfully used Axion's Maestro Z machine with CytoView-Z 96-well plates to monitor characteristics of spheroids.

62.  Dr. Tonya Webb from the University of Maryland School of Medicine is one such third party, and Dr. Webb is representative of an Axion customer.

63.  Dr. Webb reported her positive results in a public webinar.  AXION-0078021.

64.  Dr. Webb designed and conducted her own study with her own experimental controls and treatment conditions.

65.  Dr. Webb used Axion's Maestro Z machine to study lung cancer spheroid models and their response to various treatments and therapies.

13

66.     Dr. Webb's results were consistent with the Spheroid Application Note, finding that impedance measurements can track different characteristics of 3D cancer spheroid models in response to challenge with immune effector cells.

67.     Dr. Meghan Logun of the University of Pennsylvania Perelman School of Medicine[1] also successfully used Axion's CytoView-Z plates and a Maestro machine to monitor spheroids.

68.     Dr. Logun is also representative of an Axion customer.

69.     Dr. Logun reported her positive results in a public webinar.  AXION-107085.

70.     Dr. Logun designed and conducted her own study with her own experimental controls and treatment conditions.

71.     Dr. Logun used Axion's Maestro ZHT with CytoView-Z 96-well plates to study patient-derived glioblastoma organoids and their response to various treatments and therapies.

72.     Although Dr. Logun used organoids in her study, not spheroids, the difference between an organoid and a spheroid is not relevant for purposes of whether Axion's Maestro machines and CytoView-Z plates are able monitor changes in impedance from spheroids.  The main difference between an organoid and a spheroid is that organoids can be comprised of multiple cell lines while spheroids are typically only a single cell line.

73.     Dr. Logun's impedance results were orthogonally confirmed with immunostaining.

74.     Dr. Logun's impedance results correlated with patient response to treatment.

---

[1] Dr. Logun is now currently at the Food and Drug Administration as a NIH-FDA Interagency Oncology Task Force Fellow.

75. Dr. Logun's results were consistent with the Spheroid Application Note, finding that impedance measurements can track different characteristics of 3D cancer spheroid models in response to challenge with immune effector cells.

76. Dr. Logun's study and results were published in the peer-reviewed Journal *Cell Stem Cell* in February 2025 in a paper entitled "Patient-derived glioblastoma organoids as real-time avatars for assessing response to clinical CAR-T cell therapy." AXION_1071419-AXION-1071443.

77. Dr. Logun's paper reports that the organoids studied are approximately the same size as the spheroids Axion studied in the Spheroid Application Note.

78. The results of Dr. Logun's webinar and published article demonstrate that Axion's Maestro ZHT and CytoView-Z 96-well plates can be used to monitor 3D cell culture models. The results also confirm that Axion's impedance products can monitor 3D cell culture models accurately because Dr. Logun's impedance results correlated to patient outcomes.

**Third Party Use of Impedance to Monitor Spheroids**

79. Lei et al, "Real-time and label-free impedimetric analysis of the formation and drug testing of tumor spheroids formed via the liquid overlay technique," (AXION-0750365-AXION-0750372) reports the finding of Dr. Lei and colleagues studying spheroids using planar, interdigitated electrodes where the spheroids are not attached to the electrodes.

80. The spheroids in the Lei article were formed on a hydrogel surface and did not attach to the electrodes, as shown in Figure 1 of the article.

81. The Lei article describes tracking changes in impedance of the spheroids upon the addition of cytotoxic agents to the spheroids.

15

82.     The Lei article concludes that "real-time and label free impedimetric analysis of drug testing of tumor spheroids was successfully demonstrated using interdigitated electrodes." *Id.* at AXION-0750371.

83.     The Lei article supports that (i) attachment to the electrode is not required to monitor changes in impedance of spheroids using an interdigitated electrode design, and (ii) others in the scientific community have come to the same conclusions as Axion that interdigitated electrodes can successfully monitor changes in impedance due to changes in spheroids.

84.     Agilent's application note entitled "Monitoring Drug-Mediated 3D Tumor Spheroid Shrinkage in Real time Using the Agilent xCELLigence RTCA eSight" (AXION-0045521-AXION-045530) is primarily an article regarding 2D imaging of spheroids, but also discusses the use of impedance to monitor spheroids.  This Agilent application note states "impedance has been used for >20 years to study hundreds of cell lines in diverse assay contexts, including spheroids[.]"  AXION-045522.  This Agilent application note further states that monitoring spheroids with impedance is not optimal for two reasons—(1) spheroids cannot be formed directly on Agilent's E-Plates and (2) spheroids result in a relativity small impedance signal.  *Id.*  This Agilent application note supports that using impedance to monitor spheroids is possible.

16

ASHBY & GEDDES

*Of Counsel:*

*/s/ Andrew C. Mayo*

Ryan K. Walsh
Geoffrey K. Gavin
Laura M. Kanouse
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
(404) 521-3939
rkwalsh@jonesday.com
ggavin@jonesday.com
lkvining@jonesday.com

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant*
*Axion BioSystems, Inc.*

Anna E. Raimer
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002-2712
(832) 239-3939
aeraimer@jonesday.com

David M. Maiorana
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
dmaiorana@jonesday.com

Dated:  April 25, 2025

17

# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


AGILENT TECHNOLOGIES, INC.,

    Plaintiff,

vs.                              C.A. No. 23-198-CJB

AXION BIOSYSTEMS, INC.,

    Defendant.


VIDEOTAPE DEPOSITION

OF DANIEL C. MILLARD


JONES DAY

1221 PEACHTREE STREET, N.E.

SUITE 400

ATLANTA, GEORGIA   30361


JUNE 6, 2025

9:55 A.M.


Reported Remotely By:

Judith L. Leitz Moran

RPR, RSA, CCR-B-2312

Page 1

Veritext Legal Solutions
346-293-7000

electronics and bioinstrumentation classes throughout college, we discussed electronic circuits that could be used to measure an ECG, for example.

Q    And none that are -- that were actually used in a design of a smart watch?

A    None that were used in the design of a smart watch, no.

Q    Do you intend to provide any expert testimony related to smart watches at trial?

A    No.

Q    Do you intend to provide any expert testimony on the aspects of measuring a person's heart rate at trial?

A    Insofar as it could be an example used to discuss the principles of indirect measurements and how they apply in science, yes.

Q    Do you have any professional experience related to optical techniques for measuring blood flow?

A    No.

Q    Do you intend to provide any expert testimony on optical techniques to measure blood flow at trial?

A    No.

Page 50

Q    Paragraph 8 refers to water displacement, correct?

A    Yes.

Q    Do you have any professional experience conducting water displacement experiments?

A    Just as I -- I mentioned before, this is an example that I have learned and been taught throughout my training as an engineer in my course work.

Q    At school?

A    Yes.

Q    And you have not performed any experiments using water displacement in your professional career?

A    No.

Q    Do you intend to provide any expert testimony on water displacement at trial?

A    Insofar as it's a useful example to describe or illustrate the principles of indirect measurements and how they apply in science, yes.

Q    Paragraph 8 states that "These principles of indirect measurements apply in other areas of science, such as cell analysis," correct?

A    Yes.

Q    What principles of indirect measurements

Page 51

in cell analysis do you intend to provide testimony at trial about?

A    Specifically related to the indirect measurements that is impedance for cell analysis.

Q    What do you mean indirect impedance measurement for cell analysis?

A    Impedance is a measurement technique used by the Maestro Pro/Edge, Maestro Z and ZHT and TrayZ at issue in this case, and other products in the field in scientific literature that uses the measurement of impedance to infer various other characteristics for cell analysis.

But it does not measure those aspects directly.

Q    Well, my question was about the principles of indirect measurement that you intend to testify about.  So you know -- strike that.

You said that impedance is a measurement technique that uses the measurement of impedance to infer various other characteristics for cell analysis but does not measure those aspects correctly.

What aspects that are not measured correctly are you referring to?

A    I believe I said and would have to

Page 52

double-check, but measure directly.

Q    Sorry, I'm looking at the transcript.  So let me ask you that question again.

What aspects of cell analysis that are not measured directly by impedance are you referring to?

A    As an example, cell proliferation is not measured explicitly or directly by impedance, rather it is inferred as changes in impedance occur over time as cells proliferate.

And it's only through the use of careful controls and knowledge of the experiment design that one can use the indirect measurement of impedance to infer those additional properties for cell analysis.

Q    Do you have experience in designing any of those careful controls and experiments to infer the cell proliferation properties based on impedance measurements?

A    Yes.

Q    What experience is that?

A    The experience -- that experience is reflected in the application that we discussed before as well as the other application that's -- that Axion has published as it relates to the

Page 53

impedance functionality of the accused products.

Q    Other than cell proliferation, are there any other aspects of cell analysis that you're referring to in Paragraph 8?

A    Cell death is another one.  I believe it's also mentioned here in this document a little later, cell swelling, for example.

Q    Anything else?

A    The activation of cells via GPCRs for cell signaling, the use of impedance to measure the barrier properties of an endothelial or epithelial cell layer, cell motion, cell motility as it relates to scratch assays.

Those are a number of examples.  I would not call them an exhaustive list.

Q    Are the examples that you just provided related to impedance measurements?

A    Yes.

Q    Are there any other examples that you're aware of sitting here today?

A    No, I don't -- I don't consider that an exhaustive list, but it's the ones that come to mind off the top of my head.

Q    You didn't describe any other examples in Exhibit 77, correct?

Page 54

A    No, I don't think so.

Q    Please take a look at Paragraph 10 of Exhibit 77, Page 3.

A    Okay.

Q    Paragraph 10 refers to the scientific community.  Is it the same scientific community that we discussed before in connection with Paragraph 8?

A    Yes.

Q    And Paragraph 10 refers to scientists. Are those the scientists that are part of the same scientific community that we discussed in connection with Paragraph 8?

A    Yes.

Q    Paragraph 10 refers to models, correct?

A    Yes.

Q    What specific models do you intend to testify about at trial?

A    I intend to testify on the -- the concept of a model in science in general.  And then specifically as it relates to cell culture models or spheroid models as it pertains to the details about the case.

Q    Paragraph 10 states that "Models do not provide an exact replica of a system being studied,

Page 55

but only provide a simplified version," correct?

A    Yes.

Q    The models that you intend to testify at trial about which include cell culture models and spheroid models, what systems are they designed to replicate?

A    It really depends on the application. There are cell culture models, too many to count, that are designed and developed for a whole host of applications.

The one specifically mentioned in the application note are cancer cells in the 2D monolayer versus cancer cells that are in a 3D model as an example, a spheroid.

And those are both representative models of cancer within the body.  And many would argue that 3D models are a better model than, say, 2D cancer cells of solid tumors that would be present pathophysiologically in the human body.

Q    I appreciate the additional explanation. I was just asking for you to identify the models, and then if I have additional questions, we can go through them, but we have limited time today, so I appreciate if we could focus on the questions.

So just to make sure we're on the same

Page 56

page, I am asking about the models that you intend to testify about at trial.  And you had mentioned that there are many models and you mentioned one example in the application note.

Are there any other specific models besides the one that you reference in the application note that you intend to testify about?

A    I intend to use examples from my personal experience within using model systems to make sure it's clear to those at trial the concept of scientific models.

And then the specific examples that I just mentioned, cell culture models and in particular 2D and 3D cell culture models of cancer cells as it relates to solid tumors, would be the ones that I would likely focus on.

Q    And what are the examples from your personal experience with models that you intend to rely on?

A    As an example in my graduate work, I studied neuroscience and specifically how sensory information is coded in the thalamus and cortex of the brain.

However, it is very difficult to do experiments on the human brain, so we used a model

Page 57

system, we used rodents, rats specifically.  And I studied the rodent vibrissa system, so their whiskers, that they use much in the same way that we use our fingers or eyes.

And that was the model system in which I studied the thalamocortical processes of sensory information and made inferences or understandings as it relates to the function of the brain generally.

Q    Any other models based on what you refer to as your personal experience?

A    My personal experience extends further in my time at Axion to cardiomyocyte models that we have used extensively to model the human heart for cardiac safety testing pharmaceuticals.

And then the use of neuronal cells in vitro to generate models, for example, of epilepsy.

Q    Anything else?

A    At -- at this point I don't think I can provide an exhaustive list, but those are some important examples from my personal experience, but -- but there are others.

Q    Referring to the first example of a model in your personal experience from your graduate work in neuroscience.  Did that model involve impedance

Page 58

measurements using a planar electrode arrays?

A    No, it did not.

Q    Referring to the second example, based on your work at Axion that you said is within your personal experience, the model related to studies on the heart, did that model involve using impedance measurements with planar electrodes?

A    Yes.

Q    And what products were used in connection with that model?

A    The Maestro Pro and Maestro Edge and the CytoView MEA plates.

Q    And that model did not involve the use of the CytoView-Z plates, correct?

A    That's correct.

Q    With respect to the third example from your personal experience related to -- it doesn't make sense.  What was that?  Can you give that to me again?

A    Neuronal cells.

Q    Neuronal cells.

Okay.  Let me ask the question again.

With respect to the third example from your personal experience related to the neuronal cells at Axion, did that model involve impedance

Page 59

measurements using planar electrodes?

A    Yes.

Q    What products were used in connection with that model?

A    The Maestro Pro and Edge and the CytoView MEA plates.

Q    The CytoView-Z plates were not used in that model, correct?

A    Correct.

Q    Now, with reference to the cancer cell models and 2D model and the 3D model -- strike that.

With reference to the cancer cell models that you intend to testify about, what full complexity, as mentioned in Paragraph 10, is not captured by that model?

A    For example, a 3D model that is a cancer spheroid does not contain vascularization which is an important mechanism of cell tumors in the human body and the development of their pathophysiology.

Q    Anything else?

A    I mean, there -- yes, many things.  So a cancer spheroid model is a -- what I would consider a fairly reduced model, but still more complex than a 2D monolayer.

Page 60

It would not have various other supporting cell types that would be present within a solid tumor.  It may not even have in many cases the genetic profile of a tumor of which they can be quite varied across patients and -- and the development of -- of tumors.

So, yeah, there -- there is a host of things that are different and not included within a cancer spheroid model as it relates to a cell tumor in the human body.

Q   Yeah, I -- I think that's understandable that -- I -- I would like to focus the discussion on the impedance measurements and 2D monolayer versus a 3D model of a cancer spheroid and what specific aspects you're going to testify about that are not captured by the model that would need to be better validated using the language in paragraph 10?

A   I'm not sure I -- I don't understand the -- the -- the question.

Q   All right.  Paragraph 10 says, "In cell analysis, cell culture models do not represent the full complexity of a living organism, but offer significant advantages in cost, time, and details compared to performing in vivo studies.  Scientists

Page 61

A    Added into the wells in media and allowed to settle to the bottom of the well.

And in the case of adherent cells, they will very often attach sometimes mediated by additional coatings that facilitate that attachment.

And in other cases for nonadherent cells, they simply rest on the bottom of the well.

Q    Is there anything else you intend to testify about concerning the plating of cells?

A    I think generally what I just described summarizes the -- the types of things that I would -- I would testify to in the plating of cells.

Q    Paragraph 16 of Exhibit 77 on Page 4 refers to depth of the electric field, right?

A    Yes.

Q    By depth of the electric field, do you mean the height of the electric field from the bottom of the well?

A    To -- to the extent it's the distance from the electric fields -- or of the electric field lines from the electrodes into the sample or the well, yes, if we could use depth or height interchangeably there.

Q    Is the depth of the electric field

Page 67

dependent on factors other than the spacing of the electrodes in the well?

A   Yes.   The spacing of the electrodes at the bottom of the field will impact it, but so, also would the material of the electrodes, the connectivity of the media, et cetera.

Q   So does the depth of the electric field depend on the voltage that's applied?

A   The -- my understanding is the electrical field lines, the shape of those field lines, would not change based on the voltage, but the intensity of the field at those various locations would change as a -- a function of voltage.

Q   Would anything else impact the depth of the electric field?

A   Off the top of my head, I -- I think the -- the examples I provided before are -- are illustrative of the types of things that would affect the depth of the electric field.

Q   Paragraph 16 talks about electric fields created within wells generally, right?

A   Yes.

Q   Paragraph 16 does not refer to any specific product?

A   Correct.

Page 68

record, and my question was simply, is it the same scientific community.

A    Okay.

Q    So I would appreciate if you can answer the question, and if there's any follow-up we can address it, okay?

A    Sure.

Q    Do you intend to express any opinions at trial that the attachment of cells to an electrode is not necessary to monitor changes in spheroids using interdigitated electrodes embodied at the bottom of the well?

A    As summarized in the disclosure, yes, that is something I may provide testimony on based on the -- the Lei article.

Q    What else do you intend to say about the Lei article at trial?

A    I think --

Q    Actually, strike that.  I'm sorry.  I'll ask you a follow-up question on the one I just asked and then I can -- I will reask that.

What -- other than the Lei article, is there any other basis for your opinion that you intend to provide that attachment of cells to an electrode array is not necessary to monitor changes

Page 113

in spheroids using interdigitated electrodes at the bottom of a well?

A    I -- I would say I am aware of other examples where electrode technologies are used to measure from cells and monitor changes in cell behavior over time without the attachment of those cells to the electrode.

I do not include or specify those beyond the Lei article in this disclosure, though.

Q    Do you intend to testify at trial that others in the scientific community have come to the same conclusions as Axion that interdigitated electrodes can successfully monitor changes and impedance to changes in spheroids?

A    Yes, as that's mentioned in the disclosure, I would express -- expect to testify to that statement.

Q    And by "others" are you referring to Dr. Lei?

A    Yes, as an example.

Q    There are no other examples in Exhibit -- I'm sorry, in Paragraph 83 of Exhibit 77?

A    That's correct.

Q    Do you intend to testify about others outside of referring to Dr. Lei?

Page 114

A    There's a statement in Paragraph 84 as it relates to an Agilent application note.

Q    In addition to Dr. Lei and what you describe in Paragraph 84, are you intending to testify about any other specific scientists in -- in the community that have came to the same conclusions as Axion's as described in Paragraph 83?

A    Well, there would also be Dr. Logun and Dr. Webb that we discussed earlier at a minimum.

Q    Anyone else?

A    Not off the top of my head, no.  I think this is a representative summary of -- of at least four different works.

Q    What is your knowledge of who makes up the scientific community based on?

A    My participation as a scientist in the scientific community.

Q    So it's your opinion on who should and should not be within the scientific community?

A    I would not say -- no, I'm not the arbiter of -- of who belongs.

But my knowledge of who participates in the scientific community, who communicates their results in the scientific literature or at

Page 115

to imaging for cell analysis.

Q    Paragraph 32 refers to the image being used to estimate the diameter of a spheroid, right? Last sentence.

A    Paragraph 33, yes.

Q    Okay.  So let me just make the record clear.  Sorry about that.

Paragraph 33 references an image being used to estimate the diameter of the spheroid and track changes in spheroid that develop over time, correct?

A    That's correct.

Q    And used by whom?

A    Members of the scientific community.

There's a host of instruments that can provide this type of functionality.  Our product, Axion's product.  The Omni, can do this.  It can estimate the diameter of a spheroid and track changes that develop over time.

So our internal scientists have done it with our own products that -- that we produce.  But also a variety of others.  It's a pretty common technique in the literature.

Q    And Paragraph 33 does not specify any products that implement that technique, correct?

Page 121

A    No, it does not.

Q    And Paragraph 33 does not identify any specific scientists or persons in general that use that technique?

A    Nope.  It's speaking on the technology behind brightfield imaging and its use in cell analysis.

Q    Have you used the Omni product to estimate the diameter of the spheroid?

A    Yes.

Q    Now, you mentioned that other scientists use the technique you referenced in Paragraph 33, but you haven't identified any specific scientists that use that technique?

A    Not in the disclosure, no.  I mean, the application note from Agilent that was produced as Exhibit 83, and as you just referred, is one such example.  But otherwise, we have not identified specific individuals in the disclosure.

Q    Imaging generates different types of outputs that those obtained from the impedance technology, correct?

A    Yeah, imaging uses light.  It illuminates a sample and a camera captures an image.

Whereas, impedance uses voltage and --

Q    Paragraph 36 does not provide any additional details about Figure 4 of Exhibit 68 or 78?

A    Nope.

Q    In the context of Paragraph 36, how were the results verified with spheroid imaging data?

A    There's existing published data that showed the response of cancer spheroids and 3D models to drug treatments and immune effector cells being added to the wells.

And we wanted -- because there were not many other impedance-related assays, wanted to compare our results to the existing literature and make sure that -- to the degree that our results were or were not consistent with existing literature.

Q    Were there any instances where those results were not entirely consistent with the results published in the spheroid note in Exhibits 68 and 78?

A    No, everything was consistent and that gave us added confidence in addition to the other validations that we had done internally.

Q    The validations that were done internally, that you reference in your answers, are

Page 126

the ones performed with the Lux3 equipment?

A    And the impedance experiments with the monolayer controls.

Q    That are described in the application note, Exhibit 68 and 78?

A    Uh-huh.  Yes.

Q    Paragraph 38 on Page 8 of Exhibit 77 states that "Axion believes Axion CytoView-Z plates are more sensitive to changes in impedance due to spheroids, as compared to Agilent's E-plates, because Axion's electrodes have a larger spacing between the alternating interdigitated elements of the electrode pair in the bottom of the well and this allows the electrical field to penetrate further into the well," correct?

A    That is correct.

Q    What is the basis for this statement?

A    The basis for this statement is published models and analysis that suggests, as we discussed earlier today and elsewhere in the disclosure, that the gap width size of the electrodes and the gap between the electrodes of an interdigitated electrode affects the depth or height at which the electric field penetrates into the well.

And that those are different for the

Page 127

Axion CytoView-Z plate which is a hundred micron gap and a hundred micron fingers.

And then Agilent's E-plates, to the best that I can tell from published literature and images presented thereof, that is about half, significantly less spacing between the electrodes and then the electrodes themselves are smaller as well.

Q   What analysis, if any, have you done of Agilent's impedance plates in connection with your opinions in Paragraph 38?

A   I guess, what do you mean?  Could you be more specific by "analysis"?

Q   Other than reviewing publicly available literature on Agilent impedance plates, have you performed any analysis of the Agilent impedance plates in connection with your opinions in Paragraph 38?

A   No, I have not.

Q   Paragraph 39 of Exhibit 77 on Page 9 states in part, "The electrical field does not need to fully cover a spheroid in order for Axion's impedance instruments to monitor changes in impedance due to changes in the spheroid."

Do you see that?

Page 128

C E R T I F I C A T E

Deposition of: DANIEL C. MILLARD

Date of Deposition: JUNE 6, 2025

STATE OF GEORGIA:

I hereby certify that the foregoing transcript was stenographically recorded by me as stated in the caption.  The deponent was duly sworn to tell the truth, the whole truth, and nothing but the truth.  And the colloquies, statements, questions and answers thereto were reduced to typewriting under my direction and supervision and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel to any of the parties in the case, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action.

This, the 11th day of June 2025.

Judith L. Leitz Moran, CCR-B-2312
Registered Professional Reporter

Page 172

# EXHIBIT C

| Subject Matter | Permissible Examples |
|---|---|
| The scientific community heavily relies on indirect measurements to understand the world, especially aspects that cannot easily be directly measured. (The Millard Disclosure, ¶ 8) | Smart watches, water (Millard Tr. at 50:9-17, 51:16-20) |
| "In order to correlate an indirect measurement to a characteristic that is being studied, many scientists use models." (The Millard Disclosure, ¶ 10) | "A cell spheroid, typically all of the same cell line, refers to when the cells grow in a three-dimensional (3D) cell aggregate—similar to a ball." (The Millard Disclosure, ¶ 27); "The concept of a model in science in general. And then specifically as it relates to cell culture models or spheroid models as it pertains to the details about the case." (Millard Tr. at 55:19-23); "cell culture models and in particular 2D and 3D cell culture models of cancer cells as it relates to solid tumors." (Millard Tr. at 57:13-15); "rodents, rats specifically. And I studied the rodent vibrissa system, so their whiskers" (Millard Tr. at 58:1-3); "cardiomyocyte models . . . to models the human heat for cardiac safety testing pharmaceuticals" (Millard Tr. at 58:13-15); "neuronal cells in vitro to generally models, for example, of epilepsy" (Millard Tr. at 58:16-17) |
| "In cell analysis, cell culture models do not represent the full complexity of a living organism" (The Millard Disclosure ¶ 10) | "a 3D model that is a cancer spheroid does not contain vascularization which is an important mechanism of cell tumors in the human body and the development of their pathophysiology." (Millard Tr. at 60:17-20); "It would not have various other supporting cell types that would be present within a solid tumor. It may not even have in many cases the genetic profile of a tumor of which they can be quite varied across patients and -- and the development of -- of tumors." (Millard Tr. at 61:1-6) |
| Any change in impedance from the cells is not an intrinsic property of the cells themselves. Changes in impedance of a well containing cells can be used to reach conclusions regarding cell characteristics. (Rule 26 Disclosure, ¶ 24) | Cell proliferation (Rule 26 Disclosure, ¶ 24; Millard Tr. at 53:7–10); Cell death / cytolysis (Rule 26 Disclosure, ¶ 24; Millard Tr. at 54:5); Cell swelling (Rule 26 Disclosure, ¶ 23; Millard Tr. at 54:5–7); the activation of cells via GPCRs for cell signaling (Millard Tr. at 54:9-10); the use of impedance to measure the barrier properties of an endothelial or epithelial cell layer (Millard Tr. at 54:10-12); Cell motion (Millard Tr. at 54:12); Cell motility as it relates to scratch assays (Millard Tr. at 54:12-13). |

1

| | |
|---|---|
| "attachment to the electrode is not required to monitor changes in impedance of spheroids using an interdigitated electrode design" (The Millard Disclosure, ¶ 83) | Lei et al article at AXION-0750365. (The Millard Disclosure, ¶¶ 79-83, Millard Tr. at 113:8-15); Agilent's application note at AXION-0045521 (The Millard Disclosure, ¶ 84; Millard Tr. at 115:1-2); work of Dr. Logun (The Millard Disclosure, ¶¶ 67-78; Millard Tr. at 115:9-10); work of Dr. Webb (The Millard Disclosure, ¶¶ 62-66; Millard Tr. at 115:9-10) |
| Factors impacting the strength of the electrical field within a well (The Millard Disclosure, ¶ 16) | Limited to details in The Millard Disclosure, ¶ 16 and deposition (Millard Tr. 67:25-68:19). |
| Other technologies to monitor cellular activity (The Millard Disclosure, ¶¶ 32-33) | Only the details identified in The Millard Disclosure, ¶¶ 12, 32, 33. No testimony. |
| "brightfield imaging may be used to characterize a 3D cell culture model" (The Millard Disclosure, ¶ 33) | Axion's Omni and Lux3. (Millard Tr. at 121:14-19); "the application note from Agilent that was produced as Exhibit 83, and as you just referred, is one such example." (Millard Tr. at 122:15-17) |
| "Axion believes Axion's CytoView-Z plates are more sensitive to changes in impedance due to spheroids, as compared to Agilent's E-plates" (The Millard Disclosure, ¶ 38) | "The basis for this statement is published models and analysis that suggests . . . . that the gap width size of the electrodes and the gap between the electrodes of an interdigitated electrode affects the depth or height at which the electric field penetrates into the well. And that those are different for the Axion CytoView-Z plate which is a hundred micron gap and a hundred micron fingers. And then Agilent's E-Plates, to the best that I can tell from published literature and images presented thereof, that is about half, significantly less spacing between the electrodes and then the electrodes themselves are smaller as well." (Millard Tr. at 127:18-128:8) |
| "the intended audience [of Axion's cancer spheroids for the Maestro Z cell culture protocol] would understand how Axion reached its conclusions based on the reported information." (The Millard Disclosure, ¶ 56) | No customer discussions beyond Boehringer Ingelheim. (Millard Tr. at 160:4–14) |
| "Axion published the Spheroid Application Note in July 2022, after months of internal testing and validation of the reported results and conclusions. | "There's existing published data that showed the response of cancer spheroids and 3D models to drug treatments and immune effector cells being added to |

- 2 -

| These validations include verifying results with spheroid imaging data and comparing results to monolayer controls." (The Millard Disclosure, ¶ 36) | the wells." (Millard Tr. at 126:7-10)  No examples of "published data" provided. |

**Axion's Response to Agilent's Motion *in Limine #2***

**<u>Axion's Response to Agilent's MIL #2 to Exclude Testimony by Axion's Non-Retained Expert, Dr. Millard</u>**

## INTRODUCTION

Agilent's motion *in limine* improperly seeks to preclude Axion's VP of Research & Development, Dr. Daniel Millard, from testifying about facts that go beyond the specific examples identified in his Rule 26 disclosure and those he identified in response to open-ended questions during his deposition.  Agilent's motion overreaches, is premature, and should be denied.

## ARGUMENT

Federal Rule of Civil Procedure 26(a)(2)(C) requires a party disclosing an expert who does not provide a written report to state "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  The Advisory Committee Notes emphasize that this disclosure is "considerably less extensive" than a full report under Rule 26(a)(2)(B), and courts "must take care against requiring undue detail" from non-retained experts.  Rule 26 Advisory Committee Notes, 2010 Amendment, Subdivision (a)(2)(C).  Accordingly, Agilent's attempt to limit the testimony solicited of Dr. Millard, who was timely disclosed as a non-retained expert, is improper and should be rejected.

### A.    Dr. Millard's Disclosure Complies With Rule 26(a)(2)(C) and Should Not Be Limited to Specific Examples.

Dr. Millard's disclosure meets Rule 26(a)(2)(C)'s requirements, and he should be permitted to testify on those disclosed topics without being confined to a finite list of "examples" that support his opinions.  Rule 26(a)(2)(C) requires non-retained experts to disclose a concise ***summary*** of facts and opinions to which they will testify, and the Advisory Committee cautions against imposing report-level detail on such witnesses.  Agilent's motion departs from that framework by asking the Court to preemptively limit Dr. Millard to the specific examples mentioned in his disclosure or that he was able to recall at his deposition.

The dearth of support for Agilent's position is telling.  Nothing in Rule 26(a)(2)(C) or in the two non-precedential cases Agilent cites impose such an examples-only constraint on a non-retained expert.  If the heightened specificity requirement Agilent seeks were intended, it would appear in the Rule or controlling caselaw.  However, Agilent cites no authority suggesting that Dr. Millard is required to disclose an exhaustive list of all facts he may testify to at trial, or any case that limits a non-retained expert's testimony to the specific examples provided in their Rule 26 disclosure or deposition testimony.  Instead, Agilent cites *Eli Lilly*, which addresses a late-disclosed witness and whether exclusion was warranted under Rules 26 and 37.  *Eli Lilly & Co. v. Actavis Elizabeth LLC*, No. 07-3770 (DMC), 2010 WL 1849913 (D.N.J. May 7, 2010).  The court found the prejudice "genuine but curable" and permitted the witness to testify subject to tailored conditions.  *Id.* at *10.  That case-specific cure for late disclosure does not support Agilent's proposed limitation on Dr. Millard's testimony here, particularly when Axion identified Dr. Millard in Axion's initial disclosures (August 14, 2023), disclosed him as a non-retained expert (April 25, 2025), and Agilent deposed him regarding his expert opinions on June 6, 2025 (after

previously deposing him for two days as a fact witness, as well).

In the only other case Agilent cites, *Liquid Dynamics*, the court excluded new opinion testimony first disclosed through expert declarations submitted with motions *in limine*, beyond what the original report disclosed. *Liquid Dynamics Corp. v. Vaughan Co.*, No. 01 C 6934, 2004 WL 2260626, at *3 (N.D. Ill. Oct. 1, 2004). Agilent's request here is different: it seeks to preemptively limit Dr. Millard's trial testimony to specific examples—not to exclude belated, new opinions introduced through post-report declarations as in *Liquid Dynamics*.

Agilent's failure to muster any authority for its motion is unsurprising. Even retained experts, who are required to provide substantially more detailed reports, are permitted to elaborate on their disclosed opinions at trial. *See, e.g., Lab. Skin Care, Inc. v. Ltd. Brands, Inc.*, No. CIV.A. 06-601-LPS, 2011 WL 4005444, at *8 (D. Del. Sept. 8, 2011), *aff'd*, 478 F. App'x 672 (Fed. Cir. 2012) ("When testifying at trial, however, expert witnesses are allowed to elaborate on the opinions set out in their expert reports; this elaboration is not improper evidence.") (internal citation omitted); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 581 (D. Del. 2008) ("In determining whether an expert's testimony has exceeded the scope of his or her report, the Court has not required verbatim consistency with the report, but has allowed testimony which is consistent with the report and is a reasonable synthesis and/or elaboration of the opinions contained in the expert's report."). The same principle is even more applicable here given that the requirements for non-retained experts' disclosures are "considerably less extensive."

In sum, Dr. Millard's disclosure complies with Rule 26(a)(2)(C), and Agilent cites no authority to preemptively limit his testimony to specific "examples." Just as retained experts may reasonably elaborate on disclosed opinions at trial, Dr. Millard's testimony may elaborate within the subjects and summarized opinions previously disclosed in his Rule 26 disclosure.

### B.      Agilent's Motion Is Premature, and Agilent Will Not Suffer Any Unfair Prejudice If Denied.

Agilent's motion also amounts to a premature request to resolve hypothetical disputes regarding the testimony that Axion may elicit from Dr. Millard. Courts generally decline to grant sweeping, abstract motions *in limine* on the scope of non-retained expert testimony, preferring to address overreach through live objections and cross-examination at trial. *Lebow v. State Farm Fire & Cas. Co.*, No. 2:24-cv-02200, 2025 WL 605496, at *3 (E.D. Pa. Feb. 24, 2025) (denying motion to exclude and allowing live objections of non-retained expert testimony and impeachment through cross-examination); *Russell v. Big V. Feeds, Inc.*, No. 4:23-CV-622, 2024 WL 4528913, at *5 (E.D. Tex. Oct. 18, 2024) (noting that movants may object to testimony that exceeds the scope of the non-retained expert's first-hand knowledge "at trial as it arises"); *Hanson v. Werner Ents., Inc.*, No. 3:21-cv-00245, 2022 WL 17834317, at *1 (E.D. Tex. Dec. 21, 2022) (noting that issues raised regarding the scope of non-retained experts' opinions would be decided during trial).

Agilent's concerns about potential testimony may never materialize, and, if they do, Agilent will have the opportunity to object at trial. Agilent cites no authority to suggest that such hypothetical disputes should be resolved at this stage of the case. Further, Agilent will not suffer unfair prejudice if the Court denies its request to confine Dr. Millard's testimony to a handful of

specific "examples" that support his opinions.  Agilent deposed Dr. Millard after his timely 26(a)(2)(C) disclosure.  Any concern is fully addressable through contemporaneous objections and cross-examination.

**CONCLUSION**

Dr. Millard complied with the streamlined disclosures required under Rule 26(a)(2)(C) for non-retained experts.  Agilent faces no prejudice from Dr. Millard's hypothetical testimony; any issues with the scope of his testimony are premature and should be addressed through contemporaneous objections and cross-examination.  The Court should deny Agilent's MIL #2.

**Agilent's Reply in Support of Motion *in Limine #2***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AGILENT TECHNOLOGIES, INC.,    )
    )
    Plaintiff,    )
    )
    v.    )  C.A. No. 23-198 (CJB)
    )
AXION BIOSYSTEMS, INC.,    )  ████████████
    )
    Defendant.    )


**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION *IN LIMINE* #2 TO EXCLUDE IMPROPER TESTIMONY BY AXION'S NON-RETAINED EXPERT, DR. <u>MILLARD</u>**

This dispute is about full disclosure and fair notice, issues inherently addressed pre-trial, following Axion's opportunity to disclose the full extent of Dr. Millard's anticipated testimony during discovery. Axion characterizes this dispute as "premature" and involving "hypothetical disputes," Axion Resp. at 2, but does nothing to dispel those concerns. Moreover, "*[m]otions in limine* allow the court 'to exclude **anticipated** prejudicial evidence **before** the evidence is actually offered.'" *Chervon (HK) Ltd. v. One World Techs., Inc.*, C.A. No. 19-1293-GBW, 2025 WL 2630480, at *1 (D. Del. Feb. 5, 2025) (bolding added) (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). That is precisely what Agilent seeks to do here.

Axion's case citations either support Agilent's position or are inapposite. *Hanson* supports Agilent's position by emphasizing, "[the] purpose of that [Rule 26(a)(2)(C)] disclosure is to inform [the opposition] that such opinions may be offered so that a deposition can be taken to discover the details of that testimony." *Hanson v. Werner Ents., Inc.*, C.A. No. 3:21-cv-00245, 2022 WL 17834317, at *3 (E.D. Tex. Dec. 21, 2022). Agilent did just that – it deposed Dr. Millard based on his disclosure and sought details of his anticipated trial testimony, to which Agilent now seeks to limit Dr. Millard. *Lebow* is inapposite because, there, the defendant moved to exclude testimony from plaintiff's non-retained expert on the grounds that he was not qualified or that he did not provide a report (but should have). *Lebow v. State Farm Fire & Cas. Co.*, C.A. No. 2:24-cv-02200, 2025 WL 605496, at *1-2 (E.D. Pa. Feb. 24, 2025). Agilent's MIL is not based on Dr. Millard's qualifications or lack of a report. *Russell* is also inapposite because, there, the issue was whether certain opinions of non-retained experts were beyond their personal knowledge. *Russell v. Big V. Feeds, Inc.*, No. 4:23-CV-622, 2024 WL 4528913, *5 (E.D. Tex. Oct. 18, 2024). Agilent makes no such challenges in this MIL, although Agilent challenged portions of Dr. Millard's disclosure as beyond his personal knowledge under *Daubert*. *See*, D.I. 366, 371, 392, 422.

Axion characterizes this request as overly restrictive, but its argument lacks support. Axion Resp. at 1-2. Axion argues that non-retained experts should be allowed to elaborate on their disclosed opinions at trial because their disclosure requirements are less extensive than retained experts, without regard to the surprise to the opposing party at trial. *Id.* But Axion cites no cases to support this premise. Both *Lab. Skin Care, Inc. v. Ltd. Brands, Inc.*, C.A. No. 06-601-LPS, 2011 WL 4005444, at *8 (D. Del. Sept. 8, 2011), *aff'd*, 478 F. App'x 672 (Fed. Cir. 2012) and *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 581-82 (D. Del. 2008) explicitly limit their holdings to **retained** experts. Indeed, it is the less stringent disclosure requirements of non-retained experts that necessitates holding them more strictly to their pre-trial disclosures than retained experts to fulfill notice requirements. Courts have recognized this fact when they equate the scope of a non-retained expert's testimony to the reduced disclosure allowed by Rule 26(a)(2)(C). *See Russell*, 2024 WL 4528913, at *9 ("The appropriate scope of a non-retained expert's testimony is far more limited than that of a retained or specially employed expert."). Accordingly, Axion's argument falls flat, and the scope of Dr. Millard's testimony, as a non-retained expert, should be more limited than that of a retained expert, not less.

Agilent merely asks that Dr. Millard's trial testimony be limited to the facts and opinions set forth in his disclosures, as clarified at his deposition – a very reasonable request. Axion had the opportunity to disclose the facts and opinions to which Dr. Millard would testify, and Dr. Millard had the opportunity to clarify those facts and opinions during his deposition.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Travis J. Murray*

Brian P. Egan (#6227)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

OF COUNSEL:

Peter J. Chassman
Michael J. Forbes
Hallie H. Wimberly
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX  77010
(713) 469-3800

Anna M. Targowska
Jacob M. Stone
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
(312) 207-1000

Paul J. McDonnell
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222
(412) 288-3131

January 6, 2026

2

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2026, copies of the foregoing were caused to be served upon the following in the manner indicated:

John G. Day, Esquire                                          *VIA ELECTRONIC MAIL*
Andrew C. Mayo, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
*Attorneys for Defendant Axion Biosystems, Inc.*

David M. Maiorana, Esquire                                   *VIA ELECTRONIC MAIL*
JONES DAY
901 Lakeside Avenue
Cleveland, OH  44114
*Attorneys for Defendant Axion Biosystems, Inc.*

Ryan K. Walsh, Esquire                                       *VIA ELECTRONIC MAIL*
Geoffrey K. Gavin, Esquire
Laura M. Kanouse, Esquire
Rachel Krutz, Esquire
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA  30361
*Attorneys for Defendant Axion Biosystems, Inc.*

Anna E. Raimer, Esquire                                      *VIA ELECTRONIC MAIL*
JONES DAY
717 Texas Street, Suite 3300
Houston, TX  77002-2712
*Attorneys for Defendant Axion Biosystems, Inc.*

Collin J. Kurtenbach, Esquire                                *VIA ELECTRONIC MAIL*
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL  60606
*Attorneys for Defendant Axion Biosystems, Inc.*


                                             */s/ Travis J. Murray*
                                             _____
                                             Travis J. Murray (#6882)